## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | Chapter 11 Case |
| | § | |
| Old LC, Inc., *et al.*[1] | § | Case No. 19-11791 (BLS) |
| | § | |
| Debtors. | § | Jointly Administered |

| | | |
|---|---|---|
| | § | |
| Official Committee of Unsecured Creditors of Old LC, Inc., et al., for and on behalf of the estates of Old LC, Inc., et al.; | § | |
| | § | |
| | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Adv. No. 20-51002 (BLS) |
| | § | |
| Upfront V, LP, Breakwater Credit Opportunities Fund, L.P.; Upfront GP V, LLC; Mark Suster; Dana Kibler; Gregory Bettinelli; Saif Mansour; Aamir Amdani; Eric Beckman; Darrick Geant; and Joseph Kaczorowski | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| *Defendants.* | § | |

## FIRST AMENDED COMPLAINT AND OBJECTION TO CLAIMS

---

[1] The Debtors are the following four entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Old LC, Inc. (7119), Old LC Holdings, Inc., Old LCF, Inc., and Old LC Parent, Inc. The Debtors' noticing address in these Chapter 11 cases is c/o Bryan Cave Leighton Paisner LLP, Attn: Mark I. Duedall, 1201 W. Peachtree Street, 14th Floor, Atlanta, Georgia 30309.

The Official Committee of Unsecured Creditors (the "*Committee*") of Old LC, Inc.; Old LC Holdings, Inc.; Old LCF, Inc.; and Old LC Parent, Inc. (collectively, "***Loot Crate***" or the "***Debtors***")[2] bring this action on behalf of and for the benefit of the Debtors' estate and respectfully alleges as follows:

## Nature of the Action

1.      From 2012 to 2019, Loot Crate operated a subscription box service that catered to fandom and enthusiasts through "crates" curated with "geek and gamer products" each month. Loot Crate partnered with industry leaders in entertainment, gaming, sports, and pop culture to deliver monthly themed crates, create interactive experiences and digital content, and film original video productions. Products included exclusive shirts, gear, and gadgets, as well as limited edition collectibles. Loot Crate became the worldwide leader in pop culture subscription boxes with over 250,000 recurring subscribers.

2.      Unfortunately, from early 2017 through mid-2019, Loot Crate's investors and senior secured lender suffocated Loot Crate into bankruptcy by working in concert to seize control of the company by blocking Loot Crate's access to alternative sources of funding and insisting on its own onerous, commercially unreasonable terms. Defendants Upfront V, LP (individually and with its board designees, including defendants Mark Suster, Dana Kibler, and Gregory Bettinelli, "***Upfront***") and Breakwater Credit Opportunities Fund, L.P. (individually and with its board designees, including Saif Mansour, "***Breakwater***") engaged in a concerted pattern of behavior and conspiracy to benefit themselves at Loot Crate's ultimately fatal expense.

---

[2]      The Debtors were formerly named Loot Crate, Inc., Loot Crate Holdings, Inc., LC Funding, Inc., and Loot Crate Parent, Inc. Following the closing of the sale of substantially all of the Debtors' assets completed in the administrative bankruptcy case, no. 19-11791 (the "*Admin Case*"), the Debtors filed the necessary documentation in the applicable jurisdictions to change their corporate names and filed the *Notice of Changes of Debtors' Names and Case Caption* [Admin Case D.I. 265] with the Court, all in accordance with the terms of the sale and the order approving the same [Admin Case D.I. 254].

3.     Upfront and Breakwater used both overt and covert tactics in furtherance of their concerted plan, including: (i) prewritten scripts and "playbooks" (containing speaking lines and even planned facial reactions) where board actions and the exercise of loan remedies were pre-ordained; (ii) secret, subversive meetings with members of Loot Crate's management to whom Upfront and Breakwater promised promotions and equity in exchange for their loyalties; and (iii) threats of personal lawsuits and reputational harm to those who opposed them.  Relying on their collective power held pursuant to consent rights, board control, and Breakwater's role as Loot Crate's senior secured lender, Upfront and Breakwater devised and implemented a series of bad-faith, disloyal acts to delay or outright block Loot Crate from pursuing financing alternatives at a time when the company was running out of cash reserves.  Thus, Upfront and Breakwater accomplished their own selfish goals by choking Loot Crate into accepting burdensome financing from Upfront and Breakwater.

4.     Through Suster, Kibler, Bettinelli, and Mansour, as well as Upfront and Breakwater's other representatives and enablers, Upfront and Breakwater committed serial fiduciary breaches in expropriating hard control over Loot Crate while pursuing self-interested goals in direct conflict with the company's interests.  These breaches damaged Loot Crate, causing the company a catastrophic loss of enterprise value and materially undermining its ability to continue as a going concern.  Because of Defendants' misconduct and breach of fiduciary duties, Loot Crate went from having revenues of $145 million, gross profits in excess of $40 million, and an estimated enterprise value of more than $100 million at the end of 2017, to being forced to file for protection under chapter 11 and selling its assets in the bankruptcy proceedings less than two years later.

5.     This is a suit to recover from Upfront, Breakwater, and certain of their agents and representatives, including several former members of the board of directors of Old LC, Inc., money damages sustained by the Debtors as a result of the Defendants' concerted efforts to exercise dominion and control over the Debtors' business in direct violation of their respective fiduciary and other obligations to the Debtors.  In addition, Plaintiff seeks to avoid and recover a $1 million payment to Breakwater as a constructively

fraudulent transfer under 11 U.S.C. §§ 544, 548, and applicable provisions of Delaware statutory law.

6.      For the foregoing reasons and those stated below, the Plaintiffs seek money damages and/or disgorgement to compensate them for losses to the company's enterprise value.  Because the actions complained of were taken in bad faith, in violation of the duty of loyalty owed to Loot Crate and its stakeholders by each of the Defendants, the claims asserted fall outside of the exculpatory scope of 8 Del C. §102(b)(7).  Further, for the reasons explained herein, the business judgment rule does not apply to the transactions/dealings at issue; rather, entire fairness applies.

## Jurisdiction and Venue

7.      This adversary proceeding arises in and relates to the Debtors' chapter 11 cases (the "***Chapter 11 Cases***").

8.      This Court has jurisdiction over the adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 1335.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (E), (H), and (O).  To the extent any part of this adversary proceeding is determined not to be a core proceeding, Plaintiff consents to the entry of final orders or judgments by the Court.

9.      Venue is proper under 28 U.S.C. § 1409 because this adversary proceeding arises under title 11 or arises in or relates to the Chapter 11 Cases.

10.     The statutory predicate for the relief requested herein is found in §§ 544, 548, and 550 of title 11 of the United States Code (the "Bankruptcy Code"), as well as 6 Del. Code §§ 1304, 1305, and 1307.

## The Parties

11.     In accordance with 11 U.S.C. § 1102(a)(1), the Committee was duly formed by the Office of the United States Trustee on August 22, 2019.  The Committee is vested with all of the powers of a committee under 11 U.S.C. § 1103.

12.     By order of this Court dated October 21, 2020 [Admin Case D.I. 714], the Committee was granted standing and authority to assert and

prosecute the claims set forth herein on behalf of and for the benefit of the Debtors' estates.

13. Defendant Upfront is a private equity fund that focuses on debt and equity investments in start-up companies. Upon information and belief, Upfront GP V, LLC is the general partner of, and operates, Upfront. Upon information and belief, Upfront is, and at all relevant times was, a Delaware limited partnership with its principal place of business in the County of Los Angeles, in the State of California. At all times relevant to the claims in this complaint, Upfront was a shareholder of Loot Crate.

14. Defendant Breakwater is a private equity fund that focuses on debt and equity investments in start-up companies. Upon information and belief, Breakwater is, and at all relevant times was, a Delaware limited partnership with its principal place of business in the County of Los Angeles, in the State of California. At all times relevant to the claims in this complaint, Breakwater was a shareholder and lender of Loot Crate.

15. Upfront and Breakwater are private equity funds that, among other business, focus on debt and equity investments in start-ups and young companies.

16. Defendant Mark Suster ("**Suster**") is the Managing Partner of Upfront and is a resident of the State of California. At all times relevant to the claims in this complaint, Suster was either a member of the Loot Crate's board of directors (the "**Board**") and/or managing Upfront's affairs with respect to its position as a shareholder of Loot Crate.

17. Defendant Dana Kibler ("**Kibler**") is a Partner and Chief Financial Officer of Upfront and is a resident of the State of California. At all times relevant to the claims in this complaint, Kibler was either a member of the Board and/or managing Upfront's affairs with respect to its position as a shareholder of Loot Crate.

18. Defendant Gregory Bettinelli ("**Bettinelli**") is a Partner at Upfront and is a resident of the State of California. At all times relevant to the claims in this complaint, Bettinelli was either a member of the Board

and/or managing Upfront's affairs with respect to its position as a shareholder of Loot Crate.

19.     Defendant Saif Mansour ("**_Mansour_**") is a Managing Partner of Breakwater and is a resident of the State of California.  At all times relevant to the claims in this complaint, Mansour was either a member of the Board, a Board observer, and/or managing Breakwater's affairs with respect to its position as a shareholder and lender of Loot Crate.

20.     Defendant Aamir Amdani ("**_Amdani_**") is Director at Breakwater and is a resident of the State of California.  At all times relevant to the claims in this complaint, Amdani was either a member of the Board, a Board observer, and/or managing Breakwater's affairs with respect to its position as a shareholder and lender of Loot Crate.

21.     Defendant Eric Beckman ("**_Beckman_**") is a Managing Partner of Breakwater and is a resident of the State of California.  At all times relevant to the claims in this complaint, Beckman was either a member of the Board, a Board observer, and/or managing Breakwater's affairs with respect to its position as a shareholder and lender of Loot Crate.

22.     Defendant Darrick Geant ("**_Geant_**") is a Partner at Breakwater and is a resident of the State of California.  At all times relevant to the claims in this complaint, Geant was either a member of the Board, a Board observer, and/or managing Breakwater's affairs with respect to its position as a shareholder and lender of Loot Crate.

23.     Defendant Joseph Kaczorowski ("**_Kaczorowski_**") is a Partner and Chief Financial Officer at Breakwater and is a resident of the State of California.  At all times relevant to the claims in this complaint, Kaczorowski was either a member of the Board, a Board observer, and/or managing Breakwater's affairs with respect to its position as a shareholder and lender of Loot Crate.

24.     Upfront, Breakwater, Suster, Kibler, Bettinelli, Mansour, Amdani, Beckman, Geant, and Kaczorowski are referred to collectively herein as the "**_Defendants_**."

## Factual Background

**I.     Loot Crate Begins as a Small Start-Up in 2012, and Grows to a Nine-Figure Company in Just Five Years.**

25.     Loot Crate was an eCommerce subscription company specializing in providing its customers with curated boxes (or "crates") of "geek and gamer products" each month.  These products consisted of exclusive figurines, shirts, gear, and gadgets, as well as limited edition collectibles.

26.     Combining his entrepreneurial spirit with his interest in video games, comics, and science fiction, Christopher Davis created Loot Crate in 2012 along with his business partner, Matthew Arevalo.  As a small start-up company, Loot Crate grew quickly.

27.     Loot Crate developed, designed, and sourced popular merchandise from over 350 distinct entertainment properties, each of which used Loot Crate and its innovative business model as a key intellectual property monetization partner.

28.     Approximately 97% of Loot Crate's merchandise was exclusive to Loot Crate, driving fan enthusiasm and loyalty for these "must-have" collectibles.  Accordingly, Loot Crate enjoyed a loyal customer base that returned again and again to buy Loot Crate's products.

29.     Loot Crate's business also benefitted from other companies' desire to use Loot Crate to expand their own product offerings and cross-market television, film, and other popular media with fun-filled items, toys, collectibles, clothes, and other unique accoutrements.

30.     As of November 2017, Loot Crate had approximately 190 full-time employees and approximately another 200 temporary or part-time employees involved in packing the crates.

31.     At year-end 2017, Loot Crate had revenues of $145,000,000, gross profits in excess of $40,000,000 and an estimated enterprise value of more than $100,000,000.

32. Loot Crate grew quickly and, by mid-2019, had shipped more than 32 million crates of customized merchandise across the world.

33. In 2018, Loot Crate was voted #1 Geek Box by over 250,000 users, voted #3 for customer service for Subscription Box Services, and was the 2018 Subscription Trade Association CUBE award winner for "Best Overall Box."

34. Davis was also repeatedly recognized in the industry as an up-and-coming entrepreneur. In 2016, Davis was named as a finalist for the Ernst & Young Entrepreneur of the Year Award for the Greater Los Angeles area. In 2016, Davis was also named as an Entrepreneur Superstar by Inc. Magazine.



35. In addition to its founders' recognized skill as entrepreneurs, Loot Crate and Davis were consistently surrounded by reputable consulting companies focused exclusively on positioning Loot Crate for success (unlike

Defendants who had ulterior motives). Specifically, Loot Crate retained consultants from Dendera Advisory, LLC and McKinsey & Company, Mark Palmer of Theseus Strategy Group, and law firms such as Bryan Cave.

36. As a result of its rapid success, Loot Crate became the worldwide leader in fan subscription boxes, partnering with industry leaders in entertainment, gaming, sports, and pop culture to deliver monthly and limited-edition themed crates, interactive experiences and digital content, and original video content.

37. Together with Loot Crate's entrepreneurial founders and expert advisors and consultants, Loot Crate was well-positioned for long-term success. Unfortunately, when the time came for Loot Crate to obtain capital to support its growth, Loot Crate chose Defendants without knowing they would be more focused on enriching themselves at Loot Crate's expense, rather than fulfilling their duties of care, loyalty, and good faith. Therefore, because of Defendants' breach of their fiduciary duties, the wheels began to come apart at Loot Crate when Defendants got involved.

## II. Loot Crate Obtains Financing from Upfront and Breakwater.

38. To meet the needs of its rapidly growing customer base, Loot Crate required access to capital. Therefore, in the summer of 2016, Loot Crate led its Series A funding round and obtained $18.599 million in equity funding, including approximately $12.499 million in equity funding from Upfront and approximately $1.99 million in equity funding from Breakwater.

39. On or about May 10, 2016 (the "***Private Equity Agreements***"), in exchange for their equity funding, Upfront received approximately 45% of the newly-issued Series A Preferred Stock of Loot Crate, and Breakwater received approximately 10% of the newly-issued Series A Preferred Stock. Thus, Upfront and Breakwater held 55% of the issued and outstanding Series A Preferred Stock.

40. Under the terms of Upfront's Private Equity Agreement, Upfront was granted the right to designate a member of the Board, and designated Bettinelli to initially fill that role.

41.     From May 10, 2016, and at all relevant times thereafter, Bettinelli (along with Suster and Kibler) were principals at Upfront.

42.     Under the terms of Breakwater's Private Equity Agreement, Breakwater was granted the right to designate an observer to the Board, and designated Mansour to fill that role.

43.     Although Breakwater's board observer could not vote, the observer still had the right to be fully apprised of all of Loot Crate's financial and business affairs, and could actively participate in and direct discussions of Loot Crate's affairs.

44.     Also, under the terms of the Private Equity Agreements, a majority of the class of Series A Preferred Shares was required to approve any new preferred equity issuances for Loot Crate.  Together, Upfront and Breakwater held a majority of the Series A Preferred Shares and therefore had the power veto any subsequent financing for Loot Crate.

45.     On or about June 1, 2016, Loot Crate entered into a $20 million credit facility with Breakwater, as lender and agent, under the terms of that certain Loan and Security Agreement, dated on or about June 1, 2016 (the "***Loan Agreement***").  Under the Loan Agreement, Breakwater and the other lenders funded a $15 million loan to Loot Crate (the "***Loan***").

III.    **Upfront and Breakwater Collude and Conspire to Suffocate Loot Crate by Blocking Financing Proposals.**

    A.    **Upfront and Breakwater Develop a Scheme to Reconstitute the Board in their Favor.**

46.     As early as January 2017, Upfront and Breakwater conspired to obtain control over Loot Crate's Board so they could force financing through that would benefit their own companies at Loot Crate's detriment.

47.     In an email exchange on January 2, 2017 between Upfront's then-Board designee (Bettinelli) and Breakwater's designated observer (Mansour), Bettinelli and Mansour discussed their scheme of using alleged breaches under the Loan Agreement as "leverage" to effect "changes" at Loot

Crate. Their plot included using the pretext of defaults under the Loan Agreement to trigger Breakwater's right to designate a full Board seat.

48. As Bettinelli and Mansour discussed in their January 2, 2017 emails, the first step in the plan to obtain a Board seat for Mansour was for Breakwater to find a pretext to notice a default under the Loan Agreement to use as leverage. So, they alleged a covenant default against Loot Crate for allegedly failing to maintain a certain minimum number of subscribers.

49. However, the number of subscribers that Breakwater based this alleged default upon came from a presentation Davis gave to the Board on January 5, 2017. The presentation did not include certain categories of subscribers. Regardless, on January 31, 2017, without seeking any clarification from the company, Breakwater took the extraordinary step of formally declaring a covenant default.

50. Further evidence of their conspiracy can be found in an email exchange between Bettinelli and Mansour on January 13, 2017 with the subject line "Terry Boyle Update." The first email is from the company to Bettinelli informing him that the company was finalizing the addition of Terry Boyle to the Board. Bettinelli and Mansour viewed Boyle as a potential ally on the Board once Mansour was also added. Bettinelli then forwarded this Board communication to Mansour (who was not then a Board member), and Mansour responded "one down one to go," referring to Boyle and himself, respectively.

51. Mansour and Bettinelli routinely communicated and coordinated their plans via text messages as well. Although only a board observer, Mansour informed Bettinelli of conversations he had with Eric Chan—a Loot Crate employee—concerning operations at Loot Crate. In coordinating operations of the business to benefit Upfront and Breakwater, Mansour and Bettinelli shared with each other their plans to deceive Chris Davis during any negotiations. Mansour and Bettinelli discussed how they could slow-play Davis on various issues to protect their interests and how they could dupe and mislead Davis by acting as if they were under duress in negotiations.

### B. Breakwater Utilizes its Law Firm to Further the Scheme Against Loot Crate.

52. Breakwater also turned to its counsel, Morgan, Lewis & Bockius LLP ("***Morgan Lewis***") for recommendations regarding how to obtain a Board seat for itself.

53. In an email dated February 8, 2017 (the "***Carry the Water Email***"), Morgan Lewis outlined "some thoughts" on a strategy for Breakwater to leverage its relationship with Upfront to gain a full voting Board seat, including:

> 4. I would not suggest that you have further discussions with Davis about the board seat for waiver trade if you have already floated that idea

> 5. Up Front [sic][3] should carry the heavy water before and during the meeting in terms of pressing Davis on how to address the continuing defaults. The best way forward is like this:

> Up Front presses Davis prior to the meeting and in the meeting on the defaults and the company's strategies to address. Upfront should press Davis to describe the remedies [Breakwater] could now take and how damaging those remedies could be to the company.

> Up Front should tease out of Davis the possibility of a waiver of defaults in exchange for a board seat for you.

> Up Front should aggressively support that outcome. It costs the Company nothing, it avoids potentially crippling consequences of remedies.

> Upfront should push these issues aggressively at the board meeting, not you/Breakwater

> If Davis or the board or both invite you back into the room to consider waiving the defaults in exchange for a board seat, I would suggest that you carefully listen, ask

---

[3] Morgan Lewis inadvertently refers to Upfront incorrectly as "Up Front" in the Carry the Water Email.

> questions as appropriate, and then ask for a few minutes
> to discuss with your partners (or something like that).
> *Don't say ok right away. Be deliberate. Don't want it
> to seem like this was all pre wired. Then say ok.*
>
> Before you get the offer to take the seat in exchange for
> the waiver, don't show your hand. Say you have a lot
> of concerns and are considering all your options.
>
> [emphasis added]

54.     An hour after receiving the Carry the Water Email from Morgan Lewis, Mansour forwarded it to Bettinelli at Upfront.

55.     Consistent with the recommendations of Breakwater's counsel, on February 13, 2017, Bettinelli sent Davis an email (the "***February 13 Email***") "strongly" recommending that Mansour be immediately appointed to the Board in exchange for certain conditions, including waiver of the alleged Loan default.

56.     In the February 13 email, Bettinelli did not disclose that Upfront and Breakwater had previously discussed the possibility of Breakwater's appointment to the Board, nor that the email was sent at Breakwater's urging.

57.     Upfront's inability to remember which law firm represented which entities further highlights Upfront's and Breakwater's joint coordination to harm Loot Crate. For example, when Breakwater sent a default letter on January 31, 2017, Loot Crate responded on February 22, 2017 denying the existence of any default. After Mansour forwarded Loot Crate's response to Bettinelli, Bettinelli sent an email to "Chris [Davis] and Morgan Lewis team" furious that the response letter had been sent to Breakwater without his approval (presumably as it disrupted the plans outlined in the Carry the Water Email). Of course, Morgan Lewis represented Breakwater and not Loot Crate, but Bettinelli could not keep his allegiances straight. When he realized his error, Bettinelli wrote, "Shit. Oh no. My bad. I thought that was our counsel!"

**C.    Upfront and Breakwater Install a Lackey on the Board as a Purported "Independent" Director.**

58.    Upfront's and Breakwater's efforts to reconstitute the Board in their favor were not limited to attempting to install a Breakwater representative on the Board.  Instead, their scheme extended to installing purportedly "independent" directors who would, in reality, be nothing more than an extension of Upfront and/or Breakwater.

59.    In early 2017, Mansour and Bettinelli sought to add Ynon Kreiz ("Kreiz") to the Board.

60.    Although Kreiz may have appeared to be an independent director and officer, communications between Upfront and Mansour both prior to Kreiz's appointment in May 2017 and after his removal in December 2017 reveal that Kreiz had a pre-existing relationship with both Suster and Upfront.

61.    In an email dated February 20, 2017, Bettinelli wrote to Mansour: "Ynon Kreiz would be a great fit (again this is in the concept stage but obviously someone we know and have worked with in the past)."  On February 29, 2017, Mansour instructed Bettinelli ensure he was onboard as executive chair."

62.    In an email dated March 11, 2017, Bettinelli wrote to Mansour: "it will take some work to get a deal done with Ynon if Chris [Davis] were to formally agree, but I am hopefully [sic] his experience with our firm [Upfront] and his relationship with my partner Mark [Suster] will also help get us there."

63.    In an email dated October 22, 2017, Suster wrote to Mansour regarding his vision for the Board, including with Kreiz as Executive Chairman: "I would play an active role on the board as I did with Maker Studios working side-by-side with Ynon."

64.    On August 26, 2019, Suster posted in his blog a story about how, "[e]xactly six years ago today [2013] I received an email from ***my friend*** Ynon Kreiz introducing me to Andrew Stalbow and Petri Järvilehto.

Ynon had been the CEO of Maker Studios and ***I trust his opinion a great
deal*** so of course I took the meeting." *See*
[https://bothsidesofthetable.com/some-seriously-great-news-no-seriously-c57936f1f61c](https://bothsidesofthetable.com/some-seriously-great-news-no-seriously-c57936f1f61c).

65. Upfront never disclosed the prior relationship between it and
Kreiz or the prior relationship between Suster and Kreiz.[4] Appointing Kreiz
to the Board thwarted the Board's independence with respect to Loot Crate's
financing efforts. As described below, Kreiz's appointment allowed Upfront
and Breakwater to successfully manipulate board independence in their favor
(and at the company's detriment) with respect to Loot Crate's financing
efforts.

## IV. Upfront and Breakwater Breached their Fiduciary Duties in Connection with Loot Crate's 2017-18 Financing Efforts.

### A. Loot Crate Receives Three Financing Offers.

66. By October 2017, Suster, Bettinelli, and Upfront no longer
cared about fulfilling their fiduciary duties to Loot Crate; rather, Suster,
Bettinelli, and Upfront were solely interested in protecting their own interests
at Loot Crate's expense. To achieve their desired outcome, they decided that
a sale would be the only way to achieve a return for Upfront. Accordingly,
rather than exploring ways for the company to thrive, on October 10, 2017,
Suster wrote to Bettinelli and others at Upfront, "[a]fter a full day review I've
concluded that LootCrate [*sic*] is fucked unless it sells immediately. I told
the board today."

67. To implement their desired outcome, Suster, Bettinelli, and
Upfront knew they needed to exploit Loot Crate's need for additional
financing to seize further control of the company and, ultimately, force a sale.
Thus, the Upfront Defendants and the Breakwater Defendants continued
their coordinated attack on Loot Crate to seize control and force a sale in

---

[4] The relationship and allegiances evidence between Upfront, Suster, and Kreiz are also
demonstrated after Kreiz was removed from the Board. Following Kreiz's removal from the Board,
Upfront lobbied Loot Crate to pay Kreiz a $250,000 subordinated note to avoid Upfront's obligation
to pay it. In an email dated January 3, 2018, Suster wrote to Mansour: "We believe in supporting
partners so in bringing Ynon on board we agreed to [the note] to give him comfort."

order to further their own interests. Every action taken by the Upfront Defendants discussed below was taken with the "laser focus" intent to sell Loot Crate so Defendants could profit.

68. Loot Crate sought additional financing in the summer of 2017 to normalize operations and for additional working capital. In late 2017, Loot Crate received three financing proposals (the "*2017 Proposals*").

69. The first proposal came from Upfront and Breakwater in October 2017. Suster, both in his capacity as a Loot Crate director and as a representative of Upfront, presented a term sheet for a Series A-2 preferred equity financing to Loot Crate (the "*A-2 Proposal*").

70. Under the A-2 Proposal, Upfront would commit only $5 million in cash and Breakwater committed up to $1 million.

71. In response to the A-2 Proposal, Loot Crate requested approximately $1.5 million of additional bridge financing from Upfront and Breakwater. Suster informed Loot Crate that Upfront and Breakwater would provide such bridge financing under certain conditions.

72. The second proposal came from one of Loot Crate's vendors, BioWorld Merchandising, Inc. ("*BioWorld*") on November 2, 2017. BioWorld presented a term sheet proposal for between $10 and $15 million in financing through a combination of preferred equity and subordinated convertible notes (the "*Original BioWorld Proposal*").

73. No officer, director, or other insider of Loot Crate was affiliated with BioWorld or the Original BioWorld Proposal.

74. The third proposal also came on November 2, 2017, from certain members of Loot Crate's management team (together with certain of their friends and family). This third proposal was for between $7.25 and 10 million in financing through issuance of new preferred equity (the "*Management Proposal*").

75.     The Original BioWorld Proposal and the Management Proposal were objectively superior to the financing contemplated by the A-2 Proposal.

76.     For example, the A-2 Proposal included anti-dilution protections with respect to Upfront and Breakwater's Series A Preferred Shares and the same liquidation preference being given to the new capital (the "***Anti-Dilution Provisions***").   These Anti-Dilution Provisions were favorable to Upfront and Breakwater, but created a materially negative economic impact on the majority of Loot Crate's other shareholders.   The Management Proposal and the Original BioWorld Proposal did not contain these same onerous, Anti-Dilution Provisions.

77.     Email communications by and between Upfront and a separate Loot Crate investor demonstrated the onerous, unreasonable terms presented in the A-2 Proposal, including how A-2 Proposal prioritized Upfront and Breakwater over Loot Crate and its other shareholders.   On the eve of the November 3, 2017 board meeting discussed below, the investor wrote to Suster, "[t]here are parts of your offers, though, that ***unfairly favor Upfront over all other shareholders***.   That is why we are supportive of the offer presented yesterday, which we believe is significantly more favorable to the company, existing shareholders, and Series B investors."

78.     In response, Suster admitted to his actual allegiances and his unwillingness to fulfill his fiduciary duties to Loot Crate.   Suster responded, "I hope you can understand why I must focus my time and energy on the largest shareholders (founder), the largest debt holders (Breakwater), the largest financiers (my partners at Upfront who need to be persuaded why they should risk more of our capital) and the board members of LootCrate whom I call daily."   Further, "you'll excuse me from not having the time to negotiate with each and every small shareholder . . .."

79.     Given these startling statements from Suster, the investor responded by reminding Suster, "[a]ny proposal this board reviews must take into consideration the impact on all shareholders, not simply investors.   And there are more bona fide offers on the table then [*sic*] the ones Upfront has presented."

80.     The investor even identified the ways in which the Series A-2 Proposal was inferior to the other proposals by stating, "[o]nly your proposal drastically dilutes all shareholders to the benefit of certain shareholders with significant participation – as well as certain board members.  It is the management proposal that more fairly treats all shareholders and the company as a whole."  The investor concluded his email by reminding Suster of his fiduciary obligations, the duty of care, and the duty of loyalty.[5]

81.     As the holders of a majority of Series A Preferred Stock, and without any consideration of fiduciary duties, Upfront and Breakwater collaborated to veto any alternatives to the A-2 Proposal through coercion and subversion of the Board's fiduciary duties.

**B.      Upfront and Breakwater Force the Board's Acceptance of the A-2 Proposal Despite its Inferior Terms in Order to Further Upfront's and Breakwater's Interests.**

82.     Beginning in October 2017, Suster made multiple threats to Loot Crate that it would suffer severe financial distress unless Loot Crate complied with Upfront's demands, including, in particular, acceptance and consummation of the financing transaction described in the A-2 Proposal.

83.     On November 3, 2017, Loot Crate held a board meeting to consider the three 2017 Proposals described above.  At the November 3, 2017 meeting, Suster and Mansour informed the Board that Upfront and Breakwater would veto any financing alternative other than the A-2 Proposal.

84.     Davis suggested to Suster and Mansour in the meeting that he and his team be permitted to consider all three 2017 Proposals and to conduct appropriate due diligence consistent with the Board's fiduciary duty.

85.     With no interest or consideration of their fiduciary obligations, Suster and Mansour refused Davis's suggestion at the meeting.  Instead,

---

[5] Ironically, when Loot Crate considered a transaction that could harm Upfront's position in mid-2018, Suster utilized the very same approach he scolded the investor above for using by writing to the board, "[y]ou have the power and the responsibility to protect shareholders and stop a major legal battle from ensuing."  So, when Upfront could benefit at the expense of Loot Crate, Suster ignored other shareholders, but when Upfront's position could be legally reduced, Suster expected all shareholders to be considered.

Suster and Mansour insisted that Loot Crate immediately enter into the A-2 Proposal.

86. The minutes of the November 3 Board meeting reflect that Loot Crate was under duress caused by Upfront and Breakwater to accept the A-2 Proposal before the conclusion of the meeting because: (i) the BioWorld and Management Proposals for new equity required the approval of the preferred shareholders (controlled by Upfront and Breakwater's combined consent rights); (ii) Suster and Mansour advised the Board that neither Upfront nor Breakwater would approve the BioWorld or Management Proposals without the same Anti-Dilution Provisions as were in the A-2 Proposal; and (iii) the deadline for Loot Crate to accept the A-2 Proposal (with its Anti-Dilution Provisions that benefitted Upfront and Breakwater to the detriment of all other Loot Crate Shareholders) was the end of that November 3 meeting.

87. The minutes of the November 3 Board meeting are accurate.

88. Suster and Mansour had a self-interest with respect to the A-2 Proposal.

89. The November 3 Board meeting lasted more than six hours. Neither Suster nor Mansour recused themselves at any time from the discussion or negotiation of the self-interested transaction during the November 3 Board meeting. Instead, Suster and Mansour collaborated to negotiate the A-2 Proposal on behalf of, and for the benefit of, Upfront and Breakwater.

90. With no other option to ensure Loot Crate received much-needed financing, Loot Crate accepted the A-2 Proposal and executed a term sheet with Upfront and Breakwater (the "*A-2 Term Sheet*") at the end of the November 3 Board meeting.

91. As a director, Suster owed a duty to advance Loot Crate's interests independently from the interests of any individual shareholder, and to refrain from any conduct that would harm Loot Crate. Upfront and Breakwater also owed a duty to Loot Crate in connection with its financing

19

efforts, and Suster and Mansour had the obligation to recuse themselves from board meetings during any negotiations of the A-2 Proposal. Although Upfront and Breakwater individually were minority shareholders, their combined ownership of 55% of the Series A Preferred Stock gave them control over Loot Crate's search for financing. Breakwater also exerted control over the Debtors as the company's senior secured lender.

92.    Suster also consistently refused to recuse himself from conference calls with the Board during discussions and negotiations related to the A-2 Proposal.  In numerous emails throughout November and December 2017, Suster directed Loot Crate's independent directors on the structure and strategy for the A-2 Proposal.

### C.    Upfront and Breakwater Utilize the A-2 Term Sheet to Attempt an Ouster of the CEO to Gain Further Control.

93.    The A-2 Term Sheet contained purportedly binding exclusivity and confidentiality provisions (the "*Exclusivity Provisions*").    The Exclusivity Provisions prohibited Loot Crate and its Board from pursuing any other proposal regardless of whether any other proposal might be in the best interests of Loot Crate or its shareholders.

94.    On or about November 9, 2017, Upfront and Breakwater informed Loot Crate that they would not provide the additional $1.5 million in bridge financing that had been previously offered unless Davis provided an irrevocable power of attorney over his common stock in Loot Crate.

95.    By this condition, Upfront and Breakwater placed Davis exactly where they wanted him in their scheme: Between a rock and a hard place. If Davis agreed, Upfront and Breakwater would obtain even greater, unfettered control of Loot Crate.  If Davis refused, the lack of additional bridge financing would leave Loot Crate without sufficient working capital.

96.    Davis did not consent to the additional demand.

**D.    Upfront and Breakwater Create and Execute "Playbook" to Block Other Financing Options.**

97.    On November 15, 2017, the Board called a meeting to approve the minutes of the previous November 3 Board meeting; however, Suster and Mansour used the November 15 meeting as an opportunity to further the individual agendas of Upfront and Breakwater at Loot Crate's expense.

98.    Prior to the November 15 meeting, Upfront and Breakwater prepared a detailed, coordinated plan (described by them in emails as the "***Playbook***") for Upfront and Breakwater representatives, Kreiz, and Boyle to block the Board from considering other financing options and to force Davis and the company to consummate the A-2 Proposal.

99.    Like the Carry the Water Email, the Playbook contained a scripted plan—this time, for the November 15 Board meeting.  As part of that coordinated plan, (i)  Upfront and Breakwater would offer to close on the A-2 Proposal and fund by Friday, November 17, 2017, as opposed to the December 4 date contained in the A-2 Term Sheet; (ii) Mansour would threaten to accelerate the Loan and begin seeking remedies on November 20 if the A-2 Proposal was not closed by November 17; (iii) the Board would vote to instruct Davis to focus 100% of his time to close the A-2 Proposal by November 17; (iv)  Kreiz would call for a subsequent Board meeting on November 17 to approve the final terms of the A-2 Proposal for close that same day; and (v) on November 22nd, Upfront would notify key parties of its intent to pursue litigation against Davis, and would notify George Davis (Christopher Davis's father) of their intent to pursue legal action and "impl[y] subtly / politely that this is likely to be a very public, protracted battle in which he would be involved."

100.    Despite the efforts of Upfront and Breakwater to conceal the Playbook, an Upfront employee, Michael Carney ("***Carney***"), revealed its existence in separate emails on November 14, 2017.

101.    On November 14, 2017, Carney emailed Mansour using the subject line "Mechanics of acceleration / default" to say that he and Suster "feel like we didn't get a clear enough understanding yesterday of the

mechanics and implications of what happens once (if) you accelerate the loan and the company is able to unable to pay."

102. In that November 14, 2017 email, Carney said, I'd like to make sure we have a thorough understanding [of] the full 'if / then decision tree' around what obligations the company has and when, what steps Breakwater can/will take and when, etc. Is this something you or someone on your team could talk through with me or possibly your counsel at Morgan Lewis?"

103. Presumably after receiving the clarification he needed, Carney wrote up the Playbook and sent it to Suster later on November 14—the night before the scheduled November 15 Board meeting.

104. In his cover email to Suster on November 14, 2017, Carney wrote: "I think I have a good handle on this, but figured it's best to talk through this verbally tomorrow."

105. Declining to answer substantively in writing, Suster replied in an email dated November 14, 2017, "No emails. Talk in Am."

106. In another email dated November 21, 2017, Suster wrote to Upfront representatives: "I can update anybody verbally. Carney can confirm it was another tense board meeting. But he should do so verbally. I fear there are enough threats of legal action to know this is a possibility. I will do my best to avoid a legal situation."

107. Upfront and Breakwater representatives, and Kreiz and Boyle, also used text message communications during this period to conceal their activities. Despite anticipating litigation, Suster failed to appropriately preserve many text messages relevant to the disputes, a convenient assertion given Suster's desire to keep communications verbal.

108. When the November 15 Board meeting commenced, Suster and Mansour acted consistently with their Playbook strategy.

### E. Suster and Mansour Begin Implementing the Playbook Strategy During the November 15 Meeting.

109. At the November 15 Board meeting, Suster and Mansour informed Loot Crate that they wanted to accelerate the planned closing of the A-2 Term Sheet from December 4 to November 17 even though the transaction documents were still in draft form. Otherwise, Suster and Mansour said, Breakwater would accelerate the Loan and commence enforcement actions.

110. On November 16, 2017, Davis emailed the Board to respond to Breakwater's demand to accelerate the A-2 Term Sheet closing and to raise the "very serious issues" he had "with the process that led to the approval of" the A-2 Term Sheet at the November 3, 2017 Board meeting and, "in particular, acceptance of the Term Sheet's Exclusivity Provision."

111. In that November 16 e-mail, Davis stated:

> [W]e all have a continuing fiduciary duty to work for the benefit of the company and its shareholders. At the November 3 Board meeting, there were three financing proposals considered. Consequently, we were not in a situation where there was only one possible path. Even if the Management Proposal and [Original] BioWorld Proposal were not acceptable on their proposed terms at the time, there was no basis for determining that they could not be improved, or that other financing sources would not be available. Nevertheless, the Board was presented with the [A-2] Term Sheet, with its Exclusivity Provision, and was not advised by Cooley [Loot Crate's counsel] as to the potential breach of fiduciary duty inherent in contracting away the Company's right to seek better financing terms from another party or parties.
>
> Additionally, Upfront has failed to provide the $1.5 million of bridge financing at reasonable terms that was promised in connection with the [A-2] Term Sheet and has sought other changes to the terms, including the accelerated closing. Therefore the financing that we are

now being asked to approve and close on Friday is not even what was approved on November 3.

112. On November 16, 2017, Suster responded to Davis's November 16, 2017 email by following the strategy laid out in the Playbook. Specifically, Suster responded to Davis's email, replying to the full Board stating: "You signed a legal contract. If you violate the terms we will begin immediate legal proceedings."

113. On November 16, 2017, Suster forwarded Davis's email to members of Loot Crate's management team, including those with whom Upfront and Breakwater had been discussing employment opportunities and equity compensation, with the subject line to "Your company faces the potential of bankruptcy next week." In that email, Suster called on them to pressure Davis to close the A-2 Term Sheet.

114. On November 16, 2017, Suster separately forwarded his initial exchange with Davis (including his litigation threats) to Davis's father, this time changing the subject line to "Loot Crate Bankruptcy & Lawsuit," and stating that Loot Crate would have to file bankruptcy, as "Break Water is threatening to call their $15 million loan on Monday."

115. In a fourth email on November 16, 2017 to Davis and the full Board, Suster wrote, among other things, that if "you're thinking your secured creditor [Breakwater] is bluffing I hope you understand they're not – you will lose control of your financial situation next week and possibly face bankruptcy by Thanksgiving."

116. On November 16, 2017, Suster then forwarded this last email to the Loot Crate management team.

117. On November 16, 2017, Suster sent another email to Davis and the Board stating: "With respect to other financing options, you signed a legally binding 'no shop' agreement and on that basis I have spent countless hours and tens of thousands of dollars on legal bills to provide financing before you become bankrupt. I will protect the legal rights in that agreement vociferously."

118.    On November 17, 2017, Suster sent an email to the company's purportedly "independent" directors, Kreiz and Boyle, as well as Mansour and Carney, in which Suster directed Kreiz and Boyle to approve the A-2 Term Sheet transaction document.

119.    Continuing to follow the steps laid out in the Playbook, on November 17 and November 20, Breakwater issued to Loot Crate two separate notices of alleged covenant defaults.  In the November 20 notice, Breakwater announced that it would accelerate the loan unless Loot Crate addressed the alleged defaults to Breakwater's satisfaction.

120.    Through the actions described above, Suster, Mansour, Kreiz, and Boyle acted for the benefit of Upfront and Breakwater to the detriment of Loot Crate.

121.    Further proof of Upfront and Breakwater's dominance and control of the Board with respect to Loot Crate's financing efforts is the absence of any evidence that Kreiz or Boyle attempted to negotiate any of the terms of the A-2 Proposal or give any consideration to the BioWorld or Management Proposals.  In fact, Kreiz and Boyle emailed Upfront's counsel seeking advice on the different financing proposals.

122.    The existence of the Playbook and the actions of Suster and Mansour in furtherance of the steps described in it—as well as the absence of any evidence of independent action on the part of Kreiz and Boyle— demonstrate that Upfront and Breakwater acted in concert to force Loot Crate to take actions that were in Upfront and Breakwater's best interest, yet detrimental to Loot Crate and its shareholders.

123.    Had Suster, Mansour, Kreiz, and Boyle acted in accordance with their fiduciary duties to Loot Crate, rather than in the best interests of Upfront and Breakwater, and had Upfront and Breakwater not colluded to veto alternative financing options, Loot Crate could have consummated one or more forms of equity financing beneficial to Loot Crate in early November 2017.

### F. Upfront and Breakwater's Campaign to Thwart Financing from BioWorld.

124. So long as Upfront and Breakwater continued to exercise their veto right, and in light of the A-2 Term Sheet's exclusivity provision, Loot Crate could not pursue the Management Proposal, the Original BioWorld Proposal, or any other financing alternatives without the risk of litigation from Upfront and Breakwater.

125. Loot Crate needed additional financing by the end of December 2017, and the absence of such financing had already created liquidity problems for the company. Although Loot Crate had positive cash flow in December 2017, its ability to maintain and expand its business operations was hampered by its inability to obtain proper financing.

126. The uncertainty created by Upfront and Breakwater caused a number of Loot Crate's vendors, including Federal Express, to insist on prepayment. Consequently, Loot Crate's shipments were delayed until it could accumulate the cash necessary to pay in advance for needed shipments.

127. In late November and early December 2017, Loot Crate continued to seek additional debt financing, entering into further negotiations with BioWorld that culminated in a new proposal for debt financing from BioWorld (the "***New BioWorld Proposal***").

128. BioWorld thus remained a viable financing alternative in November 2017 that the Board could have pursued absent Upfront and Breakwater's continued obstruction.

129. Regardless, and given his own conflicted interest, Suster insisted that the A-2 Proposal was preferable to the New BioWorld Proposal and that Loot Crate should pursue equity financing, rather than pure debt financing.

130. In email exchanges Bettinelli and Mansour agreed that both equity and debt options were valid "options worth pursuit."

131. Upfront and Breakwater did not oppose debt financing for the company; they simply opposed debt financing for the company that was provided by anyone other than Upfront and Breakwater and blocked any effort by Loot Crate to secure such third-party financing.

132. On December 3, 2017, Suster sent an email to Davis and the other Board members, stating:

> you completing the Bio World deal against our interests and against my will as a Director and as a shareholder will possibly lead to years of public legal battles between us that will costs us each millions and lead us to both spend countless hours of non-productive time that may damage reputations and won't benefit any of us. I don't want to spend my time on this. You shouldn't want to spend your time like you have had to in the past 30 days and a legal battle will be even worse. It's not good for either of us.

133. Suster sent similar communications during this time threatening to commence litigation against Davis and the Board and to bankrupt the company.

134. Suster also threatened that, in a Loot Crate bankruptcy, Breakwater would "jam in a DIP loan," and the company would have no option but to accept super-priority debtor in possession financing from Upfront and Breakwater.

135. On December 4, 2017, Davis explained Suster's misconduct to the Board,

> It is extremely unfortunate that Mark, Upfront's designated director, has decided that his interest in continuing pushing for a financing would benefit Upfront to the detriment of the Company and the great majority of its shareholders, is superior to his fiduciary duty of loyalty to the Company. That is the only reason I can see for why he would send a communication which (a) ignores/misstates the Company's current financial state, (b) places the Company's efforts to obtain a forbearance from its current lender, Breakwater, at great risk, and (c) makes statements and accusations that are not accurate but will, just

by their being made, create difficulties for the Company's efforts to either go public itself or be acquired by a public company. I am advised by counsel that when a director takes steps such as these to try to put a company in jeopardy just so the director can, through a self-interested transaction, "save the company," that is a direct breach of the director 's fiduciary duty.

136.    Davis ended his email by stating, "Mark is advocating for a transaction that would benefit Upfront (on whose behalf he is acting) and likely himself, personally."

137.    To remove any doubt of Suster's allegiances and disloyalty to Loot Crate, on December 25, 2017, Suster wrote an email to himself with the subject line "Business Objectives Regarding Loot Crate" in which he stated:

> We [Upfront] have $12.75 million invested in the company.  Our primary goal is to recover as much of this as possible, in the shortest period of time, while spending the least possible to recover it. . . .  We theoretically have the ability to block more board appointments (like Bioworld board seat) and block issuances of new equity except that Dendera knows how to structure deals around our rights (debt from Bioworld, convertible note proposal, which is senior to us and can convert later … need to understand ability to block this. . . .  We believe that Dendera will construct a financing structure that makes it harder for Upfront to make money.  Upfront still has a reasonable chance of financial recovery in a future sale if it's $50 million or greater.

138.    Two hours later, Suster sent a "Christmas Peace Offering" to Davis deceptively hiding Suster's actual motives to protect Upfront at Loot Crate's expense.  The "Christmas Peace Offering" was nothing more than a demand to give Suster and Upfront everything it wanted and, in return, for Upfront to agree to give nothing.  Suster ended his email to Davis by writing, "[w]e hope you will stop to consider a peace offering before we go off to war.  Our expectation is that we hear back from you today, December 25th."

139. Upon information and belief, Suster and Upfront considered one of Loot Crates' advisors, Dendera (and their inability to control Dendera), to be a formidable foil to Upfront's interests.

### G. Suster Takes His Bat and Ball and Goes Home, Refusing to Attend Board Meetings to Avoid the Necessary Quorum

140. Knowing that Upfront's rights as a preferred shareholder could not block the incurrence of debt, Suster instead refused to attend that and other Board meetings in order to deprive the Board of achieving the necessary quorum to act.

141. During this time period, the Board remained deadlocked on financing matters and other business matters because of Upfront's and Breakwater's improper and disloyal actions, tactics, and overall scheme.

142. To break the deadlock and avoid Loot Crate's imminent financial collapse, on December 8, 2017, Davis, as majority shareholder, removed Kreiz from the Board and appointed Alex Zyngier to replace Kreiz as the common shareholder's Board designee and an independent director with extensive turnaround experience.

143. Prior to the removal of Kreiz and appointment of Zyngier, Loot Crate consulted on the proper corporate formalities and requirements with Richards, Layton, & Finger, PA, a preeminent Delaware firm known for its expertise in corporate governance.

144. Suster refused to accept Zyngier's appointment as an independent director.

145. Shortly after Kreiz's replacement, Boyle resigned. Upon information and belief, Boyle resigned because of the litigiousness of Upfront and Breakwater and the ensuing strife this had created on the Board.

146. On December 11, 2017, Upfront, through counsel, sent a letter to the Board demanding an independent investigation into a variety of matters, including Loot Crate's refusal to consummate the A-2 Proposal. Upon information and belief, the letter was not sent with the goal of actually

prompting the requested investigation, but only to further delay Loot Crate's progress in obtaining financing from BioWorld and thereby compel Loot Crate to consummate the A-2 Proposal.

147.   On December 12, 2017, Loot Crate called another board meeting to, among other things, receive comments on the New BioWorld Proposal term sheet.

148.   Suster again refused to attend the board meeting, thus denying the Board the ability to form a quorum.

149.   In a contemporaneous email, Suster complained to the Board about Kreiz's removal and demanded Kreiz's reinstatement.

150.   On December 13, 2017, Upfront, through counsel, sent a letter to Davis, complaining that Kreiz's removal was not permitted and demanding his reinstatement.

151.   At the same time, Suster sent emails to the Board echoing the complaints in the letter from Upfront's counsel.

152.   On December 13, 2017, Loot Crate again called for a Board meeting, and Suster again declined to attend.

153.   Suster knew exactly what he was doing, what the results would be, and thereby acted with actual intent to protect Upfront at the expense of Loot Crate. As confirmed in Suster's emails, on December 13, 2017, Suster wrote, "I will not attend the board meeting scheduled for later today. This means that there will be no quorum (as at most only 2 of 5 authorized directors will be present) and the Board will therefore be unable to pass any valid resolutions."

154.   On December 19, 2017, Loot Crate again called for a Board meeting, this time to address the New BioWorld Proposal and other financing, and also to address general Loot Crate operations and the investigation that Upfront and Suster had requested. Prior to the meeting, Loot Crate even circulated a proposed unanimous written consent to allow the independent investigation demanded by Upfront to begin.

155.     Regardless, Suster again refused to attend the Board meeting and refused to sign the unanimous written consent that would have authorized the independent investigation that he and Upfront previously demanded.

156.     On December 20, 2017, Loot Crate again called for a Board meeting and Suster refused to attend.

157.     On December 21, 2017, Loot Crate, through counsel, sent a letter to Upfront's counsel, stating that Loot Crate intended to pursue the independent investigation requested by Upfront, but could not do so because Suster had both failed to attend the last four duly-noticed Board meetings and had declined to sign the proposed unanimous written consent that would have permitted the requested investigation to begin.

158.     By engaging in a letter writing campaign against the Board and CEO and actively working to deny the Board the quorum necessary for it to conduct business, Upfront and Breakwater's concerted actions delayed Loot Crate's consideration and potential consummation of the New BioWorld Proposal or any other financing transaction proposed by any party other than Upfront and Breakwater.

159.     Eventually, Upfront's and Breakwater's tactics achieved their goal.  Despite spending close to two months of time and effort to advance the financing transaction, BioWorld withdrew its proposals.

**H.     Upfront and Breakwater Use Obstructionist Tactics to Maintain Control and Assure Loot Crate's Demise.**

160.     On January 4, 2018, Suster resigned from the Board shortly before the commencement of a duly scheduled Board meeting.

161.     Suster's reasons for his resignation demonstrate his breach of the duty of loyalty, including his intent to protect preferred stockholders like Upfront at the expense of common shareholders.  On January 13, 2018, Suster informed an investor that he resigned because, in Suster's mind, the removal of Ynon was "against the ***best interests of preferred stockholders***." [emphasis added].

162.    Suster's resignation also furthered Upfront's interest at Loot Crate's expense, including by (i) creating uncertainty around the formation of a quorum so that the legitimacy of decisions made at the January 4 meeting and thereafter could be challenged; and (ii) allowing Upfront the ability to sue the company and the Board without the risk of claims against Suster or Upfront for breaches of loyalty associated with commencing a lawsuit.

163.    In fact, in January 2018, Mansour confirmed to Davis that Suster stepped down from the board in preparation for filing a lawsuit.

164.    Although Suster was no longer on the Board, over the next few months, Upfront and Breakwater used Breakwater's leverage as Loot Crate's lender to obtain control of the Board.    Simultaneously, Breakwater improperly utilized its position to force Loot Crate to hand over the business.

165.    On February 9, 2018, Breakwater and Loot Crate entered into an initial forbearance agreement.    However, that agreement was not fully consummated because the reorganization of Loot Crate's holding company that was required by Breakwater did not occur until March 21, 2018.

166.    On May 8, 2018, Breakwater and Loot Crate entered into a second forbearance agreement (the "*May 2018 Forbearance*") that granted Breakwater the right to a $2 million original issue discount ("*OID*") on the 60th day following the effective date of the forbearance (the "*Breakwater Trigger Date*") that would be reduced to $1 million if the Breakwater Loan was refinanced by September 30, 2018.

167.    In addition, the May 2018 Forbearance permitted Breakwater the right to appoint one designee to the Board and also required the creation of a Strategic Transaction Committee comprising two independent directors and Mansour, who was Breakwater's Board designee under the forbearance agreement.

168.    The May 2018 Forbearance also required Loot Crate to raise $3 million of subordinated debt or equity in a form and substance satisfactory to Breakwater, in its sole discretion.    If Loot Crate failed to raise the $3 million of junior capital within 60 days, the Board would expand to seven members and Breakwater would have the right to appoint a majority of the

members of both the expanded board and the Strategic Transaction Committee.

169. At roughly the same time it was negotiating the May 2018 Forbearance, Loot Crate was negotiating the terms of a letter of intent with Atalaya Capital Management ("*Atalaya*") to provide Loot Crate with a new loan facility that would both repay Breakwater and offer Loot Crate some incremental liquidity.

170. At the time, Loot Crate's goal was to refinance Breakwater before the Breakwater Trigger Date to avoid the added financial burden of the full $2 million OID.

171. Loot Crate and Atalaya executed the letter of intent (the "*Atalaya Letter of Intent*") on May 9, 2018, the day after the execution of the May 2018 Forbearance.

172. In late May 2018, Atalaya's principal, Matt Spiro ("*Spiro*"), emailed his contact at Upfront, Kobie Fuller, to request a meeting with Suster in connection with Atalaya's due diligence efforts for its financing commitment. When Kiber received word of this inquiry, she immediately sought to protect Upfront's interests over Loot Crate's interests. On May 22, 2018, Kiber wrote Fuller, "either they [Atalaya] are proposing something that Breakwater won't approve because it requires them to roll over a portion of their debt or it's a structure that *would likely not end well for us*."

173. Accordingly, Suster, on behalf of Upfront, attempted to poison Atalaya's financing efforts. In May 2018, Amdani—Mansour's right-hand man and future Loot Crate director—summarized Suster's efforts to torpedo the deal by directly contacting Atalaya and alleging that Loot Crate's management was not trustworthy as well as threatening litigation if the deal moved forward.

174. Upon information and belief, following Suster's threat to Spiro, Atalaya notified Loot Crate that it would no longer provide the financing in the face of litigation risk posed by Upfront and therefore intended to withdraw its offer.

175.    After learning of Suster's, Kibler's and Upfront's efforts to interfere with the financing efforts, Loot Crate's counsel sent Upfront's counsel a letter on May 26, 2018 demanding that Upfront cease and desist from any further interference.

176.    In response, Suster referred to the letter as "baseless and completely & verifiably inaccurate and untrue." Among other things, Suster represented that Upfront, "would never and have never threatened legal action against Atalaya," and that he would "never and have never said to Atalaya that I would in any way block a debt financing."

177.    Yet, two months later, Suster did exactly what he said he would not do: threaten litigation against Atalaya. On July 31, 2018, Suster wrote to Spiro, "I hear rumblings that you are close to completing a deal. It is being done with a structure designed to avoid shareholder approval. We have both a litigator and Delaware counsel who make it clear we have a strong case to challenge and to hold all parties involved responsible for knowingly subverting our rights." Further, "I know you guys have lawyers saying you can ram this through. I'm sure they're telling you it's not black and white. . . . But we certainly will not be intentionally screwed by you and the company and simply roll over."

178.    Upon information and belief, although Loot Crate was able to persuade Atalaya not to withdraw, Atalaya only agreed to continue negotiations based upon significantly increased pricing and other terms to account for the litigation risk of providing the loan.

179.    On June 5, 2018, Loot Crate delivered a signed term sheet to Breakwater for $3.2 million of subordinated note financing by South River Capital, LLC ("*South River*") to meet Loot Crate's continuing working capital needs (the "*South River Proposal*").

180.    Breakwater rejected the South River Proposal, citing five requirements that the South River Proposal did not address or satisfy.

181.    Loot Crate worked with South River to address these issues and, on June 16, 2018, delivered a second signed term sheet from South River that resolved all five of Breakwater's enumerated issues.

182.   Breakwater nevertheless rejected this revised term sheet on the alleged basis that it still failed to satisfy the five enumerated issues, but did not provide any explanation as to the defects allegedly remaining.

183.   Between June 16 and 19, 2018, Loot Crate's independent directors made multiple efforts to demonstrate to Breakwater that the five enumerated issues had in fact been resolved.

184.   For example, one of Breakwater's five enumerated requirements was that the South River debt had to be "deeply subordinated." Accordingly, the South River term sheet included customary term sheet language providing for the subordination of the proposed South River loan to the Breakwater Loan on customary terms to be provided in definitive documents acceptable to Breakwater.

185.   Despite these attempts to resolve Breakwater's complaints with the South River Proposal, Breakwater refused to engage in further discussions.

186.   On June 21, 2018, Suster once again re-inserted himself to try to derail the South River Proposal by sending an email to the board comparing the South River Proposal with a proposal purportedly made by Upfront in 2017.  In response, Davis reminded Suster, "[Loot Crate] doesn't disagree we would have performed better with a +$10mm in equity financing in November, we disagreed with a full change of control, $78mm of total liquidation preference, and the pricing you set.  We also would have performed better without accruing $3mm in legal fees."

187.   At the June 22, 2018 Board meeting called to consider the approval of the South River Proposal, Mansour voted against the proposed financing rather than recusing himself from the vote.

188.   At the time of the June 22 Board meeting, Breakwater had a clear and express interest in the failure of the South River Proposal because Loot Crate's inability to obtain additional financing would ultimately trigger the full $2 million OID accrual and Breakwater's alleged right to Board control on the terms set forth in the May 2018 Forbearance.

189.     Mansour and Breakwater knew that the funding under the South River Proposal was a necessary condition to consummation of the Atalaya financing.

190.     On June 28, 2018, Spiro attempted to engage Mansour to reach a resolution with Breakwater.  Mansour declined and stated that he would be happy to partner with Atalaya "once [Breakwater] ha[s] secured equity interests."

191.     On July 17, 2018, Breakwater sent Loot Crate a letter, through counsel, prematurely noticing a default under the forbearance agreement, thereby attempting to exercise its rights to the full OID and appointment of a majority of the Board while the company was attempting to finalize the transactions with Atalaya and South River.

192.     Breakwater only agreed to back down from its premature effort after receiving a cease and desist letter from Loot Crate's counsel.

193.     On July 23, 2018, Suster called Zyngier to advise that if Breakwater acquired majority control of the Board, Upfront would make a proposal to provide up to $7 million of equity financing.

194.     As a result of the various delays in renegotiating the South River Proposal caused by the actions of Upfront and Breakwater, Loot Crate missed its 60-day deadline under the May 2018 Forbearance to raise the needed junior capital.

195.     As a result, on July 24, 2018, Breakwater triggered its right to receive the full $2 million OID and appointed four new directors to the Board (Beckman, Geant, Kaczorowski, and Amdani), thereby giving Breakwater majority control of the Board.

196.     Around the same time, Upfront appointed Kibler to refill the Upfront Board seat previously held by Suster.

I. **Upfront and Breakwater Undermine Loot Crate through Meetings with Existing Management.**

197. Throughout this time period, including leading up to and following the negotiations around the A-2 Proposal, Upfront and Breakwater had numerous communications with Loot Crate's existing and former management team, including holding several secret, undisclosed meetings.

198. The purpose of these communications was to further Upfront's and Breakwater's own agendas to Loot Crate's detriment.

199. In communications between and among Upfront directors, Breakwater representatives, and Loot Crate's existing and former management team, Upfront and Breakwater discussed prospective employment opportunities and equity compensation with these existing and former members of the Loot Crate management team in the event that Upfront and Breakwater were able to wrest control of the Board, including specific plans to oust and replace Davis as CEO.

200. For example, in February 2017, Bettinelli admitted to an executive that Upfront and Breakwater were working behind the scenes on a scheme to ensure scenarios that benefitted Upfront and Breakwater over any others. Mansour confirmed Bettinelli's admissions along with Breakwater's active and consistent participation with current and former executives at Loot Crate to undermine the company. Specifically, Mansour and Bettinelli covertly discussed plans with Eric Chan to further their own interests while simultaneously lying and/or deceiving the CEO about what needed to occur for the company to succeed.

201. Upfront and Breakwater routinely shared their plans and status of meetings with current and prior executives at Loot Crate, and confirmed their coordination with one another to achieve their goals at Loot Crate's expense. On November 6, 2017, Suster characterized Mansour a true partner in their schemes and regularly shared with Mansour his plans for meeting with numerous current and former executives at Loot Crate to get their way. On November 8, 2017, Suster emailed Eric Chan and Peter Lai concerning

Defendants' scheme to seize control of the company and place its own hand-picked officers in charge.

202. Although Suster was a director of the time and Eric Chan was a former employee, Suster transparently shared Loot Crate's confidential information and strategy concerning potential organizational changes. Suster went so far as to make actual proposals to Eric Chan of what the company would offer in terms of a compensation package, offering "3% of the fully diluted share capital." Sensing the inappropriateness of a director making unapproved offers to a future executive, Suster wrote to Chan on November 6, 2017 (in the midst of negotiating the A-2 Proposal), "These are HIGHLY confidential documents so I am obviously trusting you greatly through a FrieNDA. I would love to work with you. It's not risk free by [*sic*] my ass would be on the line as much as yours would be."

203. At the same time these communications occurred, (i) the Upfront representatives were interested directors due to Upfront's participation in the A-2 Proposal; (ii) Breakwater was a shareholder and the company's senior secured lender with a vested interest in the consummation of the A-2 Proposal; and (iii) the current employees being courted by Upfront and Breakwater in these communications were the same individuals that were, in part, responsible for providing unbiased financial analysis and reporting to the Board.

## J. Loot Crate Cannot Recover from Upfront and Breakwater's Serial Fiduciary Breaches.

204. On July 25, 2018, with Breakwater holding control of a majority of the Loot Crate Board, Upfront proposed to lead a $7.5 million Series B financing to be closed in just three weeks. The Breakwater proposal required the commitment of other parties, as well as Breakwater's commitment to restructure its debt.

205. In late July 2018, however, Breakwater would not commit to permit the refinancing of its debt.

206. On August 1, 2018, Upfront revised its offer in response to feedback from Loot Crate and the Board.

207. During the course of the ensuing Board meetings to discuss Loot Crate's pending financing proposals, including the Breakwater Series B financing proposal, neither Kibler nor the Breakwater Board members recused themselves from Board discussions.

208. Shortly before the scheduled closing of the Atalaya financing, Kibler and Upfront's general counsel called Spiro to persuade him that Atalaya should not move forward with its proposed transaction.

209. In the weeks prior to the Atalaya closing in August 2018, Upfront attempted to convince Atalaya to join with Upfront to complete an alternative transaction in which Upfront would provide equity capital and Atalaya would provide debt financing with minimal covenant protection and 5% interest.

210. Although Atalaya initially engaged in discussions with Upfront to see if a realistic deal could be achieved, it soon became apparent that Upfront would not negotiate reasonable debt terms.

211. In the Board meetings that followed, Kibler continued to refuse to recuse herself from any of the discussions involving the Upfront proposal and its comparison to the Atalaya and other financing proposals.

212. Even while a special committee of the Board moved to a closed-door session with special counsel to the Board and Loot Crate's counsel to evaluate the Upfront proposal against the Atalaya subordinated debt proposal, Kibler refused to recuse herself from most of the deliberation.

213. Kibler's disruptions of the Atalaya financing for the benefit of Upfront were clear breaches of her fiduciary duties to the company.

214. On August 6, 2018, Loot Crate finally closed the Atalaya and South River transactions.

215. On August 18, 2018, Breakwater's designees resigned from the Board.

216. Despite the success in closing the Atalaya and South River transactions, Loot Crate continued to struggle because the resulting

transactions still did not provide Loot Crate with sufficient working capital, and because the Atalaya debt was more expensive than originally proposed because of Atalaya's renegotiated terms in response to the added difficulties, delay, and litigation risks imposed by Upfront.

217.    In connection with the closing of the Atalaya and South River transactions, on August 6, 2018, Loot Crate paid Breakwater all amounts due and owing under the Loan Agreement, including the OID in the amount of $1,000,000.00 (the "**OID Payment**").

218.    While the August 2018 financing provided Loot Crate with a slight liquidity reprieve, the fees and expenses that had to be repaid to Breakwater—including $1 million of the OID—made this amount far less than expected and necessary to improve marketing and pay vendors.  As a result, Loot Crate continued to experience challenges with vendors after the transaction, resulting in difficulties with fulfilling orders due to missing custom items, causing subscriber chargebacks and cancellations.

219.    Likewise, because the financing provided less than the expected liquidity injection, Loot Crate's credit card processor began withholding funds from Loot Crate.  Between marketing shortfalls, vendor pressure, and credit card withholdings, Loot Crate's liquidity issues began to worsen each passing week and month.

220.    In July 2019, Breakwater, Upfront, and Atalaya engaged in discussions regarding the potential acquisition of Loot Crate by the three of them through a chapter 11 bankruptcy reorganization.

221.    Initially, their discussions contemplated that Upfront and Breakwater would each own 40% of the equity of a reorganized Loot Crate, and Atalaya would own the remaining 20% and have its outstanding loans to Loot Crate assumed by the reorganized Loot Crate post-bankruptcy.

222.    Ultimately, Upfront withdrew from the transaction.

223.    Although Kibler was still a member of the Board at that time, she never disclosed the occurrence of, or the content of, these discussions to the Board.

224.     By this point, the damage to Loot Crate caused by the Defendants' collusive, obstructionist acts during Loot Crate's 2017 and 2018 refinancing efforts was done.   The company was trapped in a negative financial cycle, with each negative event causing other negative events, again and again, and liquidity problems continued.

225.     On August 11 and 12, 2019 (the "***Petition Date***"), the four Loot Crate entities each sought bankruptcy protection by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.   Because of Defendants' misconduct, the enterprise value of the company fell to zero and its shares were worthless.

<u>COUNT I</u>

**Breach of Fiduciary Duty (Against All Defendants)**

226.     Plaintiff realleges and incorporate by reference each of the allegations contained in the preceding paragraphs of this complaint as though fully set forth herein.

227.     The individual defendants served as directors during the following time periods:

| Defendant | Entity | Dates as Director |
|---|---|---|
| Bettinelli | Upfront | May 2016 – October 2017 |
| Suster | Upfront | October 2017 – January 2018 |
| Kibler | Upfront | July 2018 – July 2019 |
| Mansour | Breakwater | Director: May 2018 – August 2018<br><br>Observer: June 2016 – May 2018 |
| Amdani | Breakwater | July 2018 – August 2018 |
| Beckman | Breakwater | July 2018 – August 2018 |
| Geant | Breakwater | July 2018 – August 2018 |

41

| Kaczorowski | Breakwater | July 2018 – August 2018 |
| --- | --- | --- |

228.    At all relevant times, Defendant Upfront exercised actual and pervasive control over Loot Crate and its governance apparatus through its active coordination and scheming with Breakwater, which placed Upfront in a position no different than if Upfront had majority voting control.  Between the two of them, Upfront and Breakwater held a majority (55%) of the issued and outstanding Series A Preferred Stock.  The Series A Preferred Stock provided certain rights, preferences, privileges, and restrictions in favor of Upfront and Breakwater involving dividends, liquidation preferences, conversion rights, and voting rights.  Moreover, Loot Crate was unable to take certain actions (such as increasing or decreasing the number of authorized common or preferred shares and/or changing the number of directors) without obtaining an affirmative vote or written consent of a majority of the voting power of the Preferred Stock.

229.    Additionally, Upfront maintained control over the Board by exercising its right to designate one Board member (such as Bettinelli, Suster, and Kibler), and by influencing and forcing the appointment of purportedly "independent" directors that Upfront knew would do Upfront's bidding rather than Loot Crate (such as Ynon Kreiz and Terry Boyle).  Thus, Upfront—through Bettinelli, Suster, and Kibler—used their relationships with particular directors such as Kreiz and Boyle to compromise the disinterestedness and independence of the Board in connection with the transactions described herein.  Upfront further utilized and coordinated with Breakwater to ensure purportedly "independent" directors were appointed to the Board.

230.    Upfront's actual control also included developing the Playbook in coordination with Breakwater to suffocate Loot Crate and to block or restrict other, more advantageous, options for financing and raising capital.

231.    Upfront—through Suster—further exercised control over Loot Crate by refusing to attend meetings to preclude the existence of a quorum.

As confirmed in Suster's emails, on December 13, 2017, Suster wrote, "I will not attend the board meeting scheduled for later today. This means that there will be no quorum (as at most only 2 of 5 authorized directors will be present) and the Board will therefore be unable to pass any valid resolutions."

232. To exercise more control, Upfront—through Suster and Kibler—used its position and relationships in the industry to attempt to convince Atalaya and/or South River from completing its financing proposals, including by threatening litigation.

233. Upfront—through Bettinelli, Suster, and Kibler—also held secret meetings with current and/or former Loot Crate employees and executives. Upfront discussed confidential company information with these employees and devised schemes to replace current management (without informing management even though they were members of the Board).

234. Through the confluence of these multiple sources and instances of control, Upfront exercised actual control over Loot Crate. Thus, at all relevant times, Upfront owed Loot Crate and each Loot Crate shareholder the fiduciary duties of due care and loyalty, and good faith and candor.

235. At all relevant times, Defendant Breakwater exercised actual and pervasive control over Loot Crate and its governance apparatus through its active coordination and scheming with Upfront, which placed Breakwater in a position no different than if Breakwater had majority voting control. Between the two of them, Upfront and Breakwater held a majority (55%) of the issued and outstanding Series A Preferred Stock. The Series A Preferred Stock provided certain rights, preferences, privileges, and restrictions in favor of Upfront and Breakwater involving dividends, liquidation preferences, conversion rights, and voting rights. Moreover, Loot Crate was unable to take certain actions (such as increasing or decreasing the number of authorized common or preferred shares and/or changing the number of directors) without obtaining an affirmative vote or written consent of a majority of the voting power of the Preferred Stock.

236. Additionally, Breakwater maintained control over the Board by exercising its right to initially designate a Board observer (Mansour), and

subsequently to designate directors on the Board (Mansour, Amdani, Beckman, Geant, and Kaczorowski). Although only a Board observer until 2018, Breakwater—through the Breakwater Defendants—texted and coordinated with the Upfront Defendants to obtain company information and to influence and force the appointment of purportedly "independent" directors that Breakwater knew would do Breakwater's bidding rather than Loot Crate (such as Ynon Kreiz and Terry Boyle). Thus, the Breakwater Defendants routinely texted and emailed with one another and, at times, with Upfront to ensure that Breakwater's interests were protected at Loot Crate's expense.

237. Breakwater's actual control also included developing the Playbook in coordination with Upfront to suffocate Loot Crate and to block or restrict other, more advantageous, options for financing and raising capital.

238. Further, Breakwater exercised its influence as lender and shareholder to block and/or restrict Loot Crate's ability to obtain financing from South River, including by refusing to consent to the financing even though the financing satisfied all requirements imposed by Breakwater. By blocking the financing, Breakwater utilized its control to declare that it was entitled to the $2 million OID.

239. Through the confluence of these multiple sources and instances of control, Breakwater exercised actual control over Loot Crate. Thus, Breakwater owed Loot Crate and each Loot Crate shareholder the fiduciary duties of due care and loyalty, and good faith and candor.

240. In accordance with the dates reflected in the chart above, each of Defendants Suster, Kibler, Bettinelli, Mansour, Amdani, Beckman, Geant, and Kaczorowski was a Loot Crate director, and owed Loot Crate and each Loot Crate shareholder the fiduciary duties of due care and loyalty, and good faith and candor.

241. The following defendants breached their obligations and duties owed to Loot Crate and its shareholders by, among other things:

(a)     intentionally creating a cash crisis within Loot Crate for the purpose of reinforcing Upfront and Breakwater's effective control over Loot Crate (Bettinelli, Suster, Mansour);

(b)     preventing the Board from considering or seeking out alternative funding options, rendering the Board incapable of negotiating meaningfully in connection with the A-2, BioWorld, or Management Proposals (Bettinelli, Suster, Mansour);

(c)     aggressively and threateningly attempting to coerce the Board under duress into palpably unfavorable funding terms that would benefit Upfront and Breakwater at Loot Crate's expense (Bettinelli, Suster, Mansour);

(d)     intentionally sabotaging Loot Crate's efforts to comply under the Breakwater forbearance agreement in order to wrest Board control from Davis and other independent directors (Mansour, Kibler, Amdani, Beckman, Geant, Kaczorowski)

(e)     surreptitiously manipulating Loot Crate's financing efforts, including through: (i) creating and executing the Playbook, a secret and coordinated plan among ostensibly independent directors, interested directors, and dominant shareholders to force financing on Loot Crate that would solely benefit Upfront and Breakwater; and (ii) having secret meetings and communications with Loot Crate's former and existing management to sow seeds of disloyalty and apply additional pressure on Davis to act against his fiduciary duties (Bettinelli, Suster, Mansour);

(f)     failing to disclose dual loyalties (Bettinelli, Suster, Kibler, Mansour); and

(g)     using serial threats of litigation and other threats and antagonistic behavior directed at Davis, the Board, Loot Crate management, and other Loot Crate shareholders (Bettinelli, Suster, Mansour).

242.    These breaches of their fiduciary duties and the direct and reasonably foreseeable consequences of these breaches caused substantial damage to Loot Crate and its shareholders, and substantially benefitted Upfront and Breakwater.

243. The Defendants' misconduct was perpetrated in bad faith and violated their respective fiduciary duties of loyalty and otherwise falls outside the exculpatory scope of 8 Del. C. § 102(b)(7). Given the lack of independence and numerous instances of disloyalty, the entire fairness doctrine applies to the matters in dispute.

## COUNT II
### Aiding and Abetting Breach of Fiduciary Duty (Against All Defendants)

244. Plaintiff realleges and incorporate by reference each of the allegations contained in the preceding paragraphs of this complaint as though fully set forth herein.

245. At all relevant times, Defendant Upfront exercised effective control over Loot Crate and its governance apparatus through its active coordination and scheming with Breakwater, which placed Upfront in a position no different than if Upfront had majority voting control.

246. At all relevant times, Upfront owed Loot Crate and each Loot Crate shareholder the fiduciary duties of due care and loyalty, and good faith and candor.

247. At all relevant times, Breakwater exercised effective control over Loot Crate and its governance apparatus through its active coordination and scheming with Upfront and through the power it wielded pursuant to its role as Loot Crate's senior secured lender. This placed Breakwater in a position no different than if Breakwater had majority voting control.

248. At all relevant times, Breakwater owed Loot Crate and each Loot Crate shareholder the fiduciary duties of due care and loyalty, and good faith and candor.

249. In accordance with the dates reflected in the chart above, each of Defendants Suster, Kibler, Bettinelli, Mansour, Amdani, Beckman, Geant, and Kaczorowski served as a Loot Crate director, and owed Loot Crate and each Loot Crate shareholder the fiduciary duties of due care and loyalty, and good faith and candor at various times identified above.

250. Mansour, Amdani, Beckman, Geant, and Kaczorowski individually or through Breakwater knowingly and intentionally worked in concert with Upfront and its representatives to assist or encourage Upfront, Suster, Kibler, and Bettinelli to breach their fiduciary duties to Loot Crate in the ways enumerated in Count I above.

251. Bettinelli, Suster, and Kibler individually or through Upfront knowingly and intentionally worked in concert with Breakwater and its representatives to assist or encourage Breakwater, Mansour, Amdani, Beckman, Geant, and Kaczorowski to breach their fiduciary duties to Loot Crate in the ways enumerated in Count I above.

252. Based on internal email and text communications during the relevant time period, each of Bettinelli, Suster, and Kibler knowingly and intentionally worked in concert with one another when one of them was on the Board to breach their fiduciary duties to Loot Crate in the ways enumerated in Count I above. For example, while Bettinelli was on the Board, Suster and Kibler intentionally worked in concert with him to aid and abet him in breaching his fiduciary duties.

253. Based on internal email and text communications during the relevant timer period, each of Mansour, Amdani, Beckman, Geant, and Kaczorowski knowingly and intentionally worked in concert with one another when one of them was on the Board to breach their fiduciary duties to Loot Crate in the ways enumerated in Count I above. For example, while Mansour was on the Board, Amdani, Beckman, Geant, and Kaczorowski intentionally worked in concert with him to aid and abet him in breaching his fiduciary duties. For example, in one text message conversation from April 2018, Amdani informed Mansour that Beckman was against a proposal being considered at Loot Crate. Specifically, Beckman "was a pretty quick no on dendera's proposal. His initial thought was that I call Palmer and say, 'Eric said…Are you fucking kidding me? We bend over backwards and allow you to bring the proceeds in the form of debt and you have the audacity to ask us to subordinate any of our forbearance shares? Just hand us the keys to the business.'" Amdani finished his text by asking Mansour how he wanted to proceed. Similarly, text messages by and between Mansour, Kaczorowski, and Beckman in June 2018 reflect discussions and strategy with respect to

delaying the Atalaya financing in order to protect Breakwater's interests. Mansour repeatedly informed Beckman, Kaczorowski, Geant, and Amdani of Upfront's plans and inquired of their thoughts on various proposals in connection with protecting Breakwater's interests at Loot Crate's expense. These breaches, and the direct and reasonably foreseeable consequences of these breaches, caused substantial damage to Loot Crate and its shareholders.

## COUNT III
### Breach of the Implied Covenant of Good Faith and Fair Dealing
### (Against Upfront and Breakwater)

254.    Plaintiff realleges and incorporate by reference each of the allegations contained in the preceding paragraphs of this complaint as though fully set forth herein.

255.    Loot Crate entered into the Private Equity Agreements and the A-2 Term Sheet with Upfront and Breakwater.  Section 8.2 of that certain *Series A Preferred Stock Purchase Agreement* states that the agreement "shall be governed in all respect by the internal laws of the State of California, without reference to principles of conflicts of law."  Even if Delaware law applies to this claim, Delaware similarly recognizes a claim for breach of the implied covenant of good faith and fair dealing

256.    Loot Crate further entered into the Loan Agreement and May 2018 Forbearance Agreement with Breakwater.

257.    Loot Crate performed all or substantially all of the things these contracts required it to do and all conditions for Upfront's and Breakwater's performance occurred.

258.    Upfront and Breakwater unfairly interfered with Loot Crate's right to receive the benefits of these contracts by preventing the consideration or pursuit of alternative funding/financing options, threatening coercing Loot Crate to accept more onerous financing terms than needed, and intentionally sabotaging Loot Crate's efforts to comply under the May 2018 Forbearance Agreement in order to obtain further control from Davis and other Board members.

259.     Upfront's and Breakwater's misconduct breached the implied covenant of good faith and fair dealing that governed these contracts, causing substantial damage to Loot Crate and its shareholders.

## COUNT IV
### Civil Conspiracy (Against All Defendants)

260.     Plaintiff realleges and incorporate by reference each of the allegations contained in the preceding paragraphs of this complaint as though fully set forth herein.

261.     During all relevant times, Defendants combined and coordinated their actions, inactions, and misconduct, and unlawful activity. Defendants' conspiracy is shown, for example, in the sharing of the Carry the Water Email and the exchange and coordination surrounding the Playbook.  Defendants regularly and routinely texted or emailed one another concerning their strategies with respect to Loot Crate and how they could work together to further their own interests at the expense of Loot Crate's interest.

262.     In accordance with the dates reflected in the chart above, each of Defendants Suster, Kibler, Bettinelli, Mansour, Amdani, Beckman, Geant, and Kaczorowski served as a Loot Crate director, and owed Loot Crate and each Loot Crate shareholder the fiduciary duties of due care and loyalty, and good faith and candor at various times identified above.

263.     Mansour, Amdani, Beckman, Geant, and Kaczorowski individually or through Breakwater knowingly and intentionally worked in concert with Upfront and its representatives to assist or encourage Upfront, Suster, Kibler, and Bettinelli to breach their fiduciary duties to Loot Crate in the ways enumerated in Count I above.

264.     Bettinelli, Suster, and Kibler individually or through Upfront knowingly and intentionally worked in concert with Breakwater and its representatives to assist or encourage Breakwater, Mansour, Amdani, Beckman, Geant, and Kaczorowski to breach their fiduciary duties to Loot Crate in the ways enumerated in Count I above.

265.    Based on internal email and text communications during the relevant time period, each of Bettinelli, Suster, and Kibler knowingly and intentionally worked in concert with one another when one of them was on the Board to breach their fiduciary duties to Loot Crate in the ways enumerated in Count I above.  For example, while Bettinelli was on the Board, Suster and Kibler intentionally worked in concert with him to aid and abet him in breaching his fiduciary duties.

266.    Based on internal email and text communications during the relevant timer period, each of Mansour, Amdani, Beckman, Geant, and Kaczorowski knowingly and intentionally worked in concert with one another when one of them was on the Board to breach their fiduciary duties to Loot Crate in the ways enumerated in Count I above.  For example, while Mansour was on the Board, Amdani, Beckman, Geant, and Kaczorowski intentionally worked in concert with him to aid and abet him in breaching his fiduciary duties.  For example, in one text message conversation from April 2018, Amdani informed Mansour that Beckman was against a proposal being considered at Loot Crate.  Specifically, Beckman "was a pretty quick no on dendera's proposal.  His initial thought was that I call Palmer and say, 'Eric said…Are you fucking kidding me?  We bend over backwards and allow you to bring the proceeds in the form of debt and you have the audacity to ask us to subordinate any of our forbearance shares?  Just hand us the keys to the business.'"  Amdani finished his text by asking Mansour how he wanted to proceed.  Similarly, text messages by and between Mansour, Kaczorowski, and Beckman in June 2018 reflect discussions and strategy with respect to delaying the Atalaya financing in order to protect Breakwater's interests.  Mansour repeatedly informed Beckman, Kaczorowski, Geant, and Amdani of Upfront's plans and inquired of their thoughts on various proposals in connection with protecting Breakwater's interests at Loot Crate's expense.  These breaches, and the direct and reasonably foreseeable consequences of these breaches, caused substantial damage to Loot Crate and its shareholders.

267.    Defendants' civil conspiracy caused substantial damage to Loot Crate and its shareholders.

## COUNT V
### Fraudulent Transfer – The OID
### 11 U.S.C. § 544(b); 6 Delaware Code §§ 1304(a) and 1307 (Against Breakwater)

268.     Plaintiff realleges and incorporate by reference each of the allegations contained in the preceding paragraphs of this complaint as though fully set forth herein.

269.     Pursuant to section 544(b) of the Bankruptcy Code, a trustee may avoid any transfer of an interest of the debtor in property that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of the Bankruptcy Code.

270.     By order of this Court dated October 21, 2020 [Admin Case D.I. 714], the Committee was granted standing and authority to assert and prosecute the claims set forth herein on behalf of and for the benefit of the Debtors' estates.

271.     On May 8, 2018, Loot Crate and Breakwater entered into the May 2018 Forbearance whereby Loot Crate granted Breakwater the right to a $2 million OID via term loans that increased the total principal payment amount outstanding to Breakwater by $2 million.  Loot Crate paid and transferred the $1 million OID Payment to or for the benefit of Breakwater on August 6, 2018,[6] which is within four years before the Petition Date.

272.     Loot Crate received less than reasonably equivalent value in exchange for incurring the $2 million OID obligation and in exchange for making the OID Payment to Breakwater.

273.     At the time of the incurrence of the $2 million OID obligation and subsequent OID Payment, Loot Crate was engaged or about to engage in a business or a transaction for which Loot Crate's remaining assets were unreasonably small in relation to its business.

---

[6]      Due to delays in issuing wires, Loot Crate was not able to fully fund payments to Breakwater on the August 3, 2018 closing.  The remaining amounts, plus additional interest, were paid on August 6, 2018.

274.	At all relevant times, Loot Crate had one or more actual creditors holding unsecured claims allowable within the meanings of sections 502 and 544(b) of the Bankruptcy Code and section 1301 of Title 6 of the Delaware Code (the "***Delaware Code***").

275.	Accordingly, the OID Payment must be avoided as a fraudulent transfer in accordance with section 544(b) of the Bankruptcy Code and sections 1304(a) and section 1307 of the Delaware Code.

## COUNT VI
### Fraudulent Transfer – The OID
### 11 U.S.C. § 544(b); 6 Delaware Code §§ 1305 and 1307 (Against Breakwater)

276.	Plaintiff realleges and incorporate by reference each of the allegations contained in the preceding paragraphs of this complaint as though fully set forth herein.

277.	On or within four years before the Petition Date, the Debtors made one or more transfers of an interest of the Debtors in property to or for the benefit of Breakwater, including the $1 million OID Payment.

278.	The Debtors received less than reasonably equivalent value in exchange for the OID Payment.

279.	At the time of the OID Payment, Loot Crate was insolvent or became insolvent as a result of the OID Payment within the meaning of section 1305 of the Delaware Code.

280.	At all relevant times, Loot Crate had one or more actual creditors holding an unsecured claim allowable within the meanings of sections 502 and 544(b) of the Bankruptcy Code and section 1301 of the Delaware Code.

281.	Accordingly, the OID Payment must be avoided as a fraudulent transfer in accordance with section 544(b) of the Bankruptcy Code, and sections 1305 and 1307 of the Delaware Code.

## COUNT VII
## Fraudulent Transfer – The OID
## 11 U.S.C. § 548 (Against Breakwater)

282. Plaintiff realleges and incorporate by reference each of the allegations contained in the preceding paragraphs of this complaint as though fully set forth herein.

283. On or within two years before the Petition Date, the Debtors made one or more transfers of an interest of the Debtors in property to or for the benefit of Breakwater, including the $1 million OID Payment.

284. The Debtors received less than reasonably equivalent value in exchange for the OID Payment.

285. At the time the OID Payment was made, and as alleged above, each of the Debtors either (i) was insolvent on the date the OID Payment was made or became insolvent as a result of such transfer; (ii) was engaged in was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Loot Crate was an unreasonably small capital; or (iii) intended to incur, or believed that Loot Crate would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

286. Accordingly, the OID Payment must be avoided as a fraudulent transfer in accordance with section 548 of the Bankruptcy Code.

## COUNT VIII
## Recovery of Avoided Transfers – The OID
## 11 U.S.C. § 550 (Against Breakwater)

287. Plaintiff realleges and incorporate by reference each of the allegations contained in the preceding paragraphs of this complaint as though fully set forth herein.

288. Pursuant to 11 U.S.C. § 550(a), Plaintiff is entitled to recover, for the benefit of the estate, the property transferred and avoided under

sections 544 and 548 of the Bankruptcy Code from the initial transferee of such transfer or the entity for whose benefit such transfer was made.

289. Pursuant to § 550(a), Plaintiff is entitled to recover the value of any and all property transferred and avoided under section 548, plus interest thereon to the date of payment and the costs of this action from Breakwater as either initial transferee or subsequent transferee.

## COUNT IX
### Objection to Claims (Against All Defendants)

290. Plaintiff realleges and incorporate by reference each of the allegations contained in the preceding paragraphs of this complaint as though fully set forth herein.

291. One or more of the Defendants assert claims against the estate based either on information provided in the Debtors' *Schedules of Assets and Liabilities* filed in the Chapter 11 Cases or asserted in one or more proofs of claim filed in the Chapter 11 Cases.

292. In particular, Upfront filed a proof of claim asserting an unsecured claim against Old LC, Inc. in the amount of $250,000 (this and any other claim asserted by any Defendant against a Debtor, the "Defendants' Claims").

293. Section 502(a) of the Bankruptcy Code states that "[a] claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest…objects." 11 U.S.C. § 502(a).

294. Section 502(b) of the Bankruptcy Code states that, if an objection is made, then the Court must disallow any claim which is not enforceable against the debtor and property of the debtor." 11 U.S.C. § 502(b)(1).

295. Pursuant to section 502(b)(1), Plaintiff objects to the allowance of the Defendants' Claims:

    a. the Defendants' Claims do not represent an actual, authorized liability of any of the Debtors;

b. even if any part of any Defendants' Claim is enforceable, the Debtors are entitled to offset for amounts or credits due and owing by Defendants, including amounts owing for damages owed to the Debtors on account of one or more of the claims for relief identified herein;

c. As authorized under section 502(d) of the Bankruptcy Code, any Defendants' Claims must be disallowed to the extent the corresponding Defendant is a transferee of a transfers avoidable under 11 U.S.C. § 548 and a person from whom property is recoverable under § 550.

296. Accordingly, the Defendants' Claims must be disallowed in their entirety.

## DEMAND FOR JURY

297. Pursuant to Federal Rule of Bankruptcy Procedure 9015 and Federal Rules of Civil Procedure 38, Plaintiff hereby demands a jury trial.

## RESERVATION OF RIGHTS

298. In accordance with the Federal Rules of Bankruptcy Procedure and Federal Rules of Civil Procedure, the Committee reserves any and all rights to amend or otherwise supplement this Complaint with additional claims, parties, and allegations, including but not limited to additional claims for violation of the any party's breach of fiduciary duty, and avoidance and recovery of any transfers made to any defendant under sections 544, 547, 548, 549 and/or 550 or applicable non-bankruptcy law.

## RELIEF REQUESTED

WHEREFORE Plaintiffs demand judgment in their favor and request the following relief:

(a) money damages to compensate in an amount of not less than $100 million for their losses and to restore enterprise value;

(b)     disgorgement of any amounts illicitly received by Defendants in connection with their misconduct;

(c)     entry of an order avoiding the OID Payment as a constructively fraudulent transfer and recovering the OID Payment from Breakwater;

(d)     entry of an order disallowing the Defendants' Claims; and

(e)     Such other and further relief, including legal costs and fees, as is just.

*[This space left intentionally blank.]*

Dated: February 5, 2021
Wilmington, Delaware                Respectfully submitted,

**MORRIS JAMES LLP**


*/s/ Jeffrey R. Waxman*
Jeffrey R. Waxman (DE Bar No. 4159)
Eric J. Monzo (DE Bar No. 5214)
Brya M. Keilson (DE Bar No. 4643)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
E-mail: jwaxman@morrisjames.com
E-mail: emonzo@morrisjames.com
E-mail: bkeilson@morrisjames.com

- and -

Joel B. Bailey, Esquire
Joshua L. Hedrick, Esquire
**HEDRICK KRING, PLLC**
1700 Pacific Avenue, Suite 4650
Dallas, Texas 75201
Telephone: (214) 880-9625
Facsimile:  (214) 481-1844
E-mail: Josh@HedrickKring.com
E-mail: Joel@HedrickKring.com

- and -

Samuel M. Stricklin, Esquire
**STRICKLIN LAW FIRM, P.C.**
Palisade Central II
2435 North Central Expressway
Suite 1200
Richardson, Texas 75080
Telephone 972-2388687
E-mail: Sam.stricklin@stricklaw.pro

*Counsel for Plaintiff*