## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | Chapter 11 Case |
| | § | |
| Old LC, Inc., *et al.*[1] | § | Case No. 19-11791 (BLS) |
| | § | |
| Debtors. | § | Jointly Administered |

| | | |
|---|---|---|
| | § | |
| Official Committee of Unsecured Creditors | § | |
| of Old LC, Inc., et al., for and on behalf of | § | |
| the estates of Old LC, Inc., *et al.*; | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Adv. No. 20-51002 (BLS) |
| | § | |
| Upfront V, LP, Breakwater Credit | § | |
| Opportunities Fund, L.P.; Upfront GP V, | § | |
| LLC; Mark Suster; Dana Kibler; Gregory | § | |
| Bettinelli; Saif Mansour; Aamir Amdani; | § | |
| Eric Beckman; Darrick Geant; and Joseph | § | |
| Kaczorowski | § | |
| | § | |
| *Defendants.* | § | |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO UPFRONT DEFENDANTS' MOTION TO DISMISS

---

[1]   The Debtors are the following four entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Old LC, Inc. (7119), Old LC Holdings, Inc., Old LCF, Inc., and Old LC Parent, Inc. The Debtors' noticing address in these Chapter 11 cases is c/o Bryan Cave Leighton Paisner LLP, Attn: Mark I. Duedall, 1201 W. Peachtree Street, 14th Floor, Atlanta, Georgia 30309.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

I.    INTRODUCTION ................................................................................................ 1

II.   STATEMENT OF FACTS .................................................................................. 2

      A.    Upfront Becomes a Sizeable Investor in Loot Crate and
            Obtains Significant Voting Rights .......................................................... 2

      B.    Upfront and Breakwater, Along with the Individual
            Defendants, Scheme to Preclude Third-Party Investors ........................ 3

      C.    Upfront Develops New Schemes to Block Loot Crate's to Debt
            Financing Strategies ............................................................................... 5

      D.    Upfront Continues to Block Additional Funding Efforts and
            Take Majority Control of the Board ........................................................ 5

      E.    Upfront Continues to Block Additional Funding Efforts and
            Take Majority Control of the Board ........................................................ 6

III.  ARGUMENT AND AUTHORITIES .................................................................. 7

      A.    Loot Crate Has Adequately Alleged a Claim for Breach of
            Fiduciary Duty ........................................................................................ 7

      B.    Loot Crate Alleged a Plausible Claim for Aiding and Abetting
            Breach of Fiduciary Duty ....................................................................... 25

      C.    Loot Crate Has Adequately Alleged a Cause of Action for
            Breach of the Implied Covenant of Good Faith and Fair
            Dealing .................................................................................................... 27

      D.    Loot Crate Has Sufficiently Alleged a Plausible Claim for Civil
            Conspiracy .............................................................................................. 28

      E.    Loot Crate's Objection to Upfront's Proof of Claim is Proper .............. 29

      F.    The Upfront Defendants' Motion Under Rules 10 and 12(e)
            Must be Denied ....................................................................................... 29

IV.   CONCLUSION .................................................................................................... 31

12802219/1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aegis Mortg. Corp.*,
  No. 07-11119 (BLS), 2008 WL 2150120 (Bankr. D. Del. May 22, 2008)............................29

*Am. Capital Acquisition Partners, LLC v. LPL Hldgs., Inc.*,
  No. CIV.A. 8490-VCG, 2014 WL 354496 (Del. Ch. Feb. 3, 2014).......................................27

*In re Am. Int'l Grp., Inc.*,
  965 A.2d 763 (Del. Ch. 2009), *aff'd sub nom. Teachers' Ret. Sys. of Louisiana
  v. PricewaterhouseCoopers LLP,* 11 A.3d 228 (Del. 2011)....................................................23

*Americas Mining Corp. v. Theriault*,
  51 A.3d 1213 (Del. 2012) ........................................................................................................24

*Auriga Caital. Corp. v. Gatz Props. LLC*,
  40 A.3d 839 (Del. Ch.), *aff'd,* 59 A.3d 1206 (Del. 2012) .......................................................19

*In re Autobacs Strauss, Inc.*,
  473 B.R. 525 (Bankr. D. Del. 2012) ........................................................................................22

*Basho Techs. Holdco B, LLC v. Georgetown Basho Inv'rs, LLC*,
  2018 WL 3326693 (Del. Ch. July 6, 2018), *aff'd sub nom. Davenport v. Basho
  Techs. Holdco B, LLC,* 221 A.3d 100 (Del. 2019).......................................................... *passim*

*Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*,
  C.A. No. 3658-VCS, 2009 WL 1124451 (Del. Ch. Apr. 20, 2009) .......................................27

*Beard Research, Inc. v. Kates*,
  8 A.3d 573 (Del. Ch. 2010)......................................................................................................25

*BelCom, Inc. v. Robb*,
  No. CIV. A. 14663, 1998 WL 229527 (Del. Ch. Apr. 28, 1998), *aff'd,* 725
  A.2d 443 (Del. 1999) ................................................................................................................20

*Boyer v. Wilmington Materials, Inc.*,
  754 A.2d 881 (Del. Ch. 1999)..................................................................................................25

*Brooks-McCollum v. Shareef*,
  No. CIV.A. 05C-12-198MMJ, 2006 WL 3587246 (Del. Super. Ct. Nov. 1,
  2006) .........................................................................................................................................28

*Buckley v. O'Hanlon*,
  No. 04-955GMS, 2007 WL 956947 (D. Del. Mar. 28, 2007) .................................................23

ii

*Calesa Assocs., L.P. v. Am. Capital Ltd.*,
   No. 10557–VCG, 2016 WL 770251 (Del. Ch. Feb. 29, 2016) ..................................................8

*CMS Inv. Holdings, LLC v. Castle*,
   No. CV 9468-VCP, 2015 WL 3894021 (Del. Ch. June 23, 2015) ..........................................28

*In re Crimson Expl. Inc. S'holder Litig.*,
   No. 8541-VCP, 2014 WL 5449419 (Del. Ch. Oct. 24, 2014) ............................................9, 15

*CSH Theatres, L.L.C. v. Nederlander of San Francisco Assocs.*,
   No. CV 9380-VCMR, 2018 WL 3646817 (Del. Ch. July 31, 2018), *aff'd in
   part, rev'd in part sub nom. In re Shorenstein Hays-Nederlander Theatres
   LLC Appeals*, 213 A.3d 39 (Del. 2019) ..................................................................20

*In re Cysive, Inc. S'holders Litig.*,
   836 A.2d 531 (Del. Ch. 2003) ..................................................................................7

*Daimler AG v. Bauman*,
   571 U.S. 117 (2014) ................................................................................................23

*Del. Cty. Emps. Ret. Fund v. Sanchez*,
   124 S.3d 1017, 1022 (Del. 2015) ...........................................................................12

*Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*,
   624 A.2d 1199 (Del. 1993) ....................................................................................20

*Dieckman v. Regency GP LP*,
   155 A.3d 358 (Del. 2017) .......................................................................................27

*Dieckman v. Regency GP LP*,
   2018 WL 1006558 (Del. Ch. Feb. 20, 2018) ...................................................20, 22

*In re DSI Renal Hldgs., LLC*,
   574 B.R. 446 (Bankr. D. Del. 2017) .........................................................16, 18, 26

*Dubroff v. Wren Hldgs., LLC*,
   No. 3940-VCN, 2009 WL 1478697 (Del. Ch. May 22, 2009) ...............................15

*Emerald Partners v. Berlin*,
   726 A.2d 1215 (Del. 1999) .....................................................................................23

*In re Ezcorp Consulting Agreement Deriv. Litig.*,
   No. 9962-VCL, 2016 WL 301245 (Del. Ch. Jan. 25, 2016)...................................24

*Gammon v. J.W. Steel & Supply, Inc.*,
   No. CIV A H-02-0647, 2006 WL 2505631 (S.D. Tex. Aug. 28, 2006) .................30

iii

*In re Global Telecom Corp.*,
    327 B.R. 711 (Bankr. D. Del. 2005) ................................................................31

*In re Hansen Med.*,
    2018 WL 3025525 ................................................................................................23

*In re Hansen Med. Inc. S'holders Litig.*,
    2018 WL 3030808 (Del. Ch. June 18, 2018) ................................................15, 16

*Kahn v. Tremont Corp.*,
    694 A.2d 422 (Del. 1997) ...................................................................................24

*Klein v. Wasserman*,
    WL 2296027 (Del. Ch. May 29, 2019) .....................................................20, 22, 24

*In re Lexington Healthcare Grp., Inc.*,
    339 B.R. 570 (Bankr. D. Del. 2006) ....................................................................29

*In re Loral Space and Commc'ns Inc.*,
    2008 WL 4293781 (Del. Ch. Sept. 19, 2008) .......................................................11

*Malpiede v. Townson*,
    780 A.2d 1075 (Del.2001) .............................................................................25, 29

*OTK Assocs, LLC v. Friedman*,
    85 A.3d 696 (Del. Ch. 2014) ..........................................................................24, 25

*In re PennySaver USA Publ'g, LLC*,
    587 B.R. 445 (Bankr. D. Del. 2018) ....................................................................25

*In re PMTS Liquidating Corp.*,
    526 B.R. 536 (D. Del. 2014) ................................................................................25

*Sandvik AB v. Advent Intern. Corp.*,
    83 F. Supp. 2d 442 (D. Del. 1999). *Aff'd*, 220 F.3d 99 (3d Cir. 2000) ..................18

*Schmidt v. Skolas*,
    770 F.3d 241 (3d Cir. 2014) ..................................................................................9

*Sinclair Oil Corporation v. Levien*,
    280 A.2d 717 (Del. 1971) .....................................................................................24

*Skye Mineral Invs., LLC v. DXS (U.S.) Ltd.*,
    2020 WL 881544 (Del. Ch. Feb. 24, 2020) .....................................................10, 27

*Stone v. Ritter*,
    911 A.2d 362 (Del. 2006) .....................................................................................19

iv

*Superior Vision Servs., Inc. v. ReliaStar Life Ins. Co.*,
    2006 WL 2521426 (Del. Ch. Aug. 25, 2006) ...................................................8, 10

*Susavage v. Bucks Cty. Sch. Intermediate Unit No. 22*,
    2002 WL 109615 (E.D. Pa. Jan. 22, 2002) ...........................................................30

*Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*,
    119A.3d 44, 61 (Del. Ch. 2015).............................................................................12

*In re USA Detergents Inc.*,
    418 B.R. 533 (Bankr. D. Del. 2009) ...............................................20, 26, 28, 29

*In re USDigital, Inc.*,
    443 B.R. 22 (Bankr. D. Del. 2011) .......................................................................29

*Voigt v. Metcalf*,
    2020 WL 614999 (Del. Ch. Feb. 10, 2020) ............................................... *passim*

*In re W.J. Bradley Mortg. Cap., LLC*,
    598 B.R. 150 (Bankr. D. Del. 2019) ....................................................................23

*In re Walt Disney Co. Deriv. Litig.*,
    906 A.2d 27 (Del. 2006) ........................................................................................23

*Weinberger* v. *UOP, Inc.*,
    457 A.2d 701 (Del. 1983) ......................................................................................25

*Williamson v. Cox Commc'n Sys., Inc.*,
    2006 WL 1586375 (Del. Ch. June 5, 2006)..............................................11, 15, 16

*Zimmerman v. Crothall*,
    2012 WL 707238 (Del. Ch. Mar. 5, 2012)............................................................16

**Statutes**

6 Del. C. § 15-301.......................................................................................................23

6 Del. C. § 17-403(b) ..................................................................................................18

11 U.S.C. § 502(b) ......................................................................................................29

**Rules**

Fed. R. Bankr. P. 7015 ...............................................................................................31

Fed. R. Civ. P. 15 .......................................................................................................31

Rule 10 ........................................................................................................................29

Rule 12(e)..........................................................................................................................29, 30

# I. INTRODUCTION

Loot Crate's[2] controlling shareholders and their self-appointed board members pursued their own interests for nearly two years while plunging Loot Crate into insolvency. Upfront,[3] along with its self-appointed board members, co-investor, and the Individual Defendants,[4] engaged in a protracted campaign to starve Loot Crate of capital and use the company's resulting precarious position to force through Upfront's self-interested and unreasonable deals or to force a sale of the company. While Upfront and its allies ultimately gained majority-appointment powers to the board, the repeated use of their control to cut off Loot Crate's ability to secure alternative funding left the company's financial health beyond repair. Now, the Upfront Defendants[5] seek to avoid liability for the harm caused by the pursuit of their own interests based on a meritless pleading stage challenge to Loot Crate's Complaint. Based on the well-pled Complaint, the reasonable inferences drawn from it, and the arguments in this Response,[6] the Court should deny the Motion.[7]

---

[2] "Loot Crate" shall collectively refer to the Official Committee of Unsecured Creditors (of Old LC, Inc.; Old LC Holdings, Inc.; Old LCF, Inc.; and Old LC Parent, Inc. *See* First Amended Complaint and Objection to Claims, D.I. 28 (the "Complaint") ¶ 1, n.2.

[3] "Upfront" shall refer to Defendant Upfront V, LP. As alleged in the Complaint, Upfront acted through its board designees, agents, principals, partners, and directors, including Mark Suster, Dana Kibler, and Gregory Bettinelli.

[4] "Individual Defendants" shall collectively refer to Upfront board designees and Defendants Mark Suster ("Suster"), Dana Kibler ("Kibler"), and Gregory Bettinelli ("Bettinelli").

[5] "Upfront Defendants" shall collectively refer to Upfront and the Individual Defendants.

[6] "Response" shall refer to this, Plaintiffs' Memorandum of Law in Opposition to Upfront Defendants' Motion to Dismiss, D.I. 38.

[7] "Motion" shall refer to Motion of Upfront V. L.P., Upfront GP V, LLC, Mark Suster, Dana Kibler and Gregory Bettinelli to Dismiss First Amended Complaint and Objection to Claims and Motion to Strike Prayer for Compensatory Damages, D.I. 35.

## II.  STATEMENT OF FACTS

A.  **Upfront Becomes a Sizeable Investor in Loot Crate and Obtains Significant Voting Rights.**

Loot Crate began in 2012 as a "geek and gamer" subscription service, selling products in curated boxes to consumers.  *See* Complaint ¶ 25.  From 2012 to 2017, Loot Crate grew significantly, with revenues of $145,000,000.00, gross profits of $40,000,000.00, and an estimated enterprise value of $100,000,000.00.  *Id.* ¶¶ 25-32.  Loot Crate and its founding CEO, Chris Davis ("Davis") won numerous awards and accolades from industry observers.  *Id.* ¶¶ 33-27.

To support Loot Crate's growth, it began a Series A funding round in 2016 and obtained $18.599 million in equity funding, with approximately $12.499 million from Upfront and $1.99 million from Breakwater.[8]  *Id.* ¶ 38.  In exchange for their investment, Upfront and Breakwater received 45% and 10% of Loot Crates' newly issued Series A Preferred Shares (the "Preferred Shares"), respectively, pursuant to a Private Equity Agreement.  *Id.* ¶ 39.  The Preferred Shares carried certain rights not held by the common shareholders.  *See id.* ¶¶ 40-44.  Notably, Upfront received the right to appoint a member to Loot Crate's five-person board of directors.  *Id.* ¶ 40.  During all relevant times, Upfront appointed its own principals to fill its board seat.  *Id.*; *see also id.* ¶ 277.  Without the majority approval of the owners of the Preferred Shares, Loot Crate could not issue any additional preferred shares or change the size of the board.  *Id.* ¶ 42-44.

In addition, Breakwater entered into a $20 million credit facility with Loot Crate pursuant to a Loan and Security Agreement (the "Loan Agreement").  *Id.* ¶ 45.

---

[8] "Breakwater" shall refer to Defendant Breakwater Credit Opportunities Fund, L.P. (individually and with its board designees, including Defendants Saif Mansour, Aamir Amdani, Eric Beckman, Darrick Geant, and Joseph Kaczorowski).

2

**B.**    **Upfront and Breakwater, Along with the Individual Defendants, Scheme to Preclude Third-Party Investors.**

Beginning in 2017, Upfront and Breakwater[9] conspired to pursue their own objectives to Loot Crate's detriment.  *See* Complaint ¶ 46.  Initially, Upfront conspired with Breakwater to use pre-textual defaults under the Loan Agreement to install a Breakwater principal, and Upfront ally, on the Loot Crate board.  *Id.* ¶¶ 46-57.  To carry out this scheme, Upfront was responsible for "carry[ing] the heavy water" and covertly pressuring Davis to approve a waiver of default under the Loan Agreement in exchange for a Breakwater board seat.  *Id.* (explaining the "Carry the Water Email").  In addition, Upfront installed a third, purportedly independent, board director, Ynon Kreiz ("Kreiz").  *Id.* ¶¶ 58-65. However, Kreiz was not independent at all.  Upfront had an extensive pre-existing relationship with Kreiz, which Upfront believed would provide it control and influence over an additional board seat.  *Id.*  And Upfront's influence and control over board member Terry Boyle ("Boyle") gave it a third board seat—and a majority.  *See id.* ¶¶ 50, 97-99, 107, 118-23.

By October 2017, Loot Crate needed additional capital and began exploring an additional funding round.  *Id.* ¶¶ 66-81.  Unknown to Loot Crate, Upfront, together with Breakwater, intended to use this second funding round to further their controlling interests in Loot Crate and/or force a sale.  *Id.* ¶ 67.  Loot Crate initially received three proposals—one from Upfront and Breakwater (the "A-2 Proposal"), one from BioWorld Merchandising, Inc. ("BioWorld"), and one from Loot Crate's management team.  *Id.* ¶¶ 66-81.  The proposal made by Upfront and Breakwater included an anti-dilution provision that protected their Preferred Shares.  *Id.* ¶¶ 76, 86.  The BioWorld and

---

[9] Although the bulk of this Response addresses action taken by Upfront and the Individual Defendants, many of the same or similar allegations in the Complaint demonstrate the wrongful conduct of Breakwater.  But because only Breakwater did not file a motion to dismiss, this Response primarily focuses on the Upfront Defendants.

3

management proposals did not include the same anti-dilution provision, making their proposals more advantageous for the company. *Id.* ¶ 76-81.

Recognizing that the proposals made by BioWorld and the management team posed a threat to their own plan to force through their own self-interested funding proposal, Upfront and Breakwater, together with their self-appointed board members and the Individual Defendants, used their blocking rights to threaten to veto any funding other than the A-2 Proposal. *Id.* ¶¶ 82-89. Given Upfront and Breakwater's stranglehold on the ability to raise additional funding, Loot Crate had no option but to agree to the A-2 Proposal, and Loot Crate signed the A-2 Term Sheet. *Id.* ¶¶ 90-92.

The A-2 Term Sheet included an exclusivity provision prohibiting Loot Crate and its board from pursuing other proposals. *Id.* ¶ 93. Upfront and Breakwater used this exclusivity provision to dangle a bridge loan, (a bridge loan both Upfront and Breakwater knew that Loot Crate desperately needed), to obtain control of Davis's common shares in Loot Crate. *See id.* ¶¶ 94-96. When Davis refused, Upfront and Breakwater developed a "Playbook," in which Breakwater would threaten to accelerate the amounts due under the Loan Agreement unless Loot Crate expedited a final agreement consummating the A-2 Proposal and the A-2 Term Sheet. *Id.* ¶¶ 97-108. Upfront and Breakwater carried through with the plan laid out in the Playbook, forcing through Loot Crate's acceptance of the A-2 Term Sheet. *Id.* ¶¶ 109-23. Upfront's control and influence over two board members, Kreiz and Boyle, along with its own self-appointed board member, played a critical role in allowing Upfront to push through its plan. *Id.* Upfront also used numerous threats of litigation against Davis, Davis's father, and Loot Crate in order to exert control over Loot Crate's acceptance of the A-2 Proposal and A-2 Term Sheet. *Id.*

C.    **Upfront Develops New Schemes to Block Loot Crate's to Debt Financing Strategies.**

While Upfront and Breakwater worked together to use their Preferred Shares and the A-2 Term Sheet's exclusivity provisions to block all equity investments (except their own), Upfront developed a different way to preclude Loot Crate's debt financing options. *Id.* ¶¶ 124-39.  Separate from its prior proposal for equity, BioWorld made a second proposal in November 2017 for debt financing. *Id.*  While Upfront saw debt financing as a viable option to keep Loot Crate floating, it opposed financing from any group that did not include Upfront. *See id.* ¶¶ 130-31.

Recognizing that its Preferred Shares did not carry a right to block debt financing, Upfront and Suster devised a new strategy of depriving the board of a quorum in order to prevent any financing other than from Upfront. *Id.* ¶¶ 140-59.  After Loot Crate attempted to call board meetings to consider and/or approve the BioWorld debt proposal, Upfront, through Suster, refused to participate in board meetings, effectively blocking Loot Crate's ability to pursue the BioWorld debt proposal. *Id.*  Upfront and Suster turned their self-appointed board seat into a switch used to turn on and off Loot Crate's ability to obtain any additional funding. *Id.*  These efforts worked, and BioWorld withdrew its debt proposal. *Id.* ¶¶ 158-59.  In January 2018, Upfront and Suster continued using their board appointment to wield control by resigning Suster's board position, which in turn created uncertainty around the ability to reach a quorum. *Id.* ¶¶ 160-63.

D.    **Upfront Continues to Block Additional Funding Efforts and Take Majority Control of the Board.**

Together with Breakwater, Upfront and Suster used pre-textual defaults under the Loan Agreement to gain total control of Loot Crate's board. *See id.* ¶¶ 164-96.  Beginning in February 2018, Breakwater, with Upfront's cooperation, used its Loan Agreement to force Loot Crate into an onerous forbearance agreement. *Id.* ¶¶ 465-68.  Loot Crate and Breakwater entered a forbearance agreement in May 2018 (the "May 2018 Forbearance Agreement") that gave

Breakwater a significant original issue discount and required Loot Crate to raise substantial junior capital within 60 days. *Id.* If Loot Crate failed to raise additional capital, Breakwater would receive the right to appoint the majority of Loot Crate's board. *Id.*

At the time of the May 2018 Forbearance Agreement, Loot Crate was in the process of working with Atalaya Capital Management ("Atalaya") for a new loan facility. *Id.* ¶¶ 169-71. Recognizing that a Loot Crate deal with Atalaya would shut down its plan with Breakwater to take complete control of Loot Crate and force a sale, Upfront and Suster torpedoed Loot Crate's negotiations with Atalaya. *See id.* ¶¶ 172-78. Suster and Upfront made targeted threats of litigation against Atalaya and undermined Loot Crate's management in order to prevent a deal from closing. *Id.*

Loot Crate also began to negotiate debt financing with South River Capital, LLC ("South River"). *See id.* ¶¶ 179. Breakwater stood in the way of Loot Crate's negotiations with South River through pretextual objections, while Upfront once again engaged in obstructionist tactics. *See id.* ¶¶ 180-94.

At the same time, Suster and Upfront urged Breakwater to declare a default under the May 2018 Forbearance Agreement. *See id.* ¶¶ 193-96. Upfront floated a proposal of additional equity financing if Breakwater would declare a default, which in turn would permit Breakwater to take total control of the Loot Crate board. *Id.* With Upfront's commitment, Breakwater followed through, and Upfront and Breakwater's plan crystalized. *Id.*

E.    **Upfront and Breakwater's Scheme Launched Loot Crate into a Death Spiral Ending in Bankruptcy.**

By July 2018, with Breakwater having majority-appointment powers to Loot Crate's board, Upfront proposed a new equity funding round. *See id.* ¶¶ 204-25. Upfront initially attempted to achieve a funding deal along with Atalaya, but Upfront used its control to insert unreasonable

6

terms. *Id.* Loot Crate eventually closed a deal with Atalaya and South River. *Id.* ¶¶ 216. But the delay, difficulties, and litigation threats previously launched by Upfront resulted in a deal that was insufficient to cover Loot Crate's working capital needs. *Id.* ¶¶ 216-19. Recognizing the precarious position of Loot Crate, Breakwater, Atalaya, and Upfront began working to determine whether a restructuring would save Loot Crate from bankruptcy. *Id.* ¶¶ 220-21. Upfront ultimately withdrew from the negotiations, and the collusive, obstructionist way in which Upfront and Breakwater used their control over Loot Crate over the course of nearly two years ultimately led to Loot Crate filing voluntary Chapter 11 petitions. *See id.* ¶¶ 222-25.

### III. ARGUMENT AND AUTHORITIES

**A.**     **Loot Crate Has Adequately Alleged a Claim for Breach of Fiduciary Duty.**

    1.     Upfront Owed Fiduciary Duties to Loot Crate as a Result of Its Control.

As the Motion recognizes, a shareholder's effective control a corporation carries with it fiduciary duties. *See* Motion ¶ 22. Loot Crate has alleged that Upfront had fiduciary duties on two independent grounds: (1) Upfront was a controlling shareholder due to the control it exerted over Loot Crate's attempts to obtain funding, and (2) Upfront and Breakwater formed a "control group" with effective control over both the majority of the Preferred Shares and Loot Crate's ability to raise funding.

    *a.*     *Upfront Was a Controlling Shareholder with Respect to Loot Crate's Funding Efforts.*

Determining whether the combination of a shareholder's powers makes it a controlling shareholder is a highly fact intensive analysis that is rarely appropriate to resolve on a motion to dismiss. *See Voigt v. Metcalf*, No. 2018-0828-JTL, 2020 WL 614999, at *12 nn.8, 9 (Del. Ch. Feb. 10, 2020); *In re Cysive, Inc. S'holders Litig.*, 836 A.2d 531, 550–51 (Del. Ch. 2003). Indeed, there is no "magic formula," and the question of control looks to the reasonable inferences drawn

from the plaintiff's complaint.  *See Calesa Assocs., L.P. v. Am. Capital Ltd.*, No. 10557–VCG, 2016 WL 770251, at *11 (Del. Ch. Feb. 29, 2016).

A shareholder may be deemed controlling if the confluence of its powers give it effective control over the company's decision-making process relating to a particular transaction or course of action.[10]  *See Voigt*, 2020 WL 614999, at *12; *see also Superior Vision Servs., Inc. v. ReliaStar Life Ins. Co.*, No. 1668-N, 2006 WL 2521426, at *4 (Del. Ch. Aug. 25, 2006); *Basho Techs. Holdco B, LLC v. Georgetown Basho Inv'rs, LLC*, 2018 WL 3326693, at *26 (Del. Ch. July 6, 2018), *aff'd sub nom. Davenport v. Basho Techs. Holdco B, LLC*, 221 A.3d 100 (Del. 2019) (TABLE).    In analyzing whether a shareholder effectively wields controlling power over a transaction or decision, courts look to a number of factors.  *See id.* at *25-28 (providing a summary of the non-exhaustive factors court have analyzed in controlling shareholder cases); *Voigt*, 2020 WL 614999, at *11-13 (same).  In order to analyze these factors, courts look to the allegations of control as a whole, rather than discrete actions.[11]  *Basho*, 2018 WL 3326693, at *28; *Voigt*, 2020 WL 614999, at *13.  Although a single act or source of control standing alone may not be enough to establish control in its own right, courts must collectively analyze allegations regarding a shareholder's actions, sources of control, and exercise of influence to determine whether a plaintiff has sufficiently pled controlling shareholder status.  *Id.* at *13.

---

[10] Instead of analyzing whether Upfront controlled Loot Crate's funding efforts, the Motion solely focuses on whether the Complaint makes sufficient allegations to show Upfront wielded pervasive control over the general day-to-day business of Loot Crate.  *See* Motion ¶¶ 26-38.  If the allegations in a plaintiff's complaint relate to a particular transaction or decision, however, pervasive control over the corporation is not required in order to survive a motion to dismiss.  *See Voigt*, 2020 WL 614999, at *12; *see also Basho*, 2018 WL 3326693, at *26; *Superior Vision*, 2006 WL 2521426, at *4.

[11] Rather analyzing the Complaint's allegations on the whole, the Motion analyzes a small number of Upfront's levers of control in isolation, arguing that each lever on its own is insufficient to support a controlling shareholder theory.  This directly contradicts Delaware law, which requires courts to consider shareholder's powers in a collective or additive manner.

As demonstrated below, the Complaint includes a significant number of well-pled allegations sufficient to carry Loot Crate's pleading-stage burden to support a reasonable inference that Upfront was a controlling shareholder.

### i.    Upfront Held a Significant Block of Preferred Shares.

Courts look to the size of a shareholder's equity interest as a factor in determining whether a plaintiff's allegations are sufficient to support an inference of control. *Voigt*, 2020 WL 614999, at *17-19; *see also Basho*, 2018 WL 3326693, at *27 n.319 (collecting authority). Although the case law is unclear as to precisely how to weigh the size of a shareholder's equity, *In re Crimson Expl. Inc. S'holder Litig.*, No. 8541-VCP, 2014 WL 5449419, at *10 (Del. Ch. Oct. 24, 2014), "a relatively larger block size *should* make an inference of actual control more likely," *Voigt*, 2020 WL 614999, at *17 (emphasis in original). Ownership interest in the amount of 40% or more carries with it a significant ability to control corporate action. *See id.* at *17.

The Complaint alleges that Upfront held 45% of Loot Crate's Preferred Shares, carrying with it significant rights to control Loot Crate's actions. *See* Complaint ¶¶ 39, 44, 81, 91, 228. Accordingly, the allegations in the Complaint regarding Upfront's significant block of Preferred Shares supports an inference that Upfront was a controlling shareholder.

Upfront attempts to downplay the size of its equity ownership by relying on its proportional share of common stock, rather than preferred shares. *See* Motion ¶¶ 9, 23-24. Not only does Upfront rely on allegations not included in the Complaint,[12] Upfront attempts to misdirect the Court's attention to an allegedly smaller proportion of common shares. But because the Complaint

---

[12] The Motion includes a number of allegations not alleged in the Complaint, which the Court should not consider in deciding the Motion. *See, e.g.*, Motion ¶¶ 2 (alleging mismanagement by Davis), 6 n.3 (alleging Loot Crate has taken significant discovery), 9 (alleging Upfront's ownership interest on a converted basis and circumstances surrounding Private Equity Agreement's negotiation), 24 (alleging Upfront and Davis's ownership interests and referencing a declaration not included with the Complaint), 36 (including dates not in the Complaint), 55 (alleging unanimous approval of the A-2 Term Sheet); *see also Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (explaining boundaries of information court may consider in deciding a motion to dismiss).

focuses in on Upfront's conduct during Loot Crate's funding efforts, its block of Preferred Shares is the relevant measure of Upfront's control. *See Voigt*, 2020 WL 614999, at *12 (noting that the analysis is guided by whether the plaintiff alleges pervasive control or transaction-specific control); *see also Superior Vision*, 2006 WL 25821426, at *4; *Basho*, 2020 WL 3326693, at *26. As explained below, the Preferred Shares carried rights particularly relevant to Loot Crate's funding. With 45% percent of control over the voting rights relating to the at-issue funding, Upfront's significant block size supports a pleading stage inference that it was a controlling shareholder.

> ii.    *Upfront Held and Used Its Contractual Rights to Bar Funding That Did Not Include Itself.*

The contractual rights associated with Upfront's Preferred Shares also support an inference that it was a controlling shareholder. *See Basho*, 2020 WL 3326693, at *29-31; *see also Skye Mineral Invs., LLC v. DXS (U.S.) Ltd.*, No. 2018-0059-JRS, 2020 WL 881544, at *26-27 (Del. Ch. Feb. 24, 2020). With its Preferred Shares, Upfront had a number of rights, privileges, and restrictions relating to dividends, liquidation preferences, conversion rights, and voting rights that common shareholders did not enjoy. Complaint ¶ 228. Upfront's substantial block of Preferred Shares also gave it the ability to prevent Loot Crate from taking certain actions, like changing the size of the board and issuing additional preferred or common shares. *Id.*; *see also* Motion, Ex. A § 6 (listing the protective provisions for preferred shareholders). Upfront's blocking rights are particularly relevant considering the transaction-specific control Upfront enjoyed as a result. *See Basho*, 2020 WL 3326693, at *29-30.

Upfront took advantage of its ability to block additional board seats and issuance of equity by repeatedly blocking alternative funding sources in order to put Loot Crate in a cash-strapped

position.[13]  *See* Complaint ¶¶ 81, 83 (describing Suster's threat from Upfront to veto any financing

other than the A-2 Proposal), 86 (explaining the relationship between Upfront's preferred shares

and the funding proposals), 137.  In an email to himself, Suster acknowledged that Upfront's

Preferred Shares gave it the ability to control whether or not Loot Crate received additional

funding, the funding terms, and the source.  *Id.* ¶ 137.  Upfront used its Preferred Share rights to

place the company in a vulnerable position, which in turn enabled it to push through the A-2

Proposal and eventually the A-2 Term Sheet.  *See id.*  Upfront's blocking rights enabled it to "sit

on the company's lifeline, with the ability to turn it on or off."  *Basho*, 2018 WL 3326693, at *29.

These "self-interested steps to choke off the air supply provide a strong indicator of control."  *Id.*

In addition to the rights provided by its Preferred Shares, the A-2 Term Sheet included

additional contractual powers that Upfront used to further its own interests to the detriment of Loot

Crate.  After using the blocking rights provided by its Preferred Shares to jam through the A-2

Term Sheet, Upfront then used the A-2 Term Sheet's exclusivity provisions to fend off any other

investors, regardless of the merits of those potential investors' proposals.  *See* Complaint ¶¶ 93,

110-11, 124.

### iii.   *Upfront Had Significant Influence Over a Majority of the Board.*

The ability to appoint members to the board, even if less than a majority of the board, is an

indication that Upfront was a controlling shareholder.  *See Voigt*, 2020 WL 614999, at *14 n.12

(collecting cases).

---

[13] Upfront argues that its blocking rights were merely contractual and that it never formally exercised those rights, so the blocking rights cannot create fiduciary duties.  *See* Motion ¶ 28. Upfront also urges the Court to strip the blocking rights from the full context of Upfront's control and influence.  *Id.*  When viewed in the whole, along with all of the other factors relating to Upfront's control, the blocking rights are "significant for analysis of the control issue." *Williamson v. Cox Commc'n Sys., Inc.*, No. Civ.A 1663-N, 2006 WL 1586375, at *5 (Del. Ch. June 5, 2006).  In addition, Upfront's repeated invocation of its blocking rights to prevent equity funding proposals from BioWorld and Loot Crate's management team is sufficient to support a pleading stage inference that these rights contributed to Upfront's control.  *Id.*; *see also In re Loral Space and Commc'ns Inc.*, No. 2808-VCS, 2008 WL 4293781, at *21 (Del. Ch. Sept. 19, 2008).

Upfront exercised its ability to appoint a board member to fill the seat with its own principals. *See* Complaint ¶¶ 40-41, 277.  At various times, Upfront appointed Betinelli, Suster, and Kibler to its seat on the board. *Id.* ¶ 277.  Each of the Individual Defendants was either an Upfront partner or director and was responsible for managing Upfront's affairs with respect to Upfront's position as a shareholder. *Id.* ¶¶ 16-18.  During their tenure on the board, each of the Individual Defendants acted to pursue Upfront's interests. *See, e.g., id.* ¶¶ 44-65 (describing Upfront's use of its board seat to add board members it controlled or influenced), 83-92 (explaining Suster's role in forcing through the A-2 Proposal while serving on the board), 211-13 (detailing Kibler's refusal to recuse from deliberations in which Upfront had an interest).  And Upfront was able to control the board's ability to consider and approve funding proposals by denying it a quorum. *See id.* ¶¶ 140-59, 160-62.

Beyond Upfront's own appointment power and its decision to fill a board sit with its own principals, Upfront held significant influence over a number of the board's other directors, including Kreiz and Boyle.[14]  As alleged in the Complaint, an inference that Upfront had control and influence over Kreiz arises as a result of Upfront's own admissions.[15]  *See* Complaint ¶¶ 60-65.  Upfront and Kreiz had a pre-existing relationship before Kreiz's appointment to the Loot Crate board, which Upfront believed would help it further its own interests. *See id.* ¶ 61 ("[W]e know and have worked with him in the past."), 62 (referencing Bettinelli's belief that Upfront's

---

[14] Whether an individual director is independent is a highly fact intensive inquiry, requiring a case-by-case analysis. *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 61 (Del. Ch. 2015).  Given its fact-driven nature, there are no "bright-line tests" for determining whether a director is independent. *Id.*  For the same reason, allegations relating to director independence must be "considered in full context." *Del. Cty. Emps. Ret. Fund v. Sanchez*, 124 S.3d 1017, 1022 (Del. 2015).  At the pleading stage, the plaintiff's allegations must only support a reasonable inference that a board member was subject to the influence or control of a controlling shareholder. *Voigt*, 2020 WL 614999, at *14, 16.

[15] At the pleading stage, Upfront's own communications documenting its beliefs support an inference that it had control and influence over Kreiz and Boyle—and with it a second and third seat on the Loot Crate board, constituting a majority. *See Basho*, 2018 WL 3326693, at *33-34 (crediting a shareholder's communications that it believed a third-party advisor would "work with us to help accomplish our goal" to support a finding of influence).

12

relationship with Kreiz "will also help us get there"), 98-99 (explaining Kreiz's role in Upfront's scripted plan), 107, 161 (describing Upfront's belief that Kreiz would act in the best interests of the preferred shareholders). Upfront also viewed Boyle as a board member over whom it had influence and control. *See id.* ¶ 50 (describing Upfront's belief that it had influence over Boyle), 98 (describing Boyle's role in the Playbook), 107.

And Upfront's expectation of control and influence over Kreiz and Boyle was correct. When Upfront presented the A-2 Term Sheet, Kreiz and Boyle not only failed to negotiate any terms, but affirmatively sought out counsel from Upfront's own lawyer. *See id.* ¶¶ 118-23. Kreiz and Boyle would go on to play central roles in carrying out the Playbook, *see id.* ¶¶ 98-99, and obtaining approval for the A-2 Term Sheet, *id.* ¶¶ 118-23.

Upfront also had extensive influence over the Breakwater-appointed directors. Upfront itself believed that its influence over Breakwater and any board designee it chose to appoint was so strong that it coordinated efforts with Breakwater to obtain a Breakwater board seat. *See id.* ¶¶ 46-57. When Breakwater eventually gained the ability to appoint a director, it appointed Mansour, who was Suster's partner in the parties' scheme. *See, e.g.*, *id.* ¶¶ 58-65 (discussing Mansour's coordination with Bettinelli and Suster to obtain a board seat for Kreiz), 82-92 (detailing Mansour's role in assisting Upfront with jamming through the A-2 Proposal), 97-23 (explaining Suster's used of Mansour in carrying out the Playbook), 200-01 (describing Mansour's relationship with Upfront and the Individual Defendants). And when presented opportunity to control the board under the May 2018 Forbearance Agreement, Upfront played an active role in sabotaging Loot Crate's ability to comply with the agreement in order to trigger Breakwater's ability to fill the majority of board positions. *See id.* ¶¶ 168-77. Accordingly, Upfront's control over the board supports a pleading-stage inference that it was a controlling shareholder.

iv.    *Upfront Coordinated with Breakwater to Take Advantage of the Loan Agreement.*

Although not a lender in its own right, Upfront used Breakwater's status as a lender to Loot Crate to further Upfront's own interest, supporting an inference that Upfront was a controlling shareholder.   As early as January 2017, Upfront, through Bettinelli, began coordinating with Breakwater to use a pretextual default under Loan Agreement to obtain a board seat for Breakwater, a position that Upfront believed would serve its own interests.  *See id.* ¶¶ 47-51.  To further this plan, Breakwater and its attorneys developed a plan in which Upfront would play a central role and provided that plan to Upfront.  *See id.* ¶¶ 52-54 (describing the Carry the Water Email).  Breakwater and Upfront agreed that Breakwater would issue a pretextual notice of default under the Loan Agreement, and from there, Upfront would "carry the heavy water" in pushing Davis to exchange an additional board seat for Breakwater.  *Id.*  In much the same way, Upfront used its influence with Breakwater to turn the Loan Agreement and May 2018 Forbearance Agreement into a complete takeover of Loot Crate's board.  *See id.* ¶¶ 164-96.

v.    *Upfront's Threats, Influence Over Management, and Obstruction to Funding Proposals That Didn't' Further Its Interested Support an Inference of Control.*

Upfront and the Individual Defendants' repeated threats against Davis, other members of Upfront's management, and third-party investors and lenders also support an inference that Upfront was a controlling shareholder.[16]  The Complaint is replete with allegations that Upfront, through Suster and/or the other Individual Defendants, used threats of litigation, *id.* ¶¶ 112, 114, 117, 132-33, 138, 145, 163, 173, 177, insolvency, *id.* ¶ 113-16, and declarations of loan defaults, *id.* ¶¶ 52-54, 109, 114-16, 119, to assert its control.

---

[16] When a shareholder's aggression, threats, disruptions, and punitive behavior are beyond the realm of ordinary advocacy, that shareholder's behavior contributes to an inference that it was a controlling shareholder.  *See Basho*, 2018 WL 3326693, at *28 n.323 (collecting cases), 31-32 (cataloging a controlling shareholder's interference with third-party financing and use of threats to interfere with management), 34 (describing a controlling shareholder's threats of litigation and insolvency to coerce favorably deal terms).

Upfront's interference with Loot Crate's management also supports an inference of control. *See Basho*, 2018 WL 3326693, at *32. As detailed in the Complaint, Upfront and the Individual Defendants repeatedly used lies, deceit, and promises of employment and compensation to assert influence and control over Upfront's management. *See* Complaint ¶¶ 197-203. Based on the well-pled allegations in the Complaint, Upfront and the Individual Defendants' aggression, threats, disruptions to Loots Crate's funding efforts, along with its interference with management, lends support to an inference that Upfront was a controlling shareholder.

Based on the confluence of each of these factors, Loot Crate has met its pleading-stage burden of supporting a reasonable inference that Upfront was a controlling shareholder.

      b.    <u>*Upfront Was Part of a Control Group Along with Breakwater*</u>.

In addition to operating as a controlling shareholder in its own right, the facts in the Complaint also make clear that Upfront owed fiduciary duties on a second, independent basis— that it was part of a "control group" with Breakwater. *In re Hansen Med. Inc. S'holders Litig.*, No. 12316-VCMR, 2018 WL 3030808, at *5 (Del. Ch. June 18, 2018). A control group exists when two or more shareholders are "connected in some legally significant way—e.g., by contract, common ownership, agreement, or other arrangement—to work together toward a shared goal." *Dubroff v. Wren Hldgs., LLC*, No. 3940-VCN, 2009 WL 1478697, at *3 (Del. Ch. May 22, 2009). A formal written agreement among controlling shareholders is not necessary, and it is sufficient to allege "some indication of an actual agreement." *In re Crimson*, 2014 WL 5449419, at *15. Similar to an individual controlling shareholder, a plaintiff can survive a motion to dismiss "by alleging actual control with regard to the particular transaction being challenged," rather than complete and pervasive control over the company's day-to-day operations. *Williamson*, 2006 WL 1586375, at *4.

Courts analyze the allegations as a whole in order to determine whether a plaintiff has adequately alleged facts that support an inference that shareholders cooperated to exert control over a company. *See Williamson*, 2006 WL 1586375, at \*4-5; *In re DSI Renal Hldgs., LLC*, 574 B.R. 446, 473-74 (Bankr. D. Del. 2017); *Zimmerman v. Crothall*, No. 6001-VCP, 2012 WL 707238, at \*11-12 (Del. Ch. Mar. 5, 2012). For example, the allegation that the shares of multiple minority shareholders collectively amount to a majority of voting shares supports an inference of a control group. *See id.* at \*11. The ability of control group members to veto a decision by the board "is significant for analysis of the control issue" even if the members never affirmatively exercise their veto right, because it gives the members control over the company's deal-making power. *See Williamson*, 2006 WL 1586375, at \*5.

Although not enough to support a control group inference on its own, the fact that a group of early-stage venture capital investors constitute a company's largest investors and that they share parallel interests may combine with other allegations to contribute to a control group inference. *See Zimmerman*, 2012 WL 707238, at \*11. Finally, even in the absence of an overt agreement, courts look to communications between control group members to determine whether they support an inference that the members in fact acted in concert. *See Zimmerman*, 2012 WL 707238, at \*11; *see also In re DSI Renal Hldgs.*, 574 B.R. at 473-74. Given the highly fact-intensive analysis and necessity of weighing of factors, allegations that multiple shareholders constituted a control group are difficult to resolve on a motion to dismiss. *See In re DSI Renal Hldgs.*, 574 B.R. at 472-73; *Williamson*, 2006 WL 1586375, at \*4, 6; *In re Hansen Med.*, 2018 WL 3030808, at \*6.

When considered collectively, the allegations in the Complaint support an inference that Upfront and Breakwater acted together as a control group in Loot Crate's funding efforts. Together, Upfront and Breakwater held 55% of Loot Crate's Preferred Shares, giving them

complete and absolute control to approve or reject any potential funding that included an expansion of the board or additional Preferred Shares. *See* Complaint ¶¶ 39, 44. Once Breakwater obtained the ability to appoint a board member, Upfront and Breakwater each held one seat on the board along with their influence over Kreiz and Boyle. Finally, the Complaint is filled with allegations concerning the agreements, coordination, and actions taken by both Breakwater and Upfront: their agreement in the Carry the Water Email, *see* Complaint ¶¶ 46-57, their coordination to install Kreiz and Boyle on the board, *id.* ¶¶ 58-65, the collective use of their Preferred Shares to block funding proposals from BioWorld and Loot Crate's management team, *id.* ¶¶ 69-71, 81, 83-91, the use of a bridge loan in an attempt to wrest Davis's common shares, *id.* ¶¶ 94-95, the development and implementation of the Playbook, *id.* ¶¶ 97-123, their blocking of BioWorld's debt financing proposal, *id.* ¶¶ 158-59, the use of Breakwater's Loan Agreement and May 2018 Forbearance Agreement to wrest total control of the board, *id.* ¶¶ 164-95, and their coordinated campaign to interfere with Loot Crate's management, *id.* ¶¶ 197-203. These allegations are more than sufficient to carry Loot Crate's pleading-stage burden of supporting a reasonable inference that Breakwater and Upfront exercised control over Loot Crate's funding efforts.

Despite these allegations in the Complaint, Upfront makes a short, cursory, and conclusive argument that its coordination with Breakwater cannot give rise to fiduciary duties as a matter of law. *See* Motion ¶ 28. Upfront downplays the allegation that it coordinated and schemed with Breakwater to create a cash crisis by blocking all other sources of funding in order force Loot Crate into a self-interested transaction or force a sale of the company. Upfront also ignores the numerous allegations in the Complaint highlighting the agreement and coordinated efforts made by it and Breakwater, instead making a single passing reference to one paragraph in the Complaint. *See id.* Upfront goes on to misstate the law (without a supporting citation), arguing that its

12802219/1

coordination and scheming with Breakwater "does not support an allegation that Upfront actually controlled Debtors." *Id.* As demonstrated above, the allegations in the Complaint support a pleading stage inference that Upfront and Breakwater constituted a control group, which carries with it fiduciary duties.

2.    Each of the Individual Defendants Owed Fiduciary Duties As Board Members.

Each of the Individual Defendants does not dispute that they owed Loot Crate fiduciary duties as a Loot Crate director. *See* Motion ¶ 41. The Motion nevertheless asks the Court to dismiss the claims against the Individual Defendants, because they only owed fiduciary duties during the period they served on the Loot Crate board. *Id.* In turn, the Individual Defendants also seek dismissal of the aiding and abetting and conspiracy claims against them, which would have the effect of exculpating all liability of the Individual Defendants. *See* Motion ¶¶ 60-67.

As the Individual Defendants expressly recognize though, they owed fiduciary duties, barring dismissal of the breach of fiduciary duty claim against them on the grounds that no duty existed. To the extent the Individual Directors argue that they can only be liable for conduct during their service on the Loot Crate board, the Motion must also be denied. The Complaint plainly alleges that the Individual Defendants both breached their fiduciary duties while they served on the Board by pushing Upfront's interests to the detriment of Loot Crate and aided and abetted Upfront, Breakwater, and the other Individual Defendants breach their fiduciary duties while not serving on the board. *See In re DSI Renal Hldgs.*, 574 B.R. at 474-75 (applying the same theory).

3.    Upfront GP Has Liability Because it is a General Partner in a Limited Partnership.

As the general partner of Upfront V, L.P., Upfront GP C, LLC, *see* Complaint ¶ 13, is liable for the debts—including breach of fiduciary duty—resulting from the partnership's actions. *See* DEL. CODE ANN. tit. 6 § 17-403(b); *see also Sandvik AB v. Advent Intern. Corp.*, 83 F. Supp. 2d 442, 448 (D. Del. 1999). *Aff'd*, 220 F.3d 99 (3d Cir. 2000).

18

4.    Loot Crate Has Adequately Alleged That the Upfront Defendants Breached Their Fiduciary Duties.

Loot Crate's breach of fiduciary duty claim against the Upfront Defendants asserts well-pled allegations that the Upfront Defendants breached their fiduciary duties to Loot Crate in two independent ways: (1) acting in bad faith during in order to pursue Upfront's interests, and (2) engaging in a self-dealing by pursuing transactions in which Upfront would receive a substantial benefit.

a.    *The Upfront Defendants Breached Their Duty of Loyalty Through Bad Faith Efforts to Pursue Their Own Interests Rather than the Best Interests of Loot Crate.*

Each of the Upfront Defendants[17] breached their duty of loyalty[18] by failing to act in good faith[19] through their pursuit of a scheme to financially cripple Loot Crate and use the manufactured liquidity crisis to obtain either a self-interested funding deal or total control of Loot Crate's board through a default under the Loan Agreement and the May 2018 Forbearance Agreement.

When a fiduciary pursues a course of action designed to further its own interests, rather than its company's, the fiduciary faces liability for breach of the duty of loyalty. *Auriga Caital. Corp. v. Gatz Props. LLC*, 40 A.3d 839, 844, 859 (Del. Ch.), *aff'd*, 59 A.3d 1206 (Del. 2012). Fiduciaries face liability when they pursue a scheme that exploits the company's weaknesses in

[17] Incredibly, Upfront asserts that the Complaint does not allege that it breached its fiduciary duties, citing only one paragraph of the 298-paragraph Complaint. *See* Motion ¶ 44. But as the entirety of the allegations in the Complaint make clear, the plan developed and carried out to deprive Loot Crate of liquidity and use the resulting crisis to obtain a self-interested deal or force a sale belonged to all of the Defendants, including Upfront. *See generally* Complaint.

[18] The Motion makes a fundamental error that misframes the entirety of the of the Upfront Defendants' "breach" analysis. The Upfront Defendants solely rely on an argument that the Complaint fails to adequately allege a breach of the duty of *care*. Motion ¶ 42. But the Complaint plainly alleges that the Upfront Defendants breached of the duty of loyalty and good faith and candor. *See* Complaint ¶¶ 234 (alleging that Upfront owed duties of loyalty, care, and good faith, and candor), 240 (alleging that Suster, Kibler, and Bettinelli owed duties of loyalty, care, and good faith, and candor), 241 (alleging that each of the Upfront Defendants breached all of their duties). The absence of any analysis on the Upfront Defendants' breach of their duty of loyalty makes the Motion wholly flawed and not sufficient to warrant dismissing Loot Crate's claim for breach of fiduciary duty.

[19] The duty of loyalty is "not limited to cases involving a financial or other cognizable fiduciary conflict of interest. It also encompasses cases where the fiduciary fails to act in good faith." *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006) (citing *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 66 (Del. 2006)).

19

12802219/1

order to serve their own interests. *See Klein v. Wasserman*, No. 2017-0643-KSJM, 2019 WL 2296027, at *4-7 (Del. Ch. May 29, 2019) (denying motion to dismiss where shareholder-director pursued his appointing shareholder's plan to force a buyout or gain complete control); *see also In re USA Detergents Inc.*, 418 B.R. 533, 546 (Bankr. D. Del. 2009); *CSH Theatres, L.L.C. v. Nederlander of San Francisco Assocs.*, No. CV 9380-VCMR, 2018 WL 3646817, at *27 (Del. Ch. July 31, 2018), *aff'd in part, rev'd in part sub nom. In re Shorenstein Hays-Nederlander Theatres LLC Appeals*, 213 A.3d 39 (Del. 2019); *BelCom, Inc. v. Robb*, No. CIV. A. 14663, 1998 WL 229527, at *3 (Del. Ch. Apr. 28, 1998), *aff'd*, 725 A.2d 443 (Del. 1999).

In most cases, claims alleging a failure to act in good faith cannot be resolved on the pleadings. *Dieckman v. Regency GP LP*, No. CV 11130-CB, 2018 WL 1006558, at *3 (Del. Ch. Feb. 20, 2018). A "fairly pleaded claim of good faith/bad faith raises essentially a question of fact which generally cannot be resolved on the pleadings or without first granting an adequate opportunity for discovery."[20] *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1208 (Del. 1993).

The Complaint alleges that Upfront and each of the Individual Defendants participated in Upfront's plan to create a cash crisis in order to obtain a favorable self-interested deal or force a sale of the company.[21] The same month Upfront appointed Suster to the Loot Crate board, he recognized that the only way Upfront would achieve a return on its investment was to force a sale.

---

[20] Although the allegation appears nowhere in the Complaint, the Motion asserts that Loot Crate has already conducted extensive discovery. *See* Motion at 4 n.3. Not only is this statement not entirely accurate and not relevant to deciding the merits of the Motion, it is incredibly misleading. First, each of the Upfront Defendants' state of mind comes into play as a result of their bad faith, making the Upfront Defendants' depositions critical. *See Dieckman*, 2018 WL 1006558, at *3. Second, as alleged in the Complaint, the Upfront Defendants recognized their potential liability, causing them to delete written communications and communicate solely by oral conversation. *See, e.g.*, Complaint ¶¶ 104-07. As a result, Loot Crate cannot gather all of the evidence necessary without having the opportunity to depose each of the Upfront Defendants and take additional discovery.

[21] Each of the actions by the Individual Defendants while they served on the Loot Crate board cannot be stripped of their full context. With Upfront behind the entire plan, each of the Individual Defendants played an active role in pursuing Upfront's plan before, during, and after they served on the Board.

*See* Complaint ¶¶ 66-67; *see also id.* ¶ 137.  From that point on, Suster chose to "focus [his] time on the largest shareholders (founders) . . . [and] the largest financiers (my partners at Upfront . . . .)." *Id.* ¶ 78.  With this goal in mind and his attention focused on Upfront's interests, Suster threatened to veto financing proposals in order to leave the A-2 Proposal as the only viable option for the cash-strapped Loot Crate, *id.* ¶¶ 82-92, and later implemented the Playbook in order to force Loot Crate's hand into accepting the A-2 Proposal, *id.* ¶¶ 97-123.  In the process, Suster resorted to threats of litigation and forcing Loot Crate into bankruptcy in order to strong-arm Loot Crate's decision makers into favoring Upfront's funding proposal.  *See, e.g.*, *id.* ¶¶ 99, 109, 112-17, 132-34, 201-03.  And when Loot Crate attempted to consider debt funding, which Upfront was unable to block with its Preferred Shares, Suster did Upfront's bidding by depriving the board of a quorum, which prevented the board from considering non-Upfront funding proposals necessary to avoid Loot Crate's imminent collapse.  *Id.* ¶¶ 140-41, 148-59.

Bettinelli similarly breached his fiduciary duties during his time on the Loot Crate board by pursuing the interests of Upfront, rather than Loot Crate.  For example, Bettinelli participated the scheme laid out in the Carry the Water Email to use a pretextual default under the Loan Agreement to further Upfront and Breakwater's control over the board, *see* Complaint ¶¶ 46-57, and obtaining the appointment of Kreiz and Boyle without disclosing their pre-existing relationships with Upfront, *see id.* ¶¶ 46-51, 58-62.  And Bettinelli intentionally interfered with Loot Crate's management through lies and deceit.  *See id.* ¶¶ 51-57, 200, 203.

Finally, Kibler took an active role in disrupting Loot Crate's funding efforts during her time on the board in order to achieve Upfront's end goal of either obtaining a sweetheart deal or forcing Loot Crate's sale.  Specifically, Kibler engaged Atalaya along with Upfront's general counsel in order to force to withdraw its proposal.  *See id.* ¶¶ 207-13.  And Kibler refused to recuse

herself from deliberations over Upfront's proposal. *Id.* Kibler also failed to disclose Upfront's plans to pursue its own interests in an eventual bankruptcy reorganization. *Id.* ¶¶ 220-23. In sum, all of these allegations are more than enough to meet Loot Crate's pleading-stage burden of supporting a cause of action against the Individual Defendants for their breach of the duty of loyalty.[22] *See Klein*, 2019 WL 2296027, at *5-7.

With respect to Upfront itself, the Motion makes a single, deceptive argument that the Complaint only identifies alleged breaches by the Individual Defendants and not Upfront. *See* Motion ¶ 44. Even a cursory review of the Complaint makes clear that Upfront, along with Breakwater, was the driving force behind all of the events outlined therein. Indeed, the allegations make clear that the plan to suffocate Loot Crate's cash flow in order to jam through a self-interested transaction or to force a sale was developed and carried out by Upfront along with Breakwater. *See, e.g.*, *id.* ¶¶ 2-5, 46-65 (describing Upfront's use of its control to wrest seats on the board), 66-92 (walking through Upfront's freeze-out of third-party investors in order to push the A-2 Proposal), 93-123 (recounting Upfront's development and use of the Playbook), 124-59 (chronicling Upfront's blocking of debt investments), 160-96 (relating Upfront's role in the abuse of the May 2018 Forbearance Agreement), 197-203 (detailing Upfront's interference with Loot Crate's management), 204-225 (setting out Upfront's final pre-bankruptcy bid to force through its own funding proposals). And to the extent the Complaint details specific actors, it likewise makes clear Upfront was acting through its self-appointed board members and the Individual

---

[22] At the motion to dismiss stage, courts must analyze allegations of bad faith "collectively." *Dieckman*, 2018 WL 1006558, at *3. The Upfront Defendants "merely isolate[] one allegation" at a time, but at the pleadings stage the Court must look to the allegations as a whole to determine whether Loot Crate has sufficiently alleged that the Upfront Defendants acted in bad faith. *In re Autobacs Strauss, Inc.*, 473 B.R. 525, 563 (Bankr. D. Del. 2012); *see also Klein*, 2019 WL 2296027, at *5 ("At the pleadings stage, this Court does not review in piecemeal fashion, but rather, reads the allegations as a whole."). Viewing their actions as a whole, Loot Crate has sufficiently alleged a claim for breach of fiduciary duty against each of the Upfront Defendants.

Defendants.[23]  *See, e.g.*, Complaint ¶¶ 229-33; *see also id.* ¶¶ 4, 16-18, 41. Taken as a whole, the entirety of the Complaint pleads more than sufficient facts to carry the pleading-stage burden of alleging Upfront's breach of its fiduciary duties.

> b.  <u>The Upfront Defendants Breached the Duty of Loyalty by Engaging in Self-Dealing</u>.

From the A-2 Proposal, *see* Complaint ¶¶ 69-71, 76-81, to the A-2 Term Sheet, *see id.* ¶¶ 90-95, to its final pre-bankruptcy attempts to force through additional funding, *see id.* ¶¶ 193-96, 204-25, Upfront sought and obtained a number of terms and pursued a number of proposed deals in which it stood on both sides of the transaction as a controlling shareholder and financier. Each of these funding attempts, proposed and considered by the Individual Defendants during their time on the board,[24] is a classic example of a self-dealing transaction in that Upfront appeared on both sides of the transaction and received a benefit. *See In re W.J. Bradley Mortg. Cap., LLC*, 598 B.R. 150, 163 (Bankr. D. Del. 2019); *Emerald Partners v. Berlin*, 726 A.2d 1215 (Del. 1999).

Under the entire fairness standard,[25] the burden of proof shifts the burden of proof to the defendants, who must prove the self-dealing transaction was fair in both price and dealing.

---

[23] Upfront is liable for the actions carried out on Upfront's behalf by the Individual Defendants. *See Daimler AG v. Bauman*, 571 U.S. 117, 135 (2014) (recognizing that a corporation is "a distinct legal entity" that "can act only through its agents"); *see also* DEL. CODE ANN. tit. 6, § 15-301 ("Each partner is an agent of the partnership for the purpose of its business, purposes or activities."); *In re Am. Int'l Grp., Inc.*, 965 A.2d 763, 823 (Del. Ch. 2009), *aff'd sub nom. Teachers' Ret. Sys. of Louisiana v. PricewaterhouseCoopers LLP*, 11 A.3d 228 (Del. 2011) ("Under that traditional principle, a corporation can be held liable for wrongful acts of its directors and officers on behalf of the corporation that injure third parties."); *Buckley v. O'Hanlon*, No. 04-955GMS, 2007 WL 956947, at *5 (D. Del. Mar. 28, 2007) (approving grouping by collective action and decision making in complaint).

[24] For example, Bettinelli served on the board while Loot Crate sought additional financing, *see* Complaint ¶¶ 66-68, which would go on to include the A-2 Proposal Suster presented in both his capacity as a Loot Crate director and a representative of Upfront, *see id.* ¶ 69; *see also id.* ¶ 88. Similarly, Suster also had an active role in Upfront's effort to jam through the A-2 Term Sheet using the Playbook while also serving on Loot Crate's board. *See id.* ¶¶ 77-92, 97-123. And Kibler actively participated on Upfront's behalf in its final bids to obtain a funding deal during her tenure on the Loot Crate board. *See id.* ¶¶ 204-13, 220-25.

[25] While the entire fairness standard applies, the self-dealing transactions engaged in by the Upfront Defendants would still fail under the business judgment rule. But because each of these deals was self-interested, the business judgment rule does not save the Upfront Defendants. *See In re Walk Disney Co. Derivative Litig.*, 906 A.2d 27, 52 (Del. 2006). Self-interested transactions are subject to the entire fairness standard of review, which is "Delaware's most onerous standard." *In re Hansen Med.*, 2018 WL 3025525, at *9 (quoting *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 44

23

*Americas Mining Corp. v. Theriault*, 51 A.3d 1213, 1239 (Del. 2012); *Basho*, 2018 WL 3326693, at *23. At the pleading stage, dismissal is not proper under the entire fairness standard "because defendants do not have the luxury of arguing facts that would counter the plaintiffs' well-pled allegations that are assumed as true." *In re Ezcorp Consulting Agreement Deriv. Litig.*, No. 9962-VCL, 2016 WL 301245, at *30 (Del. Ch. Jan. 25, 2016) (citing *Orman v. Cullman*, 794 A.2d 5, 20 n.36 (Del. Ch. 2002)).

In the Motion, the Upfront Defendants do not once reference or mention the entire fairness standard or the business judgment rule, making the Motion insufficient to carry the Upfront Defendants' burden to obtain dismissal. Nor do the Upfront Defendants escape liability because Upfront never provided funding under any of its proposals. *See OTK Assocs, LLC v. Friedman*, 85 A.3d 696, 724 (Del. Ch. 2014) (refusing to find an abandoned self-dealing transaction by a controlling shareholder rendered case moot); *accord Klein*, 2019 WL 2296027, at *7.

Nevertheless, the A-2 Proposal and the A-2 Term Sheet were neither fair in price nor process. First, each transaction was inferior in price to other options. The A-2 Proposal included an anti-dilution provision favorable to Upfront, *see* Complaint ¶¶ 75-76, and was unfairly favorable to Upfront, *id.* ¶¶ 77-81. The A-2 Term Sheet was similarly unfair in price. *See id.* ¶¶ 93 (delineating exclusivity provision), 124 (outlining detrimental effect of exclusivity provision). With respect to process, each proposal was jammed through in the course of Upfront's manufactured cash crisis. *See id.* ¶¶ 69-71 (explaining the bridge loan promised by Upfront), ¶¶ 82-92 (detailing the circumstances surrounding the A-2 Proposal, Suster's refusal to recuse, and Upfront's control over Kreiz and Boyle), 97-123 (describing the Defendants'[26] use of the Playbook

---

(Del. Ch. 2013)); *see also Kahn v. Tremont Corp.*, 694 A.2d 422, 428 (Del. 1997); *Sinclair Oil Corporation v. Levien*, 280 A.2d 717, 723 (Del. 1971).

[26] "Defendants" shall collectively refer to Upfront, Breakwater, and the Individual Defendants.

to jam through the A-2 Term Sheet); ¶¶ 137-203 (recounting Upfront's interference with Loot Crate management while considering the A-2 Proposal).  Accordingly, the Court should not dismiss Loot Crate's breach of fiduciary duty claim based upon the Upfront Defendants' self-dealing, because they have failed to carry their pleading-stage burden.

     5.    <u>A Theory of Damages is not Required at the Pleading Stage</u>.

The Upfront Defendants repeatedly argue that Loot Crate has not alleged a damages theory. Motion ¶¶ 5, 21, 37, 50, 55, 56, 58.  It is unnecessary to allege a theory for damages in support of a breach of fiduciary duty claim at the pleading stage. *In re PennySaver USA Publ'g, LLC*, 587 B.R. 445, 464 (Bankr. D. Del. 2018).  Even so, Loot Crate has pled a number of damages theories, including lost enterprise value, benefit received, and incidental damages, that it is entitled to recover in light of the Court's broad ability to fashion a remedy to cure the defendants' wrongdoing.  *OTK Assocs.* 85 A.3d at 716; *Weinberger* v. *UOP, Inc.*, 457 A.2d 701, 714 (Del. 1983) (finding that in cases of self-dealing, the judge may "fashion any form of equitable and monetary relief as may be appropriate…"); *see also In re PMTS Liquidating Corp.*, 526 B.R. 536, 546-47 (D. Del. 2014); *Beard Research, Inc. v. Kates*, 8 A.3d 573, 615-18 (Del. Ch. 2010); *Boyer v. Wilmington Materials, Inc.*, 754 A.2d 881, 902-05 (Del. Ch. 1999).

**B.**    <u>**Loot Crate Alleged a Plausible Claim for Aiding and Abetting Breach of Fiduciary Duty.**</u>

    1.    <u>The Complaint Plausibly Alleges the Existence of Fiduciary Duties and a Breach</u>.

The first two elements of an aiding and abetting a breach of fiduciary duty, the existence[27] of a fiduciary duty and a breach of that duty, are established above. *See supra* pp. 7-25.

---

[27] In the Motion, the Upfront Defendants misstate the first element by arguing that the aider and abettor must have *knowledge* of a fiduciary duty, when in fact only the *existence* of a fiduciary duty is required.  *See Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del.2001). The standard does not require that Loot Crate make an allegation of knowledge without the benefit of discovery.  *Id.*

The Upfront Defendants misrepresent scope of the Complaint's aiding and abetting claims against them in two ways.  First, the Upfront Defendants argue that the claim is only directed against actions they took to aid and abet Breakwater's breach of fiduciary duty.  *See* Motion ¶¶ 61-62.  But the Complaint is not so limited, and it alleges claims against each of the Upfront Defendants for aiding and abetting one another's breach of fiduciary duty, *see* Complaint ¶ 252, as well as for aiding and abetting Breakwater's breach of fiduciary duty, *id.* ¶ 251.  *See In re DSI Renal Hldgs.*, 574 B.R. at 474 (approving a similar theory). Second, the Upfront Defendants inaccurately state that their only potential liability for aiding and abetting Breakwater arose after July 2018.  *See* Motion ¶ 62.  But the Complaint makes clear that Breakwater was a controlling shareholder itself after obtaining its own Preferred Shares and that it constituted part of a control group along with Upfront.  Moreover, as alleged in the Complaint and explained in this Response, each of the Upfront Defendants, along with Breakwater, breached their fiduciary duties by forcing through the A-2 Proposal, the A-2 Term Sheet, and their later efforts to engage in self-dealing, as well as all of the Defendants' concerted effort to breach their duty of good faith by placing their own interests ahead of those of Loot Crate.

2.    The Upfront Defendants "Knowingly Participated" in the Breach of the Duty of Loyalty.

Next, the Complaint sufficiently alleges facts in support of the third element because the Upfront Defendants "knowingly participated" in the breach of the duty of loyalty against Loot Crate.  The Motion solely looks to the allegation in paragraph 250 through 252 to argue that those paragraphs' allegations concerning the Upfront Defendants' knowledge is conclusory.  *See* Motion ¶ 65-66.  Not only does the Motion ignore the allegations concerning the Upfront Defendants' communications in paragraph 253, but it ignores the other 294 paragraphs in the Complaint.

The Complaint contains factual allegations that allow the Court to reasonably infer that the Upfront Defendants knowingly participated in breach of a fiduciary duty.  *See In re USA*

26

*Detergents Inc.*, 418 B.R. at 546; *see also Skye Minerals*, 2020 WL 881544, at *30. The Complaint alleges that each of the Upfront Defendants acted on behalf of one another. *See* Complaint ¶¶ 2, 4, 16-18, 41, 69, 71, 83, 89, 107, 120, 162, 203, 212-13, 229, 231-33, 251-52, 264. In addition, the Upfront Defendants' communications, detailed in the Complaint, make clear that they were aware that their actions breached the fiduciary duties owed by one another and by Breakwater. *See, e.g., id.* ¶¶ 47-51, 53-55, 59-65, 78, 100-106, 118, 153, 200-02.

3.  <u>Loot Crate Alleges Damages as a Result of the Upfront Defendant's Aiding and Abetting Breaches of the Defendants' Fiduciary Duties.</u>

Lastly, the Complaint also satisfies the fourth element by alleging damages as a result of the breaches of fiduciary duty. *See* Complaint ¶ 253; *see also supra* pp. 24-25.

## C.    **Loot Crate Has Adequately Alleged a Cause of Action for Breach of the Implied Covenant of Good Faith and Fair Dealing**.

The Complaint plausibly alleges a claim for breach of the implied covenant of good faith and fair dealing against Upfront for impeding Loot Crate's ability to seek funding. The Motion does not dispute that breach of the implied covenant of good faith and fair dealing is a viable claim under both Delaware and California law. *See* Motion ¶ 68.

The Private Equity Agreement and A-2 Term Sheet impliedly required Upfront use reasonable discretion[28] in relation to Loot Crate's attempt to seek funding and financing. In using its blocking rights under the Private Equity Agreement, the implied covenant required Upfront to reasonably, not arbitrarily, permit Loot Crate to seek funding alternatives. *See* Complaint ¶ 228;

---

[28] The implied covenant acts to protect stockholders' expectation that the those in control of a company will use the discretion given to them in good faith. *See Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*, C.A. No. 3658-VCS, 2009 WL 1124451, at *7-8  (Del. Ch. Apr. 20, 2009) (denying motion to dismiss managing entity exercised discretion to decline to cause entities under its control to perform under agreement); *see also  Dieckman v. Regency GP LP*, 155 A.3d 358, 367 (Del. 2017); *See Am. Capital Acquisition Partners, LLC v. LPL Hldgs., Inc.*, No. CIV.A. 8490-VCG, 2014 WL 354496, at *6-7 (Del. Ch. Feb. 3, 2014).  The covenant also operates as a check on a party's ability to arbitrarily use discretion provided by a company's organizational documents. *See Bay Ctr. Apartments*, 2009 WL 1124451, at *7.

*see also* Motion, Ex. A § 6.  Similarly, the implied covenant required Upfront to act reasonably when exercising the exclusivity provision of the A-2 Term Sheet.  *See* Complaint ¶ 93.  Instead, Upfront abused its discretion by unreasonably blocking funding proposals that did not include Upfront, *see* Complaint ¶¶ 82-89, impeding financing options from Atalaya and South River, *see id.* ¶¶ 172-74, 177, 186, 258, and sabotaging Loot Crate's efforts to comply under the May 2018 Forbearance Agreement, *see id.* ¶¶ 169-84, 258.  Upfront breached the implied covenant with respect to both the Private Equity Agreement and the A-2 Term Sheet by unreasonably impeding Loot Crate's ability to receive additional financing.

While Upfront argues that it had a right to negotiate the provisions in the Private Equity Agreement and A-2 Term Sheet that imbued it with unfettered control, *see* Motion ¶ 71, the Motion fails to address Upfront's abuse of the discretion it held.

**D.     Loot Crate Has Sufficiently Alleged a Plausible Claim for Civil Conspiracy.**

Loot Crate's claim that the Upfront Defendants are liable for civil conspiracy predicated on breach of fiduciary duty survives the Motion, because the Complaint sufficiently alleges that the Upfront Defendants conspired among themselves and with Breakwater to breach each of the Defendants' fiduciary duties.  *See* Complaint ¶¶ 261-66. Delaware defines a civil conspiracy as "the combination of two or more persons or entities either for an unlawful purpose, or for the accomplishment of a lawful purpose by unlawful means, resulting in damage." *Brooks-McCollum v. Shareef*, No. CIV.A. 05C-12-198MMJ, 2006 WL 3587246, at *3 (Del. Super. Ct. Nov. 1, 2006); *see also In re USA Detergents Inc.*, 418 B.R. at 546. "To survive a motion to dismiss, all that is needed is a reasonable inference that [the defendant in question] was part of this conspiracy." *CMS Inv. Holdings, LLC v. Castle*, No. CV 9468-VCP, 2015 WL 3894021, at *22 (Del. Ch. June 23, 2015) (quoting *In re Am. Int'l Gp., Inc.*, 965 A.2d 763, 806 (Del. Ch.2009)).  Civil conspiracy

12802219/1

claims allow a plaintiff "to recover against all conspirators, under a theory of vicarious liability, for the acts of co-conspirators in furtherance of a conspiracy." *In re USA Detergents Inc.*, 418 B.R. at 546.

Aiding and abetting a breach of fiduciary duties and civil conspiracy to breach fiduciary duties overlap. *Id.* at 546; *see also Malpiede*, 780 A.2d at 1098 n.82 (finding the distinction between civil conspiracy and aiding and abetting to not be a "meaningful"). For the same reasons that the Upfront Defendants are liable for aiding and abetting each of the other Defendants' breach of their fiduciary duties, they are liable for conspiring with one another to breach each other's fiduciary duties. *See supra* pp. 25-27.

## E.    Loot Crate's Objection to Upfront's Proof of Claim is Proper.

The Complaint sufficiently objects to the Upfront Defendants' claims and proofs of claims. If a debtor objects to a creditor's claim, the court must determine the allowed amount of the contested claim after notice and a hearing. 11 U.S.C. § 502(b); *In re Aegis Mortg. Corp.*, No. 07-11119 (BLS), 2008 WL 2150120, at *6 (Bankr. D. Del. May 22, 2008). As noted in the arguments above, the Complaint plausibly alleges multiple claims for liability against the Upfront, foreclosing Upfront's argument that Count IX should be dismissed. *See In re Lexington Healthcare Grp., Inc.*, 339 B.R. 570, 578 (Bankr. D. Del. 2006) (refusing to dismiss debtor's objection to creditor's claim before determining liability).

## F.    The Upfront Defendants' Motion Under Rules 10 and 12(e) Must be Denied.

The Upfront Defendants' motion for a more definite statement under Rule 12(e) is baseless, because the 57-page, 298-paragraph Complaint sets out the detailed allegations against the each of the Defendants. "Motions for a more definite statement are not favored" and the "class of pleadings sufficiently ambiguous as to merit the granting of a Rule 12(e) motion is small." *In re USDigital, Inc.*, 443 B.R. 22, 53 (Bankr. D. Del. 2011) (internal citations omitted). Motions for more definite

12802219/1

statement are not granted when the complaint provides specific allegations against each defendant. *Susavage v. Bucks Cty. Sch. Intermediate Unit No. 22*, No. CIV.A. 00-6217, 2002 WL 109615, at *24 (E.D. Pa. Jan. 22, 2002).  When the defendant can "well discern the plaintiffs' claims given the specific allegations," a motion for more definite statement must be denied.  *Id.*; *see also Gammon v. J.W. Steel & Supply, Inc.*, No. CIV A H-02-0647, 2006 WL 2505631, at *1 (S.D. Tex. Aug. 28, 2006).  Here, the 57-page, 298-paragraph Complaint provides specific allegations against each of the Defendants, making the Upfront Defendants' motion under Rule 12(e) baseless.

The Upfront Defendants inaccurately argue that the Loot Crate relies entirely on group pleading throughout the causes of action alleged against the Upfront Defendants.  *See* Motion ¶ 17.  The Upfront Defendants attack paragraphs 226-98 of the Complaint, arguing that they fail to distinguish between which conduct gives rise to liability for each of the Defendants.  *See id.*  Not only do each of the causes of action incorporate the preceding factual allegations, *see* Complaint ¶¶ 226, 244, 254, 260, 290, which the Upfront Defendants ignore, but they also describe the conduct resulting in each of the Upfront Defendants' liability, *see e.g.*, *id.* ¶ 232 ("Upfront— through Suster and Kibler—used its position and relationships . . . .").  The Complaint makes clear which of the Individual Defendants—Bettinelli, Suster, and/or Kibler—were responsible for carrying out the actions giving rise to Upfront's liability, as well as each of the Individual Defendants' liability.  A cursory reading of the Complaint provides the Upfront Defendants with more than adequate information to respond to the Complaint, including by filing a 30-page motion to dismiss.

30

## IV.  CONCLUSION

For each of these reasons, Loot Crate respectfully requests that the Court deny the Upfront

Defendants' Motion and grant Loot Crate all relief to which it is entitled,[29] whether at law or in

equity.

Dated: April 5, 2021
Wilmington, Delaware                    Respectfully submitted,

                                        **MORRIS JAMES LLP**

                                        */s/ Jeffrey R. Waxman*
                                        Jeffrey R. Waxman (DE Bar No. 4159)
                                        Eric J. Monzo (DE Bar No. 5214)
                                        Brya M. Keilson (DE Bar No. 4643)
                                        500 Delaware Avenue, Suite 1500
                                        Wilmington, DE 19801
                                        Telephone: (302) 888-6800
                                        Facsimile: (302) 571-1750
                                        E-mail: jwaxman@morrisjames.com
                                        E-mail: emonzo@morrisjames.com
                                        E-mail: bkeilson@morrisjames.com

                                                -    and    -

                                        Joel B. Bailey, Esquire
                                        Joshua L. Hedrick, Esquire
                                        **HEDRICK KRING, PLLC**
                                        1700 Pacific Avenue, Suite 4650
                                        Dallas, Texas 75201
                                        Telephone: (214) 880-9625
                                        Facsimile:  (214) 481-1844
                                        E-mail: Josh@HedrickKring.com
                                        E-mail: Joel@HedrickKring.com

                                                -    and    -

---

[29] Although it believes that its Complaint adequately alleges claims against each of the Upfront Defendants, Loot Crate respectfully requests that the Court grant it leave to amend its Complaint in the event the Court finds the facts pled are not sufficient.  A plaintiff should be granted leave to amend where justice so requires.  *See* Fed. R. Bankr. P.  7015 (incorporating Fed. R. Civ. P. 15).  When courts grant a motion to dismiss based on the sufficiency of the allegations in a complaint, leave to amend is usually granted.  *In re Global Telecom Corp.*, 327 B.R. 711, 718 (Bankr. D. Del. 2005).

Samuel M. Stricklin, Esquire
**STRICKLIN LAW FIRM, P.C.**
Palisade Central II
2435 North Central Expressway
Suite 1200
Richardson, Texas 75080
Telephone 972-2388687
E-mail: Sam.stricklin@stricklaw.pro

***Counsel for Plaintiffs***

12802219/1