IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>OLD LC, INC., *et al.*,[1]<br><br>　　　　　　　　　　Debtors. | Chapter 11<br><br>Case No. 19-11791 (BLS)<br><br>Jointly Administered |
| Official Committee of Unsecured Creditors of Old LC, Inc., et al., for and on behalf of the estates of Old LC, Inc., et al.;<br><br>　　　　　　　　　　Plaintiff,<br>v.<br><br>Upfront V, LP, Breakwater Credit Opportunities Fund, L.P.; Upfront GP V, LLC; Mark Suster; Dana Kibler; Gregory Bettinelli; Saif Mansour; Aamir Amdani; Eric Beckman; Darrick Geant; and Joseph Kaczorowski | Adv. No. 20-51002 (BLS) |

**REPLY OF UPFRONT V, L.P., UPFRONT GP V, LLC, MARK SUSTER, DANA KIBLER AND GREGORY BETTINELLI TO PLAINTIFF'S OPPOSITION TO UPFRONT DEFENDANTS' MOTION TO DISMISS**

Defendants Upfront V, L.P., Upfront GP V, LLC, Mark Suster, Dana Kibler and Gregory Bettinelli (collectively, the "Upfront Defendants") hereby reply (the "Reply") to *Plaintiff's Memorandum of Law in Opposition to Upfront Defendants' Motion to Dismiss* [Docket No. 38] (the "Opposition").[2] In support of the Reply, Defendants respectfully state as follows:

---

[1] The Debtors are the following four entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Old LC, Inc. (7119), Old LC Holdings, Inc., Old LCF, Inc. and Old LC Parent, Inc. The Debtors' noticing address in these Chapter 11 cases is 3401 Pasadena Ave, Los Angeles, CA 90031.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the *Motion of Upfront V. L.P., Upfront GP V, LLC, Mark Suster, Dana Kibler and Gregory Bettinelli to Dismiss First Amended Complaint and Objection to Claims and Motion to Strike Prayer for Compensatory Damages* [Docket No. 35].

**PRELIMINARY STATEMENT**

1. The Complaint's legal theories might have merit if a different set of facts existed. For example, if Upfront had prevailed in forcing the Debtors to enter into the Series A Financing, which then caused the Company to collapse, there would be a potential cause of action. Or if Upfront had prevented the Company from entering into an alternative financing that would have saved the Company, there might arguably be a potential cause of action (if Upfront did more than exercise its contractual right to prevent the issuance of additional preferred shares). The Complaint is written as if both these circumstances existed; but neither does.

2. It is undisputed that the "Series A" financing proposed and championed by Upfront <u>*was never consummated*</u>. Similarly, there was never a viable, alternative financing actually proposed that Upfront prevented from being consummated, and certainly none that would have saved Loot Crate from bankruptcy. As a result, there are no conceivable damages suffered by Loot Crate and the Motion to Dismiss includes a motion to strike the Committee's prayer for $100 million in compensatory damages.

3. The Opposition does not address the requirement that in order to seek more than nominal damages, <u>factual allegations</u> to support the damages claim must be pleaded. For that reason alone that Complaint has no merit in the bankruptcy context where the Debtors must seek to benefit creditors of the estates rather than harm creditors further by wasting administrative resources to pursue a grudge match with only nominal damages available.

4. The crucial gap between "attempted to cause" and "caused" obliterates viability of the Complaint in terms of its ability to plausibly plead compensatory damages. Similarly fatal to its claims against Upfront, Upfront is not a controlling shareholder if it *attempted* to, but did not actually, control the board. It therefore owed no fiduciary duties.

5. The Opposition attempts to recast certain counts against the Upfront Defendants but instead only highlights the implausibility of Plaintiff's narrative: the proposed "Series A" financing was *equity* financing, by which Upfront sought to infuse additional *equity* into Loot Crate. While the equity infusion from Upfront would have diluted Chris Davis's precarious 50.5761% controlling stake in the Company,[3] it objectively would have been superior to Loot Crate's creditors than any alternative debt financing.

6. Plaintiff's claims are inadequately pleaded, contradictory, implausible and include Defendants against whom certain (or all) of the claims cannot be brought. The Motion to Dismiss should be granted.

A. **Court Should Strike Prayer for Compensatory Damages.**

7. Plaintiff states that "[i]t is unnecessary to allege a theory of damages in support of a breach of fiduciary duty claim at the pleading stage." Opposition at 25. This is true, so long as Plaintiff is only seeking nominal damages. As to compensatory damages, the issue is not whether there is a damages "theory", but factual allegations to support the damages claim. Courts have made clear that if a plaintiff seeks compensatory damages, they must allege facts sufficient to support the damages requested. *O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902, 920 (Del. Ch. 1999) ("If the plaintiff requests more than nominal damages, the complaint must allege facts sufficient to support the damages requested."); *Overwell Harvest Ltd. v. Widerhorn*, 2019 U.S. Dist. LEXIS 153560, *8 (N.D. Ill. Sept. 9, 2019) (applying Delaware law and stating "If a plaintiff seeks compensatory damages, as Overwell does in this case, they must allege damages to sustain a breach of fiduciary duty claim.").

---

[3] As of the Petition Date. *Declaration of Stuart Kaufman in Support of First Day Motions and Related Relief*, at ¶ 14(c) [Docket No. 4].

8. The entirety of the Complaint (save for a completely conclusory line that Upfront created a cash crisis without any factual allegations in support thereof) is based on "breaches" with respect to a proposed funding that was never consummated, that did not delay Loot Crate's financing efforts (the Complaint admits that the Company was simultaneously negotiating a term sheet with BioWorld), and there is no evidence that but for Upfront's actions, a different result would have occurred. Simply, there is no viable "theory" of compensatory damages; and more critically no factual allegations to support compensatory damages.

9. While solvent plaintiffs may be entitled to pursue breach of fiduciary duty claims based purely on nominal damages, in the bankruptcy context that would be extraordinarily wasteful and not in the best interests of the estates. The motion to strike compensatory damages goes to the heart of whether this litigation is viable, and the Opposition's failure to address this issue speaks volumes.

**B.** **Upfront Did Not Owe Fiduciary Duties to Loot Crate.**

    **a.** **Focus of "Controlling Shareholder" Analysis is Control Over Board.**

10. A logical fallacy underpins Plaintiffs' theory that Upfront was a "controlling shareholder" and therefore owed fiduciary duties to Loot Crate: Plaintiff conflates the concept of control over a decision based on a contractual right with that person or entity being a "controlling shareholder." These concepts are distinct.

11. To be a "controlling shareholder," a party must effectively control the <u>board</u>. For example, in *In re Western National Corp. Shareholders Litigation*, the court inquired as to whether the significant shareholder "in fact, exercise[d] actual control over the board of directors during the course of a particular transaction." 2000 Del. Ch. LEXIS 82, at *20 (Del. Ch. May 22, 2000). Similarly, in *Kahn v. Lynch Communications Systems, Inc.*, a 43% minority shareholder (Alcatel) was deemed a controlling shareholder of Lynch Communications Systems

4

because of its influence over the Lynch board. As the Court observed:

> [t]he [Lynch] management and independent directors disagreed with Alcatel on several important issues. However, when Alcatel made its position clear, and reminded the other directors of its significant stockholdings, Alcatel prevailed.

638 A.2d 1110 (Del. 1994).

12. Control over a particular decision, without more, is not sufficient for a party to be considered a "controlling shareholder" for purposes of imposing fiduciary duties. *See Superior Vision Servs. v. ReliaStar Life Ins. Co.*, 2006 Del. Ch. LEXIS 160, \*14 (Del. Ch. Aug. 25, 2006) ("[defendant] has exercised 'actual control' with regard to the payment of dividends. SVS, however, has not alleged that ReliaStar controlled the Board"). As stated by the Chancery Court in *Superior Vision*:

> In sum, a significant shareholder, who exercises a duly-obtained contractual right that somehow limits or restricts the actions that a corporation otherwise would take, does not become, without more, a "controlling shareholder" for that particular purpose. There may be circumstances where the holding of contractual rights, coupled with a significant equity position and other factors, will support the finding that a particular shareholder is, indeed, a "controlling shareholder," ***especially if those contractual rights are used to induce or to coerce the board of directors to approve (or refrain from approving) certain actions***. That confluence of factors is not alleged to be present in this matter and, accordingly, ReliaStar may not fairly be deemed a "controlling shareholder" with respect to the payment of dividends by SVS. With that conclusion, SVS's claim against ReliaStar for breach of fiduciary duty fails.

*Superior Vision Servs.*, 2006 Del. Ch. LEXIS 160, \*19-20.

13. Accordingly, the inquiry as to whether a party is a "controlling shareholder" is on the *de facto* power of a significant (but less than majority) shareholder, which, when coupled with other factors, gives that shareholder the ability to control the board. *Id*. The concern is that the significant shareholder will use its power to obtain (or compel) favorable actions by the board to the ultimate detriment of other shareholders. *Id*.

5

14. Here, Upfront was not a controlling shareholder. As set forth below, Upfront was not a controlling shareholder based on its preferred share ownership (which converts to a small minority of shares overall on a diluted basis); it was not a controlling shareholder based on its contractual rights to prevent the issuance of new shares; it was not a controlling shareholder when Breakwater's additional shares are added on; and it is not a controlling shareholder based on the confluence of those factors. Count I must be dismissed against Upfront.

        **i.**     **Preferred Share Block of Does Not Create "Controlling Shareholder."**

15. Plaintiffs' focus on the Upfront Defendants' percentage ownership of preferred shares (which equates to a small overall equity position) highlights the disconnect. The Opposition states that Upfront's 45% share of Loot Crate's preferred shares (equating to approximately 10% of Loot Crate's common stock) equated to "45% of control over the voting rights relating to the at-issue funding." Opposition at 10. As an initial matter, this is simply incorrect (and is not alleged in the Complaint). Upfront did not have control over the voting rights relating to the at-issue funding; at most it had 45% control of the voting rights related to <u>the issuance of additional preferred shares</u>, which was a contractual right provided to it.

16. Moreover, Plaintiffs' focus on the 45% shareholder ownership of preferred shares misses the point: the inquiry into share ownership relates to whether a shareholder can *control the board* through a combination of its shareholder ownership and something more. While it is likely correct that Upfront's 10% diluted share ownership and effective right to appoint 1 of 5 directors resulted in greater effective control than a generic 10% common stockholder, the confluence of its rights in no way rises to effective majority control of the Loot Crate board.

17. If Upfront had effectively or actually controlled Loot Crate's board, it would have caused the Company enter into the Series-A Financing. Plaintiff's argument that Upfront

6

controlled the Debtor's financing efforts, while simultaneously (though grudgingly) acknowledging that Upfront's financing was not consummated, is irreconcilable. Indeed, in the "control" cases cited by Plaintiff, the challenged transactions allegedly caused by defendants were actually consummated. *See*, *e.g.*, *Voigt v. Metcalf*, 2020 Del. Ch. LEXIS 55, *2 (Del. Ch. Feb. 10, 2020) (denying dismissal of claims against shareholder who allegedly caused merger that actually was consummated); *Basho Techs. Holdco B, LLC v. Georgetown Basho Inv'rs, LLC*, 2018 Del. Ch. LEXIS 222, *1-2 (Del. Ch. July 6, 2018) (finding breach of fiduciary duties where challenged financing transaction actually consummated). "Reasonable inferences" of control, therefore, can only be relevant where a challenged transaction is actually consummated (i.e., the control is actually exerted). Plaintiff does not cite, and the Upfront Defendants have been unable to locate, one case in which a shareholder is found to be a controlling shareholder where the challenged transaction was proposed but not consummated.

18. Accordingly, Upfront's relatively small overall ownership did not contribute to Upfront obtaining effective control over the Board, or over the Board's decisions with respect to financing. Accordingly, Upfront is not a "controlling shareholder" for purposes of the imposition of fiduciary duties.

### ii. Threat of Exercise of Contractual Right Does Not Create "Controlling Shareholder."

19. The exercise of contractual rights, *when used with other control levers*, may lead to an inference that a party is a controlling shareholder. However, as set forth above, without more, control based on the exercise of a duly-obtained contractual right that somehow limits or restricts the actions that a corporation otherwise would take, does not create a "controlling shareholder" for that particular purpose. *Superior Vision Servs.*, 2006 Del. Ch. LEXIS 160, at *19.

7

20.     Notably, Upfront (through Mr. Suster) is only alleged to have *threatened* to veto an alternative financing at the November 3, 2017 board meeting.  Upfront is not alleged to have ever actually exercised its veto right.  As discussed in the Motion to Dismiss, a potential ability to exercise control is not equivalent to the actual exercise of that ability.  Motion to Dismiss ¶24 (citing authorities).

21.     Further, the alleged blocking rights were not ironclad.  As noted in an email quoted in the Complaint: "We theoretically have the ability to . . . block issuances of new equity except that Dendera knows how to structure deals around our rights (debt from Bioworld, convertible note proposal, which is senior to us and can convert later[)]."  Complaint ¶ 137.  Accordingly, the contractual rights that were held by Upfront were never actually exercised, and could have been worked around.  The reality is that Loot Crate never had another viable proposal, which is why the right was never exercised -- not that it even would have needed to be.

22.     Under *Superior Vision Servs.*, 2006 Del. Ch. LEXIS 160, at *19-20, the existence and use of contractual rights do not transform Upfront to a "controlling shareholder."

### iii.    Upfront Did Not Control the Board through Appointments.

23.     Upfront acknowledges that it, at times, caused one of its principals to be appointed to a single seat on the five-member board.  However, its single seat (and not even at all relevant times) never constituted control of the board, and the Complaint alleges no facts to support the lack of independence of a majority of board members in favor of Upfront.  Specifically, the Complaint alleges no facts to support that Kreiz was somehow not independent; it only alleges that Kreiz had a pre-existing relationship with Upfront and Suster.  Further, even if the Complaint had pleaded facts to support its allegation that Kreiz was not independent and acted as Upfront's "lackey," Kreiz's alleged support on the Board could not constitute Upfront's

actual control over the Board as Kreiz and Suster, acting together, would still never have had control over the five-person Board.

24. There is no allegation that Boyle had any pre-existing relationship with Upfront or any of the Defendants, nor that he acted on the instruction of Upfront. Accordingly, the Complaint's allegation that Upfront controlled the Board is a conclusory one unsupported by an adequately alleged factual basis therefor. Upfront cannot be found to owe fiduciary duties as a "controller" of the Board based on the facts alleged.

### iv. Coordination with Breakwater/Pressure Do Not Constitute Controlling Shareholder Status.

25. The Motion to Dismiss argues that Upfront's coordination with Breakwater to obtain an additional seat and threats of litigation were acts of control over Loot Crate. The Complaint concedes that any coordination did not result in the addition of a board seat. Even if there were something improper with these actions, an attempt to obtain control is not an exercise of control. *See* Motion to Dismiss ¶24, citing *Sea-Land*, 1987 Del. Ch. LEXIS 439, *13 ("*potential* ability to exercise control is not equivalent to the actual *exercise* of that ability") (emphasis in original); *see also Williamson*, 2006 Del. Ch. LEXIS 111 at *4 ("potential ability to exercise control is not sufficient"); *Gilbert v. El Paso Co.*, Del. Ch., 490 A.2d 1050, 1056 (1984), *aff'd*, Del. Supr., 575 A.2d 1131 (1990) (holding that claims of breach of fiduciary duty "must subsist on the actuality of a specific relationship, not its potential"). Accordingly, Upfront is not a controlling shareholder by virtue of its alleged coordination with Breakwater, since it did not result in any actual control over the board.

### b. "Control Group" Does Not Result in Actual Control.

26. The Opposition suggests that a "control group" of Upfront and Breakwater together controlled Loot Crate. This theory might be viable if the two parties acting in concert

9

actually together controlled a board. That, however, is not the case here.

27. As set forth above, Upfront's percentage ownership of preferred shares (whether 45% on its own or 55% with Breakwater) did not result in anything other than control of the voting rights related to <u>the issuance of additional preferred shares</u>, which was a contractual right provided to them. The additional ten percent ownership of preferred shares Breakwater "added" to the "control group" did not result in any increased ability to control the board or appoint additional directors.

28. Quite simply, with or without Breakwater, Upfront cannot be considered a controlling shareholder as it never had the ability to control the board and never did control the board. Regardless of any "inferences", the simple truth is that there was no actual control by Upfront: to the detriment of everyone involved, Upfront was unable to cause the Company to consummate the A-2 *equity* financing because it never had control over the board. As a result it cannot be considered a controlling shareholder.

### C. Defendant Upfront GP V, LLC Did Not Owe Debtors Fiduciary Duties at Any Time.

29. In the Opposition, Plaintiff appears to acknowledge that Upfront GP V, LLC does not owe fiduciary duties, but should remain a Defendant because "[a]s the general partner . . . [it] is liable for the debts . . . resulting from the partnership's actions." Motion to Dismiss at 18. If true, Plaintiffs can seek to collect against Upfront GP V, LLC in the event any judgment is entered against Upfront, but the Complaint must be dismissed against Upfront GP V, LLC.

### D. Individual Upfront Defendants Only Owed Fiduciary Duties During Limited Periods of Time

30. The Opposition misstates the Upfront Defendants' argument with respect to claims against the Individual Upfront Defendants. To the extent any alleged breach occurred at a time when the individual Upfront Director was not on the Board, the Complaint must be

dismissed as ***to the breach of fiduciary duty claim*** with respect to that Individual Upfront Defendant.

### E.  Insufficient Allegations of Breaches of Fiduciary Duties.

31. While the Opposition is correct that the Motion to Dismiss inadvertently omitted the standard for breach of the duty of loyalty, the deficiencies in the Complaint with respect to the fiduciary duty counts do not relate to a particular element of a breach of any duty, whether of care, loyalty, good faith or candor, but rather that the claims themselves are implausible and unsupported by factual allegations.  The Complaint lists each alleged act constituting a breach: (i.e., (a) creation of a cash crisis; (b) preclusion of alternative funding; (c) coercion of board into unfavorable funding terms; (d) sabotaging compliance with forbearance agreement; (e) secret meetings and the "Playbook"); (f) failing to disclose dual loyalties; and (g) threats of litigation) [Complaint ¶241(a)-(g)], and the Motion to Dismiss addressed each of these alleged acts and set forth the reasons they were pleaded insufficiently and did not state a cause of action.[4]

32. The Opposition has now reframed the issues as follows: (i) breach of duty of loyalty through bad faith pursuit of own interests (and specifying their pursuit of a scheme to obtain either a self-interested funding deal or total control of the board); and (ii) breach of duty of loyalty by engaging in self-dealing by pursuing self-dealing transactions.  However, for all the

---

[4] To summarize the arguments in the Motion to Dismiss: (a) creation of cash crisis: insufficiently pleaded; no specific allegations of when or how "cash crisis" was created or what anyone at Upfront did to create such; conclusory allegation with nothing more; (b) preclusion of alternative funding: no evidence that consideration of alternative financing was precluded and, in fact, the Complaint makes clear alternative financing **was** considered; (c) coercion of board into unfavorable funding terms: board was not coerced because it, in fact, did not proceed with the A-2 financing;  (d) sabotaging compliance with forbearance agreement: insufficiently pleaded in that it is unclear what Kibler did to sabotage or when; it appears Kibler was not even on the board (nor was any other Individual Upfront Defendant) at the time any sabotage could even occurred; (e) secret meetings and the "Playbook": Complaint states the Playbook to obtain more board seats did not succeed and alleged "secret meetings" do not provide sufficient factual detail to enable Upfront Defendants to respond and are not alleged to have caused any damage; (f) failing to disclose dual loyalties: there can be no doubt all parties knew of Bettinelli, Suster, and Kibler's roles at Upfront; and (g) antagonistic behavior and threats of litigation: party entitled to state its intent to pursue legal rights and no allegation that damages resulted.

reasons set forth in the Motion to Dismiss (and summarized in footnote 3 hereto), none of the *factual allegations* supporting these alleged breaches are sufficient to maintain a cause of action for breach of fiduciary duty.

### i. No Breach of Duty of Loyalty Through "Bad Faith Efforts to Pursue Their Own Interests Rather than the Best Interests of Loot Crate"

33. The Opposition's stated breach of duty of loyalty "by failing to act in good faith through their pursuit of a scheme to financially cripple Loot Crate and use the manufactured liquidity crisis to obtain either a self-interested funding deal or total control of Loot Crate's board through a default under the Loan Agreement and the May 2018 Forbearance Agreement" is premised on a "scheme to financially cripple Loot Crate."  Opposition at 9.  However, as set forth in greater detail in the Motion to Dismiss, the Complaint is devoid of any reasonable specificity as to when the cash crisis occurred or how any of the Upfront Defendants caused or contributed to the cause of that cash crisis, and the Motion to Dismiss details why each of the allegations that "support" this alleged breach do not state a claim.  Further, this count is premised on the Upfront Defendants wanting to "strong-arm Loot Crate's decision makers into favoring Upfront's funding proposal."  Opposition at 21.  Yet, the Upfront funding proposal was an *equity* funding proposal, which would have unquestionably and objectively <u>benefitted</u> the Company and its creditors, even if it would have diluted Chris Davis's disastrous stronghold (perhaps death grip would be more accurate) over Loot Crate.  Plaintiff's theory of this count is insufficiently pleaded and implausible and should be dismissed.

### ii. No Breach of Duty of Loyalty Through "Self-Dealing"

34. The Opposition next argues that Upfront "sought and obtained a number of terms and pursued a number of proposed deals in which it stood on both sides of the transaction . . . Each of these funding ***attempts*** . . . is a classic example of a self-dealing transaction in that

12

Upfront appeared on both sides of the transaction and received a benefit." Opposition at 23. The Complaint concedes these were attempted transactions rather than consummated transactions.

35. Further, although the Opposition states that Upfront received a benefit, the Complaint does not so plead (nor was there or could there have been a benefit when no transaction was consummated). Without even the allegation of the receipt of a benefit, the Complaint fails to meet its pleading standard, as deriving a benefit is a required element of self-dealing. *Gilbert v. El Paso Co.*, 1988 Del. Ch. LEXIS 150, \*23 (Del. Ch. 1988) ("To engage in self-dealing, however, the directors must have . . . derived a benefit to the exclusion of the shareholders. The plaintiffs have failed to show that that occurred here. The directors did not . . . receive a benefit to the exclusion of the class.") (*citing Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).

36. While Plaintiff states that the Motion to Dismiss is "insufficient to carry the Upfront Defendants' burden to obtain dismissal" because the Upfront Defendants "do not once reference or mention the entire fairness standard or business judgment rule" [Opposition at 24], no analysis of those standards is needed where the basis for dismissal is that a claim for relief was not adequately pleaded. Because no benefit on Upfront was ever conferred, the entire standard never comes into play. *See id.* (entire fairness standard not implicated when, *inter alia*, no benefit received by allegedly self-dealing fiduciary). ***Further, because no transaction was ever consummated, no standard of review of the propriety of a transaction is relevant***. Once again, Plaintiff envisions its claims against Upfront based on a set of facts that were not pleaded and do not exist. Plaintiff's theory of this count is impossible based on the failure to consummate the transaction and should be dismissed.

### F.     No Claims for Aiding and Abetting.

37.     Contrary to Plaintiff's assertion, the Motion to Dismiss does address[5] the reason that the Complaint must be dismissed *as to any claims for aiding and abetting the **_Upfront_** breaches of duty*: there were no plausibly alleged breaches of duty by the Upfront Defendants. Motion to Dismiss, ¶ 63 ("To the extent Count I is dismissed, there can be no aiding and abetting any breach of fiduciary duty that is dismissed and Count II must be dismissed as to those dismissed claims."). Accordingly, the *remainder* of the aiding and abetting section of the Motion to Dismiss focused on aiding and abetting *the alleged Breakwater breaches*.

38.     As set forth in the Motion to Dismiss, the Complaint does not adequately plead any of the required elements; in particular, the Complaint's failure to allege damages, relying on its ability to plead nominal damages with respect to the breach of fiduciary duty claims, is completely insufficient for the aiding and abetting count, for which proximate, non-nominal damages must be adequately alleged. *See Malpiede v. Townson*, 780 A.2d 1075, 1096 ("To survive a motion to dismiss, the complaint must allege facts that satisfy the four elements of an aiding and abetting claim: '(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, . . . (3) knowing participation in that breach by the defendants,' and (4) damages proximately caused by the breach."); *Henkel of Am., Inc. v. Bell*, 825 Fed. App'x. 243, 260 (6th Cir. 2020) (applying Delaware law and stating "unlike a claim for breach of fiduciary

---

[5] The Motion to Dismiss Plaintiff misrepresents the Motion to Dismiss with respect to aiding and abetting claims. Plaintiff states:

> The Upfront Defendants misrepresent scope of the Complaint's aiding and abetting claims against them in two ways. First, the Upfront Defendants argue that the claim is only directed against actions they took to aid and abet Breakwater's breach of fiduciary duty. See Motion ¶¶ 61-62.

Opposition at 26. However, paragraph 61 of the Motion to Dismiss relates to Plaintiff's failure to allege aiding and abetting related to the *__entity__* Upfront Defendants, and paragraph 62 relates solely to aiding and abetting the Breakwater Defendants.

duty, a claim for aiding and abetting a breach of fiduciary duty under Delaware law does require damages and proximate causation as elements of the claim").

### G. Count III Must Be Dismissed as Plausible Claims for Breach of Implied Covenant of Good Faith and Fair Dealing Have Not Been Alleged.

39. The Motion to Dismiss cites extensive law for the proposition that the Upfront Defendants' use of its specifically bargained for contractual rights cannot be a violation of the implied covenant of good faith and fair dealing. The Opposition asserts that the Upfront Defendants were required to use "reasonable discretion" in exercising any such rights. Critically, however, the Complaint never alleges that Upfront *actually exercised* its blocking right; it merely alleges a threat to exercise such rights. With respect to the exclusivity provision of the A-2 Term Sheet, it does not matter if Upfront did not grant an exception because the Complaint acknowledges that Loot Crate pursued alternative funding sources during this time anyway. Further, as with the aiding and abetting count, the Complaint's failure to adequately allege damages is fatal to the breach of the implied covenant of good faith and fair dealing count.

### H. Count IV Must Be Dismissed as Plausible Claims for Civil Conspiracy Have Not Been Alleged.

40. The Parties appear to agree that the viability of this count largely hinge on whether Counts I and II are dismissed. However, in addition, because the Complaint fails to allege to cognizable damages theory, Count IV must be dismissed.

### CONCLUSION

41. For all of the foregoing reasons, Upfront submits that Counts I, II, III, IV, and IX be dismissed as to the Upfront Defendants and that the prayer for compensatory damages should be stricken.

Dated: April 26, 2021            PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Colin R. Robinson*
Dean A. Ziehl (NY Bar No. 4133971)
James K.T. Hunter (CA Bar No. 73369)
Colin R. Robinson (DE Bar No. 5524)
919 North Market Street, 17th Floor
P.O. Box. 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:   (302) 652-4100
Facsimile:   (302) 652-4400
E-mail:   dziehl@pszjlaw.com
        jhunter@pszjlaw.com
        crobinson@pszjlaw.com

*Counsel to the Upfront Defendants*