## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>Old LC, Inc., et al.,<br><br>              Debtors. | Chapter 11<br><br>Case No. 19-11791 (BLS) |
| Official Committee of Unsecured Creditors<br>of Old LC, Inc., et al., for and on behalf of<br>the estates of Old LC, Inc., et al.,<br>      *the Committee*,<br>v.<br><br>Upfront V, LP, Breakwater Credit<br>Opportunities Fund, L.P., et al.,<br>      *Defendants*. | Adv. No. 20-51002 (BLS) |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
## PARTIAL SUMMARY JUDGMENT OF BREAKWATER DEFENDANTS

Pursuant to Federal Rule of Bankruptcy Procedure 7056, Defendants Breakwater Credit Opportunities Fund, L.P. ("Breakwater"), Saif Mansour, Aamir Amdani, Eric Beckman, Darrick Geant, and Joseph Kaczorowski (together with Breakwater, the "Movants") submit this memorandum of law in support of their motion for partial summary judgment on Counts I-IV of the First Amended Complaint, Docket No. 28 (the "Complaint").[1]

---

[1] Capitalized terms not otherwise defined in this brief are defined in the Complaint.

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................................. 1

Summary of Undisputed Facts ...................................................................................... 2

A.     Breakwater Invests in Loot Crate. .................................................................. 3

B.     Loot Crate Seeks and Considers Financing Proposals in 2017 ........................................ 5

C.     Davis gets Cold Feet; Loot Crate Fails to Close Any Financing Proposal. ..................... 8

D.     The Forbearance Agreements. ........................................................................ 8

E.     Loot Crate Fails to Satisfy the Conditions of the Second Forbearance Agreement. ......... 9

Argument ................................................................................................................... 11

A.     Standard of Review. ..................................................................................... 11

B.     A Fiduciary Is Not Required to Engage in Self-Sacrifice. .............................................. 12

C.     Each Financing Proposal Required Breakwater to Compromise its Contractual
Rights. ............................................................................................................ 14

Conclusion ................................................................................................................. 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bevis v. Terrace View Partners, LP*,
  33 Cal. App. 5th 230, 244 Cal. Rptr. 3d 797 (2019)...............................................................16

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)........................................................................................................11, 17

*In re CNX Gas Corp. S'holders Litig.*,
  4 A.3d 397 (Del. Ch. 2010)....................................................................................................14

*Edgar v. MITE Corp.*,
  457 U.S. 624 (1982)................................................................................................................13

*Hamilton Partners, L.P. v. Highland Cap. Mgmt., L.P.*,
  No. 6547-VCN, 2014 WL 1813340 (Del. Ch. May 7, 2014) ...........................................13, 18

*Hubicki v. ACF Indus., Inc.*,
  484 F.2d 519 (3d Cir. 1973)...................................................................................................12

*Ivanhoe Partners v. Newmont Mining Corp.*,
  535 A.2d 1334 (Del. 1987) .....................................................................................................15

*Jedwab v. MGM Grand Hotels, Inc.*,
  509 A.2d 584 (Del. Ch. 1986).................................................................................................13

*Kuroda v. SPJS Holdings, L.L.C.*,
  971 A.2d 872 (Del. Ch. 2009).................................................................................................16

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986)................................................................................................................11

*MHC Inv. Co. v. Racom Corp.*,
  254 F. Supp. 2d 1090 (S.D. Iowa 2002) .................................................................................15

*In re Mullins*,
  No. 16-11032 (BLS), 2017 WL 3705071 (Bankr. D. Del. Aug. 24, 2017) ............................11

*In re Newpage Corp.*,
  517 B.R. 508 (Bankr. D. Del. 2014) .......................................................................................11

*Odyssey Partners, L.P. v. Fleming Co. Inc.*,
  735 A.2d 386 (Del. Ch. May 13, 1999) ........................................................................13, 14, 15

*Odyssey Partners, L.P. v. Fleming Co., Inc.*,
   CIV. A. No. 14770, 1996 WL 422377 (Del. Ch. July 24, 1996) .......................................13, 14

*Racine & Laramie, Ltd. v. Dep't of Parks & Recreation*,
   11 Cal. App. 4th 1026, 14 Cal. Rptr. 2d 335 (1992) ................................................................16

*Superior Offshore Int'l, Inc. v. Bristow Grp. Inc.*,
   No. 1:09-CV-00438-LDD, 2011 WL 2516522 (D. Del. June 23, 2011), *aff'd*,
   490 F. App'x 492 (3d Cir. 2012) .............................................................................................12

*In re Synthes, Inc. S'holder Litig.*,
   50 A.3d 1022 (Del. Ch. 2012) ................................................................................................15

**Statutes**

United States Bankruptcy Code Section 502(d) ...............................................................................2

**Other Authorities**

Federal Rule of Bankruptcy Procedure 7056 .................................................................................11

Federal Rules of Civil Procedure Rule 56 ...............................................................................11, 12

## Introduction

Loot Crate, a Delaware corporation, sold boxes of computer games and related "loot" to consumers – many of them adolescents. Its rise and fall were meteoric: the hot new 2012 thing had grown cold by 2019. At relevant times, Breakwater was Loot Crate's senior secured lender, and a minority holder of preferred shares.[2]

Adolescent tastes in online paraphernalia proved fickle, and today present the Committee[3] with no litigation targets, so its Complaint devises an operatic account of Loot Crate's demise. Its premise is that villainous board members[4] and observers conspired to torpedo their own investments by crippling Loot Crate's efforts to (1) obtain fresh capital in 2017 and 2018 and (2) refinance the Breakwater loan in 2018 in time to avoid forbearance fees. Counts I (Breach of Fiduciary Duty), II (Aiding and Abetting Breach of Fiduciary Duty), III (Breach of the Implied Covenant of Good Faith and Fair Dealing), and IV (Civil Conspiracy) all turn on Loot Crate's alleged loss of three recapitalization "opportunities": the so-called Management Proposal, Compl. ¶ 74, the Original BioWorld Proposal, *id*. ¶ 72, and the South River Proposal, *id*. ¶ 179.

The Committee's libretto raises a potpourri of legal and factual questions, among them whether Movants had a fiduciary duty to Loot Crate at all, whether any third party would actually have closed a restructuring, why none of them did, and, centrally, whether Loot Crate's ultimate collapse was inevitable.[5] The burden of litigating these questions is unnecessary because one of

---

[2] *See* the May 10, 2016 Series A Preferred Shareholder Agreement (the "Shareholder Agreement"), Wolf Decl., Ex. A. References to "Exhibits" in this brief refer to the exhibits attached to the Declaration of Shannon B. Wolf ("Wolf Decl.") file contemporaneously herewith.

[3] The Official Committee of Unsecured Creditors of Old LC, Inc.

[4] Plaintiff alleges that Upfront V, L.P. and employees Gregory Bettinelli, Mark Suster and Dana Kibler conspired with certain Movants at various times.

[5] Some of these points are set out by the Upfront Defendants in their Motion to Dismiss (Dkt. No. 35) and apply equally to the Movants.

the Complaint's infirmities is simple, ripe and inescapable.  Each of the three alleged
"opportunities" required that Breakwater and/or Upfront compromise its respective contractual
rights.  Because no fiduciary is obliged to do that, Counts I-IV do not allege, and Plaintiff cannot
prove, an *actual* lost "opportunity," or any actual breach of duty by Movants.

*This is not a point that can be saved by depositions*.  The recapitalization proposals are
alleged with particularity in a novella-length, illustrated second round of pleading, and are
evidenced by board minutes, term sheets and other writings.  This point being undisputed, Counts
I-IV give rise to no *material* factual dispute, and Movants are entitled to summary judgment on
each of those counts.[6]

## Summary of Undisputed Facts

The claims against Movants for breach of fiduciary duty (Count I), aiding and abetting
breach of fiduciary duty (Count II), and civil conspiracy (Count IV) all allege Breakwater's refusal
to consent (or active opposition) to a compromise of its rights under the Loan Agreement and the
Shareholder Agreement in favor of allegedly "more advantageous options" for Loot Crate. Compl.
¶¶ 235-38 (Count I), ¶¶ 247-53 (Count II), ¶¶ 261-66 (Count IV).  Count III, alleging breach of the
implied covenant of good faith and fair dealing, depends in part on the same alleged failure to
compromise, and partial summary judgment should be granted on so much of Count III as concerns
Loot Crate's alleged loss of recapitalization opportunities. Compl. ¶¶ 255-58.

---

[6] Movants have not moved on Counts V-IX of the Complaint.  Count IX is a follow-on claims objection
under Section 502(d) of the Bankruptcy Code, best addressed later in the case.  At issue in Counts V-VIII
is a $1 million "OID" payment made in 2018 as consideration for Breakwater's forbearance.  Each of the
four fraudulent transfer counts seeks to avoid that payment.

The fee was reasonably equivalent value for Breakwater's forbearance from exercising remedies over
substantially all of the company's assets. Because Plaintiff is expected to argue that the reasonableness
of the fee may raise a dispute of fact, Movants have not moved on those counts here.  This litigation, with its
sprawling and extravagant claims of lost enterprise value, would be enormously streamlined by distillation
to a $1 million controversy over a fee for admitted forbearance.

### A.      *Breakwater Invests in Loot Crate.*

*The Shareholder Agreement*. At relevant times, Breakwater held preferred shares that it had acquired for approximately $2 million, *see Statement of Undisputed Material Facts in Support of Motion for Partial Summary Judgment of Breakwater Defendants,* filed contemporaneously herewith (the "SUF") ¶ 2; Wolf Decl., Ex. A, Schedule of Purchasers, while Upfront held preferred shares acquired for approximately $12.5 million, SUF ¶ 3; Wolf Decl., Ex. A, Schedule of Purchasers.  At the times relevant to the Complaint, Breakwater held approximately 10% of Loot Crate's issued preferred shares, Upfront approximately 45%, and the two firms collectively held a majority of the preferred shares.  See Compl ¶ 39; SUF ¶ 4.  The preferred shares enjoyed a liquidation preference over the common stock.  SUF ¶ 5; Wolf Decl., Ex. B (Amended and Restated Certification of Incorporation of Loot Crate, Inc., ("Restated Certificate"), Section 2(a)). The Restated Certificate required majority approval from preferred holders for any increase or decrease in the total number of authorized shares of the preferred stock or any amendment of the Restated Certificate in any manner that adversely affects the preferred stock. SUF ¶ 6; Wolf Decl., Ex. B, Sections 6(a)-(b).

*The Loan Agreement*. On June 1, 2016, Breakwater entered into the Loan Agreement with Loot Crate.  It provided Loot Crate with $20 million in term loan financing, with interest and principal payable monthly. SUF ¶ 7; Wolf Decl., Ex. C, Section 2.4; see also Compl. ¶ 45. Breakwater was Loot Crate's senior, and largest, secured lender. Compl. ¶ 91.  It was granted the right to appoint one board observer. SUF ¶ 8; Wolf Decl., Ex. D.  From June 2016 until approximately May 24, 2018, Mansour served as Breakwater's appointed observer.  Compl. ¶ 227; SUF ¶ 42; Wolf Dec., Ex. Q.

The Loan Agreement obligated Loot Crate to meet certain minimum cash, debt and subscriber targets, and to refrain from taking on new debt, making changes to senior management

or key personnel, or opening new offices or locations without Breakwater's consent. The Loan Agreement also included comprehensive and restrictive affirmative and negative covenants and events of default, including financial reporting obligations; restrictions on additional debt, liens, investments, and acquisitions; noticing obligations for certain changes (for example, changes in management); the requirement of Account Control Agreements; and protection of certain intellectual property (which served as collateral under the Loan Agreement). SUF ¶ 9, 11; Wolf Decl., Ex. C, Sections 6.2, 6.7(b), 6.13, 7.2, 7.12.  In January 2017, Loot Crate breached Section 7.2 of the Loan Agreement by leasing a location in the United Kingdom without advance written notice.  SUF ¶ 10; Wolf Decl., Exs. E, F and G.

In March 2017, Loot Crate breached Section 6.13 of the Loan Agreement by failing to execute required Account Control Agreements in a timely fashion and Section 6.7(b) by failing to notify Breakwater of new registered Trademarks and applications for Trademarks. SUF ¶ 12; Wolf Decl., Exs. E, F and G.

The defaults mounted.  Loot Crate breached Section 6.2(a) of the Loan Agreement by failing to provide consolidated audited financial statements within 180 days after the end of the fiscal year ending December 31, 2016.  SUF ¶ 13; Wolf Decl., Exs. E, F and G.  Loot Crate breached its minimum revenue covenant under Section 7.12(b) of the Loan Agreement for the fiscal quarter ending June 30, 2017 SUF ¶ 14; Wolf Decl., Exs. E, F and G.  Loot Crate failed to provide monthly financial statements, violating Section 6.2(b) of the Loan Agreement; it then breached Section 6.2(e) by failing to cure. SUF ¶ 15; Wolf Decl., Exs. E, F and G.

Loot Crate then breached the minimum cash, revenue and subscriber financial covenants under Section 7.12 of the Loan Agreement for the period ending September 30, 2017.  SUF ¶ 16;

Wolf Decl., Exs. E, F and G. Each breach constituted an Event of Default under Section 8.3(a) of the Loan Agreement. See SUF ¶¶ 10-16; Wolf Decl., Exs. E, F and G.

There is no dispute of material fact about these defaults: each was acknowledged by CEO Chris Davis in the First Forbearance Agreement. SUF ¶ 15; Wolf Decl., Ex. G.

### B.    *Loot Crate Seeks and Considers Financing Proposals in 2017.*

In August 2017, Davis informed Loot Crate's board of directors that the company needed to raise additional capital. SUF ¶ 18; Wolf Decl., Ex. H, August 25, 2017 Minutes. The board soon "instructed management to pursue potential financing opportunities with urgency and deliver any financing proposals to the board for consideration." SUF ¶ 19; Wolf Decl., Ex. H, October 18, 2017 Minutes. Three weeks later, Loot Crate's management put three proposals before the board:

1.    The A-2 Proposal, Compl. ¶ 69,

2.    The Original BioWorld Proposal, *id.* ¶ 72, and

3.    The Management Proposal, *id.* ¶ 74.

SUF ¶ 20; Wolf Decl., Ex. H, November 3, 2017 Minutes.

*The A-2 Proposal.* From the outset, Loot Crate *did* have a restructuring opportunity, supported by both Upfront and Breakwater, under which each would contribute fresh capital. The A-2 Proposal contemplated up to $18.5 million in new equity funding in exchange for a new issue of preferred stock, in which Breakwater and other existing Loot Crate investors could participate. The new shares would enjoy a liquidation preference over existing preferred stock. SUF ¶ 21; Wolf Decl., Ex. I. The A-2 Proposal would have imposed tighter controls on Loot Crate's management, including the requirement that Davis "have no direct reports and will no longer manage the company's day-to-day operations. . . . Cash controls must be in place such that [Davis] cannot solely approve cash transactions without the signature of the most senior finance

5

professional in the company and [Davis] cannot commit the Company to any expenditures on a go-forward basis." SUF ¶ 23; Wolf Decl., Ex. I. Breakwater and Upfront supported the A-2 Proposal.  SUF ¶ 24; Wolf Decl., Ex. H, Nov. 3, 2017 Minutes.  For a short while, the company did too.  Then it pulled the plug.  *See* discussion, *infra* at 8.

*The Original BioWorld Proposal.*  Loot Crate's vendor BioWorld submitted the Original BioWorld Proposal, proposing a new issue of up to $10 million in Series B preferred stock.  SUF ¶ 25; Wolf Decl., Ex. J.  This proposed issuance required consent of a majority of existing preferred holders under paragraph 6(b) of the Restated Certificate.[7]  The Original BioWorld proposal also contemplated a new issue of $2.5 million to $5 million of subordinated convertible debt on "terms to be determined and subject to consent from the Company's Senior Secured Lender," that is, Breakwater. SUF ¶ 25; Wolf Decl., Ex. J. In short, the Original BioWorld Proposal included issuance of preferred equity that required the consent of a majority of the existing preferred shareholders and issuance of subordinated debt that required the consent of Breakwater as senior lender.

Each of Breakwater and Upfront advised the board of directors that it declined to compromise its contractual rights in the manner required by the Original BioWorld Proposal. SUF ¶26; Wolf Decl., Ex. H, Nov. 3, 2017 Minutes; Compl. ¶ 86 ("Suster and Mansour advised the board that neither Upfront or Breakwater would approve the BioWorld or Management Proposals without the same Anti-Dilution Provisions as were in the A-2 Proposal.").  This put a majority of preferred holders in opposition to the proposal. The board itself expressed doubt about the proposal's viability, noting that the contract rights of Breakwater and the Series A holders would have to be compromised.  *See* SUF ¶ 27; Wolf Decl., Ex. H, Nov. 3, 2017 Minutes.

---

[7] *See supra* at 3 (summarizing consent requirements).

*The Management Proposal.*  The Complaint alleges that management (with friends and family) separately proposed to invest up to $10 million in exchange for new preferred equity (in the form of new Series B preferred stock). Compl. ¶ 74; SUF ¶ 28; Wolf Decl., Ex. K.  Because it called for the issuance of new preferred stock, the Management Proposal also required the consent of a majority of existing preferred holders.[8]  Breakwater and Upfront advised that neither would consent to the Management Proposal.  SUF ¶ 29; Wolf Decl., Ex. H, Nov. 3, 2017 Minutes; Compl. ¶ 86.

The Management Proposal also was subject to the "satisfactory resolution of the potential default related to outstanding debt [i.e., the Loan Agreement] and satisfactory restructuring of covenants and terms therein."[9]  SUF ¶ 30; Wolf Decl., Ex. K.  It separately required resolution of "any breaches of existing debt covenants," and renegotiation of "future debt covenants under the existing loan facility(ies)" or refinancing.  SUF ¶ 32; Wolf Decl., Ex. K. These conditions required Breakwater's consent and compromise of its contractual rights.[10]  The board acknowledged this proposal's deficiencies of structure, uncommitted financing, and the necessity for modification of Breakwater's contract rights.  SUF ¶ 33; Wolf Decl., Ex. H, Nov. 3, 2017 Minutes.

At the time, no Breakwater representative sat on the board.  The minutes of the board's November 3, 2017 meeting reflect discussion of the A-2, Original BioWorld and Management Proposals.  The board rejected the latter alternatives, and unanimously approved the A-2 Proposal. SUF ¶ 34; Wolf Decl., Ex. H, Nov. 3, 2017 Minutes.

---

[8] *See supra* at 3-4 (summarizing consent requirements).

[9] Like the A-2 Proposal, the Management Proposal included restrictions on Davis's authority as CEO ("Cash controls must be in place such that the CEO cannot solely approve cash transactions without the signature of the most senior finance professional in the company and the CEO cannot commit the Company to any expenditures on a go forward basis."). SUF ¶ 31; Wolf Decl., Ex. K.

[10] *See supra* at 3-4 (summarizing consent requirements).

### C.    Davis gets Cold Feet; Loot Crate Fails to Close Any Financing Proposal.

Soon after, Davis reversed field.  The A-2 Proposal meant tight operational controls on Davis, and it meant subordinating his common stock to more preferred stock.  He soon revoked his consent and informed the board that additional proposals would be sought.  SUF ¶ 35; Wolf Decl., Ex. I.  On November 17 and 20, 2017, Breakwater served Loot Crate with formal notices of loan defaults. SUF ¶ 36; Wolf Decl., Exs.  E & F.

Negotiations continued. Breakwater, Loot Crate and BioWorld explored a refinancing of the Breakwater loan, SUF ¶37; Wolf Decl., Ex. M., but Loot Crate's operations had deteriorated, and in January BioWorld pulled out.  Davis advised the board that he had learned that BioWorld's advisors thought that the Loot Crate investment was too risky.  SUF ¶38; Wolf Decl., Ex. N. BioWorld "needed to see Q1 2018 performance before they are willing to close on a financing." SUF ¶ 38; Wolf Decl., Ex. N.

Realizing that Davis's renunciation of the A-2 Proposal left it with no feasible recapitalization opportunity, Loot Crate's board then pivoted to negotiating a forbearance with Breakwater.  SUF ¶ 39; Wolf Decl., Ex. N.

### D.    The Forbearance Agreements.

On February 9, 2018, Breakwater and Loot Crate executed an initial forbearance agreement.  SUF ¶ 40; Wolf Decl., Ex. G.  Loot Crate acknowledged its defaults; Breakwater agreed to forbear from remedies for a defined period.  *Id*.  In exchange for Breakwater's forbearance, Loot Crate promised to pursue new equity financing, on terms satisfactory to Breakwater.  *Id*.  But Loot Crate was unable to raise that financing, and had to seek a second forbearance in May 2018.  Loot Crate then had been in continuous default of its financial covenants for nearly a year.  SUF ¶ 41; Wolf Decl., Exs. G and O.

On May 8, 2018, the parties executed the Second Forbearance. SUF ¶ 41; Wolf Decl., Ex. O; Compl. ¶ 166.   Breakwater would continue to forbear from remedies under the Loan Agreement, while Loot Crate promised, among other things, to:

> [c]onsummate one or more debt or equity financings in form and substance and on terms satisfactory to [Breakwater] . . . which shall . . . provide liquidity in a single or series of issuances, to [Loot Crate] in an aggregate amount of not less than $3,000,000 . . ., and . . . shall be consummated by, and funds thereunder shall be received by [Loot Crate] on or before, the date that is sixty (60) days after the Effective Date.

SUF ¶ 43; Wolf Decl., Ex. O, Section 8(d).

In exchange for Breakwater's continued forbearance, Loot Crate granted Breakwater the right to appoint one designee to the board, and created a Strategic Transaction Committee comprised of two independent directors and Mansour (Breakwater's board designee). Compl. ¶ 167.  If Loot Crate failed to consummate the junior capital raise within sixty days of the effective date of the Second Forbearance, the stockholders of Loot Crate would increase the board to seven directors, of which a majority would be appointed by Breakwater. *Id.* ¶ 168; SUF ¶ 46; Wolf Decl., Ex. P, Amendment to Voting Agreement.

### E.    *Loot Crate Fails to Satisfy the Conditions of the Second Forbearance Agreement.*

In June 2018, Loot Crate received and showed Breakwater a term sheet for $3.2 million in proposed financing by South River Capital – the South River Proposal.  Compl. ¶ 179.  Similar to the Original BioWorld and Management Proposals, the South River Proposal required Breakwater to compromise its contract rights as Loot Crate's senior secured lender.  Breakwater declined.

As we show below, its reasons for declining to approve the proposal are legally irrelevant – even a fiduciary has no duty to compromise its contract rights.  But Breakwater's reasons were sound. The proposal was not the kind of subordinated loan that the Second Forbearance Agreement contemplated.  It required a 6.0% annual cash coupon (styled as a "facility fee"), SUF ¶ 44; Wolf

Decl., Ex. Q, thus requiring Breakwater to consent to cash payments by an illiquid, defaulting

borrower to a junior lender. SUF ¶ 45; Wolf Decl., Ex. R.  The proposal also contained cross-

default and acceleration provisions with the Loan Agreement, SUF ¶ 44; Wolf Decl., Ex. Q, that

would increase the risk profile for the senior lender in the default scenario.  SUF ¶ 45; Wolf Decl.,

Ex. R. Breakwater was willing to consent to the incurrence of the subordinated debt, but only if

the terms of that debt, in its judgment, did not raise the risk profile of its own loan.  And Breakwater

communicated clearly and consistently to Loot Crate about what terms would be satisfactory.  So

long as the senior debt was unsatisfied, the subordinated loan would have to (i) pay no cash interest

or amortization, (ii) not mature until six months outside of the Breakwater loan, (iii) contain no

financial covenants, and (iv) have no ability to accelerate.  SUF ¶ 45; Wolf Decl., Ex. R.

When July passed, Loot Crate had failed, as the Second Forbearance required, to

"[c]onsummate one or more debt or equity financings in form and substance and on terms

satisfactory to [Breakwater] and pursuant to document and a capital structure approved by

[Breakwater]." Compl. ¶1 94; SUF ¶ 46; Wolf Decl. Ex. O.  Breakwater delivered notices of Loot

Crate's failure and, pursuant to the Voting Agreement, named Eric Beckman, Darrick Geant, Joe

Kaczorowski and Aamir Amdani as directors.  Compl. ¶ 195.[11]

On August 2, 2018, the board's Strategic Transaction Committee (with Mansour, the only

Breakwater affiliate, abstaining) approved a refinancing of the Breakwater Loan.  SUF ¶ 47; Wolf

Decl., Ex. S, Aug. 2, 2018 Minutes.  None of the Movants voted on this approval or attended the

Strategic Transaction Committee session.  *Id*.  On August 6, 2018, Loot Crate repaid the loan in

---

[11] The Second Forbearance led to Mr. Mansour's appointment to the Loot Crate Board on May 24, 2018.
SUF ¶ 42; Wolf Decl. Ex. Q, May 24, 2018 Minutes.  Messrs. Beckman, Geant, Kaczorowski, and Amdani
joined the board on July 24, 2018.  SUF ¶ 46; Wolf Decl., Ex. S, July 24, 2018 Minutes.  Each resigned on
August 6, 2018. SUF ¶ 48; Wolf Decl., Ex. T.

full and paid a $1 million OID fee under the Second Forbearance Agreement, Compl. ¶ 217, and

Breakwater's designees resigned from the board.  SUF ¶ 48; Wolf Decl., Ex. T.

**Argument**

### A.    *Standard of Review.*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Rule") (made applicable by

Federal Rule of Bankruptcy Procedure 7056), summary judgment should be granted where there

is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of

law. *In re Mullins*, No. 16-11032 (BLS), 2017 WL 3705071, at *2 (Bankr. D. Del. Aug. 24, 2017)

(*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986)). The "mere existence of some alleged

factual dispute" is not sufficient to defeat a motion for summary judgment; "the requirement is

that there be no genuine issue of material fact." *In re Newpage Corp.*, 517 B.R. 508, 510 (Bankr.

D. Del. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). A fact is

"material" if a dispute over that fact "might affect the outcome of the suit under the governing

law."  *Id*. (quoting *Anderson*, 477 U.S. at 248). In order for a dispute to be "genuine," the

nonmoving party must "come forward with specific facts showing that there is a genuine issue for

trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

Central to Celotex and its progeny is that summary judgment – whether complete or partial

– is warranted where a single, necessary element of a claim must fail.  "[T]he plain language of

Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon

motion, against a party who fails to make a showing sufficient to establish the existence of *an*

*element essential to that party's case*, and on which that party will bear the burden of proof at trial.

In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure

of proof concerning an essential element of the nonmoving party's case necessarily renders all

other facts immaterial." *Celotex Corp*., 477 U.S. at 322–23 (emphasis added).  Focusing on the

11

single broken link in the chain is, as the Court put it, "[o]ne of the principal purposes of the summary judgment rule." *Id*. at 323–24.

Whenever failure of an essential element appears, summary judgment may be warranted. Rule 56(b) "authorizes a defending party to move 'at any time' for a summary judgment in his favor." *See, e.g., Hubicki v. ACF Indus., Inc.*, 484 F.2d 519, 522 (3d Cir. 1973) (affirming summary judgment where the only facts before the court were those contained in the committee's complaint and opposing affidavit); *Superior Offshore Int'l, Inc. v. Bristow Grp. Inc.*, No. 1:09-CV-00438-LDD, 2011 WL 2516522, at *7 (D. Del. June 23, 2011), *aff'd*, 490 F. App'x 492 (3d Cir. 2012). Fact discovery in a tripartite fiduciary duty dispute can be a crushing burden to all parties. In a busy Court like this, teasing apart all factual disputes raised by a once-profitable company's slide into insolvency would impose enormous time and expense. That investment is unwarranted here because Counts I-IV of the Complaint present no material factual dispute on one dispositive element: whether Plaintiff can prove an actionable breach. The Committee has benefitted from broad prefiling document discovery from Movants and the Upfront Defendants, and has Loot Crate's documents. It has already amended its pleadings. But in Counts I-IV it has not alleged – because it cannot allege – any breach of a legal duty by any Movant giving rise to harm to Loot Crate with respect to the suggestion of lost recapitalization opportunities.

### B.    *A Fiduciary Is Not Required to Engage in Self-Sacrifice.*

Viewed in the most charitable light, the Committee's Complaint pleads – and the documents show the point is not subject to dispute – that an alleged fiduciary (i) declined to compromise its own contract rights and (ii) acted in a cooperative manner with another investor, Upfront, that declined to compromise *its* contract rights. Each of the alleged "opportunities lost" was no opportunity at all.

Delaware law controls the question presented here.  Claims implicating a corporation's internal affairs (including claims depending on alleged breaches of fiduciary duty to the corporation) are governed by the law of the state of incorporation – here, Delaware. *Hamilton Partners, L.P. v. Highland Cap. Mgmt., L.P.*, No. 6547-VCN, 2014 WL 1813340, at *9 (Del. Ch. May 7, 2014); *see Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982) ("The internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders—because otherwise a corporation could be faced with conflicting demands.").

A Delaware fiduciary undertakes no duty to compromise its own contractual rights to benefit the object of its trust. *See generally Odyssey Partners, L.P. v. Fleming Co., Inc.*, CIV. A. No. 14770, 1996 WL 422377, at *3 (Del. Ch. July 24, 1996) ("*Odyssey*") (reciting the well-accepted principle of Delaware law that "fiduciary obligation does not require self-sacrifice"); *Odyssey Partners, L.P. v. Fleming Co. Inc.*, 735 A.2d 386, 411, 415 (Del. Ch. May 13, 1999) ("*Odyssey II*") (same; granting judgment to defendant where "[defendant's] refusal to waive its preemptive rights or to assume further financial obligations . . . without adequate compensation cannot seriously be thought to have been a breach of its fiduciary duties"). A fiduciary obligation imposes no limitations on the "legal powers held by one otherwise under a fiduciary duty, when such collateral legal powers do not derive from the circumstances or conditions giving rise to the fiduciary obligation in the first instance." *Odyssey*, 1996 WL 422377, at *3.  A creditor's fiduciary status – assuming it has one at all – does not compromise its rights as a creditor. *Id*.; *see Jedwab v. MGM Grand Hotels, Inc.*, 509 A.2d 584, 598 (Del. Ch. 1986) ("[The law] does not, absent a showing of culpability, require that directors or controlling shareholders sacrifice their own

financial interest in the enterprise for the sake of the corporation or its minority shareholders."); *In re CNX Gas Corp. S'holders Litig.*, 4 A.3d 397, 408-09 (Del. Ch. 2010) ("When a controller exercises contractual or statutory rights as a third-party lender, its actions are not subject to fiduciary review.").

*Odyssey* and *Odyssey II* map directly onto this dispute. The decisions concerned ABCO Holdings, Inc. ("ABCO"), a Delaware corporation. Fleming Companies, Inc. ("Fleming") was ABCO's largest lender and supplier as well as, at certain times, a fiduciary by reason of its shareholdings. Plaintiff alleged that Fleming used its position to frustrate ABCO's search for new capital. *See Odyssey II*, 735 A.2d at 410-11. The record showed two recapitalization opportunities. Fleming declined to give necessary consents for either. The court found that the two proposals would have required Fleming to suffer a "material dilution of its equity interest" and to provide additional credit, defer payments on a loan, make certain guarantees and subordinate its debt. *Id.* at 411. "Fleming was under no obligation to agree to any of these things, either as a stockholder, a supplier or a creditor." *Id.* (internal citation omitted). No breach could be proved because Fleming's "refusal to waive its preemptive rights or to assume further financial obligations on behalf of ABCO without adequate compensation cannot seriously be thought to have been a breach of its fiduciary duties." *Id.*

### C. *Each Financing Proposal Required Breakwater to Compromise its Contractual Rights.*

Even if any Movant had been a fiduciary – or had aided and abetted a fiduciary – each of the allegedly lost opportunities required Breakwater to compromise its rights under the Loan Agreement, or Breakwater or Upfront to consent to dilution of their preferred share interests, or

both.[12] There was no duty to do so. Delaware law clearly "recognizes the right of a preferred shareholder or creditor to protect its interests." *MHC Inv. Co. v. Racom Corp.*, 254 F. Supp. 2d 1090, 1102 (S.D. Iowa 2002) (applying Delaware law); *Odyssey II*, 735 A.2d at 415 ("one who may be both a creditor and a fiduciary . . . does not by reason of that status alone have special limitations imposed upon the exercise of his or her creditor rights"). It is axiomatic that nothing precludes a stockholder (or a contract counterparty for that matter) "from acting in its own self-interest." *Ivanhoe Partners v. Newmont Mining Corp.*, 535 A.2d 1334, 1344 (Del. 1987). The fiduciary's right to protect its interests does not evaporate when the company is in distress. *See generally In re Synthes, Inc. S'holder Litig.*, 50 A.3d 1022, 1040–41 (Del. Ch. 2012) (holding that controlling shareholder was not required to accept a sale bid that would have delivered a better deal for minority shareholders at its expense).

*Count I.* Count I alleges that Movants breached fiduciary duties. But Odyssey II held that declining to waive contractual lending rights or permit dilution of equity holdings could not be a fiduciary breach. Precisely the same is true here. Breakwater's "refusal to waive its preemptive rights or assume further financial obligations . . . cannot seriously be thought to have been a breach." *See Odyssey II*, 735 A.2d at 411. Thus, Plaintiff cannot prove the necessary element of breach of fiduciary duty under Count I, and that Count must fail.

*Count III.* To the extent that Count III, the implied covenant count, locates breach in Breakwater's failure to accept any of the alleged proposals, Plaintiff would have to identify and prove an implied covenant and its breach. Under California law (which governs both agreements

---

[12] The Complaint seeks to devise a "controlling" shareholder by lumping Breakwater's 10% of the preferred equity with Upfront's 45% stake. Compl. ¶¶ 39, 81. While Breakwater was never a controlling shareholder, and neither it nor its affiliated defendants held any board seat prior to May 2018, the Court need not reach the point to resolve this motion.

cited in paragraphs 39 and 45 of the Complaint), "[i]f there exists a contractual relationship between the parties . . . the implied covenant is limited to assuring compliance with the express terms of the contract, and cannot be extended to create obligations not contemplated in the contract." *Racine & Laramie, Ltd. v. Dep't of Parks & Recreation*, 11 Cal. App. 4th 1026, 1032, 14 Cal. Rptr. 2d 335, 339 (1992).  Here, the argument is nonsensical.  The loan agreement granted Breakwater comprehensive restrictive covenants and remedies on default.  Each of the alleged recapitalization proposals required Breakwater to compromise those restrictive covenants and remedies.  A contract cannot expressly grant a lender a right or remedy and impliedly require the lender to give it back.  The California Appeals Court recently observed that:

> "[t]he implied covenant of good faith and fair dealing cannot be read to require defendants to take a particular action that is discretionary under the contract when the contract also expressly grants them the discretion to take a different action. To apply the covenant to require a party to take one of two alternative actions expressly allowed by the contract and forgo the other would contravene the rule that the implied covenant of good faith and fair dealing may not be read to prohibit a party from doing that which is expressly permitted by an agreement."

*Bevis v. Terrace View Partners, LP*, 33 Cal. App. 5th 230, 256, 244 Cal. Rptr. 3d 797, 819 (2019) (internal citations and quotation marks omitted).

Delaware law is to the same effect.  *See Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009) ("*The implied covenant cannot be invoked to override the express terms of the contract*.  Moreover, rather than constituting a free floating duty imposed on a contracting party, the implied covenant can only be used conservatively to ensure the parties' 'reasonable expectations' are fulfilled." (internal quotations omitted; emphasis added)).  Thus so much of Count III as depends upon the "failed recapitalization" theory must fail because the covenant at issue cannot in law be implied, and thus there can be no breach.

*Counts II and IV*. Counts II and IV must fail under the logic that governs Count I. Each seeks damages for alleged collaboration with an alleged breach of fiduciary duty by the Upfront Defendants under "aiding and abetting" and "civil conspiracy" theories. But as to the Upfront Defendants as well, there is no dispute of material fact. The Complaint alleges no missed opportunity that Upfront was obliged to accept (or that its board designees were obligated to approve) because it is undisputed that each of the alleged opportunities required consent of the majority holders of preferred shares, each of the holders of preferred shares had the contractual right not to consent, and a majority (Breakwater and Upfront) never provided that consent.

In sum, as to each of Counts I-IV, Plaintiff can prove no actionable breach with regard to the alleged recapitalization opportunities. A claim that must fail of a single element is an archetypal *Celotex* claim, as to which partial summary judgment is warranted. 477 U.S. at 322–23 (ruling summary judgment was warranted where the party with the burden of proof could not succeed on "*an element essential to that party's case*"). Whether Breakwater's internal business judgment not to compromise its contractual rights was prudent is irrelevant because, in law, it had no duty ever to compromise those personal rights. The Management and Original BioWorld Proposals each involved the issuance of new preferred stock. Each would have required a Breakwater/Upfront consent that Breakwater and Upfront had no duty to give. Each also required Breakwater to relax rights under its Loan Agreement that it had every right to enforce. All of the South River subordinated debt financing proposals required compromise of Breakwater's rights and remedies under the Loan Agreement. The negotiations over the South River Proposal were efforts to negotiate a compromise to which Breakwater had no legal duty to agree to. *See supra* at 12. As the Complaint alleges, when a proposal was made for a full refinancing, Movants did not obstruct Loot Crate and that refinancing closed. Compl. ¶ 214.

There is simply no way around the record.  There is neither an allegation in the Complaint nor evidence that Loot Crate ever had a recapitalization opportunity that any duty, contractual or fiduciary, would have obliged Movants to support.  The company's failure was unfortunate (including for Breakwater, as its preferred equity became worthless), but it is not grounds for litigation against these Defendants. Partial summary judgment should enter in favor of Movants on Counts I, II, IV and so much of Count III as concerns alleged loss of corporate recapitalization opportunities.

### Conclusion

For the foregoing reasons, the Motion should be allowed.

Dated: June 17, 2021
Wilmington, Delaware

**MORGAN, LEWIS & BOCKIUS LLP**

By:  _/s/ Jody C. Barillare_
Jody C. Barillare (#5107)
1201 N. Market Street, Suite 2201
Wilmington, DE 19801
Telephone: (302) 574-7294
Email: jody.barillare@morganlewis.com

Sabin Willett (pro hac vice)
One Federal Street
Boston, MA 02110-1726
Telephone: (617) 951-8775
Email: sabin.willett@morganlewis.com

Shannon B. Wolf (pro hac vice)
One State Street
Hartford, CT 06103-3178
Telephone: (860) 240-2700
Email: shannon.wolf@morganlewis.com

*Attorneys for Movants Breakwater Credit Opportunities Fund, L.P., Saif Mansour, Aamir Amdani, Eric Beckman, Darrick Geant, and Joseph Kaczorowski*