Exhibit B



Page 1

The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE RESTATED CERTIFICATE OF "LOOT CRATE, INC.", FILED IN THIS OFFICE ON THE NINTH DAY OF MAY, A.D. 2016, AT 8:07 O`CLOCK A.M.

A FILED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE NEW CASTLE COUNTY RECORDER OF DEEDS.

Jeffrey W. Bullock, Secretary of State

5236088  8100
SR# 20162942292

You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 202289711
Date: 05-10-16

**#16063.1**

State of Delaware
Secretary of State
Division of Corporations
Delivered 08:07 AM 05/09/2016
FILED 08:07 AM 05/09/2016
SR 20162942292 - File Number 5236088

# AMENDED AND RESTATED
## CERTIFICATE OF INCORPORATION
## OF LOOT CRATE, INC.

**Loot Crate, Inc.**, a corporation organized and existing under the laws of the State of Delaware, hereby certifies as follows:

1.	The corporation was originally incorporated in the State of Delaware pursuant to a Certificate of Incorporation filed with the Secretary of State of the State of Delaware on November 1, 2012.

2.	This Amended and Restated Certificate of Incorporation restates, integrates and amends the Certificate of Incorporation of the corporation in its entirety as set forth in **Exhibit A**.

3.	This Amended and Restated Certificate of Incorporation has been duly adopted by the board of directors and stockholders of the Corporation in accordance with the provisions of Sections 228, 242 and 245 of the General Corporation Law of the State of Delaware.

IN WITNESS WHEREOF, the undersigned has executed this Amended and Restated Certificate of Incorporation on this sixth day of May, 2016.

**LOOT CRATE, INC.**

By: /S/Christopher Davis _____
Name: Christopher Davis
Title: Chief Executive Officer

## EXHIBIT A

### ARTICLE I

The name of the corporation is **Loot Crate, Inc.** (hereinafter, the "***Corporation***").

### ARTICLE II

The address of the registered office of the Corporation in the State of Delaware is 2711 Centerville Road, Suite 400, City of Wilmington, County of New Castle, and the name of the registered agent of the Corporation in the State of Delaware at such address is Corporation Service Company.

### ARTICLE III

The purpose of the Corporation is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of Delaware.

### ARTICLE IV

The Corporation is authorized to issue two classes of stock, designated "***Common Stock***" and "***Preferred Stock***," each with a par value of $0.0001 per share.  The total number of shares of Common Stock that the Corporation is authorized to issue is 14,000,000 shares.  The total number of shares of Preferred Stock that the Corporation is authorized to issue is 2,700,000 shares.

The Preferred Stock may be issued from time to time in one or more series.  The first series of Preferred Stock shall consist of 1,847,297 shares and shall be designated "***Series A Preferred Stock***" and the second series of Preferred Stock shall consist of 852,703 shares and shall be designated "***Series A-1 Preferred Stock***."  As used herein, the term "***Preferred Stock***" without designation shall refer to shares of the Series A Preferred Stock and shares of the Series A-1 Preferred Stock.

The number of authorized shares of Common Stock may be increased or decreased (but not below the number of shares thereof then outstanding) by (in addition to any vote of the holders of one or more series of Preferred Stock that may be required by the terms of the Certificate of Incorporation) the affirmative vote of the holders of shares of stock of the Corporation representing a majority of the votes represented by all outstanding shares of stock of the Corporation entitled to vote, irrespective of the provisions of Section 242(b)(2) of the General Corporation Law of Delaware..

The relative rights, preferences, privileges and restrictions granted to or imposed upon the Preferred Stock are as follows:

**1.  Dividends.**  No dividends shall be paid on any share of Common Stock unless a dividend (including the amount of any dividends paid pursuant to the above provisions of this Section 1) is paid with respect to all outstanding shares of Preferred Stock in an amount for each such share of Preferred Stock equal to or greater than the aggregate amount of such dividends for

**#16063.3**

all shares of Common Stock into which each such share of Preferred Stock could then be converted. The right to dividends on shares of Preferred Stock shall not be cumulative, and no right shall accrue to holders of Preferred Stock by reason of the fact that dividends on the Preferred Stock are not declared in any period, nor shall any undeclared or unpaid dividend bear or accrue interest.

    **2. Liquidation Preference.** In the event of a Liquidation Event (as defined below), the assets and funds of the Corporation available for distribution to stockholders shall be distributed as follows:

    (a) First, the holders of shares of Preferred Stock then outstanding shall be entitled to receive, out of the assets of the Corporation legally available for distribution to its stockholders, before any payment or distribution of such assets shall be made in respect of the Corporation's Common Stock, on a *pari passu* basis, an amount equal to $11.4343 per share of Series A Preferred Stock, as adjusted for any Recapitalization Events (as defined below) (the "*Original Series A Price*"), plus all declared and unpaid dividends on such shares to the date fixed for such distribution (the "*Series A Liquidation Preference*"), and an amount equal to $0.1173 per share of Series A-1 Preferred Stock, as adjusted for any Recapitalization Events (the "*Original Series A-1 Price*"), plus all declared and unpaid dividends on such shares to the date fixed for such distribution (the "*Series A-1 Liquidation Preference*"). If, upon the occurrence of such event, the assets of the Corporation legally available for distribution are insufficient to permit the payment to the holders of Preferred Stock of the full preferential amounts described in this Section 2(a), then the entire assets legally available for distribution to stockholders shall be distributed to the holders of the Preferred Stock ratably in proportion to the full preferential amounts which they would be entitled to receive pursuant to the preceding sentence of this Section 2(a). As used herein, "*Recapitalization Event*" means any stock split, reverse stock split, stock dividend and similar recapitalization event.

    (b) After the full preferential amounts due the holders of Preferred Stock pursuant to Section 2(a) have been paid or set aside, the remaining assets of the Corporation legally available for distribution to its stockholders, if any, shall be distributed to the holders of Common Stock ratably in proportion to the number of shares of Common Stock then held by each holder.

    (c) Each of the following events shall be deemed to be a "*Liquidation Event*" as that term is used in this Amended and Restated Certificate of Incorporation unless the holders of at least a majority of the outstanding shares of the Preferred Stock elect otherwise by written notice sent to the Corporation at least 15 days prior to the effective date of any such event: (i) the liquidation, dissolution or winding up of the Corporation, either voluntary or involuntary, (ii) a merger or consolidation of the Corporation into or with another entity after which the stockholders of the Corporation immediately prior to such transaction do not own, immediately following the consummation of the transaction by virtue of their shares in the Corporation or securities received in exchange for such shares in connection with the transaction, a majority of the voting power of the surviving entity in proportions substantially similar to those that existed immediately prior to such transaction, (iii) the sale, transfer or issuance by the Corporation, or the sale or transfer by the Corporation's stockholders other

**#16063.4**

than a sale or transfer by the stockholders to existing stockholders of the Corporation or affiliated parties of such existing stockholders, in either case, of more than 50% of the voting power of the Corporation in a transaction or series of related transactions other than in a transaction or series of transactions effected by the Corporation primarily for financing purposes, and (iv) the sale, transfer or other disposition (but not including a transfer or disposition by pledge or mortgage to a bona fide lender) of all or substantially all of the assets or intellectual property of the Corporation (other than to a wholly-owned subsidiary) (each of the transactions referred to in clauses (ii)-(iv), an "*Acquisition Event*"). Notwithstanding the foregoing, neither (A) a merger effected exclusively for the purpose of changing the domicile of the Corporation nor (B) the sale of shares of Preferred Stock of the Corporation in a transaction or series of related transactions effected primarily for equity financing purposes shall be deemed a Liquidation Event.

(d) In the event of any Liquidation Event of the Corporation involving the distribution of assets other than cash to the stockholders of the Corporation, the value of the assets to be distributed shall be determined as follows:

(i)    In the case of securities that are not subject to investment letter or other similar restrictions on free tradability,

(A) if traded on a national securities exchange or through the Nasdaq Global Market, the value shall be deemed to be the average of the closing prices of the securities over the 10 trading day period ending three trading days prior to the closing;

(B) if actively traded over-the-counter, the value shall be deemed to be the average of (i) the average of the last bid and ask prices or (ii) the closing sale prices (whichever is applicable) over the 30 day period ending three trading days prior to the closing; and

(C) if there is no active public market, the value shall be the fair market value thereof, as mutually determined by the Corporation and the holders of at least a majority of the voting power of all then outstanding shares of Preferred Stock.

(ii)    In the case of securities subject to investment letter or other restrictions on free marketability (other than restrictions arising solely by virtue of a stockholder's status as an affiliate or former affiliate), the value shall be based on an appropriate discount from the market value determined as above in Section 2(d)(i) to reflect the approximate fair market value thereof, as determined by the Board of Directors in the good faith exercise of its reasonable judgment.

(iii)    In the case of any other property, the value shall be equal to the property's fair market value, as determined by the Board of Directors in the good faith exercise of its reasonable judgment.

(iv)    The foregoing methods for valuing non-cash consideration to be distributed in connection with a Liquidation Event may be superseded by any determination of such value set forth in the definitive agreements governing such Liquidation Event.

#16063.5

(e) The Corporation does not have the power to effect any transaction constituting a Liquidation Event pursuant to Section 2(c)(ii) above unless the agreement or plan of merger or consolidation provides that the consideration payable to the stockholders of the Corporation shall be allocated among the holders of capital stock of the Corporation in accordance with Sections 2(a) and 2(b) above.

(f) Following the occurrence of any Liquidation Event, the Corporation shall, to the extent that the Corporation has control over, or title to, the proceeds from such Liquidation Event, use commercially reasonable efforts to distribute such proceeds as promptly as practicable in accordance with Sections 2(a) and 2(b) above, taking into account the terms and conditions of the Liquidation Event, including but not limited to, any earn-out or escrow provisions, subject to the limitations set forth in Section 2(g), below. Prior to the distribution in accordance with this Section 2(f), the Corporation shall not expend or dissipate the consideration received for such Liquidation Event, except (i) to discharge expenses incurred in the ordinary course of business, and (ii) as otherwise required by the agreement providing for such Liquidation Event, including but not limited to, payment for the fees and expenses, if any, of bankers, accountants and attorneys for the Corporation.

(g) Notwithstanding anything herein to the contrary, in the event of an Acquisition Event, if any portion of the consideration payable to the stockholders of the Corporation is payable only upon satisfaction of contingencies (the "*Additional Consideration*"), the merger agreement shall provide that (a) the portion of such consideration that is not Additional Consideration (such portion, the "*Initial Consideration*") shall be allocated among the holders of capital stock of the Corporation in accordance with Subsections 2(a) and 2(b) as if the Initial Consideration were the only consideration payable in connection with such Deemed Liquidation Event; and (b) any Additional Consideration which becomes payable to the stockholders of the Corporation upon satisfaction of such contingencies shall be allocated among the holders of capital stock of the Corporation in accordance with Subsections 2(a) and 2(b) after taking into account the previous payment of the Initial Consideration as part of the same transaction. For the purposes of this subsection, consideration placed into escrow or retained as holdback to be available for satisfaction of indemnification or similar obligations in connection with such Deemed Liquidation Event shall be deemed to be Additional Consideration.

3.    **Conversion.** The holders of the Preferred Stock shall have conversion rights as follows:

(a) **Right to Convert.** Each share of Preferred Stock shall be convertible, at the option of the holder thereof, without payment of any additional consideration by the holder thereof, at any time after the date of issuance of such share at the office of the Corporation or any transfer agent for the Preferred Stock, into Common Stock. The number of shares of fully paid and nonassessable Common Stock into which each share of Series A Preferred Stock may be converted shall equal the Original Series A Price divided by the Series A Conversion Price (as defined below) in effect at the time of conversion (the "*Series A Conversion Rate*"). The number of shares of fully paid and nonassessable Common Stock into which each share of Series A-1 Preferred Stock may be converted shall equal the Original Series A-1 Price divided by the Series A-1 Conversion Price (as defined

**#16063.6**

below) in effect at the time of conversion (the "*Series A-1 Conversion Rate*"). The Conversion Price for the Series A Preferred Stock (the "*Series A Conversion Price*") shall initially be $11.4343 and shall be subject to adjustment as provided in Section 3(d) below, and the Conversion Price for the Series A-1 Preferred Stock (the "*Series A-1 Conversion Price*") shall initially be $0.1173 and shall be subject to adjustment as provided in Section 3(d) below. Each of the Series A Conversion Price and the Series A-1 Conversion Price shall be referred to herein as a "*Conversion Price*" and each of the Series A Conversion Rate and the Series A-1 Conversion Rate shall be referred to herein as a "*Conversion Rate*."

(b) **Automatic Conversion.**    Each share of Preferred Stock shall automatically be converted into fully paid and nonassessable shares of Common Stock, at the then effective Conversion Rate, (i) upon the receipt by the Corporation of a written request or consent for such conversion from the holders of at least a majority of the voting power represented by the then outstanding shares of Preferred Stock (voting together as a single class on an as-converted basis) or (ii) immediately prior to the closing of a firm commitment underwritten public offering pursuant to an effective registration statement under the Securities Act of 1933, as amended, covering the offer and sale of Common Stock (a "*Qualified IPO*").

(c) **Mechanics of Conversion.**    Before any holder of Preferred Stock shall be entitled to convert the same into shares of Common Stock, such holder shall surrender the certificate or certificates therefore (or a reasonably acceptable affidavit and indemnity undertaking in the case of a lost, stolen or destroyed certificate), duly endorsed, at the headquarters of the Corporation or of any transfer agent for the Corporation and shall give written notice to the Corporation at such office of the number of shares of Preferred Stock that the holder is converting and shall state therein the name or names in which the certificate or certificates for shares of Common Stock are to be issued (except that no such written notice of election to convert shall be necessary in the event of an automatic conversion upon a Qualified IPO pursuant to Section 3(b)(ii) above).   The Corporation shall, as soon as practicable thereafter, issue and deliver at such office to such holder of Preferred Stock, or to the nominee or nominees of such holder, (A) a certificate or certificates for the number of shares of Common Stock to which he shall be entitled as aforesaid and (B) a check payable to the holder in the amount of any cash amounts payable as the result of a conversion into fractional shares of Common Stock.   Such conversion shall be deemed to have been made immediately prior to the close of business on the date of such surrender of the shares of Preferred Stock to be converted (except that, in the case of an automatic conversion upon a Qualified IPO pursuant to Section 3(b)(ii) above), such conversion shall be deemed to have been made immediately prior to the closing of the Qualified IPO) and the person or persons entitled to receive the shares of Common Stock issuable upon such conversion shall be treated for all purposes as the record holder or holders of such shares of Common Stock on such date.   Upon the occurrence of either of the events specified in Section 3(b) above, the outstanding shares of Preferred Stock shall be converted automatically without any further action by the holders of such shares and whether or not the certificates representing such shares are surrendered to the Corporation or its transfer agent; *provided, however*, that the Corporation shall not be obligated to issue certificates evidencing the shares of Common Stock issuable upon such conversion unless either the certificates evidencing such shares of Preferred Stock are delivered to the Corporation or its transfer agent as provided above, or

#16063.7

the holder notifies the Corporation or its transfer agent that such certificates have been lost, stolen or destroyed and executes an agreement satisfactory to the Corporation to indemnify the Corporation against any loss incurred by it in connection with such certificates.

(d) **Adjustments to Conversion Price for Dilutive Issuances.**

(i)    **Special Definitions.**    For purposes of this Section 3(d), the following definitions shall apply:

(A)    "*Original Issue Date*" shall mean, with respect to any series of Preferred Stock, the date on which shares of such series are first issued by the Corporation.

(B)    "*Additional Shares of Common Stock*" shall mean all shares of Common Stock issued (or, pursuant to Section 3(d)(ii) below, deemed to be issued) by the Corporation after the Original Issue Date, other than:

(1) shares of Common Stock issued upon conversion of Preferred Stock;

(2) shares for which an adjustment is made pursuant to Section 3(d)(v);

(3) shares actually issued upon the exercise or conversion of any Options, warrants to purchase equity securities or other Convertible Securities outstanding on the date of this Amended and Restated Certificate of Incorporation provided such issuance is pursuant to the terms of such Option, warrant or other Convertible Security;

(4) shares issued in connection with any Recapitalization Event;

(5) shares issued or issuable to officers, directors, employees or other service providers of, or consultants or advisors to, the Corporation pursuant to any stock option plan, restricted stock purchase agreement or other stock incentive program or similar arrangement in effect on the date of this Amended and Restated Certificate of Incorporation, including, without limitation, the Loot Crate, Inc. 2012 Stock Plan, as may be amended or amended and restated from time to time;

(6) shares issued or issuable to officers, directors, employees or other service providers of, or consultants or advisors to, the Corporation pursuant to any stock option plan, restricted stock purchase agreement or other stock incentive program or similar arrangement entered into or created following the date of this Amended and Restated Certificate of Incorporation (a "*New Plan*"); *provided*, *however*, that, before any such shares shall qualify under this exemption, such New Plan shall first be approved by the Board of Directors, including the Series A Director (as defined below) if then serving;

**#16063.8**

(7) shares issued in connection with a public offering pursuant to an effective registration statement under the Securities Act of 1933, as amended, covering the offer and sale of Common Stock;

(8) shares issued or issuable to financial institutions, equipment lessors, landlords, business partners or other entities in connection with commercial credit arrangements, equipment financings, real estate transactions, joint ventures or other partnering arrangements or similar transactions approved by the Board of Directors, including the Series A Director if then serving;

(9) shares issued or issuable to any other persons or entities with which the Corporation has business relationships; *provided* that such issuances are not undertaken primarily for capital-raising purposes; and *provided further* that such issuances are approved by the Board of Directors, including the Series A Director if then serving;

(10)    shares issued or issuable in connection with the acquisition by the Corporation of voting control or all or substantially all of the assets of another business entity in a transaction approved by the Board of Directors, including the Series A Director if then serving; and

(11)    shares issued or issuable pursuant to or in connection with any other transaction in which an exemption from this Section 3(d) is approved and consented to by the holders of a majority of the of the voting power represented by the then outstanding shares of Preferred Stock (voting together as a single class on an as-converted basis) (the shares described in the preceding clauses 1-11, "***Exempted Securities***").

(C)    "***Options***" shall mean rights, options or warrants to subscribe for, purchase or otherwise acquire either Common Stock or Convertible Securities (as defined below).

(D)    "***Convertible Securities***" shall mean any evidences of indebtedness, shares of Preferred Stock or other securities convertible into or exchangeable for Common Stock or Preferred Stock.

(ii)    **Deemed Issue of Additional Shares of Common Stock.**  In the event the Corporation at any time or from time to time after the Original Issue Date shall issue any Options or Convertible Securities or shall fix a record date for the determination of holders of any class of securities entitled to receive any such Options or Convertible Securities, then the following provisions shall apply:

(A)    The maximum number of shares (as set forth in the instrument relating thereto without regard to any provisions contained therein for a subsequent adjustment of such number) of Common Stock issuable upon the exercise of such Options or upon the conversion or exchange of such Convertible Securities shall be deemed to have been issued as of the time of the issuance of such Option or Convertible Security or, in case such a record date shall have been fixed, as of the close of business on such record date.

**#16063.9**

(B)     Except as provided in paragraphs (C) and (D) below, no further adjustment in the Conversion Price shall be made upon the subsequent issue of Convertible Securities or shares of Common Stock upon the exercise of such Options or conversion or exchange of such Convertible Securities.

(C)     If such Options or Convertible Securities by their terms provide, with the passage of time or otherwise, for any change in the consideration payable to the Corporation or the number of shares of Common Stock issuable upon the exercise, conversion or exchange thereof (other than a change resulting from the antidilution provisions of such Options or Convertible Securities), the Conversion Price computed upon the original issue thereof (or upon the occurrence of a record date with respect thereto) and any subsequent adjustments based thereon shall, upon any such increase or decrease becoming effective, be recomputed to reflect such change insofar as it affects such Options or the rights of conversion or exchange under such Convertible Securities; provided, however, that such recomputed Conversion Price shall not exceed the Conversion Price that would have been in effect had the original issuance of Options or Convertible Securities not been deemed to constitute an issuance of Additional Shares of Common Stock.

(D)     Upon the expiration of any such Options or Convertible Securities, the Conversion Price, to the extent in any way affected by or computed using such Options or Convertible Securities, shall be recomputed to reflect the issuance of only the number of shares of Common Stock actually issued upon the exercise of such Options or Convertible Securities.

(iii)     **Adjustment of Conversion Price for Dilutive Issuances.**  In the event the Corporation shall issue Additional Shares of Common Stock (including Additional Shares of Common Stock deemed to be issued pursuant to Section 3(d)(ii)) after the Original Issue Date of any series of Preferred Stock) without consideration or for a consideration per share less than the Conversion Price for such series in effect immediately prior to such issuance, then and in each such event the Conversion Price for such series shall be reduced to a price (rounded to the nearest one one-hundredth of one cent) equal to such Conversion Price multiplied by a fraction:

(x)     the numerator of which shall be the number of shares of Common Stock outstanding or deemed to be outstanding immediately prior to such issuance plus the number of shares of Common Stock which the aggregate consideration received by the Corporation for the total number of Additional Shares of Common Stock so issued would purchase at the Conversion Price in effect immediately prior to such issuance; and

(y)     the denominator of which shall be the number of shares of Common Stock outstanding or deemed to be outstanding immediately prior to such issuance plus the number of Additional Shares of Common Stock so issued.

For the purposes of this Section 3(d)(iii), the number of shares of Common Stock deemed to be outstanding shall include the Common Stock issuable upon full exercise and conversion of all then outstanding Options and Convertible Securities.

**#16063.10**

(iv)    **Determination of Consideration.**    For purposes of this Section 3(d), the consideration received by the Corporation for the issuance (or deemed issuance) of any Additional Shares of Common Stock shall be computed as follows:

(A)    **Cash and Property.**  Such consideration shall:

(1)    insofar as it consists of cash, be computed at the aggregate amount of cash received by the Corporation before deducting any reasonable discounts, commissions or other expenses allowed, paid or incurred by the Corporation for any underwriting or otherwise in connection with the issuance and sale thereof;

(2)    insofar as it consists of property other than cash, be computed at the fair value thereof at the time of such issue, as determined by the Board of Directors in the good faith exercise of its reasonable business judgment; and

(3)    in the event Additional Shares of Common Stock are issued together with other securities or other assets of the Corporation for consideration that covers both, be the proportion of such consideration so received, computed as provided in clauses (1) and (2) above, as determined by the Board of Directors in the good faith exercise of its reasonable business judgment.

(B)    **Options and Convertible Securities.**  The consideration per share received by the Corporation for Additional Shares of Common Stock deemed to have been issued pursuant to Section 3(d) relating to Options and Convertible Securities shall be equal to:

**(x)**    the total amount, if any, received or receivable by the Corporation as consideration for the issuance of such Options or Convertible Securities, plus the minimum aggregate amount of additional consideration (as set forth in the instruments relating thereto, without regard to any provision contained therein for a subsequent adjustment of such consideration) payable to the Corporation upon the exercise of such Options or the conversion or exchange of such Convertible Securities, or in the case of Options for Convertible Securities, the exercise of such Options for Convertible Securities and the conversion or exchange of such Convertible Securities, divided by

**(y)**    the maximum number of shares of Common Stock (as set forth in the instruments relating thereto, without regard to any provision contained therein for a subsequent adjustment of such number) issuable upon the exercise of such Options or the conversion or exchange of such Convertible Securities.

(v)    **Other Adjustments to Conversion Price.**

(A)    **Subdivisions, Combinations or Consolidations of Common Stock.**  In the event the outstanding shares of Common Stock shall be subdivided, combined or consolidated, by stock split, reverse stock split or similar event, into a greater or lesser number of shares of Common Stock after the Original Issue Date of a series of Preferred Stock, the Conversion Price for such series in effect immediately prior to such subdivision,

**#16063.11**

combination or consolidation shall, concurrently with the effectiveness of such subdivision, combination or consolidation, be proportionately adjusted.

(B)    **Common Stock Dividends and Distributions.**    If, after the Original Issue Date of a series of Preferred Stock, the Corporation at any time or from time to time issues, or fixes a record date for determination of holders of Common Stock entitled to receive, a dividend or other distribution payable in additional shares of Common Stock, then in each such event, as of the time of such issuance or, in the event such record date is fixed, as of the close of business on such record date, the Conversion Price for such series that is then in effect shall be decreased by multiplying the Conversion Price then in effect by a fraction, (x) the numerator of which is the number of shares of Common Stock issued and outstanding immediately prior to the time of such issuance or the close of business on such record date, and (y) the denominator of which is the number of shares of Common Stock issued and outstanding immediately prior to the time of such issuance or the close of business on such record date plus the number of shares of Common Stock issuable in payment of such dividend or distribution; provided, however, that if a record date is fixed and such dividend or distribution is not paid in full on the date fixed therefor, each Conversion Price shall be recomputed accordingly as of the close of business on such record date and thereafter each Conversion Price shall be adjusted pursuant to this Section 3(d)(v)(B) to reflect the actual payment of such dividend or distribution.

(C)    **Other Distributions.**    In case the Corporation shall distribute to holders of its Common Stock shares of its capital stock (other than shares of Common Stock and other than as otherwise subject to adjustment pursuant to this Section 3(d)), stock or other securities of other persons, evidences of indebtedness issued by the Corporation or other persons, assets (excluding cash dividends) or options or rights (excluding options to purchase and rights to subscribe for Common Stock or other securities of the Corporation convertible into or exchangeable for Common Stock), or shall fix a record date for determination of holders of Common Stock entitled to receive such a distribution, then, in each such case, provision shall be made so that the holders of Preferred Stock shall be entitled to receive, upon conversion thereof, in addition to the number of shares of Common Stock receivable thereupon, the distribution of securities of the Corporation that they would have received had their Preferred Stock been converted into Common Stock on the date of such event (or on the record date with respect thereto, if such record date is fixed) and had they thereafter, during the period from the date of such event to and including the date of conversion, retained such distribution receivable by them as aforesaid during such period, subject to all other adjustments called for during such period under this Section 3 with respect to the rights of the holders of the Preferred Stock.

(D)    **Recapitalizations and Reorganizations.**    In the case of any capital recapitalization or reorganization (other than a subdivision, combination or other recapitalization provided for elsewhere in this Section 3 or a Liquidation Event provided for in Section 2), or the fixing of any record date for determination of holders of Common Stock affected by such recapitalization or reorganization, provision shall be made so that the holders of Preferred Stock shall be entitled to receive, upon conversion thereof, the type and number of shares of stock or other securities or property of the Corporation or otherwise that they would have received had their Preferred Stock been converted into Common Stock on the date of such event (or on the record date with respect thereto, if such record date is fixed) and had they thereafter, during the period from the date of such event to and including the date of conversion,

**#16063.12**

retained such shares of stock or other securities or property receivable by them as aforesaid during such period, subject to all other adjustments called for during such period under this Section 3 with respect to the rights of the holders of the Preferred Stock.

(e) **Certificate as to Adjustments.**   Upon the occurrence of each adjustment or readjustment of the Conversion Prices pursuant to this Section 3, the Corporation at its expense shall promptly compute such adjustment or readjustment in accordance with the terms hereof and furnish to each holder of a share of such series of Preferred Stock a certificate setting forth such adjustment or readjustment and showing in detail the facts upon which such adjustment or readjustment is based, including the consideration received for any Additional Shares of Common Stock issued.  The Corporation shall, upon the written request at any time of any holder of a Preferred Stock, furnish or cause to be furnished to such holder a like certificate setting forth (i) such adjustments and readjustments, (ii) the Conversion Price at the time in effect for the series of Preferred Stock held by such holder and (iii) the number of shares of Common Stock and the type and amount, if any, of other property which at the time would be received upon the conversion of a share of such series of Preferred Stock.

(f) **Fractional Shares.**   No fractional shares of Common Stock shall be issued upon conversion of shares of Preferred Stock.  In lieu of any fractional shares to which the holder of Preferred Stock would otherwise be entitled, the Corporation shall pay cash equal to such fraction multiplied by the then fair market value of a share of Common Stock as determined by the Board of Directors.  The number of whole shares issuable to each holder of a series of Preferred Stock upon such conversion shall be determined on the basis of the number of shares of Common Stock issuable upon conversion of the total number of shares of such series being converted into Common Stock by such holder at that time.

(g) **Notices of Record Date.**   In the event (i) the Corporation shall set a record date for the purpose of entitling the holders of its capital stock to receive a dividend or other distribution (other than a cash dividend), (ii) of any capital reorganization, reclassification or recapitalization (other than a subdivision or combination of its outstanding shares of Common Stock), or (iii) of a Liquidation Event pursuant to Section 2, then, and in any such case, the Corporation shall cause to be mailed to each holder of record of Preferred Stock at the address of record of such stockholder as set forth on the Corporation's books, at least 10 days prior to the earliest date hereinafter specified, a notice stating the material terms of the proposed transaction and the date on which (x) a record is to be taken for the purpose of such dividend or distribution or (y) such reorganization, reclassification, recapitalization or Liquidation Event is to take place and the date, if any is to be fixed, as of which holders of capital stock of record shall be entitled to exchange their shares of capital stock for securities or other property deliverable upon such reorganization, reclassification, recapitalization or Liquidation Event; *provided, however*, that such notice period may be shortened upon the written consent of holders of Preferred Stock that are entitled to such notice rights or similar notice rights and that represent at least a majority of the voting power of all then outstanding shares of such Preferred Stock (voting together as a single class on a converted basis).  If any material change in the facts set forth in the written notice shall occur, the Corporation shall promptly give written notice of such material change to each holder of shares of Preferred Stock.

#16063.13

(h) **No Impairment.** Without obtaining such consent of the holders of Preferred Stock as may be required under Section 6 hereof, the Corporation will not, by amendment of its Certificate of Incorporation or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by the Corporation, but will at all times in good faith assist in the carrying out of all the provisions of this Section 3 and in the taking of all such action as may be necessary or appropriate in order to protect the conversion rights of the holders of Preferred Stock against impairment.

(i) **Reservation of Stock Issuable Upon Conversion.** The Corporation shall at all times reserve and keep available out of its authorized but unissued shares of Common Stock, solely for the purpose of effecting the conversion of the Preferred Stock, such number of shares of its Common Stock as shall from time to time be sufficient to effect the conversion of all outstanding shares of Preferred Stock; and if at any time the number of authorized but unissued shares of Common Stock shall not be sufficient to effect the conversion of all then outstanding shares of Preferred Stock, the Corporation will take such corporate action as may, in the opinion of its counsel, be necessary to increase its authorized but unissued shares of Common Stock to such number of shares as shall be sufficient for such purpose.

(j) **Waiver of Adjustment to Conversion Price.** Notwithstanding anything herein to the contrary, any adjustment of the Conversion Price required by Section 3(d)(iii) hereof may be waived, either prospectively or retroactively, by the written consent or vote of the holders of a majority of the outstanding shares of Preferred Stock, voting as a separate series. Any such waiver shall bind all holders of Preferred Stock.

**4. Redemption.** No shares of the Preferred Stock shall be redeemable at the option of the holders thereof.

**5. Voting Rights.**

(a) **General.** Each holder of Preferred Stock shall be entitled to the number of votes equal to the number of whole shares of Common Stock into which the shares of Preferred Stock held by such holder could then be converted and, except as otherwise required by law or as set forth herein, shall have voting rights and powers equal to the voting rights and powers of the Common Stock. Each holder of Preferred Stock shall be entitled to notice of any stockholders' meeting in accordance with the Bylaws of the Corporation and shall be entitled to vote with the holders of Common Stock with respect to any matter upon which holders of Common Stock have the right to vote, except as otherwise provided herein or those matters required by law to be submitted to a class vote.

(b) **Election of Directors.** At each election of directors of the Corporation (i) at any time when shares of Preferred Stock remain outstanding, the holders of Preferred Stock, voting together as a single class on an as-converted basis, shall be entitled to elect one (1) director (the "*Series A Director*"), (ii) the holders of Common Stock, voting as a separate class, shall be entitled to elect two (2) directors and (iii) the holders of Preferred Stock and

Common Stock, voting together as a single class on an as-converted basis, shall be entitled to elect the remaining directors of the Corporation. Any director elected as provided in the preceding sentence may be removed with or without cause by, and only by, the affirmative vote of the holders of the shares of the class or series of stock entitled to elect such director or directors, given either at a special meeting of such stockholders duly called for that purpose or pursuant to a written consent of stockholders.

6. **Protective Provisions.** At any time when shares of Preferred Stock are outstanding, the Corporation shall not, without first obtaining the affirmative vote or written consent of the holders of a majority of the voting power represented by the then outstanding shares of Preferred Stock, voting together as a single class on an as-converted basis:

(a) amend this Amended and Restated Certificate of Incorporation or the Bylaws of the Corporation in any manner that adversely affects the Preferred Stock

(b) increase or decrease the total number of authorized shares of the Common Stock or the Preferred Stock;

(c) redeem, purchase or otherwise acquire (or pay into or set aside a sinking fund for such purpose) any shares of Common Stock or Preferred Stock other than in connection with (i) the repurchase of Common Stock at the original purchase price thereof from employees, officers, directors, consultants or other service providers pursuant to agreements providing for such repurchase upon termination of employment or service to the Corporation, or (ii) the exercise of a contractual right of first refusal entitling the Corporation to purchase such shares upon substantially the same terms offered by a third party;

(d) declare, set aside for payment or pay any dividend on the Common Stock, other than a dividend payable solely in shares of Common Stock;

(e) change the authorized number of directors of the Corporation; or

(f) enter into transaction or series of related transactions constituting a Liquidation Event.

7. **Status of Converted or Redeemed Stock.** In the event any shares of Preferred Stock shall be converted pursuant to Section 3 hereof, or otherwise acquired by the Corporation, the shares so converted or acquired shall be canceled and shall not be issuable by the Corporation, and the Certificate of Incorporation of the Corporation shall be appropriately amended to effect the corresponding reduction in the Corporation's authorized capital stock.

8. **Residual Rights.** All rights accruing to the outstanding shares of the Corporation not expressly provided for to the contrary herein shall be vested in the Common Stock.

9. **Consent to Certain Repurchases.** To the extent the Corporation may be subject to Section 2115 of the California Corporations Code, each holder of an outstanding share of Preferred Stock shall be deemed to have consented, for purposes of Section 500 of the California Corporations Code (or for purposes of former Sections 502 and 503 thereof, and any successor provisions thereto), to distributions made by the Corporation in connection with the repurchase

#16063.15

of shares of Common Stock issued to or held by directors, employees, consultants or other service providers (i) upon termination of their employment or services, (ii) in connection with other repurchases from employees at the then deemed fair market value of the Common Stock, if approved by the Board of Directors of the Corporation, or (iii) in connection with the exercise by the Corporation of contractual rights of first refusal or first offer pursuant to agreements providing for the right of said repurchase between the Corporation and such persons, provided the terms of such repurchase shall have been approved by the Board of Directors of the Corporation, and agrees that any such distributions can be made without regard to the "preferential rights amount" or "preferential rights" or "preferential dividends arrears amount" referenced in Section 500(b) of the California Corporations Code.

**10. Waiver.** Any of the rights, powers, preferences and other terms of the Series A Preferred Stock set forth herein including, without limitation, the requirements set forth in Section 2(g), may be waived on behalf of all holders of the Series A Preferred Stock by the affirmative written consent or vote of the holders of at least a majority of the shares of the Series A Preferred Stock then outstanding. Any of the rights, powers, preferences and other terms of the Series A-1 Preferred Stock set forth herein including, without limitation, the requirements set forth in Section 2(g), may be waived on behalf of all holders of the Series A-1 Preferred Stock by the affirmative written consent or vote of the holders of at least a majority of the shares of the Series A-1 Preferred Stock then outstanding.

## ARTICLE V

The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors. In addition to the powers and authority expressly conferred upon them by statute or by this Amended and Restated Certificate of Incorporation or the Bylaws of the Corporation, the directors are hereby empowered to exercise all such powers and do all such acts and things as may be exercised or done by the Corporation. Election of directors need not be by written ballot, unless the Bylaws of the Corporation so provide. Except as otherwise provided in this Amended and Restated Certificate of Incorporation, the number of directors of the Corporation shall be determined in the manner set forth in the Bylaws of the Corporation.

## ARTICLE VI

The Board of Directors is authorized to make, adopt, amend, alter or repeal the Bylaws of the Corporation. The stockholders shall also have power to make, adopt, amend, alter or repeal the Bylaws of the Corporation.

## ARTICLE VII

To the fullest extent permitted by the Delaware General Corporation Law, as the same exists or may hereafter be amended, a director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director. Any repeal or modification of the foregoing provisions of this Article VII, or the adoption of any provision of the Certificate of Incorporation inconsistent with this Article VII, shall not adversely affect any right or protection of a director of the Corporation existing at the

**#16063.16**

time of, or increase the liability of any director of the Corporation with respect to any acts or omissions occurring prior to, such repeal or modification.

## ARTICLE VIII

The Corporation is authorized to provide indemnification of (and advancement of expenses to) agents (as defined in Section 317 of the California Corporations Code) through Bylaw provisions, agreements with agents, the affirmative vote of shareholders or disinterested directors or otherwise, in excess of the indemnification and advancement otherwise permitted by Section 317 of the California Corporations Code, subject only to the applicable limits on indemnification set forth in Sections 204 and 317 of the California Corporations Code with respect to actions for breach of duty to the Corporation or its stockholders, to the extent the Corporation is subject to those provisions pursuant to Section 2115 of the California Corporations Code. To the fullest extent permitted by the Delaware General Corporation Law, as the same exists or may hereafter be amended, the Corporation is authorized to provide indemnification of (and advancement of expenses to) agents of the Corporation (and any other persons to which the Delaware General Corporation Law permits the Corporation to provide indemnification) through Bylaw provisions, agreements with such agents or other persons, the affirmative vote of stockholders or disinterested directors or otherwise, in excess of the indemnification and advancement otherwise permitted by Section 145 of the Delaware General Corporation Law, subject only to limits created by applicable Delaware General Corporation Law (statutory or non-statutory), with respect to actions for breach of duty to the Corporation, its stockholders and others.

Any repeal or modification of the foregoing provisions of this Article VIII, or the adoption of any provision of the Certificate of Incorporation inconsistent with this Article VIII, shall not adversely affect any right or protection of a director, officer, agent or other person existing at the time of, or increase the liability of any director, officer, agent or other person with respect to any acts or omissions of such director, officer, agent or other person occurring prior to, such repeal or modification.

## ARTICLE IX

The Corporation reserves the right to amend or repeal any of the provisions contained in this Amended and Restated Certificate of Incorporation in any manner now or hereafter permitted by law, and the rights conferred upon the stockholders of the Corporation herein are granted subject to this reservation.

**#16063.17**

# LOOT CRATE, INC.

# VOTING AGREEMENT

THIS VOTING AGREEMENT (this "*Agreement*") is made and entered into as of May 10, 2016, by and among Loot Crate, Inc., a Delaware corporation (the "*Company*"), each of those persons and entities, severally and not jointly, whose names are set forth on the Schedule of Investors attached hereto as <u>Exhibit A</u> (individually, an "*Investor*," and collectively, together with any subsequent purchasers or transferees who become parties hereto as an Investor pursuant to Sections 5.1 or 5.2, the "*Investors*"), and each of those persons, severally and not jointly, whose names are set forth on the Schedule of Key Holders attached hereto as <u>Exhibit B</u> (individually, a "*Key Holder*," or collectively, together with any subsequent purchasers or transferees who become parties hereto as a Key Holder pursuant to Sections 5.1 or 5.2, the "*Key Holders*," and, together with the Investors, the "*Stockholders*").

## RECITALS

A.    The Company and the Investors are parties to a Series A Preferred Stock Purchase Agreement of even date herewith (the "*Series A Agreement*") pursuant to which the Investors shall purchase shares of the Series A Preferred Stock of the Company (the "*Series A Preferred Stock*") and/or shares of the Series A-1 Preferred Stock of the Company (together with the Series A Preferred Stock, the "*Preferred Stock*").

B.    In order to induce the Investors to enter into the Series A Agreement and invest funds in the Company pursuant thereto, the Company and the Key Holders desire to enter into this Agreement with the Investors.

C.    The Amended and Restated Certificate of Incorporation of the Company (the "*Restated Certificate*") provides that (i) the holders of Preferred Stock, voting together as a single class on an as-converted basis, shall be entitled to elect one director of the Company (the "*Series A Director*"), (ii) the holders of Common Stock, voting as a separate class, shall be entitled to elect two (2) directors of the Company (each, a "*Common Director*"), and (iii) the holders of Preferred Stock and Common Stock, voting together as a single class on an as-converted basis, shall be entitled to elect the remaining directors of the Company ("*At-Large Directors*").

## AGREEMENT

NOW, THEREFORE, in consideration of mutual promises herein contained and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.    **Shares Subject to this Agreement**.  The Key Holders each agree to hold all shares of voting capital stock of the Company registered in their respective names or beneficially owned by them as of the date of this Agreement and any other shares of voting capital stock of the Company legally or beneficially held or acquired by them after the date hereof (the "*Key Holder Shares*") subject to, and to vote the Key Holder Shares in accordance with, the

**#16072.1**

provisions of this Agreement.  The Investors each agree to hold all shares of voting capital stock of the Company registered in their respective names or beneficially owned by them as of the date of this Agreement and any other shares of voting capital stock of the Company legally or beneficially held or acquired by them after the date hereof (the "***Investor Shares***" or, collectively with the Key Holder Shares, the "***Stockholder Shares***") subject to, and to vote the Investor Shares in accordance with, the provisions of this Agreement.

2.     **Board of Directors.**

2.1     **Size of Board.**    Each of the Stockholders shall vote all of their Stockholder Shares, and shall take all other necessary actions within their control (whether in their capacity as a stockholder, director, or officer of the Company or otherwise), including, without limitation, calling meetings, attending meetings, executing a proxy to vote at any meeting and executing written consents, in order to ensure that the size of the Board of Directors (the "***Board***") shall be set at five (5) directors.

2.2     **Board Composition.**    Each of the Stockholders shall vote all of their Stockholder Shares, and shall take all other necessary actions within their control (whether in their capacity as a stockholder, director, or officer of the Company or otherwise), including, without limitation, calling meetings, attending meetings, executing a proxy to vote at any meeting and executing written consents, to cause the election to the Board of:

(a)     One person designated by Upfront V, LP ("***Upfront***"), to serve as the Series A Director, who shall initially be Greg Bettinelli, for so long as Upfront and its Affiliates (as defined below) continue to own beneficially at least thirty percent (30%) of the shares of the Preferred Stock issued and sold by the Company to Upfront and its Affiliates pursuant to the terms and conditions of the Series A Agreement;

(b)     One person designated by Christopher Davis ("***Davis***"), or, at Davis's election, the holders of a majority of the issued and outstanding shares of the Common Stock (the "***Common Holders***"), to serve as a Common Director (the "***Non-CEO Common Director***"), which such seat shall initially be vacant; *provided, however*, that if Davis's service to the Company is terminated for Cause, the Non-CEO Common Director shall be designated by the Common Holders;

(c)     The Company's Chief Executive Officer, to serve as a Common Director (the "***CEO Director***"), who shall initially be Davis; and

(d)     Two persons not otherwise an Affiliate of the Company or any Investor who are, in each case, mutually acceptable to the Series A Director (if then serving) and the holders a majority of the issued and outstanding shares of the Common Stock, who shall serve as the At-Large Directors, which such seats shall initially be vacant.

For purposes of this Agreement, (i) an individual or entity shall be deemed an "***Affiliate***" of another individual or entity that, directly or indirectly, controls, is controlled by or is under common control with such individual or entity, including, without limitation, any general partner, managing member, officer or director of such entity or any venture capital fund now or hereafter existing that is controlled by one or more general partners or managing members of, or

WEST\268453087.11
383293-000012

shares the same management company with, such entity; and (ii) "*Cause*" shall mean (A) repeated gross negligence or willful misconduct in the performance of Davis's duties to the Company or a subsidiary thereof where such repeated gross negligence or willful misconduct has resulted or is likely to result in substantial and material damage to the Company or any subsidiary thereof; (B) failure or inability to perform any assigned duties after written notice from the Company to Davis of, and a reasonable opportunity to cure, such failure or inability; (C) commission of any act of fraud with respect to the Company or any subsidiary thereof causing material harm to the business, assets or reputation of the Company of any subsidiary thereof; (D) conviction (including any plea of no contest) of a felony or a crime involving moral turpitude; or (E) Davis's unauthorized use or disclosure of the confidential information or trade secrets of the Company or any subsidiary thereof which use causes material harm to the Company or any subsidiary thereof.

2.3    **Removal.**

(a)    Upon the request of any Investor that is entitled to designate a director pursuant to Section 2.2, each of the Stockholders shall vote all of their Stockholder Shares in favor of the removal of the director designated by that Investor.  Absent such a request by an Investor, the Stockholders agree not to vote their Stockholder Shares in favor of the removal of the director designated by such Investor.

(b)    In the event that the CEO Director shall cease to serve as the Chief Executive Officer of the Company without resigning from the Board, the Stockholders agree to vote all of their Stockholder Shares in favor of the removal of the former Chief Executive Officer from the position of CEO Director.

2.4    **Vacancies.**  If any representative designated as provided in Section 2.2 above for any reason ceases to serve as a member of the Board during his or her term of office, the parties to this Agreement shall cause the resulting vacancy to be filled by a representative designated as provided above by the respective person or persons entitled to designate such representative.

2.5    **Expenses Incurred by Non-Employee Directors.**  The Company shall reimburse all non-employee directors for their actual and reasonable out-of-pocket expenses incurred in attending meetings of the Board and all committees of the Board and otherwise incurred in fulfilling their duties as directors.

2.6    **Indemnification Agreements.**    At the date of the closing of the transactions contemplated by the Series A Agreement and on each later date that a director is first elected or appointed to the Board, the Company shall enter into an indemnification agreement in substantially the form attached hereto as Exhibit C with each director of the Company who is elected or appointed to the Board on such date.

3.    **Vote to Increase Authorized Common Stock.**  Each Stockholder agrees to vote or cause to be voted all Stockholder Shares beneficially owned by such Stockholder in whatever manner as shall be necessary to increase the number of authorized shares of Common Stock from

3

time to time to ensure that there will be sufficient shares of Common Stock available for conversion of all of the shares of Preferred Stock outstanding at any given time.

4.    **Drag-Along Right**.

4.1    **Definitions**.  A "***Sale of the Company***" shall mean either: (a) a transaction or series of related transactions in which a Person, or a group of related Persons, acquires from stockholders of the Company shares representing more than fifty percent (50%) of the out-standing voting power of the Company (a "***Stock Sale***"); or (b) a transaction that qualifies as a "***Deemed Liquidation Event***" as defined in the Restated Certificate.  "***Shares***" shall mean and include any securities of the Company the holders of which are entitled to vote for members of the Board, including without limitation, all shares of Common Stock and Series A Preferred Stock, by whatever name called, now owned or subsequently acquired by a Stockholder, however acquired, whether through stock splits, stock dividends, reclassifications, recapitalizations, similar events or otherwise.  "***Person***" shall mean an individual, firm, corporation, partnership, association, limited liability company, trust or any other entity.

4.2    **Actions to be Taken.**  In the event that (i) the holders of at least a majority of the shares of Common Stock then issued or issuable upon conversion of the shares of Series A Preferred Stock (the "***Selling Investors***"); (ii) the Board; and (iii) the holders of a majority of the then outstanding shares of Common Stock (other than those issued or issuable upon conversion of the shares of Series A Preferred Stock) (collectively, the "***Electing Holders***") approve a Sale of the Company in writing, specifying that this Section 4 shall apply to such transaction, then each Stockholder and the Company hereby agree:

(a)    if such transaction requires stockholder approval, with respect to all Shares that such Stockholder owns or over which such Stockholder otherwise exercises voting power, to vote (in person, by proxy or by action by written consent, as applicable) all Shares in favor of, and adopt, such Sale of the Company (together with any related amendment to the Restated Certificate required in order to implement such Sale of the Company) and to vote in opposition to any and all other proposals that could reasonably be expected to delay or impair the ability of the Company to consummate such Sale of the Company;

(b)    if such transaction is a Stock Sale, to sell the same proportion of shares of capital stock of the Company beneficially held by such Stockholder as is being sold by the Selling Investors to the Person to whom the Selling Investors propose to sell their Shares, and, except as permitted in Subsection 4.3 below, on the same terms and conditions as the Selling Investors;

(c)    to execute and deliver all related documentation and take such other action in support of the Sale of the Company as shall reasonably be requested by the Company or the Selling Investors in order to carry out the terms and provision of this Section 4, including, without limitation, executing and delivering instruments of conveyance and transfer, and any purchase agreement, merger agreement, indemnity agreement, escrow agreement, consent, waiver, governmental filing, share certificates duly endorsed for transfer (free and clear of impermissible liens, claims and encumbrances), and any similar or related documents;

4

**#16072.4**

(d)    not to deposit, and to cause their Affiliates not to deposit, except as provided in this Agreement, any Shares of the Company owned by such party or Affiliate in a voting trust or subject any Shares to any arrangement or agreement with respect to the voting of such Shares, unless specifically requested to do so by the acquiror in connection with the Sale of the Company;

(e)    to refrain from exercising any dissenters' rights or rights of appraisal under applicable law at any time with respect to such Sale of the Company;

(f)    if the consideration to be paid in exchange for the Shares pursuant to this Section 4 includes any securities and due receipt thereof by any Stockholder would require under applicable law (x) the registration or qualification of such securities or of any person as a broker or dealer or agent with respect to such securities; or (y) the provision to any Stockholder of any information other than such information as a prudent issuer would generally furnish in an offering made solely to "accredited investors" as defined in Regulation D promulgated under the the Securities Act of 1933, as amended (the "***Securities Act***"), the Company may cause to be paid to any such Stockholder in lieu thereof, against surrender of the Shares which would have otherwise been sold by such Stockholder, an amount in cash equal to the fair value (as determined in good faith by the Company) of the securities which such Stockholder would otherwise receive as of the date of the issuance of such securities in exchange for the Shares; and

(g)    in the event that the Selling Investors, in connection with such Sale of the Company, appoint a stockholder representative (the "***Stockholder Representative***") with respect to matters affecting the Stockholders under the applicable definitive transaction agreements following consummation of such Sale of the Company, (x) to consent to (i) the appointment of such Stockholder Representative, (ii) the establishment of any applicable escrow, expense or similar fund in connection with any indemnification or similar obligations, and (iii) the payment of such Stockholder's pro rata portion (from the applicable escrow or expense fund or otherwise) of any and all reasonable fees and expenses to such Stockholder Representative in connection with such Stockholder Representative's services and duties in connection with such Sale of the Company and its related service as the representative of the Stockholders, and (y) not to assert any claim or commence any suit against the Stockholder Representative or any other Stockholder  with respect to any action or inaction taken or failed to be taken by the Stockholder Representative in connection with its service as the Stockholder Representative, absent fraud or willful misconduct.

4.3    **Exceptions**.  Notwithstanding the foregoing, a Stockholder will not be required to comply with Subsection 4.2 above in connection with any proposed Sale of the Company (the "***Proposed Sale***"), unless:

(a)    the liability for indemnification, if any, of such Stockholder in the Proposed Sale and for the inaccuracy of any representations and warranties made by the Company or its Stockholders in connection with such Proposed Sale, is several and not joint with any other Person (except to the extent that funds may be paid out of an escrow established to cover breach of representations, warranties and covenants of the Company as well as breach by any stockholder of any of identical representations, warranties and covenants provided by all

5

#16072.5

stockholders), and subject to the provisions of the Restated Certificate related to the allocation of the escrow, is pro rata in proportion to, and does not exceed, the amount of consideration paid to such Stockholder in connection with such Proposed Sale; and

(b)     upon the consummation of the Proposed Sale (i) each holder of each class or series of the Company's stock will receive the same form of consideration for their shares of such class or series as is received by other holders in respect of their shares of such same class or series of stock,  (ii) each holder of a series of Preferred Stock will receive the same amount of consideration per share of such series of Preferred Stock as is received by other holders in respect of their shares of such same series, (iii) each holder of Common Stock will receive the same amount of consideration per share of Common Stock as is received by other holders in respect of their shares of Common Stock, and (iv) unless the holders of at least a majority of the Series A Preferred Stock elect to receive a lesser amount by written notice given to the Company at least 20 days prior to the effective date of any such Proposed Sale, the aggregate consideration receivable by all holders of the Preferred Stock and Common Stock shall be allocated among the holders of Preferred Stock and Common Stock on the basis of the relative liquidation preferences to which the holders of each respective series of Preferred Stock and the holders of Common Stock are entitled in a Deemed Liquidation Event (assuming for this purpose that the Proposed Sale is a Deemed Liquidation Event) in accordance with the Company's Certificate of Incorporation in effect immediately prior to the Proposed Sale; provided, however, that, notwithstanding the foregoing, if the consideration to be paid in exchange for the Key Holder Shares or Investor Shares, as applicable, pursuant to this Subsection 4.3(b) includes any securities and due receipt thereof by any Key Holder or Investor would require under applicable law (x) the registration or qualification of such securities or of any person as a broker or dealer or agent with respect to such securities; or (y) the provision to any Key Holder or Investor of any information other than such information as a prudent issuer would generally furnish in an offering made solely to "accredited investors" as defined in Regulation D promulgated under the Securities Act, the Company may cause to be paid to any such Key Holder or Investor in lieu thereof, against surrender of the Key Holder Shares or Investor Shares, as applicable, which would have otherwise been sold by such Key Holder or Investor, an amount in cash equal to the fair value (as determined in good faith by the Company) of the securities which such Key Holder or Investor would otherwise receive as of the date of the issuance of such securities in exchange for the Key Holder Shares or Investor Shares, as applicable.

5.     **Miscellaneous.**

5.1     **Application of Agreement to Additional Shares.**  If, after the date of this Agreement, any shares or other securities are issued in respect of or in exchange for any of the Stockholder Shares as a result of any stock splits, stock dividends, recapitalizations, combinations, or similar transactions, such shares or securities shall be deemed to be Stockholder Shares for the purposes of this Agreement.

5.2     **Additional Parties; Successors and Assigns.**

(a)     Notwithstanding anything to the contrary herein, if the Company issues additional shares of Preferred Stock after the date hereof pursuant to the terms and conditions of the Series A Agreement, as a condition to the issuance of such shares, the

6

purchasers of such shares shall become a party to this Agreement by executing and delivering a counterpart signature page hereto agreeing to be bound by and subject to the terms and conditions of this Agreement. In either event, each such person shall thereafter be deemed an "Investor" and "Stockholder" for all purposes under this Agreement and, notwithstanding anything herein to the contrary, the Company shall, without needing the consent of any other party, amend Exhibit A hereto to include information regarding such persons.

(b)    Each transferee or assignee of any shares of capital stock of the Company subject to this Agreement shall continue to be subject to the terms and conditions hereof and, as a condition precedent to the Company's recognizing such transfer or assignment, each transferee or assignee shall become a party to this Agreement by executing and delivering a counterpart signature page hereto agreeing to be bound by and subject to the terms and conditions of this Agreement. In either event, each such person shall thereafter be deemed (a) an "Investor" or "Key Holder," as applicable, and (b) a Stockholder for all purposes under this Agreement and, notwithstanding anything herein to the contrary, the Company may, without needing the consent of any other party, amend Exhibit A or Exhibit B hereto, as applicable, to include information regarding such persons. The Company shall not permit the transfer or assignment of any shares of capital stock subject to this Agreement on its books or issue a new certificate representing any such shares of capital stock unless and until such transferee or assignee shall have complied with the terms and conditions of this Section 5.2(b).

(c)    For the avoidance of doubt, subject to the terms and conditions of this Agreement, this Agreement and the rights and obligations of the parties hereunder, will inure to the benefit of, and be binding upon, the parties' respective successors, assigns, heirs, executors, administrators and legal representatives; *provided*, *however*, that the Company shall not register the transfer or assignment of any Stockholder Shares or issue a new certificate representing any Stockholder Shares unless and until the transferee or assignee, as applicable, shall have executed a counterpart signature page to this Agreement, pursuant to which such person becomes a party to this Agreement and agrees to be bound by all the provisions of this Agreement as and to the same extent as if he, she or it were an original stockholder, as more fully set forth in this Section 5.2.  Any transfer of shares in contravention of the foregoing shall be void *ab initio*. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

5.3    **Legends on Stock Certificates.**  The certificates representing Stockholder Shares shall bear the following legend (the "***Legend***"), together with any other legends required by separate agreement and applicable law:

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THE TERMS AND CONDITIONS OF A VOTING AGREEMENT WHICH PLACES CERTAIN RESTRICTIONS ON THE VOTING OF THE SHARES REPRESENTED HEREBY.  ANY PERSON ACCEPTING ANY INTEREST IN SUCH SHARES SHALL BE DEEMED TO AGREE TO AND SHALL BECOME BOUND BY ALL THE PROVISIONS OF SUCH AGREEMENT.  A COPY OF SUCH VOTING AGREEMENT WILL BE FURNISHED TO THE

WEST\268453087.11
383293-000012

**#16072.7**

RECORD HOLDER OF THIS CERTIFICATE WITHOUT CHARGE UPON WRITTEN REQUEST TO THE COMPANY AT ITS PRINCIPAL PLACE OF BUSINESS.

The Company agrees that, during the term of this Agreement, it will maintain (upon registration of transfer, reissuance, or otherwise), the Legend on any such certificate and will place or cause to be placed the Legend on any new certificate issued to represent Stockholder Shares. The failure of the Company to cause the certificates evidencing the Stockholder Shares to bear the Legend or the failure of the Company to supply, free of charge, a copy of this Agreement as provided hereunder shall not affect the validity or enforcement of this Agreement.

5.4 **Stockholder Representations.** Each Stockholder represents and warrants that (a) such Stockholder owns its Stockholder Shares free and clear of liens and encumbrances and has not, prior to or on the date of this Agreement, executed or delivered any proxy or entered into any other voting agreement or similar arrangement with respect to such shares and (b) such Stockholder has full power and capacity to execute, deliver, and perform this Agreement, which has been duly executed and delivered by, and evidences the valid and binding obligation of, such Stockholder, enforceable in accordance with its terms.

5.5 **Irrevocable Proxy.** To insure the performance of each Stockholder with the provisions set forth in this Agreement, each Stockholder hereby appoints the Secretary of the Company or his designee, as his, her, or its true and lawful proxy and attorney-in-fact, with full power of substitution and resubstitution, to vote all Stockholder Shares owned or held by such Stockholder, subject to the provisions of this Agreement, upon any matter presented to the stockholders of the Company, if (and only if) such Stockholder fails to comply with the provisions of this Agreement. The proxies and powers granted by each Stockholder pursuant to the preceding sentence are coupled with an interest and are given to secure the performance of such Stockholder's commitments under this Agreement. Such proxies shall be irrevocable for the term of this Agreement and shall survive the death, incompetency, disability, dissolution or winding up of such Stockholder. Except as provided above, no Stockholder shall grant a proxy with respect to, transfer any voting control over, or create any right to vote any shares of capital stock of the Company without the prior written consent of the Company.

5.6 **Specific Enforcement.** It is agreed and understood that monetary damages would not adequately compensate an injured Stockholder for the breach of this Agreement by any party to this Agreement, that this Agreement shall be specifically enforceable, and that any breach or threatened breach of this Agreement shall be the proper subject of a temporary or permanent injunction or restraining order. Further, each of the Company and the Stockholders waives any claim or defense that there is an adequate remedy at law for such breach or threatened breach.

5.7 **Remedies Cumulative.** All remedies, either under this Agreement, by law, or otherwise afforded to any party, shall be cumulative and not alternative.

5.8 **Termination.** This Agreement shall terminate and be of no further force or effect upon the earliest to occur of (a) the date of the closing of a firmly underwritten public offering of the Common Stock pursuant to a registration statement filed with the Securities and

WEST\268453087.11
383293-000012

**#16072.8**

Exchange Commission, and declared effective under the Securities Act, which results in the outstanding Preferred Stock of the Company being converted into Common Stock, or (b) the closing of a transaction that is deemed to be a liquidation pursuant to the Restated Certificate.

5.9 **Third Parties.** Nothing in this Agreement, express or implied, is intended to confer upon any person, other than the parties to this Agreement and their respective successors and assigns, any rights, remedies, obligations, or liabilities under or by reason of this Agreement except as expressly provided in this Agreement.

5.10 **Governing Law.** This Agreement shall be governed by and construed under the laws of the State of Delaware in all respects as such laws are applied to agreements among Delaware residents entered into and performed entirely within Delaware. The parties agree that any action brought by either party under or in relation to this Agreement, including, without limitation to interpret or enforce any provision of this Agreement, shall be brought in, and each party agrees to and does hereby submit to the jurisdiction and venue of, any state or federal court located in the County of Santa Clara, California.

5.11 **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be enforceable against the parties actually executing such counterparts, and all of which together shall constitute one instrument.

5.12 **Headings, Titles and Subtitles; References.** The titles and subtitles used in this Agreement are for convenience only and are not to be considered in construing or interpreting this Agreement. All references in this Agreement to sections, paragraphs, exhibits and schedules shall, unless otherwise provided, refer to sections and paragraphs hereof and exhibits and schedules attached hereto, all of which exhibits and schedules are incorporated herein by this reference.

5.13 **Notices, Etc.** Any notice, request or other communication required or permitted hereunder shall be in writing and shall be deemed to have been duly given if delivered personally, by facsimile when receipt is electronically confirmed, one business day after delivery to a nationally recognized overnight delivery service, or otherwise upon receipt, addressed (i) if to an Investor, at the address set forth below such Investor's name on Exhibit A, (ii) if to a Key Holder, at the address set forth below such Key Holder's name on Exhibit B, and (iii) if to the Company, at the following address:

> **LOOT CRATE, INC.**
> 3401 Pasadena Avenue
> Los Angeles, CA 90031
> Attention: Chief Executive Officer
>
> with a copy, which shall not constitute notice, to:
>
> **DLA PIPER LLP (US)**
> 2000 University Avenue
> East Palo Alto, CA 94303-2215
> Attention: Curtis L. Mo, Esq.
> Email: curtis.mo@dlapiper.com

9

Fax:  (650) 687-1170

Any party hereto may, by ten (10) days' prior notice so given, change its address for future notices hereunder.

5.14   **Costs and Attorneys' Fees.**  Notwithstanding any other provision herein, if any action at law or in equity is instituted under or in relation to this Agreement, including without limitation to enforce any provision in this Agreement, the prevailing party in such dispute shall be entitled to recover from the losing party all fees, costs and expenses of enforcing any right of such prevailing party under or with respect to this Agreement, including without limitation, such reasonable fees and expenses of attorneys and accountants, which shall include, without limitation, all fees, costs and expenses of appeals.

5.15   **Severability.**  If one or more provisions of this Agreement are held to be invalid, illegal, or unenforceable under applicable law, then such provision(s) shall be excluded from this Agreement and the balance of the Agreement shall be interpreted as if such provision(s) had never been contained herein.

5.16   **Entire Agreement; Amendment; Waiver.**  This Agreement, together with all the exhibits hereto, constitutes and contains the entire agreement and understanding of the parties with respect to the subject matter hereof and supersedes any and all prior negotiations, correspondence, agreements, understandings, duties or obligations between the parties with respect to the subject matter hereof.  Any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively) only with the written consent of (i) the Company, (ii) the holders of a majority of the Investor Shares, and (iii) the holders of a majority of the Key Holder Shares who are then providing services to the Company as officers, directors, employees or consultants; *provided, however,* that any amendment or waiver of this Agreement shall also require the written consent of any party that is adversely affected by such amendment or waiver to a materially greater degree than the other parties hereto *provided, further*, that Section 2.2(a) and this Section 5.16 cannot be amended, waived, discharged or terminated without the prior written consent of Upfront.

5.17   **Delays or Omissions.**  No delay or omission to exercise any right, power or remedy accruing to any party, upon any breach, default or noncompliance by another party under this Agreement shall impair any such right, power or remedy, nor shall it be construed to be a waiver of any such breach, default or noncompliance, or any acquiescence therein, or of or in any similar breach, default or noncompliance thereafter occurring.

5.18   **Further Assurances.**  From and after the date of this Agreement, upon the reasonable request of any Stockholder or the Company, the Company and the Stockholders shall execute and deliver such instruments, documents, or other writings as may be reasonably necessary or desirable to confirm and carry out and to effectuate fully the intent and purposes of this Agreement.

5.19   **Adjustments for Recapitalization Events.**  Wherever in this Agreement there is a reference to a specific number of shares of Common Stock or Preferred Stock of the

WEST\268453087.11
383293-000012

**#16072.10**

Company or a specific dollar amount per share, then, upon the occurrence of any stock split, stock dividend, reverse stock split or similar recapitalization event affecting such shares, the specific number of shares or dollar amount so referenced in this Agreement shall automatically be proportionally adjusted to reflect the effect on the outstanding shares of such class or series of stock of such recapitalization event.

5.20    **Aggregation of Stock.**  All Stockholder Shares held or acquired by a Stockholder and its Affiliates shall be aggregated together for the purpose of determining the availability of any rights of such Stockholder under this Agreement.  For purposes of the foregoing, the shares held by any Stockholder that (a) is a partnership or corporation shall be deemed to include shares held by affiliated partnerships or the partners, retired partners, and stockholders of such holder or affiliated partnership, or any spouse, father, mother, brother, sister, lineal descendant of spouse, or lineal descendant (the "***Immediate Family***") of any such partners, retired partners, and stockholders, and any custodian or trustee for the benefit of any of the foregoing persons and (b) is an individual shall be deemed to include shares held by any members of the Stockholder's Immediate Family or to any custodian or trustee for the benefit of any of the foregoing persons.

5.21    **No Heightened Duties.**  Each party hereby acknowledges and agrees that no fiduciary duty, duty of care, duty of loyalty or other heightened duty shall be created or imposed upon any party to any other party, the Company or other stockholder of the Company, by reason of this Agreement and/or any right or obligation hereunder.  None of the Stockholders and no officer, director, stockholder, partner, employee or agent of any Stockholder makes any representation or warranty as to the fitness or competence of the nominee of any party hereunder to serve on the Board by virtue of such party's execution of this Agreement or by the act of such party in voting for such nominee pursuant to this Agreement.

***[Signature Page Follows]***

WEST\268453087.11
383293-000012

**#16072.11**

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

**"COMPANY"**

**LOOT CRATE, INC.**

By: _____

Name: Christopher Davis
Title: Chief Executive Officer

**"KEY HOLDERS"**

_____

Name: Christopher Davis

_____

Name: Matthew Arevalo

*[Signature Page to Series A Voting Agreement]*

**#16072.12**

**COUNTERPART SIGNATURE PAGE TO
VOTING AGREEMENT**

**UPFRONT V, L.P.**

By: Upfront GP V, LLC, its general partner
By: Upfront Ventures Management, LLC, its
managing member

Greg Bettinelli
Partner

*[Signature Page to Series A Voting Agreement]*

**#16072.13**

**COUNTERPART SIGNATURE PAGE TO**
**VOTING AGREEMENT**

**CLEMENTINE CAPITAL LLC**

By: _____
                    (Signature)

Name: Nick Grouf

Title: Authorized Signatory

*[Signature Page to Series A Voting Agreement]*

**#16072.14**

**COUNTERPART SIGNATURE PAGE TO
VOTING AGREEMENT**

DORSET SQUARE LLC

By: _____
                    (Signature)

Name: <u>David Waxman</u>

Title: <u>Authorized Signatory</u>

**EXHIBIT A**

**SCHEDULE OF INVESTORS**

| Name and Address | Number of Shares of Series A Preferred Stock Held |
|---|---|
| Upfront V, L.P.<br>C/O Upfront GP V, LLC<br>1314 7th Street, Suite 600<br>Santa Monica, CA 90401 | 1,093,202 |

| Name and Address | Number of Shares of Series A-1 Preferred Stock Held |
|---|---|
| Dorset Square LLC<br>8163 Melrose Avenue<br>Los Angeles, CA 90046 | 284,234 |
| Clementine Capital LLC<br>8163 Melrose Avenue<br>Los Angeles, CA 90046 | 568,469 |

**#16072.16**

**EXHIBIT B**

**SCHEDULE OF KEY HOLDERS**

| Name and Address | Number of Shares of Common Stock Held |
| --- | --- |
| Christopher Davis<br>3585 Helms Ave<br>Culver City, CA 90232 | 5,500,000 |
| Matthew Arevalo<br>3700 San Augustine Drive<br>Glendale, CA 91206 | 2,250,000 |