Exhibit C

**EXECUTION VERSION**

**LOAN AND SECURITY AGREEMENT**

**by and among**

**LOOT CRATE, INC.**

**as Borrower**
**and**

**BREAKWATER CREDIT OPPORTUNITIES FUND, L.P.**

**as Agent for the Lenders,**
**and the Lenders**

**dated as of June 1, 2016**

**TABLE OF CONTENTS**

**Page**

1.   DEFINITIONS; RULES OF CONSTRUCTION........................................................................... 1

    1.1   Definitions............................................................................................................ 1

    1.2   Accounting and other Terms................................................................................ 12

2.   LOAN AND TERMS OF PAYMENT.................................................................................. 13

    2.1   Initial Term Loan................................................................................................ 13

    2.2   Second Term Loan.............................................................................................. 13

    2.3   Promise to Pay.................................................................................................... 13

    2.4   Payment of Notes................................................................................................ 13

    2.5   Payment of Interest on the Term Loan................................................................ 15

    2.6   Fees..................................................................................................................... 15

    2.7   Payments............................................................................................................. 16

    2.8   Warrants.............................................................................................................. 17

3.   CONDITIONS PRECEDENT.............................................................................................. 17

    3.1   Conditions Precedent to Initial Term Loan........................................................ 17

    3.2   Conditions Precedent to Second Term Loan....................................................... 18

    3.3   Covenant to Deliver............................................................................................ 19

4.   CREATION OF SECURITY INTEREST........................................................................... 19

    4.1   Grant of Security Interest.................................................................................... 19

    4.2   Perfection and Priority of Security Interest........................................................ 19

    4.3   Authorization to File Financing Statements........................................................ 19

    4.4   Further Assurances.............................................................................................. 19

5.   REPRESENTATIONS AND WARRANTIES .................................................................... 20

    5.1   Due Organization, Authorization; Power and Authority.................................... 20

    5.2   Collateral............................................................................................................. 20

    5.3   Litigation............................................................................................................. 21

    5.4   Financial Statements; Financial Condition ........................................................ 21

    5.5   Solvency.............................................................................................................. 21

    5.6   Regulatory Compliance....................................................................................... 21

    5.7   Subsidiaries; Investments; Capitalization .......................................................... 21

    5.8   Tax Returns and Payments.................................................................................. 21

    5.9   Use of Proceeds................................................................................................... 22

    5.10   Full Disclosure.................................................................................................. 22

    5.11   No Winding-Up................................................................................................. 22

    5.12   Insurance........................................................................................................... 22

    5.13   Material Contracts............................................................................................. 22

**TABLE OF CONTENTS**
(continued)

|  |  |  |  |
|---|---|---|---|
| 5.14 | Liens of the Agent | | 22 |
| 5.15 | Intellectual Property | | 22 |
| 5.16 | Leased Real Property | | 23 |
| 6. | AFFIRMATIVE COVENANTS | | 23 |
| 6.1 | Government Compliance | | 23 |
| 6.2 | Reporting, Financial and Other Information | | 24 |
| 6.3 | Inventory; Returns | | 25 |
| 6.4 | Taxes; Pensions | | 26 |
| 6.5 | Insurance | | 26 |
| 6.6 | Operating Accounts | | 26 |
| 6.7 | Protection of Intellectual Property Rights | | 26 |
| 6.8 | Access to Collateral; Books and Records; Appraisals | | 27 |
| 6.9 | Formation or Acquisition of Subsidiaries; Existing Subsidiaries | | 27 |
| 6.10 | Board Observation Rights | | 27 |
| 6.11 | Further Assurances | | 28 |
| 6.12 | Landlord Agreements | | 28 |
| 6.13 | Account Control Agreements | | 28 |
| 6.14 | Material Contracts | | 29 |
| 7. | NEGATIVE COVENANTS | | 29 |
| 7.1 | Disposition of Property | | 29 |
| 7.2 | Changes in Business, Management, Ownership, or Business Locations | | 29 |
| 7.3 | Mergers | | 29 |
| 7.4 | Indebtedness | | 29 |
| 7.5 | Encumbrances | | 30 |
| 7.6 | Maintenance of Collateral Accounts | | 30 |
| 7.7 | Investments; Acquisitions | | 30 |
| 7.8 | Transactions with Affiliates | | 30 |
| 7.9 | Restricted Payments | | 30 |
| 7.10 | Maximum Capital Expenditures | | 31 |
| 7.11 | Accounting Changes | | 31 |
| 7.12 | Financial Covenants | | 31 |
| 8. | EVENTS OF DEFAULT | | 32 |
| 8.1 | Payment Default | | 32 |
| 8.2 | Representation or Warranty | | 32 |
| 8.3 | Covenants | | 32 |

**TABLE OF CONTENTS**
(continued)

Page

| | | |
|---|---|---|
| 8.4 | Reserved | 32 |
| 8.5 | Attachment; Levy; Restraint on Business | 32 |
| 8.6 | Insolvency | 33 |
| 8.7 | Other Agreements | 33 |
| 8.8 | Judgments | 33 |
| 8.9 | Invalidity | 33 |
| 8.10 | Equity Documents | 34 |
| 8.11 | Lien Priority | 34 |
| 8.12 | Change of Control | 34 |
| 9. | AGENT'S AND LENDERS' RIGHTS AND REMEDIES | 34 |
| 9.1 | Rights and Remedies | 34 |
| 9.2 | Power of Attorney | 35 |
| 9.3 | Protective Payments | 35 |
| 9.4 | Application of Payments and Proceeds Upon Default | 35 |
| 9.5 | No Waiver; Remedies Cumulative | 35 |
| 9.6 | Demand Waiver | 35 |
| 10. | NOTICES | 36 |
| 11. | CHOICE OF LAW, VENUE AND JURY TRIAL WAIVER | 36 |
| 12. | GENERAL PROVISIONS | 37 |
| 12.1 | Successors and Assigns | 37 |
| 12.2 | Indemnification | 37 |
| 12.3 | Time of Essence | 37 |
| 12.4 | Severability of Provisions | 37 |
| 12.5 | Correction of Loan Documents | 37 |
| 12.6 | Amendments in Writing; Waiver; Integration | 37 |
| 12.7 | Counterparts | 38 |
| 12.8 | Survival | 38 |
| 12.9 | Confidentiality | 38 |
| 12.10 | Right of Set Off | 38 |
| 12.11 | Electronic Execution of Documents | 38 |
| 12.12 | Captions | 38 |
| 12.13 | Construction of Agreement | 39 |
| 12.14 | Relationship | 39 |
| 12.15 | Third Parties | 39 |
| 12.16 | Conflicts | 39 |

# LOAN AND SECURITY AGREEMENT

This **LOAN AND SECURITY AGREEMENT** (this "**Agreement**"), dated as of June 1, 2016 (the "**Effective Date**"), is by and among **BREAKWATER CREDIT OPPORTUNITIES FUND, L.P.**, a Delaware limited partnership with an office located at 1999 Avenue of the Stars, Suite 3430, Los Angeles, CA 90067 , as a Lender (as defined herein) and as agent for the Lenders (in such capacity, and any successors and assigns, "**Agent**"), **LOOT CRATE, INC.**, a Delaware corporation ("**Borrower**"), and the lenders from time to time party hereto  (the "**Lenders**") and provides the terms and conditions on which Lenders shall lend to Borrower and Borrower shall repay Lenders.  The parties agree as follows:

## 1.    DEFINITIONS; RULES OF CONSTRUCTION

**1.1    Definitions**.  As used in the Loan Documents, the word "shall" is mandatory, the word "may" is permissive, the word "or" is not exclusive, the words "includes" and "including" are not limiting, the singular includes the plural, and numbers denoting amounts that are set off in brackets are negative.  As used in this Agreement, the following capitalized terms have the following meanings:

"**Account**" is any "account" as defined in the Code with such additions to such term as may hereafter be made, and includes, without limitation, all accounts receivable and other sums owing to Borrower.

"**Account Control Agreement**" is any control agreement entered into among any depository institution at which any Loan Party maintains a Deposit Account or the securities intermediary or commodity intermediary at which any Loan Party maintains a Securities Account or a Commodity Account, such Loan Party, and Agent pursuant to which Agent obtains control (within the meaning of the Code) over such Deposit Account, Securities Account, or Commodity Account.

"**Account Debtor**" is any "account debtor" as defined in the Code with such additions to such term as may hereafter be made.

"**Acquisition**" is any transaction or series of related transactions for the purpose of or resulting, directly or indirectly, in (a) the acquisition by any Loan Party  of all or a substantial part of the assets of a Person, or of any business, division or product line of a Person, (b) the acquisition by any Loan Party  of in excess of fifty percent (50%) of the Stock, partnership interests or equity of any Person or otherwise causing any Person to become a subsidiary any Loan Party , (c) a merger or consolidation or any other combination of any Loan Party  with another Person (other than a Loan Party or a Person that is already a subsidiary of such Loan Party at the time) provided that a Loan Party (other than  unless it is specifically formed for the purpose of the acquisition) is the surviving entity, or (d) a merger or consolidation or any other combination of a subsidiary of any Loan Party  with another Person (other than a Person that is already a subsidiary of a Loan Party at the time) provided that a Loan Party  or a subsidiary shall own in excess of fifty percent (50%) of the Stock or equity of such Person or the surviving entity.

"**Affiliate**" is, with respect to any Person, each other Person that owns or controls directly or indirectly the Person, any Person that controls or is controlled by or is under common control with the Person, and each of that Person's senior executive officers, directors, partners and, for any Person that is a limited liability company, that Person's managers and members.  For purposes of this definition, "control" of a Person shall mean the power, direct or indirect, (x) to vote 10% or more of the Stock having ordinary voting power for the election of directors of such Person or other Persons performing similar functions for any such Person, or (y) to direct or cause the direction of the management and policies of such Person whether by ownership of Stock, contract or otherwise.

"**Agency Appointment Agreement**" is that certain Agency Appointment Agreement, dated as of the Effective Date, by and among Agent and each of the Lenders and acknowledged by the Loan Parties.

"**Agent**" is defined in the preamble hereof.

"**Aggregate Net Cash Proceeds**" is defined in Section 2.4(f).

"**Agreement**" is defined in the preamble hereof.

"**Bankruptcy Code**" is the United States Bankruptcy Code (11 U.S.C. § 101, et seq.) and any other insolvency or similar statute in the U.S. or in any other jurisdiction.

"**Board**" is defined in Section 6.10.

"**Borrower**" is defined in the preamble hereof.

"**Borrower's Books**" are all Borrower's books and records including ledgers, federal and state tax returns, records regarding Borrower's assets or liabilities, the Collateral, business operations or financial condition, and all computer programs or storage or any equipment containing such information.

"**Borrowing Resolutions**" are, with respect to any Person, those resolutions adopted by such Person's Board of Directors and delivered by such Person to Lender approving the Loan Documents to which such Person is a party and the transactions contemplated thereby, together with a certificate executed by its Secretary on behalf of such Person certifying that (a) such Person has the authority to execute, deliver, and perform its obligations under each of the Loan Documents to which it is a party, (b) that attached as an exhibit to such certificate is a true, correct, and complete copy of the resolutions then in full force and effect authorizing and ratifying the execution, delivery, and performance by such Person of the Loan Documents to which it is a party, (c) the name(s) of the Person(s) authorized to execute the Loan Documents on behalf of such Person, together with a sample of the true signature(s) of such Person(s), and (d) that Lender may conclusively rely on such certificate unless and until such Person shall have delivered to Lender a further certificate canceling or amending such prior certificate.

"**Breakwater**" is Breakwater Credit Opportunities Fund, L.P.

"**Business Day**" is any day other than a Saturday, Sunday or other day on which banking institutions in the State of California are authorized or required by law or other governmental action to close.

"**Cash Cure Event**" is defined in Section 7.12.

"**Cash Equivalents**" are (a) marketable direct obligations issued or unconditionally guaranteed by the United States or any agency or any State thereof having maturities of not more than one (1) year from the date of acquisition; (b) commercial paper maturing no more than one (1) year after its creation and having the highest rating from either Standard & Poor's Ratings Group or Moody's Investors Service, Inc.; (c) certificates of deposit having a maturity of one (1) year or less issued by members of the Federal Reserve System having deposits in excess of $100,000,000 (which certificates of deposit or bankers' acceptances are fully insured by the Federal Deposit Insurance Corporation); and (d) funds in transit from Borrower's payment processors to a Collateral Account subject to an Account Control Agreement.

"**Change of Control**" is any of the following events or occurrences:  (i) at any time after the Effective Date (x) prior to Borrower becoming a Public Company**,** any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act, but excluding any employee benefit plan of such Person or its Subsidiaries and any Person acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan) becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Exchange Act, directly or indirectly, of fifty-and 10/100 percent (50.1%) or more of the equity securities of Borrower entitled to vote for members of the board of directors or equivalent governing body of Borrower on a fully-diluted basis and (y) after Borrower becomes a Public Company, any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act, but excluding any employee benefit plan of such Person or its Subsidiaries and any Person acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan) becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Exchange Act, directly or indirectly, of thirty-three percent (33%) or more of the equity securities of Borrower entitled to vote for members of the board of directors or equivalent governing body of Borrower on a fully-diluted basis; (ii) Borrower ceases to own, directly or indirectly, one hundred percent (100%) of the equity interests of each Subsidiary, except as expressly permitted under this Agreement; or (iii) any "Change of Control" or similar term as defined in any other Indebtedness documentation of any Loan Party.

"**Claims**" is defined in Section 12.2.

"**Code**" is the Uniform Commercial Code, as the same may, from time to time, be enacted and in effect in the State of California; provided, that, to the extent that the Code is used to define any term herein or in any other Loan Document and such term is defined differently in different Articles or Divisions of the Code, the definition of such term contained in Article or Division 9 shall govern; provided further, that in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection, or priority of, or remedies with respect to, Agent's Lien on any Collateral is governed by the Uniform Commercial Code in effect in a jurisdiction other than the State of California, the term "Code" shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority, or remedies and for purposes of definitions relating to such provisions.

"**Collateral**" is, with respect to each Loan Party, any and all properties, rights and assets of such Loan Party described on Exhibit B.

"**Collateral Account**" is any Deposit Account, Securities Account, or Commodity Account.

"**Collections**" are all cash, checks, credit card slips or receipts, notes, instruments, and other items of payment (including insurance proceeds, proceeds of cash sales, rental proceeds, and tax refunds) of any Loan Party.

"**Commodity Account**" is any "commodity account" as defined in the Code with such additions to such term as may hereafter be made.

"**Compliance Certificate**" is a certificate in the form attached hereto as Exhibit D.

"**Concentration Account**" is that certain Collateral Account number 140021221 maintained at Avidbank.

"**Copyrights**" are any and all copyright rights, copyright applications, copyright registrations and like protections in each work or authorship and derivative work thereof, whether published or unpublished and whether or not the same also constitutes a trade secret.

"**Curative Equity**" means the amount of equity contributions made to Borrower in immediately available funds and which is designated "Curative Equity" by Borrower under Section 7.12 at the time it is contributed.

"**Curative Equity Event**" is defined in Section 7.12.

"**Cure Event**" is defined in Section 7.12.

"**Default Rate**" is defined in Section 2.5(c).

"**Deposit Account**" is any "deposit account" as defined in the Code with such additions to such term as may hereafter be made.

"**Dollars**," "**dollars**" or use of the sign "$" means only lawful money of the United States and not any other currency, regardless of whether that currency uses the "$" sign to denote its currency or may be readily converted into lawful money of the United States.

"**Domestic Subsidiary**" is a Subsidiary organized under the laws of the United States or any state or territory thereof or the District of Columbia.

"**EBITDA**" is for any period, net income, as determined in accordance with GAAP, plus (a) the sum of (i) interest expense, (ii) income taxes, (iii) depreciation and amortization expense, (iv) charges resulting from the impact of changes to accounting policies, (v) non-recurring severance costs, (vi) non-recurring restructuring costs, (vii) non-recurring business relocation costs, (viii) non-recurring fundraising costs, (ix) non-recurring asset impairments, (x) non-recurring inventory liquidation costs for inventory aged in excess of 180 days as identified on an inventory report delivered pursuant to Section 6.2(o)(iii), (xi) non-recurring inventory reserve expenses, (xii) stock based compensation expenses deducted in determining net income for such period, and (xiii) any extraordinary

or unusual charges for such period; provided, that, (A) with respect to any period, the aggregate amount of all cash add-backs enumerated in clauses (iv) through (ix) and (xi) through (xiii), collectively, may not exceed $2,000,000 (for the avoidance of doubt, the amount of all non-cash add-backs enumerated in clauses (iv) through (xiii) will not be subject to such cap) without the prior written consent of the Required Lenders and (B) with respect to each add-back described in clauses (iv) through (xiii), each such add-back amount shall be as calculated in the good faith determination of Borrower and as certified by Borrower's chief financial officer, chief executive officer, controller or other comparable executive, minus (b) to the extent increasing net income, the sum of, without duplication, amounts for other extraordinary non-cash gains increasing net income for such period.

"**Effective Date**" is defined in the preamble hereof.

"**Equipment**" is all "equipment" as defined in the Code with such additions to such term as may hereafter be made, and includes without limitation all machinery, fixtures, goods, vehicles (including motor vehicles and trailers), and any interest in any of the foregoing.

"**Equity Documents**" means the Warrant and the Side Letter, together with any other documents or instruments entered into in connection therewith or referenced therein.

"**Event of Default**" is defined in Article 8.

"**Exchange Act**" is the Securities Exchange Act of 1934, as amended.

"**Extraordinary Receipts**" are any cash or other amounts or receipts received by, on behalf of or on account of any Loan Party not in the ordinary course of business, including, without limitation, (a) proceeds of judgments, proceeds of settlements and other consideration of any kind received in connection with any cause of action, (b) indemnification payments received by any Loan Party (other than indemnification payments to the extent that the amounts so received are applied by a Loan Party for the purpose of replacing, repairing or restoring any assets or properties of such Loan Party, or satisfying the condition giving rise to the claim for indemnification or otherwise covering any out-of-pocket expenses incurred by such Borrower in obtaining such payments), and (c) any tax refunds or pension plan reversions.

"**Extraordinary Receipts Threshold**" is defined in Section 2.4(f).

"**Fee Letter**" is the fee letter, dated as of the Effective Date, by and between each Loan Party and Agent.

"**Fixed Charge Coverage Ratio**"

      (a)      EBITDA for such period minus capital expenditures made by the Loan Parties during such period, to

      (b)      the sum of (i) all principal Indebtedness for money borrowed of the Loan Parties and their respective Subsidiaries scheduled to be paid during such period, plus (ii) any interest expense for such period (other than PIK Interest and other non-cash interest expense), plus (iii) income taxes paid or payable by the Loan Parties and their respective Subsidiaries during such period, plus (iv) cash dividends or distributions paid by Borrower during such period.

"**Foreign Subsidiary**" is a Subsidiary that is not a Domestic Subsidiary.

"**Funding Date**" is any date on which the Second Term Loan is made to or for the account of Borrower which shall be a Business Day.

"**GAAP**" is generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other Person as may be approved by a significant segment of the accounting profession, which are applicable to the circumstances as of the date of determination.

"**General Intangibles**" are all "general intangibles" as defined in the Code as in effect on the date hereof with such additions to such term as may hereafter be made, and includes, without limitation, all Intellectual Property, claims, income and other tax refunds, security and other deposits, payment intangibles, contract rights, options to purchase or sell real or personal property, rights in all litigation presently or hereafter pending (whether in contract, tort or otherwise), insurance policies (including without limitation key man, property damage, and business interruption insurance), payments of insurance and rights to payment of any kind.

"**Governmental Approval**" is any consent, authorization, approval, order, license, franchise, permit, certificate, accreditation, registration, filing or notice, of, issued by, from or to, or other act by or in respect of, any Governmental Authority.

"**Governmental Authority**" is any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central lender or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization.

"**Guarantor**" is, collectively, the Persons liable for the Obligations from time to time and signatories to a guarantee in favor of Agent and the Lenders.

"**Guaranty**" is a Guaranty, entered into by any Guarantor, in favor of Agent (on behalf of itself and the Lenders) in the form of Exhibit E.

"**Historical Financial Statements**" is defined in Section 3.1(s).

"**Indebtedness**" of any Person is, without duplication:  (a) all indebtedness for borrowed money; (b) all obligations issued, undertaken or assumed as the deferred purchase price of property or services (other than:  (i) trade payables entered into in the Ordinary Course of Business, and (ii) accrued wages, fees and benefits due employees and consultants incurred in the Ordinary Course of Business within the current unexpired payroll period of such Person as of any date on which Indebtedness is determined hereunder);  (c) all non-contingent reimbursement or payment obligations with respect to Surety Instruments; (d) all obligations evidenced by notes, bonds, debentures or similar instruments, including obligations so evidenced incurred in connection with the acquisition of property, assets or businesses; (e) all indebtedness created or arising under any conditional sale or other title retention agreement, or incurred as financing, in either case with respect to Property acquired by the Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property); (f) all capital lease obligations; (g) all indebtedness secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in Property (including accounts and contracts rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness; (h) obligations under any interest rate management device, foreign currency exchange agreement, currency swap agreement, commodity price protection agreement or other interest or currency exchange rate or commodity price hedging arrangement; (i) all Stock of such Person subject to repurchase or redemption rights or obligations (excluding repurchases or redemptions at the sole option of such Person) on or prior to the date that is twelve (12) months after the Term Loan Maturity Date; (j) off-balance sheet liabilities of such Person; and (k) all guaranty obligations in respect of indebtedness or obligations of other Persons of the kinds referred to in clauses (a) through (j) above.  Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture in which such Person is a general partner or a joint venturer, except to the extent such Person's liability for such Indebtedness is otherwise limited.

"**Indemnified Person**" is defined in Section 12.2.

"**Initial Note**" is defined in Section 2.1.

"**Initial Term Loan**" is defined in Section 2.1.

"**Indemnified Taxes**" is defined in Section 2.7(b).

"**Insolvency Proceeding**" is any proceeding by or against any Person under the Bankruptcy Code, or any other bankruptcy or insolvency law, including assignments for the benefit of creditors, compositions, extensions generally with its creditors, or proceedings seeking reorganization, arrangement, or other relief.

"**Intellectual Property**" is all of each Loan Party's right, title, and interest in and to the following:

(a)    its Copyrights, Trademarks and Patents;

(b)    any and all trade secrets and trade secret rights, including, without limitation, any rights to unpatented inventions, know-how, operating manuals;

(c)    any and all source code;

(d)    any and all design rights which may be available to a Loan Party;

(e)    any and all claims for damages by way of past, present and future infringement of any of the foregoing, with the right, but not the obligation, to sue for and collect such damages for said use or infringement of the Intellectual Property rights identified above; and

(f)    all amendments, renewals and extensions of any of the Copyrights, Trademarks or Patents.

"**Interest Payment Date**" is defined in Section 2.5(b).

"**Inventory**" is all "inventory" as defined in the Code as in effect on the date hereof with such additions to such term as may hereafter be made, and includes without limitation all merchandise, raw materials, parts, supplies, packing and shipping materials, work in process and finished products, including without limitation such inventory as is temporarily out of Borrower's custody or possession or in transit and including any returned goods and any documents of title representing any of the above.

"**Investment**" is any beneficial ownership interest in any Person (including stock, partnership interest or other securities), and any loan, advance or capital contribution to any Person.

"**IP Security Agreement**" is the Intellectual Property Security Agreement, dated as of the Effective Date, by and between Borrower and Agent, and any Intellectual Property Security Agreement entered into by any Loan Party and Agent after the Effective Date.

"**Key Persons**" are each of Christopher Davis and Eric Chan who are, respectively, as of the Effective Date, Chief Executive Officer and Chief Financial Officer.

"**Lease**" is defined in Section 5.16.

"**Leased Real Property**" is defined in Section 5.16.

"**Lender**" is defined in the preamble hereof.

"**Lender Entities**" is defined in Section 12.9.

"**Lender Expenses**" are all audit fees and expenses (to the extent that Borrower is obligated to reimburse such fees and expenses as provided in Section 6.8), costs, and expenses (including reasonable attorneys' fees and expenses) for preparing, amending, negotiating, administering, defending and enforcing the Loan Documents (including, without limitation, those incurred in connection with appeals or Insolvency Proceedings) or otherwise incurred with respect to Agent or any Lender.

"**LIBOR Based Rate**" shall mean, for any LIBOR Interest Period the greater of (i) the rate per annum (rounded upwards, if necessary, to the nearest one-sixteenth of one percent (1/16 of 1%)) equal to the LIBOR Rate for such LIBOR Interest Period or (ii) 0.50% per annum.

"**LIBOR Interest Period**" means each thirty (30) day period during the term hereof, commencing as of the Effective Date; provided, however, that: (i) the first day of each LIBOR Interest Period must be a Business Day; (ii) any LIBOR Interest Period which would otherwise expire on a day which is not a Business Day, shall be extended to the next succeeding Business Day, unless the result of such extension would be to extend such LIBOR Interest Period into another calendar month, in which event the LIBOR Interest Period shall end on the immediately preceding Business Day; and (iii) any LIBOR Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such LIBOR Interest Period) shall end on the last Business Day of a calendar month.

"**LIBOR Rate**" means the offered rate for deposits in United States Dollars (rounded upwards, if necessary, to the nearest one-sixteenth of one percent (1/16 of 1%)), for delivery of such deposits on the first day of a LIBOR Interest Period for the number of days in such LIBOR Interest Period, which appears on Bloomberg Page BBAM1.

"**LIBOR Rate Margin**" is 11.50% per annum.

"**Lien**" is a claim, mortgage, deed of trust, levy, charge, pledge, security interest or other encumbrance of any kind, whether voluntarily incurred or arising by operation of law or otherwise against any property.

"**Loan Documents**" are, collectively, this Agreement, the Perfection Certificate, the Security Documents, the Fee Letter, any subordination agreement, any note, or notes or guaranties executed by any Loan Party, and any other present or future agreement between any Loan Party and/or for the benefit of Agent and the Lenders, all as amended, restated, or otherwise modified.

"**Loan Party**" is each of Borrower and each Guarantor.

"**Material Adverse Change**" or "**Material Adverse Effect**" is:  (a) a material impairment in the perfection or priority of Agent's Lien in the Collateral; (b) a material adverse change in the business, operations, or condition (financial or otherwise), liabilities or assets of the Loan Parties, taken as a whole; or (c) the Loan Parties will be unable to repay any portion of the Obligations when due.

"**Material Contracts**" are (i) any agreement evidencing, securing or pertaining to any Indebtedness, or to any other monetary obligation in excess of $250,000, or any guaranty thereof, (ii) any real property lease with aggregate annual payments in excess of $250,000, (iii) any management, consulting, advisory or similar services agreement between a Loan Party and a Person that is not a Loan Party, (v) any warrant, option or similar agreement giving any Person a right to acquire an interest in any Loan Party or any Subsidiary, and (vi) any other contract, agreement, permit or license, (A) the default under, failure to comply with which, or the termination of which, could reasonably be expected to result in a Material Adverse Change or (B) which involves monetary obligations in excess of $250,000 in any year.

"**Maturity Date**" is, (x) with respect to the Initial Term Loan made on the Effective Date, June 1, 2020, and, (y) with respect to the Second Term Loan, the date that is four (4) years after the Funding Date.

"**Montage Indebtedness**" is the Indebtedness arising under that certain Loan and Security Agreement, dated as of January 26, 2016, by and between Borrower and Montage Capital II, L.P.

"**Montage Subordination Agreement**" shall mean that certain Subordination and Intercreditor Agreement, dated on or about the date hereof, by and among Montage Capital II, L.P., Loot Crate, Inc. and Breakwater Credit Opportunities Fund, L.P.

"**Monthly Financial Statements**" is defined in Section 6.2(b).

"**Mortgage**" is a mortgage or a deed of trust, deed to secure debt, trust deed or other security document entered into by any applicable Loan Party and Agent for the benefit of itself and the Lenders in respect of any real property owned by such Loan Party, in form and substance satisfactory to Agent.

"**New Lending Office**" is defined in Section 2.7(c).

"**Non-U.S. Lender**" is defined in Section 2.7(c).

"**Notice of Exclusive Control**" is defined in Section 6.13.

"**Notes**" is defined in Section 2.2.

"**Obligations**" are (a) with respect to Borrower, all obligations (monetary or otherwise, whenever arising, and whether absolute or contingent, liquidated or unliquidated, due or to become due, or matured or unmatured) of Borrower arising under or in connection with this Loan Agreement, the Notes, or any other Loan Document, including the principal of, and interest (including interest accruing after the commencement or during the pendency of any proceeding, action or case under the Bankruptcy Code or otherwise, whether or not allowed in such proceeding, action or case) on, and the Prepayment Premium with respect to, the Term Loan, and all fees, expenses, costs, indemnities and other sums payable at any time under any Loan Document and (b) with respect to each Loan Party other than Borrower, all obligations (monetary or otherwise, whenever arising, and whether absolute or contingent, liquidated or unliquidated, due or to become due, or matured or unmatured) of such Loan Party arising under or in connection with this Loan Agreement or any other Loan Document.

"**Operating Documents**" are, for any Person, such Person's formation documents, as certified with the Secretary of State of such Person's state of formation on a date that is no earlier than thirty (30) days prior to the Effective Date, and, (a) if such Person is a corporation, its bylaws in current form, (b) if such Person is a limited liability company, its limited liability company agreement (or similar agreement), and (c) if such Person is a partnership, its partnership agreement (or similar agreement), each of the foregoing with all current amendments or modifications thereto.

"**Ordinary Course of Business**" is, in respect of any transaction involving a Loan Party, the ordinary course of such Person's business, as conducted by any such Person in accordance with past practice (or as modified pursuant to the good faith reasonable business judgment of the governing body or a Responsible Officer of such Person) and undertaken by such Person in good faith and not for purposes of evading any covenant or restriction in any Loan Document.

"**Patents**" are all patents, patent applications and like protections including without limitation improvements, divisions, continuations, renewals, reissues, extensions and continuations-in-part of the same.

"**PayPal Account**" is defined in Section 6.6.

"**Perfection Certificate**" is defined in Section 5.1.

"**Permitted Acquisition**" is the purchase or other acquisition of all or substantially all of the Stock and/or assets of a Person, provided that (i) the total consideration (whether in cash or other liabilities, including deferred payment obligations or contingent obligations, including earn-out obligations) paid or payable by or on behalf of Borrower or its Subsidiary for such purchase or other acquisition (including any earn-out or contingent obligations in respect thereof), when aggregated with the total cash consideration paid by or on behalf of Borrower and its Subsidiaries for all other acquisitions pursuant to this Permitted Acquisitions definition, does not exceed $10,000,000, (ii) no Default or Event of Default has occurred, is continuing or would exist after giving effect to such transactions, (iii) such transaction would not result in a Change of Control, (iv) such acquisition is of a business engaged in a line of business that is compatible with, comparable to, or complementary to, the Loan Parties' business as of the Effective Date, (v) if such acquisition is structured as an acquisition of the Stock of any Person, then the Person so acquired shall (1) become a wholly-owned direct Subsidiary of Borrower or its Subsidiaries and any applicable Loan Party shall cause such acquired Person to comply with Section 6.9 (to the extent applicable) or (2) be merged with and into the Borrower or such Subsidiary (and, in the case of Borrower, with Borrower being the surviving entity), (vi) if such acquisition is structured as the acquisition of assets, such assets shall be acquired directly by Borrower or its Subsidiaries (including a Subsidiary organized specifically for the purpose of such acquisition), (vii) Borrower shall have delivered to Agent not less than 15 days (or such shorter period of time agreed to by Agent) nor more than 90 days prior to the date of such acquisition, notice of such acquisition together with the documents related to the acquisition presented to Borrower's Board in connection with its review and approval of the transaction, (viii) the board of directors or other governing body of the seller of the assets or issuer of the Stock being acquired shall not have disapproved such transaction or recommended that such transaction be

disapproved, (ix) all licenses, authorizations, exemptions, qualifications, consents and approvals of any Governmental Authority necessary under any laws applicable to such Loan Party that is making the acquisition, or the acquisition target (if applicable) for or in connection with the proposed acquisition and all necessary non-governmental and other third-party approvals which, in each case, are material to such acquisition shall have been obtained, and all necessary or appropriate declarations, registrations or other filings with any court, Governmental Authority, securities exchange or any other Person, which in each case, are material to the consummation of such acquisition or to the acquisition target, if applicable, have been made, and evidence thereof reasonably satisfactory in form and substance to Agent shall have been delivered, or caused to have been delivered, by the Loan Parties to Agent, and (x) there shall be no actions, suits or proceedings pending or, to the knowledge of any Loan Party threatened in writing against or affecting the acquisition target in any court or before or by any Governmental Authority which would reasonably be expected to have, after giving effect to the acquisition, a Material Adverse Effect.

**"Permitted Investments"** are:  (a) Investments shown on Schedule 7.7 and existing on the Effective Date; (b) (i) Cash Equivalents, and (ii) any similar short term Investments permitted by Borrower's investment policy, as amended from time to time, provided that such investment policy (and any such amendment thereto) has been approved in writing by Agent, which approval shall be unreasonably withheld, delayed or conditioned; (c) Investments consisting of the endorsement of negotiable instruments for deposit or collection or similar transactions in the Ordinary Course of Business; (d) Investments in an aggregate amount at any time outstanding not exceeding $250,000 consisting of (i) travel advances and employee relocation loans and other employee loans and advances in the Ordinary Course of Business, and (ii) loans to employees, officers or directors relating to the purchase of equity securities of Borrower or its Subsidiaries pursuant to employee stock purchase plans or agreements approved by the Board; (e) Investments (including debt obligations) received in connection with the bankruptcy or reorganization of customers or suppliers and in settlement of delinquent obligations of, and other disputes with, customers or suppliers arising in the Ordinary Course of Business; (f) Investments consisting of notes receivable of, or prepaid royalties and other credit extensions, to customers and suppliers who are not Affiliates, in the Ordinary Course of Business; provided that this subpart (f) shall not apply to Investments of Borrower in any Subsidiary; (g)  Investments consisting of Collateral Accounts, provided that, to the extent required under Section 6.6, Agent has received a Deposit Account Control Agreement or Securities Account Control Agreement; (h)  Investments by Borrower in any Subsidiary; (i) Investments in joint ventures and similar arrangements customary in Borrower's industry to the extent that the aggregate value of such Investments in any twelve (12) month period does not exceed $5,000,000; (j) Investments in the nature of Indebtedness owed by Borrower to any of its Subsidiaries; (k) Permitted Acquisitions; (l) Investments received as consideration in connection with a disposition permitted under Section 7.1; (m) extensions of credit in the nature of accounts receivable (including, but not limited to, intercompany accounts receivable) or notes receivable arising from the sale or lease of goods or services in the Ordinary Course of Business; (n) Investments consistent with Borrower' investment policy as in effect from time to time, and (o) other Investments in an amount not exceeding $250,000 in the aggregate at any time outstanding.

"**Permitted Liens**" are:

      (a)      any Lien existing on the Property of any Loan Party on the Effective Date and expressly approved by Lender in writing for these purposes, each of which shall be listed on Schedule 7.1 attached hereto;

      (b)      any Lien created under any Loan Document;

      (c)      Liens for taxes, fees, assessments or other governmental charges which are not delinquent or remain payable without penalty and for which appropriate reserves have been maintained in accordance with GAAP;

      (d)      Liens incurred and arising out of surety bonds, appeal bonds, statutory obligations, bids, performance and return of money and similar obligations and pledges or deposits made in the Ordinary Course of Business, including, without limitation, those made in connection with worker compensation, unemployment insurance, old age pensions and other social security benefits and those made to secure bids, tenders, contracts (other than contacts for the payment of money or the deferred purchase price of property or services);

(e)       Liens imposed by law, including carriers', warehousemen's, mechanics', materialmen's and vendors' Liens incurred in the Ordinary Course of Business and securing obligations which are not yet due or which are being contested in good faith by appropriate proceedings;

(f)       Liens arising from judgments, decrees or attachments in circumstances not constituting an Event of Default under Section 8.8;

(g)       Liens in favor of financial institutions in connection with a Loan Party's depository accounts held at such institution to secure standard fees for depository services charged by, but not financing made available by, such institutions, provided that Agent, on behalf of itself and the Lenders, has a perfected security interest in the amounts held in such deposit accounts;

(h)       Liens securing lease obligations, provided that each such Lien does not secure any other Indebtedness and does not encumber any Property other than that Property acquired with the proceeds of such Indebtedness;

(i)       Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(j)       purchase money Liens (i) on Equipment and software acquired or held by Borrower securing Indebtedness incurred to finance the acquisition of such assets, or (ii) on existing Equipment or software when acquired, and not imposed in anticipation of such acquisition, in each case if the Lien is confined to such assets and the proceeds thereof (for purposes of this clause, Indebtedness shall qualify under this clause if it is incurred within one hundred eighty (180) days of the date that the Loan Party acquired the Equipment and/or software which is to secure such Indebtedness) in each case, securing Indebtedness in an aggregate amount not to exceed the amount permitted under Section 7.4(f); and

(k)       Statutory and contractual liens in favor of landlords incurred in the Ordinary Course of Business in connection with any lease of real property.

"**Person**" is any individual, sole proprietorship, partnership, limited liability company, joint venture, company, trust, unincorporated organization, association, corporation, institution, public benefit corporation, firm, joint stock company, estate, entity or government agency.

"**Pledge Agreement**" is a Pledge Agreement made by the Loan Parties, as pledgors, in favor of Agent, for the benefit of itself and the Lenders, in respect of any Stock owned by each such Loan Party, in form and substance satisfactory to Agent.

"**Property**" is any interest in any kind of property or asset, whether real, personal or mixed, and whether tangible or intangible.

"**PIK Amount**" is defined in Section 2.5(b).

"**PIK Interest**" is defined in Section 2.5(b).

"**PIK Rate**" is 2.00% per annum.

"**Prepayment Premium**" is, with respect to (and upon and following) any acceleration of the Term Loan pursuant to Article 9 or any payment or prepayment of the Term Loan permitted under Section 2.4: (i) 3.00% of the amount so paid or prepaid or if such payment or prepayment occurs at any time after the Effective Date and on or prior to the first year anniversary of the Effective Date; (ii) 1.00% of the amount so paid or prepaid if such payment or prepayment occurs at any time after the first year anniversary of the Effective Date and on or before the second year anniversary of the Effective Date; (iii) 0.50% of the amount so paid or prepaid if such payment or prepayment occurs at any time after the second year anniversary of the Effective Date and on or before the third year anniversary of the Effective Date; and (iv) 0.00% of the amount so paid or prepaid if such payment or prepayment occurs at any time occurs at any time after the third year anniversary of the Effective Date, which percentage premiums (and any Prepayment Premium Incremental Amount) (a) are additional consideration for providing the Term Loan, (b) constitute reasonable liquidated damages to compensate the Lenders for (and are a proportionate quantification of)

the actual loss of the anticipated stream of interest payments upon an early prepayment of the Term Loan (such damages being otherwise impossible to ascertain or even estimate for various reasons, including, without limitation, because such damages would depend on, among other things, (x) when the Term Loan might otherwise be repaid and (y) future changes in interest rates which are not readily ascertainable on the Effective Date), and (c) are not a penalty to punish Borrower for its early prepayment of the Term Loan or for the occurrence of any Event of Default.

"**Prepayment Premium Incremental Amount**" are the following amounts: (i) for any prepayment in relation to which the Prepayment Premium is due after the second Cure Event, but before the third Cure Event, one percent (1.00%); (ii) for any prepayment in relation to which the Prepayment Premium is due after the third Cure Event, but before the fourth Cure Event, two percent (2.00%); and (iii) for any prepayment in relation to which the Prepayment Premium is due after the fourth Cure Event, three percent (3.00%).

"**Public Company**" is a company that is a reporting company under the Exchange Act.

"**Registered Organization**" is any "registered organization" as defined in the Code with such additions to such term as may hereafter be made.

"**Required Lenders**" are, at any time, Lenders holding more than 50% of the aggregate outstanding principal amount of the Term Loans at such time.

"**Requirement of Law**" is as to any Person, the organizational or governing documents of such Person, and any law (statutory or common), treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"**Responsible Officer**" is any of the Chief Executive Officer, President, Chief Financial Officer, Secretary or Controller of Borrower or other Loan Party, as applicable.

"**Restricted License**" is any license or other agreement with respect to which Loan Party is the licensee, excluding any agreement which is not necessary to the operation of any Loan Party's business (such as financial/purchasing, reporting, analytics, customer service, warehouse management, credit card processing, hosting and email services and systems), (a) that prohibits or otherwise restricts any Loan Party from granting a security interest in any Loan Party's interest in such license or agreement, or (b) for which a default under or termination of would reasonably be expected to materially interfere with Agent's right to sell any material portion of the Collateral.

"**Revenue**" means revenue as recognized in accordance with GAAP, and as presented in Borrower's consolidated financial statements delivered hereunder.

"**SEC**" is the Securities and Exchange Commission, any successor thereto, and any analogous Governmental Authority.

"**Second Note**" is defined in Section 2.2.

"**Second Note Funding Request**" is a notice given by Borrower to Agent in accordance with Section 2.2, substantially in the form of Exhibit C, with appropriate insertions.

"**Second Term Loan**" is defined in Section 2.2.

"**Securities Account**" is any "securities account" as defined in the Code with such additions to such term as may hereafter be made.

"**Security Documents**" are, collectively, this Agreement, the Pledge Agreement, each Mortgage, each Account Control Agreement, each IP Security Agreement, and each other security or collateral instrument or document executed and delivered pursuant to this Agreement or pursuant to any of the other Loan Documents to guarantee or secure any of the Obligations.

"**Side Letter**" means that certain letter agreement regarding investor rights dated as of the date hereof among Loot Crate, Inc. and Breakwater Credit Opportunities Fund, L.P.

"**Stock**" is comprised of all shares, options, warrants, general or limited partnership interests, membership interests or other equivalents (regardless of how designated) of or in a corporation, partnership, limited liability company or equivalent entity whether voting or nonvoting, including common stock, preferred stock or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the SEC under the Securities Exchange Act of 1934).

"**Subscribers**" means bona fide subscribers to the Loan Parties' services and orders associated with non-recurring sales, as offered in the Ordinary Course of Business and without any discounts, rebates or refunds outside of the Ordinary Course of Business, that are not Affiliates of any of the Loan Parties.

"**Subsidiary**" is, with respect to any Person, a corporation, partnership, limited liability company or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person.  Unless the context otherwise requires, each reference to a Subsidiary herein shall be a reference to a Subsidiary of Borrower.

"**Surety Instruments**" are all letters of credit (including standby and commercial), banker's acceptances, bank guaranties, shipside bonds, surety bonds and similar instruments.

"**Taxes**" are any present or future taxes, levies, duties, imposts or other charges or withholdings of a similar nature (including any penalty or interest payable in connection with any failure to pay or any delay in paying any of the same), and "Tax" and "Taxation" have a corresponding meaning.

"**Term Loan**" is defined in Section 2.2.

"**Total Indebtedness**" means, with respect to the Loan Parties and their Subsidiaries as of the date of determination, the sum without duplication of all Indebtedness (including, without limitation, the Obligations), obligations or liabilities for or in respect of (a) borrowed money, regardless of maturity date, <u>plus</u> (b) all bonds, notes, debentures or similar debt instruments, <u>plus</u> (c) the undrawn amount of outstanding letters of credit, <u>plus</u> (d) all capital lease obligations, <u>plus</u> (e) the present value of all basic rental obligations under any synthetic lease.

"**Trademarks**" are any trademark and servicemark rights, whether registered or not, applications to register and registrations of the same and like protections, and the entire goodwill of the business of the Loan Parties connected with and symbolized by such trademarks.

"**Transfer**" is defined in Section 7.1.

"**UCC**" means the Uniform Commercial Code as adopted in the State of California as of the Effective Date, and as the same may be amended from time to time thereafter.

"**US**", "**U.S.**" or "**United States**" is the United States of America.

"**Warrant**" is that certain Warrant to Purchase Common Stock dated as of the Effective Date, executed by Borrower in favor of Breakwater.

**1.2**        Accounting and other Terms

Accounting terms not defined in this Agreement shall be construed in accordance with GAAP. Calculations and determinations must be made in accordance with GAAP.  Capitalized terms not otherwise defined in this Agreement shall have the meanings set forth in Section 1.1.  All other terms contained in this Agreement, unless otherwise indicated, shall have the meanings provided by the Code to the extent such terms are defined therein.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either Borrower or any Lender shall so request, Agent, Lenders and Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of Agent); <u>provided</u> that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) Borrower shall

provide to Agent and Lenders the financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

## 2.    LOAN AND TERMS OF PAYMENT

**2.1    Initial Term Loan.**  Subject to the terms and conditions of this Agreement, on the Effective Date, the Lenders severally agree to make a term loan (the "**Initial Term Loan**") to Borrower in the aggregate principal amount of $15,000,000 (exclusive of fees and other charges payable by Borrower on the Effective Date) which shall be evidenced by one or more Senior Secured Promissory Notes in the form of Exhibit A-1 attached hereto and incorporated herein by reference (as the same may be amended, modified, renewed or extended, the "**Initial Note**") and in relation to each Lender's respective Initial Term Loan Commitments set forth on Schedule 2.1.

**2.2    Second Term Loan.**  Subject to the terms and conditions of this Agreement, on the Funding Date, the Lenders severally may elect to make an additional term loan (the "**Second Term Loan**", together with the Initial Term Loan, the "**Term Loan**") to Borrower in the aggregate principal amount of up to $5,000,000 (exclusive of fees and other charge payable by Borrower on the Funding Date) upon written request of Borrower.  The Second Term Loan, if any, shall be evidenced by one or more Senior Secured Promissory Notes (as the same may be amended, modified, renewed or extended, the "**Second Note**"), in the form of Exhibit A-2 attached hereto and incorporated herein by reference, together with the Second Note, the "**Notes**") and in relation to each Lender's respective Second Term Loan Commitments set forth on Schedule 2.1.  In the event Borrower wishes Lender to make the Second Term Loan, Borrower shall give to Lender irrevocable notice of a request, including the amount (equal to $5,000,000), for the Second Term Loan in writing on a Business Day that is at least fifteen (15) Business Days prior to the date of the proposed Second Term Loan, in the form of Exhibit A-2 attached hereto and incorporated herein by this reference (as the same may be amended, modified, renewed or extended, the "**Second Note Funding Request**").  Each Lender shall have the right to accept or refuse to make the Second Term Loan in its respective sole and absolute discretion. Each Lender's respective obligation to fund the Second Term Loan shall be subject to satisfaction, in each Lender's respective sole discretion, by Borrower of the conditions precedent described in Section 3.2.

**2.3    Promise to Pay**.  Borrower hereby unconditionally promises to pay Lender the outstanding principal amount of the Term Loan and accrued and unpaid interest thereon as and when due in accordance with this Agreement.

**2.4    Payment of Notes**.  The outstanding principal and interest of the Notes shall be due and payable as follows:

(a)    Beginning on June 30, 2016 and on the last day of each month thereafter, Borrower shall repay the outstanding principal of the Term Loan in an amount equal to the then drawn amount of the Term Loan multiplied by the percentage listed in the column labeled "Principal Amortization" set forth below, divided by twelve (12):

| Loan Year | Principal Amortization |
|-----------|------------------------|
| 1 | 0.0% |
| 2 | 5.0% |
| 3 | 10.0% |
| 4 | 15.0% |

(b)    On the Maturity Date, the entire unpaid principal balance of the Term Loan, and all unpaid interest and other amounts accrued thereon, shall be due and payable.

(c)    Except as otherwise provided herein, concurrently with any payment or prepayment in whole or in part of the Term Loan for any reason, whether voluntary or mandatory, prior to the Maturity Date, and whether before, during or after acceleration of the Term Loan and/or the occurrence of any Event of Default and/or the commencement of any proceeding under the Bankruptcy Code involving Borrower or any other Loan Party, Borrower shall pay to the Lender an amount equal to the Prepayment Premium.  Notwithstanding the foregoing, no Prepayment Premium shall be payable in connection with any amortization payments pursuant to Section 2.4(a). The parties hereto acknowledge and agree that the Prepayment Premium referred to in the first sentence of this Section 2.4(c) is additional consideration for providing the Term Loan, (ii) constitutes reasonable liquidated damages to compensate the Lender for (and is a proportionate quantification of) the actual loss of the anticipated stream of interest payments upon an early prepayment of the Term Loan (such damages being otherwise impossible to ascertain or even estimate for various reasons, including, without limitation, because such damages would depend on, among other things, (x) when the Term Loan might otherwise be repaid and (y) future changes in interest rates which are not readily ascertainable on the Funding Date), and (iii) is not a penalty to punish Borrower for its early prepayment of the Term Loan or for the occurrence of any Event of Default.

Prior to an Event of Default, Agent shall apply all payments received on the Term Loan first to any unpaid late charges and prepayment premiums and penalties, then to accrued and unpaid interest then due and owing on the Term Loan and then to the reduction of principal of the Term Loan, and, during an Event of Default, in such order and in such amounts as Agent and the Required Lenders may determine from time to time.

(d)    Upon receipt by any Loan Party of net cash proceeds from any sale, transfer or other disposition of any assets (other than Inventory dispositions in the Ordinary Course of Business) in excess of an aggregate amount of $250,000 in any calendar year, Borrower shall immediately prepay the Term Loan in an amount equal to one hundred percent (100%) of such net cash proceeds, after payment of any applicable taxes and reasonable selling expenses and any Indebtedness secured by a Permitted Lien on such assets; provided, however, that such Loan Party may, at its election, and upon written notice to Agent, reinvest such net proceeds within one hundred eighty (180) days following such sale, transfer or other disposition without being subject to the mandatory prepayment obligation of this Section 2.4(d).  No Prepayment Premium shall be due and payable in connection with such prepayment.

(e)    Concurrently with the receipt by any Loan Party or any of its Subsidiaries of any Curative Equity, Borrower shall prepay the Term Loan in an amount equal to one hundred percent (100%) of such Curative Equity in relation thereto, together with the Prepayment Premium and the Prepayment Premium Incremental Amount with respect to each such amount, provided, that with respect to the first Curative Equity Event and prepayment of the Term Loan with the proceeds of such Curative Equity, no Prepayment Premium Incremental Amount is due and payable.  Nothing in this Section 2.4(e) shall be construed to permit or waive any Default or Event of Default arising, directly or indirectly, from any such issuance of Stock to the extent it violates the provisions of Section 7.12.

(f)    Concurrently with the receipt by or on behalf of any Loan Party or any Affiliate of any Loan Party of the net cash proceeds of any Extraordinary Receipts which, when aggregated with the net cash proceeds of all other Extraordinary Receipts received during the fiscal year in which such date occurs (such aggregate net cash proceeds the "**Aggregate Net Cash Proceeds**"), exceeds $500,000 (the "**Extraordinary Receipts Threshold**"), Borrower shall immediately prepay the Term Loan in an amount equal to one hundred percent (100%) of the net cash proceeds of the Aggregate Net Cash Proceeds in excess of the Extraordinary Receipts Threshold.  No Prepayment Premium shall be due and payable in connection with such prepayment.

(g)    Upon receipt by any Loan Party of net cash proceeds in excess of $250,000 from any insurance policy with respect to any casualty event, Borrower shall immediately prepay the Term Loan  in an amount equal to one hundred (100%) of such net cash proceeds; provided, however, that, such Loan Party may, at its election, and upon written notice to Agent, reinvest such net proceeds in replacement assets within one hundred eighty (180) days following such sale, transfer or other disposition without being subject to the mandatory prepayment obligation of this Section 2.4(g).  No Prepayment Premium shall be due and payable in connection with such prepayment.

(h)    If a Loan Party elects to reinvest net cash proceeds pursuant to Section 2.4(d) or (g), Borrower shall promptly following the receipt of such net cash proceeds execute and deliver a reinvestment

certificate to Agent, which certificate shall (i) state the amount of the applicable net cash proceeds received by the applicable Loan Party and the amount to be reinvested, (ii) that such reinvestment is permitted pursuant to Section 2.4(d) or (g), as applicable, (iii) provide a description of the planned reinvestment.

(i)     All voluntary and mandatory prepayments of the Term Loan shall be applied to the principal installments thereof in the inverse order of maturity.

**2.5     Payment of Interest on the Term Loan.**

(a)     <u>Computation of Interest</u>.  Interest on the Term Loan and all fees payable hereunder shall be computed on the basis of a 360-day year and the actual number of days elapsed in the period during which such interest accrues.  In computing interest on the Term Loan, the date of the making of the Term Loan shall be included and the date of payment shall be excluded; *provided, however,* that if the Term Loan is repaid on the same day on which it is made, such day shall be included in computing interest on the Term Loan.

(b)     <u>Interest Rate</u>.  Each Term Loan shall bear interest on the outstanding principal amount thereof from the date when made, continued or converted until paid in full at a rate *per annum* equal to (x) the LIBOR Based Rate plus the LIBOR Rate Margin <u>plus</u> (y) the PIK Rate.  Interest accrued on the Term Loan under the PIK Rate (the "**PIK Amount**") shall automatically be added to the principal amount of the Term Loan and shall thereafter constitute principal for all purposes of this Agreement (such interest, "**PIK Interest**").  The principal amount of the Term Loan increased by any PIK Amount may be evidenced in writing only by the Lender, which writing shall be deemed to be correct absent manifest error.

Interest shall be paid on the date of any prepayment of the Term Loan pursuant to this Agreement for the portion of the Term Loan so prepaid and upon payment (including any Prepayment Premium) in full thereof. All accrued but unpaid interest on the Term Loan shall be due and payable in full on the Maturity Date.

Interest accruing on the Term Loan shall be due and payable on (x) the first day of each month with respect to interest payable in cash and (y) the first day of each quarter with respect to PIK Interest and, in the case of all interest, on the Termination Date (each an "**Interest Payment Date**").  Interest will accrue daily from the most recent date to which interest has been paid or, if no interest has been paid, from the date the Term Loan is made to the Interest Payment Date.

(c)     <u>Default Rate</u>.  Immediately upon the occurrence and during the continuance of an Event of Default, Obligations shall bear interest at a rate per annum which is three percentage points (3.00%) above the rate that is otherwise applicable thereto (the "**Default Rate**") unless Lender otherwise elects from time to time in its sole discretion to impose a smaller increase. Fees and expenses which are required to be paid by Borrower pursuant to the Loan Documents (including, without limitation, Lender Expenses) but are not paid when due shall bear interest until paid at a rate equal to the highest rate applicable to the Obligations. Payment or acceptance of the increased interest rate provided in this Section 2.5(c) is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of Lender.

**2.6     Fees**.  Borrower shall pay to Lender:

(a)     <u>Fee Letter</u>.  The fees due pursuant to the Fee Letter.

(b)     <u>Prepayment Premiums</u>.  Except as otherwise provided herein, upon any prepayment in whole or in part of the Term Loan for any reason, whether voluntary or mandatory and whether before, during or after acceleration of the Term Loan and/or the occurrence of any Event of Default and/or the commencement of any proceeding under the Bankruptcy Code involving Borrower, Borrower shall pay to Agent, for application to the Lenders, an amount equal to the Prepayment Premium.  The parties hereto acknowledge and agree that the Prepayment Premium referred to in the first sentence of this Section 2.6(b) is additional consideration for providing the Term Loan, (ii) constitutes reasonable liquidated damages to compensate the Lender for (and is a proportionate quantification of) the actual loss of the anticipated stream of interest payments upon an early prepayment of the Term Loan (such damages being otherwise impossible to ascertain or even estimate for various reasons, including, without limitation, because such damages would depend on, among other things, (x) when the Term Loan might otherwise be repaid and (y) future changes in interest rates which are not readily ascertainable on the Funding Date),

and (iii) is not a penalty to punish Borrower for its early prepayment of the Term Loan or for the occurrence of any Event of Default.

(c)    Late Fee.  If any principal, interest or any other sum due under the Loan Documents is not paid by Borrower within five (5) Business Days of the date such unpaid sum becomes due and payable, Borrower shall pay to Agent, for allocation to the Lenders, a charge in an amount equal to the lesser of (a) five percent (5.0%) of such unpaid sum or (b) the maximum amount permitted by applicable law in order to defray the expense incurred by Agent in handling and processing such delinquent payment and to compensate Agent and the Lenders for the loss of the use of such delinquent payment.

2.7    **Payments**.

(a)    All payments (including prepayments) to be made by Borrower under any Loan Document shall be made in immediately available funds in Dollars, without setoff or counterclaim, before 2:00 p.m. Pacific time on the date when due.  Payments of principal and/or interest received after 2:00 p.m. Pacific time are considered received at the opening of business on the next Business Day.  When a payment is due on a day that is not a Business Day, the payment shall be due the next Business Day, and additional fees or interest, as applicable, shall continue to accrue until paid.

(b)    All payments Borrower makes to a Lender under this Loan Agreement shall be made free and clear of and without deduction for present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority (including any interest, additions to tax or penalties applicable thereto) other than any taxes imposed on or measured by such Lender's overall net income and franchise taxes imposed on it (in lieu of net income taxes), by a jurisdiction (or any political subdivision thereof) as a result of such Lender being organized or resident, conducting business (other than a business deemed to arise from such Lender having executed, delivered or performed its obligations or received a payment under, or enforced, or otherwise with respect to, this Agreement) or having its principal office in such jurisdiction ("**Indemnified Taxes**").  If any Indemnified Taxes shall be required by law to be withheld or deducted from or in respect of any sum payable under this Agreement to a Lender (i) an additional amount shall be payable as may be necessary so that, after making all required withholdings or deductions (including withholdings or deductions applicable to additional sums payable under this Section 2.7(b)), such Lender receives an amount equal to the sum it would have received had no such withholdings or deductions been made, (ii) Borrower shall make such withholdings or deductions, (iii) Borrower shall pay the full amount withheld or deducted to the relevant taxing authority or other authority in accordance with applicable law and (iv) Borrower shall deliver to such Lender evidence of such payment.  Borrower's obligation hereunder shall survive the termination of this Agreement.

(c)    If any Lender after the Effective Date is organized under the laws of a jurisdiction other than the United States, any State thereof or the District of Columbia (each, a "**Non-U.S. Lender**"), such Non-U.S. Lender shall deliver to Borrower two (2) copies of either United States Internal Revenue Service Form W8-BEN or Form W8-ECI, or, in the case of a Non-U.S. Lender claiming exemption from U.S. Federal withholding tax under Section 871(h) or 881(c) of the Internal Revenue Code with respect to payments of "portfolio interest", a Form W8-BEN, or any subsequent versions thereof or successors thereto (and, if such Non-U.S. Lender delivers a Form W8-BEN, a certificate representing that such Non-U.S. Lender is not a bank for purposes of Section 881(c) of the Internal Revenue Code, is not a ten (10%) percent shareholder (within the meaning of Section 871(h)(3)(B) of the Internal Revenue Code) of Borrower and is not a controlled foreign corporation related to Borrower (within the meaning of Section 864(d)(4) of the Internal Revenue Code)), properly completed and duly executed by such Non-U.S. Lender claiming complete exemption from U.S. Federal withholding tax on payments by Borrower hereunder. Such forms shall be delivered by any Lender that is a Non-U.S. Lender on or before the date it becomes a party to this Agreement and on or before the date, if any, such Non-U.S. Lender changes its applicable lending office by designating a different lending office that is outside the United States (a "**New Lending Office**").  In addition, a Non-U.S. Lender shall upon written notice from Borrower promptly deliver such new forms as are required by the Internal Revenue Code or the regulations issued thereunder to claim exemption from, or reduction in the rate of, U.S. Federal withholding tax upon the obsolescence or invalidity of any form previously delivered by such Non-U.S. Lender.  Notwithstanding any other provision of this Section 2.7(c), a Non-U.S. Lender shall not be required to deliver any form pursuant to this Section 2.7(c) that such Non U.S. Lender is not legally able to deliver.  Borrower shall not be required to indemnify any Non-U.S. Lender or to pay any additional amounts to any Non-U.S. Lender, in respect of United States Federal withholding tax pursuant to Section 2.7(b) to the extent that (i) the obligation to

withhold amounts with respect to United States Federal withholding tax was applicable on the date such Non-U.S. Lender became a party to this Agreement or, with respect to payments to a New Lending Office, the date such Non-U.S. Lender designated such New Lending Office.

    **2.8**    **Warrants**.

    (a)    On the Effective Date, Borrower will issue to Breakwater a warrant representing the right to acquire one percent (1.00%) of the fully-diluted shares of Borrower's common stock (calculated on an as-if converted basis and as-if exercised (the "**Warrant**"). The Warrant shall have a term of seven (7) years and shall have a per share exercise price equal to the par value of a share of Borrower's common stock ($.0001 per share).

    (b)    Notwithstanding anything to the contrary contained in this Agreement or any other Loan Document, the obligations of Borrower under the Warrant shall survive the repayment of the Term Loan. Notwithstanding the survival of Borrower's obligations under the Warrant, Borrower, Agent and the Lenders agree that upon repayment of the Term Loan: (i) all Collateral shall be released from the lien of the Loan Documents, (ii) Borrower shall no longer be held to be making any of the representations or warranties set forth in this Agreement or the other Loan Documents on an ongoing basis, except for the representations and warranties relating to the Warrant, (iii) Borrower shall no longer be subject to any affirmative or negative covenants contained in this Agreement (other than solely with respect to the Warrant) or any other Loan Document, (iv) Borrower shall no longer be subject to any of the Default or Event of Default provisions set forth in this Agreement or any of the other Loan Documents, and (v) any and all other payment or performance obligations of Borrower under this Agreement and the other Loan Documents, other than the surviving obligations with respect to the Warrant and the indemnification obligations of Borrower under Section 12.2, shall terminate.

    **3.**    CONDITIONS PRECEDENT

    **3.1**    **Conditions Precedent to Initial Term Loan**. Each Lender's respective obligation to make the Initial Term Loan is subject to the condition precedent that Agent shall either (i) have received, in form and substance satisfactory to Agent, each of the following documents or deliverables, or (ii) be satisfied with the fulfillment, to its satisfaction, of each of the following conditions precedent, as applicable:

    (a)    duly executed original signatures to the Loan Documents;

    (b)    an executed original Initial Note, in accordance with Section 2.1;

    (c)    duly executed original signatures to the Equity Documents;

    (d)    (i) Operating Documents and a good standing certificate of Borrower certified by the Secretary of State of the State of Delaware and (ii) Operating Documents and a good standing certificate of each other Loan Party, certified by the Secretary of State or equivalent in its jurisdiction of organization, in each case, as of a date no earlier than thirty (30) days prior to the Effective Date;

    (e)    certificates of good standing of Borrower and each other Loan Party, certified by the applicable Secretary of State (or equivalent) for each additional U.S. state in which Borrower or each such Loan Party is qualified to do business as of a date no earlier than thirty (30) days prior to the Effective Date;

    (f)    a customary secretary's certificate from each Loan Party with completed Borrowing Resolutions;

    (g)    certified copies, dated as of a recent date, of financing statement searches with respect to the Loan Parties, as Agent shall reasonably request, accompanied by written evidence (including any termination statements under the Code) that the Liens indicated in any such financing statements either constitute Permitted Liens or have been or, in connection with the Initial Term Loan, will be terminated or released;

    (h)    delivery of a fully executed Montage Subordination Agreement;

    (i)    a legal opinion of the Loan Parties' counsel, dated as of the Effective Date;

        (j)      payment of the fees and Lender Expenses then due as specified in Section 2.6 hereof;

        (k)      fully-executed Account Control Agreements with respect to each deposit account and securities account of the Loan Parties as of the Effective Date, to the extent required by Section 6.6;

        (l)      such fully-executed IP Security Agreements as are required to perfect the Lien granted to Agent, on behalf of itself and the Lenders, in the Intellectual Property described in the Perfection Certificate;

        (m)      repayment in full of the Montage Indebtedness and release of any and all Liens in any of the Collateral associated therewith;

        (n)      delivery of a fully executed Pledge Agreement;

        (o)      all Stock of each of Borrower's Domestic Subsidiaries and all non-voting Stock of each of Borrower's Foreign Subsidiaries and sixty-five percent (65%) of the voting Stock of each of Borrower's Foreign Subsidiaries shall have been pledged pursuant to this Agreement and the Pledge Agreement, and Agent shall have received all certificates representing such Stock accompanied by instruments of transfer and undated stock powers executed in blank;

        (p)      delivery of a fully-executed Agency Appointment Agreement;

        (q)      delivery of a fully-executed Fee Letter;

        (r)      opening of the Concentration Account and the delivery of a fully-executed Account Control Agreement in relation to such Concentration Account;

        (s)      consolidated reviewed financial statements for each Loan Party's fiscal year ended December 31, 2014, consolidated unaudited financial statements for each Loan Party's fiscal year ended December 31, 2015, draft financial statements for each Loan Party's fiscal year ending December 31, 2015, and unaudited financial statements prepared on a monthly basis for each month through and including February 29, 2016 (collectively, the "**Historical Financial Statements**");

        (t)      the representations and warranties in this Agreement shall be true, accurate, and complete in all respects on the Effective Date; provided that those representations and warranties expressly referring to a specific date shall be true, accurate and complete in all respects as of such date, and no Default or Event of Default shall have occurred and be continuing or result from the making of the Initial Term Loan;

        (u)      Agent shall have completed and be satisfied with its business, legal, tax, environmental, accounting and collateral due diligence in respect of Borrower, the other Loan Parties and the Collateral, including, without limitation, (i) the corporate, capital, tax and legal structure of Borrower and the other Loan Parties (including satisfaction with the ownership structure, board composition and employment agreements with management) and the general tax attributes of Borrower and the other Loan Parties and (ii) securities, labor, insurance, and litigation matters;

        (v)      evidence reasonably satisfactory to Agent that the insurance policies and endorsements required by Section 6.5 hereof are in full force and effect, together with appropriate evidence showing lender loss payable and/or additional insured clauses or endorsements in favor of Agent, on behalf of itself and the Lenders; and

        (w)      in Agent's reasonable discretion, there has not been any material adverse change in the general affairs, management, results of operation, financial condition or the prospect of repayment of the Obligations, or any material adverse deviation by Borrower from the most recent business plan of Borrower presented to and accepted by Agent.

      **3.2**      **Conditions Precedent to Second Term Loan**.  The funding of the Second Term Loan, if any, shall be subject to the satisfaction of the conditions precedent in Section 3.1 and any internal credit approval procedures of Agent and the Lenders, all in Agent's and each such Lender's respective sole and absolute discretion. In addition, any closing of any Second Term Loan shall be subject to such conditions as the Lender shall reasonably require, including the following conditions:  (i) no Material Adverse Change shall have occurred and be continuing,

(ii) Agent shall have received, in form and substance satisfactory to Agent, each of the following documents or deliverables, or (iii) be satisfied with the fulfillment, to its satisfaction, of each of the following conditions precedent, as applicable:

(a)    the executed original Second Note Funding Request and the executed original Second Note;

(b)    the representations and warranties in this Agreement shall be true, accurate, and complete in all respects on the date of the Second Note Funding Request and on the Funding Date of such Second Term Loan; and provided that those representations and warranties expressly referring to a specific date shall be true, accurate and complete in all respects as of such date, and no Event of Default shall have occurred and be continuing or result from such Second Term Loan.  The Second Note Funding Request is Borrower's representation and warranty on that date that the representations and warranties in this Agreement remain true, accurate, and complete in all respects; provided, however, that those representations and warranties expressly referring to a specific date shall be true, accurate and complete in all material respects as of such date; and

(c)    payment of the fees and Lender Expenses then due as specified in Section 2.6 hereof.

**3.3    Covenant to Deliver**.  Borrower agrees to deliver to Agent each item required to be delivered to Agent and Lenders under this Agreement as a condition precedent to the Term Loan.  Borrower expressly agrees that a Term Loan made prior to the receipt by Agent of any such item shall not constitute a waiver by Agent or any Lender of Borrower's obligation to deliver such item, and the making of the Term Loan in the absence of a required item shall be in Agent's and each Lender's respective sole discretion.

**4.    CREATION OF SECURITY INTEREST**

**4.1    Grant of Security Interest**.  Borrower and each other Loan Party hereby grants Agent, on behalf of itself and the Lenders, to secure the payment and performance in full of all of the Obligations, a continuing security interest in, and pledges to Agent, on behalf of itself and the Lenders, all of its respective right, title and interest in and to, the Collateral, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof.  All Obligations shall be also be secured by the any and all security agreements, mortgages or other collateral granted to Agent, on behalf of itself and the Lenders, by any Loan Party as security for the Obligations, now or in the future.  If this Agreement is terminated, Agent's Lien in the Collateral shall continue until the Obligations (other than inchoate indemnity obligations and Obligations that have been cash collateralized in amounts and manner satisfactory to Agent) are satisfied in full, and at such time, shall automatically terminate and all rights therein shall revert to Borrower and the other Loan Parties.  Any termination of Agent's Lien in the Collateral shall be at Borrower's sole cost and expense.

**4.2    Perfection and Priority of Security Interest**.  Each Loan Party represents, warrants, and covenants that the security interest granted herein is and shall at all times continue to be a first priority perfected security interest in the Collateral (subject only to Permitted Liens that expressly have superior priority to Agent's Lien under this Agreement).

**4.3    Authorization to File Financing Statements**.  Borrower hereby authorizes Agent, on behalf of itself and the Lenders, to file financing statements, without notice to Borrower, with all appropriate jurisdictions to perfect or protect Agent's and the Lenders' interests or rights hereunder, including a notice that any disposition of the Collateral, by Borrower, any other Loan Party or any other Person, shall be deemed to violate the rights of Agent or any Lender under the Code.  Such financing statements may indicate the Collateral as "all assets of the Debtor" or words of similar effect, or as being of an equal or lesser scope, or with greater detail, all in Agent's sole discretion.

**4.4    Further Assurances.**  Without limiting the foregoing, each Loan Party will, and will cause each Subsidiary to, execute and deliver, or cause to be executed and delivered, to Agent such documents, agreements and instruments, and will take or cause to be taken such further actions (including the filing and recording of financing statements, fixture filings, mortgages, deeds of trust and other documents and such other actions or deliveries of the type required hereunder, as applicable), which may be required by any Requirement of Law or which Agent may, from time to time, reasonably request to carry out the terms and conditions of this Agreement and the other Loan

Documents and to ensure perfection and priority of the Liens created or intended to be created by the Loan Documents, all in form and substance reasonably satisfactory to Agent and all at the expense of the Loan Parties. If any material assets (including any real property or improvements thereto or any interest therein) are acquired by any Loan Party after the Effective Date (other than assets constituting Collateral under the Security Agreement that become subject to the Lien under the Security Agreement upon acquisition thereof),a Responsible Officer of Borrower will (i) notify Agent and the Lenders thereof and, if requested by Agent or the Required Lenders, cause such assets to be subjected to a Lien securing the Obligations and (ii) take, and cause each applicable Loan Party to take, such actions as shall be necessary or reasonably requested by Agent to grant and perfect such Liens, all at the sole cost and expense of the Loan Parties.

## 5.    REPRESENTATIONS AND WARRANTIES

Each Loan Party, jointly and severally, represents and warrants as follows:

**5.1    Due Organization, Authorization; Power and Authority**.  Each Loan Party and each of its Subsidiaries is duly existing and in good standing as a Registered Organization in its respective jurisdiction of formation or organization and is qualified and licensed to do business and is in good standing in any jurisdiction in which the conduct of its business or the ownership of its property requires that it be qualified except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.  In connection with this Agreement, each Loan Party has delivered to Lender a completed certificate signed by such Loan Party, entitled "Perfection Certificate" (collectively, the "**Perfection Certificate**").  Each Loan Party represents and warrants to Lender that (a) each Loan Party's exact legal name is that indicated on the Perfection Certificate and on the signature page hereof; (b) each Loan Party is an organization of the type and is organized in the jurisdiction set forth in the Perfection Certificate; (c) the Perfection Certificate accurately sets forth each Loan Party's organizational identification number or accurately states that such Loan Party has none; (d) the Perfection Certificate accurately sets forth each Loan Party's place of business, or, if more than one, its chief executive office as well as each Loan Party's mailing address (if different from its chief executive office); (e) except as set forth on the Perfection Certificate, each Loan Party (and each of its respective predecessors) has not, in the past five (5) years, changed its jurisdiction of formation, organizational structure or type, or any organizational number assigned by its jurisdiction; and (f) all other information set forth on the Perfection Certificate pertaining to each Loan Party and each of its Subsidiaries is accurate and complete in all material respects (it being understood and agreed that each Loan Party may from time to time update certain information in the Perfection Certificate after the Effective Date to the extent expressly permitted by one or more specific provisions in this Agreement).  If any Loan Party is not now a Registered Organization but later becomes one, such Loan Party shall promptly notify Lender of such occurrence and provide Lender with such Loan Party's organizational identification number.  The execution, delivery and performance by each Loan Party of the Loan Documents to which it is a party have been duly authorized, and do not (i) conflict with any Loan Party's organizational documents, (ii) contravene, conflict with, constitute a default under or violate any Requirement of Law, (iii) contravene, conflict or violate any applicable order, writ, judgment, injunction, decree, determination or award of any Governmental Authority by which any Loan Party or any of its Subsidiaries or any of their property or assets may be bound or affected, (iv) require any action by, filing, registration, or qualification with, or Governmental Approval from, any Governmental Authority (except such Governmental Approvals which have already been obtained and are in full force and effect), or (v) constitute an event of default under any agreement, note, indenture or other instrument by which any Loan Party is bound.  Each Loan Party is not in default under any agreement, note, indenture or other instrument to which it is a party or by which it is bound.

**5.2    Collateral**.  Each Loan Party has good title to, has rights in, and the power to transfer each item of the Collateral upon which it purports to grant a Lien hereunder and under the Security Agreements, free and clear of any and all Liens except Permitted Liens.  No Loan Party has deposit accounts other than as described in the Perfection Certificate delivered to Agent in connection herewith, or of which Borrower has given Agent notice and taken such actions as are necessary to give Lender a perfected security interest therein, subject to Section 6.6 hereof. To the Loan Party's knowledge, the Accounts are bona fide, existing obligations of the Account Debtors.  The Collateral is not in the possession of any third party bailee (such as a warehouse) except as otherwise provided in the Perfection Certificate or as permitted pursuant to Section 7.2.  None of the components of the Collateral shall be maintained at locations other than as provided in the Perfection Certificate or as permitted pursuant to Section 7.2.

As of the Effective Date and the Funding Date, except as noted on the Perfection Certificate, no Loan Party is a party to, nor is it bound by, any Restricted License.

       **5.3**     **Litigation**.  Except as disclosed in the Perfection Certificate, there are no actions or proceedings spending or, to the knowledge of the Responsible Officers of Borrower, threatened by or against the Loan Parties or any of their Subsidiaries that (i) as of the Effective Date or the Funding Date, could reasonably be expected to result in damages or costs to any Loan Party or any of its Subsidiaries of, individually or in the aggregate, $250,000 or more, or (ii) would be reasonably expected to have a Material Adverse Effect.

       **5.4**     **Financial Statements; Financial Condition**.  The Historical Financial Statements fairly present in all material respects the Borrower's financial condition on the dates thereof and the results of its operations and cash flows for the periods then ended and were prepared in accordance with GAAP, subject to year-end audit adjustments and the absence of footnote disclosures in the case of the unaudited financial statements.  All consolidated financial statements for the Loan Parties and their Subsidiaries delivered to Agent and the Lenders fairly present in all material respects the Loan Party's consolidated financial condition and the Loan Party's consolidated results of operations.

       **5.5**     **Solvency**.  The fair salable value of the Loan Parties' assets (including goodwill minus disposition costs), taken as a whole, exceeds the fair value of their liabilities, taken as a whole; the Loan Parties, on a consolidated basis, are not left with unreasonably small capital after the transactions in this Agreement; and the Loan Parties', on a consolidated basis are able to pay their debts (including trade debts) as they mature.

       **5.6**     **Regulatory Compliance**.  No Loan Party is an "investment company" or a company "controlled" by an "investment company" under the Investment Company Act of 1940, as amended.  No Loan Party is engaged as one of its important activities in extending credit for margin stock (under Regulations T, U and X of the Federal Reserve Board of Governors).  Each Loan Party has complied in all material respects with the Federal Fair Labor Standards Act.  No Loan Party or any of its Subsidiaries is a "holding company" or an "affiliate" of a "holding company" or a "subsidiary company" of a "holding company" as each term is defined and used in the Public Utility Holding Company Act of 2005.  No Loan Party has violated any laws, ordinances or rules which violation would be reasonably be expected to result in liabilities in excess of $250,000.  None of the Loan Parties' or any of its Subsidiaries' properties or assets has been used by any Loan Party or any Subsidiary or, to the best of Borrower's knowledge, by previous Persons, in disposing, producing, storing, treating, or transporting any hazardous substance other than in material compliance with applicable law.  Except as noted in the Perfection Certificate, each Loan Party and each of its Subsidiaries have obtained all consents, approvals and authorizations of, made all declarations or filings with, and given all notices to, all Governmental Authorities that are necessary to continue their respective businesses as currently conducted to the extent that the failure to do so would be reasonably be expected to result in liabilities in excess of $250,000.

       **5.7**     **Subsidiaries; Investments; Capitalization**.  No Loan Party owns any stock, partnership interest or other equity securities except (i) as of the Effective Date, for those described in the Perfection Certificate and (ii) after the Effective Date, as disclosed in writing to Agent; as of the Effective Date, the capitalization of each Loan Party is described in the Perfection Certificate and, except as described in the Perfection Certificate, no Person has any option, warrant, preemptive right, right of first refusal or other right to acquire any Stock or other ownership interest in any Loan Party; after the Effective Date, the capitalization of each Loan Party is described in the Perfection Certificate as updated from time to time by Borrower's written notice to Agent and, except as described in the Perfection Certificate as updated from time to time by Borrower's written notice to Agent, no Person has any option, warrant, preemptive right, right of first refusal or other right to acquire any Stock or other ownership interest in any Loan Party.

       **5.8**     **Tax Returns and Payments**.  Except as noted on the Perfection Certificate, each Loan Party (i) has timely filed all required tax returns and reports, and (ii) has timely paid all foreign, federal, state and material local taxes, assessments, deposits and contributions owed by such Loan Party.  Any Loan Party may defer payment of any contested taxes, provided that such Loan Party (a) in good faith contests its obligation to pay such taxes by appropriate proceedings promptly and diligently instituted and conducted, (b) notifies Agent in writing of the commencement of, and any material development in, the proceedings, and (c) posts bonds or takes any other steps required to prevent the Governmental Authority levying such contested taxes from obtaining a Lien upon any of the Collateral (other than a Permitted Lien).  No Loan Party is aware of any claims or adjustments proposed for any of

Loan Party's prior tax years which could result in additional taxes becoming due and payable by any Loan Party which would reasonably be expected to result in liabilities in excess of $250,000.

**5.9    Use of Proceeds**.  Borrower shall use the proceeds of the Term Loan as working capital; to repay certain of Borrower's existing debt; and to fund costs, fees and expenses of Agent and the Lender under the Loan Documents.

**5.10    Full Disclosure**.  No written representation, warranty or other statement of any Loan Party in any certificate or written statement given to Agent or any Lender, as of the date such representation, warranty, or other statement was made, taken together with all such written certificates and written statements given to Agent or any Lender, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained in the certificates or statements not misleading in any material respect (it being recognized by Agent and the Lenders that the projections and forecasts provided by Borrower in good faith and based upon assumptions reasonable at the time such projections or forecasts were prepared are not to be viewed as facts and that actual results during the period or periods covered by such projections and forecasts may differ materially from the projected or forecasted results).

**5.11    No Winding-Up**.  No Loan Party has taken any corporate or other action nor has any application been made or any other steps been taken or legal proceedings been started or (to the best of any Loan Party's knowledge and belief having made due and proper enquiry) threatened in writing against any Loan Party or any of its Subsidiaries for its winding-up or for the appointment of a liquidator, trustee, receiver, administrative receiver, administrator, examiner or similar officer of it or of any or all of its assets, except to the extent not prohibited under this Agreement.

**5.12    Insurance**.  The properties of each Loan Party are insured with financially sound and reputable insurance companies that are not Affiliates of any Loan Party, against loss and damage in such amounts, with such deductibles and covering such risks, as are customarily carried by Persons of comparable size and of established reputation engaged in the same or similar businesses and owning similar properties in the general locations where such Loan Party operates, in each case as described on Schedule 5.12.  As of the Effective Date and the Funding Date, all premiums with respect thereto that are due and payable have been duly paid and no Loan Party has received or is aware of any notice of violation or cancellation thereof and each Loan Party has complied in all material respects with the requirements of each such policy.

**5.13    Material Contracts**.  As of the Effective Date, Borrower has delivered to Agent true and complete copies of all Material Contracts to which it or any other Loan Party or their Subsidiaries is a party or to which it or any of its or their properties is subject.

**5.14    Liens of the Agent.**  The Liens granted to the Agent, on behalf of itself and the Lenders, pursuant to the Loan Documents will at all times, assuming the proper and timely filing of renewal statements for all financing statements with respect to Collateral included in the Security Documents which may be perfected by the filing of such financing statements under the UCC, the possession of items of Collateral which may be perfected by the possession of such Collateral under the UCC (including, without limitation, instruments or documents of title or certificated securities), the control of items of Collateral which may be perfected by control over such Collateral under the UCC (including, without limitation, deposit accounts), shall be fully perfected first priority Liens in and to the Collateral described therein, subject, as to priority, only to Permitted Liens with respect to the Collateral.

**5.15    Intellectual Property**.

(a)    To each Loan Party's knowledge, each Loan Party owns or has, as applicable, valid licenses to use all Intellectual Property necessary for the operations or conduct of its business as presently or currently expected to be conducted.  As of the Effective Date and the Funding Date, the validity and/or enforceability of the Intellectual Property and the title of ownership or rights of each Loan Party to use the Intellectual Property are not being questioned in any litigation, action, claim, suit, proceeding, hearing, investigation, notice or complaint to which any Loan Party is a party, nor, to any Loan Party's knowledge, is any such action threatened.  To each Loan Party's knowledge, as of the Effective Date and the Funding Date,  the conduct of each Loan Party's business has not and does not infringe, misappropriate or otherwise violate the Intellectual Property rights of any third party and no Loan Party knows of any basis for any claim of infringement, misappropriation or

other violation of any third party Intellectual Property rights, and, to the knowledge of each Loan Party, there are no infringements of the Intellectual Property by any third party.  As of the Effective Date and the Funding Date, no Loan Party or any registered agent thereof has received any written notice of an allegation of any infringement or misappropriation by, or other conflict with, any third party with respect to any Intellectual Property, nor has any such Person received any claims of infringement or misappropriation of or other conflict with any Intellectual Property of any third party.

(b)    Schedule 5.15 is a complete and accurate list of all Patents, Trademarks, trade names and Copyrights owned by any Loan Party and registered with the United States Patent and Trademark Office or any state or foreign Governmental Authority along with applicable registration numbers and jurisdictions of registration. Each item of registered Intellectual Property is and has at all times been in compliance with all legal requirements, and all filings, payments, and other actions required to be made or taken to maintain such item of registered Intellectual Property in full force and effect have been made by the applicable deadline.

(c)    Each Person who is or was an employee or contractor of any Loan Party and who is or was involved in the creation or development of any Intellectual Property either (i) has signed a valid and enforceable agreement containing an assignment to such Loan Party of the rights to such Intellectual Property, or (ii) if no such agreement exists, was an employee of a Loan Party whose work and any resulting Intellectual Property automatically, and without need for any assignment or other documentation, constitutes the property of such Loan Party under applicable laws.  No current or former member, manager, officer, director, or employee of any Loan Party has any valid claim, right (whether or not currently exercisable), or interest to or in any of the Intellectual Property.

5.16    **Leased Real Property.**  Schedule 5.16 sets forth a list of any and all real property leased, subleased, licensed or otherwise occupied or used by any Loan Party (the "**Leased Real Property**") and all leases, subleases, licenses or other agreements (whether written or oral) in connection therewith (each individually, a "**Lease**" and collectively, the "**Leases**").  All Leases of Leased Real Property are legal, valid, binding, and enforceable in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting creditors' rights generally and to general principles of equity.  There does not exist under any such Lease any breach or default on the part of any of the Loan Parties, or, to the knowledge of the Loan Parties, any other party thereto, and no event has occurred or circumstances exist that with notice or lapse of time or both would reasonably be expected to result in liabilities in excess of $250,000.  No Loan Party is a landlord under any Lease.  With respect to each of the Leased Real Properties and Leases, respectively, except as set forth on Schedule 5.16 and as Borrower has notified Agent in writing at any time after the Effective Date:  (i) there are no pending or, to knowledge of any Loan Party, threatened condemnation or expropriation proceedings (or negotiations regarding transfers in lieu thereof), lawsuits or administrative actions relating to any of the Leased Real Property or any portion thereof, or other legal matters affecting materially and adversely the current use, occupancy or value thereof; and (ii) no Loan Party's possession and quiet enjoyment of any such Leased Real Property has been disturbed and, to the knowledge of any Loan Party, there are no disputes with respect to the Leases.

6.    AFFIRMATIVE COVENANTS

From the Effective Date through the date on which this Agreement has been terminated and all Obligations (other than inchoate indemnity obligations and Obligations that have been cash collateralized in amounts and manner satisfactory to Agent) have been paid in full, each Loan Party shall, and shall cause its Subsidiaries to, do all of the following:

6.1    **Government Compliance**.

(a)    Maintain its and all its Subsidiaries' legal existence and good standing in their respective jurisdictions of formation and maintain qualification in each jurisdiction in which the failure to so qualify would reasonably be expected to have a Material Adverse Effect.  Each Loan Party shall comply, and have each Subsidiary comply, with all applicable laws, ordinances and regulations to which it is subject to the extent that the failure to do so would reasonably be expected to result in liabilities in excess of $250,000.

(b)    Obtain all of the Governmental Approvals necessary for the performance by each Loan Party of its obligations under the Loan Documents to which it is a party and the grant of a security interest to Agent, on behalf of itself and the Lenders, in all of its property.  shall promptly provide copies of any such obtained Governmental Approvals to Agent.

**6.2    Reporting, Financial and Other Information**.  Deliver to Agent:

(a)    *Annual Financial Statements.*  As soon as available, and in any event within 180 days after the end of each fiscal year of the Loan Parties (commencing with the fiscal year ending December 2016), the Loan Parties' consolidated audited financial statements with the opinion (unqualified as to scope or going concern status) of independent certified public accountants selected by Borrower and acceptable to Agent (it being agreed that KPMG is acceptable to Agent), which annual financial statements shall include the Loan Parties' balance sheet as of the end of such fiscal year and the related statements of the Loan Parties' income, retained earnings and cash flows for the fiscal year then ended, all in reasonable detail and prepared in accordance with GAAP, together with (i) copies of all management letters prepared by such accountants; and (ii) a certificate of the chief financial officer of Borrower stating that such financial statements have been prepared in accordance with GAAP, fairly present in all material respects the Loan Parties' financial position and the results of their operations and cash flows, and whether or not the chief financial officer has knowledge of the occurrence of any Default or Event of Default and, if so, stating in reasonable detail the facts with respect thereto.

(b)    *Monthly Financial Statements.*  As soon as available, and in any event within forty-five (45) days after the end of each month (other than January in relation to which such financials will be delivered along with the February period financials), the consolidated unaudited balance sheet and statements of income and retained earnings of the Loan Parties as of the end of and for such month and for the year-to-date period then ended, prepared in reasonable detail and stating in comparative form the figures for the corresponding date and periods in the previous year, all in accordance with GAAP, subject to year-end audit adjustments and the absence of footnote disclosures, and which fairly present in all material respects the Loan Parties' financial position and the results of their operations and cash flows, and, with respect to each month in which a fiscal quarter ends, accompanied by a certificate of the chief financial officer of Borrower, substantially in the form of Exhibit D hereto, stating (i) that such financial statements have been prepared in accordance with GAAP, subject to year-end audit adjustments, and fairly present in all material respects the Loan Parties' financial position and the results of their operations and cash flows, (ii) whether or not the chief financial officer has knowledge of the occurrence of any Default or Event of Default not previously reported and remedied and, if so, stating in reasonable detail the facts with respect thereto, and (iii) all relevant facts in reasonable detail to evidence, and the computations as to, whether or not the Loan Parties are in compliance with the financial covenants under Section 7.12 hereof.

(c)    *Projections.*  No later than sixty (60) days after the end of each fiscal year of Borrower, Borrower's projected balance sheets, income statements, and statements of cash flow for each month of the succeeding fiscal year, each in reasonable detail.  Such items will be certified by a Responsible Officer of Borrower as being based on assumptions believed by Borrower to be reasonable at the time they were made, together with a statement of material underlying assumptions and such supporting schedules and information as Agent or any Lender may in its reasonable discretion require.

(d)    *Litigation.*  Promptly after the commencement thereof, notice in writing of all litigation and of all proceedings pending before any governmental or regulatory agency (or threatened) affecting any Loan Party that seek a monetary recovery or injunctive relief against such Loan Party in excess of $250,000, individually or in the aggregate.

(e)    *Defaults.*  When any Loan Party becomes aware of the occurrence of any Default or Event of Default, notice of such occurrence, together with a detailed statement by a Responsible Officer of Borrower of the steps being taken by the Loan Parties to cure the same.

(f)    *Disputes*.  Promptly upon knowledge thereof, notice of any disputes or claims by any of the Loan Party's material customers, licensors, licensees or suppliers in excess of $250,000, individually or in the aggregate.

(g)        ***Ownership; Officers and Directors.***  Promptly upon knowledge thereof, notice of any change in the equity ownership of any Loan Party or in the persons constituting such Loan Party's senior managers, executive officers and Board of Directors.

(h)        ***Collateral.*** Promptly upon knowledge thereof, notice of any loss of, or damage to, any of the Collateral, or of any adverse change in any of the Collateral in excess of $250,000, individually or in the aggregate.

(i)        ***Commercial Tort Claims.***  Promptly upon knowledge thereof, notice of any commercial tort claims with an estimated value in excess of $50,000, individually or in the aggregate, that it may bring against any Person, including the name and address of each defendant, a summary of the facts, an estimate of the applicable Loan Party's damages, copies of any complaint or demand letter submitted by such Loan Party, and such other information as Agent may request.

(j)        ***Intellectual Property***.  (i) Except for transfers and dispositions permitted under this Agreement, thirty (30) days' prior written notice of any Loan Party's intent to dispose of Intellectual Property with a value in excess of $250,000, individually or in the aggregate, and upon request shall provide Agent with copies of all proposed documents and agreements concerning such rights. (ii) Promptly upon knowledge thereof, notice of (A) any infringement of its Intellectual Property by others, (B) material claims that any Loan Party is infringing another Person's Intellectual Property, with damage claims in excess of $250,000, individually or in the aggregate, and (C) any threatened cancellation, termination or material limitation of its Intellectual Property with a value in excess of $250,000, individually or in the aggregate.  (iii) Within forty-five (45) days of the end of each fiscal quarter, copies of all registrations and filings with respect to its Intellectual Property with the U.S. Patent and Trademark Office and the U.S. Copyright Office.

(k)        ***Reports to Stockholders.***  Promptly after circulation thereof, copies of all financial statements, reports and proxy statements which Borrower shall have sent to its stockholders.

(l)        ***Violations of Law.***  Promptly upon knowledge thereof, notice of any Loan Party's violation of any law, rule or regulation, the non-compliance with which would reasonably be expected to result in a Material Adverse Change.

(m)        ***Material Adverse Change***.  Promptly upon knowledge thereof, the occurrence or existence of any action or set of facts or circumstances that has resulted in, or is reasonably likely to result in, a Material Adverse Change.

(n)        ***Material Change in Accounting or Reporting Practices***.  Promptly upon knowledge thereof, any material change in accounting policies or financial reporting practices by Borrower or any other Loan Party.

(o)        ***Accounts and Inventory Reporting***.  As soon as available but in any event within thirty (30) days of the end of each calendar month, in each case as of the month then ended, all delivered in a form acceptable to Agent:

        (i)        an accounts receivable aging report;

        (ii)        an accounts payable aging report; and

        (iii)        an inventory report.

(p)        ***Other Reports.***  From time to time, with reasonable promptness, any and all receivables schedules, inventory reports, collection reports, deposit records, equipment schedules, copies of invoices to account debtors, shipment documents and delivery receipts for goods sold, and such other material, reports, records or information as Agent or any Lender may reasonably request.

**6.3        Inventory; Returns**.  Keep all Inventory in good and marketable condition, free from material defects.  Returns and allowances between any Loan Party and its Account Debtors shall follow such Loan Party's customary practices as instituted and in place as of the Effective Date.

**6.4    Taxes; Pensions**.  Timely file, and require each of its Subsidiaries to timely file, all required tax returns and reports and timely pay, and require each of its Subsidiaries to timely pay, all foreign, federal, state and local taxes, assessments, deposits and contributions owed by any Loan Party and each of its Subsidiaries, except for deferred payment of any taxes contested, or otherwise permitted, pursuant to the terms of Section 5.8 hereof, and shall deliver to Agent, on demand, appropriate certificates attesting to such payments, and pay all amounts necessary to fund, present pension, profit sharing and deferred compensation plans in accordance with their terms.

**6.5    Insurance**.  Keep its business and the Collateral insured for risks and in amounts standard for companies in Borrower's industry and location and as Agent or any Lender may otherwise request.  Insurance policies shall be in a form, with companies, and in amounts that are satisfactory to Agent.  All property policies shall have a lender's loss payable endorsement showing Agent as lender loss payee and waive subrogation against Agent and shall provide that the insurer must give Agent at least twenty (20) days' notice before canceling, amending, or declining to renew its policy.  All liability policies shall show, or have endorsements showing, Agent as an additional insured, and all such policies (or the loss payable and additional insured endorsements) shall provide that the insurer shall give Agent at least ten (10) days' notice before canceling, amending, or declining to renew its policy.  At Agent's request, Borrower shall deliver certified copies of policies and evidence of all premium payments.  Upon the occurrence and during the continuance of an Event of Default, proceeds payable under any policy shall, at Agent's option, be payable to Agent on behalf of itself and the Lenders on account of the Obligations.  If Borrower fails to obtain insurance as required under this Section 6.5 or to pay any amount or furnish any required proof of payment to third persons, Agent may make all or part of such payment or obtain such insurance policies required in this Section 6.5, and take any action under the policies as Agent deems prudent.

**6.6    Operating Accounts**.  Provide Lender fifteen (15) Business Days' prior written notice before establishing any Collateral Account at or with any bank or financial institution.  For each Collateral Account that any Loan Party at any time maintains, such Loan Party shall cause the applicable bank or financial institution at or with which any Collateral Account is maintained to execute and deliver an Account Control Agreement or other appropriate instrument with respect to such Collateral Account prior to opening such Collateral Account; provided, however, that for a sixty (60) day period commencing on the Effective Date and ending on the date that is sixty (60) days after the Effective Date, Borrower may maintain up to $100,000 at any time in Collateral Accounts for which Account Control Agreements are not in effect.  The provisions of the previous sentence shall not apply to (i) deposit accounts exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of any Loan Party's employees and identified to Agent by Borrower as such, which continue to be used solely for such purposes, (ii) a deposit account that provides cash collateral for the credit card services provided to the Loan Parties and permitted pursuant to Section 7.4(c), or (iii) a deposit account for Borrower's PayPal relationship (the "**PayPal Account**"), provided that (x) the funds on deposit therein are promptly transferred to a Collateral Account for which an Account Control Agreement is in place and (y) the aggregate amount in such PayPal Account shall not exceed $250,000 at any time outstanding.

**6.7    Protection of Intellectual Property Rights**.

(a)    (i) Use commercially reasonable efforts to protect, defend and maintain the validity and enforceability of its Intellectual Property; (ii) promptly advise Agent in writing of material infringements of its Intellectual Property; and (iii) not allow any Intellectual Property material to any Loan Party's business to be abandoned, forfeited or dedicated to the public without Agent's written consent, except in the ordinary course of business in Borrower's good faith business judgment with respect to Intellectual Property no longer used or useful in any Loan Party's business and not constituting a material portion of the Intellectual Property.

(b)    If any Loan Party (i) obtains any Patent, registered Trademark, registered Copyright, registered mask work, or any pending application for any of the foregoing, whether as owner, licensee or otherwise, or (ii) applies for any Patent or the registration of any Trademark, then Borrower shall provide written notice thereof to Lender on the next monthly Compliance Certificate deliverable to Agent hereunder and, shall, within ten (10) Business Days delivery of such Compliance Certificate, execute such intellectual property security agreements and other documents and take such other actions as Agent shall request in its sole discretion to perfect and maintain a first priority perfected security interest in favor of Agent, on behalf of itself and the Lenders, in such property.  If any Loan Party decides to register any Copyrights or mask works in the United States Copyright Office, Borrower shall:  (x) provide Lender with at least fifteen (15) Business Days prior written notice of such Loan Party's intent to register such a Copyright or mask work, together with a copy of the application it intends to file with the United

States Copyright Office (excluding exhibits thereto); (y) execute an intellectual property security agreement and such other documents and take such other actions as Agent may request in its sole discretion to perfect and maintain a first priority perfected security interest in favor of Agent, on behalf of itself and the Lenders, in the Copyrights or mask works intended to be registered with the United States Copyright Office; and (z) record such intellectual property security agreement with the United States Copyright Office contemporaneously with filing the Copyright or mask work application(s) with the United States Copyright Office. Borrower shall provide to Agent copies of any applications that any Loan Party files for Patents or for the registration of Trademarks, Copyrights or mask works on its monthly Compliance Certificates and will promptly provide Agent evidence of the recording of the intellectual property security agreement necessary for Agent to perfect and maintain a first priority perfected security interest in such property.

(c)    Provide written notice to Agent within ten (10) days of its intent to be bound by any Restricted License (other than, for the avoidance of doubt, over-the-counter software that is commercially available to the public). Borrower shall use commercially reasonable efforts to obtain the consent of, or waiver by, any Person whose consent or waiver is necessary for (i) any Restricted License to be deemed "Collateral" and for Agent, on behalf of itself and the Lenders, to have a security interest in it that might otherwise be restricted or prohibited by law or by the terms of any such Restricted License, whether now existing or entered into in the future, and (ii) Agent to have the ability in the event of a liquidation of any Collateral to dispose of such Collateral in accordance with Agent's rights and remedies under this Agreement and the other Loan Documents.

6.8    **Access to Collateral; Books and Records; Appraisals**. Allow Agent or any Lender, or its respective agents, at reasonable times, upon reasonable written notice (provided no notice is required if an Event of Default has occurred and is continuing) and during normal business hours (provided no Event of Default has occurred and is continuing), to inspect the Collateral and audit and copy Borrower's Books provided, that, prior to the occurrence and continuance of an Event of Default, such inspections and audits shall only be subject to reimbursement by Borrower no more often than one (1) time in any twelve (12) month period. The foregoing inspections and audits shall be at Borrower's expense, and include the reasonable and documented out-of-pocket expenses of Agent and the Lenders. Borrower shall, deliver or cause to be delivered to Agent written appraisals as to the Inventory in form, scope and methodology acceptable to Agent and by an appraiser acceptable to Agent, addressed to Agent and Lenders and upon which Agent and Lenders are expressly permitted to rely, one (1) time in any consecutive twelve (12) month period at Borrower's expense.

6.9    **Formation or Acquisition of Subsidiaries; Existing Subsidiaries**. Notwithstanding and without limiting the negative covenants contained in Sections 7.3 and 7.7 hereof:

At the time that any Loan Party forms any direct or indirect Subsidiary or acquires in an Acquisition permitted under this Agreement any direct or indirect Subsidiary after the Effective Date, such Loan Party shall within, five (5) Business Days after the date such Subsidiary is formed or acquired, cause such new Subsidiary (a) if it is a Domestic Subsidiary, to (i) provide to Agent a joinder to this Agreement to cause such Subsidiary to become a Loan Party hereunder, together with such appropriate security interests, financing statements and/or Account Control Agreements, all in form and substance satisfactory to Lender (including being sufficient to grant Lender a first priority Lien (subject only to Permitted Liens that are expressly permitted to have superior priority to Agent's Lien under this Agreement) in and to the assets of such newly formed or acquired Subsidiary), (ii) provide to Agent appropriate certificates and powers, if applicable, and financing statements, pledging all of the direct or beneficial ownership interest in such new Subsidiary, in form and substance satisfactory to Agent, and (iii) provide to Agent all other documentation in form and substance satisfactory to Agent, including an opinion of counsel satisfactory to Agent, which in Agent's sole discretion is appropriate with respect to the execution and delivery of the applicable documentation referred to above or (b) if it a Foreign Subsidiary, to pledge to the Agent all non-voting Stock and sixty-five percent (65%) of its voting Stock and deliver to Agent all certificates representing such Stock accompanied by instruments of transfer and undated stock powers executed in blank. Any document, agreement, or instrument executed or issued pursuant to this Section 6.9 shall be a Loan Document.

6.10    **Board Observation Rights.** Agent shall have the right to appoint two (2) observers to the Board of Directors and the board of directors of each Loan Party other than Borrower (the Board of Directors and such other boards individually a "**Board**"), one of which Persons shall be entitled to attend (or at the option of such observer, monitor by telephone) and the other of which Persons shall be entitled to monitor by telephone, all meetings of the Board and each committee of the Board (other than any portions of any meetings that relate to this

Agreement or which involve the exchange of privileged attorney-client information or work product or, to the extent that such persons are not bound by confidentiality agreements in form and substance reasonably satisfactory to Borrower, confidential information) but shall not be entitled to vote, and which Persons shall receive all reports, meeting materials, notices, written consents, and other materials (in each case, other than any portions of such reports or materials that contain information relating to this Agreement or attorney-client privileged information or work product or, to the extent that such persons are not bound by confidentiality agreements in form and substance reasonably satisfactory to Borrower, confidential information) as and when provided to the members of the Board of Directors. Borrower shall reimburse Agent for the reasonable travel expenses incurred by any such observer appointed by Agent in connection with attendance at or participation in meetings in person that have been pre-approved by the Borrower (which approval, for the avoidance of doubt, shall not be unreasonably withheld).

      **6.11    Further Assurances**. Execute any further instruments and take further action as Agent or any Lender reasonably requests to perfect or continue Agent's Lien in the Collateral or to effect the purposes of this Agreement.

      **6.12    Landlord Agreements.** The Loan Parties shall use commercially reasonable efforts to cause each leased location of a Loan Party and each other location where Collateral having a value greater than $25,000 is stored to be subject to a Landlord Agreement to be provided by the landlord of such leased location or other applicable lessor, warehouseman, processor, consignee, or other Person in possession of, having a Lien upon, or having rights or interests in such Collateral.

      **6.13    Account Control Agreements.** Each Loan Party shall cause each deposit account, securities account and Commodity Account listed on <u>Schedule 6.13</u> to be subject to an Account Control Agreement, and shall cause all Collections to be deposited in a deposit account listed on <u>Schedule 6.13</u> that is subject to an Account Control Agreement; <u>provided</u>, <u>however</u>, that, so long as no Event of Default has occurred and is continuing, the Loan Parties may open new deposit accounts, new securities accounts and new Commodity Accounts so long as, prior to or concurrently with opening each such account, (i) such Loan Party shall have delivered to Agent an amended <u>Schedule 6.13</u> including such account and (ii) such Loan Party shall have delivered to Agent an Account Control Agreement with respect to such account unless such account (A) is a deposit account used solely to fund payroll or employee benefits and is a zero-balance account, and will remain in use solely for such purpose or (B) will contain at all times less than $25,000 individually and less than $250,000 in the aggregate together with the balances of all accounts of all Loan Parties that are not subject to an Account Control Agreement.

      The Loan Parties shall cause each Account Control Agreement to provide, among other things, that (i) upon notice from Agent (a "**Notice of Exclusive Control**"), the depositary bank, securities intermediary, commodity intermediary or other financial institution party thereto will (x) cease to comply with instructions directing the disposition of funds in, cease to comply with entitlement orders with respect to financial assets in, and cease to apply any value distributed on account of the commodity contracts in, the account issued by the applicable Loan Party, and (y) comply only with instructions of Agent directing the disposition of funds in, or entitlement orders with respect to financial assets in, or the application of value on account of the commodity contracts in, the account without the consent of any Loan Party; <u>provided</u> that Agent hereby agrees not to issue a Notice of Exclusive Control unless an Event of Default has occurred and is continuing, and (ii) the depositary bank, securities intermediary, commodity intermediary or other financial institution party thereto has no rights of setoff or recoupment or any other claim against the account subject thereto, other than for payment of its routine fees and other charges directly related to the administration of such account and for returned checks or other items of payment. In the event Agent issues a Notice of Exclusive Control under any Account Control Agreement, all Collections or other amounts subject to such Account Control Agreement shall be transferred as directed by Agent and used to pay the Obligations in the manner set forth in Section 2. Upon cure or waiver of the Event of Default that served as a basis for the delivery of a Notice of Exclusive Control, and provided that no other Event of Default then exists, Agent shall promptly terminate such Notice of Exclusive Control by written notice to the financial institution that received such Notice of Exclusive Control.

      If, notwithstanding the provisions of this Section 6.13, after the occurrence and during the continuance of an Event of Default, Loan Party receives or otherwise has dominion over or control of any Collections or other amounts, such Loan Party shall hold such Collections and amounts in trust for Agent, on behalf of itself and the Lenders, and shall not commingle such Collections with any other funds of any Loan Party or any other Person or

deposit such Collections in any account other than those accounts set forth on Schedule 6.13 (unless otherwise instructed by Agent).

Promptly upon Agent's request, Borrower shall provide Agent with copies of monthly or other periodic account statements with respect to deposit accounts, securities accounts, Commodity Accounts, and investment property of Borrower.

**6.14    Material Contracts.**  Except in each case as would not reasonably be expected to result in liability of the Loan Parties or their Subsidiaries in excess of $500,000,  each Loan Party and Subsidiary thereof shall perform and observe all the material terms and provisions of each Material Contract to be performed or observed by it, maintain each such Material Contract in full force and effect, and enforce each such Material Contract in accordance with its terms; provided, however, that the Board of a Loan Party may determine in its reasonable business judgment whether to enforce a Material Contract to which it is a party.

**6.15    Post-Closing Matters.**  Borrower shall deliver or shall cause to be delivered the following:

(a)    within ten (10) Business Days following the Closing Date or such later date as the Administrative Agent may allow, fully-executed landlord's consents or bailee waivers in favor of Agent, together with the duly executed original signatures thereto for all leased property contained in Schedule 5.16;

(b)    within five (5) Business Days following the Closing Date or such later date as the Administrative Agent may allow, evidence satisfactory to Agent that the insurance policies and endorsements required by Section 6.5 hereof are in full force and effect, together with appropriate evidence showing lender loss payable and/or additional insured clauses or endorsements in favor of Agent.

**7.    NEGATIVE COVENANTS**

From the Effective Date through the date on which this Agreement has been terminated and all Obligations (other than inchoate indemnity obligations and Obligations that have been cash collateralized in amounts and manner satisfactory to Agent) have been paid in full, no Loan Party or any of its Subsidiaries shall do any of the following without Agent's and Required Lenders' prior written consent:

**7.1    Disposition of Property.**  Directly or indirectly, sell, assign, lease, convey, transfer or otherwise dispose of (whether in one or a series of transactions) any Property (including Accounts and notes receivable, with or without recourse) or enter into any agreement to do any of the foregoing, except in the Ordinary Course of Business.  For purposes of this Section 7.1, any single disposition or single group of related dispositions of Property by the Loan Parties or their Subsidiaries not exceeding, in the aggregate, a value of $250,000 shall automatically be deemed as being in the Ordinary Course of Business and shall not require prior Agent or Required Lender consent.

**7.2    Changes in Business, Management, Ownership, or Business Locations**.  (a) Engage in or permit any of its Subsidiaries to engage in any business other than the businesses currently engaged in by the Loan Parties and such Subsidiaries, as applicable, or reasonably related thereto; (b) except as permitted in Section 7.3, liquidate or dissolve; or (c) have a change in management such that any Key Person resigns, is terminated, or is no longer actively involved in the management of the Loan Parties in his/her current position and a replacement satisfactory to the Board of Directors for such Key Person is not made within ninety (90) days after such Key Person's departure from such Loan Party.  Further, no Loan Party shall, without at least fifteen (15) days' prior written notice to Agent:  (1) add any new offices or business locations, including warehouses (unless such new offices or business locations contain less than $50,000 in Collateral) or deliver any portion of the Collateral valued, individually or in the aggregate, in excess of $50,000 to a bailee at a location other than to a bailee and at a location already disclosed in the Perfection Certificate, (2) change its jurisdiction of organization, (3) change its organizational structure or type, (4) change its legal name, or (5) change any organizational number (if any) assigned by its jurisdiction of organization.  If any Loan Party intends to deliver any portion of the Collateral valued, individually or in the aggregate, in excess of $50,000 to a bailee, warehouseman or other third party, and Agent and such bailee, warehouseman or other third party are not already parties to a bailee agreement governing both the Collateral and the location to which such Loan Party intends to deliver the Collateral, then such Loan Party shall use commercially reasonable efforts to cause such bailee, warehouseman or other third party to execute and deliver a bailee agreement or Landlord Agreement in form and substance satisfactory to Agent in its sole discretion.

**7.3** **Mergers**.  Merge or consolidate, or permit any of its Subsidiaries to merge or consolidate, with or into any other Person, or acquire, or permit any of its Subsidiaries to acquire, all or substantially all of the capital stock or property of another Person or enter into an agreement to do any of the foregoing, except for (i) Permitted Acquisitions, (ii) a Loan Party's merger or consolidation with or into Borrower or any other Loan Party, other than , and (iii) a Subsidiary of Borrower merging or consolidating with or into another Subsidiary of Borrower or with and into Borrower.

**7.4** **Indebtedness**.  Create, incur, assume, suffer to exist, or otherwise become or remain directly or indirectly liable with respect to, any Indebtedness or, enter into an agreement to do any of the foregoing, except:

      (a)      Indebtedness incurred pursuant to this Agreement;

      (b)      Indebtedness existing on the Effective Date and listed on Schedule 7.4 attached hereto;

      (c)      Secured (with such security solely limited to cash collateral posted to sureties on such obligation) Indebtedness with respect to the Loan Parties' credit card obligations in an aggregate amount not to exceed $2,000,000 at any time outstanding;

      (d)      Indebtedness arising from agreements providing for indemnification, adjustment of purchase price or similar obligations (other than for borrowed money) or from guaranties or letters of credit, surety bonds or performance bonds securing the performance of the Loan Parties in connection with commercial contracts and other commercial lease transactions entered into in the Ordinary Course of Business;

      (e)      Indebtedness secured by Liens described in clause (j) of the definition of Permitted Liens in an aggregate amount not to exceed $1,000,000 at any time outstanding; and

      (f)      Indebtedness in connection with commercial real estate lease transactions entered into in the Ordinary Course of Business.

**7.5** **Encumbrances**.  (a) Create, incur, allow, or suffer any Lien on any of its property, or assign or convey any right to receive income, including the sale of any Accounts (except as otherwise permitted hereunder), or permit any of its Subsidiaries to do so, except for Permitted Liens, or permit any Collateral not to be subject to the first priority security interest granted herein, or (b) enter into any agreement, document, instrument or other arrangement (except with or in favor of Agent or a Lender) with any Person which directly or indirectly prohibits or has the effect of prohibiting any Loan Party or any Subsidiary from assigning, mortgaging, pledging, granting a security interest in or upon, or encumbering any Loan Party's or any Subsidiary's Intellectual Property, except (i) as is otherwise permitted in Section 7.1 hereof and the definition of Permitted Liens herein, and (ii) purchase money financing agreements, operating leases, capital leases and licenses which prohibit Liens upon the assets that are subject thereto (without waiving the requirements of this Agreement).

**7.6** **Maintenance of Collateral Accounts**.  Maintain any Collateral Account except pursuant to the terms of Section 6.6 hereof.

**7.7** **Investments; Acquisitions**.  Purchase or acquire or make any commitment therefor or enter into an agreement related thereto, any capital stock, equity interest or any obligations or other securities of, or any interest in, any Person, or make or commit to make any Acquisitions, or direct any revenues, income, business opportunities, or other rights to, or make or commit to make any advance, loan, extension of credit or capital contribution to or any other investment in, any Person, including any Affiliate of Borrower or enter into an agreement related thereto, without first obtaining Agent's and the Required Lenders' written consent, which consent shall not be unreasonably withheld, except for Permitted Investments.

**7.8** **Transactions with Affiliates**.  Directly or indirectly enter into or permit to exist any transaction with any Affiliate of any Loan Party, except for (a) transactions by and among Loan Parties, (b) transactions that are in the Ordinary Course of Business of any Loan Party, upon fair and reasonable terms that are no less favorable to such Loan Party than would be obtained in an arm's length transaction with a non-affiliated Person, and (c) transactions or arrangements set forth on Schedule 7.8.

**7.9**    **Restricted Payments**.

(a)    Declare or make any dividend payment or other distribution of assets, properties, cash, Cash Equivalents, rights, obligations or securities on account of any shares of any class of its Stock, or purchase, redeem or otherwise acquire for value any shares of its Stock or any warrants, rights or options to acquire such shares, now or hereafter outstanding; provided, however, that (i) the Loan Parties' Subsidiaries may, in the Ordinary Course of Business, make distributions to any Loan Party and (ii) Borrower may repurchase the Stock of departed directors, officers, employees and consultants for the original purchase price of such Stock, provided that the aggregate cash paid for such Stock in any fiscal year does not exceed $250,000.

(b)    Make any payment of interest or principal on any other Indebtedness for borrowed money subject to a subordination agreement (in form and substance satisfactory to Agent in its sole discretion) except as specifically permitted by the terms of such subordination agreement in favor of Agent.

**7.10**    **Maximum Capital Expenditures**.    Make Capital Expenditures of the Loan Parties and their Subsidiaries in the aggregate in excess of $6,000,000 in the period from and after January 1, 2016 through and including December 31, 2017, except with the consent of the Required Lenders.

**7.11**    **Accounting Changes**.    No Loan Party shall make any significant change in accounting treatment or reporting practices, except as required by GAAP.

**7.12**    **Financial Covenants**.

(a)    ***Minimum Cash***.    Permit the aggregate balance of all unrestricted cash and Cash Equivalents of the Loan Parties as of the close of business as of the last Business Day of any four (4) week fiscal period to be less than $2,000,000.

(b)    ***Minimum Subscribers and Revenue.***    Permit (x) the number of Subscribers to be less than the number set forth in the column headed "Subscribers" in the chart set forth below, measured as of the last day of each fiscal quarter, set forth in the column headed "Quarter Ended" in the chart set forth below opposite the figure for such quarter or (y) Revenue for the four (4) fiscal quarter period then ending to be less than the number set forth in the column headed "Revenue" in the chart set forth below, measured as of the last day of each fiscal quarter set forth in the column headed "Quarter Ended" in the chart set forth below opposite such figures for such quarter:

| Quarter Ended | Subscribers | Revenue |
|---|---|---|
| 6/30/16 | 530,000 | $115,000,000 |
| 9/30/16 | 590,000 | $135,000,000 |
| 12/31/16 | 670,000 | $150,000,000 |
| 3/31/17 | 605,000 | $150,000,000 |
| 6/30/17 | 635,000 | $170,000,000 |
| 9/30/17 | 680,000 | $190,000,000 |
| 12/31/17 | 770,000 | $215,000,000 |
| 3/31/18 | 790,000 | $225,000,000 |

(c)    ***Maximum Total Indebtedness to EBITDA Ratio***.    Fail to maintain as of the last day of each fiscal quarter, beginning with the fiscal quarter ending on December 31, 2017, for the four (4) fiscal quarter period then ending, a ratio of Total Indebtedness to EBITDA of not greater than 4.00 to 1.00; provided, that, (x) with respect to the fiscal quarter ending on December 31, 2017, EBITDA shall be calculated as the product of (A) the sum of (i) EBITDA for the fiscal quarter ending on September 30, 2017 plus (ii) EBITDA for the fiscal quarter ending on December 31, 2017 and (B) two (2) and (y) with respect to the fiscal quarter ending on March 31, 2018, EBITDA shall be calculated as the product of (A) the sum of (i) EBITDA for the fiscal quarter ending on December 31, 2017 plus (ii) EBITDA for the fiscal quarter ending on March 31, 2018 and (B) two (2).

(d)    ***Minimum Fixed Charge Coverage Ratio***. Fail to maintain as of the last day of each fiscal quarter beginning with the fiscal quarter ending on June 30, 2018, for the four (4)-fiscal-quarter period then ending a Fixed Charge Coverage Ratio of 1.10 to 1.00.

Notwithstanding the foregoing, Borrower shall not be in breach of a financial covenant set forth in this Section 7.12 if either:

(i)    as of the date that such financial covenant is tested, Borrower's and its Subsidiaries' aggregate unrestricted cash and unrestricted Cash Equivalents in Collateral Accounts subject to Account Control Agreements are Ten Million Dollars ($10,000,000); provided, however, that (x) this clause (i) shall only be deemed to cure a breach of a financial covenant set forth in this Section 7.12 from the date such financial covenant is tested through and including the date that is ninety (90) days after such date, (y) a cure under this clause (i) (each a "**Cash Cure Event**") shall not be permitted in two (2) consecutive fiscal quarters and (z) the aggregate amount of Cure Events (as defined below) shall not exceed four (4) such Cure Events over the term of the Term Loan; or

(ii)    Borrower notifies Agent no later than five (5) days after the date on which financial statements and a Compliance Certificate for the applicable fiscal quarter are required to be delivered and (ii) Borrower receives the cash proceeds of an investment of Curative Equity no more than ninety (90) days after the date the applicable financial covenant was tested (each a "**Curative Equity Event**" and, together with any Cash Cure Event, the "**Cure Events**").  Borrower shall promptly notify Agent of its receipt of any proceeds of Curative Equity.  Any investment of Curative Equity shall be in an amount not to exceed the amount that is sufficient to cause Borrower to be in compliance with the applicable financial covenant as of the most recently test date, calculated as if such amount of Curative Equity were (i) additional unrestricted cash, in the case of Section 7.12(a), (ii) additional Revenue or additional EBITDA, as applicable, in the case of Section 7.12(b), and/or (iii) additional EBITDA, in the case of Section 7.12(c) and/or Section 7.12(d).   If a Compliance Certificate is delivered with respect to the time period for which Curative Equity is used, Borrower shall (i) include evidence of its receipt of the Curative Equity proceeds, and (ii) set forth a calculation of the financial results and balance sheet of Borrower as at such time period (including, for such purposes, the proceeds of such Curative Equity (broken out separately) as deemed unrestricted cash, additional Revenue and/or additional EBITDA, as applicable, as if received on such date), which shall confirm that, on a pro forma basis after taking into account the receipt of the Curative Equity proceeds, Borrower would have been in compliance with the applicable financial covenant or covenants.   To the extent that Curative Equity is received and included in the calculation of a financial covenant as deemed Revenue and/or deemed EBITDA for any fiscal quarter, such Curative Equity shall be deemed to be Revenue and/or EBITDA for purposes of determining compliance with the financial covenants for subsequent periods that include such fiscal quarter but only with respect to such fiscal quarter in relation to which such Curative Equity was contributed.  All Curative Equity and the use of proceeds therefrom will be disregarded for all other purposes under this Agreement and the other Loan Documents.  All Curative Equity proceeds will be applied to prepay the Term Loan pursuant to Section 2.4(e). The amount of the Term Loan prepaid with the proceeds of Curative Equity shall be deemed outstanding for purposes of determining compliance with the financial covenants contained in Sections 7.12(c) and (d) for the current fiscal quarter. A Curative Equity Event shall not be permitted in two (2) consecutive fiscal quarters and the aggregate amount of Cure Events shall not exceed four (4) such Cure Events over the term of the Term Loan.

**8.**    EVENTS OF DEFAULT

Any one of the following shall constitute an event of default (an "**Event of Default**") under this Agreement:

**8.1**    **Payment Default**.  Borrower fails to (a) make any payment of principal or interest on the Term Loan on its due date, or (b) pay any other Obligations within five (5) Business Days after such Obligations are due and payable.  During the cure period, the failure to make or pay any payment specified under clause (b) hereunder is not an Event of Default (but no Second Term Loan will be made during the cure period);

**8.2**    **Representation or Warranty**.  Any representation or warranty by any Loan Party made herein or in any other Loan Document, or which is contained in any certificate or document by such Loan Party or its Responsible Officers, furnished at any time under this Agreement, or in or under any other Loan Document, shall prove to have been incorrect in any material respect on or as of the date made.

**8.3**    **Covenants.**  (a) Any Loan Party shall default in the due performance or observance of any of its obligations under Sections 6.2, 6.4, 6.5, 6.6, 6.9, 6.10, 6.12, 6.13 or Article 7, or any Loan Party shall default in the due performance or observance of its obligations under any covenant applicable to it under the Security Documents or (b) any Loan Party fails to perform or observe any other term or covenant contained in this Agreement or any other Loan Document, and, if such default is capable of remedy, such default shall continue unremedied for a period of thirty (30) days after the earlier of (i) the date upon which a Responsible Officer of such Loan Party obtains knowledge of such failure or (ii) the date upon which written notice thereof is given to such Loan Party by Agent;

**8.4**    **Reserved**.

**8.5**    **Attachment; Levy; Restraint on Business**.

(a)    (i) The service of process seeking to attach, by trustee or similar process, any funds of any Loan Party in excess of $100,000, or (ii) a notice of lien or levy is filed against any Loan Party's assets in excess of $100,000 by any government agency, and the same under subclauses (i) and (ii) hereof are not, within ten (10) days after the occurrence thereof, discharged or stayed (whether through the posting of a bond or otherwise); provided, however, no Second Term Loan shall be made during any such ten (10) day cure period; or

(b)    (i) any portion of any Loan Party's or any of its Subsidiary's assets with a value in excess of $250,000 in the aggregate is attached, seized, levied on, or comes into possession of a trustee or receiver and such attachment, seizure, levy or possession is not removed, discharged or rescinded within ten (10) days after the occurrence thereof, or (ii) any court order enjoins, restrains, or prevents any Loan Party from conducting any part of its business and such business suspension continues for more than thirty (30) days;

**8.6**    **Insolvency**.

(a)    If any of the following occurs in respect of any Loan Party or any Subsidiary: (i) it is, or is deemed for the purposes of any law to be, unable to pay its debts as they fall due; (ii) it fails to be solvent as described under Section 5.5 hereof; (iii) it admits its inability to pay its debts as they fall due; it suspends making payments on any of its debts or announces an intention to do so; (iv) a moratorium is declared in respect of any of its Indebtedness; or (v) by reason of actual or anticipated inability to pay debts as they fall due or insolvency it begins negotiations with any creditor for the rescheduling of any of its indebtedness;

(b)    If any of the following occurs in respect of any Loan Party or any Subsidiary (each of which shall be an "**Insolvency Proceeding**"): (i) a meeting of its shareholders, directors or other officers is convened for the purpose of considering any resolution for, to petition for or to make an application to or to file documents with a court or any registrar for, its winding-up, examination, administration or dissolution or any such resolution is passed; (ii) an order is made for its winding-up, examination, administration or dissolution, or any Person presents a petition, or makes an application to or files documents with a court or any registrar, for its winding-up, placement in examinership, administration or dissolution, or gives notice to Agent or any Lender of an intention to appoint an administrator; (iii) any liquidator, examiner, receiver, administrative receiver, administrator or similar officer is appointed in respect of it or any of its assets; (iv) its shareholders, directors or other officers request the appointment of, or give notice of their intention to appoint, a liquidator, receiver, administrator or similar officer; (v) any Loan Party commences or files an Insolvency Proceeding; or (vi) an Insolvency Proceeding is commenced or filed against any Loan Party and not dismissed or stayed within forty-five (45) days;

**8.7**    **Other Agreements**.  There is, under any agreement to which any Loan Party is a party with a third party or parties, (a) any default resulting in a right by such third party or parties, whether or not exercised, to accelerate the maturity of any Indebtedness in an amount individually or in the aggregate in excess of $250,000 which default is not cured or waived within any applicable grace period set forth in the documentation of such Indebtedness; or (b) any default by any Loan Party, the result of which could reasonably be expected to result in a Material Adverse Change; provided, however, that upon the cure or waiver of such default, the Event of Default under this Section 8.7 shall be automatically cured;

**8.8**    **Judgments**.  (a) One or more final judgments, orders, or decrees for the payment of money in an amount, individually or in the aggregate, of at least $100,000 (not covered by independent third-party insurance as to which liability has been accepted by such insurance carrier) shall be rendered against any Loan Party and the

same are not, within thirty (30) days after the entry thereof, discharged or execution thereof stayed or bonded pending appeal, or such judgments are not discharged prior to the expiration of any such stay or (b) one or more final non-monetary judgments, orders or decrees shall be rendered against any Loan Party which would reasonably be expected to result in the impairment of Agent's or any Lender's rights and remedies hereunder or in respect of any portion of the Collateral or which would otherwise reasonably be expected to result in a liability of the Loan Parties in an amount, individually or in the aggregate, of at least $100,000 (not covered by independent third-party insurance as to which liability has been accepted by such insurance carrier), and the same are not, within thirty (30) days after the entry thereof, discharged or execution thereof stayed or bonded pending appeal, or such judgments are not discharged prior to the expiration of any such stay;

**8.9    Invalidity**.  Either (a) the subordination provisions of any agreement or instrument governing any Indebtedness required to be subordinated to the Obligations pursuant to the terms hereof shall for any reason be revoked or invalidated or otherwise cease to be in full force and effect; or any Person shall contest in any manner the validity or enforceability thereof or deny that it has any further liability or obligation thereunder; or any of the Obligations for any reason shall not have the priority contemplated by this Agreement or such subordination provisions or (b) any material provision of this Agreement or any other Loan Document shall, for any reason, cease to be valid and binding on any Loan Party, or any Loan Party shall so claim in writing to Agent or any Lender or any Loan Party challenges the validity of its liability under this Agreement or any other Loan Document;

**8.10    Equity Documents**.  There is, under any Equity Document to which any Loan Party is a party any default, breach, or event of default; provided, that in the event such default, breach or event of default is cured under such Equity Document prior to the Agent exercising any remedies pursuant to Section 9.1, such default, breach or event of default shall not be an Event of Default pursuant to this Section 8.10.

**8.11    Lien Priority**.  Any Lien created hereunder or provided for hereby or under any related agreement for any reason ceases to be or is not a valid and perfected Lien having a first priority interest (subject only to Permitted Liens that have priority as a matter of applicable law) with respect to Collateral in excess of $100,000; or

**8.12    Change of Control**.  A Change of Control shall occur.

**9.**    AGENT'S AND LENDERS' RIGHTS AND REMEDIES

**9.1    Rights and Remedies**.  For so long as an Event of Default has occurred and is continuing Agent, on behalf of itself and the Lenders, may, without notice or demand, do any or all of the following:

(a)    declare all Obligations immediately due and payable (but if an Event of Default described in Section 8.6 occurs, all Obligations are immediately due and payable without any action by Agent or any Lender);

(b)    stop advancing money for Borrower's benefit under this Agreement or under any other agreement between the Loan Parties, Agent and the Lenders;

(c)    settle or adjust disputes and claims directly with Account Debtors for amounts on terms and in any order that Agent or any Lender considers advisable, notify any Person owing Borrower money of Agent's security interest in such funds, and verify the amount of such account;

(d)    make any payments and do any acts it considers necessary or reasonable to protect the Collateral and/or its security interest in the Collateral.  The Loan Parties shall assemble the Collateral if Agent requests and make it available as Agent designates.  Agent may enter premises where the Collateral is located, take and maintain possession of any part of the Collateral, and pay, purchase, contest, or compromise any Lien which appears to be prior or superior to its security interest and pay all expenses incurred.  Borrower grants Agent a license to enter and occupy any of its premises, without charge, to exercise any of Agent's rights or remedies;

(e)    apply to the Obligations any balances and deposits of the Loan Parties it holds;

(f)    ship, reclaim, recover, store, finish, maintain, repair, prepare for sale, advertise for sale, and sell the Collateral.  Agent is hereby granted a non-exclusive, royalty-free license or other right to use, without charge, exercisable solely upon the occurrence and during the continuance of an Event of Default, the Loan Parties'

labels, Patents, Copyrights, mask works, rights of use of any name, trade secrets, trade names, Trademarks, and advertising matter, or any similar property as it pertains to the Collateral, in completing production of, advertising for sale, and selling any Collateral and, in connection with Agent's exercise of its rights under this Section, Borrower's rights under all licenses and all franchise agreements will inure to Agent's benefit for the benefit of itself and the Lenders;

(g)    deliver a notice of exclusive control, any entitlement order, or other directions or instructions pursuant to any Account Control Agreement or similar agreements providing control of any Collateral;

(h)    demand and receive possession of Borrower's Books; and

(i)    exercise all rights and remedies available to Agent or any Lender under the Loan Documents or at law or equity, including all remedies provided under the Code (including disposal of the Collateral pursuant to the terms thereof).

**9.2    Power of Attorney**.  Each Loan Party hereby irrevocably appoints Agent as its lawful attorney-in-fact, exercisable upon the occurrence and during the continuance of an Event of Default, to:  (a) endorse any Loan Party's name on any checks or other forms of payment or security; (b) sign any Loan Party's name on any invoice or bill of lading for any Account or drafts against Account Debtors; (c) settle and adjust disputes and claims about the Accounts directly with Account Debtors, for amounts and on terms Agent determines reasonable; (d) make, settle, and adjust all claims under any Loan Party's insurance policies; provided, that Agent agrees that it will not terminate, or reduce coverage under, any insurance policy pursuant to this power of attorney; (e) pay, contest or settle any Lien, charge, encumbrance, security interest, and adverse claim in or to the Collateral, or any judgment based thereon, or otherwise take any action to terminate or discharge the same; and (f) transfer the Collateral into the name of Lender or a third party as the Code permits.  Each Loan Party hereby appoints Agent, on behalf of itself and the Lenders, as its lawful attorney-in-fact to sign any Loan Party's name on any documents necessary to perfect or continue the perfection of Agent's security interest in the Collateral (on behalf of itself and the Lenders) regardless of whether an Event of Default has occurred until all Obligations have been satisfied in full and neither Agent nor any Lender is under any further obligation to make the Second Term Loan hereunder.  Agent's foregoing appointment as Borrower's attorney in fact, and all of Agent's rights and powers, coupled with an interest, are irrevocable until all Obligations have been fully repaid and performed.

**9.3    Protective Payments**.  If any Loan Party fails to obtain the insurance called for by Section 6.5 or fails to pay any premium thereon or fails to pay any other amount which Borrower or any other Loan Party is obligated to pay under this Agreement or any other Loan Document, Agent may obtain such insurance or make such payment, and all amounts so paid by Agent are Lender Expenses and immediately due and payable, bearing interest at the then highest rate applicable to the Obligations, and secured by the Collateral.  Agent will make reasonable efforts to provide Borrower with notice of Agent obtaining such insurance at the time it is obtained or within a reasonable time thereafter.  No payments by Agent are deemed an agreement to make similar payments in the future or Agent or any Lender's waiver of any Event of Default.

**9.4    Application of Payments and Proceeds Upon Default**.  If an Event of Default has occurred and is continuing, Agent may apply any funds in its possession, whether from Loan Party account balances, payments, proceeds realized as the result of any collection of Accounts or other disposition of the Collateral, or otherwise, to the Obligations in such order as Agent shall determine in its sole discretion or as directed by the Required Lenders in their sole discretion.  Any surplus shall be paid to the Loan Parties or other Persons legally entitled thereto; Borrower shall remain liable to Agent and the Lenders for any deficiency.  If Agent or any Lender, in its respective sole discretion, directly or indirectly enters into a deferred payment or other credit transaction with any purchaser at any sale of Collateral, Agent or such Lender shall have the option, exercisable at any time, of either reducing the Obligations by the principal amount of the purchase price or deferring the reduction of the Obligations until the actual receipt by Agent or any Lender of cash therefor.

**9.5    No Waiver; Remedies Cumulative**.  Lender's failure, at any time or times, to require strict performance by any Loan Party of any provision of this Agreement or any other Loan Document shall not waive, affect, or diminish any right of Agent or any Lender thereafter to demand strict performance and compliance herewith or therewith.  No waiver hereunder shall be effective unless signed by the party granting the waiver and then is only effective for the specific instance and purpose for which it is given.  Agent's and the Lenders' rights and

remedies under this Agreement and the other Loan Documents are cumulative. Agent and the Lenders have all rights and remedies provided under the Code, by law, or in equity. Agent's or a Lender's exercise of one right or remedy is not an election and shall not preclude Agent from exercising any other remedy under this Agreement or other remedy available at law or in equity, and Agent's or the Required Lenders' waiver of any Event of Default is not a continuing waiver. Agent and any Lenders' delay in exercising any remedy is not a waiver, election, or acquiescence.

       **9.6**    **Demand Waiver**. Each Loan Party waives demand, notice of default or dishonor, notice of payment and nonpayment, notice of any default, nonpayment at maturity, release, compromise, settlement, extension, or renewal of accounts, documents, instruments, chattel paper, and guarantees held by Agent and the Lenders on which any Loan Party is liable.

       **10.**    NOTICES

       All notices, consents, requests, approvals, demands, or other communication by any party to this Agreement or any other Loan Document must be in writing and shall be deemed to have been validly served, given, or delivered: (a) upon the earlier of actual receipt and three (3) Business Days after deposit in the U.S. mail, first class, registered or certified mail return receipt requested, with proper postage prepaid; (b) upon transmission, when sent by electronic mail or facsimile transmission; (c) one (1) Business Day after deposit with a reputable overnight courier with all charges prepaid; or (d) when delivered, if hand-delivered by messenger, all of which shall be addressed to the party to be notified and sent to the address, facsimile number, or email address indicated below. Agent or any Loan Party may change its mailing or electronic mail address or facsimile number by giving the other party written notice thereof in accordance with the terms of this Article 10.

| | |
|---|---|
| If to Loan Parties: | c/o Loot Crate, Inc.<br>3401 Pasadena Avenue<br>Los Angeles, CA 90031<br>Attn: Christopher Davis<br>Email: Chris@lootcrate.com |
| If to Agent or<br>any Lender: | c/o Breakwater Investment Management, LLC<br>1999 Avenue of the Stars<br>Suite 3430<br>Los Angeles, CA 90067<br>Attn: Saif Mansour<br>Fax: (424) 777-4001<br>Email: smansour@breakwater.com |
| with a copy to: | Morgan, Lewis & Bockius LLP<br>101 Park Avenue<br>New York, New York 10178<br>Attn: Frederick F. Eisenbiegler<br>Fax: (212) 309-6001<br>Email: frederick.eisenbiegler@morganlewis.com |

       **11.**    CHOICE OF LAW, VENUE AND JURY TRIAL WAIVER

       California law governs the Loan Documents without regard to principles of conflicts of law. Each of the Loan Parties, Agent and each Lender submits to the exclusive jurisdiction of the State and Federal courts in Los Angeles, California; provided, however, that nothing in this Agreement shall be deemed to operate to preclude Agent or any Lender from bringing suit or taking other legal action in any other jurisdiction to realize on the Collateral or any other security for the Obligations, or to enforce a judgment or other court order in favor of Agent or any Lender. Each of the Loan Parties expressly submits and consents in advance to such jurisdiction in any action or suit commenced in any such court, and each of the Loan Parties hereby waives any objection that it may have based upon lack of personal jurisdiction, improper venue, or forum non conveniens and hereby consents to the

granting of such legal or equitable relief as is deemed appropriate by such court.  Each of the Loan Parties hereby waives personal service of the summons, complaints, and other process issued in such action or suit and agrees that service of such summons, complaints, and other process may be made by registered or certified mail addressed to Borrower at the address set forth in, or subsequently provided by Borrower in accordance with, Section 10 of this Agreement and that service so made shall be deemed completed upon the earlier to occur of Borrower's actual receipt thereof or three (3) days after deposit in the U.S. mails, proper postage prepaid.

**EACH LOAN PARTY, AGENT AND EACH LENDER WAIVE THEIR RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE LOAN DOCUMENTS OR ANY CONTEMPLATED TRANSACTION, INCLUDING CONTRACT, TORT, BREACH OF DUTY AND ALL OTHER CLAIMS.   THIS WAIVER IS A MATERIAL INDUCEMENT FOR BOTH PARTIES TO ENTER INTO THIS AGREEMENT.  EACH PARTY HAS REVIEWED THIS WAIVER WITH ITS COUNSEL.**

12. GENERAL PROVISIONS

**12.1 Successors and Assigns**.  This Agreement binds and is for the benefit of the successors and permitted assigns of each party.  No Loan Party may assign this Agreement or any rights or obligations under it without Agent's and the Required Lenders' prior written consent (which may be granted or withheld in Agent and each Lender's respective sole discretion).  Each Lender has the right, without the consent of or notice to Borrower: (a) to grant or sell participations in all or any part of, or any interest in, such Lender's obligations, rights, and benefits under this Agreement and the other Loan Documents (other than the Warrant, as to which assignment, transfer and other such actions are governed by the terms of the Warrant).  No participant shall be permitted to seek reimbursement or indemnity under Section 2.7  to the extent that its participation in the Term Loan would result in increased costs for Borrower in excess of costs accruing in relation to such Lender as a Lender hereunder at the time of any such participation, and (b) to sell, transfer, assign, negotiate, all or any part of, or any interest in, each Lender's obligations, rights, and benefits under this Agreement and the other Loan Documents (other than the Warrant, as to which assignment, transfer and other such actions are governed by the terms of the Warrant); provided that, if no Event of Default has occurred and is continuing, (i) such Lender will provide prompt written notice to Borrower of any sale, transfer or assignment of its interest under this Agreement and (ii) such Lender may not sell, transfer or assign any of its interest to a competitor of any Loan Party, as reasonably determined by Agent in consultation with Borrower.

**12.2 Indemnification**.  Each Loan Party agrees to indemnify, defend and hold Agent, and each Lender and their respective directors, officers, employees, agents, attorneys, or any other Person affiliated with or representing Agent or any Lender (each, an "**Indemnified Person**") harmless against:  (a) all obligations, demands, claims, and liabilities (collectively, "**Claims**") claimed or asserted by any other party in connection with the transactions contemplated by the Loan Documents; and (b) all losses or expenses (including Lender Expenses) in any way suffered, incurred, or paid by such Indemnified Person as a result of, following from, consequential to, or arising from transactions between Agent, Lender and the Loan Parties contemplated by the Loan Documents (including reasonable attorneys' fees and expenses), except for Claims and/or losses caused by such Indemnified Person's gross negligence or willful misconduct as determined in a final, non-appealable judgment of a court of competent jurisdiction.

**12.3 Time of Essence**.  Time is of the essence for the performance of all obligations in this Agreement.

**12.4 Severability of Provisions**.  Each provision of this Agreement is severable from every other provision in determining the enforceability of any provision.

**12.5 Correction of Loan Documents**.  Agent may correct patent errors and fill in any blanks in the Loan Documents consistent with the agreement of the parties.

**12.6 Amendments in Writing; Waiver; Integration.**  No purported amendment or modification of any Loan Document, or waiver, discharge or termination of any obligation under any Loan Document, shall be enforceable or admissible unless, and only to the extent, expressly set forth in a writing signed by the party against which enforcement or admission is sought and provided, that, no  amendment or modification of any Loan Document or waiver, discharge or termination of any obligation under any Loan Document shall be enforceable or

admissible unless the consent of Agent and the Required Lenders has been obtained.  Without limiting the generality of the foregoing, no oral promise or statement, nor any action, inaction, delay, failure to require performance or course of conduct shall operate as, or evidence, an amendment, supplement or waiver or have any other effect on any Loan Document.  Any waiver granted shall be limited to the specific circumstance expressly described in it, and shall not apply to any subsequent or other circumstance, whether similar or dissimilar, or give rise to, or evidence, any obligation or commitment to grant any further waiver.  The Loan Documents represent the entire agreement about this subject matter and supersede prior negotiations or agreements.  All prior agreements, understandings, representations, warranties, and negotiations between the parties about the subject matter of the Loan Documents merge into the Loan Documents.

      **12.7**    **Counterparts**.  This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, is an original, and all taken together, constitute one Agreement.

      **12.8**    **Survival**.  All covenants, representations and warranties made in this Agreement continue in full force until this Agreement has terminated pursuant to its terms and all Obligations (other than inchoate indemnity obligations and Obligations that have been cash collateralized in amounts and manner satisfactory to Agent) have been paid in full and satisfied.

      **12.9**    **Confidentiality.**  In handling any confidential information provided to Agent or any Lender by any Loan Party, each of Agent and each Lender shall exercise the same degree of care that it exercises for its own proprietary information, but disclosure of information may be made:  (a) to Agent's or such Lender's Subsidiaries or Affiliates (such Subsidiaries and Affiliates, together with Agent and each Lender, collectively, "**Lender Entities**"); (b) to prospective transferees or purchasers of any interest in the Term Loan (provided, however, Agent or any applicable Lender shall obtain any prospective transferee's or purchaser's written agreement to the terms of this provision); (c) as required by law, regulation, subpoena, or other order, in each case based on the reasonable advice of Agent or any Lender's legal counsel, in which event, Agent or such Lender, as applicable, agrees to use its best efforts to maintain the confidentiality of the information provided by any of the Loan Parties and to give prompt written notice to the affected Loan Party of the proposed disclosure where permitted by applicable law or regulation; (d) to Agent's or to any Lender's regulators or as otherwise required in connection with Agent's or any Lender's examination or audit, in each case based on the reasonable advice of Agent's or the applicable Lender's legal counsel, in which event, Agent or the Lender, as applicable, agrees to use its best efforts to maintain the confidentiality of the information provided by the Loan Parties; (e) as Agent or any Lender considers appropriate in exercising remedies under the Loan Documents during the continuance of an Event of Default; and (f) to third-party service providers of Agent or any Lender so long as such service providers have executed a confidentiality agreement with Agent or such Lender, as applicable, with terms no less restrictive than those contained herein.  Confidential information does not include information that is either:  (i) in the public domain or in Agent or any Lender's possession when disclosed to Agent or such Lender, as applicable, or becomes part of the public domain after disclosure to Agent or such Lender; or (ii) disclosed to Agent or any Lender by a third party if Agent or such Lender does not, in good faith, know that the third party is prohibited from disclosing the information.  Agent and any Lender Entities may use the confidential information for reporting purposes and the development and distribution of databases and market analyses so long as such confidential information is aggregated and anonymized prior to distribution unless otherwise expressly permitted by Borrower. The provisions of the immediately preceding sentence shall survive the termination of this Agreement.

      **12.10**    **Right of Set Off**.  Each Loan Party hereby grants to Agent, on behalf of itself and the Lenders, a lien, security interest and right of set off as security for all Obligations owing to Agent and the Lenders, whether now existing or hereafter arising upon and against all deposits, credits, collateral and property, now or hereafter in the possession, custody, safekeeping or control of Agent or any Lender or any entity under the control of Agent or any Lender (including a subsidiary thereof) or in transit to any of them.  At any time after the occurrence and during the continuance of an Event of Default, without demand or notice, Agent, on behalf of itself and the Lenders, may set off the same or any part thereof and apply the same to any liability or obligation of any Loan Party even though unmatured and regardless of the adequacy of any other collateral securing the Obligations.  ANY AND ALL RIGHTS TO REQUIRE AGENT OR ANY LENDER TO EXERCISE ITS RIGHTS OR REMEDIES WITH RESPECT TO ANY OTHER COLLATERAL WHICH SECURES THE OBLIGATIONS, PRIOR TO EXERCISING ITS RIGHT OF SETOFF WITH RESPECT TO SUCH DEPOSITS, CREDITS OR OTHER

PROPERTY OF ANY LOAN PARTY ARE HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVED.

**12.11    Electronic Execution of Documents**.  The words "execution," "signed," "signature" and words of like import in any Loan Document shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity and enforceability as a manually executed signature or the use of a paper-based recordkeeping systems, as the case may be, to the extent and as provided for in any applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act.

**12.12    Captions**.  The headings used in this Agreement are for convenience only and shall not affect the interpretation of this Agreement.

**12.13    Construction of Agreement**.  The parties mutually acknowledge that they and their attorneys have participated in the preparation and negotiation of this Agreement.  In cases of uncertainty this Agreement shall be construed without regard to which of the parties caused the uncertainty to exist.

**12.14    Relationship**.  The relationship of the parties to this Agreement is determined solely by the provisions of this Agreement.  The parties do not intend to create any agency, partnership, joint venture, trust, fiduciary or other relationship with duties or incidents different from those of parties to an arm's-length contract.

**12.15    Third Parties**.  Nothing in this Agreement, whether express or implied, is intended to:  (a) confer any benefits, rights or remedies under or by reason of this Agreement on any Persons other than the express parties to it and their respective permitted successors and assigns; (b) relieve or discharge the obligation or liability of any Person not an express party to this Agreement; or (c) give any Person not an express party to this Agreement any right of subrogation or action against any party to this Agreement.

**12.16    Conflicts**.  In the event of a conflict between a provision of this Agreement and a provision in any other Loan Document, the provision in this Agreement will govern.

[Signature pages follow.]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the Effective Date.

**BORROWER:**

LOOT CRATE, INC.

By: _____

Name: Christopher Davis

Title: Chief Executive Officer

AGENT:


**BREAKWATER CREDIT OPPORTUNITIES FUND, L.P.**

**By:  BREAKWATER INVESTMENT MANAGEMENT, LLC**, its general partner

By: _____
Name:  Saif Mansour
Title:  Managing Partner


**LENDER:**


**BREAKWATER CREDIT OPPORTUNITIES FUND, L.P.**

**By:  BREAKWATER INVESTMENT MANAGEMENT, LLC**, its general partner

By: _____
Name:  Saif Mansour
Title:  Managing Partner

**EXHIBIT A-1**

**SENIOR SECURED PROMISSORY NOTE**

**INITIAL TERM LOAN**

$[_____]                                                                                    [___], 2016

For value received, the undersigned, LOOT CRATE, INC., a Delaware corporation,  "**Borrower**"), hereby promise to pay on the Maturity Date under the Loan Agreement (defined below), to the order of BREAKWATER CREDIT OPPORTUNITIES FUND, L.P. ("**Lender**"), at its office in Los Angeles, California, or at any other place designated at any time by the holder hereof, in lawful money of the United States of America and in immediately available funds, the principal sum of FIFTEEN MILLION AND 00/100 DOLLARS ($15,000,000.00).   The principal hereof and interest accruing thereon shall be due and payable as provided in that certain Loan and Security Agreement, dated as of June 1, 2016 (as amended, modified, supplemented or restated from time to time, the "**Loan Agreement**"), by and among **BREAKWATER CREDIT OPPORTUNITIES FUND, L.P.**, a Delaware limited partnership with an office located at 1999 Avenue of the Stars, Suite 3430, Los Angeles, CA 90067 , as a Lender (as defined herein) and as agent for the Lenders (in such capacity, and any successors and assigns, "**Agent**"), **LOOT CRATE, INC.**, a Delaware corporation ("**Borrower**"), and the lenders from time to time party hereto (the "**Lenders**").  This Senior Secured Promissory Note may be prepaid only in accordance with the Loan Agreement.

This Senior Secured Promissory Note is issued pursuant, and is subject, to the Loan Agreement, which provides, among other things, for acceleration hereof.  This Senior Secured Promissory Note is the "Initial Note" referred to in the Loan Agreement.

This Senior Secured Promissory Note is secured, among other things, pursuant to the Loan Agreement and the Security Documents as therein defined, and may now or hereafter be secured by one or more other security agreements, mortgages, deeds of trust, assignments or other instruments or agreements.

Borrower shall pay all costs of collection, including reasonable attorneys' fees and legal expenses if this Senior Secured Promissory Note is not paid when due, whether or not legal proceeding are commenced.

Presentment or other demand for payment, notice of dishonor and protest are expressly waived.

**LOOT CRATE, INC.**

By: _____
Name:
Title:

**EXHIBIT A-2**

**SENIOR SECURED PROMISSORY NOTE**

**SECOND TERM LOAN**

$[_____]                                                                                    [___], 2016

For value received, the undersigned, LOOT CRATE, INC., a Delaware corporation,  "**Borrower**"), hereby promise to pay on the Maturity Date under the Loan Agreement (defined below), to the order of BREAKWATER CREDIT OPPORTUNITIES FUND, L.P. ("**Lender**"), at its office in Los Angeles, California, or at any other place designated at any time by the holder hereof, in lawful money of the United States of America and in immediately available funds, the principal sum of FIVE MILLION AND 00/100 DOLLARS ($5,000,000.00).  The principal hereof and interest accruing thereon shall be due and payable as provided in that certain Loan and Security Agreement, dated as of June 1, 2016 (as amended, modified, supplemented or restated from time to time, the "**Loan Agreement**"), by and among **BREAKWATER CREDIT OPPORTUNITIES FUND, L.P.**, a Delaware limited partnership with an office located at 1999 Avenue of the Stars, Suite 3430, Los Angeles, CA 90067 , as a Lender (as defined herein) and as agent for the Lenders (in such capacity, and any successors and assigns, "**Agent**"), **LOOT CRATE, INC.**, a Delaware corporation ("**Borrower**"), and the lenders from time to time party hereto (the "**Lenders**").  This Senior Secured Promissory Note may be prepaid only in accordance with the Loan Agreement.

This Senior Secured Promissory Note is issued pursuant, and is subject, to the Loan Agreement, which provides, among other things, for acceleration hereof.  This Senior Secured Promissory Note is the "Second Note" referred to in the Loan Agreement.

This Senior Secured Promissory Note is secured, among other things, pursuant to the Loan Agreement and the Security Documents as therein defined, and may now or hereafter be secured by one or more other security agreements, mortgages, deeds of trust, assignments or other instruments or agreements.

Borrower shall pay all costs of collection, including reasonable attorneys' fees and legal expenses if this Senior Secured Promissory Note is not paid when due, whether or not legal proceeding are commenced.

Presentment or other demand for payment, notice of dishonor and protest are expressly waived.

**LOOT CRATE, INC.**

By: _____
Name:
Title:

## EXHIBIT B – COLLATERAL DESCRIPTION

The Collateral consists of all of each Loan Party's respective right, title and interest in and to the following personal property:

All goods, Accounts (including health-care receivables), Equipment, Inventory, contract rights or rights to payment of money, leases, license agreements, franchise agreements, General Intangibles, commercial tort claims, documents, instruments (including any promissory notes), chattel paper (whether tangible or electronic), cash, deposit accounts, certificates of deposit, fixtures, letters of credit rights (whether or not the letter of credit is evidenced by a writing), securities, and all other investment property, supporting obligations, and financial assets, whether now owned or hereafter acquired, wherever located; and

All Borrower's Books relating to the foregoing, and any and all claims, rights and interests in any of the above and all substitutions for, additions, attachments, accessories, accessions and improvements to and replacements, products, proceeds and insurance proceeds of any or all of the foregoing.

Notwithstanding anything herein or in the Agreement or any other Loan Document to the contrary, the term "Collateral" shall not include, and the security interests granted in Section 4.1 or under any of the other Loan Documents shall not extend to (i) any lease or equipment financing restricted pursuant to the terms thereby or by applicable law to which such Person is a party or any of its rights or interests thereunder if and for so long as the grant of such security interest shall constitute or result in (x) the abandonment, invalidation or unenforceability of any right, title or interest of such Person therein or (y) in a breach or termination pursuant to the terms of, or a default under, any such lease or equipment financing (other than to the extent that any such term or applicable law would be rendered ineffective pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of the Code (or any successor provision or provisions) of any relevant jurisdiction or any other applicable law (including the Bankruptcy Code) or principles of equity), provided however that the Collateral shall include and such security interest shall attach immediately at such time as the condition causing such abandonment, invalidation or unenforceability shall be remedied and to the extent severable, shall attach immediately to any portion of such lease or equipment financing that does not result in any of the consequences specified in (x) or (y) above; (ii) any "intent to use" Trademark applications for which a statement of use has not been filed (but only until such statement is filed); or (iii) more than sixty-five percent (65%) of any issued and outstanding equity interest of any Foreign Subsidiary owned by Borrower which interests entitle the holder thereof to vote for the election of directors or any other matter.

**EXHIBIT C - SECOND NOTE FUNDING REQUEST**

**LOOT CRATE, INC.**

Date:

TO:    BREAKWATER CREDIT OPPORTUNITIES, L.P.

1999 Avenue of the Stars, Suite 3430

Los Angeles, CA 90067

Attention:  Saif Mansour

RE:    Loan and Security Agreement, dated as of June 1, 2016 (as amended, modified, supplemented or restated from time to time, the "**Loan Agreement**"), by and among **BREAKWATER CREDIT OPPORTUNITIES FUND, L.P.**, a Delaware limited partnership with an office located at 1999 Avenue of the Stars, Suite 3430, Los Angeles, CA 90067 , as a Lender (as defined herein) and as agent for the Lenders (in such capacity, and any successors and assigns, "**Agent**"), **LOOT CRATE, INC.**, a Delaware corporation ("**Borrower**"), and the lenders from time to time party hereto (the "**Lenders**").

Ladies and Gentlemen:

The undersigned refers to the Loan Agreement, the terms defined therein and used herein as so defined, and hereby gives you notice irrevocably, pursuant to Section 2.2 of the Loan Agreement, of the borrowing of the Second Term Loan.

1.    The Funding Date, which shall be a Business Day, of the requested borrowing is _____.

2.    The aggregate amount of the requested borrowing is $_____.

The undersigned hereby certifies that the following statements are true on the date hereof, and will be true on the date of the proposed Advance before and after giving effect thereto, and to the application of the proceeds therefrom, as applicable:

(a)    all representations and warranties of Borrower contained in the Loan Agreement are true, accurate and complete in all material respects as of the date hereof; and

(b)    no Default or Event of Default has occurred and is continuing, or would result from such proposed Advance.

BORROWER:

_____

By:_____
Name: _____
Title: _____

**EXHIBIT D -**

**FORM OF COMPLIANCE CERTIFICATE**

Date:

TO:      BREAKWATER CREDIT OPPORTUNITIES, L.P.

FROM:  LOOT CRATE, INC.

The undersigned authorized officer of **LOOT CRATE, INC.**, a Delaware corporation ("**Borrower**"), hereby certifies that under the terms and conditions of the Loan and Security Agreement, dated as of June 1, 2016 (as amended, modified, supplemented or restated from time to time, the "**Loan Agreement**"), by and among **BREAKWATER CREDIT OPPORTUNITIES FUND, L.P.**, a Delaware limited partnership with an office located at 1999 Avenue of the Stars, Suite 3430, Los Angeles, CA 90067 , as a Lender (as defined herein) and as agent for the Lenders (in such capacity, and any successors and assigns, "**Agent**"), and the lenders from time to time party hereto (the "**Lenders**"):

(1) the Loan Parties are in complete compliance for the period ending with all required covenants except as noted below; (2) there are no Events of Default; (3) all representations and warranties in the Agreement are true and correct in all material respects on this date except as noted below; provided, however, that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof; and provided, further that those representations and warranties expressly referring to a specific date shall be true, accurate and complete in all material respects as of such date; (4) the Loan Parties, and each of their Subsidiaries, have timely filed all required tax returns and reports, and the Loan Parties, and each of their Subsidiaries, have timely paid all foreign, federal, state and local taxes, assessments, deposits and contributions owed by Borrower except as otherwise permitted pursuant to the terms of Section 5.8 of the Agreement; and (5) no Liens have been levied or claims made against the Loan Parties or any of their Subsidiaries relating to unpaid employee payroll or benefits of which Borrower has not previously provided written notification to Lender.

Attached are the required documents supporting the certification. The undersigned certifies that each of these documents has been prepared in accordance with GAAP consistently applied from one period to the next except as explained in an accompanying letter or footnotes. The undersigned acknowledges that the Second Loan may not be requested at any time or date of determination that the Loan Parties are not in compliance with any of the terms of the Agreement, and that compliance is determined not just at the date this certificate is delivered. Capitalized terms used but not otherwise defined herein shall have the meanings given them in the Agreement.

**Please indicate compliance status by circling Yes/No under "Complies" column.**

| Reporting Covenant | Required | Complies | |
|---|---|---|---|
| Monthly consolidated financial statements with Compliance Certificate | Monthly within 30 days | Yes | No |
| Annual financial statement (Audited) | FYE within 180 days | Yes | No |

| Financial Covenant | Required | Actual | Complies | |
|---|---|---|---|---|
| Minimum Cash | $2,000,000 | $_____ | Yes | No |
| Minimum Subscribers | | | Yes | No |
| Minimum EBITDA | | | Yes | No |
| Minimum Revenue | | | Yes | No |
| Maximum Total Indebtedness to EBITDA Ratio | 4.00 to 1.00 | _____ to 1.00 | Yes | No |
| Minimum Fixed Charge Coverage Ratio | 1.10 to 1.00 | _____ to 1.00 | Yes | No |

The following financial covenant analyses and information set forth in Schedule 1 attached hereto are true and accurate as of the date of this Certificate.

The following are the exceptions with respect to the certification above:  (If no exceptions exist, state "No exceptions to note.")

*[Remainder of Page is Intentionally Left Blank]*

**EXHIBIT E -**

**FORM OF GUARANTY**

**GUARANTY**

This Guaranty (this "Guaranty"), dated as of [        ][   ], 201[   ], is made by [                ], a [_____] ("Guarantor") for the benefit of BREAKWATER CREDIT OPPORTUNITIES FUND, L.P., as Agent for the Lenders (in such capacity, with its participants, successors and assigns, the "Agent").

A.    The Lenders, Loot Crate, Inc., a Delaware corporation ("Borrower") are parties to the Loan and Security Agreement dated as of the date hereof (as the same may be amended, supplemented or restated from time to time, the "Loan Agreement") pursuant to which the Lenders and the Agent may make term loans and extend other financial accommodations to the Borrower.

B.    As a condition to extending such financial accommodations to the Borrower, the Lenders and the Agent have required the execution and delivery of this Guaranty.

NOW, THEREFORE, each Guarantor, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, hereby agrees as follows: Definitions. All terms defined in the Loan Agreement that are not otherwise defined herein shall have the meanings given them in the Loan Agreement.

"CEA" means the Commodity Exchange Act (7 U.S.C. §1 et seq.), as amended from time to time, and any successor statute thereof.

"CFTC" means the Commodity Futures Trading Commission.

"Eligibility Date" means, with respect to a Swap, the date on which this Guaranty becomes effective with respect to such Swap (for the avoidance of doubt, such date shall be the date of the execution of such Swap if this Guaranty is then in effect, and otherwise it shall be the date of execution and delivery of this Guaranty).

"Excluded Swap Obligation" means, with respect to each Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a Swap if, and to the extent that, all or any portion of this Guaranty that relates to the obligations under such Swap is or becomes illegal as to such Guarantor under the CEA, or any rule, regulation or order of the CFTC by virtue of such Guarantor's failure for any reason to qualify as an "eligible contract participant" (as defined in the CEA and regulations promulgated thereunder) on the Eligibility Date for such Swap.

"Fraudulent Transfer Laws" means applicable law relating to fraudulent conveyance or fraudulent transfer, including, without limitation, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act and Section 548 of title 11 of the United States Code or any applicable provisions of comparable law.

"Obligations" means all obligations, including, but not limited to, the Obligations, that may now or hereafter become owing from any Loan Party to the Agent and the Lenders other than any obligation that constitutes an Excluded Swap Obligation.

"Swap" means any "swap" as defined in Section 1a(47) of the CEA and regulations thereunder between the Borrowers and the Lender, other than (A) a swap entered into on, or subject to the rules of, a board of trade designated as a contract market under Section 5 of the CEA, or (B) a commodity option entered into pursuant to CFTC Regulation 32.3(a).

**1**

I.   <u>Obligations Guaranteed</u>. Each Guarantor hereby absolutely and unconditionally guarantees to the Lenders full and prompt payment when due, whether at maturity or earlier by reason of acceleration or otherwise, of the Obligations. If there is more than one Guarantor, the obligations hereunder are joint and several, and whether or not there is more than one Guarantor, the obligations hereunder are independent of the obligations of the Borrower and any other Person, and a separate action may be brought and prosecuted against the Guarantors whether action is brought against the Borrower or whether the Borrower is joined in any such action.

II.  <u>Limitation of Guaranty</u>. Any term or provision of this Guaranty or any other Loan Document to the contrary notwithstanding, the maximum aggregate amount for which any Guarantor shall be liable hereunder shall not exceed the maximum amount for which such Guarantor can be liable without rendering this Guaranty or any other Loan Document, as it relates to such Guarantor, subject to avoidance under Fraudulent Transfer Laws. Any analysis of the provisions of this Guaranty for purposes of Fraudulent Transfer Laws shall take into account the right of contribution established in Section IV and, for purposes of such analysis, give effect to any discharge of intercompany debt among the Loan Parties as a result of any payment made under this Guaranty

III. <u>Contribution</u>. To the extent that any Guarantor shall be required hereunder to pay any portion of the Obligations exceeding the greater of (a) the amount of the value actually received by such Guarantor from the Term Loan and other Obligations and (b) the amount such Guarantor would otherwise have paid if such Guarantor had paid the aggregate amount of the Obligations (excluding the amount thereof repaid by the Borrower and any other Guarantor) in the same proportion as such Guarantor's net worth on the date enforcement is sought hereunder bears to the aggregate net worth of all the Guarantors on such date, then such Guarantor shall be reimbursed by the other Guarantors for the amount of such excess, pro rata, based on the respective net worth of the other Guarantors on such date.

IV.  <u>Guarantors' Representations and Warranties</u>. Each Guarantor represents and warrants to the Agent and the Lenders that (a) such Guarantor is a corporation, limited liability company or partnership, as applicable, duly organized, validly existing and in good standing under the laws of its jurisdiction of formation and has full power and authority to make and deliver this Guaranty; (b) the execution, delivery and performance of this Guaranty by such Guarantor have been duly authorized by all necessary action of its board of directors, managers, members or its general partner, as applicable, and do not and will not violate the provisions of, or constitute a default under, any presently applicable law or such Guarantor's certificate of incorporation or bylaws, certificate of formation and operating agreement or partnership agreement, as applicable, or any agreement presently binding on it; (c) this Guaranty has been duly executed and delivered by an authorized officer of such Guarantor or its general partner and constitutes its lawful, binding and legally enforceable obligation, subject to applicable bankruptcy, insolvency, reorganization, moratorium and other laws affecting creditors' rights generally, and to general principals of equity; and (d) the authorization, execution, delivery and performance of this Guaranty do not require notification to, registration with or consent or approval by, any federal, state or local regulatory body or administrative agency. Each Guarantor represents and warrants to the Agent and the Lenders that such Guarantor has a direct or indirect and substantial economic interest in the Borrower and the other Loan Parties and expects to derive substantial benefits therefrom and from any loans, credit transactions, financial accommodations, discounts, purchases of property and other transactions and events resulting in the creation of the Obligations guarantied hereby, and that this Guaranty is given for a corporate purpose.

V.   <u>Unconditional Nature</u>. No act or thing need occur to establish each Guarantor's liability hereunder, and no act or thing, except full payment and discharge of all of the Obligations, shall in any way exonerate the Guarantors hereunder or modify, reduce, limit or release any Guarantor's liability hereunder. This is an absolute, unconditional and continuing guaranty of payment, and not of collection, of the Obligations and shall continue to be in force and be binding upon each Guarantor.

VI.   <u>Dissolution or Insolvency of the Guarantors</u>. The dissolution or adjudication of bankruptcy of any of the Guarantors shall not revoke this Guaranty, except upon actual receipt of written notice thereof by the Agent and only prospectively, as to future transactions, as herein set forth. If any Guarantor shall be dissolved or shall be or become insolvent (however defined), then the Agent shall have the right to declare immediately due and payable, and the Guarantors will forthwith pay to the Agent and the Lenders, the full amount of all of the Obligations, whether due and payable or unmatured. If any Guarantor voluntarily commences or there is commenced involuntarily against any Guarantor as debtor a case under the United States Bankruptcy Code (and, with respect to any involuntary filing, such case is not dismissed or stayed within sixty (60) days after such filing), the full amount of all Obligations, whether due and payable or unmatured, shall be immediately due and payable without demand or notice thereof.

VII.   <u>Subrogation</u>. Each Guarantor will not exercise or enforce any right of contribution, reimbursement, recourse or subrogation available to such Guarantor as to any of the Obligations, or against any Person liable therefor, or as to any collateral security therefor, unless and until all of the Obligations shall have been fully paid and discharged.

VIII.   <u>Enforcement Expenses</u>. The Guarantors will pay or reimburse the Agent and the Lenders for all out-of-pocket costs, expenses and attorneys' fees paid or incurred by the Agent and the Lenders in endeavoring to collect and enforce the Obligations and in enforcing this Guaranty.

IX.   <u>Agent's and Lenders' Rights</u>. The Agent and the Lenders shall not be obligated by reason of its acceptance of this Guaranty to engage in any transactions with or for any Loan Party. Whether or not any existing relationship between any Guarantor and any other Loan Party has been changed or ended, the Agent or any Lender may enter into transactions resulting in the creation or continuance of the Obligations and may otherwise agree, consent to or suffer the creation or continuance of any of the Obligations, without any consent or approval by the Guarantors and without any prior or subsequent notice to the Guarantors.  Each Guarantor's liability shall not be affected or impaired by any of the following acts or things (which the Agent and each Lender is expressly authorized to do, omit or suffer from time to time, without consent or approval by or notice to the Guarantors): (a) any acceptance of collateral security, guarantors, accommodation parties or sureties for any or all of the Obligations; (b) one or more extensions or renewals of the Obligations (whether or not for longer than the original period) or any modification of the interest rates, maturities, if any, or other contractual terms applicable to any of the Obligations or any amendment or modification of any of the terms or provisions of any loan agreement or other agreement under which the Obligations or any part thereof arose; (c) any waiver or indulgence granted to the Borrower or any other Loan Party, any delay or lack of diligence in the enforcement of the Obligations or any failure to institute proceedings, file a claim, give any required notices or otherwise protect any of the Obligations; (d) any full or partial release of, compromise or settlement with, or agreement not to sue, the Borrower, any other Loan Party or any other guarantor or other Person liable in respect of any of the Obligations; (e) any release, surrender, cancellation or other discharge of any evidence of the Obligations or the acceptance of any instrument in renewal or substitution therefor; (f) any failure to obtain collateral security (including rights of setoff) for the Obligations, or to see to the proper or sufficient creation and perfection thereof, or to establish the priority thereof, or to preserve, protect, insure, care for, exercise or enforce any collateral security; or any modification, alteration, substitution, exchange, surrender, cancellation, termination, release or other change, impairment, limitation, loss or discharge of any collateral security; (g) any collection, sale, lease or disposition of, or any other foreclosure or enforcement of or realization on, any collateral security; (h) any assignment, pledge or other transfer of any of the Obligations or any evidence thereof; (i) any manner, order or method of application of any payments or credits upon the Obligations; and (j) any election under Section 1111(b) of the United States Bankruptcy Code.

X.   <u>Waivers by Guarantors</u>. Each Guarantor waives any and all defenses, claims, setoffs and discharges of Borrower or any other Loan Party, or any other obligor, pertaining to the Obligations, except the defense of discharge by payment in full. Without limiting the generality of the foregoing, each Guarantor will not assert, plead or enforce against the Agent or any Lender any defense of waiver, release, discharge or disallowance in bankruptcy, statute of limitations, res judicata, statute of frauds, anti-deficiency statute, fraud, incapacity, minority, usury, illegality or unenforceability which may be available to the Borrower, any other Loan Party or any other Person liable in respect of any of the Obligations, or any setoff available against the Agent or any Lender to the Borrower, any other Loan Party or any other Person, whether or not on account of a related transaction. Each Guarantor expressly agrees that such Guarantor shall be and remain liable for any deficiency remaining after foreclosure of any mortgage or security interest securing the Obligations, whether or not the liability of the Borrower, any other Loan Party or any other obligor for such deficiency is discharged pursuant to statute or judicial decision. The liability of each Guarantor shall not be affected or impaired by any voluntary or involuntary liquidation, dissolution, sale or other disposition of all or substantially all of the assets, marshalling of assets and liabilities, receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization, arrangement, composition or readjustment of, or other similar event or proceeding affecting, the Borrower or any Loan Party or any of its assets. Each Guarantor will not assert, plead or enforce against the Agent and the Lenders any claim, defense or setoff available to such Guarantor against Borrower or any other Loan Party. Each Guarantor waives presentment, demand for payment, notice of dishonor or nonpayment and protest of any instrument evidencing the Obligations. The Agent or any Lender shall not be required first to resort for payment of the Obligations to the Borrower, any other Loan Party or other Person, or their properties, or first to enforce, realize upon or exhaust any collateral security for the Obligations, before enforcing this Guaranty. Each Guarantor waives any and all defenses and discharges available to a surety, guarantor or accommodation co-obligor.

XI.   <u>If Payments Set Aside, etc</u>. If any payment applied by the Agent or any Lender to the Obligations is thereafter set aside, recovered, rescinded or required to be returned for any reason (including, without limitation, the bankruptcy, insolvency or reorganization of the Borrower, any other Loan Party or any other obligor), the Obligations to which such payment was applied shall for the purpose of this Guaranty be deemed to have continued in existence, notwithstanding such application, and this Guaranty shall be enforceable as to such Obligations as fully as if such application had never been made.

XII.   <u>Additional Obligation of Guarantors</u>. Each Guarantor's liability under this Guaranty is in addition to and shall be cumulative with all other liabilities of such Guarantor to the Agent or any Lender as guarantor, surety, endorser, accommodation co-obligor or otherwise of any of the Obligations or obligation of the Borrower or any other Loan Party, without any limitation as to amount, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary.

XIII.   <u>No Duties Owed by Agent or Lenders</u>. Each Guarantor acknowledges and agrees that neither Agent nor any Lender (a) has made any representations or warranties with respect to, (b) assumes any responsibility to the Guarantors for, and (c) has a duty to provide information to the Guarantors regarding, the enforceability of any of the Obligations or the financial condition of the Borrower, any other Loan Party or any guarantor. Each Guarantor has independently determined the creditworthiness of the Borrower and the other Loan Parties and the enforceability of the Obligations and until the Obligations are paid in full will independently and without reliance on the Agent or any Lender continue to make such determinations.

XIV.   <u>Miscellaneous</u>. This Guaranty shall be effective upon delivery to the Agent, without further act, condition or acceptance by the Agent, shall be binding upon each Guarantor and the successors and assigns of the Guarantors and shall inure to the benefit of the Agent and the Lenders and their respective participants, successors and assigns. Any invalidity or unenforceability of any provision or application of this Guaranty shall

not affect other lawful provisions and application thereof, and to this end the provisions of this Guaranty are declared to be severable. This Guaranty may not be waived, modified, amended, terminated, released or otherwise changed except by a writing signed by each Guarantor and the Agent. This Guaranty shall be governed by and construed in accordance with the substantive laws (other than conflict laws) of the State of California. Each Guarantor hereby (a) consents to the personal jurisdiction of the state and federal courts located in the City of Los Angeles in the State of California in connection with any controversy related to this Guaranty; (b) waives any argument that venue in any such forum is not convenient; (c) agrees that any litigation initiated by Agent, any Lender or the Guarantors in connection with this Guaranty may be venued in either the state or federal courts located in Los Angeles, California; and (d) agrees that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

XV.    <u>Waiver of Jury Trial</u>. **EACH GUARANTOR AND EACH OF THE AGENT AND EACH OF THE LENDERS, BY ACCEPTANCE HEREOF, HEREBY IRREVOCABLY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF, BASED ON OR PERTAINING TO THIS GUARANTY.**

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, this Guaranty has been duly executed by the Guarantors as of the date first written above.

**GUARANTORS:**

[                    ]

By:  _____
Name:
Title:

Address:

[OTHERS TBD]

By:  _____
Name:
Title:

Address:

**SCHEDULE 2.1**

**Initial Term Loan Commitments**

**Breakwater Credit Opportunities Fund, L.P. –$15,000,000**

**Second Term Loan Commitments (if any)**

**SCHEDULE 5.12**

**<u>Insurance</u>**

See attached.

## Policy Overview

**Prepared on :  05/25/2016**    **Page 1 of 26**

agency:  Risk Strategies Company
160 Federal Street
Boston, MA  02110
(617)330-5700

For:  Loot Crate, Inc.
3401 Pasadena Ave
Los Angeles, CA  90031

| Policy Type | Insurance Company | Policy Number | Policy Period | Total Cost |
|---|---|---|---|---|
| D&O Private | Lloyd's of London | DOE00173829 | 2/25/2016 - 4/30/2017 | 23,750.96 |
| Workers Compensation | American Casualty Co of Reading PA | WC618102550 | 4/30/2016 - 4/30/2017 | 539,332.00 |
| Business Auto | The Continental Insurance Co | 6020201046 | 9/26/2015 - 9/26/2016 | 1,814.00 |
| Cyber Liability | Illinois Union Ins Co | G25660511002 | 4/30/2016 - 4/30/2017 | 21,517.20 |
| Employment Practices Liab | Hanover Insurance Group | LH3A61251500 | 4/30/2016 - 4/30/2017 | 17,611.00 |
| Crime | Hiscox Insurance Company | UC2153966215 | 4/30/2016 - 4/30/2017 | 7,865.00 |
| Business Auto | National Fire & Marine Insurance Co | 72APS064973 | 4/30/2016 - 4/30/2017 | 4,559.53 |
| Umbrella(C) | Continental Casualty Co | 6020201077 | 9/26/2015 - 9/26/2016 | 10,269.00 |
| Package | Valley Forge Ins Co | 6020201063 | 9/26/2015 - 9/26/2016 | 66,895.00 |
| Package | Hiscox Insurance Company | USUEN271452815 | 9/26/2015 - 9/26/2016 | 5,280.00 |
| Ocean Marine | Travelers Property & Casualty Co of Americ | ZOC41M1940214ND | 12/4/2015 - 9/26/2016 | 23,260.00 |

These schedules are provided as a brief outline of your policy.  You must refer to the provisions found in your policy for the details of your coverages, terms, conditions and exclusions that apply.

## Applicant Information

**Prepared on : 05/25/2016**    **Page 2 of 26**

agency: Risk Strategies Company
160 Federal Street
Boston, MA 02110
(617)330-5700

For: Loot Crate, Inc.
3401 Pasadena Ave
Los Angeles, CA 90031

| Applicant Information | | Amount/Limits | Insurance Company | Policy Number | Policy Period | Premium |
|---|---|---|---|---|---|---|
| **First Named Insured:** | Loot Crate, Inc. | | **The Continental Insurance Co** | **6020201046** | 9/26/2015 - 9/26/2016 | |
| **First Named Insured:** | Loot Crate, Inc. | | **Valley Forge Ins Co** | **6020201063** | 9/26/2015 - 9/26/2016 | |
| **First Named Insured:** | Loot Crate, Inc. | | **Continental Casualty Co** | **6020201077** | 9/26/2015 - 9/26/2016 | |
| **First Named Insured:** | Loot Crate, Inc. | | **National Fire & Marine Insurance Co** | **72APS064973** | 4/30/2016 - 4/30/2017 | |
| **First Named Insured:** | Loot Crate, Inc. | | **Lloyd's of London** | **DOE00173829** | 2/25/2016 - 4/30/2017 | |
| **First Named Insured:** | Loot Crate, Inc. | | **Illinois Union Ins Co** | **G25660511002** | 4/30/2016 - 4/30/2017 | |
| **First Named Insured:** | Loot Crate, Inc. | | **Hanover Insurance Group** | **LH3A61251500** | 4/30/2016 - 4/30/2017 | |
| **First Named Insured:** | Loot Crate, Inc. | | **Hiscox Insurance Company** | **UC2153966215** | 4/30/2016 - 4/30/2017 | |
| **First Named Insured:** | Loot Crate, Inc. | | **Hiscox Insurance Company** | **USUEN271452815** | 9/26/2015 - 9/26/2016 | |
| **First Named Insured:** | Loot Crate, Inc. | | **American Casualty Co of Reading PA** | **WC618102550** | 4/30/2016 - 4/30/2017 | |
| **First Named Insured:** | Loot Crate, Inc. | | **Travelers Property & Casualty Co of /** | **ZOC41M1940214ND** | 12/4/2015 - 9/26/2016 | |

These schedules are provided as a brief outline of your policy.  You must refer to the provisions found in your policy for the details of your coverages, terms, conditions and exclusions that apply.

# Summary of Insurance

**Prepared on :  05/25/2016**    **Page 6 of 26**

| agency: | Risk Strategies Company 160 Federal Street Boston, MA  02110 (617)330-5700 | For: | Loot Crate, Inc. 3401 Pasadena Ave Los Angeles, CA  90031 |
|---|---|---|---|

| Coverage | Amount/Limits | Insurance Company | Policy Number | Policy Period | Premium |
|---|---|---|---|---|---|
| **Cyber Liability** | | **Illinois Union Ins Co** | **G25660511002** | **4/30/2016 - 4/30/2017** | |
| Privacy Liability | 1,000,000/1,000,000 | | | | |
| | 25,000 Ded | | | | |
| Data Breach Fund | 100,000/500,000 | | | | |
| | 25,000 Ded | | | | |
| Internt Media Liability | 1,000,000 | | | | |
| | 25,000 Ded | | | | |
| Network Security Liability | 1,000,000/1,000,000 | | | | |
| | 25,000 Ded | | | | |
| Network Extortion | 1,000,000 | | | | |
| | 25,000 Ded | | | | |
| Digital Asset Coverage | 1,000,000 | | | | |
| | 25,000 Ded | | | | |
| Business Interruption | 1,000,000 | | | | |
| | 25,000 Ded | | | | |
| Regulatory Procedding Sub Limit | 500,000/500,000 | | | | |
| | 0 Ded | | | | |
| Payment Card Industry Sub Limit | 500,000 | | | | |
| Maximum Policy Agg | 1,000,000 | | | | |
| | 25,000 Ded | | | | |

These schedules are provided as a brief outline of your policy.  You must refer to the provisions found in your policy for the details of your coverages, terms, conditions and exclusions that apply.

## Summary of Insurance

**Prepared on :** 05/25/2016    **Page 8 of 26**

| agency: | Risk Strategies Company<br>160 Federal Street<br>Boston, MA 02110<br>(617)330-5700 | For: | Loot Crate, Inc.<br>3401 Pasadena Ave<br>Los Angeles, CA 90031 |
|---|---|---|---|

| Coverage | Amount/Limits | Insurance Company | Policy Number | Policy Period | Premium |
|---|---|---|---|---|---|
| **Crime** | | **Hiscox Insurance Company** | **UC2153966215** | **4/30/2016 - 4/30/2017** | |
| **A. Employee Dishonesty** | 1,000,000/50,000 Ded | | | | |
| **   Schedule** | | | | | |
| **A. Employee Dishonesty** | 1,000,000 | | | | |
| **B. Forgery or Alteration** | 1,000,000/50,000 Ded | | | | |
| **C. Theft, Disappearance & Destruction** | | | | | |
| **   Sec 1-Inside the Premises** | 1,000,000/50,000 Ded | | | | |
| **   Sec 2-Outside the Premises** | 1,000,000/50,000 Ded | | | | |
| **   Schedule** | | | | | |
| **D. Robbery & Safe Burglary** | | | | | |
| **   Sec 1-Inside:Robbery of Custodians** | | | | | |
| **   Safe Burglary** | | | | | |
| **   Sec 2-Outside the Premises** | | | | | |
| **E. Premises Burglary** | | | | | |
| **F. Computer Fraud** | 1,000,000/50,000 Ded | | | | |
| **G. Extortion** | | | | | |
| **   Ins Loss Participation** | | | | | |
| **H. Premises Theft & Robbery Outside** | | | | | |
| **   Sec 1 - Theft** | | | | | |
| **   Sec 2 - Robbery Outside** | | | | | |
| **Q. Robbery & Safe Burglary** | | | | | |
| **   Money & Securities** | | | | | |
| **   Sec 1 - Inside the Premises** | | | | | |
| **   Sec 2 - Outside the Premises** | | | | | |
| **U. Other Coverage** | | | | | |
| Funds Transfer Fraud | 1,000,000 | | | | |
| | 50,000 Ded | | | | |
| Money Orders and Counterfeit Paper Currency | 1,000,000 | | | | |
| | 50,000 Ded | | | | |

These schedules are provided as a brief outline of your policy.  You must refer to the provisions found in your policy for the details of your coverages, terms, conditions and exclusions that apply.

## Summary of Insurance

**Prepared on :  05/25/2016**     **Page 9 of 26**

agency:    Risk Strategies Company
           160 Federal Street
           Boston, MA  02110
           (617)330-5700

For:    Loot Crate, Inc.
        3401 Pasadena Ave
        Los Angeles, CA  90031

| Coverage | Amount/Limits | Insurance Company | Policy Number | Policy Period | Premium |
|---|---|---|---|---|---|
| **Business Auto** | | **National Fire & Marine Insurance Co** | **72APS064973** | **4/30/2016 - 4/30/2017** | |
| Combined single limit | 500,000 | | | | |

These schedules are provided as a brief outline of your policy.  You must refer to the provisions found in your policy for the details of your coverages, terms, conditions and exclusions that apply.

## Summary of Insurance

**Prepared on : 05/25/2016**          **Page 10 of 26**

| | | |
|---|---|---|
| agency: | Risk Strategies Company<br>160 Federal Street<br>Boston, MA  02110<br>(617)330-5700 | For:      Loot Crate, Inc.<br>3401 Pasadena Ave<br>Los Angeles, CA  90031 |

| Coverage | Amount/Limits | Insurance Company | Policy Number | Policy Period | Premium |
|---|---|---|---|---|---|
| **Umbrella(C)** | | **Continental Casualty Co** | **6020201077** | **9/26/2015 - 9/26/2016** | |
| Coverage Type:  Umbrella | | | | | |
| Umbrella(C) | 3,000,000<br>10,000 Ded | | | | |

These schedules are provided as a brief outline of your policy.  You must refer to the provisions found in your policy for the details of your coverages, terms, conditions and exclusions that apply.

# Summary of Insurance

**Prepared on :  05/25/2016**    **Page 11 of 26**

| agency: | Risk Strategies Company | For: | Loot Crate, Inc. |
|---|---|---|---|
| | 160 Federal Street | | 3401 Pasadena Ave |
| | Boston, MA  02110 | | Los Angeles, CA  90031 |
| | (617)330-5700 | | |

| Coverage | Amount/Limits | Insurance Company | Policy Number | Policy Period | Premium |
|---|---|---|---|---|---|
| **Commercial Property** | | **Valley Forge Ins Co** | **6020201063** | **9/26/2015 - 9/26/2016** | |
| **Blanket**          **Bldg #** | | | | | |
| **Business Personal Property** | | | | | |
| | 1,000,000 Lim | | | | |
| | 5,000 Ded | | | | |
| Valuation:    Replacement Cost | | | | | |
| **Business Income** | | | | | |
| | 12 months Lim | | | | |
| | 24 Ded | | | | |
| Valuation:    Actual Loss Sustained | | | | | |
| **Employee Dishonesty** | | | | | |
| | 25,000 Lim | | | | |
| | 5,000 Ded | | | | |
| **Forgery & Alterations Coverage** | | | | | |
| | 50,000 Lim | | | | |
| | 5,000 Ded | | | | |
| **Debris Removal** | | | | | |
| | 300,000 Lim | | | | |
| | 5,000 Ded | | | | |
| **Expediting Cost and Expenses** | | | | | |
| | 50,000 Lim | | | | |
| | 5,000 Ded | | | | |
| **Property In Transit** | | | | | |
| | 100,000 Lim | | | | |
| | 5,000 Ded | | | | |
| **Storage of Media Coverage** | | | | | |
| | 100,000 Lim | | | | |
| | 5,000 Ded | | | | |
| **Contractual penalties** | | | | | |
| | 50,000 Lim | | | | |
| | 5,000 Ded | | | | |

These schedules are provided as a brief outline of your policy.  You must refer to the provisions found in your policy for the details of your coverages, terms, conditions and exclusions that apply.

## Summary of Insurance

**Prepared on : 05/25/2016**   **Page 12 of 26**

| | |
|---|---|
| agency: | Risk Strategies Company<br>160 Federal Street<br>Boston, MA 02110<br>(617)330-5700 |
| For: | Loot Crate, Inc.<br>3401 Pasadena Ave<br>Los Angeles, CA 90031 |

| Coverage | Amount/Limits | Insurance Company | Policy Number | Policy Period | Premium |
|---|---|---|---|---|---|
| **Equipment Breakdown** | 250,000 Lim<br>5,000 Ded | | | | |
| **Money and Securitires** | 25,000 Lim<br>5,000 Ded | | | | |
| **Demolition and Repair** | 500,000 Lim<br>5,000 Ded | | | | |
| **Unintentional E&O** | 250,000 Lim<br>5,000 Ded | | | | |
| **Backup - Sewers and Drains** | 50,000 Lim<br>5,000 Ded | | | | |
| **EQSL** | 3,000,000 Lim<br>25,000 Ded | | | | |
| **Distributors Product Reimbursement** | 100,000 Lim<br>5,000 Ded | | | | |
| **Loc # 00001**      **Bldg #**    **00001**<br>3401 Pasadena Ave<br>Los Angeles, CA 90031 | | | | | |
| **Loc # 00002**      **Bldg #**<br>3433 Pasadena Ave<br>Los Angeles, CA 90031 | | | | | |

These schedules are provided as a brief outline of your policy.  You must refer to the provisions found in your policy for the details of your coverages, terms, conditions and exclusions that apply.

## Summary of Insurance

**Prepared on : 05/25/2016**  **Page 13 of 26**

| | | |
|---|---|---|
| agency: | Risk Strategies Company<br>160 Federal Street<br>Boston, MA 02110<br>(617)330-5700 | For: Loot Crate, Inc.<br>3401 Pasadena Ave<br>Los Angeles, CA 90031 |

| Coverage | Amount/Limits | Insurance Company | Policy Number | Policy Period | Premium |
|---|---|---|---|---|---|
| **Loc # 00003       Bldg #**<br>5630 Rickenbacker Rd<br>Bell Garden, CA 90201 | | | | | |
| **Loc # 00005       Bldg #**<br>5831 E. 61st Street<br>Commerce, CA 90040 | | | | | |
| **General Liability** | | **Valley Forge Ins Co** | **6020201063** | **9/26/2015 - 9/26/2016** | |
| General Aggregate | 2,000,000 | | | | |
| Products/Completed Ops Aggregate | 2,000,000 | | | | |
| Personal & Advertising Injury | 1,000,000 | | | | |
| Each Occurrence | 1,000,000 | | | | |
| Fire Damage | 300,000 | | | | |
| Medical Expense | 15,000 | | | | |
| **Inland Marine (C)** | | **Valley Forge Ins Co** | **6020201063** | **9/26/2015 - 9/26/2016** | |

These schedules are provided as a brief outline of your policy.  You must refer to the provisions found in your policy for the details of your coverages, terms, conditions and exclusions that apply.

## Summary of Insurance

**Prepared on :  05/25/2016**    **Page 14 of 26**

| agency: | Risk Strategies Company | For: | Loot Crate, Inc. |
|---|---|---|---|
| | 160 Federal Street | | 3401 Pasadena Ave |
| | Boston, MA  02110 | | Los Angeles, CA  90031 |
| | (617)330-5700 | | |

| Coverage | Amount/Limits | Insurance Company | Policy Number | Policy Period | Premium |
|---|---|---|---|---|---|
| **Commercial Property** | | **Hiscox Insurance Company** | **USUEN271452815** | **9/26/2015 - 9/26/2016** | |
| **Blanket**          **Bldg #** | | | | | |
| **Media** | | | | | |
| | 1,000,000 Lim | | | | |
| | 5,000 Ded | | | | |
| **Extra Expense** | | | | | |
| | 400,000 Lim | | | | |
| | 3,000 Ded | | | | |
| **Library Stock** | | | | | |
| | 10,000 Lim | | | | |
| | 5,000 Ded | | | | |
| **Civil or Military Authority** | | | | | |
| | 250,000 Lim | | | | |
| | 10,000 Ded | | | | |
| **Civil Commotion, Demonstration** | | | | | |
| | 250,000 Lim | | | | |
| | 10,000 Ded | | | | |
| **Imminent Peril** | | | | | |
| | 25,000 Lim | | | | |
| | 10,000 Ded | | | | |
| **Strike** | | | | | |
| | 25,000 Lim | | | | |
| | 10,000 Ded | | | | |
| **Resumption of Operations** | | | | | |
| | 100,000 Lim | | | | |
| | 2,000 Ded | | | | |
| **Talent and Agency Rshoot Expenses** | | | | | |
| | 50,000 Lim | | | | |
| | 2,000 Ded | | | | |

These schedules are provided as a brief outline of your policy.  You must refer to the provisions found in your policy for the details of your coverages, terms, conditions and exclusions that apply.

## Summary of Insurance

**Prepared on :  05/25/2016**     **Page 15 of 26**

| | | | | | |
|---|---|---|---|---|---|
| agency: | Risk Strategies Company<br>160 Federal Street<br>Boston, MA  02110<br>(617)330-5700 | For: | Loot Crate, Inc.<br>3401 Pasadena Ave<br>Los Angeles, CA  90031 | | |

| Coverage | Amount/Limits | Insurance Company | Policy Number | Policy Period | Premium |
|---|---|---|---|---|---|
| **Utility Failure** | | | | | |
| | 200,000 Lim | | | | |
| | 3,000 Ded | | | | |
| **Production Equipment** | | | | | |
| | 1,000,000 Lim | | | | |
| | 2,500 Ded | | | | |
| **Props, Sets and Wardrobe** | | | | | |
| | 500,000 Lim | | | | |
| | 2,000 Ded | | | | |
| **Third Party Property Damage** | | | | | |
| | 1,000,000 Lim | | | | |
| | 2,500 Ded | | | | |
| **Production Office Property** | | | | | |
| | 100,000 Lim | | | | |
| | 1,500 Ded | | | | |
| **Money** | | | | | |
| | 50,000 Lim | | | | |
| | 2,500 Ded | | | | |
| **Auto Physcial damage** | | | | | |
| | 1,000,000 Lim | | | | |
| | 2,000 Ded | | | | |
| **General Liability** | | **Hiscox Insurance Company** | **USUEN271452815** | **9/26/2015 - 9/26/2016** | |
| General Aggregate | 2,000,000 | | | | |
| Products/Completed Ops Aggregate | 2,000,000 | | | | |
| Personal & Advertising Injury | 1,000,000 | | | | |
| Each Occurrence | 1,000,000 | | | | |
| Fire Damage | 1,000,000 | | | | |
| Medical Expense | 10,000 | | | | |
| Hired & Non-Owned Auto Liability | 1,000,000 | | | | |

These schedules are provided as a brief outline of your policy.  You must refer to the provisions found in your policy for the details of your coverages, terms, conditions and exclusions that apply.

| Summary of Insurance | | | Prepared on : 05/25/2016 | Page 16 of 26 | |
|---|---|---|---|---|---|

agency: Risk Strategies Company
160 Federal Street
Boston, MA  02110
(617)330-5700

For: Loot Crate, Inc.
3401 Pasadena Ave
Los Angeles, CA  90031

| Coverage | Amount/Limits | Insurance Company | Policy Number | Policy Period | Premium |
|---|---|---|---|---|---|
| **Ocean Marine** | | **Travelers Property & Casualty Co of** | **ZOC41M1940214ND** | **12/4/2015 - 9/26/2016** | |
| **Transport/Motor Truck Cargo** | | | | | |
| Applicant Interest: | | | | | |
| Type: | | | | | |
| Transportation | | | | | |
| **Transportation Coverage** | | | | | |
| Conveyance: | Trade Show | | | | |
| Incoming: | | | | | |
| Outgoing: | | | | | |
| Average Value: | | | | | |
| Cause of Loss: | Direct physcial loss or Damage | | | | |
| Conveyance: | Air Carrier | | | | |
| Incoming: | | | | | |
| Outgoing: | | | | | |
| Average Value: | | | | | |
| Cause of Loss: | ie Aircraft or Connecting Conveyance | | | | |
| Conveyance: | Common Carrier | | | | |
| Incoming: | | | | | |
| Outgoing: | | | | | |
| Average Value: | | | | | |
| Cause of Loss: | Mail or Parcel | | | | |
| Conveyance: | Other | | | | |
| Incoming: | | | | | |
| Outgoing: | | | | | |
| Average Value: | | | | | |
| Cause of Loss: | War Risk | | | | |

These schedules are provided as a brief outline of your policy.  You must refer to the provisions found in your policy for the details of your coverages, terms, conditions and exclusions that apply.

## Summary of Insurance

| | | |
|---|---|---|
| agency: | Risk Strategies Company<br>160 Federal Street<br>Boston, MA 02110<br>(617)330-5700 | For:  Loot Crate, Inc.<br>3401 Pasadena Ave<br>Los Angeles, CA 90031 |

| Coverage | Amount/Limits | Insurance Company | Policy Number | Policy Period | Premium |
|---|---|---|---|---|---|
| Conveyance: | Other | | | | |
| Incoming: | | | | | |
| Outgoing: | | | | | |
| Average Value: | | | | | |
| Cause of Loss: | ANy One Barge or Tow | | | | |
| Conveyance: | Other | | | | |
| Incoming: | | | | | |
| Outgoing: | | | | | |
| Average Value: | | | | | |
| Cause of Loss: | tor vessel and connecting conveyanc | | | | |
| Conveyance: | Rail | | | | |
| Incoming: | | | | | |
| Outgoing: | | | | | |
| Average Value: | | | | | |
| Cause of Loss: | national air freight express delivery sv | | | | |
| **Motor Truck Cargo Legal Liability** | | | | | |
| Single Conveyance: | | | | | |
| Per Disaster: | | | | | |
| Loading/Unloading: | | | | | |
| Loading/Unloading Deductible: | | | | | |
| Cause of Loss: | | | | | |

These schedules are provided as a brief outline of your policy.  You must refer to the provisions found in your policy for the details of your coverages, terms, conditions and exclusions that apply.

## Summary of Insurance

**Prepared on : 05/25/2016**     **Page 18 of 26**

| | |
|---|---|
| agency: | Risk Strategies Company |
| | 160 Federal Street |
| | Boston, MA  02110 |
| | (617)330-5700 |

For:   Loot Crate, Inc.
3401 Pasadena Ave
Los Angeles, CA  90031

| Coverage | Amount/Limits | Insurance Company | Policy Number | Policy Period | Premium |
|---|---|---|---|---|---|
| **Business Auto** | | **Continental Casualty Co** | **6020201046** | **9/26/2015 - 9/26/2016** | |
| Combined single limit | 1,000,000 | | | | |
| HNOA Property Damage | 1,000 Ded | | | | |
| HNOA Property Damage | 100 Ded | | | | |

These schedules are provided as a brief outline of your policy.  You must refer to the provisions found in your policy for the details of your coverages, terms, conditions and exclusions that apply.

## Business Auto Vehicle Schedule

**Prepared on : 05/25/2016**    **Page 19 of 26**

agency: Risk Strategies Company
160 Federal Street
Boston, MA 02110
(617)330-5700

For: Loot Crate, Inc.
3401 Pasadena Ave
Los Angeles, CA 90031

| Veh# | Cust# | Year | Make/Model | VIN | Garaged | Class | Cost New | Liab | PIP | Med | UM | UIM | Comp | Coll | SP | Stated Amt |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Policy No: 72APS064973 LOB: AUTOB** | | | | | | | | | | | | | | | | |
| 00001 | 00001 | 1993 | Coach/Carpenter School Bus | 493525 | Los Angeles, CA | | 20,000 | X | | | | | | | | |

These schedules are provided as a brief outline of your policy.  You must refer to the provisions found in your policy for the details of your coverages, terms, conditions and exclusions that apply.

## Business Auto Covered Auto Symbols

Prepared on : 05/25/2016      Page 20 of 26

| agency: | Risk Strategies Company | For: | Loot Crate, Inc. |
|---|---|---|---|
| | 160 Federal Street | | 3401 Pasadena Ave |
| | Boston, MA  02110 | | Los Angeles, CA  90031 |
| | (617)330-5700 | | |

**Business Auto**

(1)  ANY AUTO

(2)  ALL OWNED AUTOS

(3)  OWNED PRIVATE PASSENGER AUTOS

(4)  OWNED AUTOS OTHER THAN PRIVATE PASSENGER

(5)  ALL OWNED AUTOS WHICH REQUIRE NO-FAULT COVERAGE

(6)  OWNED AUTOS SUBJECT TO COMPULSORY U.M. LAW

(7)  AUTOS SPECIFIED ON SCHEDULE

(8)  HIRED AUTOS

(9)  NON-OWNED AUTOS

These schedules are provided as a brief outline of your policy.  You must refer to the provisions found in your policy for the details of your coverages, terms, conditions and exclusions that apply.

## Business Auto Driver Schedule

**Prepared on : 05/25/2016**    **Page 21 of 26**

| agency: | Risk Strategies Company | For: | Loot Crate, Inc. |
|---|---|---|---|
| | 160 Federal Street | | 3401 Pasadena Ave |
| | Boston, MA  02110 | | Los Angeles, CA  90031 |
| | (617)330-5700 | | |

| Driver Number | Driver Name | DOB | License Number | License State |
|---|---|---|---|---|
| **Policy No: 72APS064973 LOB: AUTOB** | | | | |
| 0001 | Christopher Davis | 6/22/1985 | D2873659 | CA |
| 0002 | Christopher Darbo | 7/21/1984 | D9844592 | CA |

These schedules are provided as a brief outline of your policy.  You must refer to the provisions found in your policy for the details of your coverages, terms, conditions and exclusions that apply.

## Business Auto Garage Location Schedule

Prepared on : 05/25/2016      Page 22 of 26

| agency: | Risk Strategies Company | For: | Loot Crate, Inc. |
|---------|-------------------------|------|------------------|
| | 160 Federal Street | | 3401 Pasadena Ave |
| | Boston, MA  02110 | | Los Angeles, CA  90031 |
| | (617)330-5700 | | |

| Garage Number | Address |
|---------------|---------|
| **Policy No: 72APS064973 LOB: AUTOB** | |
| 00001 | 3401 Pasadena Ave |
| | Los Angeles, CA  90031 |

These schedules are provided as a brief outline of your policy.  You must refer to the provisions found in your policy for the details of your coverages, terms, conditions and exclusions that apply.

## General Liability Classification Schedule

**Prepared on : 05/25/2016**    **Page 23 of 26**

| agency: | Risk Strategies Company | For: | Loot Crate, Inc. |
|---|---|---|---|
| | 160 Federal Street | | 3401 Pasadena Ave |
| | Boston, MA  02110 | | Los Angeles, CA  90031 |
| | (617)330-5700 | | |

| Loc# | Classification | Class Code | Prem Basis | Exposure | Terr | Rate Prem/OPS | Rate Products | Premium Prem/OPS | Premium Products |
|---|---|---|---|---|---|---|---|---|---|
| **Policy No: 6020201063 LOB: CGL** | | | | | | | | | |
| 00001 | Toy, Hobby Goods & Supplies Stores | 59998 | S | 100,000,000 | | | | | |

These schedules are provided as a brief outline of your policy.  You must refer to the provisions found in your policy for the details of your coverages, terms, conditions and exclusions that apply.

## Commercial Property - Premise Schedule

**Prepared on : 05/25/2016**    **Page 26 of 26**

| agency: | Risk Strategies Company | For: | Loot Crate, Inc. |
|---|---|---|---|
| | 160 Federal Street | | 3401 Pasadena Ave |
| | Boston, MA  02110 | | Los Angeles, CA  90031 |
| | (617)330-5700 | | |

| Location # | Building # | Address | | Building Description |
|---|---|---|---|---|
| Policy No: 6020201063 LOB: PROP | | | | |
| 00001 | 00001 | 3401 Pasadena Ave | Los Angeles, CA  90031 | |
| 00002 | | 3433 Pasadena Ave | Los Angeles, CA  90031 | |
| 00003 | | 5630 Rickenbacker Rd | Bell Garden, CA  90201 | |
| 00005 | | 5831 E. 61st Street | Commerce, CA  90040 | |
| Policy No: USUEN271452815 LOB: | | | | |

These schedules are provided as a brief outline of your policy.  You must refer to the provisions found in your policy for the details of your coverages, terms, conditions and exclusions that apply.

**SCHEDULE 5.15**

**Intellectual Property**

**Trademarks – Intent to Use**

| Mark | Application/Registration No. | Filing Date | Country |
|---|---|---|---|
| Level Up | 86/774,045 | 9/30/2015 | USA |
| Level Up | 86/774,053 | 9/30/2015 | USA |
| Level Up | 86/774,061 | 9/30/2015 | USA |
| Level Up | 86/774,071 | 9/30/2015 | USA |
| Level Up | 86/774,081 | 9/30/2015 | USA |
| Level Up | 86/774,093 | 9/30/2015 | USA |
| Level Up | 86/774,099 | 9/30/2015 | USA |
| Loot Anime | 86/819,244 | 11/13/2015 | USA |
| Loot Anime | 86/819,248 | 11/13/2015 | USA |
| Loot Anime | 86/819,251 | 11/13/2015 | USA |
| Loot Anime | 86/819,257 | 11/13/2015 | USA |
| Loot Anime | 86/819,265 | 11/13/2015 | USA |
| Loot Anime | 86/819,269 | 11/13/2015 | USA |
| Loot Anime | 86/819,276 | 11/13/2015 | USA |
| Loot Gaming | 86/861,555 | 12/30/2015 | USA |
| Loot Gaming | 86/861,561 | 12/30/2015 | USA |
| Loot Gaming | 86/861,568 | 12/30/2015 | USA |
| Loot Gaming | 86/861,572 | 12/30/2015 | USA |
| Loot Gaming | 86/861,575 | 12/30/2015 | USA |
| Loot Gaming | 86/861,577 | 12/30/2015 | USA |
| Loot Gaming | 86/861,581 | 12/30/2015 | USA |
| Loot Pets | 86/808,338 | 11/3/2015 | USA |
| Loot Pets | 86/808,343 | 11/3/2015 | USA |
| Loot Pets | 86/808,353 | 11/3/2015 | USA |
| Loot Pets | 86/808,347 | 11/3/2015 | USA |
| Loot Pets | 86/808,357 | 11/3/2015 | USA |
| Loot Pets | 86/808,374 | 11/3/2015 | USA |
| Loot Pets | 86/808,373 | 11/3/2015 | USA |
| Loot Pets | 86/808,360 | 11/3/2015 | USA |
| LVL UP+ (stylized and/or with design) | 86/852,857 | 12/17/2015 | USA |
| LVL UP+ (stylized and/or with design) | 86/852,861 | 12/17/2015 | USA |
| LVL UP+ (stylized and/or with design) | 86/852,864 | 12/17/2015 | USA |
| LVL UP+ (stylized and/or with design) | 86/852,866 | 12/17/2015 | USA |
| LVL UP+ (stylized and/or with design) | 86/852,869 | 12/17/2015 | USA |
| LVL UP+ (stylized and/or with design) | 86/852,871 | 12/17/2015 | USA |
| LVL UP+ (stylized and/or with design) | 86/852,875 | 12/17/2015 | USA |
| Level Up | 1,755,380 | 11/17/2015 | Canada |
| Loot Anime | 1,755,381 | 11/17/2015 | Canada |
| Loot Gaming | 1,762,617 | 1/8/2016 | Canada |

Schedule 5.15-1

| Mark | Application/Registration No. | Filing Date | Country |
|---|---|---|---|
| Loot Pets | 1,755,378 | 11/17/2015 | Canada |
| LVL UP+ (stylized and/or with design) | 1,761,738 | 12/31/2015 | Canada |

**Trademarks – Use**

| Mark | Application/Registration No. | Filing Date | Country |
|---|---|---|---|
| Loot Crate | 1724602 | 4/20/2015 | Canada |
| Loot Crate (illustration with words, letters and/or numbers) | 1724601 | 4/20/2015 | Canada |
| Loot Crate | 86/471,727 | 12/4/2014 | USA |
| Loot Crate (illustration with words, letters and/or numbers) | 86/471,731 | 12/4/2014 | USA |

**Trademarks – International (other than Canada)**

| Mark | Application/Registration No. | Filing Date | Country |
|---|---|---|---|
| Level Up | 1294775 | 11/24/2015 | Australia |
| Loot Anime | 1294776 | 11/24/2015 | Australia |
| Loot Crate (illustration with words, letters and/or numbers) | 1284118 | 4/17/2015 | Australia |
| Loot Gaming | A0055720 | 1/7/2016 | Australia |
| Loot Pets | A0054889 | 11/24/2015 | Australia |
| LVL UP+ (stylized and/or with design) | A0055605 | 12/31/2015 | Australia |
| Level Up | 1294775 | 11/24/2015 | China |
| Loot Anime | 1294776 | 11/24/2015 | China |
| Loot Crate | 1269214 | 6/4/2015 | China |
| Loot Crate (illustration with words, letters and/or numbers) | A0050821 | 6/4/2015 | China |
| Loot Gaming | A0055720 | 1/7/2016 | China |
| Loot Pets | A0054889 | 11/24/2015 | China |
| LVL UP+ (stylized and/or with design) | A0055605 | 12/31/2015 | China |
| Level Up | 1294775 | 11/24/2015 | Cuba |
| Loot Anime | 1294776 | 11/24/2015 | Cuba |
| Loot Crate | 1269214 | 6/4/2015 | Cuba |
| Loot Crate (illustration with words, letters | 1284118 | 4/17/2015 | Cuba |

Schedule 5.15-2

| | | | |
|---|---|---|---|
| and/or numbers) | | | |
| Loot Gaming | A0055720 | 1/7/2016 | Cuba |
| Loot Pets | A0054889 | 11/24/2015 | Cuba |
| LVL UP+ (stylized and/or with design) | A0055605 | 12/31/2015 | Cuba |
| Level Up | 1294775 | 11/24/2015 | Japan |
| Loot Anime | 1294776 | 11/24/2015 | Japan |
| Loot Crate | 1269214 | 6/4/2015 | Japan |
| Loot Crate (illustration with words, letters and/or numbers) | A0050821 | 6/4/2015 | Japan |
| Loot Gaming | A0055720 | 1/7/2016 | Japan |
| Loot Pets | A0054889 | 11/24/2015 | Japan |
| LVL UP+ (stylized and/or with design) | A0055605 | 12/31/2015 | Japan |
| Level Up | 1294775 | 11/24/2015 | Korea |
| Loot Anime | 1294776 | 11/24/2015 | Korea |
| Loot Crate | 1269214 | 6/4/2015 | Korea |
| Loot Crate (illustration with words, letters and/or numbers) | A0050821 | 6/4/2015 | Korea |
| Loot Gaming | A0055720 | 1/7/2016 | Korea |
| Loot Pets | A0054889 | 11/24/2015 | Korea |
| LVL UP+ (stylized and/or with design) | A0055605 | 12/31/2015 | Korea |
| Level Up | 1294775 | 11/24/2015 | Mexico |
| Loot Anime | 1294776 | 11/24/2015 | Mexico |
| Loot Crate | 1269214 | 6/4/2015 | Mexico |
| Loot Crate (illustration with words, letters and/or numbers) | 1284118 | 4/17/2015 | Mexico |
| Level Up | 1294775 | 11/24/2015 | New Zealand |
| Loot Anime | 1294776 | 11/24/2015 | New Zealand |
| Loot Crate | 1 269 052 | 4/17/2015 | New Zealand |
| Loot Crate (illustration with words, letters and/or numbers) | 1284118 | 4/17/2015 | New Zealand |
| Loot Gaming | A0055720 | 1/7/2016 | New Zealand |
| Loot Pets | A0054889 | 11/24/2015 | New Zealand |
| LVL UP+ (stylized and/or with design) | A0055605 | 12/31/2015 | New Zealand |
| Level Up | 1294775 | 11/24/2015 | Norway |
| Loot Anime | 1294776 | 11/24/2015 | Norway |
| Loot Crate | 1 269 052 | 4/17/2015 | Norway |
| Loot Crate (illustration with words, letters and/or numbers) | 1284118 | 4/17/2015 | Norway |
| Loot Gaming | A0055720 | 1/7/2016 | Norway |
| Loot Pets | A0054889 | 11/24/2015 | Norway |

Schedule 5.15-3

| | | | |
|---|---|---|---|
| LVL UP+ (stylized and/or with design) | A0055605 | 12/31/2015 | Norway |
| Level Up | 1294775 | 11/24/2015 | Singapore |
| Loot Anime | 1294776 | 11/24/2015 | Singapore |
| Loot Crate | 1269214 | 6/4/2015 | Singapore |
| Loot Crate (illustration with words, letters and/or numbers) | A0050821 | 6/4/2015 | Singapore |
| Loot Gaming | A0055720 | 1/7/2016 | Singapore |
| Loot Pets | A0054889 | 11/24/2015 | Singapore |
| LVL UP+ (stylized and/or with design) | A0055605 | 12/31/2015 | Singapore |
| Loot Crate (illustration with words, letters and/or numbers) | A0050821 | 6/4/2015 | WIPO |
| Loot Gaming | A0055720 | 1/7/2016 | WIPO |
| Loot Pets | A0054889 | 11/24/2015 | WIPO |
| LVL UP+ (stylized and/or with design) | A0055605 | 12/31/2015 | WIPO |

**Domain Names:**

| GODADDY DOMAINS | www.godaddy.com |
|---|---|
| **Domain Name** | **Expires On** |
| GETLOOTCRATE.COM | 7/23/2016 |
| LOOTCRATE.AT | 7/28/2016 |
| LOOTCRATE.BE | 7/28/2016 |
| LOOTCRATE.MX | 7/28/2016 |
| LOOTCRATE.PL | 7/28/2016 |
| LOOTCRATE.PH | 7/29/2016 |
| GEEKFUEL.CH | 7/30/2016 |
| GEEKFUEL.NL | 7/30/2016 |
| LOOTCRATE.CH | 7/30/2016 |
| LOOTCRATE.KIWI | 7/30/2016 |
| LOOTCRATE.SE | 7/30/2016 |
| NERDBLOCK.CH | 7/30/2016 |
| NERDBLOCK.NL | 7/30/2016 |
| SUBSCRIPTIONBOX.DE | 7/30/2016 |
| CAJASDESUSCRIPCIÓN.COM | 7/30/2016 |
| GEEKFUEL.IN | 7/31/2016 |
| GEEKFUEL.KIWI | 7/31/2016 |
| GEEKFUEL.MX | 7/31/2016 |
| GEEKFUEL.PH | 7/31/2016 |

Schedule 5.15-4

| | |
|---|---|
| GEEKFUEL.PL | 7/31/2016 |
| GEEKFUEL.SE | 7/31/2016 |
| NERDBLOCK.IN | 7/31/2016 |
| NERDBLOCK.KIWI | 7/31/2016 |
| NERDBLOCK.MX | 7/31/2016 |
| NERDBLOCK.PH | 7/31/2016 |
| NERDBLOCK.PL | 7/31/2016 |
| CASELLADIISCRIZIONE.IT | 8/1/2016 |
| CASELLEDIISCRIZIONE.IT | 8/1/2016 |
| GEEKFUEL.CO.UK | 7/31/2017 |
| LOOTCRATE.COM | 7/20/2020 |
| SUBSCRIPTIONBOXES.COM | 2/6/2025 |
| SUBSCRIPTIONBOX.COM | 2/20/2025 |
| | |
| GANDI DOMAINS | www.gandi.net |
| lootcrate.br.com | 8/5/2016 |
| lootcrate.jp | 8/26/2016 |
| lootcrate.sg | 8/6/2016 |
| lootcrate.fi | 8/5/2016 |
| collectorcorps.co.uk | 8/7/2016 |
| lootcrate.hk | 8/6/2016 |

Schedule 5.15-5

**SCHEDULE 5.16**

**Leased Property**

| Location | Landlord | Lease Term | Purpose/Use |
|---|---|---|---|
| 3401 Pasadena Avenue Los Angeles, CA | ED1125, LLC | Current renewal term expires 09/30/16<br><br>6-month option to extend | Office headquarters |
| 3433 Pasadena Avenue Los Angeles, CA | ED1125, LLC | Current renewal term expires 09/30/16<br><br>6-month option to extend | Office headquarters |
| 5630 Rickenbacker Road Bell, CA | PI Bell Parcel I, LLC | 01/01/15 – 12/31/18 | Warehouse, fulfillment and distribution |
| 5831 East 61st Street Commerce, CA | SCIF Olympic I, LLC | 03/01/16 – 02/28/17 | Warehouse storage |

Schedule 5.16-1

**SCHEDULE 6.13**

**<u>Accounts</u>**

Avid:   Account No. 140021221

WEST\269565093.3
383293-000013

**SCHEDULE 7.1**

**<u>Permitted Liens</u>**

None

**SCHEDULE 7.4**

**Existing Indebtedness**

Rental Agreement dated December 15, 2015 by and between Loot Crate, Inc. and LaBrea Air Inc.

Lease agreement dated October 8, 2015 by and between Loot Crate, Inc. and Ricoh USA Inc.

WEST\269565093.3
383293-000013

**SCHEDULE 7.7**

**Permitted Investments**

Borrower owns 100 Ordinary Shares of Loot Crate UK, Ltd.

WEST\269565093.3
383293-000013

**SCHEDULE 7.8**

**Transactions with Affiliates**

None