Exhibit G

From:       Schernecke, Matthew Edward
Sent:       Fri 2/09/2018 11:20 PM (GMT-05:00)
To:       Schoulder, Andrew; Lang, Aaron; Mark Palmer; Hughes, Laura; Geoffrey Arens (arens@denderaadvisory.com);
      hsu@denderaadvisory.com; chris@lootcrate.com; Ryan Hibbard (ryan@lootcrate.com); Linda Menzel
      (linda.menzel@lootcrate.com); Burroughs, Harold; Fisher, David
Cc:       Eisenbiegler, Rick; Dailey, Renee M.; Grant, Kevin M.; Heasley, Adam; Meyer, Melissa; Barclift, Ashley; Saif Mansour;
      Aamir Amdani; Joe Kaczorowski
Bcc:
Subject:       RE: Breakwater/Loot Crate - Forbearance Agreement
Attachments: Executed Forbearance Agreement.pdf; Executed Fee Letter.pdf

Please find attached, in escrow, the fully-executed Forbearance Agreement and related Fee Letter.

Regards,

**Matthew Edward Schernecke**
Morgan, Lewis & Bockius LLP
101 Park Avenue | New York, NY 10178-0060
Direct: +1.212.309.6135 | Main: +1.212.309.6000 | Fax: +1.212.309.6001
matthew.schernecke@morganlewis.com | www.morganlewis.com
Assistant: Cynthia DeSteno | +1.212.309.6919 | cdesteno@morganlewis.com

---

**From:** Schoulder, Andrew [mailto:Andrew.Schoulder@bryancave.com]
**Sent:** Friday, February 09, 2018 11:09 PM
**To:** Schernecke, Matthew Edward; Lang, Aaron; Mark Palmer; Hughes, Laura; Geoffrey Arens (arens@denderaadvisory.com); hsu@denderaadvisory.com; chris@lootcrate.com; Ryan Hibbard (ryan@lootcrate.com); Linda Menzel (linda.menzel@lootcrate.com); Burroughs, Harold; Fisher, David
**Cc:** Eisenbiegler, Rick; Dailey, Renee M.; Grant, Kevin M.; Heasley, Adam; Meyer, Melissa; Barclift, Ashley; Saif Mansour; Aamir Amdani; Joe Kaczorowski
**Subject:** RE: Breakwater/Loot Crate - Forbearance Agreement

[EXTERNAL EMAIL]
I am fine with these changes, as the execution version.

Please let confirm that Breakwater is signed off, and we will release signatures from escrow upon receipt of Breakwater's.

Thanks all.

 **Andrew Schoulder**
*Partner*
andrew.schoulder@bryancave.com   T. +1 212 541 1192   M: +1 646 982 5330

---

**From:** Schernecke, Matthew Edward [mailto:matthew.schernecke@morganlewis.com]
**Sent:** Friday, February 09, 2018 10:50 PM
**To:** Lang, Aaron; Mark Palmer; Schoulder, Andrew; Hughes, Laura; Geoffrey Arens (arens@denderaadvisory.com); hsu@denderaadvisory.com; chris@lootcrate.com; Ryan Hibbard (ryan@lootcrate.com); Linda Menzel (linda.menzel@lootcrate.com); Burroughs, Harold; Fisher, David
**Cc:** Eisenbiegler, Rick; Dailey, Renee M.; Grant, Kevin M.; Heasley, Adam; Meyer, Melissa; Barclift, Ashley; Saif Mansour; Aamir Amdani; Joe Kaczorowski
**Subject:** Breakwater/Loot Crate - Forbearance Agreement
**Importance:** High

All:

Please find attached, in clean form, together with changed pages reflecting changes to your last version, a proposed execution copy of the Forbearance Agreement. Please advise if you are signed-off. Also, for Mark Palmer and any other appropriate

personnel, Breakwater has the following questions based on its review of the financial deliverables. Can we get on a call in the near term and resolve these issues so that things can be finalized for release? Please advise and I can send a dial-in.

Best regards,

Matt

QUESTIONS:

1. How are the 10-week cash flow and operating model supposed to tie to one another? The model shows a $6.8MM cash balance at the end of February based on $8.8MM of net equity proceeds. This implies that without the equity raise, the Company would have a $2.0MM deficit. Is this accurate? In the 10-week cash flow (which doesn't contemplate an equity raise), the ending month cash balance for February is ~$275K -- what explains this ~$1.7MM discrepancy between the two files?
    a. Same question for March — the model shows a March month-end cash balance of $6.0MM, or $2.8MM deficit without the equity raise. How does this tie to the $123K ending cash balance in the 10-week cash flow file (~$3.0MM delta)?
2. 10-week cash flow:
    a. What is the $501K of new debt proceeds from the end of January?
    b. Why doesn't the cumulative weekly cash flow tie to the sum of the individual weeks? Specifically, the cumulative column shows a $413K cash balance whereas the cash balance at the end of March is showing as $123K.
    c. We don't understand the Principal and Interest paydown row -- what is the $785K of paydown this week? BW only took $200K. And what is the additional $725K of paydown over the next 3 weeks?
3. We need the excel backup (with formulas, not values) for the cash flow file, subscriber file, revenue projections and overall operating model.

**Matthew Edward Schernecke**
Morgan, Lewis & Bockius LLP
101 Park Avenue | New York, NY 10178-0060
Direct: +1.212.309.6135 | Main: +1.212.309.6000 | Fax: +1.212.309.6001
matthew.schernecke@morganlewis.com | www.morganlewis.com
Assistant: Cynthia DeSteno | +1.212.309.6919 | cdesteno@morganlewis.com

DISCLAIMER
This e-mail message is intended only for the personal use of the recipient(s) named above. This message may be an attorney-client communication and as such privileged and confidential and/or it may include attorney work product. If you are not an intended recipient, you may not review, copy or distribute this message. If you have received this communication in error, please notify us immediately by e-mail and delete the original message.

This electronic message is from a law firm. It may contain confidential or privileged information. If you received this transmission in error, please reply to the sender to advise of the error and delete this transmission and any attachments.
bcllp2018

UCC_019642

**EXECUTION VERSION**

**FORBEARANCE AGREEMENT AND FIRST AMENDMENT
TO LOAN AND SECURITY AGREEMENT**

This FORBEARANCE AGREEMENT AND FIRST AMENDMENT TO LOAN AND SECURITY AGREEMENT (this "**Agreement**") is made and entered into as of February 9, 2018 among **BREAKWATER CREDIT OPPORTUNITIES FUND, L.P.**, a Delaware limited partnership with an office located at 1999 Avenue of the Stars, Suite 3430, Los Angeles, CA 90067, as agent for the Lenders (in such capacity, and any successors and assigns (and, for purposes of every equity issuance or future equity issuance contemplated hereby, together with any of its Affiliated designees), "**Agent**"), **LOOT CRATE, INC.**, a Delaware corporation ("**Borrower**" or "**Loot Crate**"), and the undersigned Lenders (as defined in the hereinafter defined Loan Agreement). Capitalized terms not defined herein shall have the meanings ascribed thereto in the Loan Agreement (as defined below) or, if not defined therein, the other Loan Documents.

**R E C I T A L S:**

A.    WHEREAS, the Loan Parties, the Lenders party thereto, and Agent are parties to that certain Loan and Security Agreement, dated as of June 1, 2016 (as the same may be amended, restated, supplemented, or otherwise modified from time to time, the "**Loan Agreement**");

B.    WHEREAS, the Events of Default described in Schedule 3 hereto have occurred and are continuing (the "**Existing Defaults**"). As a consequence of the Existing Defaults, Agent and the Lenders are free to exercise any and all rights and remedies available to them under the Loan Documents and applicable law;

C.    WHEREAS, the Loan Parties requested that Agent and the Lenders forbear from exercising certain rights and remedies available to Agent and the Lenders under the Loan Documents and applicable law and that Agent and the Lenders agree to modify certain terms of the Loan Documents in accordance with the terms contained in this Agreement; and

D.    WHEREAS, Agent and the Lenders are willing to forbear from exercising such rights and remedies, and to modify such terms of the Loan Documents, subject to the terms and conditions contained in this Agreement.

NOW, THEREFORE, in consideration of the foregoing premises, which are hereby incorporated into and made a part of this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the undersigned, intending to be legally bound, does hereby agree as follows:

1.    <u>Certain Defined Terms</u>. As used herein, the following defined terms shall have the following meanings:

      (a)    "**Default**" shall mean a default or any other breach by any Loan Party of any representation, warranty, covenant, or agreement under any of the Loan Documents other than an Event of Default, which is not cured to the satisfaction of Agent within five (5) Business Days of either (A) notice or (B) a Responsible Officer of a Loan Party obtaining knowledge thereof.

1

UCC_019643

(b)    "**Forbearance Deliverable**" shall mean any of (i) a Cash Balance Report, (ii) a Rolling Cash Flow Report, (iii) a Cash Flow Variance Report and/or (iv) a Subscriber Report and "**Forbearance Deliverables**" shall mean all of them, collectively.

(c)    "**Forbearance Period**" shall mean the period from the Effective Date until the Termination Date.

(d)    "**Stated Termination Date**" shall mean February 28, 2018.

(e)    "**Substantial Compliance**" shall mean that (i) Borrower's total inflows shall not be less than 90% of the projected amounts set forth in each Rolling Cash Flow Report as tested weekly on an aggregate basis for each such tested week and (ii) Borrower's actual total disbursements shall not be greater than 110% of the projected amounts set forth in each Rolling Cash Flow Report as tested weekly on an aggregate basis for each such tested week. Notwithstanding the foregoing, for purposes of such weekly testing, Borrower may offset realized inflows in excess of the projected amounts set forth in each Rolling Cash Flow Report against corresponding actual increased costs, expenses and disbursements.

(f)    "**Termination Date**" shall mean the earliest to occur of (i) the Stated Termination Date as the same may be extended in compliance with Section 4 below, (ii) the date of the occurrence of any Default or an Event of Default (other than an Existing Default) or any breach of any obligation under this Agreement (including, without limitation, the failure to timely deliver any Forbearance Deliverable as and when due (subject to any cure periods expressly set forth herein) or any default in performance of any obligation in Section 8) and (iii) the date upon which any voluntary or involuntary bankruptcy or insolvency proceeding is filed by or against any Loan Party.

2.    <u>Acknowledgments</u>.  Each Loan Party hereby acknowledges, agrees and agrees not to contest, the following:

(a)    The Existing Defaults have occurred and are continuing, and, (i) as a consequence thereof, subject to and but for the terms of this Agreement, Agent and the Lenders would be free to exercise any and all rights and remedies available to them under the Loan Documents and applicable law, including, without limitation, the right of the Agent to declare all Obligations immediately due and payable and to exercise the other rights described in Section 9.1 of the Loan Agreement and (ii) effective as of January 1, 2017, the Obligations began accruing (and shall continue to accrue both during and after the Forbearance Period) interest at the Default Rate pursuant to the terms of the Loan Agreement.

(b)    Agent has valid and perfected Liens in and to the Collateral.

(c)    As of February 9, 2018, (i) the unpaid outstanding principal amount of the Term Loan is $15,212,291.23 and (ii) the unpaid amount of Lender Expenses comprised of the fees and expenses of Morgan, Lewis & Bockius LLP, which have been invoiced prior to the date hereof is $256,273.36.  Such amounts constitute a part of the Obligations, remain outstanding and unpaid, are validly owing to Agent and the Lenders by the Loan Parties, and are not subject to any right of offset, deduction, claim, or counterclaim in favor of any Loan Party.

2

UCC_019644

(d) Subject to the terms of this Agreement, Agent and the Lenders have not waived and do not hereby waive any defaults or Events of Default including, without limitation, the Existing Defaults, nor does Agent or any of the Lenders waive any rights or remedies available to them under any of the Loan Documents or applicable law, including without limitation the right to declare all Obligations to be immediately due and payable and to exercise the other rights described in Section 9.1 of the Loan Agreement, and Agent's and the Lenders' agreement to forbear from exercising certain of their rights and remedies shall not invalidate, impair, negate or otherwise affect Agent's and each Lender's ability to exercise any other rights and remedies they may have under the Loan Documents or applicable law.

(e) (i) each and every commitment of Agent and each Lender to make loans or other extensions of credit to or for the benefit of Borrower under the Loan Documents has terminated, (ii) Agent and the Lenders are not obligated, and do not intend, to make any further loan or other extension of credit to or for the benefit of Borrower under the Loan Documents or otherwise and (iii) nothing in this Agreement shall be implied or construed to obligate Agent or any of the Lenders to extend this Agreement or the Forbearance Period beyond the terms hereof.

3.    Forbearance.  In reliance upon the representations, warranties, agreements and covenants of the Loan Parties set forth herein and in the Loan Documents, during the Forbearance Period, Agent and the Lenders agree to forbear from (i) declaring all Obligations to be immediately due and payable and (ii) taking any actions to foreclose or otherwise enforce their Liens upon the Collateral, in each case, as a result of the occurrence and continuance of the Existing Defaults.

4.    Forbearance Extension.  On February 28, 2018, if the New Equity financing has not been consummated and the Termination Date has not occurred, the Forbearance Period shall automatically be extended by extending the Stated Termination Date to March 31, 2018 (the "**Forbearance Extension**") subject to the satisfaction of each of the following conditions precedent to the reasonable satisfaction of Agent:

(a) Borrower shall have delivered to Agent a list and contact information for each identified proposed equityholder (the "**Proposed Equityholders**") of the New Equity, each of whom shall be satisfactory to Agent, which list shall show the committed investment amount with respect to each such Proposed Equityholder, with aggregate commitments for all such Proposed Equityholders totaling not less than $10,000,000, unless waived by the Agent; and

(b) Borrower shall have delivered to Agent a binding, executed commitment letter, binding term sheet or other binding definitive document (together with any related documents, the "**Commitment Documents**") executed by each Proposed Equityholder and Borrower, evidencing the commitment of the Proposed Equityholders to provide the New Equity, which Commitment Documents shall be accompanied by evidence of approval by Borrower's Board of Directors, common and/or preferred shareholders, as necessary, and shall (x) provide that the New Equity shall be provided on an exclusive basis, subject to customary caveats, (y) be in form and substance and have terms and conditions satisfactory to Agent and shall not contain any due diligence or financial conditions and (z) provide terms for an amendment and restatement, amendment, extension or other modification of the Loan Agreement, which such amendment and restatement, amendment, extension or other modification shall be satisfactory to Agent in all respects.

3

UCC_019645

5.    <u>Conditions to Forbearance</u>.  Each Loan Party hereby acknowledges and agrees that compliance with the following shall constitute conditions precedent to Agent's and the Lenders' agreement to forbear, and to continue to forbear, as herein provided (the date that all such conditions precedent are satisfied to the satisfaction of Agent being the "**Effective Date**"):

(a)    The Loan Parties shall deliver to Agent an executed copy of this Agreement, duly and properly executed by each Loan Party, together with such other documentation as Agent may reasonably require;

(b)    The Loan Parties shall have delivered to Agent a Cash Balance Report (as defined below) that is current as of the Effective Date;

(c)    The Loan Parties shall have delivered to Agent a cash flow forecast through March 31, 2018, in form and substance acceptable to Agent, which shows projected cash receipts of the Loan Parties and all projected cash disbursements of the Loan Parties (including prepaid expenses and cash outflows) in each case for each week through March 31, 2018 (the "**Projected Cash Flow Report**");

(d)    There being no actions or proceedings pending or, to the knowledge of any Responsible Officer of Borrower, threatened in writing by or against any of the Loan Parties except as set forth on Schedule 1 hereto, which Schedule 1 shall set forth a reasonably detailed description of any such matters and the estimated amount in dispute with respect thereto;

(e)    The Loan Parties shall have delivered to Agent Borrower's projected operating plan and budget for the fiscal year ending December, 2018;

(f)    The Loan Parties shall have delivered to Agent an organizational chart of Borrower prepared as of the Effective Date, reflecting all senior management positions, specifying those that are filled and those that need to be filled, including the status of filling any of the positions that are currently not filled and Borrower's current plans for addressing any vacancies;

(g)    The Loan Parties shall have delivered to Agent a report with details on the number of subscribers of Borrower, including information about subscription period and "churn rate" of such subscribers (the "**Subscriber Report**");

(h)    The Loan Parties shall have delivered to Agent summary information prepared as of the Effective Date and satisfactory to Agent consisting of a list of any termination or requested termination of services or goods by any vendor or supplier and any COD requirements (the "**Vendor/Supplier Report**");

(i)    Borrower shall have issued to Agent the Forbearance Compensation Series A Shares (as defined below) in accordance with the provisions of this Agreement;

(j)    The Loan Parties shall deliver to Agent a certificate, executed by a Responsible Officer of each Loan Party, attaching resolutions authorizing the transactions contemplated by this Agreement including, without limitation, the issuance of the Forbearance Compensation Series A Shares;

(k)    Borrower shall execute and deliver to Agent a Fee Letter in form and substance satisfactory to Agent; and

4

UCC_019646

(l)    The Loan Parties shall have delivered to Agent a certificate of a Responsible Officer of Borrower dated as of the Effective Date, certifying that Borrower has satisfied (or the Lenders shall have waived) each of the conditions set forth in this Section 5 and such other matters as Agent may require.

6.    <u>Amendment to Loan Agreement</u>.  The Loan Agreement is hereby amended by amending the definition of "PIK Rate" contained in Section 1.1 of the Loan Agreement by deleting "2.00%" and replacing it with "5.00%", which amendment shall be effective as of February 1, 2018.

7.    <u>Representations and Warranties</u>.  Each Loan Party hereby represents and warrants to Agent and each Lender that, as of the date hereof:

(a)  there are no Defaults or Events of Default other than the Existing Defaults;

(b)  each Loan Party is duly organized and in good standing under the laws of the State of Delaware, is duly and legally authorized to enter into this Agreement, and has complied in all material respects with all laws, rules, regulations, charter provisions, and bylaws to which it may be subject, that this Agreement has been duly executed by each such Loan Party party thereto and is enforceable against such Loan Party in accordance with its terms, and that the execution of this Agreement by such Loan Party will not conflict with its organizational or governing documents or applicable law and that the undersigned representative is authorized to act on behalf of and bind such Loan Party in accordance with the terms of this Agreement;

(c)  it has not entered into any agreements, mortgages, financing statements, security agreements, security deeds, or any other agreement or instrument of any nature whatsoever which in any manner affects its right, title, interest, or ability to perform as herein provided;

(d)  no Loan Party has committed any act of fraud or deceit in connection with the transactions involving Agent and/or the other Lenders, including without limitation knowingly furnishing of any materially false information, financial or non-financial, knowingly withholding of any material information, financial or non-financial, or knowingly making of any warranties or representations which are materially untrue as of the date hereof;

(e)  as of the date hereof, the capitalization of Borrower consists of the following:

(i)    A total of 14,000,000 authorized shares of Common Stock, of which 8,399,219 shares will be issued and outstanding. All of the outstanding shares of Common Stock have been duly authorized, fully paid and are nonassessable and issued in compliance with all applicable federal and state securities laws.

(ii)    A total of 2,700,000 authorized shares of Preferred Stock, consisting of (i) 1,847,297 shares designated Series A Preferred Stock, of which 1,626,683 are issued and outstanding, and (ii) 852,703 shares designated Series A-1 Preferred Stock, all of which are issued and outstanding. All of the outstanding shares of Preferred Stock as of the date hereof have been duly authorized, fully paid and nonassessable and issued in compliance with all applicable federal and state securities laws.

5

UCC_019647

(iii)    Borrower has reserved 2,398,149 shares of its Common Stock for issuance to employees, directors and officers of, and consultants to, Borrower under Borrower's 2012 Stock Plan, of which 2,070,268 shares are subject to options or RSUs that are currently outstanding and 327,881 shares remain available for issuance. In addition, there are outstanding convertible notes and warrants to purchase common stock as detailed on Schedule 4. Except for this Agreement, as set forth in this Section 7(e) or Schedule 4, Borrower has no obligation (contingent or otherwise) to (i) issue any subscription, warrant, option, convertible security or other such right or to issue or distribute to holders of any shares of its capital stock any evidences of indebtedness of Borrower or (ii) purchase, redeem or otherwise acquire any shares of its capital stock or any interest therein or to pay any dividend or make any other distribution in respect thereof.

(iv)    The capitalization of Borrower is set forth on Schedule 4, which includes all (i) issued and outstanding Common Stock, (ii) granted stock options, (iii) shares of Common Stock reserved for future award grants under the 2012 Stock Plan, (iv) each series of Preferred Stock, and (v) warrants or stock purchase rights or other convertible securities, if any, calculated on a pro forma basis immediately following the issuance of the Forbearance Compensation Series A Shares (the "Capitalization Table"). Following the issuance of the Forbearance Compensation Series A Shares, the Capitalization Table will be true, accurate and complete in all respects.

(v)    The Forbearance Compensation Series A Shares, when issued, sold and delivered in accordance with the terms of this Agreement, will be validly issued, fully paid and non-assessable and free of restrictions on transfer other than restrictions on transfer under applicable state and federal securities laws, liens or encumbrances created by or imposed by Agent, or stockholder agreements which Agent is party to prior to the date hereof as a holder of Series A Preferred Stock. The Forbearance Compensation Series A Shares will be issued in compliance with all applicable federal and state securities laws.

8.    <u>Covenants</u>. Each Loan Party hereby agrees with Agent and the Lenders that it shall, and shall cause its Subsidiaries to, do all of the following, in each case in form and substance reasonably satisfactory to Agent:

(a)    <u>Forbearance Deliverables</u>. Deliver to Agent:

(i)    on each Business Day during the Forbearance Period, a daily cash balance report reflecting cash on deposit in all of Borrower's Deposit Accounts and/or cash equivalent investments in all of Borrower's Securities Accounts as of each such Business Day, which shall exclude merchant receivables (each, a "**Cash Balance Report**"); <u>provided</u>, that if a Cash Balance Report is not delivered on any Business Day during the Forbearance Period, the Loan Parties may deliver such Cash Balance Report on the immediately following Business Day;

(ii)    on the last day of each month during the Forbearance Period, an updated Subscriber Report;

DB1/ 95155257.13

UCC_019648

    (iii)    on each Friday during the Forbearance Period, a rolling update to the Projected Cash Flow Report for the period ending March 31, 2018; (each a "**Rolling Cash Flow Report**");

    (iv)    concurrent with the delivery of each Rolling Cash Flow Report, a report detailing any variances between such Rolling Cash Flow Report and each of (A) the Projected Cash Flow Report delivered on the Effective Date and (B) the previously delivered Rolling Cash Flow Report (the "**Cash Flow Variance Report**"); and

    (v)    concurrent with the delivery of each Rolling Cash Flow Report, a certificate of a Responsible Officer of Borrower certifying that the requirements of Section 8(d) hereof have been satisfied together with supporting calculations.

(b) <u>Notices; Progress Reports</u>. Deliver to Agent:

    (i)    not later than 1 Business Day after receipt by any Loan Party, or knowledge of any Responsible Officer, of notice or any written threat of any action or other proceeding, an updated schedule of all such pending or threatened actions or other proceedings, along with a reasonably detailed description of such matters and the estimated amount in dispute;

    (ii)    on a regular basis and at least as frequently as each Friday during the Forbearance Period, weekly updates on progress with respect to each item on Dendera Advisory, LLC's ("**Dendera**") initial scope of work as set forth on Schedule 2 hereto, and including updates with respect to the New Equity and any other equity financing transactions; and

    (iii)    on a weekly basis, or as more frequently as may be required by Agent, updates on the status of the New Equity, including terms, investors, conditions and expected closing date.

(c) <u>Collateral Information</u>. Within 2 Business Days of reasonable request by Agent or any Lender, execute and deliver any necessary or requested Account Control Agreements, IP Security Agreements or any other documentation required in order to maintain, perfect, or better perfect Agent's (on behalf of itself and the Lenders) Liens in any or all of the Collateral, subject to limitations set forth in the Loan Agreement.

(d) <u>Compliance With Rolling Cash Flow Report</u>. Maintain Substantial Compliance with each Rolling Cash Flow Report at all times during the Forbearance Period.

(e) <u>New Equity Financing</u>. Not later than the Stated Termination Date, consummate an equity financing in form and substance and on terms satisfactory to Agent (which shall require, among other things, that such equity include a satisfactory liquidation preference) which shall (a) be accompanied by evidence of approval by Borrower's Board of Directors (and common and/or preferred shareholders as necessary), and (b) provide liquidity to Borrower in an amount not less than $10,000,000, unless waived by the Agent (the "**New Equity**").

(f) <u>Formation of Holdings</u>. Within ten (10) Business Days following the Effective Date, form, or cause to be formed, an entity ("**Holdings**"), which shall become the direct

DB1/ 95155257.13

UCC_019649

parent of Borrower and which shall own 100% of the outstanding issued capital stock of Borrower.  Upon effectiveness of the foregoing reorganization, all references to "Preferred Stock of Borrower" and similar references in this Agreement shall be replaced by references to the Preferred Stock of the ultimate parent company of Borrower and Holdings.

(g) <u>Pledge Agreement and Guaranty of Holdings</u>. Within ten (10) Business Days following the Effective Date, deliver to Agent, or cause to be delivered to Agent, in form and substance satisfactory to Agent: (i) a pledge agreement by Holdings of 100% of the outstanding issued capital stock of Borrower, (ii) a Guaranty by Holdings whereby Holdings shall become a Guarantor, (iii) a security agreement pursuant to which Holdings shall grant a security interest in all of its assets to Agent, on behalf of the Lenders, (iv) an amendment to the Loan Agreement in form and substance satisfactory to Agent providing for, among other things, substantial limitations on dividends and distributions to Holdings and (v) an opinion of counsel to Borrower covering the formation and legal existence of Holdings and providing customary opinions regarding the execution, delivery and performance of such pledge agreement and Guaranty and such other matters as Agent may require, which opinion shall be in form and substance satisfactory to Agent.

(h) <u>Vendor/Supplier Report Updates</u>. Deliver to Agent upon request an update to the Vendor/Supplier Report, and to the extent of any terminations or pending terminations by any vendor or supplier as set forth therein, within a reasonable amount of time, at the request of Agent, schedule a teleconference with Agent to review information regarding the replacement of such supplier, vendor, or product, which teleconference call shall occur within two (2) Business Days following request by Agent.

(i) <u>Legal Expenses</u>.   On the earlier to occur of the consummation of the New Equity or the Stated Termination Date, the Loan Parties shall have paid all fees and expenses due and payable under the Loan Agreement including, without limitation, all Lender Expenses, including, without limitation, all fees, costs and expenses of Morgan, Lewis & Bockius LLP.

9.    <u>Forbearance Compensation</u>.  As consideration for the occurrence of the Effective Date:

(a) Borrower shall issue to Agent, on or prior to the Effective Date, 220,614 shares of the authorized but unissued shares of Series A Preferred Stock of Borrower for no additional consideration (the "**Forbearance Compensation Series A Shares**");

(b) Borrower shall pay or accrue, to Agent, on behalf of the Lenders, the fee described in the Fee Letter; and

(c) Agent hereby represents and warrants to Borrower as set forth on Schedule 5, which representations and warranties shall be accurate in all material respects as of the date the Forbearance Compensation Series A Shares are issued, and on the date any Exchange Shares or Additional Forbearance Compensation Series A Shares are issued to Agent.

(d) At any time on or following the authorization and issuance of shares of a new series of Preferred Stock of Borrower (the "**New Preferred**"), Agent may, at its option, exchange the Forbearance Compensation Series A Shares for 330,921 shares of New Preferred (or other appropriate number of shares that constitutes 2.50% of the Fully-

UCC_019650

Diluted (as defined below) capital stock of Borrower) (the "**Exchange Shares**"). In the event more than one new series of Preferred Stock of Borrower is authorized, the Exchange Shares shall be exchangeable into the series of New Preferred with the most senior preferred and with greatest liquidation preference. The Exchange Shares shall account for 2.50% of the Fully-Diluted capital stock of Borrower, in each case, calculated immediately following the effective time of Agent's exchange of the Forbearance Compensation Series A Shares for Exchange Shares. If Agent elects to exchange the Forbearance Compensation Series A Shares pursuant to the immediately preceding sentence, if such series of New Preferred is senior to the Forbearance Compensation Series A Shares, Agent shall be entitled to, on a *pari passu* basis, any anti-dilution provisions applicable to such New Preferred and if such series of New Preferred is *pari passu* with or junior to the Forbearance Compensation Series A Shares, Agent shall be entitled to, on a *pari passu* basis, any anti-dilution provisions applicable to such New Preferred; *provided, however,* that in the event the shares of New Preferred are issued at price per share less than the Forbearance Compensation Series A Shares conversion price or carry a liquidation preference less than $11.43 per share, then the Exchange Shares shall be appropriately adjusted such that the number of Exchange Shares constitute 2.50% of the Fully-Diluted capitalization of Borrower and the aggregate liquidation preference of such Exchange Shares equals at least $3,807,623.  Borrower covenants and agrees to reserve sufficient shares of New Preferred to permit the exchange if exercised by Agent in accordance with this Section 9(d).

(e) In the event additional shares of Series A Preferred Stock are authorized in lieu of New Preferred, at the option of Agent, concurrently with such authorization, Borrower shall issue to Agent 110,307 shares of Series A Preferred Stock for no additional consideration (or other appropriate number of shares of Series A Preferred Stock such that, following such issuance, the total Forbearance Compensation Series A Shares held by Agent equals at least 2.50% of the Fully-Diluted capitalization of Borrower) (the "**Additional Forbearance Compensation Series A Shares**").

(f) In the event the holder of the Forbearance Compensation Series A Shares exercises the exchange right under this Section 9, upon the earlier of (i) a date mutually agreed by the holder and Borrower and (ii) the date shares of New Preferred (or Additional Forbearance Compensation Series A Shares) are first issued by Borrower, Borrower and Agent shall execute and deliver the Exchange Agreement, in the form attached as Exhibit A, and Borrower shall deliver to the holder of the Exchange Shares in certificated form.

(g) Effective upon the exercise of the exchange right, with respect to the Exchange Shares, the holder thereof shall be entitled to the same rights, preferences, powers, and privileges of such New Preferred.

(h) Each of the undersigned holders of Borrower Securities agrees to vote or cause to be voted all shares of Common Stock and Preferred Stock owned by such holder, or over which such holder has voting control, from time to time and at all times, in whatever manner as shall be necessary to authorize and/or reserve the number of authorized shares of Common Stock and Preferred Stock from time to time to ensure that there will be sufficient shares of Common Stock and Preferred Stock available in the event the exchange right set forth in Section 9 is exercised by the holder of the Forbearance Compensation Series A Shares at any given time.

9

UCC_019651

(i) For purposes of this Section 9, "Fully-Diluted" means, as of the consummation of the New Equity financing, calculated on as converted to Common Stock basis, the sum of (A) all shares of Common Stock outstanding on such date, (B) all shares of Common Stock issuable in respect of all securities outstanding as of such date that are convertible into or exercisable or exchangeable for shares of Common Stock, and (C) purely for purposes of this definition, if a class of Borrower Securities is not convertible into or exercisable or exchangeable for Common Stock, one share of Common Stock for each share of such capital stock outstanding on such date; provided in the event the shares of New Preferred are issued at a price per share less than the Conversion Price (as defined in the Certificate of Incorporation of Borrower as in effect on the date hereof) applicable to the Series A Preferred Stock, then the number of Exchange Shares shall be appropriately increased such that the aggregate liquidation preference of such Exchange Shares equals at least $3,807,623.

10.    <u>Remedies Upon Default</u>.  In the event of the occurrence of the Termination Date, the Agent's and the Lenders' agreements to forbear as provided herein shall terminate, and Agent and the Lenders shall immediately be entitled to exercise any and all of their rights and remedies under any of the Loan Documents, at law, in equity, or otherwise, all without further notice except such notice as is required by applicable law.

11.    <u>No Waiver or Further Accommodations; No Novation</u>.  Each Loan Party hereby acknowledges and agrees that neither Agent nor any of the Lenders has waived any of the Existing Defaults; in addition, each Loan Party acknowledges and agrees that neither Agent nor any of the Lenders has agreed to forbear from exercising its rights and remedies under the Loan Documents with respect to any Default or Event of Default other than the Existing Defaults as set forth herein.  This Agreement is not intended to be nor shall it constitute a novation or accord and satisfaction of the Loan Documents or of the indebtedness evidenced and secured thereby.

12.    <u>No Defense</u>.  Each Loan Party hereby agrees that the execution of this Agreement shall not be raised as and shall not constitute a defense or a claim to any subsequent exercise by Agent nor any of the Lenders of its rights and remedies under the Loan Documents or otherwise.

13.    <u>No Course of Dealing</u>.  Each Loan Party acknowledges that (a) except as expressly set forth herein neither Agent nor any of the Lenders has agreed to (and has no obligation whatsoever to discuss, negotiate or agree to) any restructuring, modification, amendment, waiver or forbearance with respect to the Term Loan or any of the terms of the Loan Documents, (b) no understanding with respect to any other restructuring, modification, amendment, waiver or forbearance with respect to the Term Loan or any of the terms of the Loan Documents shall constitute a legally binding agreement or contract, or have any force or effect whatsoever, unless and until reduced to writing and signed by authorized representatives of Loan Parties, Agent and the Lenders, and (c) the execution and delivery of this Agreement has not established any course of dealing between the parties hereto or created any obligation or agreement of Agent or any Lender with respect to any future restructuring, modification, amendment, waiver or forbearance with respect to the Term Loan or any of the terms of the Loan Documents.

14.    <u>Waiver and Release</u>.  In consideration of the forbearance and other accommodations granted herein and other good and valuable consideration, each Loan Party hereby waives, remises, releases and forever discharges Agent, each Lender, and each of their respective predecessors, successors, assigns, affiliates, shareholders, directors, officers, accountants, attorneys, employees, agents, representatives and servants of, from and against any and all claims, actions, causes of action, suits, proceedings, defenses, counterclaims, contracts, judgments, damages, accounts, reckonings, executions, and liabilities whatsoever of every name and nature, whether known or unknown, whether or not well founded in fact or in law, and whether in law, at equity or otherwise, which the undersigned ever had or

10

UCC_019652

now has for or by reason of any matter, cause or anything whatsoever to this date, including without limitation any matter relating to or arising out of any of the Loan Documents or the Obligations, any actual or alleged acts or omissions of Agent or any Lender with respect to the Loan Documents, any of the Obligations, and any Liens or collateral in connection therewith, or the enforcement of any of Agent's or any Lender's rights or remedies thereunder.  The terms of this waiver and release shall survive the termination of this Agreement and the Loan Documents and shall remain in full force and effect after the Termination Date.

15.    <u>Further Assurances</u>.  In addition to this Agreement, each Loan Party hereby agrees to execute promptly any documentation Agent deems necessary in order to further effect the agreements herein made.

16.    <u>Ratification of Loan Documents</u>.  Each Loan Party hereby agrees that this Agreement is a Loan Document and hereby ratifies and affirms the Loan Documents, as modified and amended by this Agreement, and acknowledges that the Loan Documents, as so modified and amended, are and shall remain unchanged and in full force and effect, and the Liens granted in the Collateral thereby and held by Agent as of the Effective Date shall and do remain in full force and effect as valid and perfected Liens in favor of Agent therein and thereto.  The Loan Parties agree that the Loan Documents, as modified and amended by this Agreement, constitute valid and binding obligations and agreements of the Loan Parties enforceable by Agent and the Lenders against each of the Loan Parties in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

17.    <u>Time</u>.  Time is of the essence of this Agreement.

18.    <u>Binding Effect</u>.  The terms and conditions, covenants, agreements, powers, privileges and notices of authorization contained herein shall be binding upon and shall inure to the benefit of Agent, the Lenders, the Loan Parties, and their respective successors, assigns, agents, and attorneys.  No person other than the parties hereto shall be authorized to rely upon the contents of this Agreement or be deemed a beneficiary thereof.

19.    <u>Severability</u>.  Wherever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under any such law, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision, or the remaining provisions of this Agreement.

20.    <u>Choice of Law and Venue; Jurisdiction; Jury Trial Waiver</u>.  Each of the parties hereto acknowledges and agrees that all of the provisions set forth in Section 11 of the Loan Agreement shall apply to this Agreement as if incorporated herein, *mutatis mutandis*.

21.    <u>Construction of this Agreement</u>.  This Agreement constitutes and embodies the entire understanding and agreement between the parties hereto with respect to the subject matter hereof and thereof and supercedes any and all prior agreements, promises, negotiations, representations, understandings or inducements, whether express or implied, oral or written regarding the terms hereof. This Agreement may not be modified, altered or amended except by an agreement in writing signed by all of the parties hereto.  Any provision of this Agreement which is prohibited or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof in that jurisdiction or affecting the validity or enforceability of such provision in any other jurisdiction. Any warranty or representation made in this Agreement shall be deemed to be material and shall survive and remain in full force and effect after any transfer, conveyance or foreclosure of the

UCC_019653

Collateral to or by Agent, and nothing herein shall impair, affect or limit any right or claim that Agent or any Lender may have against any Loan Party for breach of any such warranty or representation.

22.    <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement among the parties hereto with respect to the subject matter hereof. There are no oral agreements among the parties hereto, and each Loan Party specifically acknowledges and agrees that it is not relying on any oral representation from Agent, the Lenders, or any of their predecessors, successors, assigns, subsidiaries, affiliates and related entities, shareholders, directors, officers, directors, accountants, attorneys, employees, agents, representatives, or servants.

23.    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of this Agreement by telecopier or electronic transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by telecopier or electronic transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.  This Agreement shall be effective when accepted by Agent (notice of which acceptance is hereby waived by the Loan Parties) and shall thereupon be binding upon each Loan Party signatory hereto irrespective of whether any other Loan Party executes this Agreement.

[SIGNATURES ON FOLLOWING PAGE]

DB1/ 95155257.13

UCC_019654

IN WITNESS WHEREOF, the parties hereto have caused their respective duly authorized officers or representatives to execute and deliver this Agreement as of the date first written above.

### LOAN PARTIES:

### LOOT CRATE, INC.

By: _____

Name: Christopher Davis

Title: CEO

UCC_019655

**STOCKHOLDERS:**

**Christopher Davis**

**[Others]**

Signature Page to Forbearance Agreement (Loot Crate)

UCC_019656

**AGENT:**

**BREAKWATER CREDIT OPPORTUNITIES FUND, L.P.**

**By:  BREAKWATER INVESTMENT MANAGEMENT, LLC**, its general partner

By: _____
Name:  Saif Mansour
Title:  Managing Partner

**LENDER:**

**BREAKWATER CREDIT OPPORTUNITIES FUND, L.P.**

**By:  BREAKWATER INVESTMENT MANAGEMENT, LLC**, its general partner

By: _____
Name:  Saif Mansour
Title:  Managing Partner

Signature Page to Forbearance Agreement (Loot Crate)

Schedule 1

**Litigation and Other Proceedings**

Inksee d/b/a White Label MFG vs. Loot Crate, Inc.
White Label MFG manufactures unique t-shirts for Loot Crate for inclusion in Loot Crate's various crate lines.  Within 30 days after receipt of a February 2016 delivery from White Label MFG, Loot Crate (i) informed White Label MFG that it over-shipped a material number of t-shirts in its February 2016 delivery, (ii) informed White Label MFG that a material number of t-shirts were defective in its February 2016 delivery, and (iii) rejected the defective and overage t-shirts in its February 2016 delivery. On April 7, 2016, White Label MG requested that Loot Crate pay an outstanding balance of $317,117.19 for all delivered goods plus late fees. On or about April 26, 2016, Loot Crate paid approximately $170,000 for the non-defective good and non-overage unites included in the February 2016 delivery. The remaining amount in dispute is approximately $150,000.

On August 23, 2016, White Label MFG filed a complaint against Loot Crate in state court in Los Angeles County, California for, among other things, breach of contract, seeking $149,192.25 in damages. Loot Crate denied all of White Label MFG's allegations and filed a cross-complaint against White Label MFG for breach of contract for delivering defective shirts and refusing to accept the return or provide credit, seeking damages in the amount of $15,000 for Loot Crate 's costs incurred in relation to the defective shirts. The parties attended a mediation in early Fall 2017, which was unsuccessful.

The parties have agreed on material terms of settlement whereby Loot Crate has agreed to pay White Label $65,000 and White Label will have a right of first refusal to purchase Loot Crate's excess inventory for resale until the earlier of 12 months or its purchase of $1 million in inventory. The settlement agreement has been finalized and is awaiting signature by the parties.

Tania Dababneh v. Loot Crate, Inc. and Steven Raby
In early November 2017, legal counsel for Ms. Dababneh, a former employee of Loot Crate, sent Loot Crate a letter requesting information relating an alleged claim that she was wrongfully terminated due to sexual harassment by Mr. Raby, a co-worker who is no longer with Loot Crate. On December 12, 2017, the parties participated in a mediation session in an attempt to settle the matter prior to filing of a formal claim.

On January 5, 2018, Ms. Dababneh filed a former complaint in the Superior Court of California alleging, among other things, wrongful termination, FEHA violations based on sexual harassment and infliction of emotional damages seeking $10 million in damages. Loot Crate's insurance carrier has accepted coverage, and Loot Crate's deductible is $100,000. Loot Crate is vigorously defending the allegations with its insurance carrier. Discovery is ongoing.

Cloud 9 eSports, Inc. v. Loot Crate, Inc.
On or about August 1, 2015, Loot Crate and Cloud9 entered into a Sponsorship Agreement in which Cloud9 agreed to provide certain promotional activities for Loot Crate. A dispute arose regarding the parties' performance of their respective obligations under the Sponsorship Agreement, with each party contending that the other party did not satisfy its contractual obligations.

UCC_019658

On June 22, 2017, Cloud9 filed a complaint against Loot Crate in state court in Los Angeles County, California alleging, among other things, claims for breach of the Sponsorship Agreement. Loot Crate denies Cloud9's allegations and maintained that Cloud9 breached the Sponsorship Agreement, which Cloud9 denies.

The parties reached a settlement of the dispute as memorialized in a Settlement Agreement effective September 1, 2017 between the parties, in which, among other things, Loot Crate agreed to pay Cloud9 the total sum of $230,000, payable in installments. Upon receipt of final payment, Cloud9 has agreed to dismiss the action with prejudice.

Other
Various vendors and service providers of Loot Crate are threatening litigation or to pursue collections actions against Loot Crate for outstanding balances.

Loot Crate received a letter dated September 11, 2017, from an attorney alleging violations of California Business and Professions Code Section 17529.5 and other violations of California law without providing specifics. Loot Crate is investigating the matter.

The State of Washington Department of Revenue has issued a tax warrant in the amount of $423,503.95 for alleged sales taxes and penalties owed. Borrower was notified on February 8, 2018 that the agency has placed a garnishment on Borrower's existing PayPal account in the amount of $351,000. Borrower disputes the total amount owed and is having its tax advisors contact the agency to resolve on its behalf.

UCC_019659

Schedule 2

**Dendera Initial Scope of Services**

**Dendera will provide from time to time the following services in respect of Borrower, in each case subject to the terms and conditions hereof:**

- Assist in reviewing the capital structure, assets, liabilities, business and operations;
- Assist in developing and updating a current business and financial plan and organizational chart as well as financial model;
- Assist Borrower in its efforts to raise the New Equity;
- Assist in structuring, negotiating and closing additional or modified funding in the form of an amended or modified loan, a new loan and/or a direct equity investment; and
- Assist in providing other strategic and/or transactional coordination and advisory services for lawyers, financial advisors and accountants, as are customary for similar transactions, including designating a person(s) reasonably acceptable to the CEO of Borrower to serve in the role as an employee(s) or officer(s) or similar person(s) with Borrower who shall report to the CEO and assist in such matters and in the "management equity" portion of the current term sheet and such other matters as the CEO shall reasonably direct.

UCC_019660

Schedule 3

**Existing Defaults**

(a)        June 30, 2017 Financial Covenant Default.  Based on information provided by Borrower to Agent, for the period ended June 30, 2017, Borrower has breached the Minimum Revenue covenant under Section 7.12(b) of the Loan Agreement for the fiscal quarter ending June 30, 2017.  Such failure to comply is a continuing Event of Default under Section 8.3(a) of the Loan Agreement.

(b)        Reporting of Monthly Financial Statements Default.  Borrower has breached the covenant in Section 6.2(b) of the Loan Agreement requiring that Borrower provide monthly financial statements within 45 days after the end of each month.  Such failure to comply is a continuing Event of Default under Section 8.3(a) of the Loan Agreement.

(c)        Notice of Event of Default.  Borrower has breached the covenant in Section 6.2(e) of the Loan Agreement requiring that Borrower provide notice to Agent upon its becoming aware of various Events of Default together with a detailed statement setting forth the steps being taken by the Loan Parties to cure the same.  Such failure to comply is a continuing Event of Default under Section 8.3(a) of the Loan Agreement.

(d)        Collateral Events of Default.  Based on information provided by Borrower to Agent on March 7, 2017, Borrower has (i) breached Section 6.13 of the Loan Agreement related to deposit account number 855657016 of Borrower and deposit account number 41390376 of Loot Crate UK, Ltd. in relation to which Account Control Agreements were not executed prior to or at the time of opening such deposit accounts (the "**Deposit Account Default**"); and (ii) breached Section 6.7(b) of the Loan Agreement by failing to notify Agent of new registered Trademarks and applications for Trademarks and provide intellectual property security agreements and other documents and take such other actions as Agent may request to perfect and maintain a first priority perfected security interest in such Trademarks and applications for Trademarks (the "**Trademarks Default**").  The Deposit Account Default is a continuing Event of Default under Section 8.3(a) of the Loan Agreement and the Trademarks Default is a continuing Event of Default under Section 8.3(b) of the Loan Agreement.

(e)        Reporting of Annual Financial Statements Default.  Borrower has breached the covenant in Section 6.2(a) requiring that Borrower provide consolidated audited financial statements within 180 days after the end of the fiscal year ending December 31, 2016.  Such failure to comply is a continuing Event of Default under Section 8.3(a) of the Loan Agreement.

(f)        September 30, 2017 Financial Covenant Default.  Based on information provided by Borrower to Agent, for the period ended September 30, 2017, Borrower has breached the Minimum Subscribers covenant under Section 7.12(b) of the Loan Agreement for the fiscal quarter ending September 30, 2017.  Such failure to comply is a continuing Event of Default under Section 8.3(a) of the Loan Agreement.

(g)        September 30, 2017 Financial Covenant Default.  Based on information provided by Borrower to Agent, for the period ended September 30, 2017, Borrower has breached the Minimum Revenue covenant under Section 7.12(b) of the Loan Agreement for the fiscal quarter ending September 30, 2017.  Such failure to comply is a continuing Event of Default under Section 8.3(a) of the Loan Agreement.

UCC_019661

(h)        Disposition of Property.  Borrower breached the covenant in Section 7.1 of the Loan Agreement requiring that Borrower receive Agent's consent before disposing of Property with a value in excess of $250,000. Such failure to comply is a continuing Event of Default under Section 8.3(a) of the Loan Agreement.

(i)        Lease.  Borrower breached the covenant in Section 7.2 requiring that Borrower provide Agent with advance written notice before entering into a lease on January 16, 2017 for a leased location located in the United Kingdom (which lease expires on January 31, 2018).  Such failure to comply is a continuing Event of Default under Section 8.3(a) of the Loan Agreement.

(j)        Key Person.  Borrower breached the covenant in Section 7.2 when Eric Chan, a Key Person and the former Chief Financial Officer, resigned and was not replaced within 90 days of such resignation.  Such failure to comply is a continuing Event of Default under Section 8.3(a) of the Loan Agreement.

(k)        December 31, 2017 Financial Covenant Default.  Based on information provided by Borrower to Agent, for the period ended December 31, 2017, Borrower has breached the Minimum Subscribers covenant under Section 7.12(b) of the Loan Agreement for the fiscal quarter ending December 31, 2017.  Such failure to comply is a continuing Event of Default under Section 8.3(a) of the Loan Agreement.

(l)        December 31, 2017 Financial Covenant Default.  Based on information provided by Borrower to Agent, for the period ended December 31, 2017, Borrower has breached the Minimum Revenue covenant under Section 7.12(b) of the Loan Agreement for the fiscal quarter ending December 31, 2017.  Such failure to comply is a continuing Event of Default under Section 8.3(a) of the Loan Agreement.

(m)        December 31, 2017 Financial Covenant Default.  Based on information provided by Borrower to Agent, for the period ended December 31, 2017, Borrower has breached the Minimum Cash covenant under Section 7.12(a) of the Loan Agreement for the month ending December 31, 2017. Such failure to comply is a continuing Event of Default under Section 8.3(a) of the Loan Agreement.

(n)        January 31, 2018 Financial Covenant Default.  Based on information provided by Borrower to Agent, for the period ended January 31, 2018, Borrower has breached the Minimum Cash covenant under Section 7.12(a) of the Loan Agreement for the month ending January 31, 2018.  Such failure to comply is a continuing Event of Default under Section 8.3(a) of the Loan Agreement.

(o)        Taxes.  Borrower is in breach of Section 7.5 of the Loan Agreement based upon a Lien arising in favor of the State of Washington Department of Revenue (the "Washington DOR") as described in correspondence Borrower received on February 8, 2018. The Washington DOR has issued a tax warrant against the Borrower in the amount of $423,503.95 for alleged sales taxes and penalties owed and has placed a garnishment on Borrower's PayPal account in the amount of $351,000. This Lien is not a Permitted Lien. Such breach is a continuing Event of Default under Section 8.3(a) of the Loan Agreement.

UCC_019662

Schedule 4

**Convertible Notes and Warrants**

Subordinated Convertible Promissory Note, issued by Borrower in favor of Upfront V, L.P., dated July 25, 2017, in the principal amount of $250,000.00.

Subordinated Convertible Promissory Note, issued by Borrower in favor of Ynon Kreiz, dated July 28, 2017, in the principal amount of $250,000.00.

Warrant to Purchase Common Stock, issued by Borrower in favor of Montage Capital II, L.P., dated January __, 2016.

Warrant to Purchase Common Stock, issued by Borrower in favor of Breakwater Credit Opportunities Fund, L.P., dated June 1, 2016.

Warrant to Purchase Common Stock, issued by Borrower in favor of Dendera Advisory, LLC, dated February 8, 2018.


**Capitalization Table**


**[See Attached]**

UCC_019663



**Pro-Forma Breakwater Forbearance Cap Table**                    2/8/18

| Shareholder | Series A Forbearance Series A | Series A Existing Series A | Total Series A | Total Series A-1 | Common | Options Outs. under 2012 plan | Warrants | F/D Outs. Shares | % |
|---|---|---|---|---|---|---|---|---|---|
| *Management* | | | | | | | | | |
| Chris Davis | | | | | 5,500,000 | | | 5,500,000 | *39.2%* |
| Matthew Arevalo | | | | | 2,250,000 | | | 2,250,000 | *16.0%* |
| Ynon Kreiz [1] | | | | | 336,764 | | | 336,764 | *2.4%* |
| Other Common Holders | | | | | 312,455 | | | 312,455 | *2.2%* |
| Options Holders | | | | | | 1,694,685 | | 1,694,685 | *12.1%* |
| Shares available for issuance under the plan | | | | | | 703,464 | | 703,464 | *5.0%* |
| | | | | | | | | | |
| *Warrants* | | | | | | | | | |
| Breakwater Credit Opportunities, LP | | | | | | | 138,828 | 138,828 | *1.0%* |
| Dendera Advisory, LLC | | | | | | | 326,358 | 326,358 | *2.3%* |
| Montage Capital II, L.P. | | | | | | | 59,087 | 59,087 | *0.4%* |
| | | | | | | | | | |
| *Preferred Share Class* | | | | | | | | | |
| Clementine Captital, LLC | | | | 568,469 | | | | 568,469 | *4.1%* |
| Dorset Square LLC | | | | 284,234 | | | | 284,234 | *2.0%* |
| Breakwater Credit Opportunities, LP [2] | 220,614 | 174,912 | 395,526 | | | | | 395,526 | *2.8%* |
| Downey Ventures III LLC | | 13,118 | 13,118 | | | | | 13,118 | *0.1%* |
| HCC Capital LP | | 21,864 | 21,864 | | | | | 21,864 | *0.2%* |
| SterlingVC I LLC | | 17,491 | 17,491 | | | | | 17,491 | *0.1%* |
| Time Inc. Ventures | | 306,096 | 306,096 | | | | | 306,096 | *2.2%* |
| Upfront V, L.P. | | 1,093,202 | 1,093,202 | | | | | 1,093,202 | *7.8%* |
| | | | | | | | | | |
| Totals | 220,614 | 1,626,683 | 1,847,297 | 852,703 | 8,399,219 | 2,398,149 | 524,273 | 14,021,641 | *100.0%* |

[1] Cap table reflects the cancellation of certain equity option grants made to Ynon Kreitz.
[2] Total Series A shares include 220,614 shares reserved under the forbearance agreement as well as 174,912 purchased in the original Series A round.

UCC_019664

<u>Schedule 5</u>

**<u>Representations and Warranties of Agent</u>**

1. **Authorization**. This Agreement, when executed and delivered by Agent, will constitute Agent's valid and legally binding obligation, enforceable in accordance with its terms except as may be limited by (i) applicable bankruptcy, insolvency, reorganization or other laws of general application relating to or affecting the enforcement of creditors' rights generally and (ii) the effect of rules of law governing the availability of equitable remedies. Agent has full power and authority to enter into this Agreement.

2. **Investment**. Agent is acquiring the Forbearance Compensation Series A Shares, the Exchange Shares and/or the Additional Forbearance Compensation Series A Shares (collectively, the "**Securities**") for investment for Agent's own account and not with the view to the public resale or distribution thereof within the meaning of the Securities Act of 1933, as amended, and the regulations thereunder (the "**Securities Act**"), and Agent has no present intention of selling, granting any participation in, or otherwise distributing the Securities. No other person or entity has a direct or indirect beneficial interest, in whole or in part, in such Securities. Agent understands that the Securities have not been registered under the Securities Act by reason of a specific exemption thereunder, which depends upon, among other things, the bona fide nature of Agent's investment intent as expressed herein.

3. **Relationship to Borrower; Sophistication; Experience**. Agent either (a) has a preexisting business or personal relationship with Borrower and/or any of its officers, directors or controlling persons or entities or (b) Agent has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of the prospective investment in the Securities.

4. **Restrictions on Transfer**. Agent acknowledges that the Securities must be held indefinitely unless subsequently registered under the Securities Act or an exemption from such registration requirements is available. Agent is aware of the provisions of Rule 144 promulgated under the Securities Act which permit limited resale of stock purchased in a private placement subject to the satisfaction of certain conditions, including, among other things, the existence of a public market for the stock, the availability of certain current public information about Borrower, the resale occurring not less than six months after a party has purchased and paid for the stock to be sold, and, in the case of sales by Affiliates of Borrower, the sale being made through a "broker's transaction" or a transaction directly with a "market maker" and the number of shares of the stock being sold during any three-month period not exceeding specified limitations. Agent further acknowledges and understands that Borrower may not be satisfying the current public information requirement of Rule 144 at the time Agent wishes to sell the Securities and, if so, Agent would be precluded from selling the Securities under Rule 144 even if the six-month minimum holding period has been satisfied.

5. **No Public Market**. Agent understands that no public market now exists for the Securities, that there can be no assurance that a public market will ever exist for the Securities and that Borrower is under no obligation to register the Securities.

6. **Exemption from Registration**. Agent further acknowledges that, in the event all of the requirements of Rule 144 are not met, compliance with another registration exemption will be required; and that, although Rule 144 is not exclusive, the staff of the SEC has expressed its opinion that persons or entities proposing to sell private placement securities other than in a

UCC_019665

registered offering and other than pursuant to Rule 144 will have a substantial burden of proof in establishing that an exemption from registration is available for such offers or sales, that such persons or entities and the brokers who participate in the transactions do so at their own risk, and that, therefore, there is no assurance that any exemption from registration under the Securities Act will be available or, if available, will allow such person or entity to dispose of, or otherwise transfer, all or any portion of the Securities.

7.  **Access to Information**. Agent has had an opportunity to discuss Borrower's business, management and financial affairs with Borrower's management and the opportunity to inspect Borrower facilities and such books and records and material contracts as Agent deemed necessary to its determination to purchase the Securities. Agent has relied only upon the information made available to it by Borrower, or information from books and records of Borrower. No oral representations have been made or oral information furnished to Agent or its advisor(s) by Borrower in connection with the offering of Securities which were not contained therein or were inconsistent therewith.

8.  **Risks**. Agent is aware that the Securities are highly speculative and that there can be no assurance as to what return, if any, there may be. Agent is aware that Borrower may issue additional securities in the future which could result in the dilution of Agent's ownership interest in Borrower.

9.  **Investment Entity**. Agent is authorized and otherwise duly qualified to purchase and hold the Securities; such entity has its principal place of business as set forth in he Loan Agreement; and such entity has not been formed for the specific purpose of acquiring the Securities.

10. **Accredited Investor**. Agent is an accredited investor as defined in Rule 501(a) of Regulation D promulgated under the Securities Act.

UCC_019666

## EXHIBIT A

## EXCHANGE AGREEMENT

This **EXCHANGE AGREEMENT** (this "Agreement"), dated as of [●], 201_, by and between Loot Crate, Inc.,[1] a Delaware corporation (the "Company"), and [Breakwater Credit Opportunities Fund, L.P.][2] (the "Holder"). Capitalized terms not defined herein shall have the meanings ascribed thereto in the Forbearance Agreement and First Amendment to Loan and Security Agreement, dated as of February 9, 2018, by and between the Company, Breakwater Credit Opportunities Fund, L.P., as agent to the Lenders and the Lenders (the "Forbearance Agreement").

**WHEREAS**, the Company has issued [220,614][3] shares of Series A Preferred Stock, par value $0.0001 per share (the "Series A Preferred Stock") to the Holder pursuant to the Forbearance Agreement, which such shares of Series A Preferred Stock may be exchanged into Exchange Shares of New Preferred in accordance with the terms and conditions of the Forbearance Agreement;

**WHEREAS**, the Holder owns the number of shares of Series A Preferred Stock as listed on the signature page attached hereto (the "Series A Preferred Shares");

**WHEREAS**, in accordance with Section 9 of the Forbearance Agreement, the Company and the Holder desire to enter into this Agreement, pursuant to which, among other things, the Company and the Holder shall exchange the Series A Preferred Shares for the number of Exchange Shares, as calculated below (the "Exchange");

**WHEREAS**, following the Exchange, the Series A Preferred Shares held by Holder shall be automatically cancelled and terminated and the Holder shall have no further rights pursuant to the Series A Preferred Shares; and

**WHEREAS**, the Exchange is being made in reliance upon the exemption from registration provided by Section 3(a)(9) of the Securities Act of 1933, as amended (the "Securities Act").

**NOW, THEREFORE,** in consideration of the premises and mutual covenants herein below, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      The Exchange. At the Closing (as defined below), the Company and the Holder shall, pursuant to Section 3(a)(9) of the Securities Act, convert the Series A Preferred Shares into Exchange Shares, as follows:

1.1.      Closing. The Exchange shall occur remotely by exchange of signatures. The closing of the Exchange shall occur on such date as determined in accordance with Section 9(f) of the Forbearance Agreement or such later date as is mutually agreed to by the Company and the Holder (the "Closing").

1.2.      Exchange Shares. The Holder shall receive the number of Exchange Shares as calculated in accordance with Section 9 of the Forbearance Agreement. No fractional shares or scrip representing fractional shares shall be issued upon the Exchange.

---

[1] Or ultimate parent company of Borrower or Holdings (as defined in the Forbearance Agreement), as applicable.
[2] Or its designee.
[3] Or such greater number issued in accordance with Section 9.

UCC_019667

1.3.    <u>Consideration</u>.  At the Closing, the Exchange Shares shall be issued to the Holder in exchange for the Series A Preferred Shares without the payment of any other consideration by the Holder that would not be consistent with the application of Section 3(a)(9) of the Securities Act to the issuance of the Exchange Shares.  The Holder hereby agrees that, upon and subject to the Closing, all of the Company's obligations under the terms and conditions of the Series A Preferred Shares shall automatically terminated and cancelled in full without any further action required, and that this Section 1.3 shall constitute an instrument of termination and cancellation of such Series A Preferred Shares.

1.4.    <u>Delivery</u>.  In the Exchange, the Company shall, at the Closing, deliver the Exchange Shares to the Holder (in electronic or certificated form as determined by the Company and its transfer agent).  The Holder shall deliver or cause to be delivered to the Company (or its designee), within five (5) business days after the Closing, the original stock certificate representing the Exchange Shares. For the avoidance of doubt, as of the Closing all of the Holder's rights under the terms and conditions of the Preferred Stock shall be extinguished.

1.5.    <u>Other Documents</u>.  The Company and the Holder shall execute and/or deliver such other documents and agreements as are reasonably necessary to effectuate the Exchange pursuant to the terms of this Agreement.

2.    <u>Representations and Warranties</u>.

2.1.    <u>Holder Representations and Warranties</u>.  The Holder hereby represents and warrants to the Company:

(a)    The Holder is an entity validly existing and in good standing under the laws of the jurisdiction of its organization.

(b)    This Agreement has been duly authorized, validly executed and delivered by the Holder and is a valid and binding agreement and obligation of the Holder enforceable against the Holder in accordance with its terms, subject to limitations on enforcement by general principles of equity and by bankruptcy or other laws affecting the enforcement of creditors' rights generally, and the Holder has full power and authority to execute and deliver this Agreement and the other agreements and documents referred to in Section 1.5 and to perform its obligations hereunder and thereunder.

(c)    The Holder understands that the Exchange Shares are being offered, sold, issued and delivered to it in reliance upon specific provisions of federal and applicable state securities laws, and that the Company is relying upon the truth and accuracy of the representations, warranties, agreements, acknowledgments and understandings of the Holder set forth herein for purposes of qualifying for exemptions from registration under the Securities Act and applicable state securities laws.

(d)    The Holder is not acquiring the Exchange Shares as a result of any advertisement, article, notice or other communication regarding the Exchange Shares published in any newspaper, magazine or similar media or broadcast over television or radio or presented at any seminar or any other general advertisement.

(e)    The Holder, either alone or together with its representatives, has such knowledge, sophistication and experience in business and financial matters so as to be capable of evaluating the merits and risks of the prospective investment in the Exchange Shares, and has so evaluated the merits and risks of such investment.  The Holder is able to bear the economic risk of an investment in the Exchange Shares and, at the present time, is able to afford a complete loss of such investment.

UCC_019668

(f)     The Holder acknowledges that the offer, sale, issuance and delivery of the Exchange Shares to it is intended to be exempt from registration under the Securities Act, by virtue of Section 3(a)(9) thereof. The Holder understands that the Exchange Shares may be sold or transferred only in compliance with all federal and applicable state securities laws.

(g)     The Holder understands that the Exchange Shares are "restricted securities" and have not been registered under the Securities Act or any applicable state securities law and the Holder is acquiring the Exchange Shares as principal for its own account and not with a view to or for distributing or reselling such Exchange Shares or any part thereof in violation of the Securities Act or any applicable state securities law, has no present intention of distributing any of such Exchange Shares in violation of the Securities Act or any applicable state securities law and has no direct or indirect arrangement or understandings with any other persons to distribute or regarding the distribution of such Exchange Shares in violation of the Securities Act or any applicable state securities law (this representation and warranty not limiting such Holder's right to sell the Securities in compliance with applicable federal and state securities laws).  Such Holder is acquiring the Exchange Shares hereunder in the ordinary course of its business.

(h)     The Holder owns and holds, beneficially and of record, the entire right, title, and interest in and to the Preferred Shares free and clear of all rights and Encumbrances (as defined below). The Holder has full power and authority to transfer and dispose of the Preferred Shares to the Company free and clear of any right or Encumbrance. Other than the transactions contemplated by this Agreement, there is no outstanding vote, plan, pending proposal, or other right of any person to acquire all or any of the Preferred Shares. As used herein, "Encumbrances" shall mean any security or other property interest or right, claim, lien, pledge, option, charge, security interest, contingent or conditional sale, or other title claim or retention agreement, interest or other right or claim of third parties, whether perfected or not perfected, voluntarily incurred or arising by operation of law, and including any agreement (other than this Agreement) to grant or submit to any of the foregoing in the future. The Preferred Shares constitute all of the Preferred Stock owned or held of record or beneficially owned or held by the Holder.

2.2.     Company Representations and Warranties.  The Company hereby represents and warrants to the Holder:

(a)     The Company has been duly incorporated and is validly existing and in good standing under the laws of the State of Delaware, with full corporate power and authority to own, lease and operate its properties and to conduct its business as currently conducted, and is duly registered and qualified to conduct its business and is in good standing in each jurisdiction or place where the nature of its properties or the conduct of its business requires such registration or qualification, except where the failure to so register or qualify would not have a Material Adverse Effect. For purposes of this Agreement, "Material Adverse Effect" shall mean any material adverse effect on the business, operations, properties, or financial condition of the Company and its subsidiaries and/or any condition, circumstance, or situation that would prohibit or otherwise materially interfere with the ability of the Company to perform any of its obligations under this Agreement.

(b)     The Exchange Shares have been duly authorized by all necessary corporate action, and, when issued and delivered in accordance with the terms hereof, the Exchange Shares shall be validly issued and outstanding, fully paid and nonassessable, free and clear of all liens, encumbrances and rights of refusal of any kind.

(c)     This Agreement has been duly authorized, validly executed and delivered on behalf of the Company and is a valid and binding agreement and obligation of the Company enforceable against the Company in accordance with its terms, subject to limitations on enforcement by general

UCC_019669

principles of equity and by bankruptcy or other laws affecting the enforcement of creditors' rights generally, and the Company has full power and authority to execute and deliver this Agreement and the other agreements and documents contemplated hereby and to perform its obligations hereunder and thereunder.

(d)    The Company represents that it has not paid, and shall not pay, any commissions or other remuneration, directly or indirectly, to any third party for the solicitation of the Exchange pursuant to this Agreement. Other than the exchange of the Series A Preferred Shares, the Company has not received and will not receive any consideration from the Holder for the Exchange Shares.

(e)    The Company has not, nor has any person acting on its behalf, directly or indirectly made any offers or sales of any security or solicited any offers to buy any security under circumstances that would cause the Exchange and the issuance of the Exchange Shares pursuant to this Agreement to be integrated with prior offerings by the Company for purposes of the Securities Act which would prevent the Company from delivering the Exchange Shares to the Holder pursuant to Section 3(a)(9) of the Securities Act, nor will the Company take any action or steps that would cause the Exchange, issuance and delivery of the Exchange Shares to be integrated with other offerings to the effect that the delivery of the Exchange Shares to the Holder would be seen not to be exempt pursuant to Section 3(a)(9) of the Securities Act.

(f)    For the purposes of Rule 144 of the Securities Act, the Company acknowledges that the holding period of the Exchange Shares may be tacked onto the holding period of the Series A Preferred Shares pursuant to applicable rules, regulations and interpretations, and the Company agrees not to take a position contrary to this Section 2.2(f).

(g)    The execution, delivery and performance of this Agreement by the Company and the consummation by the Company of the transactions contemplated hereby (including, without limitation, the issuance of the Exchange Shares) will not (i) result in a violation of the certificate of incorporation or bylaws of the Company or (ii) conflict with, or constitute a default (or an event which with notice or lapse of time or both would become a default) in any respect under, or give to others any rights of termination, amendment, acceleration or cancellation of, any agreement, indenture or instrument to which the Company or any of its subsidiaries is a party, or (iii) result in a violation of any law, rule, regulation, order, judgment or decree (including foreign, federal and state securities laws and regulations and the rules and regulations by which any property or asset of the Company or any of its subsidiaries is bound or affected).

3.    Miscellaneous.

3.1.    Entire Agreement.  This Agreement constitutes the entire agreement, and supersedes all other prior and contemporaneous agreements and understandings, both oral and written, between the Holder and the Company with respect to the subject matter hereof.

3.2.    Amendment.  This Agreement may only be amended with the written consent of the Holder and the Company.

3.3.    Successors. All the covenants and provisions of this Agreement by or for the benefit of the Holder or the Company shall bind and inure to the benefit of their respective successors and assigns.

3.4.    Applicable Law; Consent to Jurisdiction. The validity, interpretation and performance of this Agreement shall be governed in all respects by the laws of the State of Delaware, without giving effect to conflicts of law principles that would result in the application of the substantive laws of another

UCC_019670

jurisdiction. Each of the parties hereby agrees that any action, proceeding or claim against it arising out of or relating in any way to this Agreement shall be brought and enforced in the courts of the State of Delaware or the United States District Court for the District of Delaware, and irrevocably submits to such jurisdiction, which jurisdiction shall be exclusive. Each party hereby waives any objection to such exclusive jurisdiction and that such courts represent an inconvenient forum.

3.5.    <u>Counterparts</u>. This Agreement may be executed in original or facsimile counterparts, each of such counterparts shall for all purposes be deemed to be an original, and all of such counterparts shall together constitute but one and the same instrument.

3.6.    <u>Severability</u>. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of this Agreement.

3.7.    <u>No Commissions</u>. Neither the Company nor the Holder has paid or given, or will pay or give, to any person, any commission, fee or other remuneration, directly or indirectly, in connection with the transactions contemplated by this Agreement.

* * * * * * *

UCC_019671

**IN WITNESS WHEREOF**, this Exchange Agreement has been duly executed by the undersigned as of the date first written above.

**HOLDER:**

**BREAKWATER CREDIT OPPORTUNITIES FUND, L.P.**[4]

By:_____
Name:
Title:

**EXCHANGE SHARES**:

_____

**ACKNOWLEDGEMENT**

This Exchange Agreement is hereby accepted upon the terms and conditions set forth above.

**LOOT CRATE, INC.**[5]

By:_____
Name:
Title:

Dated:_____

---

[4] Or its designee.
[5] Or ultimate parent company of Borrower or Holdings (as defined in the Forbearance Agreement), as applicable.

UCC_019672