Exhibit K

| | |
|---|---|
| From: | Christopher Davis |
| Sent: | Thu 11/02/2017 7:45 AM (GMT-04:00) |
| To: | Mark Suster; Terry Boyle; Ynon Kreiz; Ryan Hibbard; Mari Provenzano; Hobson, Nick; Linda Menzel; Saif Mansour; Matthew Arevalo; Chris Powell |
| Cc: | |
| Bcc: | |
| Subject: | Series B Term Sheet from Management/New Investors |
| Attachments: | Untitled.html; Loot Crate Series B Term Sheet_signatures.pdf |

Here is the Series B management term sheet with committed signatures. This represents the third option for near term capital for the board to consider.

**Key Terms:**
Capital amount: $7.25-$10 million
Post Money: $100 Million
Liquidation Preference: 3x
Strong governance and management oversight
No participation, just liquidation preference
No ratchet

--
**Chris Davis**
Loot Crate | CEO/Co-Founder | M: 408.464.0111
3401 Pasadena Avenue, Los Angeles, CA 90031

# TERM SHEET
# FOR SERIES B PREFERRED STOCK FINANCING OF
# LOOT CRATE, INC.
## November 1, 2017

The following is a summary of the principal terms with respect to the proposed Series B Preferred Stock financing of Loot Crate, Inc. a Delaware corporation (the "*Company*"). Except for the section entitled "Exclusivity & Confidentiality," such summary of terms does not constitute a legally binding obligation. Any other legally binding obligation will only be made pursuant to definitive agreements to be negotiated and executed by the parties. This Term Sheet is not a commitment to invest, and is conditioned on the completion of due diligence, legal review and documentation that is satisfactory to the Investors. This Term Sheet shall be governed in all respects by the laws of the State of Delaware.

## OFFERING TERMS

| | |
|---|---|
| Closing Date: | As soon as practical following the Company's acceptance of this Term Sheet and satisfaction of the Conditions to Closing (the "*Closing*") with the collective goal to close no later than November 24, 2017. |
| Securities to be Issued: | Shares of Series B Preferred Stock of the Company (the "*Series B Preferred*"). The Series B Preferred shall have a 3x liquidation preference that is pari passu to all other Preferred Stock of the Company (the "*Preferred Stock*"). |
| Amount Raised: | Up to $10,000,000 in new equity funding, not including the conversion of outstanding promissory notes (the "*Series B Financing*") but not less than $7.25 million. |
| Investors: | Accredited investors approved by the Company (the "*Investors*"). |
| Price Per Share: | Price per share for the Series B Preferred (the "*Series B Original Purchase Price*") shall be based on a fully-diluted post-money valuation of $100,000,000 including an available employee option pool representing 5% of the fully-diluted post-money capitalization. |
| Dividends: | Non-cumulative dividends will be paid on the Senior Preferred (defined below) when and if declared by the Board. |
| Liquidation Preference: | Upon Liquidation of the Company, sale of the Company or substantially all of Company's assets, or any Change in Control of Company; the Series B Preferred shares shall have First priority preference and seniority to any distributions to any holders of the Company's common stock. The Series B Preferred Stock shall receive an amount equal to 3 times (3x) the Total Series B Investment Amount *pari passu* to the preferences of any other Preferred Stock. |
| Conversion: | Each share of the Senior Preferred initially converts 1:1 to Common Stock at any time at the option of the holder, subject to adjustments for stock dividends, splits, combinations and similar events and as described below under "Anti-dilution Provisions". |
| Voting Rights: | Votes together with the Common Stock on all matters on an as-converted basis. Approval of a majority of the Series B Preferred Stock, voting as a single class, is required to (i) adversely change rights of the Preferred Stock; (ii) change the authorized number of shares; (iii) redeem or repurchase any shares (other than pursuant to the Company's right of repurchase at original cost); (iv) declare or pay any dividend; (v) change the number of directors or board observers; (vi) issue any shares with rights, preferences and privileges that are senior to the Senior Preferred; or (vii) liquidate or dissolve, including any change of control. (viii) liquidate any |

assets with aggregate value of in excess of $250,000, including but not limited to business units, aged inventory, and property or equipment."

| | |
|---|---|
| Board of Directors: | At the Initial Closing, the Board shall consist of five (5) members comprised of: (i) one representative of the series B; (ii) one representative of the series A; (iii) one (1) CEO of Loot Crate and (iv) two (2) representatives as the Independent Directors to be nominated by a majority of either the Series A or Series B Preferred Stock and approved by the majority of the Common Stock (approval not to be unreasonably withheld), who will initially be Ynon Kreiz and Terry Boyle. |
| Board Observer: | Breakwater Credit Opportunities Fund, L.P. shall maintain the right to appoint a representative to observe all meetings of the Board of Directors in a non-voting capacity as an observer. |
| Existing Debt Resolution: | The investment will be subject to satisfactory resolution of the potential default related to outstanding debt and satisfactory restructuring of covenants and terms therein. |
| | In connection with outstanding Company debt, (i) any breaches of existing debt covenants and negotiation of future debt covenants under the existing loan facility(ies) shall be resolved prior to and as a condition to closing of the Series B Financing, or (ii) such loan facility(ies) will be refinanced by a new debt provider, which such new debt facility shall close concurrently with the Series B Preferred Financing. |
| | For avoidance of doubt, any additional termination or restructuring expenses incurred in conjunction with the resolution or restructuring of existing debt facility(ies) shall reduce the pre-money valuation of the Series B Preferred Financing on a dollar-for-dollar basis, and any additional warrants or other securities issued to existing lender(s) in connection with such a termination or restructuring, and/or any new warrant coverage required by a new debt provider, will be included in the pre-money fully diluted share count. |
| Financial Governance: | The Series B Preferred Financing will be conditioned on (i) a schedule of use of proceeds from the Series B Financing prior to closing (ii) a monthly Operating Expenses budget and 2018 revenue and expense budget prior to closing, and (iii) a commitment to execute an authorized plan to immediately monetize obsolete inventory prior to the Initial Closing. |
| Operational Reporting & Governance | Cash controls must be in place such that the CEO cannot solely approve cash transactions without the signature of the most senior finance professional in the company and the CEO cannot commit the Company to any expenditures on a go-forward basis. |
| Anti-dilution Provisions | In the event the Company issues additional securities at a purchase price less than the then-current Series B Preferred conversion price, such conversion price shall be adjusted in accordance with the broad based weighted average formula. |
| Hold-back Provision: | In the event that the Company is sold and the acquirer asks for funds to be held back or escrowed, the Company must ensure all Investors with liquidation preference are paid their full preference before any Investor proceeds are held back or escrowed. |
| Financial Information: | Investors who own a minimum of 250,000 shares ("*Major Investors*") will receive standard information and inspection rights and management rights letter. |
| Founder Matters: | Each Founder shall have assigned all relevant IP to the Company prior to closing. |

| | |
|---|---|
| Hiring Inclusion Rule: | The Investors strive to invest in companies that are consciously working to create a diverse leadership team, one that's inclusive across gender, ethnicity, age and national origins. While Investors would never impose hiring decisions, we aim to reduce the potential impact of unconscious bias for key C-Level and senior roles within a company. We therefore ask that each portfolio company include an "inclusion rule" in its HR policies so that at least one woman and/or member of a population currently underrepresented within the Company shall be formally interviewed for any open executive position. |
| Conditions to Closing: | The investment will be subject to customary conditions, including but not limited to (i) completion of due diligence to the satisfaction of the Investors (including legal diligence, reference checks and validation of key business metrics presented by management), (ii) negotiation and execution of definitive agreements customary in transactions of this nature, including a legal opinion from the Company's legal counsel. |
| Counsel and Expenses: | Company counsel to draft closing documents, which documents will include standard representations and warranties by the Company, preferred director consent rights and standard right of first refusal and co-sale rights. The Company to pay all legal and administrative costs of the financing at Closing, including reasonable fees and expenses of Investor counsel up to $60,000. |
| Exclusivity and Confidentiality: | So long as the parties are moving forward with the completion of the transaction contemplated by this Term Sheet, the Company will not after the date of this Term Sheet solicit or encourage new proposals or initiate or engage in further discussions with respect to the sale of its stock or substantially all of its assets prior to the date that is sixty (60) days after the date of execution of this Term Sheet by both Upfront V, L.P. and the Company (the "*Exclusivity Date*").  The exclusivity clause can be waived by a majority of "Investors" for new proposals or engaging in additional conversations with interested parties. |
| | Notwithstanding the foregoing, in the event the parties are still working towards a closing in good faith on the Exclusivity Date, the Exclusivity Date shall automatically be extended by 15 days. The terms and conditions of this term sheet are confidential information of the parties and shall not be disclosed without the written consent of the other party, except that each party may disclose this term sheet to its legal and other advisors as well as to potential investors acceptable to Upfront V, L.P. and the Company. |
| Expiration: | This Term Sheet expires on November 2, 2017 at 9:00am Pacific Time if not accepted by the Company by that date and time. |

SIGNATURE PAGE TO FOLLOW

UCC_018994

By signing below you accept the proposed terms above. This Term Sheet is non-binding (except as to Exclusivity & Confidentiality) and a binding agreement will only exist when and if the parties execute definitive agreements with respect to the matters covered by this Term Sheet.

| | |
|---|---|
| **COMPANY: LOOT CRATE, INC.** | **INVESTORS: GEORGE DAVIS, DAVIS FAMILY** |
| | By: |
| By: | By: *[signature]* |
| Name: Christopher Davis | Name: George S. Davis |
| Title: CEO | Title: |
| Date: | Date: 11/1/2017 |
| | $500,000.00 |

UCC_018995

By signing below you accept the proposed terms above. This Term Sheet is non-binding (except as to Exclusivity & Confidentiality) and a binding agreement will only exist when and if the parties execute definitive agreements with respect to the matters covered by this Term Sheet.

| COMPANY: LOOT CRATE, INC. | INVESTORS: TENONETEN VENTURES, LLC |
|---|---|
| By:_____ | By: _[signature]_____ |
| Name: Christopher Davis | Name: David Waxman |
| Title: CEO | Title: Managing Director |
| Date: _____ | Date: November 1, 2017 |

By signing below you accept the proposed terms above. This Term Sheet is non-binding (except as to Exclusivity & Confidentiality) and a binding agreement will only exist when and if the parties execute definitive agreements with respect to the matters covered by this Term Sheet.

| | |
|---|---|
| **COMPANY: LOOT CRATE, INC.** | **INVESTORS: RYAN HIBBARD AND FAMILY** |
| By: _____ | By: *[signature]* |
| Name: Christopher Davis | Name: Ryan Hibbard |
| Title: CEO | Title: _____ |
| Date: _____ | Date: 11/1/2017 |

UCC_018997

By signing below you accept the proposed terms above. This Term Sheet is non-binding (except as to Exclusivity & Confidentiality) and a binding agreement will only exist when and if the parties execute definitive agreements with respect to the matters covered by this Term Sheet.

| COMPANY: LOOT CRATE, INC. | INVESTORS: CLEMENTINE CAPITAL, TPL |
|---|---|
| By:_____ | By: _/s/_____ |
| Name: Christopher Davis | Name: _Nick Grove_ |
| Title: CEO | Title: _Authorized Signatory_ |
| Date: _____ | Date: _1/1/17_ |

UCC_018998

Email confirmation from Drew Oetting, 8VC partner confirming $500k investment

> Drew Oetting
> Re: Term Sheet
> To: Christopher Davis
>
> I confirm 500k assuming customary legal diligence and full completion of the round according to conversations with management
>
> Sent from my iPhone
>
> On Nov 1, 2017, at 3:12 PM, Christopher Davis <chris@lootcrate.com> wrote:
>
>> --
>> Chris Davis
>> Loot Crate | CEO/Co-Founder | M: 408.464.0111
>> 3401 Pasadena Avenue, Los Angeles, CA 90031
>> <Series B Term Sheet Draft - Management Team F&F v.4.docx>

UCC_018999