Exhibit O

**EXECUTION COPY**

## FORBEARANCE AGREEMENT #2 AND WAIVER TO LOAN AND SECURITY AGREEMENT

This FORBEARANCE AGREEMENT #2 AND WAIVER TO LOAN AND SECURITY AGREEMENT (this "**Agreement**") is made and entered into as of May 8, 2018 among **BREAKWATER CREDIT OPPORTUNITIES FUND, L.P.**, a Delaware limited partnership with an office located at 1999 Avenue of the Stars, Suite 3430, Los Angeles, CA 90067, as agent for the Lenders (in such capacity, and any successors and assigns (and, for purposes of every equity issuance or future equity issuance contemplated hereby, together with any of its Affiliated designees), "**Agent**"), **LOOT CRATE, INC.**, a Delaware corporation ("**Borrower**" or "**Loot Crate**"), **LOOT CRATE HOLDINGS, INC.** ("**Holdings**") and the undersigned Lenders (as defined in the hereinafter defined Loan Agreement). Capitalized terms not defined herein shall have the meanings ascribed thereto in the Loan Agreement (as defined below) or, if not defined therein, the other Loan Documents.

### R E C I T A L S:

A.    WHEREAS, the Loan Parties, the Lenders party thereto, and Agent are parties to that certain Loan and Security Agreement, dated as of June 1, 2016 (as amended by (i) that certain Forbearance Agreement and First Amendment to Loan and Security Agreement dated as of February 9, 2018 (the "**Prior Forbearance Agreement**") and (ii) that certain Joinder and Second Amendment to Loan and Security Agreement, dated as of March 21, 2018, and as the same may be further amended, restated, supplemented, or otherwise modified from time to time, the "**Loan Agreement**");

B.    WHEREAS, the Events of Default described in Schedule 3 hereto have occurred and are continuing (the "**Existing Defaults**").  As a consequence of the Existing Defaults, Agent and the Lenders are free to exercise any and all rights and remedies available to them under the Loan Documents and applicable law;

C.    WHEREAS, the Loan Parties requested that Agent and the Lenders forbear from exercising certain rights and remedies available to Agent and the Lenders under the Loan Documents and applicable law; and

D.    WHEREAS, Agent and the Lenders are willing to forbear from exercising such rights and remedies, subject to the terms and conditions contained in this Agreement.

NOW, THEREFORE, in consideration of the foregoing premises, which are hereby incorporated into and made a part of this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the undersigned, intending to be legally bound, does hereby agree as follows:

1.    <u>Certain Defined Terms</u>.  As used herein, the following defined terms shall have the following meanings:

      (a)    "**Additional Warrant**" means that certain Warrant to Purchase Common Stock dated as of the date hereof, issued to Agent for an additional 0.50% (on a fully diluted basis) of the Common Stock of Parent.

      (b)    "**Default**" shall mean a default or any other breach by any Loan Party of any representation, warranty, covenant, or agreement under any of the Loan Documents other than an Event of Default, which is not cured to the satisfaction

1

UFV-039348

of Agent within five (5) Business Days of either (A) notice or (B) a Responsible Officer of a Loan Party obtaining knowledge thereof.

(c) "**Forbearance Deliverable**" shall mean any of (i) a Cash Balance Report, (ii) a Rolling Cash Flow Report, (iii) a Cash Flow Variance Report and/or (iv) a Subscriber Report and "**Forbearance Deliverables**" shall mean all of them, collectively.

(d) "**Forbearance Period**" shall mean the period from the Effective Date until the Termination Date.

(e) "**Parent**" means Loot Crate Parent, Inc.

(f) "**Prior Forbearance Compensation Series A Shares**" means those certain 220,614 shares of the authorized but unissued shares of Series A Preferred Stock of Borrower that were issued to Breakwater Credit Opportunities Fund, L.P. pursuant to the Prior Forbearance Agreement.

(g) "**Stated Termination Date**" shall mean March 31, 2019.

(h) "**Strategic Transactions Committee**" shall have the meaning as assigned in the Voting Agreement as in effect on the Effective Date.

(i) "**Termination Date**" shall mean the earliest to occur of (i) the Stated Termination Date, (ii) the date of the occurrence of any Default or an Event of Default (other than an Existing Default), (ii) the failure to timely deliver any Forbearance Deliverable or any other notice, update or report required pursuant to Section 8(a) or 8(b) as and when due (subject to any cure periods expressly set forth herein), which has not been cured within three (3) Business Days of such failure), (iii) any other breach of any obligation under this Agreement (including, without limitation, any default in payment of any obligation set forth on Schedule 6 as and when due (any such default in payment shall be an Event of Default) or any default in the payment or performance of any other obligation in Section 8 or 9) and (iv) the date upon which any voluntary or involuntary bankruptcy or insolvency proceeding is filed by or against any Loan Party.

(j) "**Voting Agreement**" shall mean that certain Voting Agreement by and among each of Parent and the Required Parties (as defined therein), as amended or otherwise modified and in effect on the Effective Date.

2. <u>Acknowledgments</u>. Each Loan Party hereby acknowledges, agrees and agrees not to contest, the following:

(a) The Existing Defaults have occurred and are continuing, and, (i) as a consequence thereof, subject to and but for the terms of this Agreement, Agent and the Lenders would be free to exercise any and all rights and remedies available to them under the Loan Documents and applicable law, including, without limitation, the right of the Agent to declare all Obligations immediately due and payable and to exercise the other rights described in Section 9.1 of the Loan Agreement and (ii) effective as of January 1, 2017, the Obligations began accruing (and shall continue to accrue both during and after the Forbearance Period) interest at the Default Rate pursuant to the terms of the Loan Agreement.

2

UFV-039349

(b) Agent has valid and perfected Liens in and to the Collateral.

(c) As of the date hereof, (i) the total unpaid outstanding principal and accrued interest of the Term Loan is $15,379,703.32, which is comprised of: (A) total unpaid outstanding principal amount of the Term Loan of $14,312,500.00, *plus* (B) unpaid accrued interest on the Term Loan of $1,021,798.07, *plus* (C) eight (8) days of cash accrued interest of $45,405.25; and (ii) the unpaid amount of Lender Expenses comprised of the fees and expenses of Morgan, Lewis & Bockius LLP, which have been invoiced prior to the date hereof is $574,912.25, which amount shall be subject to a 10% discount to the extent such fees are timely paid as provided in Section 8(f)(i)(A) and Schedule 6. Such amounts constitute a part of the Obligations, remain outstanding and unpaid, are validly owing to Agent and the Lenders by the Loan Parties, and are not subject to any right of offset, deduction, claim, or counterclaim in favor of any Loan Party.

(d) Subject to the terms of this Agreement, Agent and the Lenders have not waived and do not hereby waive any defaults or Events of Default including, without limitation, the Existing Defaults, nor does Agent or any of the Lenders waive any rights or remedies available to them under any of the Loan Documents or applicable law, including without limitation the right to declare all Obligations to be immediately due and payable or to exercise the other rights described in Section 9.1 of the Loan Agreement, and Agent's and the Lenders' agreement to forbear from exercising certain of their rights and remedies shall not invalidate, impair, negate or otherwise affect Agent's and each Lender's ability to exercise any other rights and remedies they may have under the Loan Documents or applicable law.

(e) (i) each and every commitment of Agent and each Lender to make loans or other extensions of credit to or for the benefit of Borrower under the Loan Documents has heretofore terminated, (ii) Agent and the Lenders are not obligated, and do not intend, to make any further loan or other extension of credit to or for the benefit of Borrower under the Loan Documents or otherwise and (iii) nothing in this Agreement shall be implied or construed to obligate Agent or any of the Lenders to extend this Agreement or the Forbearance Period beyond the terms hereof.

3.    Forbearance.  In reliance upon the representations, warranties, agreements and covenants of the Loan Parties set forth herein and in the Loan Documents, during the Forbearance Period, Agent and the Lenders agree to forbear from (i) declaring all Obligations to be immediately due and payable and (ii) taking any actions to foreclose or otherwise enforce their Liens upon the Collateral, in each case, as a result of the occurrence and continuance of the Existing Defaults.

4.    Waivers to Loan and Security Agreement.  The Lenders hereby

(a) waive, solely during the Forbearance Period, any scheduled amortization payments of the principal amount of the Term Loan pursuant to Section 2.4(a) of the Loan Agreement; provided, for the avoidance of doubt, that any such scheduled amortization payments that occur after the Termination Date shall remain due and payable in accordance with Section 2.4(a) of the Loan Agreement; and

(b) waive the application of the Prepayment Premium and in furtherance thereof agree, that notwithstanding anything in Section 2.04(c) or Section 2.06 in the Loan Agreement to the contrary, there shall be no Prepayment Premium due in connection with any payment or prepayment in whole or in part of the Term Loan for any reason.

3

UFV-039350

5. <u>Conditions to Forbearance</u>.  Each Loan Party hereby acknowledges and agrees that compliance with the following shall constitute conditions precedent to Agent's and the Lenders' agreement to forbear, and to continue to forbear, as herein provided (the date that all such conditions precedent are satisfied to the satisfaction of Agent being the "**Effective Date**"):

(a)    The Loan Parties shall deliver to Agent an executed copy of this Agreement, duly and properly executed by each Loan Party, together with such other documentation as Agent may reasonably require;

(b)    The Loan Parties shall have delivered to Agent a Cash Balance Report (as defined below) that is current as of the Effective Date;

(c)    The Loan Parties shall have delivered to Agent a cash flow forecast in form and substance acceptable to Agent, which shows projected cash receipts of the Loan Parties and all projected cash disbursements of the Loan Parties (including prepaid expenses and cash outflows) in each case for the succeeding thirteen weeks (the "**Projected Cash Flow Report**")

(d)    There being no actions or proceedings pending or, to the knowledge of any Responsible Officer of Borrower, threatened in writing by or against any of the Loan Parties except as set forth on Schedule 1 hereto, which Schedule 1 shall set forth a reasonably detailed description of any such matters and the estimated amount in dispute with respect thereto;

(e)    The Loan Parties shall deliver to Agent an executed amendment to the Voting Agreement, in form and substance satisfactory to Agent, together with any other related executed documents or consents necessary to effectuate such amendments as determined by Agent in its sole discretion;

(f)    The Loan Parties shall have delivered to Agent an up-to-date report detailing the number of subscribers of Borrower, including information about subscription period and "churn rate" of such subscribers (the "**Subscriber Report**");

(g)    The Loan Parties shall have caused Parent to execute and deliver the Additional Warrant;

(h)    The Loan Parties shall deliver to Agent a certificate, executed by a Responsible Officer of each Loan Party, attaching resolutions authorizing the transactions contemplated by this Agreement including, without limitation, the execution of the Additional Warrant;

(i)    Borrower shall execute and deliver to Agent an amended and restated fee letter in form and substance satisfactory to Agent (the "**Fee Letter**");

(j)    The Loan Parties shall have delivered to Breakwater Credit Opportunities Fund, L.P. a copy of an executed proxy of Christopher Davis as provided for under the Voting Agreement and that certain letter agreement by and among Christopher Davis and Breakwater Credit Opportunities Fund, L.P, in each case executed contemporaneously herewith, which proxy shall be in form and substance satisfactory to Agent;

(k)    The Loan Parties shall be in compliance with the requirements of Section 9 hereof for the month ended March 31, 2018; and

4

(l)    The Loan Parties shall have delivered to Agent a certificate of a Responsible Officer of Borrower dated as of the Effective Date, certifying that Borrower has satisfied (or the Lenders shall have waived) each of the conditions set forth in this Section 5 (together with supporting calculations in the case of clause (k)) and such other matters as Agent may require.

6.    <u>Strategic Process Financial Advisor</u>. The parties hereto acknowledge that the Borrower will have, at its option exercisable at any time, the option to retain a strategic process financial adviser, which financial advisor shall be subject to the approval of Agent (such approval not to be unreasonably withheld), and which financial advisor shall report to the Strategic Transactions Committee, which Strategic Transactions Committee will determine the duties, responsibilities, services and scope of work to be performed by such financial advisor. All costs and fees of such financial advisor shall be paid by the Borrower at the Borrower's sole expense.

7.    <u>Representations and Warranties</u>. Each Loan Party hereby represents and warrants to Agent and each Lender that, as of the date hereof:

(a)    there are no Defaults or Events of Default other than the Existing Defaults;

(b)    each Loan Party is duly organized and in good standing under the laws of the State of Delaware, is duly and legally authorized to enter into this Agreement, and has complied in all material respects with all laws, rules, regulations, charter provisions, and bylaws to which it may be subject, that this Agreement has been duly executed by each such Loan Party party thereto and is enforceable against such Loan Party in accordance with its terms, and that the execution of this Agreement by such Loan Party will not conflict with its organizational or governing documents or applicable law and that the undersigned representative is authorized to act on behalf of and bind such Loan Party in accordance with the terms of this Agreement;

(c)    it has not entered into any agreements, mortgages, financing statements, security agreements, security deeds, or any other agreement or instrument of any nature whatsoever which in any manner affects its right, title, interest, or ability to perform as herein provided;

(d)    no Loan Party has committed any act of fraud or deceit in connection with the transactions involving Agent and/or the other Lenders, including without limitation knowingly furnishing of any materially false information, financial or non-financial, knowingly withholding of any material information, financial or non-financial, or knowingly making of any warranties or representations which are materially untrue as of the date hereof;

(e)    as of the date hereof, the capitalization of Borrower, Holdings and Parent are set forth on Schedule 4, which includes all (i) issued and outstanding Common Stock, (ii) granted stock options, (iii) shares of Common Stock reserved for future award grants under the 2012 Stock Plan, (iv) each series of Preferred Stock, and (v) warrants or stock purchase rights or other convertible securities, if any.

8.    <u>Covenants</u>. Each Loan Party hereby agrees with Agent and the Lenders that it shall, and shall cause its Subsidiaries to, do all of the following, in each case in form and substance reasonably satisfactory to Agent:

(a)    <u>Forbearance Deliverables</u>. Deliver to Agent:

UFV-039352

(i)    on each Business Day during the Forbearance Period, a daily cash balance report reflecting cash on deposit in all of Borrower's Deposit Accounts and/or cash equivalent investments in all of Borrower's Securities Accounts as of each such Business Day, which shall exclude merchant receivables (each, a "**Cash Balance Report**");

(ii)    on the last day of each month during the Forbearance Period, an updated Subscriber Report;

(iii)    on each Friday to occur during the Forbearance Period, a rolling update to the Projected Cash Flow Report in form and substance acceptable to Agent, which shows projected cash receipts of the Loan Parties and all projected cash disbursements of the Loan Parties (including prepaid expenses and cash outflows) in each case for the subsequent 13-week period (the "**Rolling Cash Flow Report**"); and

(iv)    concurrent with the delivery of each Rolling Cash Flow Report, a report detailing any variances between such Rolling Cash Flow Report and each previously delivered Rolling Cash Flow Report (the "**Cash Flow Variance Report**").

(b)  <u>Notices; Progress Reports</u>.  Deliver to Agent:

(i)    not later than 1 Business Day after receipt by any Loan Party, or knowledge of any Responsible Officer, of notice or any written threat of any action or other proceeding, an updated schedule of all such pending or threatened actions or other proceedings, along with a reasonably detailed description of such matters and the estimated amount in dispute;

(ii)    on a regular basis and at least as frequently as each Friday during the Forbearance Period, weekly updates on progress with respect to each item on Dendera Advisory, LLC's ("**Dendera**") initial scope of work as set forth on Schedule 2 hereto, and including updates with respect to the New Financing and any other equity financing transactions; and

(iii)    on a weekly basis, or as more frequently as may be required by Agent, updates on the status of the New Financing, including terms, investors, conditions and expected closing date.

(c)  <u>Collateral Information</u>.  Within 2 Business Days of reasonable request by Agent or any Lender, execute and deliver any necessary or requested Account Control Agreements, IP Security Agreements or any other documentation required in order to maintain, perfect, or better perfect Agent's (on behalf of itself and the Lenders) Liens in any or all of the Collateral, subject to limitations set forth in the Loan Agreement.

(d)  <u>New Financing</u>.  Consummate one or more debt or equity financings in form and substance and on terms satisfactory to Agent and pursuant to documentation and a capital structure approved by the Agent (which shall require, among other things, that such equity include a satisfactory liquidation preference) which shall (i) be accompanied by evidence of approval by Borrower's, Holdings' (if applicable) and Parent's respective Boards of Directors (and common and/or preferred shareholders as necessary), (ii) provide liquidity, in a single or series of issuances, to Borrower in an aggregate amount of not less than $3,000,000 (the "<u>New Financing</u>"), and (iii)

UFV-039353

shall be consummated by, and funds thereunder shall be received by the Borrower on or before, the date that is sixty (60) days after the Effective Date.

(e) <u>Vendor/Supplier Report Updates</u>. Deliver to Agent upon request an updated report listing any termination or requested termination of services or goods by any vendor or supplier and any COD requirements (the "**Vendor/Supplier Report**"), and to the extent of any terminations or pending terminations by any vendor or supplier as set forth in such updated report, within a reasonable amount of time, at the request of Agent, schedule a teleconference with Agent to review information regarding the replacement of such supplier, vendor, or product, which teleconference call shall occur within two (2) Business Days following request by Agent.

(f) <u>Legal Expenses</u>.

    (i) The Loan Parties shall:

        A. make all payments, as and when due, required pursuant to Schedule 6, which sets forth the plan for payment of certain Lender Expenses comprised of fees, costs and expenses of Morgan, Lewis & Bockius LLP, invoiced on or prior to April 24, 2018; <u>provided</u>, that at such time as Borrower and/or its Affiliates consummate one or more debt or equity financings in an aggregate amount of not less than $7,000,000, all such payments shall accelerate and the aggregate amount of such fees, costs and expenses shall become immediately due and payable by Borrower;

        B. subject to Section 8(f)(i)(C), pay all fees, costs and expenses of Morgan, Lewis & Bockius LLP invoiced after the Effective Date within thirty (30) days of presentation of an invoice therefor; and

        C. on the Termination Date, pay all fees and expenses due and payable under the Loan Agreement including, without limitation, all Lender Expenses (including, without limitation, all fees, costs and expenses of Morgan, Lewis & Bockius LLP).

    (ii) After the Effective Date, upon request by the Loan Parties no more than once per billing cycle of the Loan Parties, Agent shall use reasonable efforts to cause Morgan, Lewis & Bockius LLP to provide the Loan Parties with an update of fees and expenses then outstanding, together with an estimate of fees and expenses through the end of the current billing cycle of the Loan Parties, and thereafter shall endeavor to cause Morgan, Lewis & Bockius LLP to promptly notify the Loan Parties if it believes the estimated portion of such fees and expenses will exceed 115% of the estimated amount; <u>provided</u>, that this clause (f)(ii) shall be without liability to Agent.

9. <u>Minimum EBITDA</u>. The Loan Parties will not permit EBITDA of the Loan Parties, as of the last day of the most recently completed six-month period of the Loan Parties ended as of each date set forth on Schedule 5 on and after March 31, 2018, to be less than the amount set forth on Schedule 5 below such measurement date, as certified by a Responsible Officer of Borrower in a certificate delivered concurrent with delivery of each monthly Compliance Certificate.

UFV-039354

10.    <u>Forbearance Compensation</u>.

(a)  As consideration for the occurrence of the Effective Date:

(i)    Borrower shall cause Parent to issue to Agent, on or prior to the Effective Date, the Additional Warrant; and

(ii)    Borrower shall pay or accrue, to Agent, on behalf of the Lenders, the fees described in the Fee Letter.

(b)  The Lenders shall receive, on the date that is sixty (60) days after the Effective Date, ratably for their own account, $2,000,000 (the "**Forbearance OID Amount**"), which payment shall be in the form of Term Loans to Borrower deemed to be outstanding under the Loan Agreement and which will have the effect of increasing the principal amount of Term Loans outstanding under the Loan Agreement by $2,000,000; provided, that in the event the repayment in full in cash of all Obligations outstanding under the Loan Agreement occurs on or prior to September 30, 2018, $1,000,000 of the Forbearance OID Amount shall be forgiven by the Lenders.

11.    <u>Matters Regarding Series A Shares</u>.

(a)  At any time on or following the authorization and issuance of shares of a new series of Preferred Stock of Borrower (the "**New Preferred**"), Agent may, at its option, exchange the Prior Forbearance Compensation Series A Shares for 330,921 shares of New Preferred (or other appropriate number of shares that constitutes 2.50% of the Fully-Diluted (as defined below) capital stock of Borrower) (the "**Exchange Shares**").  In the event more than one new series of Preferred Stock of Borrower is authorized, the Exchange Shares shall be exchangeable into the series of New Preferred with the most senior preferred and with greatest liquidation preference. The Exchange Shares shall account for 2.50% of the Fully-Diluted capital stock of Borrower, in each case, calculated immediately following the effective time of Agent's exchange of the Prior Forbearance Compensation Series A Shares for Exchange Shares. If Agent elects to exchange the Prior Forbearance Compensation Series A Shares pursuant to the immediately preceding sentence, if such series of New Preferred is senior to the Prior Forbearance Compensation Series A Shares, Agent shall be entitled to, on a *pari passu* basis, any anti-dilution provisions applicable to such New Preferred and if such series of New Preferred is *pari passu* with or junior to the Prior Forbearance Compensation Series A Shares, Agent shall be entitled to, on a *pari passu* basis, any anti-dilution provisions applicable to such New Preferred; *provided, however*, that in the event the shares of New Preferred are issued at price per share less than the Prior Forbearance Compensation Series A Shares conversion price or carry a liquidation preference less than $11.43 per share, then the Exchange Shares shall be appropriately adjusted such that the number of Exchange Shares constitute 2.50% of the Fully-Diluted capitalization of Borrower and the aggregate liquidation preference of such Exchange Shares equals at least $3,807,623. Borrower covenants and agrees to reserve sufficient shares of New Preferred to permit the exchange if exercised by Agent in accordance with this Section 11(a).

(b)  In the event additional shares of Series A Preferred Stock are authorized in lieu of New Preferred, at the option of Agent, concurrently with such authorization, Borrower shall issue to Agent 110,307 shares of Series A Preferred Stock for no additional consideration (or other appropriate number of shares of Series A Preferred Stock such that, following such issuance, the total Prior Forbearance Compensation

8

Series A Shares held by Agent equals at least 2.50% of the Fully-Diluted capitalization of Borrower) (the "**Additional Forbearance Compensation Series A Shares**").

(c) In the event the holder of the Prior Forbearance Compensation Series A Shares exercises the exchange right under this Section 11, upon the earlier of (i) a date mutually agreed by the holder and Borrower and (ii) the date shares of New Preferred (or Additional Forbearance Compensation Series A Shares) are first issued by Borrower, Borrower and Agent shall execute and deliver the Exchange Agreement, in the form attached as Exhibit A to the Prior Forbearance Agreement, and Borrower shall deliver to the holder of the Exchange Shares in certificated form.

(d) Effective upon the exercise of the exchange right, with respect to the Exchange Shares, the holder thereof shall be entitled to the same rights, preferences, powers, and privileges of such New Preferred.

(e) Each of the undersigned holders of Borrower Securities agrees to vote or cause to be voted all shares of Common Stock and Preferred Stock owned by such holder, or over which such holder has voting control, from time to time and at all times, in whatever manner as shall be necessary to authorize and/or reserve the number of authorized shares of Common Stock and Preferred Stock from time to time to ensure that there will be sufficient shares of Common Stock and Preferred Stock available in the event the exchange right set forth in Section 11 is exercised by the holder of the Prior Forbearance Compensation Series A Shares at any given time.

(f) For purposes of this Section 11, "Fully-Diluted" means, as of the consummation of the New Financing, calculated on as converted to Common Stock basis, the sum of (A) all shares of Common Stock outstanding on such date, (B) all shares of Common Stock issuable in respect of all securities outstanding as of such date that are convertible into or exercisable or exchangeable for shares of Common Stock, and (C) purely for purposes of this definition, if a class of Borrower Securities is not convertible into or exercisable or exchangeable for Common Stock, one share of Common Stock for each share of such capital stock outstanding on such date; provided in the event the shares of New Preferred are issued at a price per share less than the Conversion Price (as defined in the Certificate of Incorporation of Borrower as in effect on the date hereof) applicable to the Series A Preferred Stock, then the number of Exchange Shares shall be appropriately increased such that the aggregate liquidation preference of such Exchange Shares equals at least $3,807,623.

12.    <u>Remedies Upon Default</u>.  In the event of the occurrence of the Termination Date, the Agent's and the Lenders' agreements to forbear as provided herein shall terminate, and Agent and the Lenders shall immediately be entitled to exercise any and all of their rights and remedies under any of the Loan Documents, at law, in equity, or otherwise, all without further notice except such notice as is required by applicable law.

13.    <u>No Waiver or Further Accommodations; No Novation</u>.    Each Loan Party hereby acknowledges and agrees that neither Agent nor any of the Lenders has waived any of the Existing Defaults; in addition, each Loan Party acknowledges and agrees that neither Agent nor any of the Lenders has agreed to forbear from exercising its rights and remedies under the Loan Documents with respect to any Default or Event of Default other than the Existing Defaults as set forth herein.  This Agreement is not intended to be nor shall it constitute a novation or accord and satisfaction of the Loan Documents or of the indebtedness evidenced and secured thereby.

UFV-039356

14.    <u>No Defense</u>.  Each Loan Party hereby agrees that the execution of this Agreement shall not be raised as and shall not constitute a defense or a claim to any subsequent exercise by Agent nor any of the Lenders of its rights and remedies under the Loan Documents or otherwise.

15.    <u>No Course of Dealing</u>.  Each Loan Party acknowledges that (a) except as expressly set forth herein neither Agent nor any of the Lenders has agreed to (and has no obligation whatsoever to discuss, negotiate or agree to) any restructuring, modification, amendment, waiver or forbearance with respect to the Term Loan or any of the terms of the Loan Documents, (b) no understanding with respect to any other restructuring, modification, amendment, waiver or forbearance with respect to the Term Loan or any of the terms of the Loan Documents shall constitute a legally binding agreement or contract, or have any force or effect whatsoever, unless and until reduced to writing and signed by authorized representatives of Loan Parties, Agent and the Lenders, and (c) the execution and delivery of this Agreement has not established any course of dealing between the parties hereto or created any obligation or agreement of Agent or any Lender with respect to any future restructuring, modification, amendment, waiver or forbearance with respect to the Term Loan or any of the terms of the Loan Documents.

16.    <u>Waiver and Release</u>.  In consideration of the forbearance and other accommodations granted herein and other good and valuable consideration, each Loan Party hereby waives, remises, releases and forever discharges Agent, each Lender, and each of their respective predecessors, successors, assigns, affiliates, shareholders, directors, officers, accountants, attorneys, employees, agents, representatives and servants of, from and against any and all claims, actions, causes of action, suits, proceedings, defenses, counterclaims, contracts, judgments, damages, accounts, reckonings, executions, and liabilities whatsoever of every name and nature, whether known or unknown, whether or not well founded in fact or in law, and whether in law, at equity or otherwise, which the undersigned ever had or now has for or by reason of any matter, cause or anything whatsoever to this date, including without limitation any matter relating to or arising out of any of the Loan Documents or the Obligations, any actual or alleged acts or omissions of Agent or any Lender with respect to the Loan Documents, any of the Obligations, and any Liens or collateral in connection therewith, or the enforcement of any of Agent's or any Lender's rights or remedies thereunder.

17.    <u>Survival</u>.  The terms of Sections 4(b), 11 and 16 shall survive the termination of this Agreement and the Loan Documents and shall remain in full force and effect after the Termination Date.

18.    <u>Further Assurances</u>.  In addition to this Agreement, each Loan Party hereby agrees to execute promptly any documentation Agent deems necessary in order to further effect the agreements herein made.

19.    <u>Ratification of Loan Documents</u>.  Each Loan Party hereby agrees that this Agreement is a Loan Document and hereby ratifies and affirms the Loan Documents, as modified by this Agreement, and acknowledges that the Loan Documents, as so modified, are and shall remain unchanged and in full force and effect, and the Liens granted in the Collateral thereby and held by Agent as of the Effective Date shall and do remain in full force and effect as valid and perfected Liens in favor of Agent therein and thereto. The Loan Parties agree that the Loan Documents, as modified by this Agreement, constitute valid and binding obligations and agreements of the Loan Parties enforceable by Agent and the Lenders against each of the Loan Parties in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

20.    <u>Time</u>.  Time is of the essence of this Agreement.

21.    <u>Binding Effect</u>.  The terms and conditions, covenants, agreements, powers, privileges and notices of authorization contained herein shall be binding upon and shall inure to the benefit of Agent, the Lenders, the Loan Parties, and their respective successors, assigns, agents, and attorneys.  No person other

10

UFV-039357

than the parties hereto shall be authorized to rely upon the contents of this Agreement or be deemed a beneficiary thereof.

22.    <u>Severability</u>.  Wherever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under any such law, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision, or the remaining provisions of this Agreement.

23.    <u>Choice of Law and Venue; Jurisdiction; Jury Trial Waiver</u>. Each of the parties hereto acknowledges and agrees that all of the provisions set forth in Section 11 of the Loan Agreement shall apply to this Agreement as if incorporated herein, *mutatis mutandis*.

24.    <u>Construction of this Agreement</u>.  This Agreement constitutes and embodies the entire understanding and agreement between the parties hereto with respect to the subject matter hereof and thereof and supercedes any and all prior agreements, promises, negotiations, representations, understandings or inducements, whether express or implied, oral or written regarding the terms hereof. This Agreement may not be modified, altered or amended except by an agreement in writing signed by all of the parties hereto.  Any provision of this Agreement which is prohibited or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof in that jurisdiction or affecting the validity or enforceability of such provision in any other jurisdiction. Any warranty or representation made in this Agreement shall be deemed to be material and shall survive and remain in full force and effect after any transfer, conveyance or foreclosure of the Collateral to or by Agent, and nothing herein shall impair, affect or limit any right or claim that Agent or any Lender may have against any Loan Party for breach of any such warranty or representation.

25.    <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement among the parties hereto with respect to the subject matter hereof. There are no oral agreements among the parties hereto, and each Loan Party specifically acknowledges and agrees that it is not relying on any oral representation from Agent, the Lenders, or any of their predecessors, successors, assigns, subsidiaries, affiliates and related entities, shareholders, directors, officers, directors, accountants, attorneys, employees, agents, representatives, or servants.

26.    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of this Agreement by telecopier or electronic transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by telecopier or electronic transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.  This Agreement shall be effective when accepted by Agent (notice of which acceptance is hereby waived by the Loan Parties) and shall thereupon be binding upon each Loan Party signatory hereto irrespective of whether any other Loan Party executes this Agreement.

[SIGNATURES ON FOLLOWING PAGE]

UFV-039358

IN WITNESS WHEREOF, the parties hereto have caused their respective duly authorized officers or representatives to execute and deliver this Agreement as of the date first written above.

**BORROWER:**

**LOOT CRATE, INC.**

By: _____

Name:  Christopher Davis

Title:  Chief Executive Officer

**HOLDINGS:**

**LOOT CRATE HOLDINGS, INC.**

By: _____

Name: Christopher Davis

Title: Chief Executive Officer

[Signature Page to Additional Forbearance Agreement]

UFV-039359

AGENT:

BREAKWATER CREDIT OPPORTUNITIES
FUND, L.P.

By: **BREAKWATER INVESTMENT
MANAGEMENT, LLC**, its general partner

By: _____
Name:  Saif Mansour
Title:  Managing Partner

LENDER:

BREAKWATER CREDIT OPPORTUNITIES
FUND, L.P.

By: **BREAKWATER INVESTMENT
MANAGEMENT, LLC,** its general partner

By: _____
Name:  Saif Mansour
Title:  Managing Partner

[Signature Page to Additional Forbearance Agreement]

UFV-039360

**STOCKHOLDERS:**

_____
Christopher Davis

[Signature Page to Additional Forbearance Agreement]

UFV-039361

<u>Schedule 1</u>

**<u>Litigation and Other Proceedings</u>**

<u>Inksee d/b/a White Label MFG vs. Loot Crate, Inc.</u>
White Label MFG manufactures unique t-shirts for Loot Crate for inclusion in Loot Crate's various crate lines.  Within 30 days after receipt of a February 2016 delivery from White Label MFG, Loot Crate (i) informed White Label MFG that it over-shipped a material number of t-shirts in its February 2016 delivery, (ii) informed White Label MFG that a material number of t-shirts were defective in its February 2016 delivery, and (iii) rejected the defective and overage t-shirts in its February 2016 delivery. On April 7, 2016, White Label MG requested that Loot Crate pay an outstanding balance of $317,117.19 for all delivered goods plus late fees. On or about April 26, 2016, Loot Crate paid approximately $170,000 for the non-defective good and non-overage unites included in the February 2016 delivery. The remaining amount in dispute is approximately $150,000.

On August 23, 2016, White Label MFG filed a complaint against Loot Crate in state court in Los Angeles County, California for, among other things, breach of contract, seeking $149,192.25 in damages. Loot Crate denied all of White Label MFG's allegations and filed a cross-complaint against White Label MFG for breach of contract for delivering defective shirts and refusing to accept the return or provide credit, seeking damages in the amount of $15,000 for Loot Crate 's costs incurred in relation to the defective shirts. The parties attended a mediation in early Fall 2017, which was unsuccessful.

The parties entered into a settlement agreement on February 12, 2018 whereby Loot Crate has agreed to pay White Label $65,000 and White Label will have a right of first refusal to purchase Loot Crate's excess inventory for resale until the earlier of 12 months or its purchase of $1 million in inventory.

<u>Tania Dababneh v. Loot Crate, Inc. and Steven Raby</u>
In early November 2017, legal counsel for Ms. Dababneh, a former employee of Loot Crate, sent Loot Crate a letter requesting information relating an alleged claim that she was wrongfully terminated due to sexual harassment by Mr. Raby, a co-worker who is no longer with Loot Crate. On December 12, 2017, the parties participated in a mediation session in an attempt to settle the matter prior to filing of a formal claim.

On January 5, 2018, Ms. Dababneh filed a former complaint in the Superior Court of California alleging, among other things, wrongful termination, FEHA violations based on sexual harassment and infliction of emotional damages seeking $10 million in damages. Loot Crate's insurance carrier has accepted coverage, and Loot Crate's deductible is $100,000. Loot Crate is vigorously defending the allegations with its insurance carrier. Discovery is ongoing.

<u>De Lage Landen Financial Services vs. Loot Crate</u>

De Lage Landen Financial Services (f/k/a Ricoh), a copy machine vendor of Loot Crate, filed a lawsuit against Loot Crate in Pennsylvania state court alleging breach of contract for failure to meet its payment obligations under the agreement and seeking contractual damages in the amount of $20,955.05 in addition to counsel fees, 18% default interest and costs.

The parties entered into a settlement agreement dated March 14, 2018 whereby Loot Crate has agreed to pay De Lage the total amount of $21,000 in installment payments as full and final settlement of all claims asserted by De Lage. De Lage has agreed to dismiss the action upon payment in full of the settlement amount.

UFV-039362

Other

Various vendors and service providers of Loot Crate are threatening litigation or to pursue collections actions against Loot Crate for outstanding balances.

Loot Crate received a letter dated September 11, 2017, from an attorney alleging violations of California Business and Professions Code Section 17529.5 and other violations of California law without providing specifics. Loot Crate is investigating the matter.

The State of Washington Department of Revenue has issued a tax warrant in the amount of $423,503.95 for alleged sales taxes and penalties owed.  Borrower was notified on February 8, 2018 that the agency placed a garnishment on Borrower's existing PayPal account in the amount of $351,000; however, the government has since reduced the amount of the garnishment to $75,000.  Borrower disputes the total amount allegedly owed and is in settlement discussions with the government.

Schedule 2

**Dendera Initial Scope of Services**

**Dendera will provide from time to time the following services in respect of Borrower, in each case subject to the terms and conditions hereof:**

*   Assist in reviewing the capital structure, assets, liabilities, business and operations;
*   Assist in developing and updating a current business and financial plan and organizational chart as well as financial model;
*   Assist Borrower in its efforts to raise the New Financing;
*   Assist in structuring, negotiating and closing additional or modified funding in the form of an amended or modified loan, a new loan and/or a direct equity investment; and
*   Assist in providing other strategic and/or transactional coordination and advisory services for lawyers, financial advisors and accountants, as are customary for similar transactions, including designating a person(s) reasonably acceptable to the CEO of Borrower to serve in the role as an employee(s) or officer(s) or similar person(s) with Borrower who shall report to the CEO and assist in such matters and in the "management equity" portion of the current term sheet and such other matters as the CEO shall reasonably direct.

UFV-039364

Schedule 3

**Existing Defaults**

(a)        June 30, 2017 Financial Covenant Default.  Based on information provided by Borrower to Agent, for the period ended June 30, 2017, Borrower has breached the Minimum Revenue covenant under Section 7.12(b) of the Loan Agreement for the fiscal quarter ending June 30, 2017.  Such failure to comply is a continuing Event of Default under Section 8.3(a) of the Loan Agreement.

(b)        Reporting of Monthly Financial Statements Default.  Borrower has breached the covenant in Section 6.2(b) of the Loan Agreement requiring that Borrower provide monthly financial statements within 45 days after the end of each month.  Such failure to comply is a continuing Event of Default under Section 8.3(a) of the Loan Agreement.

(c)        Notice of Event of Default.  Borrower has breached the covenant in Section 6.2(e) of the Loan Agreement requiring that Borrower provide notice to Agent upon its becoming aware of various Events of Default together with a detailed statement setting forth the steps being taken by the Loan Parties to cure the same.  Such failure to comply is a continuing Event of Default under Section 8.3(a) of the Loan Agreement.

(d)        Collateral Events of Default.  Based on information provided by Borrower to Agent on March 7, 2017, Borrower has (i) breached Section 6.13 of the Loan Agreement related to deposit account number 855657016 of Borrower and deposit account number 41390376 of Loot Crate UK, Ltd. in relation to which Account Control Agreements were not executed prior to or at the time of opening such deposit accounts (the "**Deposit Account Default**"); and (ii) breached Section 6.7(b) of the Loan Agreement by failing to notify Agent of new registered Trademarks and applications for Trademarks and provide intellectual property security agreements and other documents and take such other actions as Agent may request to perfect and maintain a first priority perfected security interest in such Trademarks and applications for Trademarks (the "**Trademarks Default**").  The Deposit Account Default is a continuing Event of Default under Section 8.3(a) of the Loan Agreement and the Trademarks Default is a continuing Event of Default under Section 8.3(b) of the Loan Agreement.

(e)        Reporting of Annual Financial Statements Default.  Borrower has breached the covenant in Section 6.2(a) requiring that Borrower provide consolidated audited financial statements within 180 days after the end of the fiscal year ending December 31, 2016.  Such failure to comply is a continuing Event of Default under Section 8.3(a) of the Loan Agreement.

(f)        September 30, 2017 Financial Covenant Default.  Based on information provided by Borrower to Agent, for the period ended September 30, 2017, Borrower has breached the Minimum Subscribers covenant under Section 7.12(b) of the Loan Agreement for the fiscal quarter ending September 30, 2017.  Such failure to comply is a continuing Event of Default under Section 8.3(a) of the Loan Agreement.

(g)        September 30, 2017 Financial Covenant Default.  Based on information provided by Borrower to Agent, for the period ended September 30, 2017, Borrower has breached the Minimum Revenue covenant under Section 7.12(b) of the Loan Agreement for the fiscal quarter ending September 30, 2017.  Such failure to comply is a continuing Event of Default under Section 8.3(a) of the Loan Agreement.

UFV-039365

(h)        Disposition of Property.  Borrower breached the covenant in Section 7.1 of the Loan Agreement requiring that Borrower receive Agent's consent before disposing of Property with a value in excess of $250,000. Such failure to comply is a continuing Event of Default under Section 8.3(a) of the Loan Agreement.

(i)        Lease.  Borrower breached the covenant in Section 7.2 requiring that Borrower provide Agent with advance written notice before entering into a lease on January 16, 2017 for a leased location located in the United Kingdom (which lease expires on January 31, 2018).  Such failure to comply is a continuing Event of Default under Section 8.3(a) of the Loan Agreement.

(j)        Key Person.  Borrower breached the covenant in Section 7.2 when Eric Chan, a Key Person and the former Chief Financial Officer, resigned and was not replaced within 90 days of such resignation.  Such failure to comply is a continuing Event of Default under Section 8.3(a) of the Loan Agreement.

(k)        December 31, 2017 Financial Covenant Default.  Based on information provided by Borrower to Agent, for the period ended December 31, 2017, Borrower has breached the Minimum Subscribers covenant under Section 7.12(b) of the Loan Agreement for the fiscal quarter ending December 31, 2017.  Such failure to comply is a continuing Event of Default under Section 8.3(a) of the Loan Agreement.

(l)        December 31, 2017 Financial Covenant Default.  Based on information provided by Borrower to Agent, for the period ended December 31, 2017, Borrower has breached the Minimum Revenue covenant under Section 7.12(b) of the Loan Agreement for the fiscal quarter ending December 31, 2017.  Such failure to comply is a continuing Event of Default under Section 8.3(a) of the Loan Agreement.

(m)        December 31, 2017 Financial Covenant Default.  Based on information provided by Borrower to Agent, for the period ended December 31, 2017, Borrower has breached the Minimum Cash covenant under Section 7.12(a) of the Loan Agreement for the month ending December 31, 2017. Such failure to comply is a continuing Event of Default under Section 8.3(a) of the Loan Agreement.

(n)        January 31, 2018 Financial Covenant Default.  Based on information provided by Borrower to Agent, for the period ended January 31, 2018, Borrower has breached the Minimum Cash covenant under Section 7.12(a) of the Loan Agreement for the month ending January 31, 2018.  Such failure to comply is a continuing Event of Default under Section 8.3(a) of the Loan Agreement.

(o)        Taxes.  Borrower is in breach of Section 7.5 of the Loan Agreement based upon a Lien arising in favor of the State of Washington Department of Revenue (the "Washington DOR") as described in correspondence Borrower received on February 8, 2018. The Washington DOR has issued a tax warrant against the Borrower in the amount of $423,503.95 for alleged sales taxes and penalties owed and has placed a garnishment on Borrower's PayPal account in the amount of $351,000. This Lien is not a Permitted Lien. Such breach is a continuing Event of Default under Section 8.3(a) of the Loan Agreement.

(p)        Forbearance Termination.  The occurrence of the Termination Date under that certain Forbearance Agreement and First Amendment to Loan and Security Agreement dated as of February 9, 2018 by and among, *inter alia*, the Borrower and Agent.

UFV-039366

(q)      February 28, 2018 Financial Covenant Default.  Based on information provided by Borrower to Agent, for the period ended February 28, 2018, Borrower has breached the Minimum Cash covenant under Section 7.12(a) of the Loan Agreement for the month ending February 28, 2018.  Such failure to comply is a continuing Event of Default under Section 8.3(a) of the Loan Agreement.

(r)      March 31, 2018 Financial Covenant Default.  Based on information provided by Borrower to Agent, for the period ended March 31, 2018, Borrower has breached the Minimum Subscribers covenant under Section 7.12(b) of the Loan Agreement for the fiscal quarter ending March 31, 2018.  Such failure to comply is a continuing Event of Default under Section 8.3(a) of the Loan Agreement.

(s)      March 31, 2018 Financial Covenant Default.  Based on information provided by Borrower to Agent, for the period ended March 31, 2018, Borrower has breached the Minimum Revenue covenant under Section 7.12(b) of the Loan Agreement for the fiscal quarter ending March 31, 2018. Such failure to comply is a continuing Event of Default under Section 8.3(a) of the Loan Agreement.

(t)      March 31, 2018 Financial Covenant Default.  Based on information provided by Borrower to Agent, for the period ended March 31, 2018, Borrower has breached the Minimum Cash covenant under Section 7.12(a) of the Loan Agreement for the month ending March 31, 2018.  Such failure to comply is a continuing Event of Default under Section 8.3(a) of the Loan Agreement.

(u)      April 30, 2018 Financial Covenant Default.  Based on information provided by Borrower to Agent, for the period ended April 30, 2018, Borrower has breached the Minimum Cash covenant under Section 7.12(a) of the Loan Agreement for the month ending April 30, 2018.  Such failure to comply is a continuing Event of Default under Section 8.3(a) of the Loan Agreement.

UFV-039367

Schedule 4

**Convertible Notes and Warrants**

Subordinated Convertible Promissory Note, issued by Parent in favor of Upfront V, L.P., dated July 25, 2017, in the principal amount of $250,000.00.

Subordinated Convertible Promissory Note, issued by Parent in favor of Ynon Kreiz, dated July 28, 2017, in the principal amount of $250,000.00.

Warrant to Purchase Common Stock, issued by Parent in favor of Montage Capital II, L.P., dated January 26, 2016.

Warrant to Purchase Common Stock, issued by Parent in favor of Breakwater Credit Opportunities Fund, L.P., dated June 1, 2016.

Warrant to Purchase Common Stock, issued by Parent in favor of Dendera Advisory, LLC, dated February 8, 2018.

**Parent Capitalization Table**

**[See Attached]**

**Holdinmgs and Borrower  Capitalization**

Holdings: 10 shares of common stock, par value $0.0001, held by LC Funding, Inc.

Borrower:  10 shares of common stock, par value $0.0001, held by Holdings

UFV-039368

## Parent Capitalization Table

### Loot Crate Parent, Inc. Summary Capitalization Table

As of 05/02/2018 •

| | Shares Authorized | Shares Issued and Outstanding | Fully Diluted Shares | Fully Diluted Ownership | | * Cash Raised |
|---|---|---|---|---|---|---|
| **Common Stock classes** | | | | | | |
| Common Stock | 14,000,000 | 8,399,219 | 8,399,219 | 59.6414% | $ | 77,641.03 |
| **Total Common Stock issued and outstanding** | | | 8,399,219 | 59.6414% | $ | 77,641.03 |
| | | | | | | |
| **Preferred Stock classes** | | | | | | |
| Series A Preferred Stock | 1,847,297 | 1,847,297 | 1,847,297 | 13.1173% | $ | 18,599,981.46 |
| Series A-1 Preferred Stock | 852,703 | 852,703 | 852,703 | 6.0549% | $ | - |
| **Total Preferred Stock issued and outstanding** | | | 2,700,000 | 19.1722% | $ | 18,599,981.46 |
| | | | | | | |
| **Common Stock Warrants** | | | | | | |
| Common Warrants | | | 585,505 | 4.1576% | $ | - |
| **Total Common Stock Warrants issued and outstanding** | | | 585,505 | 4.1576% | $ | - |
| | | | | | | |
| **Convertibles** | | | | | | |
| Convertible Promissory Notes | | | | | $ | 600,000.00 |
| **Total Convertibles issued** | | | | | $ | 600,000.00 |
| | | | | | | |
| 2012 Stock Plan | 2,937,368 | | | | | |
| **RSAs not purchased** | | | | 0.0000% | | |
| Options and RSUs issued and outstanding | | | 2,104,178 | 14.9414% | | |
| Shares available for issuance under the plan | | | 293,971 | 2.0874% | | |
| | | | | | | |
| **Totals** | | | 14,082,873 | 100.0000% | $ | 19,277,622.49 |

UFV-039369

Schedule 5

## Minimum EBITDA

| ($ in thousands) | 10/31/17 | 11/30/17 | 12/31/17 | 01/31/18 | 02/28/18 | 03/31/18 | 04/30/18 | 05/31/18 | 06/30/18 | 07/31/18 | 08/31/18 | 09/30/18 | 10/31/18 | 11/30/18 | 12/31/18 | 01/31/19 | 02/28/19 | 03/31/19 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **MANAGEMENT BUDGET** | | | | | | | | | | | | | | | | | | |
| Income / (Loss) from Operations | 668 | (912) | (623) | 176 | 117 | 123 | (516) | 726 | 277 | 554 | 148 | 1,523 | 779 | 1,102 | 1,368 | 950 | 950 | 950 |
| D&A | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 38 |
| Stock Based Comp | 94 | 94 | 94 | 94 | 94 | 94 | 94 | 94 | 94 | 94 | 94 | 94 | 94 | 94 | 94 | 94 | 94 | 94 |
| **Unadjusted EBITDA** | $800 | ($780) | ($492) | $308 | $248 | $255 | ($384) | $858 | $409 | $686 | $280 | $1,655 | $911 | $1,234 | $1,500 | $1,082 | $1,082 | $1,082 |
| **L6M Unadjusted EBITDA** | | | | | | $339 | ($845) | $792 | $1,693 | $2,071 | $2,102 | $3,502 | $4,797 | $5,173 | $6,264 | $6,660 | $7,462 | $6,889 |
| | | | | | | | | | | | | | | | | | | |
| **MINIMUM EBITDA COVENANT** | | | | | | 03/31/18 | 04/30/18 | 05/31/18 | 06/30/18 | 07/31/18 | 08/31/18 | 09/30/18 | 10/31/18 | 11/30/18 | 12/31/18 | 01/31/19 | 02/28/19 | 03/31/19 |
| **L6M EBITDA Covenant** | | | | | | ($400) | ($1,750) | ($200) | $846 | $1,243 | $1,366 | $2,452 | $3,358 | $3,621 | $4,385 | $4,662 | $4,800 | $5,000 |

Schedule 6

**Fee Payment Plan**

| Payment | Due Date | Amount* |
|---------|----------|---------|
| 1 | May 9, 2018 | $100,000 |
| 2 | June 11, 2018 | $100,000 |
| 3 | July 10, 2018 | $100,000 |
| 4 | August 10, 2018 | $100,000 |
| 5 | September 10, 2018 | $100,000 |
| 6 | October 10, 2018 | $74,912.25 |

* So long as a payment is timely made by the Loan Parties to Morgan, Lewis & Bockius LLP, the amount of such payment shall be reduced (i) in the case of each of the payments in 1 through 5, by $10,000, and (ii) in the case of payment 6, by $7,491.23, in each case, which represents a 10% discount on such amount; provided, that, if such payment is not timely made when due, but the Agent and/or the Lenders subsequently waive the Event of Default arising from such non-payment, the provisions herein shall continue to apply to any subsequent payments.

For purposes of example only, if payment 2 is not timely made by the Loan Parties, it is an Event of Default.  If the Agent and/or the Lenders waive this Event of Default, then (a) the 10% discount will not apply to payment 2, and the full $100,000 will be due and payable by the Loan Parties, but (b) so long as the remaining payments are timely made, then the 10% discount will apply to those payments if timely made.

UFV-039371