Exhibit P

From:        Lang, Aaron
Sent:        Sun 7/29/2018 12:15 PM (GMT-04:00)
To:          Crow, Alden; Nehama, Serge
Cc:          Schoulder, Andrew; Mark Palmer (mark.palmer@lootcrate.com); chris@lootcrate.com; Linda Menzel; Raj Malik; Mike Hessong (mikeh@bioworldmerch.com); Knapek, Mike; Shapland, Allie
Bcc:
Subject:     Loot Crate - Investor Rights Agreement and Voting Agreement
Attachments: Loot Crate Parent - Amendment to Voting Agreement.pdf; 6. Investor Rights Agreement (FINAL).pdf; Voting Agreement.pdf


Alden,

Attached are the Investor Rights Agreement and the Voting Agreement for Loot Crate Parent.

Best,
Aaron


Bryan Cave
Leighton Paisner
Logo

AARON LANG
Associate
aaron.lang@bclplaw.com
T. +1 212 541 1091  F: +1 212 541 1491

BRYAN CAVE LEIGHTON PAISNER LLP
1290 Avenue of the Americas, New York, NY 10104-3300

bclplaw.com


This electronic message is from a law firm. It may contain confidential or privileged information. If you received this transmission in error, please reply to the sender to advise of the error and delete this transmission and any attachments.

We may monitor and record electronic communications in accordance with applicable laws and regulations. Where appropriate we may also share certain information you give us with our other offices (including in other countries) and select third parties. For further information (including details of your privacy rights and how to exercise them), see our updated Privacy Notice at www.bclplaw.com.

## AMENDMENT TO VOTING AGREEMENT

THIS AMENDMENT TO VOTING AGREEMENT (this "*Amendment*"), effective as of May 17, 2018, is made by and among Loot Crate Parent, Inc., a Delaware corporation, (the "*Company*"), the holders of at least a majority of the Investor Shares (the "*Investor Majority*"), and the holders of at least a majority of the Key Holder Shares who are then providing services to the Company as officers, directors, employees or consultants (the "*Key Holder Majority*" and, together with the Company and the Investor Majority, the "*Required Parties*").

## RECITALS

A.    The Required Parties are parties to that certain Voting Agreement, dated as of May 10, 2016 (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "*Voting Agreement*").

B.    Section 5.16 of the Voting Agreement provides that, subject to certain exceptions, the terms of the Voting Agreement may be amended with the written consent of (i) the Company, (ii) the Investor Majority and (iii) the Key Holder Majority.

C.    The Required Parties desire to amend the Voting Agreement for the first time in accordance with the terms of this Amendment.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    **Defined Terms**. Capitalized terms used in this Amendment and not defined herein shall have the meaning given to them in the Voting Agreement.

2.    **Amendments To Voting Agreement**.

(a)    Section 2.2(d) of the Voting Agreement is hereby amended by deleting such section in its entirety and replacing it with the following:

"(d) (i) Until such time as the Obligations (as defined in the Loan Agreement) are satisfied in full (other than inchoate indemnity obligations and Obligations that have been cash collateralized in amounts and manner satisfactory to Agent):  (A) one person designated by Breakwater Credit Opportunities Fund, L.P., a Delaware limited partnership ("*Breakwater*"), which seat shall initially be vacant; and (B) one Independent Director designee who is mutually acceptable to the Series A Director (if then serving) and the holders of a majority of the issued and outstanding shares of the Common Stock, each of whom shall serve as an At-Large Director, and (ii) following the satisfaction in full of the Obligations (other than inchoate indemnity obligations and Obligations that have been cash collateralized in amounts and manner satisfactory to Agent), two Independent Director designees, mutually acceptable to the Series A Director (if then serving) and the holders of a majority of the issued and outstanding

11585592.7

UCC_007400

UCC_007400

shares of the Common Stock, who shall serve as the At-Large Directors, which seats shall initially be vacant."

(b)   Section 2.2 of the Voting Agreement is hereby amended by adding the following to the end of said Section:

"For purposes of this Agreement, (x) "*Loan Agreement*" shall mean that certain Loan and Security Agreement, dated as of June 1, 2016, by and among Breakwater, in its capacity as a Lender and as agent for the Lenders ("*Agent*"), Loot Crate, Inc., a Delaware corporation and indirect wholly-owned subsidiary of the Company ("*Loot Crate*"), and the lenders party thereto (the "*Lenders*"), as amended and as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, and (y) "*Independent Director*" shall mean a member of the Board not otherwise an Affiliate of the Company or any Investor (for avoidance of doubt, Alexandre Zyngier and Osman Khan, in their capacities as members of the Board, shall act as Independent Directors)."

(c)   Section 2.3 of the Voting Agreement is hereby amended by adding a new subsection (c) as follows:

"(c)   Until such time as the Obligations are satisfied in full (other than inchoate indemnity obligations and Obligations that have been cash collateralized in amounts and manner satisfactory to Agent), any Independent Director who is appointed or elected to the Board pursuant to this Agreement may not be removed except for Good Cause. For purposes of this Agreement, "*Good Cause*" shall mean (i) repeated gross negligence or willful misconduct in the performance of an At-Large Director's duties to the Company or a subsidiary thereof where such repeated gross negligence or willful misconduct has resulted or is likely to result in substantial and material damage to the Company or any subsidiary thereof; (ii) failure or inability to perform any assigned duties after written notice from the Company to an At-Large Director of, and a reasonable opportunity to cure, such failure or inability; (iii) commission of any act of fraud with respect to the Company or any subsidiary thereof causing material harm to the business, assets or reputation of the Company of any subsidiary thereof; (iv) conviction (including any plea of no contest) of a felony or a crime involving moral turpitude; or (v) an At-Large Director's unauthorized use or disclosure of the confidential information or trade secrets of the Company or any subsidiary thereof which use causes material harm to the Company or any subsidiary thereof."

(d)   The Voting Agreement is hereby amended by adding a new Section 2.7 as follows:

"2.7   **Strategic Transactions Committee**.   Until such time as the Obligations are satisfied in full (other than inchoate indemnity obligations and Obligations that have been cash collateralized in amounts and manner satisfactory to Agent), the Board shall form and maintain a Strategic Transactions Committee (the "*Strategic Transactions Committee*"), with the power to conduct and complete a refinance, capital raise and/or sale review process relative to the shares of capital stock and/or assets of the Company and/or its subsidiaries.  The Strategic Transactions Committee shall be composed of up to three members of the Board, two of which shall be Independent Directors, and one of which may be designated by Breakwater, in its sole discretion.

11585592.7

UCC_007401
UCC_007400

The initial number of directors on the Strategic Transactions Committee shall be fixed at two, and the initial members of the Strategic Transactions Committee shall be Alexandre Zyngier and Osman Khan."

    (e)  The Voting Agreement is hereby amended by adding a new Section 2.8 as follows:

"2.8  **Rights Upon Forbearance Termination**. Notwithstanding anything to the contrary herein, following a Material Default, and until such time as the Obligations are satisfied in full (other than inchoate indemnity obligations and Obligations that have been cash collateralized in amounts and manner satisfactory to Agent):

    (a)  *Size of Board*. Each of the Stockholders shall vote all of their Stockholder Shares, and shall take all other necessary actions within their control (whether in their capacity as a stockholder, director, or officer of the Company or otherwise), including, without limitation, calling meetings, attending meetings, executing a proxy to vote at any meeting, executing written consents and causing the organizational documents of the Company to be amended, as necessary, in order to ensure that the size of the Board be set at up to nine (9) directors.

    (b)  *Board Composition*. Each of the Stockholders shall vote all of their Stockholder Shares, and shall take all other necessary actions within their control (whether in their capacity as a stockholder, director, or officer of the Company or otherwise), including, without limitation, calling meetings, attending meetings, executing a proxy to vote at any meeting and executing written consents, to cause the Board to be comprised of persons the majority of which are designated by Breakwater.

    (c)  *Strategic Transactions Committee*. The size of the Strategic Transactions Committee shall be increased to up to five members, composed of up to three members designated by Breakwater and up to two members who are Independent Directors.

    (d)  *Drag-Along Right*. In the event that the Board, as comprised pursuant to this Section 2.8, approves a Sale of the Company in writing, specifying that this Section 2.8 shall apply to such transaction, then each Selling Investor and Eligible Holder agree to exercise their rights pursuant to Section 4.2:

For purposes of this Agreement, (x) "***Material Default***" shall mean (i) the failure to make any payment of principal or interest with respect to the Term Loans outstanding under the Loan Agreement as and when due, (ii) a breach of Section 8(d) of the Forbearance Agreement, (iii) the failure to repay in full all Obligations outstanding under the Loan Agreement by the Stated Termination Date (as defined in the Forbearance Agreement), or (iv) a breach of Section 9 of the Forbearance Agreement (which shall be deemed to occur to the extent that any Compliance Certificate and/or accompanying financial statements required to be delivered pursuant to Section 6.2(b) of the Loan Agreement are not timely delivered when required), in each case, subject to any applicable existing grace periods, and (y) "**Forbearance Agreement**" shall mean that certain Forbearance Agreement #2 and Waiver to Loan and Security Agreement, dated as of May 8, 2018, by and among Agent, Loot Crate, Loot Crate Holdings, Inc., a Delaware corporation and indirect wholly-owned subsidiary of the Company, and the Lenders."

11585592.7

UCC_007402
UCC_007400

    (a)    The Voting Agreement is hereby amended by adding a new Section 2.9 as follows:

"2.9   **Subsidiary Matters**.  Until such time as the Obligations are satisfied in full (other than inchoate indemnity obligations and Obligations that have been cash collateralized in amounts and manner satisfactory to Agent), the Company shall cause Loot Crate to comply with the provisions of Sections 2.2, 2.7 and 2.8, as applicable, as if such Sections were made to apply to Loot Crate rather than the Company."

3.    **Voting Agreement In Full Force and Effect**.  Except as otherwise expressly provided in this Amendment, the Voting Agreement is and shall remain in full force and effect. From and after the date hereof, each reference in the Voting Agreement to "this Agreement," "hereunder," "hereof," "herein" or words of like import, and each reference to the Voting Agreement in any other document shall mean and be a reference to the Voting Agreement to the extent modified by this Amendment.

4.    **Entire Agreement**.  The Voting Agreement and this Amendment contain the entire agreement of the parties with respect to the subject matter hereof and thereof and supersede all prior negotiations, agreements and understandings with respect thereto, both written and oral. The Voting Agreement and this Amendment may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements of the parties.

5.    **Governing Law**.  This Amendment shall be governed by and construed under the laws of the State of Delaware in all respects as such laws are applied to agreements among Delaware residents entered into and performed entirely within Delaware. The parties hereto agree that any action brought by a party under or in relation to this Amendment, including, without limitation to interpret or enforce any provision of this Amendment, shall be brought in, and each party hereto agrees to and does hereby submit to the jurisdiction and venue of, any state or federal court located in the County of Santa Clara, California.

6.    **Captions**. The paragraph captions utilized herein are in no way intended to interpret or limit the terms and conditions hereof, rather, they are intended for purposes of convenience only.

7.    **Counterparts**. This Amendment may be executed in multiple counterparts, and in separate counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

*[Signature Pages Follow]*

11585592.7

UCC_007403

UCC_007400

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the day and year first above written.

"COMPANY"

**LOOT CRATE PARENT, INC.,**

By: _____
Name: Christopher Davis
Title: Chief Executive Officer

"KEY HOLDERS"

_____
Christopher Davis

_____
Mathew Arevalo

[Signature Page to Amendment to Voting Agreement]

UCC_007404

UCC_007400

**"INVESTOR"**

**TIME INC. VENTURES**

By: _____

Name: John Zieger

Title:  Chief Development Officer &
        General Counsel

[Signature Page to Amendment to Voting Agreement]

UCC_007405

UCC_007400

"INVESTOR"

BREAKWATER CRATE HOLDINGS, LLC

By: _____
Name:
Title:

[Signature Page to Amendment to Voting Agreement]

UCC_007406

UCC_007400

**"INVESTOR"**

**DORSET SQUARE LLC**

By: _____

Name: David

Title: Managing

[Signature Page to Amendment to Voting Agreement]

"INVESTOR"

CLEMENTINE CAPITAL LLC

By: _____

Name: _NICK GROUP_

Title: _AUTHORISED SIGNATORY_

[Signature Page to Amendment to Voting Agreement]

UCC_007408

UCC_007400

# LOOT CRATE, INC.

## INVESTOR RIGHTS AGREEMENT

THIS INVESTOR RIGHTS AGREEMENT (this "*Agreement*") is made and entered into as of May 10, 2016 (the "*Effective Date*"), by and among **Loot Crate, Inc.**, a Delaware corporation (the "*Company*"), and the holders of Series A Preferred Stock and/or Series A-1 Preferred Stock (collectively, the "*Series A Stock*") as set forth on <u>Exhibit A</u> hereto (the "*Holders*" or the "*Investors*").

## RECITALS

A.      The Company and the Investors are parties to a Series A Preferred Stock Purchase Agreement of even date herewith (the "*Series A Agreement*").

B.      In order to induce the Investors to enter into the Series A Agreement and invest funds in the Company pursuant thereto, the Company desires to enter into this Agreement with the Series A Holders.

## AGREEMENT

NOW, THEREFORE, in consideration of mutual promises herein contained and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.      **Definitions.**

1.1      "*Affiliate*" means, with respect to any specified individual or entity, any other individual or entity who or that, directly or indirectly, controls, is controlled by, or is under common control with such specified individual or entity, including without limitation any partner, officer, director, manager or employee of such entity and any venture capital fund now or hereafter existing that is controlled by or under common control with one or more general partners or managing members of, or shares the same management company with, such individual or entity.

1.2      "*Common Stock*" means the Common Stock, $0.0001 par value, of the Company.

1.3      "*Equity Securities*" means (i) Common Stock, rights, options or warrants to purchase Common Stock, (ii) any security other than Common Stock having voting rights in the election of the Board of Directors, other than rights contingent upon a failure to pay dividends, or (iii) any security convertible into or exchangeable for any of the foregoing.

1.4      "*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

1.5      "*Form S-3*" means such form under the Securities Act as is in effect on the date hereof or any successor registration form under the Securities Act subsequently adopted by the

UCC_007409

UCC_007409

SEC (as defined below) which permits inclusion or incorporation of substantial information by reference to other documents filed by the Company with the SEC (as defined below).

1.6    "*Holder*" means any Investor that holds Registrable Securities or securities convertible into Registrable Securities or any assignee of record of such Registrable Securities to whom rights under Section 2 have been duly assigned in accordance with Section 2.11 hereof.

1.7    "*Preferred Stock*" means the Series A Stock.

1.8    "*Register*," "*registered*" and "*registration*" refer to a registration effected by the preparation and filing of a registration statement in compliance with the Securities Act, and the declaration or ordering of effectiveness of such registration statement.

1.9    "*Registrable Securities*" means: (i) any and all shares of common stock of the Company (the "*Common Stock*") issued or issuable upon conversion of the shares of Preferred Stock, and (ii) any shares of Common Stock issued as (or issuable upon the conversion or exercise of any warrant, right or other security which is issued as) a dividend or other distribution with respect to, in exchange for, or in replacement of, such shares of Common Stock described in clause (i); *provided, however*, that particular shares of any of the foregoing shall cease to be Registrable Securities once they have been sold in any public offering or transferred by the Holder in a transaction in which its rights under this Agreement are not assigned in accordance with the provisions of this Agreement.

1.10    "*Registrable Securities then outstanding*" means the number of shares of Common Stock which are Registrable Securities and (i) are then issued and outstanding or (ii) are then issuable pursuant to the exercise or conversion of options, warrants or convertible securities.

1.11    "*SEC*" means the United States Securities and Exchange Commission.

1.12    "*Securities Act*" means the Securities Act of 1933, as amended.

2.    **Registration Rights.**

2.1    **Demand Registration.**

(a)    **Request by Holders.**  If at any time after the earlier of (i) five (5) years after the date of this Agreement or (ii) at any time six (6) months after the effective date of the first registration statement for a public offering of securities of the Company (other than a registration statement relating to the sale of securities to employees of the Company pursuant to a stock option, stock purchase or similar benefit plan or an SEC Rule 145 transaction) the Company receives a written request from the Holders of a majority of the Registrable Securities then outstanding ("*Initiating Holders*") that the Company file a registration statement under the Securities Act covering the registration of at least forty percent (40%) of the Registrable Securities then outstanding or such lesser amount as would have an anticipated aggregate public offering price of not less than $10,000,000, then the Company shall, within ten (10) business days of the receipt of such written request, give written notice of such request ("*Demand Notice*") to all Holders and, as soon as practicable, file a registration statement under the

UCC_007410
UCC_007409

Securities Act covering all Registrable Securities that the Initiating Holders requested to be registered and any additional Registrable Securities requested to be included in such registration by any other Holders, as specified by notice given by each such Holder to the Company within twenty (20) days of the date the Demand Notice is given, and in each case, subject to the limitations of this Section 2.

(b)    **Underwriting.**    If the Initiating Holders intend to distribute the Registrable Securities covered by their request by means of an underwriting, then they shall so advise the Company as a part of their request made pursuant to Section 2.1(a) and the Company shall include such information in the Demand Notice.  In such event, the right of any Holder to include such Holder's Registrable Securities in such registration shall be conditioned upon such Holder's participation in such underwriting and the inclusion of such Holder's Registrable Securities in the underwriting (unless otherwise mutually agreed by a majority in interest of the Initiating Holders and such Holder) to the extent provided herein.  The underwriters will be selected by the Company and shall be reasonably acceptable to a majority in interest of the Initiating Holders.  All Holders proposing to distribute their Registrable Securities through such underwriting shall enter into an underwriting agreement in customary form with the managing underwriter or underwriters selected for such underwriting.  Notwithstanding any other provision of this Section 2.1, if the managing underwriters advise the Company in writing that marketing factors require a limitation of the number of securities to be underwritten, then the Company shall so advise all Holders of Registrable Securities that would otherwise be registered and underwritten pursuant hereto, and the number of Registrable Securities that may be included in the underwriting shall be reduced as required by the underwriters and allocated among the Holders on a pro rata basis according to the number of Registrable Securities held by each Holder requesting registration (including the Initiating Holders); *provided, however*, that the number of shares of Registrable Securities to be included in such underwriting and registration shall not be reduced unless all other securities of the Company are first entirely excluded from the underwriting and registration.  Any Registrable Securities excluded and withdrawn from such underwriting shall be withdrawn from the registration.

(c)    **Exceptions to Registration Obligations.**    The Company shall not be obligated to effect, or to take any action to effect, any registration pursuant to this Section 2.1: (i) during the period starting with the date sixty (60) days prior to the Company's good faith estimate of the date of filing of, and ending on the date that is one hundred eighty (180) days after the effective date of, a Company-initiated registration, *provided* that the Company is actively employing in good faith commercially reasonable efforts to cause such registration statement to become effective; (ii) after the Company has effected two (2) such registrations; or (iii) if the Initiating Holders propose to dispose of shares of Registrable Securities that may be immediately registered on Form S-3 pursuant to a request made pursuant to Section 2.3.  A registration shall not be counted as "effected" for purposes of this Section 2.1 until such time as the applicable registration statement has been declared effective by the SEC, unless the Initiating Holders withdraw their request for such registration and forfeit their right to one demand registration pursuant to Section 2.6.

(d)    **Deferral of Registration.**    Notwithstanding the foregoing, if the Company shall furnish to Holders requesting registration pursuant to this Section 2.1 a certificate signed by the President or Chief Executive Officer of the Company stating that, in the good faith judgment

UCC_007411
UCC_007409

of the Board of Directors of the Company, it would be materially detrimental to the Company and its shareholders for such registration statement to be filed and it is therefore essential to defer the filing of such registration statement, then the Company shall have the right to defer such filing for a period of not more than 60 days following receipt of the request of the Initiating Holders under this Section 2.1; *provided, however*, that the Company may not utilize this right more than twice in any 12-month period.

(e)    **Other Company Shares.**  If the managing underwriters have not limited the Registrable Securities to be underwritten, the Company may include securities for its own account or for the account of others in such registration if the managing underwriters so agree and if the number of Registrable Securities which would otherwise have been included in such registration and underwriting will not thereby be limited.

2.2    **Company Registration.**

(a)    **Notice to Holders.**  If (but without any obligation to do so) the Company proposes to register (including for this purpose a registration effected by the Company for shareholders other than the Holders) any of its stock in connection with the public offering of such stock (other than a registration relating solely to the issuance of securities by the Company pursuant to a stock option, stock purchase or similar benefit plan or an SEC Rule 145 transaction, or a registration in which the only stock being registered is stock issuable upon conversion of debt securities that are also being registered), the Company shall promptly give each Holder written notice of such registration.  Upon the request of each Holder given within twenty (20) days after such notice is given by the Company, the Company shall, subject to the provisions of Section 2.2(c), use all reasonable efforts to cause to be registered all of the Registrable Securities that each such Holder has requested to be included in such registration.

(b)    **Right to Terminate Registration.**  The Company shall have the right to terminate or withdraw any registration initiated by it under this Section 2.2 before the effective date of such registration, whether or not any Holder has elected to include Registrable Securities in such registration.  The expenses of such withdrawn registration shall be borne by the Company in accordance with Section 2.6.

(c)    **Underwriting.**  If a registration of which the Company gives notice under this Section 2.2 is for an underwritten offering, then the Company shall so advise the Holders.  In such event, the right of any Holder to include such Holder's Registrable Securities in such registration shall be conditioned upon such Holder's participation in such underwriting and the inclusion of such Holder's Registrable Securities in the underwriting to the extent provided herein.  All Holders proposing to distribute their Registrable Securities through such underwriting shall enter into an underwriting agreement in customary form with the managing underwriters selected for such underwriting.  Notwithstanding any other provision of this Agreement, if the managing underwriters advise the Company in writing that marketing factors require a limitation of the number of securities to be underwritten, then the managing underwriters may exclude shares (including Registrable Securities) from the registration and the underwriting, and the number of shares that may be included in the registration and the underwriting shall be allocated, first, to the Company, and second, to each of the Holders requesting inclusion of their Registrable Securities in such registration statement on a pro rata

UCC_007412
UCC_007409

basis based on the total number of Registrable Securities then held by each such Holder; *provided, however*, that no such reduction shall reduce the amount of securities of the selling Holders included in the registration below twenty percent (20%) of the total amount of securities included in such registration, unless such offering is the initial public offering, in which event all Registrable Securities may be excluded.  In no event will shares of any other selling shareholder be included in such registration which would reduce the number of shares that may be included by selling Holders without the written consent of not less than a majority in interest of the selling Holders.  If any Holder disapproves of the terms of any such underwriting, such Holder may elect to withdraw therefrom by written notice to the Company and the managing underwriters.  Any Registrable Securities excluded or withdrawn from such underwriting shall be excluded and withdrawn from the registration.  For any Holder that is a partnership, limited liability company or corporation, the partners or members, retired partners or members or shareholders of such Holder, the estates and immediate family members of any of the foregoing persons and any trusts for the benefit of any of the foregoing persons shall be deemed to be a single Holder, and any pro rata reduction with respect to such Holder shall be based upon the aggregate amount of shares carrying registration rights owned by all entities and individuals included in such Holder.

     2.3    **Form S-3 Registration.** In case the Company shall receive from any Holder or Holders of at least two-thirds of the Registrable Securities then outstanding a written request or requests that the Company effect a registration on Form S-3 or a successor form and any related qualification or compliance with respect to all or a part of the Registrable Securities owned by such Holder or Holders, then the Company shall:

     (a)    promptly give written notice of the proposed registration and the Holder's or Holders' request therefor, and any related qualification or compliance, to all other Holders of Registrable Securities; and

     (b)    as soon as practicable, use commercially reasonable efforts to effect such registration as would permit or facilitate the sale and distribution of all or such portion of such Holder's or Holders' Registrable Securities as are specified in such request, together with all or such portion of the Registrable Securities of any other Holders joining in such request as are specified in a request given to the Company within fifteen (15) days after the S-3 Notice is given; *provided, however*, that the Company shall not be obligated to effect any such registration pursuant to this Section 2.3:

     (i)    if Form S-3 is not then available for such offering by the Holders;

     (ii)    if the Holders, together with the holders of any other securities of the Company entitled to and requesting inclusion in such registration, propose to sell Registrable Securities and such other securities (if any) at an aggregate price to the public of less than $2,500,000;

     (iii)    if the Company furnishes to the Holders requesting registration pursuant to this Section 2.3 a certificate signed by the President or Chief Executive Officer of the Company stating that, in the good-faith judgment of the Board of Directors of the Company, it would be materially detrimental to the Company and its shareholders for such registration to be effected at such time, in which event the Company shall have the right to defer the filing of the

UCC_007413

UCC_007409

Form S-3 registration statement for a period of not more than 60 days following receipt of the request of the Initiating Holders under this Section 2.3; *provided, however*, that the Company shall not invoke this right more than once in any twelve (12) month period; or

(iv)    during the period ending one hundred eighty (180) days after the effective date of a registration effected under Section 2.2 hereof.

(c)    Registrations effected pursuant to this Section 2.3 shall not be counted as demands for registration effected pursuant to Section 2.1.

(d)    If the registration is for an underwritten offering, the provisions of Section 2.1(b) hereof shall apply to such registration.

2.4    **Obligations of the Company.**  Whenever required under this Section 2 to effect the registration of any Registrable Securities, the Company shall, as expeditiously as reasonably possible:

(a)    prepare and file with the SEC a registration statement with respect to such Registrable Securities and use commercially reasonable efforts to cause such registration statement to become effective, and, upon the request of the Holders of a majority of the Registrable Securities registered thereunder, keep such registration statement effective for up to one hundred twenty (120) days or until the Holders have completed the distribution described in the registration statement relating thereto, whichever first occurs;

(b)    prepare and file with the SEC such amendments and supplements to such registration statement and the prospectus used in connection with such registration statement as may be necessary to comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such registration statement;

(c)    furnish to the selling Holders such number of copies of a prospectus, including a preliminary prospectus, in conformity with the requirements of the Securities Act, and such other documents as they may reasonably request in order to facilitate the disposition of the Registrable Securities owned by them that are covered by such registration statement;

(d)    use commercially reasonable efforts to register or qualify the securities covered by such registration statement under such other securities or blue sky laws of such states or other jurisdictions as shall be reasonably requested by the selling Holders, *provided* that the Company shall not be required in connection therewith or as a condition thereto to qualify to do business or to file a general consent to service of process in any such states or jurisdictions;

(e)    in the event of any underwritten public offering, enter into and perform its obligations under an underwriting agreement, in usual and customary form, with the managing underwriters of such offering (it being understood and agreed that, as a condition to the Company's obligations under this clause (e), each Holder participating in such underwriting shall also enter into and perform its obligations under such an agreement);

(f)    notify each Holder of Registrable Securities covered by such registration statement at any time when a prospectus relating thereto is required to be delivered under the

UCC_007414
UCC_007409

Securities Act of the happening of any event as a result of which the prospectus included in such registration statement, as then in effect, includes an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading in the light of the circumstances then existing;

(g)     use commercially reasonable efforts to cause all such Registrable Securities registered pursuant hereunder to be listed on each securities exchange and trading system (if any) on which similar securities issued by the Company are then listed;

(h)     provide a transfer agent and registrar for all Registrable Securities registered pursuant to such registration statement and a CUSIP number for all such Registrable Securities, in each case not later than the effective date of such registration statement; and

(i)     promptly make available for inspection by the selling Holders, any managing underwriter participating in any disposition pursuant to such registration statement, and any attorney or accountant or other agent retained by any such underwriter or selected by the selling Holders, all financial and other records, pertinent corporate documents and properties of the Company and cause the Company's officers, directors, employees and independent accountants to supply all information reasonably requested by any such seller, underwriter, attorney, accountant or agent in connection with any such registration statement.

2.5     **Furnish Information.**  It shall be a condition precedent to the obligations of the Company to take any action pursuant to Sections 2.1, 2.2 or 2.3 hereof that the selling Holders shall furnish to the Company such information regarding themselves, the Registrable Securities held by them and the intended method of disposition of such securities as shall be required to timely effect the registration of their Registrable Securities.

2.6     **Expenses.**  All expenses (other than underwriting discounts and commissions and stock transfer taxes and fees) incurred in connection with a registration pursuant to Sections 2.1, 2.2 and 2.3, including, without limitation, registration, filing and qualification fees, printers' and accounting fees, fees and disbursements of counsel for the Company and the reasonable fees and disbursements of one counsel for the selling Holders selected by the Holders, shall be borne by the Company.  Notwithstanding the foregoing, the Company shall not be required to pay for any expenses of any registration proceeding begun pursuant to Sections 2.1 or 2.3 if the registration request is subsequently withdrawn at the request of the Holders of a majority of the Registrable Securities to be registered (in which case all participating Holders shall bear such expenses on a pro rata basis based on the number of Registrable Securities that were to requested be included in the withdrawn registration), unless the Holders of a majority of the Registrable Securities then outstanding agree to forfeit their right to one demand registration pursuant to Section 2.1.

2.7     **Delay of Registration.**  No Holder shall have any right to obtain or seek an injunction restraining or otherwise delaying any such registration as the result of any controversy that might arise with respect to the interpretation or implementation of this Section 2.

UCC_007415

UCC_007409

2.8    **Indemnification.**    In the event any Registrable Securities are included in a registration statement under Sections 2.1, 2.2 or 2.3 hereof:

(a)    **By the Company.**    To the extent permitted by law, the Company shall indemnify and hold harmless each Holder, the partners, members, officers and directors of each Holder, legal counsel and accountants for each Holder, any underwriter (as defined in the Securities Act) for such Holder and each person, if any, who controls such Holder or underwriter within the meaning of the Securities Act or the Exchange Act, against any expenses, losses, claims, damages or liabilities (joint or several) to which they may become subject under the Securities Act, the Exchange Act or other federal or state law, insofar as such expenses, losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon any of the following statements, omissions or violations (each a "*Violation*"):

(i)    any untrue statement or alleged untrue statement of a material fact contained in such registration statement, including any preliminary prospectus or final prospectus contained therein or any amendments or supplements thereto;

(ii)    the omission or alleged omission to state therein a material fact required to be stated therein, or necessary to make the statements therein not misleading; or

(iii)    any violation or alleged violation by the Company of the Securities Act, the Exchange Act, any federal or state securities law or any rule or regulation promulgated under the Securities Act, the Exchange Act or any federal or state securities law in connection with the offering covered by such registration statement;

and the Company shall reimburse each such Holder, partner, officer or director, underwriter or controlling person for any legal or other expenses reasonably incurred by them, as incurred, in connection with investigating or defending any such loss, claim, damage liability or action; *provided, however*, that the indemnity agreement contained in this Section 2.8(a) shall not apply to amounts paid in settlement of any such expense, loss, claim, damage, liability or action if such settlement is effected without the consent of the Company (which consent shall not be unreasonably withheld), nor shall the Company be liable in any such case for any such loss, claim, damage, liability or action to the extent that it arises out of or is based upon actions or omissions made in reliance upon and in conformity with written information furnished by or on behalf of any such Holder, partner, officer or director, underwriter or controlling person expressly for use in connection with such registration by such Holder, partner, officer, director, underwriter or controlling person.

(b)    **By Selling Holders.**    To the extent permitted by law, each selling Holder shall indemnify and hold harmless the Company, each of its directors, each of its officers who have signed the registration statement, each person, if any, who controls the Company within the meaning of the Securities Act, legal counsel and accountants for the Company, any underwriter and any other Holder selling securities under such registration statement or any of such other Holder's partners, directors or officers or any person who controls such Holder within the meaning of the Securities Act or the Exchange Act, against any expenses, losses, claims, damages or liabilities (joint or several) to which any of the foregoing persons may become subject under the Securities Act, the Exchange Act or other federal or state law, insofar as such

UCC_007416

UCC_007409

expenses, losses, claims, damages or liabilities (or actions in respect thereto) arise out of or are based upon any Violation, in each case to the extent (and only to the extent) that such Violation arises out of or is based on actions or omissions made in reliance upon and in conformity with written information furnished by such Holder expressly for use in connection with such registration; and each such Holder shall reimburse the Company and such other persons for any legal or other expenses reasonably incurred by them in connection with investigating or defending any such loss, claim, damage, liability or action; *provided, however*, that the indemnity agreement contained in this Section 2.8(b) shall not apply to amounts paid in settlement of any such expense, loss, claim, damage, liability or action if such settlement is effected without the consent of the Holder, which consent shall not be unreasonably withheld; and *provided further*, that the total amounts payable in indemnity by a Holder under this Section 2.8(b) in respect of any Violation shall not exceed the net proceeds received by such Holder in the registered offering out of which such Violation arises except in the case of fraud or willful misconduct by such Holder.

(c)    **Notice.**    Promptly after receipt by an indemnified party under this Section 2.8 of notice of the commencement of any action (including any governmental action) for which a party may be entitled to indemnification hereunder, such indemnified party shall, if a claim in respect thereof is to be made against any indemnifying party under this Section 2.8, deliver to the indemnifying party a written notice of the commencement thereof, and the indemnifying party shall have the right to participate in such action and, to the extent the indemnifying party so desires, jointly with any other indemnifying party to which notice has been given, to assume the defense thereof with counsel mutually satisfactory to the parties; *provided, however,* that an indemnified party (together with all other indemnified parties that may be represented without conflict by one counsel) shall have the right to retain its own counsel, with the fees and expenses to be paid by the indemnifying party, if representation of such indemnified party by the counsel retained by the indemnifying party would be inappropriate due to actual or potential differing interests between such indemnified party and any other party represented by such counsel in such proceeding.  The failure to deliver written notice to the indemnifying party within a reasonable time of the commencement of any such action, if prejudicial to its ability to defend such action, shall relieve such indemnifying party of any liability to the indemnified party under this Section 2.8, but the omission so to deliver written notice to the indemnifying party will not relieve it of any liability that it may have to any indemnified party otherwise than under this Section 2.8.

(d)    **Contribution.**    In order to provide for just and equitable contribution to joint liability under the Securities Act in any case in which either (i) any party otherwise entitled to indemnification hereunder makes a claim for indemnification pursuant to this Section 2.8 but it is judicially determined (by the entry of a final judgment or decree by a court of competent jurisdiction and the expiration of time to appeal or the denial of the last right of appeal) that such indemnification may not be enforced in such case notwithstanding the fact that this Section 2.8 provides for indemnification in such case, or (ii) contribution under the Securities Act may be required on the part of any party hereto for which indemnification is provided under this Section 2.8; then, and in each such case, such parties will contribute to the aggregate expenses, losses, claims, damages or liabilities to which they may be subject (after contribution from others) in such proportion as is appropriate to reflect the relative fault of the indemnifying party and the indemnified party in connection with the Violation that resulted in such expense, loss,

UCC_007417

UCC_007409

claim, damage or liability as well as other equitable considerations.  The relative fault of such parties shall be determined by reference to, among other things, whether the untrue or allegedly untrue statement of a material fact or the omission or alleged omission of a material fact relates to information supplied by the indemnifying party or indemnified party and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission; *provided, however*, that, in any such case, (A) no such Holder will be required to contribute any amount in excess of the net proceeds from the sale of all such Registrable Securities offered and sold by such Holder pursuant to such registration statement, and (B) no individual or entity guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) will be entitled to contribution from any individual or entity who was not guilty of such fraudulent misrepresentation; and *provided further*, that in no event shall a Holder's liability pursuant to this Section 2.8(d), when combined with the amounts paid or payable by such Holder pursuant to Section 2.8(b), exceed the net proceeds from the offering received by such Holder, except in the case of willful misconduct or fraud by such Holder.

(e)     **Survival.**  Unless otherwise superseded by an underwriting agreement entered into in connection with the offering, the obligations of the Company and Holders under this Section 2.8 shall survive the completion of any offering of Registrable Securities in a registration under this Section 2, and otherwise shall survive the termination of this Agreement.

2.9     **Rule 144 Reporting.**  With a view to making available the benefits of certain rules and regulations of the SEC which may at any time permit the sale of the Registrable Securities to the public without registration, after such time as a public market exists for the Common Stock, the Company agrees to:

(a)     make and keep public information available, as those terms are understood and defined in Rule 144 under the Securities Act, at all times after the effective date of the first registration under the Securities Act filed by the Company for an offering of its securities to the general public;

(b)     use commercially reasonable efforts to file with the SEC in a timely manner all reports and other documents required of the Company under the Securities Act and the Exchange Act (at any time after it has become subject to such reporting requirements); and

(c)     furnish to any Holder, so long as the Holder owns any Registrable Securities, forthwith upon request (i) a written statement by the Company as to its compliance with the reporting requirements of said Rule 144 (at any time after ninety (90) days after the effective date of the first registration statement filed by the Company for an offering of its securities to the general public), and of the Securities Act and the Exchange Act (at any time after it has become subject to the reporting requirements of the Exchange Act), (ii) a copy of the most recent annual or quarterly report of the Company and (iii) such other reports and documents of the Company as a Holder may reasonably request in availing itself of any rule or regulation of the Commission allowing a Holder to sell any such securities without registration (at any time after the Company has become subject to the reporting requirements of the Exchange Act).

2.10     "**Market Stand-Off" Agreement.**  Each Holder hereby agrees that it will not, without the prior written consent of the Company or the managing underwriters, as the case may

UCC_007418

UCC_007409

be, (i) lend, offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right, or warrant to purchase, or otherwise transfer or dispose of, directly or indirectly, any shares of Common Stock or any securities convertible into or exercisable or exchangeable for Common Stock (whether such shares or any such securities are then owned by the Holder or are thereafter acquired) or (ii) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of the Common Stock, whether any such transaction described in clause (i) or (ii) above is to be settled by delivery of Common Stock or other securities, in cash, or otherwise, for such period of time (not to exceed one hundred eighty (180) days) from the effective date of such registration as may be requested by the Company or such managing underwriters and to execute an agreement reflecting the foregoing as may be requested by the underwriters at the time of the Company's initial public offering; *provided. however* that, if during the last 17 days of the restricted period the Company issues an earnings release or material news or a material event relating to the Company occurs, or prior to the expiration of the restricted period the Company announces that it will release earnings results during the 16-day period beginning on the last day of the restricted period, then, upon the request of the managing underwriters, to the extent required by any FINRA rules, the restrictions imposed by this section shall continue to apply until the end of the third trading day following the expiration of the 15-day period beginning on the issuance of the earnings release or the occurrence of the material news or material event.  In no event will the restricted period extend beyond two hundred sixteen (216) days after the effective date of the registration statement.  The foregoing provisions of this Section 2.10 shall not apply to the sale of any shares to an underwriter pursuant to an underwriting agreement, and shall be applicable to the Holders only if (i) all officers and directors of the Company and (ii) shareholders individually owning more than one percent (1%) of the Company's outstanding Common Stock are subject to the same restrictions.  The underwriters in connection with the offering are intended third-party beneficiaries of this Section 2.10 and shall have the right, power, and authority to enforce the provisions hereof as though they were a party hereto.  Each Holder further agrees to execute such agreements as may be reasonably requested by the managing underwriters in the offering that are consistent with this Section 2.10 or that are necessary to give further effect thereto.  Any discretionary waiver or termination of the restrictions of any or all of such agreements by the Company or the underwriters shall apply pro rata to all Holders subject to such agreements, based on the number of shares subject to such agreements.

In order to enforce the foregoing covenant, the Company may impose stop-transfer instructions with respect to the Registrable Securities of each Holder (and the shares or securities of every other person subject to the foregoing restriction) until the end of such period.

2.11    **Assignment of Registration Rights.**  The rights to cause the Company to register Registrable Securities pursuant to this Section 2 may be assigned to a transferee or assignee in connection with any transfer or assignment of Registrable Securities by the Holder, *provided* that (i) such transfer or assignment may otherwise be effected in accordance with applicable securities laws, (ii) such transferee or assignee acquires at least 250,000 shares of Registrable Securities (subject to adjustment for stock splits, stock combinations, recapitalizations and the like) or, if less, all of the Registrable Securities held by the Holder, (iii) written notice is promptly given to the Company and (iv) such transferee or assignee agrees to be bound by the provisions of this Agreement.  The foregoing 250,000-share limitation shall not apply, however,

UCC_007419

UCC_007409

to transfers or assignments by a Holder to (a) a partner, member or shareholder of a Holder that is a partnership, limited liability company or corporation, respectively, (b) a retired partner or member of such partnership or limited liability company who retires after the date hereof, (c) the estate of any such partner, member or shareholder, or (d) an Affiliate of any such partnership, limited liability company or corporation, *provided* that all such transferees or assignees agree in writing to appoint a single representative as their attorney-in-fact for the purpose of exercising any rights, receiving notices, or taking any action under this Section 2.

2.12    **Termination of Registration Rights.**  The Company's obligations pursuant to Sections 2.1, 2.2 and 2.3 shall terminate (i) three (3) years after the closing date of the Company's first firmly underwritten public offering of its Common Stock pursuant to a Registration Statement filed with, and declared effective by, the SEC under the Securities Act or (ii) as to any Holder, at such time following such initial public offering, as all Registrable Securities that such Holder holds or has the right to acquire may immediately be sold in any three-month period without registration pursuant to Rule 144 under the Securities Act.

2.13    **Limitations on Subsequent Registration Rights.**  From and after the Effective Date, the Company shall not, without the prior written consent of the Holders of a majority of the Registrable Securities then outstanding, enter into any agreement with any holder or prospective holder of any securities of the Company that provides such holder or prospective holder with registration rights with respect to such securities unless (i) such other registration rights are subordinate to the registration rights granted to the Holders hereunder and the inclusion of such securities will not reduce the amount of the Registrable Securities of the Holders that are included in a given registration and (ii) the holders of such rights are subject to market standoff obligations no more favorable to such persons than those contained herein; *provided* that this limitation shall not apply to any additional Investor who becomes a party to this Agreement in accordance with Section 6.2 hereof; and *provided further* that this limitation shall not apply to the registration rights granted to Breakwater Credit Opportunities Fund, L.P. or an Affiliate thereof ("*Breakwater*") pursuant to the Warrant to Purchase Common Stock issued in connection with the Loan and Security Agreement, entered into following the date of this Agreement, by and among the Company, Breakwater and the other parties thereto (the "*Breakwater Warrant*").

3.    **Rights to Purchase Additional Stock.**

3.1    **Right of First Offer.**  Subject to the terms of this Section 3 and applicable securities laws, if the Company proposes to offer or sell any Equity Securities, the Company shall give each Investor that holds at least 750,000 shares of Registrable Securities (subject to adjustment for any stock splits, stock combinations, recapitalizations and the like) (each a "*Major Investor*") the right to purchase such Major Investors' pro rata share (or any part thereof) of such Equity Securities, on the same terms as the Company is willing to sell such Equity Securities to any other person.  A Major Investor's pro rata share of the Equity Securities shall be equal to that percentage of the Outstanding Common Equivalents (as defined below) held by such Major Investor on the date of the company's written notice referred to in Section 3.2 below. For purposes of this Section 3, the "*Outstanding Common Equivalents*" shall mean outstanding shares of Common Stock and all shares of Common Stock issuable, directly or indirectly, upon exercise or conversion of any outstanding preferred stock, warrants or options or any other right

UCC_007420

UCC_007409

to acquire any of the foregoing. A Major Investor shall be entitled to apportion this right of first offer among itself and its Affiliates in such proportions as it deems appropriate.

3.2 **Notice; Exercise of Right.** Prior to any sale or issuance by the Company of any Equity Securities, the Company shall give notice to each Major Investor of its intention to sell and issue such Equity Securities, setting forth the terms under which it proposes to make such sale (the "*Offer Notice*"). Within twenty (20) days after receipt of the Offer Notice, each Major Investor shall notify the Company whether such Major Investor desires to purchase its pro rata share, or any part thereof, of the Equity Securities so offered. At the expiration of such twenty (10) day period, the Company shall promptly give notice to each Major Investor that elects to purchase all the shares available to it (each, a "*Fully Exercising Investor*") of any other Major Investor's failure to do likewise, specifying the number of additional shares that are available to the Fully Exercising Investors ("*Additional Shares*"). During the ten (10) day period commencing after the Company has given such notice, each Fully Exercising Investor may, by giving notice to the Company, elect to purchase, in addition to the number of shares specified above, up to that portion of the Additional Shares which is equal to the proportion that the Common Equivalents held by such Fully Exercising Investor bears to the Common Equivalents then held by all Fully Exercising Investors who wish to purchase such Additional Shares. If a Major Investor notifies the Company of its desire to purchase any of the Equity Securities offered by the Company, the closing of the sale shall occur within sixty (60) days of the date that the Offer Notice is given or, if later, the closing date for the proposed sale of such Equity Securities to third parties.

3.3 **Permitted Sales.** With respect to any Equity Securities that are not subscribed for by Major Investors after the end of the twenty (20) day period specified in Section 3.2, the Company may, during a period of ninety (90) days following the end of such period, offer and sell such Equity Securities to other persons upon terms and conditions not less favorable to the Company than those set forth in the notice to the Investors. In the event the Company has not entered into a definitive agreement for the sale of the Equity Securities within said 90-day period, or if such agreement is not consummated within thirty (30) days after the consummation thereof, the Company shall not thereafter issue or sell any Equity Securities without first offering such securities to the Major Investors pursuant to this Section 3.

3.4 **Exceptions.** The right of first offer contained in this Section 3 shall not apply to issuances by the Company of (i) Exempt Securities (as defined in the Amended and Restated Certificate of Incorporation of the Company (as from time to time amended or amended and restated, the "*Restated Certificate*")), (ii) Shares (as defined in the Series A Agreement) pursuant to the terms and conditions of the Series A Agreement, (iii) the Breakwater Warrant or any Equity Securities issued upon the exercise thereof, or (iv) any issuance of Equity Securities with respect to which the right of first offer contained in this Section 3 has been waived by the Requisite Majority (as defined below). For the avoidance of doubt, in connection with any issuance of Equity Securities, the Requisite Majority may, when waiving the right of first offer contained in this Section 3 pursuant to the preceding clause (iv) of this Section 3.4, specify that such waiver shall only apply to a portion of such Equity Securities, and the pro rata share of each Major Investor shall thereafter be determined based upon the number of Equity Securities not subject to such waiver.

UCC_007421

UCC_007409

3.5    **Termination.**  The right of first offer contained in this Section 3 shall terminate and be of no further force and effect immediately prior to the closing of (i) the first sale of stock of the Company pursuant to a Qualified IPO (as defined in the Restated Certificate) or (ii) a Liquidation Event (as defined in the Restated Certificate).

4.    **Information Rights.**

4.1    **Financial Statements and Reports.**  The Company shall deliver to each Major Investor other than any Investor that the Board of Directors has reasonably determined is a competitor of the Company:

(a)    as soon as practicable after the end of each fiscal year of the Company, and in any event within one hundred twenty (120) days thereafter, a balance sheet as of the end of such year, statements of income and of cash flows for such year and a statement of shareholders' equity as of the end of such year, such year-end financial reports to be in reasonable detail, prepared in accordance with generally accepted accounting principles ("*GAAP*"), and audited and certified by an independent public accounting firm selected by the Company;

(b)    as soon as practicable after the end of the first three quarters of each fiscal year of the Company, and in any event within forty-five (45) days thereafter, (i) an unaudited balance sheet as of the end of each such quarterly period, (ii) an unaudited year-to-date balance sheet for the period ending on, but including, such quarterly period, (iii) unaudited statements of income and cash flows for such quarterly period, and (iv) unaudited year-to-date statements of income and cash flows for the period ending on, but including, such quarterly period, all in reasonable detail and prepared in accordance with GAAP, except that they may not contain all of the footnotes that are required by GAAP, and subject to changes resulting from year-end audit adjustments, together with a statement of stockholder equity in the form of the Company's capitalization table as of the end of such quarterly period;

(c)    as soon as practicable after the end of each month and in any event within thirty (30) days, a balance sheet for such preceding month and a year-to-date balance sheet for the period ending on, but including, such preceding month;

(d)    within thirty (30) days prior to the end of each fiscal year, a budget and business plan for the next fiscal year, prepared on a monthly basis, including balance sheets, income statements and statements of cash flows for such months; and

(e)    such other information, including capitalization tables, relating to the financial condition, business, prospects, or corporate affairs of the Company as any Major Investor may from time to time reasonably request.

Notwithstanding any provision to the contrary, the Company shall not be obligated pursuant to this Section 4.1 to provide any information (i) that it reasonably considers to be a trade secret or similar confidential information (unless covered by an enforceable confidentiality agreement, in form acceptable to the Company) or (ii) to any Investor that the Company reasonably determines to be a competitor or an officer, employee, director or greater-than-10% stockholder of a competitor, it being understood that Upfront V, L.P. (together with its affiliates) shall not be

UCC_007422

UCC_007409

deemed a competitor of the Company.  Each Investor agrees to hold in confidence and trust and not to misuse or disclose any confidential information provided pursuant to this Section 4.1.

4.2    **Inspection Rights.**  The Company shall permit each Major Investor, at such Major Investor's expense, to visit and inspect the Company's properties, to examine its books of account and records and to discuss the Company's affairs, finances and accounts with its officers, all at such reasonable times as may be requested by the Major Investor; *provided, however*, that the Company shall not be obligated pursuant to this Section 4.2 to provide access to any information (i) that it reasonably considers to be a trade secret or similar confidential information (unless covered by an enforceable confidentiality agreement, in form acceptable to the Company), (ii) to any Major Investor that the Company reasonably determines to be a competitor or an officer, employee, director or greater-than-10% stockholder of a competitor, or (iii) the disclosure of which would adversely affect the attorney-client privilege between the Company and its counsel.  Each Major Investor agrees to hold in confidence and trust and not to misuse or disclose any confidential information obtained pursuant to this Section 4.2.

4.3    **Confidentiality.**  Each Investor agrees that such Investor will keep confidential and will not disclose, divulge or use for any purpose (other than to monitor its investment in the Company) any confidential information obtained from the Company pursuant to the terms of this Agreement (including notice of the Company's intention to file a registration statement) unless such confidential information (a) is known or becomes known to the public in general (other than as a result of a breach of this Section 4.3 by such Investor), (b) is or has been independently developed or conceived by the Investor without use of the Company's confidential information, or (c) is or has been made known or disclosed to the Investor by a third party without a breach of any obligation of confidentiality such third party may have to the Company; *provided, however*, that an Investor may disclose confidential information (i) to its attorneys, accountants, consultants, and other professionals to the extent necessary to obtain their services in connection with monitoring its investment in the Company, (ii) to any prospective purchaser of any Registrable Securities from such Investor, if such prospective purchaser agrees to be bound by the provisions of this Section 4.3, (iii) to any Affiliate, partner, member, stockholder, or wholly owned subsidiary of such Investor in the ordinary course of business, provided that such Investor informs such Person that such information is confidential and directs such Person to maintain the confidentiality of such information, or (iv) as may otherwise be required by law, provided that the Investor promptly notifies the Company of such disclosure and takes reasonable steps to minimize the extent of any such required disclosure.

4.4    **Termination.**  The rights of any Investor set forth in this Section 4 shall terminate and be of no further force and effect immediately prior to the earlier of (i) the first sale of stock of the Company pursuant to a Qualified Public Offering, (ii) such time as the Company first becomes subject to the periodic reporting requirements of Section 12 or 15(d) of the Exchange Act or (iii) a Liquidation Event.

5.    **Board Observer.**  For so long as Upfront V, LP ("*Upfront*") is not represented on the Board of Directors of the Company, then so long as Upfront and its Affiliates continue to own beneficially twenty five percent (25%) of the shares of the Preferred Stock issued and sold by the Company to Upfront and its Affiliates pursuant to the terms and conditions of the Series A Agreement, Upfront shall have the right to designate a representative (the "*Board Observer*") to

UCC_007423

UCC_007409

attend all meetings of the Board of Directors of the Company and all meetings of any committee of the Board of Directors of the Company in a nonvoting observer capacity. The Company shall deliver to the Board Observer copies of all notices, minutes, consents and other materials that it provides to its directors at the same time that it provides such notices, minutes, consents and other materials to its directors; *provided, however*, that such Board Observer shall agree to hold in confidence and trust and to act in a fiduciary manner with respect to all information so provided; *provided further*, that the Company reserves the right to withhold any information and to exclude such representative from any meeting or portion thereof if access to such information or attendance at such meeting could adversely affect the attorney-client privilege between the Company and its counsel or would result in disclosure of trade secrets or if such Investor or its representative is or is an Affiliate of, in the good faith judgment of the Board of Directors of the Company, determined to be a competitor of the Company. For the avoidance of doubt, the right of Upfront to designate the Board Observer pursuant to this Section 5 shall be in addition to, and not in lieu of, any right of Upfront to designate the Series A Director (as defined in the Voting Agreement (as defined below)) pursuant to the terms and conditions of the Voting Agreement, dated as of the date hereof (the "***Voting Agreement***"), by and among the Company and certain of its stockholders.

6.    **Miscellaneous.**

6.1    **Notices.**    Any notice, request or other communication required or permitted hereunder shall be in writing and shall be deemed to have been duly given if delivered personally, by facsimile when receipt is electronically confirmed, one business day after delivery to a nationally recognized overnight delivery service, or otherwise upon receipt, addressed (i) if to Investor, at the address set forth below such Investor's name on <u>Exhibit A</u>, and (ii) if to the Company, at the address set forth below:

> **LOOT CRATE, INC.**
> 3401 Pasadena Avenue
> Los Angeles, CA 90031
> Attention: Chief Executive Officer
>
> with a copy, which shall not constitute notice, to:
>
> **DLA PIPER LLP (US)**
> 2000 University Avenue
> East Palo Alto, CA 94303-2215
> Attention: Curtis L. Mo, Esq.
> Email: curtis.mo@dlapiper.com
> Fax: (650) 687-1170

Any party hereto may, by ten (10) days' prior notice so given, change its address for future notices hereunder.

6.2    **Additional Parties; Successors and Assigns.**

(a)    Notwithstanding anything to the contrary herein, if the Company issues additional shares of Series A Stock after the date hereof pursuant to the terms and conditions of

UCC_007424
UCC_007409

the Series A Agreement, as a condition to the issuance of such shares the Company may require that any purchaser thereof shall become a party to this Agreement by executing and delivering a counterpart signature page hereto agreeing to be bound by and subject to the terms and conditions of this Agreement. In either event, each such person shall thereafter be deemed an "Investor" for all purposes under this Agreement and, notwithstanding anything herein to the contrary, the Company shall, without needing the consent of any other party, amend Exhibit A hereto to include information regarding such persons.

(b)    Each transferee or assignee of any shares of capital stock of the Company subject to this Agreement shall continue to be subject to the terms and conditions hereof and, as a condition precedent to the Company's recognizing such transfer or assignment, each transferee or assignee shall become a party to this Agreement by executing and delivering a counterpart signature page hereto agreeing to be bound by and subject to the terms and conditions of this Agreement, including, without limitation, the Market Stand-Off Agreement set forth in Section 2.10. In either event, each such person shall thereafter be deemed an "Investor" for all purposes under this Agreement and, notwithstanding anything herein to the contrary, the Company may, without needing the consent of any other party, amend Exhibit A hereto to include information regarding such persons. The Company shall not permit the transfer or assignment of any shares of capital stock subject to this Agreement on its books or issue a new certificate representing any such shares of capital stock unless and until such transferee or assignee shall have complied with the terms and conditions of this Section 6.2(b).

(c)    For the avoidance of doubt, subject to the terms and conditions of this Agreement, this Agreement and the rights and obligations of the parties hereunder, will inure to the benefit of, and be binding upon, the parties' respective successors, assigns, heirs, executors, administrators and legal representatives. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

6.3    **Amendments and Waivers.**  Any provision of this Agreement may be amended and the observance thereof may be waived, either generally or in a particular instance and either retroactively or prospectively, only with the written consent of the Company and the Investors holding a majority of the Registrable Securities held by all Investors (the "*Requisite Majority*"); *provided, however*, that this Agreement may not be amended and the observance of any term hereof may not be waived with respect to any Investor without the written consent of such Investor, unless such amendment, termination, or waiver applies to all Investors in the same fashion.  The Company shall give prompt notice of any amendment hereof or waiver hereunder to any party hereto that did not consent in writing to such amendment or waiver.  Any amendment or waiver effected in accordance with this Section 6.3 shall be binding upon each Investor, each permitted successor or assignee of such Investor and the Company.

6.4    **Entire Agreement.**  This Agreement, together with all the exhibits hereto, constitutes and contains the entire agreement and understanding of the parties with respect to the subject matter hereof and supersedes any and all prior negotiations, correspondence, agreements, understandings, duties or obligations between the parties with respect to the subject matter hereof.

UCC_007425

UCC_007409

6.5     **Governing Law.**   This Agreement shall be governed by and construed exclusively in accordance with the internal laws of the State of California as applied to agreements among California residents entered into and to be performed entirely within California.

6.6     **Severability.**   If any provision of this Agreement is held to be unenforceable under applicable law, then such provision shall be excluded from this Agreement and the balance of this Agreement shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

6.7     **Delays or Omissions.**   No delay or omission to exercise any right, power or remedy accruing to any party under Agreement upon any breach or default of any other party under this Agreement shall impair any such right, power or remedy of the nonbreaching or nondefaulting party, nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or waiver of or acquiescence in any similar breach or default theretofore or thereafter occurring, nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default therefore or thereafter occurring.   All remedies, either under this Agreement or by law or otherwise afforded to any Holder, shall be cumulative and not alternative.

6.8     **Captions.**   The captions to sections of this Agreement have been inserted for identification and reference purposes only and shall not be used to construe or interpret this Agreement.

6.9     **Counterparts.**   This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

6.10   **Costs and Attorneys' Fees.**   In the event that any action, suit or other proceeding is instituted concerning or arising out of this Agreement or any transaction contemplated hereunder, the prevailing party shall recover all of such party's costs and attorneys' fees incurred in each such action, suit or other proceeding, including any and all appeals or petitions therefrom.

6.11   **Adjustments for Recapitalization Events.**   Wherever in this Agreement there is a reference to a specific number of shares of Common Stock or Preferred Stock of the Company or a specific dollar amount per share, then, upon the occurrence of any stock split, stock dividend, reverse stock split or similar recapitalization event affecting such shares, the specific number of shares or dollar amount so referenced in this Agreement shall automatically be proportionally adjusted to reflect the effect on the outstanding shares of such class or series of stock of such recapitalization event.

6.12   **Waiver of Anti-Dilution Adjustment Rights.**   The undersigned Investors hereby expressly and irrevocably waive, for and on behalf of themselves and any other party on whose behalf such Investors may so waive, any and all anti-dilution conversion price adjustment rights with respect to any and all classes or series of the capital stock of the Company including, without limitation, the Preferred Stock, in connection with the issuance of the Breakwater

UCC_007426

UCC_007409

Warrant and any Equity Securities issued upon the exercise thereof, including, without limitation, the anti-dilution conversion price adjustment rights set forth in Article IV, Section 3(d)(iii) of the Restated Certificate as presently in effect, together with any and all notice and procedural rights which may arise in connection with any such waived rights.

6.13   **Aggregation of Stock.**   All shares held or acquired by Affiliates shall be aggregated together for the purpose of determining the availability of any rights under this Agreement.

*[Remainder of This Page Intentionally Left Blank]*

UCC_007427

UCC_007409

IN WITNESS WHEREOF, the parties hereto have executed this Investor Rights Agreement as of the date and year first above written.

**"COMPANY"**

**LOOT CRATE, INC.**

By: _____

Name: Christopher Davis
Title: Chief Executive Officer

*[Signature Page to Series A Investor Rights Agreement]*

UCC_007428

UCC_007409

COUNTERPART SIGNATURE PAGE TO
INVESTOR RIGHTS AGREEMENT

UPFRONT V, L.P.

By: Upfront GP V, LLC, its general partner
By: Upfront Ventures Management, LLC, its
managing member

_____

Greg Bettinelli
Partner

*[Signature Page to Series A Investor Rights Agreement]*

UCC_007429

UCC_007409

## COUNTERPART SIGNATURE PAGE TO
## INVESTOR RIGHTS AGREEMENT

**CLEMENTINE CAPITAL LLC**

By: _____
(Signature)

Name: Nick Grouf

Title: Authorized Signatory

*[Signature Page to Series A Investor Rights Agreement]*

UCC_007430

UCC_007409

**COUNTERPART SIGNATURE PAGE TO**
**INVESTOR RIGHTS AGREEMENT**

DORSET SQUARE LLC

By: _____
(Signature)

Name: David Waxman _____

Title: Authorized Signatory _____

*[Signature Page to Series A Investor Rights Agreement]*

UCC_007431

UCC_007409

## COUNTERPART SIGNATURE PAGE TO
## INVESTOR RIGHTS AGREEMENT

**FOR USE BY INDIVIDUALS:**

**"INVESTOR"**

**FOR USE BY ENTITIES:**

**"INVESTOR"**

Time Inc. ventures

_____
(Signature)

(Print Name of Entity)

Name: _____

By _____
(Signature)

Name: _Jeffrey John Bairstow_

Title: _President & Treasurer_

*[Signature Page to Series A Investor Rights Agreement]*

UCC_007432

UCC_007409

**COUNTERPART SIGNATURE PAGE TO**
**INVESTOR RIGHTS AGREEMENT**

"INVESTOR"

**DOWNEY VENTURES III LLC**

By: _____
Name: Steve Levin
Title:  Manager

*[Signature Page to Series A Investor Rights Agreement]*

UCC_007433

UCC_007409

**COUNTERPART SIGNATURE PAGE TO**
**INVESTOR RIGHTS AGREEMENT**

"INVESTOR"

**BREAKWATER CRATE HOLDINGS, LLC**

By: Breakwater Investment Management, LLC,
its Managing Member

By: _____
Name:  Saif  Mansar
Title:

*[Signature Page to Series A Investor Rights Agreement]*

UCC_007434

UCC_007409

## COUNTERPART SIGNATURE PAGE TO
## INVESTOR RIGHTS AGREEMENT

### "INVESTOR"

**HCC CAPITAL LP**

DocuSigned by:

*Courtney Reum*

By: _____80AAA3FFFFDE4A4..._____

Name:   Courtney Reum

Title:   Manager

*[Signature Page to Series A Investor Rights Agreement]*

UCC_007435

UCC_007409

**COUNTERPART SIGNATURE PAGE TO
INVESTOR RIGHTS AGREEMENT**

"INVESTOR"

**STERLINGVC I LLC**

By: _____
Name: Scott Wilson
Title: Partner
Address: 111 Great Neck Road, Suite 408
Great Neck, NY 11021

*[Signature Page to Series A Investor Rights Agreement]*

UCC_007436

UCC_007409

**EXHIBIT A**

**SCHEDULE OF INVESTORS**

| Name and Address | Number of Shares of Series A Preferred Stock Held |
|---|---|
| Upfront V, L.P.<br>C/O Upfront GP V, LLC<br>1314 7th Street, Suite 600<br>Santa Monica, CA 90401 | 1,093,202 |
| HCC Capital LP | 21,864 |
| SterlingVC I LLC<br>111 Great Neck Road, Suite 408<br>Great Neck, NY 11021 | 17,491 |
| Downey Ventures III LLC | 13,118 |
| Time Inc. Ventures<br>225 Liberty Street<br>New York, NY 10281<br>Attn: Jeff Bairstow | 306,097 |
| Breakwater Crate Holdings, LLC<br>1999 Avenue of the Stars, Suite 3430<br>Los Angeles, CA 90067<br>Attention: Saif Mansour | 174,912 |

| Name and Address | Number of Shares of Series A-1 Preferred Stock Held |
|---|---|
| Dorset Square LLC<br>8163 Melrose Avenue<br>Los Angeles, CA 90046 | 284,234 |
| Clementine Capital LLC<br>8163 Melrose Avenue<br>Los Angeles, CA 90046 | 568,469 |

# LOOT CRATE, INC.

# VOTING AGREEMENT

THIS VOTING AGREEMENT (this "***Agreement***") is made and entered into as of May 10, 2016, by and among Loot Crate, Inc., a Delaware corporation (the "***Company***"), each of those persons and entities, severally and not jointly, whose names are set forth on the Schedule of Investors attached hereto as <u>Exhibit A</u> (individually, an "***Investor***," and collectively, together with any subsequent purchasers or transferees who become parties hereto as an Investor pursuant to Sections 5.1 or 5.2, the "***Investors***"), and each of those persons, severally and not jointly, whose names are set forth on the Schedule of Key Holders attached hereto as <u>Exhibit B</u> (individually, a "***Key Holder***," or collectively, together with any subsequent purchasers or transferees who become parties hereto as a Key Holder pursuant to Sections 5.1 or 5.2, the "***Key Holders***," and, together with the Investors, the "***Stockholders***").

## RECITALS

A.    The Company and the Investors are parties to a Series A Preferred Stock Purchase Agreement of even date herewith (the "***Series A Agreement***") pursuant to which the Investors shall purchase shares of the Series A Preferred Stock of the Company (the "***Series A Preferred Stock***") and/or shares of the Series A-1 Preferred Stock of the Company (together with the Series A Preferred Stock, the "***Preferred Stock***").

B.    In order to induce the Investors to enter into the Series A Agreement and invest funds in the Company pursuant thereto, the Company and the Key Holders desire to enter into this Agreement with the Investors.

C.    The Amended and Restated Certificate of Incorporation of the Company (the "***Restated Certificate***") provides that (i) the holders of Preferred Stock, voting together as a single class on an as-converted basis, shall be entitled to elect one director of the Company (the "***Series A Director***"), (ii) the holders of Common Stock, voting as a separate class, shall be entitled to elect two (2) directors of the Company (each, a "***Common Director***"), and (iii) the holders of Preferred Stock and Common Stock, voting together as a single class on an as-converted basis, shall be entitled to elect the remaining directors of the Company ("***At-Large Directors***").

## AGREEMENT

NOW, THEREFORE, in consideration of mutual promises herein contained and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.    **Shares Subject to this Agreement**.  The Key Holders each agree to hold all shares of voting capital stock of the Company registered in their respective names or beneficially owned by them as of the date of this Agreement and any other shares of voting capital stock of the Company legally or beneficially held or acquired by them after the date hereof (the "***Key Holder Shares***") subject to, and to vote the Key Holder Shares in accordance with, the

WEST\268453087.11
383293-000012

UCC_007438

UCC_007438

provisions of this Agreement.  The Investors each agree to hold all shares of voting capital stock of the Company registered in their respective names or beneficially owned by them as of the date of this Agreement and any other shares of voting capital stock of the Company legally or beneficially held or acquired by them after the date hereof (the "*Investor Shares*" or, collectively with the Key Holder Shares, the "*Stockholder Shares*") subject to, and to vote the Investor Shares in accordance with, the provisions of this Agreement.

2.      **Board of Directors.**

2.1     **Size of Board.**   Each of the Stockholders shall vote all of their Stockholder Shares, and shall take all other necessary actions within their control (whether in their capacity as a stockholder, director, or officer of the Company or otherwise), including, without limitation, calling meetings, attending meetings, executing a proxy to vote at any meeting and executing written consents, in order to ensure that the size of the Board of Directors (the "*Board*") shall be set at five (5) directors.

2.2     **Board Composition.**   Each of the Stockholders shall vote all of their Stockholder Shares, and shall take all other necessary actions within their control (whether in their capacity as a stockholder, director, or officer of the Company or otherwise), including, without limitation, calling meetings, attending meetings, executing a proxy to vote at any meeting and executing written consents, to cause the election to the Board of:

(a)     One person designated by Upfront V, LP ("*Upfront*"), to serve as the Series A Director, who shall initially be Greg Bettinelli, for so long as Upfront and its Affiliates (as defined below) continue to own beneficially at least thirty percent (30%) of the shares of the Preferred Stock issued and sold by the Company to Upfront and its Affiliates pursuant to the terms and conditions of the Series A Agreement;

(b)     One person designated by Christopher Davis ("*Davis*"), or, at Davis's election, the holders of a majority of the issued and outstanding shares of the Common Stock (the "*Common Holders*"), to serve as a Common Director (the "*Non-CEO Common Director*"), which such seat shall initially be vacant; *provided, however*, that if Davis's service to the Company is terminated for Cause, the Non-CEO Common Director shall be designated by the Common Holders;

(c)     The Company's Chief Executive Officer, to serve as a Common Director (the "*CEO Director*"), who shall initially be Davis; and

(d)     Two persons not otherwise an Affiliate of the Company or any Investor who are, in each case, mutually acceptable to the Series A Director (if then serving) and the holders a majority of the issued and outstanding shares of the Common Stock, who shall serve as the At-Large Directors, which such seats shall initially be vacant.

For purposes of this Agreement, (i) an individual or entity shall be deemed an "*Affiliate*" of another individual or entity that, directly or indirectly, controls, is controlled by or is under common control with such individual or entity, including, without limitation, any general partner, managing member, officer or director of such entity or any venture capital fund now or hereafter existing that is controlled by one or more general partners or managing members of, or

WEST\268453087.11
383293-000012

UCC_007439
UCC_007438

shares the same management company with, such entity; and (ii) "*Cause*" shall mean (A) repeated gross negligence or willful misconduct in the performance of Davis's duties to the Company or a subsidiary thereof where such repeated gross negligence or willful misconduct has resulted or is likely to result in substantial and material damage to the Company or any subsidiary thereof; (B) failure or inability to perform any assigned duties after written notice from the Company to Davis of, and a reasonable opportunity to cure, such failure or inability; (C) commission of any act of fraud with respect to the Company or any subsidiary thereof causing material harm to the business, assets or reputation of the Company of any subsidiary thereof; (D) conviction (including any plea of no contest) of a felony or a crime involving moral turpitude; or (E) Davis's unauthorized use or disclosure of the confidential information or trade secrets of the Company or any subsidiary thereof which use causes material harm to the Company or any subsidiary thereof.

2.3    **Removal.**

(a)    Upon the request of any Investor that is entitled to designate a director pursuant to Section 2.2, each of the Stockholders shall vote all of their Stockholder Shares in favor of the removal of the director designated by that Investor.  Absent such a request by an Investor, the Stockholders agree not to vote their Stockholder Shares in favor of the removal of the director designated by such Investor.

(b)    In the event that the CEO Director shall cease to serve as the Chief Executive Officer of the Company without resigning from the Board, the Stockholders agree to vote all of their Stockholder Shares in favor of the removal of the former Chief Executive Officer from the position of CEO Director.

2.4    **Vacancies.**  If any representative designated as provided in Section 2.2 above for any reason ceases to serve as a member of the Board during his or her term of office, the parties to this Agreement shall cause the resulting vacancy to be filled by a representative designated as provided above by the respective person or persons entitled to designate such representative.

2.5    **Expenses Incurred by Non-Employee Directors.**  The Company shall reimburse all non-employee directors for their actual and reasonable out-of-pocket expenses incurred in attending meetings of the Board and all committees of the Board and otherwise incurred in fulfilling their duties as directors.

2.6    **Indemnification Agreements.**    At the date of the closing of the transactions contemplated by the Series A Agreement and on each later date that a director is first elected or appointed to the Board, the Company shall enter into an indemnification agreement in substantially the form attached hereto as Exhibit C with each director of the Company who is elected or appointed to the Board on such date.

3.    **Vote to Increase Authorized Common Stock.**  Each Stockholder agrees to vote or cause to be voted all Stockholder Shares beneficially owned by such Stockholder in whatever manner as shall be necessary to increase the number of authorized shares of Common Stock from

3

UCC_007440

UCC_007438

time to time to ensure that there will be sufficient shares of Common Stock available for conversion of all of the shares of Preferred Stock outstanding at any given time.

4.    **Drag-Along Right**.

      4.1    **Definitions**.  A "***Sale of the Company***" shall mean either: (a) a transaction or series of related transactions in which a Person, or a group of related Persons, acquires from stockholders of the Company shares representing more than fifty percent (50%) of the outstanding voting power of the Company (a "***Stock Sale***"); or (b) a transaction that qualifies as a "***Deemed Liquidation Event***" as defined in the Restated Certificate.  "***Shares***" shall mean and include any securities of the Company the holders of which are entitled to vote for members of the Board, including without limitation, all shares of Common Stock and Series A Preferred Stock, by whatever name called, now owned or subsequently acquired by a Stockholder, however acquired, whether through stock splits, stock dividends, reclassifications, recapitalizations, similar events or otherwise.  "***Person***" shall mean an individual, firm, corporation, partnership, association, limited liability company, trust or any other entity.

      4.2    **Actions to be Taken.**  In the event that (i) the holders of at least a majority of the shares of Common Stock then issued or issuable upon conversion of the shares of Series A Preferred Stock (the "***Selling Investors***"); (ii) the Board; and (iii) the holders of a majority of the then outstanding shares of Common Stock (other than those issued or issuable upon conversion of the shares of Series A Preferred Stock) (collectively, the "***Electing Holders***") approve a Sale of the Company in writing, specifying that this Section 4 shall apply to such transaction, then each Stockholder and the Company hereby agree:

      (a)    if such transaction requires stockholder approval, with respect to all Shares that such Stockholder owns or over which such Stockholder otherwise exercises voting power, to vote (in person, by proxy or by action by written consent, as applicable) all Shares in favor of, and adopt, such Sale of the Company (together with any related amendment to the Restated Certificate required in order to implement such Sale of the Company) and to vote in opposition to any and all other proposals that could reasonably be expected to delay or impair the ability of the Company to consummate such Sale of the Company;

      (b)    if such transaction is a Stock Sale, to sell the same proportion of shares of capital stock of the Company beneficially held by such Stockholder as is being sold by the Selling Investors to the Person to whom the Selling Investors propose to sell their Shares, and, except as permitted in Subsection 4.3 below, on the same terms and conditions as the Selling Investors;

      (c)    to execute and deliver all related documentation and take such other action in support of the Sale of the Company as shall reasonably be requested by the Company or the Selling Investors in order to carry out the terms and provision of this Section 4, including, without limitation, executing and delivering instruments of conveyance and transfer, and any purchase agreement, merger agreement, indemnity agreement, escrow agreement, consent, waiver, governmental filing, share certificates duly endorsed for transfer (free and clear of impermissible liens, claims and encumbrances), and any similar or related documents;

4

UCC_007441
UCC_007438

(d)      not to deposit, and to cause their Affiliates not to deposit, except as provided in this Agreement, any Shares of the Company owned by such party or Affiliate in a voting trust or subject any Shares to any arrangement or agreement with respect to the voting of such Shares, unless specifically requested to do so by the acquiror in connection with the Sale of the Company;

(e)      to refrain from exercising any dissenters' rights or rights of appraisal under applicable law at any time with respect to such Sale of the Company;

(f)      if the consideration to be paid in exchange for the Shares pursuant to this Section 4 includes any securities and due receipt thereof by any Stockholder would require under applicable law (x) the registration or qualification of such securities or of any person as a broker or dealer or agent with respect to such securities; or (y) the provision to any Stockholder of any information other than such information as a prudent issuer would generally furnish in an offering made solely to "accredited investors" as defined in Regulation D promulgated under the the Securities Act of 1933, as amended (the "*Securities Act*"), the Company may cause to be paid to any such Stockholder in lieu thereof, against surrender of the Shares which would have otherwise been sold by such Stockholder, an amount in cash equal to the fair value (as determined in good faith by the Company) of the securities which such Stockholder would otherwise receive as of the date of the issuance of such securities in exchange for the Shares; and

(g)      in the event that the Selling Investors, in connection with such Sale of the Company, appoint a stockholder representative (the "*Stockholder Representative*") with respect to matters affecting the Stockholders under the applicable definitive transaction agreements following consummation of such Sale of the Company, (x) to consent to (i) the appointment of such Stockholder Representative, (ii) the establishment of any applicable escrow, expense or similar fund in connection with any indemnification or similar obligations, and (iii) the payment of such Stockholder's pro rata portion (from the applicable escrow or expense fund or otherwise) of any and all reasonable fees and expenses to such Stockholder Representative in connection with such Stockholder Representative's services and duties in connection with such Sale of the Company and its related service as the representative of the Stockholders, and (y) not to assert any claim or commence any suit against the Stockholder Representative or any other Stockholder  with respect to any action or inaction taken or failed to be taken by the Stockholder Representative in connection with its service as the Stockholder Representative, absent fraud or willful misconduct.

4.3      **Exceptions**.  Notwithstanding the foregoing, a Stockholder will not be required to comply with Subsection 4.2 above in connection with any proposed Sale of the Company (the "*Proposed Sale*"), unless:

(a)      the liability for indemnification, if any, of such Stockholder in the Proposed Sale and for the inaccuracy of any representations and warranties made by the Company or its Stockholders in connection with such Proposed Sale, is several and not joint with any other Person (except to the extent that funds may be paid out of an escrow established to cover breach of representations, warranties and covenants of the Company as well as breach by any stockholder of any of identical representations, warranties and covenants provided by all

5

UCC_007442

UCC_007438

stockholders), and subject to the provisions of the Restated Certificate related to the allocation of the escrow, is pro rata in proportion to, and does not exceed, the amount of consideration paid to such Stockholder in connection with such Proposed Sale; and

(b)     upon the consummation of the Proposed Sale (i) each holder of each class or series of the Company's stock will receive the same form of consideration for their shares of such class or series as is received by other holders in respect of their shares of such same class or series of stock,  (ii) each holder of a series of Preferred Stock will receive the same amount of consideration per share of such series of Preferred Stock as is received by other holders in respect of their shares of such same series, (iii) each holder of Common Stock will receive the same amount of consideration per share of Common Stock as is received by other holders in respect of their shares of Common Stock, and (iv) unless the holders of at least a majority of the Series A Preferred Stock elect to receive a lesser amount by written notice given to the Company at least 20 days prior to the effective date of any such Proposed Sale, the aggregate consideration receivable by all holders of the Preferred Stock and Common Stock shall be allocated among the holders of Preferred Stock and Common Stock on the basis of the relative liquidation preferences to which the holders of each respective series of Preferred Stock and the holders of Common Stock are entitled in a Deemed Liquidation Event (assuming for this purpose that the Proposed Sale is a Deemed Liquidation Event) in accordance with the Company's Certificate of Incorporation in effect immediately prior to the Proposed Sale; provided, however, that, notwithstanding the foregoing, if the consideration to be paid in exchange for the Key Holder Shares or Investor Shares, as applicable, pursuant to this Subsection 4.3(b) includes any securities and due receipt thereof by any Key Holder or Investor would require under applicable law (x) the registration or qualification of such securities or of any person as a broker or dealer or agent with respect to such securities; or (y) the provision to any Key Holder or Investor of any information other than such information as a prudent issuer would generally furnish in an offering made solely to "accredited investors" as defined in Regulation D promulgated under the Securities Act, the Company may cause to be paid to any such Key Holder or Investor in lieu thereof, against surrender of the Key Holder Shares or Investor Shares, as applicable, which would have otherwise been sold by such Key Holder or Investor, an amount in cash equal to the fair value (as determined in good faith by the Company) of the securities which such Key Holder or Investor would otherwise receive as of the date of the issuance of such securities in exchange for the Key Holder Shares or Investor Shares, as applicable.

5.     **Miscellaneous.**

5.1     **Application of Agreement to Additional Shares.**  If, after the date of this Agreement, any shares or other securities are issued in respect of or in exchange for any of the Stockholder Shares as a result of any stock splits, stock dividends, recapitalizations, combinations, or similar transactions, such shares or securities shall be deemed to be Stockholder Shares for the purposes of this Agreement.

5.2     **Additional Parties; Successors and Assigns.**

(a)     Notwithstanding anything to the contrary herein, if the Company issues additional shares of Preferred Stock after the date hereof pursuant to the terms and conditions of the Series A Agreement, as a condition to the issuance of such shares, the

6

UCC_007443

UCC_007438

purchasers of such shares shall become a party to this Agreement by executing and delivering a counterpart signature page hereto agreeing to be bound by and subject to the terms and conditions of this Agreement. In either event, each such person shall thereafter be deemed an "Investor" and "Stockholder" for all purposes under this Agreement and, notwithstanding anything herein to the contrary, the Company shall, without needing the consent of any other party, amend Exhibit A hereto to include information regarding such persons.

(b)     Each transferee or assignee of any shares of capital stock of the Company subject to this Agreement shall continue to be subject to the terms and conditions hereof and, as a condition precedent to the Company's recognizing such transfer or assignment, each transferee or assignee shall become a party to this Agreement by executing and delivering a counterpart signature page hereto agreeing to be bound by and subject to the terms and conditions of this Agreement. In either event, each such person shall thereafter be deemed (a) an "Investor" or "Key Holder," as applicable, and (b) a Stockholder for all purposes under this Agreement and, notwithstanding anything herein to the contrary, the Company may, without needing the consent of any other party, amend Exhibit A or Exhibit B hereto, as applicable, to include information regarding such persons. The Company shall not permit the transfer or assignment of any shares of capital stock subject to this Agreement on its books or issue a new certificate representing any such shares of capital stock unless and until such transferee or assignee shall have complied with the terms and conditions of this Section 5.2(b).

(c)     For the avoidance of doubt, subject to the terms and conditions of this Agreement, this Agreement and the rights and obligations of the parties hereunder, will inure to the benefit of, and be binding upon, the parties' respective successors, assigns, heirs, executors, administrators and legal representatives; *provided*, *however*, that the Company shall not register the transfer or assignment of any Stockholder Shares or issue a new certificate representing any Stockholder Shares unless and until the transferee or assignee, as applicable, shall have executed a counterpart signature page to this Agreement, pursuant to which such person becomes a party to this Agreement and agrees to be bound by all the provisions of this Agreement as and to the same extent as if he, she or it were an original stockholder, as more fully set forth in this Section 5.2. Any transfer of shares in contravention of the foregoing shall be void *ab initio*. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

5.3     **Legends on Stock Certificates.** The certificates representing Stockholder Shares shall bear the following legend (the "*Legend*"), together with any other legends required by separate agreement and applicable law:

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THE TERMS AND CONDITIONS OF A VOTING AGREEMENT WHICH PLACES CERTAIN RESTRICTIONS ON THE VOTING OF THE SHARES REPRESENTED HEREBY.  ANY PERSON ACCEPTING ANY INTEREST IN SUCH SHARES SHALL BE DEEMED TO AGREE TO AND SHALL BECOME BOUND BY ALL THE PROVISIONS OF SUCH AGREEMENT.  A COPY OF SUCH VOTING AGREEMENT WILL BE FURNISHED TO THE

WEST\268453087.11
383293-000012

UCC_007444

UCC_007438

RECORD HOLDER OF THIS CERTIFICATE WITHOUT CHARGE UPON WRITTEN REQUEST TO THE COMPANY AT ITS PRINCIPAL PLACE OF BUSINESS.

The Company agrees that, during the term of this Agreement, it will maintain (upon registration of transfer, reissuance, or otherwise), the Legend on any such certificate and will place or cause to be placed the Legend on any new certificate issued to represent Stockholder Shares. The failure of the Company to cause the certificates evidencing the Stockholder Shares to bear the Legend or the failure of the Company to supply, free of charge, a copy of this Agreement as provided hereunder shall not affect the validity or enforcement of this Agreement.

      5.4    **Stockholder Representations.** Each Stockholder represents and warrants that (a) such Stockholder owns its Stockholder Shares free and clear of liens and encumbrances and has not, prior to or on the date of this Agreement, executed or delivered any proxy or entered into any other voting agreement or similar arrangement with respect to such shares and (b) such Stockholder has full power and capacity to execute, deliver, and perform this Agreement, which has been duly executed and delivered by, and evidences the valid and binding obligation of, such Stockholder, enforceable in accordance with its terms.

      5.5    **Irrevocable Proxy.** To insure the performance of each Stockholder with the provisions set forth in this Agreement, each Stockholder hereby appoints the Secretary of the Company or his designee, as his, her, or its true and lawful proxy and attorney-in-fact, with full power of substitution and resubstitution, to vote all Stockholder Shares owned or held by such Stockholder, subject to the provisions of this Agreement, upon any matter presented to the stockholders of the Company, if (and only if) such Stockholder fails to comply with the provisions of this Agreement. The proxies and powers granted by each Stockholder pursuant to the preceding sentence are coupled with an interest and are given to secure the performance of such Stockholder's commitments under this Agreement. Such proxies shall be irrevocable for the term of this Agreement and shall survive the death, incompetency, disability, dissolution or winding up of such Stockholder. Except as provided above, no Stockholder shall grant a proxy with respect to, transfer any voting control over, or create any right to vote any shares of capital stock of the Company without the prior written consent of the Company.

      5.6    **Specific Enforcement.** It is agreed and understood that monetary damages would not adequately compensate an injured Stockholder for the breach of this Agreement by any party to this Agreement, that this Agreement shall be specifically enforceable, and that any breach or threatened breach of this Agreement shall be the proper subject of a temporary or permanent injunction or restraining order. Further, each of the Company and the Stockholders waives any claim or defense that there is an adequate remedy at law for such breach or threatened breach.

      5.7    **Remedies Cumulative.** All remedies, either under this Agreement, by law, or otherwise afforded to any party, shall be cumulative and not alternative.

      5.8    **Termination.** This Agreement shall terminate and be of no further force or effect upon the earliest to occur of (a) the date of the closing of a firmly underwritten public offering of the Common Stock pursuant to a registration statement filed with the Securities and

WEST\268453087.11
383293-000012

UCC_007445

UCC_007438

Exchange Commission, and declared effective under the Securities Act, which results in the outstanding Preferred Stock of the Company being converted into Common Stock, or (b) the closing of a transaction that is deemed to be a liquidation pursuant to the Restated Certificate.

5.9    **Third Parties.**  Nothing in this Agreement, express or implied, is intended to confer upon any person, other than the parties to this Agreement and their respective successors and assigns, any rights, remedies, obligations, or liabilities under or by reason of this Agreement except as expressly provided in this Agreement.

5.10    **Governing Law.**  This Agreement shall be governed by and construed under the laws of the State of Delaware in all respects as such laws are applied to agreements among Delaware residents entered into and performed entirely within Delaware.  The parties agree that any action brought by either party under or in relation to this Agreement, including, without limitation to interpret or enforce any provision of this Agreement, shall be brought in, and each party agrees to and does hereby submit to the jurisdiction and venue of, any state or federal court located in the County of Santa Clara, California.

5.11    **Counterparts.**  This Agreement may be executed in any number of counterparts, each of which shall be enforceable against the parties actually executing such counterparts, and all of which together shall constitute one instrument.

5.12    **Headings, Titles and Subtitles; References.**  The titles and subtitles used in this Agreement are for convenience only and are not to be considered in construing or interpreting this Agreement.  All references in this Agreement to sections, paragraphs, exhibits and schedules shall, unless otherwise provided, refer to sections and paragraphs hereof and exhibits and schedules attached hereto, all of which exhibits and schedules are incorporated herein by this reference.

5.13    **Notices, Etc.**  Any notice, request or other communication required or permitted hereunder shall be in writing and shall be deemed to have been duly given if delivered personally, by facsimile when receipt is electronically confirmed, one business day after delivery to a nationally recognized overnight delivery service, or otherwise upon receipt, addressed (i) if to an Investor, at the address set forth below such Investor's name on Exhibit A, (ii) if to a Key Holder, at the address set forth below such Key Holder's name on Exhibit B, and (iii) if to the Company, at the following address:

> **LOOT CRATE, INC.**
> 3401 Pasadena Avenue
> Los Angeles, CA 90031
> Attention: Chief Executive Officer
>
> with a copy, which shall not constitute notice, to:
>
> **DLA PIPER LLP (US)**
> 2000 University Avenue
> East Palo Alto, CA 94303-2215
> Attention: Curtis L. Mo, Esq.
> Email: curtis.mo@dlapiper.com

9

UCC_007446
UCC_007438

Fax: (650) 687-1170

Any party hereto may, by ten (10) days' prior notice so given, change its address for future notices hereunder.

5.14    **Costs and Attorneys' Fees.**  Notwithstanding any other provision herein, if any action at law or in equity is instituted under or in relation to this Agreement, including without limitation to enforce any provision in this Agreement, the prevailing party in such dispute shall be entitled to recover from the losing party all fees, costs and expenses of enforcing any right of such prevailing party under or with respect to this Agreement, including without limitation, such reasonable fees and expenses of attorneys and accountants, which shall include, without limitation, all fees, costs and expenses of appeals.

5.15    **Severability.**  If one or more provisions of this Agreement are held to be invalid, illegal, or unenforceable under applicable law, then such provision(s) shall be excluded from this Agreement and the balance of the Agreement shall be interpreted as if such provision(s) had never been contained herein.

5.16    **Entire Agreement; Amendment; Waiver.**  This Agreement, together with all the exhibits hereto, constitutes and contains the entire agreement and understanding of the parties with respect to the subject matter hereof and supersedes any and all prior negotiations, correspondence, agreements, understandings, duties or obligations between the parties with respect to the subject matter hereof.  Any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively) only with the written consent of (i) the Company, (ii) the holders of a majority of the Investor Shares, and (iii) the holders of a majority of the Key Holder Shares who are then providing services to the Company as officers, directors, employees or consultants; *provided, however,* that any amendment or waiver of this Agreement shall also require the written consent of any party that is adversely affected by such amendment or waiver to a materially greater degree than the other parties hereto *provided, further,* that Section 2.2(a) and this Section 5.16 cannot be amended, waived, discharged or terminated without the prior written consent of Upfront.

5.17    **Delays or Omissions.**  No delay or omission to exercise any right, power or remedy accruing to any party, upon any breach, default or noncompliance by another party under this Agreement shall impair any such right, power or remedy, nor shall it be construed to be a waiver of any such breach, default or noncompliance, or any acquiescence therein, or of or in any similar breach, default or noncompliance thereafter occurring.

5.18    **Further Assurances.**  From and after the date of this Agreement, upon the reasonable request of any Stockholder or the Company, the Company and the Stockholders shall execute and deliver such instruments, documents, or other writings as may be reasonably necessary or desirable to confirm and carry out and to effectuate fully the intent and purposes of this Agreement.

5.19    **Adjustments for Recapitalization Events.**  Wherever in this Agreement there is a reference to a specific number of shares of Common Stock or Preferred Stock of the

WEST\268453087.11
383293-000012

UCC_007447
UCC_007438

Company or a specific dollar amount per share, then, upon the occurrence of any stock split, stock dividend, reverse stock split or similar recapitalization event affecting such shares, the specific number of shares or dollar amount so referenced in this Agreement shall automatically be proportionally adjusted to reflect the effect on the outstanding shares of such class or series of stock of such recapitalization event.

        5.20    **Aggregation of Stock.**  All Stockholder Shares held or acquired by a Stockholder and its Affiliates shall be aggregated together for the purpose of determining the availability of any rights of such Stockholder under this Agreement.  For purposes of the foregoing, the shares held by any Stockholder that (a) is a partnership or corporation shall be deemed to include shares held by affiliated partnerships or the partners, retired partners, and stockholders of such holder or affiliated partnership, or any spouse, father, mother, brother, sister, lineal descendant of spouse, or lineal descendant (the "***Immediate Family***") of any such partners, retired partners, and stockholders, and any custodian or trustee for the benefit of any of the foregoing persons and (b) is an individual shall be deemed to include shares held by any members of the Stockholder's Immediate Family or to any custodian or trustee for the benefit of any of the foregoing persons.

        5.21    **No Heightened Duties.**  Each party hereby acknowledges and agrees that no fiduciary duty, duty of care, duty of loyalty or other heightened duty shall be created or imposed upon any party to any other party, the Company or other stockholder of the Company, by reason of this Agreement and/or any right or obligation hereunder.  None of the Stockholders and no officer, director, stockholder, partner, employee or agent of any Stockholder makes any representation or warranty as to the fitness or competence of the nominee of any party hereunder to serve on the Board by virtue of such party's execution of this Agreement or by the act of such party in voting for such nominee pursuant to this Agreement.

*[Signature Page Follows]*

11

WEST\268453087.11
383293-000012

UCC_007448

UCC_007438

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

"COMPANY"

**LOOT CRATE, INC.**

By: _____
Name: Christopher Davis
Title: Chief Executive Officer

"KEY HOLDERS"

_____
Name: Christopher Davis

_____
Name: Matthew Arevalo

*[Signature Page to Series A Voting Agreement]*

UCC_007449

UCC_007438

COUNTERPART SIGNATURE PAGE TO
VOTING AGREEMENT

UPFRONT V, L.P.

By: Upfront GP V, LLC, its general partner
By: Upfront Ventures Management, LLC, its
managing member

Greg Bettinelli
Partner

*[Signature Page to Series A Voting Agreement]*

UCC_007450

UCC_007438

## COUNTERPART SIGNATURE PAGE TO
## VOTING AGREEMENT

CLEMENTINE CAPITAL LLC

By: _____
(Signature)

Name: <u>Nick Grouf</u>

Title: <u>Authorized Signatory</u>

*[Signature Page to Series A Voting Agreement]*

UCC_007451

UCC_007438

**COUNTERPART SIGNATURE PAGE TO
VOTING AGREEMENT**

DORSET SQUARE LLC

By: _____
        (Signature)

Name: David Waxman

Title: Authorized Signatory

*[Signature Page to Series A Voting Agreement]*

COUNTERPART SIGNATURE PAGE TO
VOTING AGREEMENT

FOR USE BY INDIVIDUALS:                    FOR USE BY ENTITIES:

"INVESTOR"                                 "INVESTOR"


_____                  Time Inc. ventures
(Signature)                                (Print Name of Entity)

Name: _____                    By _____
                                              (Signature)

                                           Name: Jeffrey John Bairstow
                                           Title: President & Treasurer

*[Signature Page to Series A Voting Agreement]*

UCC_007453

UCC_007438

**COUNTERPART SIGNATURE PAGE TO**
**VOTING AGREEMENT**

"INVESTOR"

**DOWNEY VENTURES III LLC**

By: _____
Name: Steve Levin
Title: Manager

*[Signature Page to Series A Voting Agreement]*

**COUNTERPART SIGNATURE PAGE TO**
**VOTING AGREEMENT**

"INVESTOR"

**BREAKWATER CRATE HOLDINGS, LLC**

By: Breakwater Investment Management, LLC,
its Managing Member

By: _____
Name: Saif Mansar
Title:

*[Signature Page to Series A Voting Agreement]*

UCC_007455

UCC_007438

## COUNTERPART SIGNATURE PAGE TO
## VOTING AGREEMENT

### "INVESTOR"

### HCC CAPITAL LP

By: _Courtney Reum_
             —— 80AAA3FFFFDE4A4...

Name:    Courtney Reum

Title:      Manager

*[Signature Page to Series A Voting Agreement]*

UCC_007456

UCC_007438

**COUNTERPART SIGNATURE PAGE TO**
**VOTING AGREEMENT**

"INVESTOR"

STERLINGVC I LLC

By: _____
Name: Scott Wilpon
Title: Partner
Address: 111 Great Neck Road, Suite 408
Great Neck, NY 11021

*[Signature Page to Series A Voting Agreement]*

UCC_007457

UCC_007438

## EXHIBIT A

## SCHEDULE OF INVESTORS

| Name and Address | Number of Shares of Series A Preferred Stock Held |
| --- | --- |
| Upfront V, L.P.<br>C/O Upfront GP V, LLC<br>1314 7th Street, Suite 600<br>Santa Monica, CA 90401 | 1,093,202 |
| HCC Capital LP | 21,864 |
| SterlingVC I LLC<br>111 Great Neck Road, Suite 408<br>Great Neck, NY 11021 | 17,491 |
| Downey Ventures III LLC | 13,118 |
| Time Inc. Ventures<br>225 Liberty Street<br>New York, NY 10281<br>Attn: Jeff Bairstow | 306,097 |
| Breakwater Crate Holdings, LLC<br>1999 Avenue of the Stars, Suite 3430<br>Los Angeles, CA 90067<br>Attention: Saif Mansour | 174,912 |

| Name and Address | Number of Shares of Series A-1 Preferred Stock Held |
| --- | --- |
| Dorset Square LLC<br>8163 Melrose Avenue<br>Los Angeles, CA 90046 | 284,234 |
| Clementine Capital LLC<br>8163 Melrose Avenue<br>Los Angeles, CA 90046 | 568,469 |

UCC_007458<br>UCC_007438

## EXHIBIT B

## SCHEDULE OF KEY HOLDERS

| Name and Address | Number of Shares of Common Stock Held |
| --- | --- |
| Christopher Davis<br>3585 Helms Ave<br>Culver City, CA 90232 | 5,500,000 |
| Matthew Arevalo<br>3700 San Augustine Drive<br>Glendale, CA 91206 | 2,250,000 |

UCC_007459

UCC_007438

# EXHIBIT C

## FORM OF INDEMNIFICATION AGREEMENT

WEST\268453087.11
383293-000012

UCC_007460

UCC_007438