Exhibit S

**From:** "Thomas, Stefani" <stefani.thomas@bclplaw.com>
**To:** Dana Kibler <dana@upfront.com>, "Chris Davis (Chris@lootcrate.com)" <Chris@lootcrate.com>, "azyngier@batutaadvisors.com" <azyngier@batutaadvisors.com>, "osman.khan.nl@lootcrate.com" <osman.khan.nl@lootcrate.com>
**Cc:** "Sonya Bhatia (sonya.bhatia@lootcrate.com)" <sonya.bhatia@lootcrate.com>, "Mari Provenzano (mari.provenzano@lootcrate.com)" <mari.provenzano@lootcrate.com>, "Schoulder, Andrew" <andrew.schoulder@bclplaw.com>
**Subject:** RE: Loot Crate - July 23, 2018 through August 2, 2018 and June 13, 2019 Board Meeting Minutes for Approval at July 2019 meeting
**Date:** Sun, 14 Jul 2019 05:46:40 +0000
**Importance:** Normal
**Attachments:** 2018-2019_Board_Meeting_Minutes_for_Approval_(07-23-18_through_08-02-18)_(Part_2)_(Revised).zip; 12754160_Loot_Crate_Parent_and_Loot_Crate_-_Board_Meeting_Minutes_(6-13-19)-v4.DOCX; 12751430_Loot_Crate_-_Form_of_Indemnification_Agreement-v2.docx

---

All,

Attached are draft meeting minutes for the June 13, 2019 Board meeting as well as the minutes from July-August 2018 that were previously circulated except that I've revised the August 2, 2018 meeting minutes to reflect Dana's comment below. did not make any other changes to the other minutes circulated in that batch.

Please review these draft minutes in advance of the meeting on Tuesday and let me know if you have any comments so we can have them approved at that meeting.

Best regards,
Stefani

Bryan Cave
Leighton Paisner
Logo

STEFANI THOMAS
Associate
BRYAN CAVE LEIGHTON PAISNER LLP - Santa Monica, CA USA
stefani.thomas@bclplaw.com
T: +1 310 576 2264

**From:** Dana Kibler [mailto:dana@upfront.com]
**Sent:** Monday, June 17, 2019 3:38 PM
**To:** Thomas, Stefani
**Cc:** Chris Davis (Chris@lootcrate.com); azyngier@batutaadvisors.com; osman.khan.nl@lootcrate.com; Sonya Bhatia (sonya.bhatia@lootcrate.com); Mari Provenzano (mari.provenzano@lootcrate.com); tyler.farrell@lootcrate.com; Schoulder, Andrew
**Subject:** Re: Loot Crate - July 23, 2018 through August 2, 2018 Board Meeting Minutes for Approval at June 2019 meeting

Stefani,

I have a comment on the August 2, 2018 minutes. While it was reflected that as a shareholder I expressed concerns about the warrants and the potential for exposing the company lawsuits, I also commented specifically as a Director that I had deep concerns about the Atalya financing because

it did not solve the company's liquidity issues, and I felt the company would find itself in default within a short amount of time with the new lender. Please reflect those comments in the minutes.

Thank you,
Dana

On Wed, Jun 12, 2019 at 6:43 PM Thomas, Stefani <stefani.thomas@bclplaw.com> wrote:

All,

Attached are draft meeting minutes for the meetings held on the following dates:

July 23, 2018
July 24, 2018
July 26, 2018
July 27, 2018
July 30, 2018
August 1, 2018
August 2, 2018

Please let me know if you have any comments or revisions.

Best regards,
Stefani

---

| Bryan Cave Leighton Paisner Logo | STEFANI THOMAS |
| --- | --- |
| | Associate |
| | BRYAN CAVE LEIGHTON PAISNER LLP – Santa Monica, CA USA |
| | stefani.thomas@bclplaw.com |
| | T: +1 310 576 2264 |

---

**From:** Thomas, Stefani
**Sent:** Tuesday, May 28, 2019 7:29 AM
**To:** Chris Davis (Chris@lootcrate.com); azyngier@batutaadvisors.com; osman.khan.nl@lootcrate.com; dana@upfront.com
**Cc:** Sonya Bhatia (sonya.bhatia@lootcrate.com); Mari Provenzano (mari.provenzano@lootcrate.com); tyler.farrell@lootcrate.com; Schoulder, Andrew
**Subject:** Loot Crate - June 12, 2018 through April 3, 2019 Board Meeting Minutes for Approval at June 2019 meeting

All,

Attached are draft Board meeting minutes for the meetings held on the following dates.  Please review these in advance of the June 13, 2019 meeting so we can have them approved at the meeting.

June 22, 2018 (previously provided for review)
August 17, 2018 (previously provided for review)
September 20, 2018 (previously provided for review)
October 18, 2018 (previously provided for review)
November 15, 2019
December 13, 2019

January 18, 2019
January 22, 2019
February 7, 2019
March 5, 2019
March 27, 2019
April 3, 2019

Please let me know if you have any comments or revisions.  Minutes from meetings held from July 23, 2018 - August 2, 2018 and on March 21, 2019 will be sent separately in advance of the June 13, 2019 meeting.

Best regards,
Stefani

Bryan Cave
Leighton Paisner
Logo

STEFANI THOMAS
Associate
BRYAN CAVE LEIGHTON PAISNER LLP · Santa Monica, CA USA
stefani.thomas@bclplaw.com
T: +1 310 576 2264

---

**From:** Thomas, Stefani
**Sent:** Tuesday, May 28, 2019 5:33 AM
**To:** Chris Davis (Chris@lootcrate.com); azyngier@batutaadvisors.com; osman.khan.nl@lootcrate.com; dana@upfront.com
**Cc:** Sonya Bhatia (sonya.bhatia@lootcrate.com); Mari Provenzano (mari.provenzano@lootcrate.com); tyler.farrell@lootcrate.com; Schoulder, Andrew
**Subject:** Loot Crate - 2017- June 13, 2018 Board Meeting Minutes for Approval by Written Consent

All,

Attached is a zip file with the draft Board meeting minutes for the meetings from November 15, 2017 through June 13, 2018, which were all previously sent to you for review and comment. The latest zip file reflects the deletion of minutes from April 2017 through November 2017, which Loot Crate has confirmed were previously approved by the Board.

Please confirm your approval of the attached minutes by executing the written consent of the Board for Loot Crate, Inc. and Loot Crate Parent, Inc., as applicable.  The Board minutes from June 22, 2018 through April 3, 2019 will be provided separately for your review, which we plan to have approved at the June 13, 2019 Board meeting.

Please let me know if you have any questions.

Best regards,
Stefani

Bryan Cave
Leighton Paisner
Logo

STEFANI THOMAS
Associate
stefani.thomas@bclplaw.com
T: +1 310 576 2264  F: +1 310 260 7164

BRYAN CAVE LEIGHTON PAISNER LLP
120 Broadway, Suite 300, Santa Monica, CA 90401-2386

bclplaw.com

This electronic message is from a law firm. It may contain confidential or privileged information. If you received this transmission in error, please reply to the sender to advise of the error and delete this transmission and any attachments.

We may monitor and record electronic communications in accordance with applicable laws and regulations. Where appropriate we may also share certain information you give us with our other offices (including in other countries) and select third parties. For further information (including details of your privacy rights and how to exercise them), see our updated Privacy Notice at www.bciplaw.com.

--

Dana Kibler
**Upfront Ventures**
310.785.5183

This electronic message is from a law firm. It may contain confidential or privileged information. If you received this transmission in error, please reply to the sender to advise of the error and delete this transmission and any attachments.

We may monitor and record electronic communications in accordance with applicable laws and regulations. Where appropriate we may also share certain information you give us with our other offices (including in other countries) and select third parties. For further information (including details of your privacy rights and how to exercise them), see our updated Privacy Notice at www.bciplaw.com.

UFV-000670

760

00000757

## INDEMNIFICATION AGREEMENT

This INDEMNIFICATION AGREEMENT (the "**Agreement**") is made and entered into as of _____ ___, 201__ between Loot Crate Parent, Inc., a Delaware corporation (the "**Company**"), and _____ ("**Indemnitee**").

**WITNESSETH THAT:**

**WHEREAS**, highly competent persons have become more reluctant to serve corporations as directors, officers or in other capacities unless they are provided with adequate protection through insurance or adequate indemnification against inordinate risks of claims and actions against them arising out of their service to and activities on behalf of the corporation;

**WHEREAS**, the Board of Directors of the Company (the "**Board**") has determined that, in order to attract and retain qualified individuals, the Company will attempt to maintain on an ongoing basis, at its sole expense, liability insurance to protect persons serving the Company and its subsidiaries from certain liabilities. Although the furnishing of such insurance has been a customary and widespread practice among United States-based corporations and other business enterprises, the Company believes that, given current market conditions and trends, such insurance may be available to it in the future only at higher premiums and with more exclusions. At the same time, directors, officers, and other persons in service to corporations or business enterprises are being increasingly subjected to expensive and time-consuming litigation relating to, among other things, matters that traditionally would have been brought only against the Company or business enterprise itself. The Certificate of Incorporation of the Company requires, and the Bylaws of the Company permit, indemnification of the officers and directors of the Company. Indemnitee may also be entitled to indemnification pursuant to the General Corporation Law of the State of Delaware ("**DGCL**"). The Bylaws and Certificate of Incorporation and the DGCL expressly provide that the indemnification provisions set forth therein are not exclusive, and thereby contemplate that contracts may be entered into between the Company and members of the Board, officers and other persons with respect to indemnification;

**WHEREAS**, the uncertainties relating to such insurance and to indemnification have increased the difficulty of attracting and retaining such persons;

**WHEREAS**, the Board has determined that the increased difficulty in attracting and retaining such persons is detrimental to the best interests of the Company's stockholders and that the Company should act to assure such persons that there will be increased certainty of such protection in the future;

**WHEREAS**, it is reasonable, prudent and necessary for the Company contractually to obligate itself to indemnify, and to advance expenses on behalf of, such persons to the fullest extent permitted by applicable law so that they will serve or continue to serve the Company free from undue concern that they will not be so indemnified;

**WHEREAS**, this Agreement is a supplement to and in furtherance of the Bylaws and Certificate of Incorporation of the Company and any resolutions adopted pursuant thereto, and shall not be deemed a substitute therefor, nor to diminish or abrogate any rights of Indemnitee thereunder; and

154140019 v4
12751430.2

UFV-000671

761

00000761

**WHEREAS**, Indemnitee does not regard the protection available under the Company's Bylaws and Certificate of Incorporation and insurance as adequate in the present circumstances, and may not be willing to serve as an officer or director without adequate protection, and the Company desires Indemnitee to serve in such capacity.  Indemnitee is willing to serve, continue to serve and to take on additional service for or on behalf of the Company on the condition that he be so indemnified.

**NOW, THEREFORE**, in consideration of Indemnitee's agreement to serve as an officer or director from and after the date hereof, the parties hereto agree as follows:

1.    <u>Indemnity of Indemnitee</u>.  The Company hereby agrees to hold harmless and indemnify Indemnitee to the fullest extent permitted by law, as such may be amended from time to time.  In furtherance of the foregoing indemnification, and without limiting the generality thereof.

(a)    <u>Proceedings Other Than Proceedings by or in the Right of the Company</u>. Indemnitee shall be entitled to the rights of indemnification provided in this <u>Section 1(a)</u> if, by reason of his Corporate Status (as hereinafter defined), the Indemnitee is, or is threatened to be made, a party to or participant in any Proceeding (as hereinafter defined) other than a Proceeding by or in the right of the Company.  Pursuant to this <u>Section 1(a)</u>, Indemnitee shall be indemnified against all Expenses (as hereinafter defined), judgments, penalties, fines and amounts paid in settlement actually and reasonably incurred by him, or on his behalf, in connection with such Proceeding or any claim, issue or matter therein, if the Indemnitee acted in good faith and in a manner the Indemnitee reasonably believed to be in or not opposed to the best interests of the Company, and with respect to any criminal Proceeding, had no reasonable cause to believe the Indemnitee's conduct was unlawful.

(b)    <u>Proceedings by or in the Right of the Company</u>.  Indemnitee shall be entitled to the rights of indemnification provided in this <u>Section 1(b)</u> if, by reason of his Corporate Status, the Indemnitee is, or is threatened to be made, a party to or participant in any Proceeding brought by or in the right of the Company.  Pursuant to this <u>Section 1(b)</u>, Indemnitee shall be indemnified against all Expenses actually and reasonably incurred by the Indemnitee, or on the Indemnitee's behalf, in connection with such Proceeding if the Indemnitee acted in good faith and in a manner the Indemnitee reasonably believed to be in or not opposed to the best interests of the Company; <u>provided</u>, <u>however</u>, if applicable law so provides, no indemnification against such Expenses shall be made in respect of any claim, issue or matter in such Proceeding as to which Indemnitee shall have been adjudged to be liable to the Company unless and to the extent that the Court of Chancery of the State of Delaware shall determine that such indemnification may be made.

(c)    <u>Indemnification for Expenses of a Party Who is Wholly or Partly Successful</u>.  Notwithstanding any other provision of this Agreement, to the extent that Indemnitee is, by reason of his Corporate Status, a party to and is successful, on the merits or otherwise, in any Proceeding, he shall be indemnified to the maximum extent permitted by law, as such may be amended from time to time, against all Expenses actually and reasonably incurred by him or on his behalf in connection therewith.  If Indemnitee is not wholly successful in such Proceeding but is successful, on the merits or otherwise, as to one or more but less than all claims, issues or matters in such Proceeding, the Company shall indemnify Indemnitee against all Expenses actually and reasonably incurred by him or on his behalf in connection with

2

each successfully resolved claim, issue or matter.  For purposes of this Section and without limitation, the termination of any claim, issue or matter in such a Proceeding by dismissal, with or without prejudice, shall be deemed to be a successful result as to such claim, issue or matter.

(d)    Indemnification of Appointing Stockholder.  If (i) Indemnitee is or was affiliated with one or more venture capital funds, including the Fund, that has invested in the Company (an "**Appointing Stockholder**"), (ii) the Appointing Stockholder is, or is threatened to be made, a party to or a participant in any Proceeding, and (iii) the Appointing Stockholder's involvement in the Proceeding results from any claim based on the Indemnitee's Corporate Status, the Appointing Stockholder will be entitled to indemnification hereunder for Expenses to the same extent as Indemnitee, and the terms of this Agreement as they relate to procedures for indemnification of Indemnitee and advancement of Expenses shall apply to any such indemnification of Appointing Stockholder. The rights provided to the Appointing Stockholder under this Section 2 shall terminate on an initial public offering of the Company's Common Stock; provided, however, that in the event of any such termination, the Appointing Stockholder's rights to indemnification will not be terminated with respect to any Proceeding based in whole or in part on facts and circumstances occurring at any time prior to such termination regardless of whether the Proceeding arises before or after such termination. The Company and Indemnitee agree that the Appointing Stockholder is an express third party beneficiary of the terms of this Section 1(d).

2.    Additional Indemnity.  In addition to, and without regard to any limitations on, the indemnification provided for in Section 1 of this Agreement, the Company shall and hereby does indemnify and hold harmless Indemnitee against all Expenses, judgments, penalties, fines and amounts paid in settlement actually and reasonably incurred by him or on his behalf if, by reason of his Corporate Status, he is, or is threatened to be made, a party to or participant in any Proceeding (including a Proceeding by or in the right of the Company), including, without limitation, all liability arising out of the negligence or active or passive wrongdoing of Indemnitee.  The only limitation that shall exist upon the Company's obligations pursuant to this Agreement shall be that the Company shall not be obligated to make any payment to Indemnitee that is finally determined (under the procedures, and subject to the presumptions, set forth in Sections 6 and 7 hereof) to be unlawful.

3.    Contribution.

(a)    Whether or not the indemnification provided in Sections 1 and 2 hereof is available, in respect of any threatened, pending or completed action, suit or proceeding in which the Company is jointly liable with Indemnitee (or would be if joined in such action, suit or proceeding), the Company shall pay, in the first instance, the entire amount of any judgment or settlement of such action, suit or proceeding without requiring Indemnitee to contribute to such payment and the Company hereby waives and relinquishes any right of contribution it may have against Indemnitee.  The Company shall not enter into any settlement of any action, suit or proceeding in which the Company is jointly liable with Indemnitee (or would be if joined in such action, suit or proceeding) unless such settlement provides for a full and final release of all claims asserted against Indemnitee.

(b)    Without diminishing or impairing the obligations of the Company set forth in the preceding subparagraph, if, for any reason, Indemnitee shall elect or be required to pay all or any portion of any judgment or settlement in any threatened, pending or completed action, suit

3

or proceeding in which the Company is jointly liable with Indemnitee (or would be if joined in such action, suit or proceeding), the Company shall contribute to the amount of Expenses, judgments, fines and amounts paid in settlement actually and reasonably incurred and paid or payable by Indemnitee in proportion to the relative benefits received by the Company and all officers, directors or employees of the Company, other than Indemnitee, who are jointly liable with Indemnitee (or would be if joined in such action, suit or proceeding), on the one hand, and Indemnitee, on the other hand, from the transaction or events from which such action, suit or proceeding arose; provided, however, that the proportion determined on the basis of relative benefit may, to the extent necessary to conform to law, be further adjusted by reference to the relative fault of the Company and all officers, directors or employees of the Company other than Indemnitee who are jointly liable with Indemnitee (or would be if joined in such action, suit or proceeding), on the one hand, and Indemnitee, on the other hand, in connection with the transaction or events that resulted in such expenses, judgments, fines or settlement amounts, as well as any other equitable considerations which applicable law may require to be considered. The relative fault of the Company and all officers, directors or employees of the Company, other than Indemnitee, who are jointly liable with Indemnitee (or would be if joined in such action, suit or proceeding), on the one hand, and Indemnitee, on the other hand, shall be determined by reference to, among other things, the degree to which their actions were motivated by intent to gain personal profit or advantage, the degree to which their liability is primary or secondary and the degree to which their conduct is active or passive.

(c)     The Company hereby agrees to fully indemnify and hold Indemnitee harmless from any claims of contribution which may be brought by past or present officers, directors, or employees of the Company, other than Indemnitee, who may be jointly liable with Indemnitee.

(d)     To the fullest extent permissible under applicable law, if the indemnification provided for in this Agreement is unavailable to Indemnitee for any reason whatsoever, the Company, in lieu of indemnifying Indemnitee, shall contribute to the amount incurred by Indemnitee, whether for judgments, fines, penalties, excise taxes, amounts paid or to be paid in settlement and/or for Expenses, in connection with any claim relating to an indemnifiable event under this Agreement, in such proportion as is deemed fair and reasonable in light of all of the circumstances of such Proceeding in order to reflect (i) the relative benefits received by the Company and Indemnitee as a result of the event(s) and/or transaction(s) giving cause to such Proceeding and/or (ii) the relative fault of the Company (and its directors, officers, employees and agents) and Indemnitee in connection with such event(s) and/or transaction(s).

4.     Indemnification for Expenses of a Witness.  Notwithstanding any other provision of this Agreement, to the extent that Indemnitee is, by reason of his Corporate Status, a witness, or is made (or asked) to respond to discovery requests, in any Proceeding to which Indemnitee is not a party, he shall be indemnified against all Expenses actually and reasonably incurred by him or on his behalf in connection therewith.

5.     Advancement of Expenses.  Notwithstanding any other provision of this Agreement, the Company shall advance all Expenses incurred by or on behalf of Indemnitee in connection with any Proceeding by reason of Indemnitee's Corporate Status within thirty (30) days after the receipt by the Company of a statement or statements from Indemnitee requesting such advance or advances from time to time, whether prior to or after final disposition of such Proceeding.  Such statement or statements shall reasonably evidence the Expenses incurred by

4

Indemnitee and shall include or be preceded or accompanied by a written undertaking by or on behalf of Indemnitee to repay any Expenses advanced if it shall ultimately be determined that Indemnitee is not entitled to be indemnified against such Expenses.  Any advances and undertakings to repay pursuant to this Section 5 shall be unsecured and interest free.

6.    Procedures and Presumptions for Determination of Entitlement to Indemnification.  It is the intent of this Agreement to secure for Indemnitee rights of indemnity that are as favorable as may be permitted under the DGCL and public policy of the State of Delaware.  Accordingly, the parties agree that the following procedures and presumptions shall apply in the event of any question as to whether Indemnitee is entitled to indemnification under this Agreement:

(a)    To obtain indemnification under this Agreement, Indemnitee shall submit to the Company a written request, including therein or therewith such documentation and information as is reasonably available to Indemnitee and is reasonably necessary to determine whether and to what extent Indemnitee is entitled to indemnification.  The Secretary of the Company shall, promptly upon receipt of such a request for indemnification, advise the Board in writing that Indemnitee has requested indemnification.  Notwithstanding the foregoing, any failure of Indemnitee to provide such a request to the Company, or to provide such a request in a timely fashion, shall not relieve the Company of any liability that it may have to Indemnitee unless, and to the extent that, such failure actually and materially prejudices the interests of the Company.

(b)    Upon written request by Indemnitee for indemnification pursuant to the first sentence of Section 6(a) hereof, a determination with respect to Indemnitee's entitlement thereto shall be made in the specific case by one of the following four methods, which shall be at the election of the Board (1) by a majority vote of the disinterested directors, even though less than a quorum, (2) by a committee of disinterested directors designated by a majority vote of the disinterested directors, even though less than a quorum, (3) if there are no disinterested directors or if the disinterested directors so direct, by independent legal counsel in a written opinion to the Board, a copy of which shall be delivered to the Indemnitee, or (4) if so directed by the Board, by the stockholders of the Company.  For purposes hereof, disinterested directors are those members of the Board who are not parties to the action, suit or proceeding in respect of which indemnification is sought by Indemnitee.

(c)    If the determination of entitlement to indemnification is to be made by Independent Counsel pursuant to Section 6(b) hereof, the Independent Counsel shall be selected as provided in this Section 6(c).  The Independent Counsel shall be selected by the Board.  Indemnitee may, within ten (10) days after such written notice of selection shall have been given, deliver to the Company a written objection to such selection; provided, however, that such objection may be asserted only on the ground that the Independent Counsel so selected does not meet the requirements of "**Independent Counsel**" as defined in Section 13 of this Agreement, and the objection shall set forth with particularity the factual basis of such assertion.  Absent a proper and timely objection, the person so selected shall act as Independent Counsel.  If a written objection is made and substantiated, the Independent Counsel selected may not serve as Independent Counsel unless and until such objection is withdrawn or a court has determined that such objection is without merit.  If, within twenty (20) days after submission by Indemnitee of a written request for indemnification pursuant to Section 6(a) hereof, no Independent Counsel shall have been selected and not objected to, either the Company or Indemnitee may petition the Court

UFV-000675

765

00000761

of Chancery of the State of Delaware or other court of competent jurisdiction for resolution of any objection which shall have been made by the Indemnitee to the Company's selection of Independent Counsel and/or for the appointment as Independent Counsel of a person selected by the court or by such other person as the court shall designate, and the person with respect to whom all objections are so resolved or the person so appointed shall act as Independent Counsel under Section 6(b) hereof.  The Company shall pay any and all reasonable fees and expenses of Independent Counsel incurred by such Independent Counsel in connection with acting pursuant to Section 6(b) hereof, and the Company shall pay all reasonable fees and expenses incident to the procedures of this Section 6(c), regardless of the manner in which such Independent Counsel was selected or appointed.

(d)    In making a determination with respect to entitlement to indemnification hereunder, the person or persons or entity making such determination shall presume that Indemnitee is entitled to indemnification under this Agreement.  Anyone seeking to overcome this presumption shall have the burden of proof and the burden of persuasion by clear and convincing evidence.  Neither the failure of the Company (including by its directors or independent legal counsel) to have made a determination prior to the commencement of any action pursuant to this Agreement that indemnification is proper in the circumstances because Indemnitee has met the applicable standard of conduct, nor an actual determination by the Company (including by its directors or independent legal counsel) that Indemnitee has not met such applicable standard of conduct, shall be a defense to the action or create a presumption that Indemnitee has not met the applicable standard of conduct.

(e)    Indemnitee shall be deemed to have acted in good faith if Indemnitee's action is based on the records or books of account of the Enterprise (as hereinafter defined), including financial statements, or on information supplied to Indemnitee by the officers of the Enterprise in the course of their duties, or on the advice of legal counsel for the Enterprise or on information or records given or reports made to the Enterprise by an independent certified public accountant or by an appraiser or other expert selected with reasonable care by the Enterprise.  In addition, the knowledge and/or actions, or failure to act, of any director, officer, agent or employee of the Enterprise shall not be imputed to Indemnitee for purposes of determining the right to indemnification under this Agreement.  Whether or not the foregoing provisions of this Section 6(e) are satisfied, it shall in any event be presumed that Indemnitee has at all times acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Company.  Anyone seeking to overcome this presumption shall have the burden of proof and the burden of persuasion by clear and convincing evidence.

(f)    If the person, persons or entity empowered or selected under Section 6 to determine whether Indemnitee is entitled to indemnification shall not have made a determination within sixty (60) days after receipt by the Company of the request therefor, the requisite determination of entitlement to indemnification shall be deemed to have been made and Indemnitee shall be entitled to such indemnification absent (i) a misstatement by Indemnitee of a material fact, or an omission of a material fact necessary to make Indemnitee's statement not materially misleading, in connection with the request for indemnification, or (ii) a prohibition of such indemnification under applicable law; provided, however, that such sixty (60) day period may be extended for a reasonable time, not to exceed an additional thirty (30) days, if the person, persons or entity making such determination with respect to entitlement to indemnification in good faith requires such additional time to obtain or evaluate documentation and/or information relating thereto; and provided further, that the foregoing provisions of this Section 6(f) shall not

6

UFV-000676

766

00000761

apply if the determination of entitlement to indemnification is to be made by the stockholders pursuant to Section 6(b) of this Agreement and if (A) within fifteen (15) days after receipt by the Company of the request for such determination, the Board or the Disinterested Directors, if appropriate, resolve to submit such determination to the stockholders for their consideration at an annual meeting thereof to be held within seventy five (75) days after such receipt and such determination is made thereat, or (B) a special meeting of stockholders is called within fifteen (15) days after such receipt for the purpose of making such determination, such meeting is held for such purpose within sixty (60) days after having been so called and such determination is made thereat.

(g)     Indemnitee shall cooperate with the person, persons or entity making such determination with respect to Indemnitee's entitlement to indemnification, including providing to such person, persons or entity upon reasonable advance request any documentation or information which is not privileged or otherwise protected from disclosure and which is reasonably available to Indemnitee and reasonably necessary to such determination.  Any Independent Counsel, member of the Board or stockholder of the Company shall act reasonably and in good faith in making a determination regarding the Indemnitee's entitlement to indemnification under this Agreement.  Any costs or expenses (including attorneys' fees and disbursements) incurred by Indemnitee in so cooperating with the person, persons or entity making such determination shall be borne by the Company (irrespective of the determination as to Indemnitee's entitlement to indemnification) and the Company hereby indemnifies and agrees to hold Indemnitee harmless therefrom.

(h)     The Company acknowledges that a settlement or other disposition short of final judgment may be successful if it permits a party to avoid expense, delay, distraction, disruption and uncertainty.  In the event that any action, claim or proceeding to which Indemnitee is a party is resolved in any manner other than by adverse judgment against Indemnitee (including, without limitation, settlement of such action, claim or proceeding with or without payment of money or other consideration) it shall be presumed that Indemnitee has been successful on the merits or otherwise in such action, suit or proceeding.  Anyone seeking to overcome this presumption shall have the burden of proof and the burden of persuasion by clear and convincing evidence.

(i)     The termination of any Proceeding or of any claim, issue or matter therein, by judgment, order, settlement or conviction, or upon a plea of nolo contendere or its equivalent, shall not (except as otherwise expressly provided in this Agreement) of itself adversely affect the right of Indemnitee to indemnification or create a presumption that Indemnitee did not act in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the Company or, with respect to any criminal Proceeding, that Indemnitee had reasonable cause to believe that his conduct was unlawful.

7.     Remedies of Indemnitee.

(a)     In the event that (i) a determination is made pursuant to Section 6 of this Agreement that Indemnitee is not entitled to indemnification under this Agreement, (ii) advancement of Expenses is not timely made pursuant to Section 5 of this Agreement, (iii) no determination of entitlement to indemnification is made pursuant to Section 6(b) of this Agreement within ninety (90) days after receipt by the Company of the request for indemnification, (iv) payment of indemnification is not made pursuant to this Agreement within

UFV-000677

767

00000761

ten (10) days after receipt by the Company of a written request therefor, or (v) payment of indemnification is not made within ten (10) days after a determination has been made that Indemnitee is entitled to indemnification or such determination is deemed to have been made pursuant to Section 6 of this Agreement, Indemnitee shall be entitled to an adjudication in an appropriate court of the State of Delaware, or in any other court of competent jurisdiction, of Indemnitee's entitlement to such indemnification.  Indemnitee shall commence such proceeding seeking an adjudication within one hundred eighty (180) days following the date on which Indemnitee first has the right to commence such proceeding pursuant to this Section 7(a).  The Company shall not oppose Indemnitee's right to seek any such adjudication.

(b)    In the event that a determination shall have been made pursuant to Section 6(b) of this Agreement that Indemnitee is not entitled to indemnification, any judicial proceeding commenced pursuant to this Section 7 shall be conducted in all respects as a de novo trial on the merits, and Indemnitee shall not be prejudiced by reason of the adverse determination under Section 6(b).

(c)    If a determination shall have been made pursuant to Section 6(b) of this Agreement that Indemnitee is entitled to indemnification, the Company shall be bound by such determination in any judicial proceeding commenced pursuant to this Section 7, absent (i) a misstatement by Indemnitee of a material fact, or an omission of a material fact necessary to make Indemnitee's misstatement not materially misleading in connection with the application for indemnification, or (ii) a prohibition of such indemnification under applicable law.

(d)    In the event that Indemnitee, pursuant to this Section 7, seeks a judicial adjudication of his rights under, or to recover damages for breach of, this Agreement, or to recover under any directors' and officers' liability insurance policies maintained by the Company, the Company shall pay on his behalf, in advance, any and all expenses (of the types described in the definition of Expenses in Section 13 of this Agreement) actually and reasonably incurred by him in such judicial adjudication, regardless of whether Indemnitee ultimately is determined to be entitled to such indemnification, advancement of expenses or insurance recovery.

(e)    The Company shall be precluded from asserting in any judicial proceeding commenced pursuant to this Section 7 that the procedures and presumptions of this Agreement are not valid, binding and enforceable and shall stipulate in any such court that the Company is bound by all the provisions of this Agreement.  The Company shall indemnify Indemnitee against any and all Expenses and, if requested by Indemnitee, shall (within ten (10) days after receipt by the Company of a written request therefor) advance, to the extent not prohibited by law, such expenses to Indemnitee, which are incurred by Indemnitee in connection with any action brought by Indemnitee for indemnification or advance of Expenses from the Company under this Agreement or under any directors' and officers' liability insurance policies maintained by the Company, regardless of whether Indemnitee ultimately is determined to be entitled to such indemnification, advancement of Expenses or insurance recovery, as the case may be.

(f)    Notwithstanding anything in this Agreement to the contrary, no determination as to entitlement to indemnification under this Agreement shall be required to be made prior to the final disposition of the Proceeding.

8

UFV-000678
768

00000761

8.    Non-Exclusivity; Survival of Rights; Insurance; Primacy of Indemnification; Subrogation.

(a)    The rights of indemnification as provided by this Agreement shall not be deemed exclusive of any other rights to which Indemnitee may at any time be entitled under applicable law, the Certificate of Incorporation, the Bylaws, any agreement, a vote of stockholders, a resolution of directors of the Company, or otherwise.  No amendment, alteration or repeal of this Agreement or of any provision hereof shall limit or restrict any right of Indemnitee under this Agreement in respect of any action taken or omitted by such Indemnitee in his Corporate Status prior to such amendment, alteration or repeal.  To the extent that a change in the DGCL, whether by statute or judicial decision, permits greater indemnification than would be afforded currently under the Certificate of Incorporation, Bylaws and this Agreement, it is the intent of the parties hereto that Indemnitee shall enjoy by this Agreement the greater benefits so afforded by such change.  No right or remedy herein conferred is intended to be exclusive of any other right or remedy, and every other right and remedy shall be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise.  The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other right or remedy.

(b)    To the extent that the Company maintains an insurance policy or policies providing liability insurance for directors, officers, employees, or agents or fiduciaries of the Company or of any other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise that such person serves at the request of the Company, Indemnitee shall be covered by such policy or policies in accordance with its or their terms to the maximum extent of the coverage available for any director, officer, employee, agent or fiduciary under such policy or policies.  If, at the time of the receipt of a notice of a claim pursuant to the terms hereof, the Company has directors' and officers' liability insurance in effect, the Company shall give prompt notice of the commencement of such proceeding to the insurers in accordance with the procedures set forth in the respective policies.  The Company shall thereafter take all necessary or desirable action to cause such insurers to pay, on behalf of the Indemnitee, all amounts payable as a result of such proceeding in accordance with the terms of such policies.

(c)    In the event of any payment under this Agreement, the Company shall be subrogated to the extent of such payment to all of the rights of recovery of Indemnitee (other than against the Fund Indemnitors), who shall execute all papers required and take all action necessary to secure such rights, including execution of such documents as are necessary to enable the Company to bring suit to enforce such rights.

(d)    The Company shall not be liable under this Agreement to make any payment of amounts otherwise indemnifiable hereunder if and to the extent that Indemnitee has otherwise actually received such payment under any insurance policy, contract, agreement or otherwise.

(e)    The Company's obligation to indemnify or advance Expenses hereunder to Indemnitee who is or was serving at the request of the Company as a director, officer, employee or agent of any other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise shall be reduced by any amount Indemnitee has actually received as indemnification or advancement of expenses from such other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise.

9

UFV-000679
769
00000761

9.     Exception to Right of Indemnification. Notwithstanding any provision in this Agreement, the Company shall not be obligated under this Agreement to make any indemnity in connection with any claim made against Indemnitee:

(a)     for which payment has actually been made to or on behalf of Indemnitee under any insurance policy or other indemnity provision, except with respect to any excess beyond the amount paid under any insurance policy or other indemnity provision, provided, that the foregoing shall not affect the rights of Indemnitee or the Fund Indemnitors set forth in Section 8(c) above; or

(b)     for an accounting of profits made from the purchase and sale (or sale and purchase) by Indemnitee of securities of the Company within the meaning of Section 16(b) of the Securities Exchange Act of 1934, as amended, or similar provisions of state statutory law or common law; or

(c)     in connection with any Proceeding (or any part of any Proceeding) initiated by Indemnitee, including any Proceeding (or any part of any Proceeding) initiated by Indemnitee against the Company or its directors, officers, employees or other indemnitees, unless (i) the Board authorized the Proceeding (or any part of any Proceeding) prior to its initiation, or (ii) the Company provides the indemnification, in its sole discretion, pursuant to the powers vested in the Company under applicable law.

10.     Duration of Agreement.   All agreements and obligations of the Company contained herein shall continue during the period Indemnitee is an officer or director of the Company (or is or was serving at the request of the Company as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise) and shall continue thereafter so long as Indemnitee shall be subject to any Proceeding (or any proceeding commenced under Section 7 hereof) by reason of his Corporate Status, whether or not he is acting or serving in any such capacity at the time any liability or expense is incurred for which indemnification can be provided under this Agreement.  This Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective successors (including any direct or indirect successor by purchase, merger, consolidation or otherwise to all or substantially all of the business or assets of the Company), assigns, spouses, heirs, executors and personal and legal representatives.

11.     Security.  To the extent requested by Indemnitee and approved by the Board, the Company may at any time and from time to time provide security to Indemnitee for the Company's obligations hereunder through an irrevocable bank line of credit, funded trust or other collateral.  Any such security, once provided to Indemnitee, may not be revoked or released without the prior written consent of the Indemnitee.

12.     Enforcement.

(a)     The Company expressly confirms and agrees that it has entered into this Agreement and assumes the obligations imposed on it hereby in order to induce Indemnitee to serve as an officer or director of the Company, and the Company acknowledges that Indemnitee is relying upon this Agreement in serving as an officer or director of the Company.

UFV-000680
770

00000761

(b)    This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral, written and implied, between the parties hereto with respect to the subject matter hereof.

(c)    The Company shall not seek from a court, or agree to, a "bar order" which would have the effect of prohibiting or limiting the Indemnitee's rights to receive advancement of expenses under this Agreement.

13.    <u>Definitions</u>.  For purposes of this Agreement:

(a)    "**Agent**" means any person who is or was a director, officer, employee or other agent of the Company or a subsidiary of the Company; or is or was serving at the request of, for the convenience of, or to represent the interests of the Company or a subsidiary of the Company as a director, officer, employee or agent of another foreign or domestic corporation, partnership, joint venture, trust or other enterprise; or was a director, officer, employee or agent of a foreign or domestic corporation which was a predecessor corporation of the Company or a subsidiary of the Company, or was a director, officer, employee or agent of another enterprise at the request of, for the convenience of, or to represent the interests of such predecessor corporation;

(b)    "**Corporate Status**" describes the status of a person who is or was a director, officer, employee, agent or fiduciary of the Company or of any other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise that such person is or was serving at the express written request of the Company.

(c)    "**Disinterested Director**" means a director of the Company who is not and was not a party to the Proceeding in respect of which indemnification is sought by Indemnitee.

(d)    "**Enterprise**" shall mean the Company and any other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise that Indemnitee is or was serving at the express written request of the Company as a director, officer, employee, agent or fiduciary.

(e)    "**Expenses**" shall include all reasonable attorneys' fees, retainers, court costs, transcript costs, fees of experts, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees and all other disbursements or expenses of the types customarily incurred in connection with prosecuting, defending, preparing to prosecute or defend, investigating, participating, or being or preparing to be a witness in a Proceeding, or responding to, or objecting to, a request to provide discovery in any Proceeding.  Expenses also shall include Expenses incurred in connection with any appeal resulting from any Proceeding and any federal, state, local or foreign taxes imposed on the Indemnitee as a result of the actual or deemed receipt of any payments under this Agreement, including without limitation the premium, security for, and other costs relating to any cost bond, supersede as bond, or other appeal bond or its equivalent.  Expenses, however, shall not include amounts paid in settlement by Indemnitee or the amount of judgments or fines against Indemnitee.

11

UFV-000681

771

00000761

(f)   "**Independent Counsel**" means a law firm, or a member of a law firm, that is experienced in matters of corporation law and neither presently is, nor in the past five years has been, retained to represent (i) the Company or Indemnitee in any matter material to either such party (other than with respect to matters concerning Indemnitee under this Agreement, or of other indemnitees under similar indemnification agreements), or (ii) any other party to the Proceeding giving rise to a claim for indemnification hereunder.  Notwithstanding the foregoing, the term "Independent Counsel" shall not include any person who, under the applicable standards of professional conduct then prevailing, would have a conflict of interest in representing either the Company or Indemnitee in an action to determine Indemnitee's rights under this Agreement.  The Company agrees to pay the reasonable fees of the Independent Counsel referred to above and to fully indemnify such counsel against any and all Expenses, claims, liabilities and damages arising out of or relating to this Agreement or its engagement pursuant hereto.

(g)   "**Proceeding**" includes any threatened, pending or completed action, suit, arbitration, alternate dispute resolution mechanism, investigation, inquiry, administrative hearing or any other actual, threatened or completed proceeding, whether brought by or in the right of the Company or otherwise and whether civil, criminal, administrative or investigative, in which Indemnitee was, is or will be involved as a party or otherwise, by reason of his or her Corporate Status, by reason of any action taken by him or of any inaction on his part while acting in his or her Corporate Status; in each case whether or not he is acting or serving in any such capacity at the time any liability or expense is incurred for which indemnification can be provided under this Agreement; including one pending on or before the date of this Agreement, but excluding one initiated by an Indemnitee pursuant to Section 7 of this Agreement to enforce his rights under this Agreement.

14.   <u>Severability</u>.  The invalidity or unenforceability of any provision hereof shall in no way affect the validity or enforceability of any other provision.  Further, the invalidity or unenforceability of any provision hereof as to either Indemnitee or Appointing Stockholder shall in no way affect the validity or enforceability of any provision hereof as to the other.  Without limiting the generality of the foregoing, this Agreement is intended to confer upon Indemnitee and Appointing Stockholder indemnification rights to the fullest extent permitted by applicable laws.  In the event any provision hereof conflicts with any applicable law, such provision shall be deemed modified, consistent with the aforementioned intent, to the extent necessary to resolve such conflict.

15.   <u>Modification and Waiver</u>.   No supplement, modification, termination or amendment of this Agreement shall be binding unless executed in writing by both of the parties hereto.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provisions hereof (whether or not similar) nor shall such waiver constitute a continuing waiver.

16.   <u>Notice By Indemnitee</u>.  Indemnitee agrees promptly to notify the Company in writing upon being served with or otherwise receiving any summons, citation, subpoena, complaint, indictment, information or other document relating to any Proceeding or matter which may be subject to indemnification covered hereunder.  The failure to so notify the Company shall not relieve the Company of any obligation which it may have to Indemnitee under this Agreement or otherwise unless and only to the extent that such failure or delay materially prejudices the Company.

UFV-000682
772

00000761

17.   <u>Notices</u>.  All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given (a) upon personal delivery to the party to be notified, (b) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient, and if not so confirmed, then on the next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt.  All communications shall be sent:

(a)   To Indemnitee at the address set forth below Indemnitee signature hereto.

(b)   To the Company at:

3401 Pasadena Avenue
Los Angeles, CA 90031

or to such other address as may have been furnished to Indemnitee by the Company or to the Company by Indemnitee, as the case may be.

18.   <u>Liability Insurance</u>.

(a)   <u>Maintenance of D&O Insurance</u>.  The Company hereby covenants and agrees that, so long as the Indemnitee shall continue to serve as an Agent of the Company and thereafter so long as the Indemnitee shall be subject to any possible Proceeding by reason of the fact that the Indemnitee was an Agent of the Company, the Company, subject to Section 18(c), shall promptly obtain and maintain in full force and effect directors' and officers' liability insurance ("**D&O Insurance**") in reasonable amounts from established and reputable insurers, as more fully described below.

(b)   <u>Rights and Benefits</u>.  In all policies of D&O Insurance, the Indemnitee shall qualify as an insured in such a manner as to provide the Indemnitee the same rights and benefits as are accorded to the most favorably insured of the Company's non-independent directors if the Indemnitee is not an independent director.

(c)   <u>Limitation on Required Maintenance of D&O Insurance</u>.  Notwithstanding the foregoing, the Company shall have no obligation to obtain or maintain D&O Insurance if the Board determines in good faith that: such insurance is not reasonably available; the premium costs for such insurance are disproportionate to the amount of coverage provided; the coverage provided by such insurance is limited by exclusions so as to provide an insufficient benefit; the Indemnitee is covered by similar insurance maintained by a subsidiary of the Company; the Company is to be acquired and a tail policy of reasonable terms and duration is purchased for pre-closing acts or omissions by the Indemnitee; or the Company is to be acquired and D&O Insurance will be maintained by the acquirer that covers pre-closing acts and omissions by the Indemnitee.

19.   <u>Counterparts</u>.  This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same the same instrument.  Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000,

UFV-000683
773
00000761

*e.g.*, www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

20.    <u>Headings</u>.    The headings of the paragraphs of this Agreement are inserted for convenience only and shall not be deemed to constitute part of this Agreement or to affect the construction thereof.

21.    <u>Governing Law and Consent to Jurisdiction.</u>    This Agreement and the legal relations among the parties shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without regard to its conflict of laws rules. The Company and Indemnitee hereby irrevocably and unconditionally (i) agree that any action or proceeding arising out of or in connection with this Agreement shall be brought only in the Chancery Court of the State of Delaware (the "**Delaware Court**"), and not in any other state or federal court in the United States of America or any court in any other country, (ii) consent to submit to the exclusive jurisdiction of the Delaware Court for purposes of any action or proceeding arising out of or in connection with this Agreement, (iii) waive any objection to the laying of venue of any such action or proceeding in the Delaware Court, and (iv) waive, and agree not to plead or to make, any claim that any such action or proceeding brought in the Delaware Court has been brought in an improper or inconvenient forum.

*[Signature Page Follows]*

14

UFV-000684
774
00000761

IN WITNESS WHEREOF, the parties hereto have executed this Indemnification Agreement on and as of the day and year first above written.

**COMPANY**

**Loot Crate Parent, Inc.**

By: _____
Name: _____
Title: _____

**INDEMNITEE**

_____

Address:

154140019 v4

UFV-000685

775

00000761

DRAFT

LOOT CRATE PARENT, INC.

LOOT CRATE, INC.

In Person Meeting of the Boards of Directors

June 13, 2019

An in person meeting of the Boards of Directors (each, the "*Board*") of Loot Crate Parent, Inc., a Delaware corporation ("*Parent*"), and Loot Crate, Inc. (the "*Company*"), was held on the above date at 10:40 a.m. PST following notice duly given to all of the directors.  Present were all the directors of Parent:  Chris Davis, Alexandre (Alex) Zyngier, Osman Khan and Dana Kibler.  Present were all the directors of the Company:  Chris Davis, Alexandre (Alex) Zyngier and Osman Khan.  Also present, in person or telephonically, were Matthew Arevalo and Mari Provenzano of the Company, Mark Palmer of Theseus Strategy, Sonya Bhatia, outside general counsel to Parent and the Company, Andrew Schoulder and Stefani Thomas of Bryan Cave Leighton Paisner LLP, counsel to Parent and the Company, Matthew Spiro, Everett Indart and Meaghan Haugh of Atalaya Capital Management LP ("*Atalaya*"), Aamir Amdani of Breakwater Credit Opportunities Fund, Bruce Gersch of Meredith and Michael Fixler and Bryant Yu of FocalPoint Partners, LLC ("*FocalPoint*").  All participants could speak and hear one another.  Ms. Thomas acted as Secretary of the meeting.

**Executive Session**

Mr. Zingier called an executive session of the Boards to order. The following attendants were present, in person or telephonically: Chris Davis, Alex Zyngier, Osman Khan, Dana Kibler, Sonya Bhatia, Andrew Schoulder, Stefani Thomas, Matthew Spiro, Everett Indart, Meaghan Haugh, Michael Fixler, Bryant Yu and Mark Palmer.

Mr. Zyngier asked Mr. Fixler to provide a summary of the marketing process run by FocalPoint.  Mr. Fixler reviewed the potential investors and strategic and financial sponsors contacted and provided a summary of the results of the marketing process.  A discussion ensued.

Mr. Schoulder explained the various strategic options considered and framework used to assess the options, including how licensors and credit card processors are key drivers of the decision.  A discussion ensued.  Questions were asked about the distinction between IP licenses and executory contracts with respect to assignment rights and the ability to terminate IP licenses and contracts.  A discussion ensued.

A discussion ensued regarding assumption of liabilities in a sale transaction.

A discussion ensued regarding potential investor interest and cash needs to operate the business.

Messrs. Fixler and Yu left the executive session at approximately 11:25 a.m. PST.

The members of the Boards of Parent and the Company discussed continuing review of strategic options and decided to wait for feedback on potential investor offers before making a decision on strategic options.

Mr. Zingier asked to continue prior Board discussions regarding sales tax.  Ms. Bhatia asked the Atalaya representatives to leave the executive session, and Messrs. Spiro and Indart and Ms. Haugh left the meeting.

12754160.4

Mr. Schoulder reviewed the confidentiality and fiduciary duty obligations with respect to the discussions regarding the reconciliation of sales taxes and completed assessment of processes and controls.  Mr. Schoulder summarized that the Finance Committee had previously directed counsel to the Company to assess the processes and controls around state sales tax collection and remittance.  Mr. Schoulder then presented and reviewed facts and circumstances with respect to state sales tax collection and remittance matters.  A discussion ensued.

Ms. Bhatia asked Mr. Palmer to recuse himself from the executive session, and Mr. Palmer left the executive session at approximately 12:10 p.m. PST.

Following a motion duly made and seconded, the Board of the Company unanimously voted in favor of adopting the following resolutions:

<u>**Approval of Sales Tax Reconciliation and Payments**</u>

**WHEREAS**, at a meeting of the Board of Parent held on December 13, 2018, the Board of Parent discussed the payment by the Company of certain amounts for sales taxes and authorized the payment of such amounts upon reconciliation of amounts owed (collectively, the "***Sales Tax Amounts***");

**WHEREAS**, the Company has completed its reconciliation of the Sales Tax Amounts and its assessment of processes and controls; and

**WHEREAS**, the Board deems it advisable and in the best interest of the Company and its stockholders to pay the Sales Tax Amounts.

**NOW, THEREFORE, BE IT RESOLVED**, that the Company is hereby authorized to pay the Sales Tax Amounts.

**RESOLVED FURTHER,** that the officers of the Company, and such persons, if any, appointed to act on their behalf pursuant to the foregoing resolutions, are hereby authorized, empowered and directed, in the name of the Company and on its behalf, to execute any agreements, instruments or documents, or any amendments or supplements thereto, or to do or to cause to be done any and all other acts as they shall deem necessary, appropriate or in furtherance of the full effectuation of the purposes of each of the foregoing resolutions and the transactions contemplated therein.

Ms. Bhatia reviewed the status of indemnification agreement coverage for the directors and officers, and a discussion ensued.  Following a motion duly made and seconded, the Boards of Parent and the Company unanimously voted in favor of adopting the following resolutions:

<u>**Indemnification Agreements**</u>

**WHEREAS**, from time to time, Parent and the Company have entered into indemnification agreements (each, an "***Existing Indemnification Agreement***") with certain directors of Parent, the Company, Loot Crate Holdings, Inc. and LC Funding, Inc. (collectively, the "***LC Entities***") providing for, among other things Parent's indemnification of such directors for certain actions taken by them in their capacity as directors of the LC Entities;

**WHEREAS**, to the extent any directors and officers of the LC Entities (the "***LC Representatives***") do not have Existing Indemnification Agreements, the Boards desire that Parent enter into an indemnification agreement with each LC Representative, in substantially the form attached hereto as <u>Exhibit A</u> (together with the Existing Indemnification Agreements, the "***Indemnification Agreements***"),

2

UFV-000687

777

00000776

providing for, among other things Parent's indemnification of such directors or officers for certain actions taken by them in their capacity as directors or officers of the LC Entities;

**WHEREAS**, that Parent and the Company desire that the obligations of the Company under the Existing Indemnification Agreements be assigned to Parent and the Existing Indemnification Agreements be amended and restated as necessary to reflect such assignment;

**WHEREAS**, the Board members are aware that they are a party to an Indemnification Agreement and as such may be deemed to be an interested party with respect to such Indemnification Agreement;

**WHEREAS**, the Board members are aware of the material facts related to the Indemnification Agreements and have had an adequate opportunity to ask questions regarding, and investigate the nature of, the relationships and/or interests of the interested parties with and in Parent and the Company in connection with the Indemnification Agreements; and

**WHEREAS**, after careful consideration, the Board members have determined that the terms and conditions of the proposed form of Indemnification Agreement are just and equitable and fair as to Parent and the Company and that it is in the best interests of Parent, the Company and their respective stockholders to approve and ratify the Existing Indemnification Agreements (including the assignment thereof to Parent) and for Parent to enter into the Indemnification Agreements with the LC Representatives.

**NOW, THEREFORE, BE IT RESOLVED**, that the Indemnification Agreements be, and the same hereby are, approved and ratified in all respects.

**RESOLVED FURTHER**, that the terms and conditions of the Indemnification Agreements be, and hereby are, approved and ratified in all respects.

**RESOLVED FURTHER**, that each of Parent and the Company be, and hereby is, authorized and empowered to perform all of its obligations under the Indemnification Agreements.

**RESOLVED FURTHER**, that the officers of Parent (each of the foregoing, individually, an "*Authorized Signatory*" and, collectively, the "*Authorized Signatories*") be, and each of them individually hereby is, authorized, empowered and directed, by and on behalf of Parent and in its name, to execute and deliver the Indemnification Agreements with the LC Entity Representatives and all other agreements, certificates, instruments and other documents related thereto and the transactions contemplated thereby, with such additions, deletions or changes therein as the Authorized Signatory executing the same shall approve (the execution and delivery thereof by any such Authorized Signatory to be conclusive evidence of his or her approval of any such additions, deletions or changes).

**RESOLVED FURTHER**, that the obligations of the Company under the Existing Indemnification Agreements be assigned to Parent and the Existing Indemnification Agreements be amended and restated as necessary to reflect such assignment.

3

UFV-000688

778

00000776

**RESOLVED FURTHER,** that the Authorized Signatories, and such persons, if any, appointed to act on their behalf pursuant to the foregoing resolutions, are hereby authorized, empowered and directed, in the name of Parent and on its behalf, to execute any additional agreements, instruments or documents, or any amendments or supplements thereto, or to do or to cause to be done any and all other acts as they shall deem necessary, appropriate or in furtherance of the full effectuation of the purposes of each of the foregoing resolutions and the transactions contemplated therein.

Ms. Thomas reviewed the status of Board meeting minutes previously circulated for review and asked the Boards of Parent and the Company to consider them for approval.  A discussion ensued.  The Board members of Parent and the Company asked for more time to review the draft meeting minutes circulated for the Board meetings held on July 23, 2018, July 24, 2018, July 26, 2018, July 27, 2018, July 30, 2018, August 1, 2018 and August 2, 2018.

Following a motion duly made and seconded, as members of the Board of Parent, Messrs. Davis, Khan and Zyngier voted in favor of adopting the following resolution and Ms. Kibler abstained from voting:

**RESOLVED**, that the minutes from the meetings of the Board of Parent held on June 22, 2018, August 17, 2018, September 20, 2018, October 18, 2018, November 15, 2018, December 13, 2018, January 18, 2019, January 22, 2019, February 7, 2019, March 5, 2019, March 27, 2019 and April 3, 2019 are hereby approved and adopted in all respects.

With respect to older Board meeting minutes, following a motion duly made and seconded, as members of the Board of Parent, Messrs. Davis, Khan and Zyngier voted in favor of adopting the resolutions attached hereto as Exhibit B, and Ms. Kibler abstained from voting.

Following a motion duly made and seconded, as members of the Board of the Company, Messrs. Davis, Khan and Zyngier unanimously voted in favor of adopting the following resolution:

**RESOLVED**, that the minutes from the meetings of the Board of the Company held on September 20, 2018, January 22, 2019, February 7, 2019, March 5, 2019 and March 27, 2019 are hereby approved and adopted in all respects.

With respect to older Board meeting minutes, following a motion duly made and seconded, as members of the Board of the Company, Messrs. Davis, Khan and Zyngier unanimously voted in favor of adopting the resolutions attached hereto as Exhibit C.

Following a motion duly made and seconded, as members of the Boards of Loot Crate Holdings, Inc. and LC Funding, Inc., Messrs. Davis, Khan and Zyngier unanimously voted in favor of adopting the following resolution:

**RESOLVED**, that the minutes from the meeting of the Boards of Loot Crate Holdings, Inc. and LC Funding, Inc. held on March 27, 2019 are hereby approved and adopted in all respects.

The executive session of the Boards of Parent and the Company then adjourned.

**Quarterly Board Meeting**

UFV-000689

779

00000776

Mr. Davis, presiding as Chairman of the meeting, called the quarterly meeting to order at approximately 12:45 p.m. PST and reviewed the agenda for the meeting.

## CEO Business Update

Mr. Davis presented a general business update since the prior meeting. Mr. Davis reviewed focused efforts on past due crate deliveries to preserve customer value. Questions were asked, and a discussion ensued. A further discussion ensued regarding brand management and handling customer complaints regarding box fulfilment. Mr. Palmer discussed the need for funds to ship these crates, as they are staged and ready to go pending funding.

Mr. Spiro asked about the status of the Clearbanc facility and use of those funds to deliver crates. A discussion ensued.

Mr. Davis provided an update on sales tax matters, including outstanding audits and payment plan negotiations in California and Texas.

Mr. Davis reviewed May financial results. Questions were asked about marketing spend and operating expenses. A discussion ensued regarding the impact of the XB Fulfillment transition. Mr. Davis discussed plans to address significant operations, liquidity and balance sheet challenges.

## Investment Bank and Financing Update

Mr. Zyngier reviewed the status and timing of the financing process. Questions were asked about potential bidders, transaction structure and value ranges, and a discussion ensued.

Messrs. David Samms, Harry Kang and Rick Kim of the Company joined the meeting at approximately 1:15 p.m. PST.

## Financial Review

Mr. Samms reviewed certain key financial metrics, including May results compared to prior forecasts and declines in billing. Mr. Samms reviewed May operating performance, including May revenue results.

Questions were asked about sponsorship revenue from the Red Bull promotion. A discussion ensued.

Mr. Kang presented on operating expenditures for May, including payroll, marketing and professional expenses.

Mr. Kim reviewed the April/May balance sheet results. Questions were asked about sales tax payment plans, the calculation of amounts owed and timing of payments, and a discussion ensued.

Mr. Kim presented on April/May cash flow results, with cash flow remaining flat.

Mr. Davis reviewed accounts payable aging to date.

Mr. Kim reviewed a summary of April/May inventory.

Mr. Kang discussed cost reduction trends from January to May. Questions were asked about facilities costs, and a discussion ensued.

UFV-000690
780

00000776

Messrs. Samms, Kang and Kim left the meeting at approximately 1:30 p.m. PST, and Ben Weitz and Jason Harvey of the Company joined the meeting.

## Brand Management Update

Mr. Weitz reviewed strategic initiatives for subscription products, brand management and retail, including cross functional team leadership, enhanced product curation, maximized licensor partnerships, specialty crate launches and strategies for the evolving retail business.  Questions were asked about the performance and termination of the Walmart retail relationship, and a discussion ensued.

Mr. Weitz then left the meeting, and Christine Chang of the Company joined the meeting at approximately 1:50 p.m. PST.

## Marketing Update

Mr. Harvey provided an overview of marketing channels for April and May and churn trends.  Mr. Harvey discussed a restructuring of the marketing organization.  Questions were asked about tracking customer feedback and brand sentiment, and a discussion ensued.

Mr. Harvey then left the meeting.

## Operations - Fulfillment and Tax and Duty Savings Update

Ms. Chang provided an overview of the implementation of XB Fulfillment for fulfilment services in Mexico and reviewed crate fulfillment during the initial test period, with expedited transitioning completed by June 1, 2019.

Mr. Gersh left the meeting at approximately 2:05 p.m. PST.

A discussion ensued regarding transition cost savings and sublease opportunities for the Vernon facility, with a term sheet proposed for mid-July lease commencement.  Ms. Chang then left the meeting.

## Legal Update

Ms. Bhatia reviewed the status of open legal matters and preservation of costs.

Mr. Amdani asked about the status of Atalaya's forbearance with respect to defaults under the credit facility.

Mr. Davis reported on Ms. Chang leaving in July.

## Adjournment

There being no further business to come before the meeting, the meeting was adjourned at approximately 2:20 p.m. PST.

Respectfully submitted,


Stefani Thomas, Secretary of the Meeting

6

UFV-000691
781

00000776

**Exhibit A**

**Form of Indemnification Agreement**

**Exhibit B**

**Loot Crate Parent, Inc. Resolutions**

**Approval and Adoption of Board Meeting Minutes**

WHEREAS, minutes of prior meetings of the Board of Parent held on May 24, 2018 and June 13, 2018 (each, a "*Meeting*") require the ratification, approval and adoption by the Board (collectively, the "*Minutes*").

WHEREAS, the Board has reviewed the Minutes presented to the Board and has deemed it to be in the best interest of Parent to ratify, approve and adopt the Minutes as the minutes of the Meetings.

NOW, THEREFORE, BE IT RESOLVED, that all Board actions reflected as approved in the Minutes, as presented to the Board, shall be, and hereby are, ratified, confirmed, approved and adopted in all respects.

RESOLVED FURTHER, that each current Board member who was present at a Meeting hereby confirms that the Minutes for such Meeting accurately reflect the decisions and discussions that took place at such Meeting.

RESOLVED FURTHER, that any actions of the Board and the officers of Parent taken in connection with all matters approved in the Minutes be, and hereby are, ratified, confirmed and approved in all respects.

RESOLVED FURTHER, that the officers of Parent be, and each hereby is, authorized and directed to take such further actions and execute such documents as may be necessary in order to implement any resolutions set forth in the Minutes.

UFV-000693

783

00000776

<u>**Exhibit C**</u>

**Loot Crate, Inc. Resolutions**

<u>**Approval and Adoption of Board Meeting Minutes**</u>

**WHEREAS**, minutes of prior meetings of the Board of the Company or a committee thereof held on the dates listed on <u>Annex 1</u> attached hereto (each, a "***Meeting***") require the ratification, approval and adoption by the Board (collectively, the "***Minutes***").

**WHEREAS**, the Board has reviewed the Minutes presented to the Board and has deemed it to be in the best interest of the Company to ratify, approve and adopt the Minutes as the minutes of the Meetings.

**NOW, THEREFORE, BE IT RESOLVED**, that all Board actions reflected as approved in the Minutes, as presented to the Board, shall be, and hereby are, ratified, confirmed, approved and adopted in all respects.

**RESOLVED FURTHER**, that each current Board member who was present at a Meeting hereby confirms that the Minutes for such Meeting accurately reflect the decisions and discussions that took place at such Meeting.

**RESOLVED FURTHER**, that any actions of the Board and the officers of the Company taken in connection with all matters approved in the Minutes be, and hereby are, ratified, confirmed and approved in all respects.

**RESOLVED FURTHER**, that the officers of the Company be, and each hereby is, authorized and directed to take such further actions and execute such documents as may be necessary in order to implement any resolutions set forth in the Minutes.

## ANNEX 1

**MEETING MINUTES FOR APPROVAL**

November 15, 2017

November 17, 2017

November 19, 2017 (Transaction Committee Meeting)

November 20, 2017 (Transaction Committee Meeting)

November 21, 2017

November 22, 2017

November 28, 2017

December 22, 2017

January 4, 2018

January 22, 2018

February 23, 2018

March 28, 2018

April 11, 2018

April 17, 2018

April 18, 2018

May 2, 2018 (1 p.m.)

May 2, 2018 (5 p.m.)

May 9, 2018

May 16, 2018

May 23, 2018

June 5, 2018

No Images Produced

UFV-000696

786

00000786

DRAFT

LOOT CRATE PARENT, INC.

Telephonic Meeting of the Board of Directors

July 23, 2018

A telephonic meeting of the Board of Directors (the "*Board*") of Loot Crate Parent, Inc., a Delaware corporation (the "*Company*"), was held on the above date at 1:00 p.m. PST following notice duly given to all of the directors.  Present were the following directors:  Chris Davis, Alexandre (Alex) Zyngier, Osman Khan and Saif Mansour.  Also present were Matthew Arevalo, Linda Menzel and Mark Palmer of the Company, Andrew Schoulder and Serge Nehama of Bryan Cave Leighton Paisner LLP ("*BCLP*"), special counsel to the Company, Dana Kibler of Upfront Ventures, Bruce Gersh of Meredith, Aamir Amdani of Breakwater Credit Opportunities Fund ("*Breakwater*") and Fredrick Eisenbiegler of Morgan Lewis & Bockius LLP.  All participants could speak and hear one another.

Mr. Davis, presiding as Chairman of the meeting, called the meeting to order and reviewed the agenda for the meeting.  Mr. Nehama acted as Secretary of the meeting.

### Review of Financials and Finance Matters

Mr. Davis reviewed the June financial results with the Board, noting the impact of the lack of marketing spend on the business, which spend was lower than the operating plan.  Mr. Davis noted that liquidity constraints have had an effect on marketing.  A discussion ensued.

### Review of Operational and Business Initiatives

Mr. Davis discussed some of the current operational and business initiatives, including various specialty crates (e.g. Lord of the Rings, Dead Pool etc.) and partnership initiatives, including with Amazon and Walmart.

### Review of Atalaya Financing Transaction/Subordinated Debt Transaction

Messrs. Davis and Schoulder reviewed the status of the Atalaya financing transaction.  A discussion ensued.  Messrs. Davis and Palmer provided an overview of their discussions with National Entertainment Collectibles Association, Inc. ("*NECA*"), who will be lead subordinated debt with a $2,500,000 investment in the convertible subordinated Notes.

Messrs. Palmer and Schoulder explained the terms of the Atalaya financing transaction.

Ms. Kibler expressed her concerns with the structure of the notes and potential for preferred stockholder claims.  A discussion ensued.

Messrs. Eisenbiegler and Schoulder discussed whether Breakwater and Morgan Lewis should receive an upcoming memorandum concerning the structuring of the subordinated debt issuances to be prepared by BCLP, as Breakwater may be viewed as an interested party.  Mr. Eisenbiegler agreed that Breakwater should not receive the memorandum and that Mr. Mansour would abstain from the decision.

12408967.2

**Appointment of Directors**

Mr. Mansour asked about resolutions appointing new members to the Board in accordance with the Voting Agreement at the next board meeting scheduled for July 24, 2018. A discussion ensued.

**Approval of Option Grants**

Ms. Menzel asked the Board to approve various option grants and amendments with respect to several employees. Upon a motion duly made and seconded, the Board members present unanimously adopted the following preamble and resolutions:

WHEREAS, the Board has determined that it is in the best interest of the Company to issue stock option grants (the "*Options*").

NOW, THEREFORE, BE IT RESOLVED, that the Board hereby authorizes the issuance of the Options under the Company's 2012 Stock Plan (the "*Plan*") to the individuals, and for the number of shares, as set forth on Schedule I attached hereto.

RESOLVED FURTHER, that the exercise price of the Options shall be $5.10 per share, which is equal to the current fair market value of the Company's Common Stock, as determined by the Board.

RESOLVED FURTHER, that the grant date for the Options shall be the date of this meeting of the Board.

RESOLVED FURTHER, that the Board hereby determines that the Options shall have the vesting schedules set forth on Schedule I.

RESOLVED FURTHER, that the grant of the Options shall be conditioned upon execution of stock option agreements (the "*Grant Agreements*"), in substantially the forms previously approved by the Board.

RESOLVED FURTHER, that the Options shall have such terms and conditions as are set forth in the applicable Grant Agreement.

RESOLVED FURTHER, that the shares subject to the Options shall, when issued in accordance with the provisions of the Plan and the applicable Grant Agreement, constitute validly issued, fully-paid and non-assessable shares of Common Stock of the Company.

RESOLVED FURTHER, that the proper officers of the Company be, and each of them hereby is, authorized and directed, for and on behalf of the Company, to cause to be prepared the Grant Agreements pursuant to the Plan reflecting the terms of the Options as set forth herein, and to take such other actions as may be necessary or advisable in order to carry out the purposes and accomplish the intent of the foregoing resolutions, and all prior actions taken by such officers in connection herewith are hereby confirmed, ratified and approved in all respects.

**Extension of Stock Options**

WHEREAS, certain employees of the Company set forth on Schedule II attached hereto (each a "*Terminated Employee*") have ceased employment with the Company on the dates set forth on Schedule II (each a "*Termination Date*");

-2-

**WHEREAS**, pursuant to the terms of the stock option grants previously awarded to the Terminated Employees under the Plan (the "***Prior Options***"), upon termination of their service to the Company, such Prior Options would expire not later than three months after such termination of service in accordance with the terms of their option agreements under the Plan;

**WHEREAS**, the Board has authority under the Plan to extend the post-termination exercise period of awards at any time upon terms it deems appropriate; and

**WHEREAS**, the Board intends to amend the Prior Options by extending the post-termination exercise period until the day prior to the third anniversary of the Termination Date for each Terminated Employee.

**NOW, THEREFORE, BE IT RESOLVED**, that the Prior Options are and shall be amended as of the date hereof such that the exercise period which respect to the Prior Options held by each Terminated Employee shall be extended until the day prior to the third anniversary of such Terminated Employee's Termination Date;

**RESOLVED FURTHER**, that in all other respects, the option agreements with respect to the Prior Options shall remain in full force and effect as is and without modification.

**RESOLVED FURTHER**, that the officers of the Company be, and each acting alone is, hereby authorized, empowered and directed, for and on behalf of the Company, to take or cause to be taken any and all actions, including, without limitation, the execution, acknowledgment, filing and delivery of any and all papers, agreements, documents, instruments and certificates, as such officers may deem necessary or advisable to carry out and perform the obligations of the Company under the Plan and the option agreements with respect to the Prior Options, consummate the transactions contemplated therein, cause the Company to comply with all applicable federal and state securities laws, and otherwise carry out the purposes and intent of the foregoing resolutions; the performance of any such acts and the execution, acknowledgment, filing and delivery by such officers of any such papers, agreements, documents, instruments and certificates shall conclusively evidence their authority therefor.

**Omnibus Resolution**

**RESOLVED**, that the officers of the Company are each hereby authorized and directed to take such further actions and execute such documents as may be necessary in order to implement the foregoing resolutions; and

**RESOLVED FURTHER**, that any actions taken prior to the date of the foregoing resolutions by the Board and the persons elected as the officers of the Company that are within the authority conferred thereby are hereby ratified, confirmed and approved as the acts and deeds of this Company.

**Executive Session**

An executive session of the Board began, with only the Board members, certain employees of the Company and Messrs. Schoulder and Nehama remaining in the meeting.

Mr. Schoulder explained the memorandum prepared by BCLP summarizing the structure of the proposed Atalaya financing transaction and requirements for consent. A discussion ensued regarding fiduciary duties to stockholders and stockholder consent requirements in connection with the proposed financing.

UFV-000699
789

00000787

A discussion ensued regarding potential stockholder litigation and discussing potential claims with Atalaya.

**Adjournment**

There being no further business to come before the meeting, the meeting was adjourned.

-4-

UFV-000700

790

00000787

## Schedule I

## Option Grants

| Name of Grantee | Vesting Commencement Date | Number of Shares | Vesting Schedule |
|---|---|---|---|
| Guerrero Guerrero | 11/30/2017 | 500 | [1] |
| Scott Cuillard | 4/24/2018 | 10,000 | [1] |
| Min (Harry) Kang | 5/7/2018 | 8,000 | [1] |
| Mark Irace | 5/16/2018 | 25,000 | [2] |
| Chrystal Villamarzo | 5/21/2018 | 500 | [1] |
| Lam Seaver | 6/4/2018 | 500 | [1] |
| Jason Harvey | 6/4/2018 | 25,000 | [1] |
| Anna Boeri | 6/11/2018 | 500 | [1] |
| Joseph Newman | 7/5/2018 | 2500 | [1] |
| Sandra Quijano | 7/5/2018 | 1,000 | [1] |
| Anita Contreras | 7/30/2018 | 1,000 | [1] |
| Tony Vo | 7/30/2018 | 1,000 | [1] |

Vesting Schedules:

1. One-fourth (1/4th) of the shares subject to the option shall vest on the one-year anniversary of the vesting commencement date. Thereafter, one forty-eighty (1/48th) of the total number of shares subject to such option shall vest upon the expiration of each full calendar month of the grantee's continuous service to the Company for the next thirty-six (36) months such that all such options shall be vested on the last day of the month in which the four-year anniversary of the vesting commencement date falls.
2. 1/365 of the shares subject to the option shall vest each day following the vesting commencement date such that all options shall be vested on the one year anniversary of the vesting commencement date.

-5-

## Schedule II

## Option Extensions

| Terminated Employee | Termination Date | New Exercise Period Deadline |
|---|---|---|
| Hai Nguyen | 4/13/2018 | 04/12/2021 |
| Bryan Marquez | 4/17/2018 | 04/16/2021 |
| Jacqueline Schaffner | 04/27/2018 | 04/26/2021 |
| Pedro Acuna | 05/21/2018 | 05/20/2021 |
| Ryan Hibbard | 05/14/2018 | 05/13/2021 |
| Benjamin Dunn | 06/01/2018 | 05/31/2021 |
| Jeffrey Leung | 06/01/2018 | 05/31/2021 |
| Brian Mann | 06/04/2018 | 06/03/2021 |
| Khoa Nguyen | 06/29/2018 | 06/28/2021 |
| Julian Della Puppa | 07/06/2018 | 07/05/2021 |
| Amber Fonseca | 07/06/2018 | 07/05/2021 |
| Wesley Citti | 07/13/2018 | 07/12/2021 |
| Michael Sheeter | 07/13/2018 | 07/12/2021 |

UFV-000702

792

00000787

DRAFT

LOOT CRATE PARENT, INC.

Telephonic Meeting of the Board of Directors

July 24, 2018

A telephonic meeting of the Board of Directors (the "*Board*") of Loot Crate Parent, Inc., a Delaware corporation (the "*Company*"), was held on the above date at 6:00 p.m. PST following notice duly given to all of the directors.  Present were the following directors:  Chris Davis, Alexandre (Alex) Zyngier, Osman Khan and Saif Mansour.  Also present were Matthew Arevalo, Linda Menzel and Mark Palmer of the Company, Andrew Schoulder and Serge Nehama of Bryan Cave Leighton Paisner LLP, special counsel to the Company, Dana Kibler of Upfront Ventures, Bruce Gersh of Meredith, Aamir Amdani of Breakwater Credit Opportunities Fund ("*Breakwater*"), Fredrick Eisenbiegler of Morgan Lewis & Bockius LLP and Jeffrey M. Reisner of Irell & Manella LLP.  All participants could speak and hear one another.

Mr. Davis, presiding as Chairman of the meeting, called the meeting to order and reviewed the agenda for the meeting.  Mr. Nehama acted as Secretary of the meeting.

## Appointments to the Board

Mr. Mansour requested that Board appointments be moved to the top of the agenda.

Upon a motion duly made and seconded, the Board members present adopted the following preamble and resolutions:

**RESOLVED**, that the appointment of Dana Kibler as a director of the Company, to hold the office until the next annual meeting of the stockholders, and until her respective successor is appointed and qualified, is hereby confirmed and ratified.

The Board then discussed the increase in the size of the Boards of the Company and Loot Crate, Inc. and the appointment of Breakwater designees.  Upon a motion duly made and seconded, the Board members present adopted the following preamble and resolutions:

**WHEREAS**, pursuant to that certain Voting Agreement Amendment of the Company, the indirect parent entity of Loot Crate, Inc. ("*Loot Crate*"), dated May 17, 2018 ("*Voting Amendment*"), among the stockholders of the Company, following a Material Default (as defined in the Voting Amendment), and until such time as the Obligations (as defined in the Voting Amendment) are satisfied in full:  The Company shall cause (i) the size of the Board and the size of the board of directors of Loot Crate (the "*Loot Crate Board*") to be set at nine (9) directors; and (ii) the Board and the Loot Crate Board to be comprised of persons the majority of which are designated by Breakwater Credit Opportunities Fund, L.P., a Delaware limited partnership and a stockholder of the Company ("*Breakwater*");

**WHEREAS**, a Material Default has occurred and, in compliance with the Voting Agreement, the Company desires to increase the size of the Board and the Loot Crate Board to nine (9) directors, and to fill the newly created vacancies with persons designated by Breakwater.

**NOW, THEREFORE, BE IT RESOLVED**, that the size of the Board and the Loot Crate Board be, and it hereby is, fixed at nine (9) directors.

12409285.2

**RESOLVED FURTHER**, that the appointment of the following persons as directors of the Company and Loot Crate, to hold the office until the next annual meeting of the stockholders, and until his respective successors are appointed and qualified, is hereby confirmed and ratified:

Eric Beckman

Darrick Geant

Joe Kaczorowski

Aamir Amdani

## Breakwater Involvement

Mr. Mansour stated that Breakwater would not vote on any transaction that results in the takeout of Breakwater's loan.  Mr. Eisenbiegler of Morgan Lewis noted that it was their view that Breakwater could participate in the discussions but would not vote.

Mr. Schoulder noted that he would reach out to Morgan Lewis, Breakwater's counsel, if any concerns arose concerning Breakwater's involvement with respect to the application of the business judgement rule.

## Review of Atalaya Financing Transaction/Subordinated Debt Transaction

Mr. Davis provided an overview of the terms and status of the Atalaya financing transaction and the negotiation of subordinated debt documentation.

Mr. Palmer explains the status of the negotiations with National Entertainment Collectables Association, Inc. ("*NECA*").  A discussion ensued.

A discussion ensued regarding engaging independent counsel to advise on the transactions.

Mr. Mansour left the meeting.

## Overview of Business

Mr. Davis provided a brief overview of the state of the business.

## Adjournment

There being no further business to come before the meeting, the meeting was adjourned.

UFV-000704
794

00000793

DRAFT

LOOT CRATE PARENT, INC.

Telephonic Meeting of the Board of Directors

July 26, 2018

A telephonic meeting of the Board of Directors (the "*Board*") of Loot Crate Parent, Inc., a Delaware corporation (the "*Company*"), was held on the above date at 5:00 p.m. PST following notice duly given to all of the directors.  Present were the following directors:  Chris Davis, Alexandre (Alex) Zyngier, Osman Khan, Saif Mansour, Eric Beckman, Darrick Geant, Joe Kaczorowski, Aamir Amdani and Dana Kibler.  Also present were Matthew Arevalo, Linda Menzel, and Mark Palmer of the Company, Andrew Schoulder and Serge Nehama of Bryan Cave Leighton Paisner LLP, special counsel to the Company ("BCLP"), Bruce Gersh of Meredith and Aamir Amdani of Breakwater Credit Opportunities Funds (*Breakwater*), Fredrick Eisenbiegler of Morgan Lewis & Bockius LLP and Will Chuchawat of Sheppard Mullin LLP.  All participants could speak and hear one another.

Mr. Davis, presiding as Chairman of the meeting, called the meeting to order and reviewed the agenda for the meeting.  Mr. Nehama acted as Secretary of the meeting.

### Discussion regarding Company Counsel

Mr. Mansour introduced Will Chuchawat of Sheppard Mullin as additional counsel to the Board. Questions were asked about the role of counsel to the Company, and a discussion ensued.

### Discussion regarding Strategic Transactions Committee

Mr. Palmer asks Mr. Schoulder to explain the process for establishing the Strategic Transactions Committee ("*STC*").  A discussion ensued regarding the process for empaneling the STC.  Mr. Schoulder explained the applicable standards for the directors in this situation under Delaware law, including discussions of duty of loyalty, business judgment rule, disinterestedness of directors, and providing examples such as the Weinberger case.  A further discussion ensued.

Mr. Mansour suggested the Board appoint the STC members in accordance with the Voting Agreement and then they can recuse if necessary.  Upon a motion duly made and seconded, the Board members present adopted the following preamble and resolutions:

### Strategic Transactions Committee

**WHEREAS**, the Board of Directors (the "*Board*") of Loot Crate Parent, Inc. (the "*Corporation*") has determined to form a Strategic Transactions Committee with the power to conduct and complete a refinance, capital raise and/or sale review process relative to the shares of capital stock and/or assets of the Corporation and/or its subsidiaries, in accordance with Section 2.7 and 2.8(c) of that certain Voting Agreement, dated May 10, 2016 and amended on May 17, 2018, by and among the Corporation and the holders of certain shares as described therein (the "*Voting Agreement*"); and

**WHEREAS**, the Strategic Transactions Committee shall consist of five members, including two Independent Director (as defined in the Voting Agreement) and three directors designated by Breakwater (as defined in the Voting Agreement).

12409466.2

**NOW, THEREFORE, BE IT RESOLVED**, that the Board hereby establishes a Strategic Transactions Committee, whose purpose and power shall be, to the extent permitted by law, to (a) conduct and complete a refinance, capital raise and/or sale review process relative to the shares of capital stock and/or assets of the Corporation and/or its subsidiaries and (b) exercise such other powers and authority as shall from time to time be assigned thereto by resolution of the Board.

**RESOLVED**, that following individuals be, and hereby are, appointed to serve as a member of the Corporation's Strategic Transactions Committee until he or she shall resign or his or her successor is appointed or elected and duly qualified:

Alexandre Zyngier, as an Independent Director member

Osman Khan, as an Independent Director member

Saif Mansour, as a designee of Breakwater

Eric Beckman, as a designee of Breakwater

Joe Kaczorowski, as a designee of Breakwater

**General**

**RESOLVED**, that any of the officers and the directors of the Corporation be, and each of them hereby is, authorized, empowered and directed, in the name and on behalf of the Corporation to (a) do all such acts and things; (b) execute, deliver and file, such agreements, certificates, instruments and other documents; (c) make such changes to any of the foregoing; and (d) pay such fees and expenses, in each case as may be necessary or desirable in order to carry out and comply with the terms and provisions of the foregoing resolutions, and that all of the acts and doings of such officers and directors, whether heretofore or hereafter taken, done or performed in furtherance of the above resolutions, are hereby ratified, approved, confirmed and authorized.

**Upfront Proposal**

A discussion ensued with respect to the proposal from Upfront and the process and timing for evaluating and responding to the proposal.

**Adjournment**

There being no further business to come before the meeting, the meeting was adjourned.

UFV-000706

796

00000795

DRAFT

## LOOT CRATE PARENT, INC.

Telephonic Meeting of the Strategic Transactions Committee of the Board of Directors

July 27, 2018

A telephonic meeting of the Strategic Transactions Committee (the "**Committee**") of the Board of Directors (the "**Board**") of Loot Crate Parent, Inc., a Delaware corporation (the "**Company**"), was held on the above date at 11:00 a.m. PST following notice duly given to all of the Committee members. Present were the following directors: Alexandre (Alex) Zyngier and Osman Khan. Also present were Chris Davis, David Chang, Linda Menzel, Harry Kang and Mark Palmer of the Company, Andrew Schoulder and Serge Nehama of Bryan Cave Leighton Paisner LLP, special counsel to the Company, Will Chuchawat of Sheppard Mullin LLP, special counsel to the Board, and Craig I. Varnen and Jeffrey Reisner of Irell & Manella LLP, counsel to independent directors. All participants could speak and hear one another.

Mr. Zyngier, presiding as Chairman of the meeting, called the meeting to order and reviewed the agenda for the meeting. Mr. Nehama acted as Secretary of the meeting.

**Review of Financing Proposals**

Mr. Zyngier asked the representatives of the Company to review the competing financing proposals from Atalaya and Upfront. Questions were asked and a discussion ensued regarding the value to common stockholders for the transaction proposals and potential for dilution with the Upfront proposal.

Further discussion ensued on the assumptions used in the modeling for each proposal.

Mr. Khan asks for a summary of where things stand on the negotiations on the Management proposal. Mr. Davis reviewed the status of the negotiations with National Entertainment Collectables Association, Inc. ("**NECA**"), Bioworld and additional amounts from individual investors. A discussion ensued.

A discussion ensued on the risks versus certainty of both proposals.

**Adjournment**

There being no further business to come before the meeting, the meeting was adjourned.

12410369.2

DRAFT

## LOOT CRATE PARENT, INC.

Telephonic Meeting of the Strategic Transactions Committee of the Board of Directors

July 30, 2018

A telephonic meeting of the Strategic Transactions Committee (the "*Committee*") of the Board of Directors (the "*Board*") of Loot Crate Parent, Inc., a Delaware corporation (the "*Company*"), was held on the above date at 1:45 p.m. PST following notice duly given to all of the Committee members.  Present were the following directors:  Alexandre (Alex) Zyngier and Osman Khan.  Also present were Chris Davis, Harry Kang, David Chang, Linda Menzel and Mark Palmer of the Company, Andrew Schoulder and Serge Nehama of Bryan Cave Leighton Paisner LLP, special counsel to the Company, and Jeffrey Reisner and Craig Varnen of Irell & Manella LLP, counsel to independent directors.  All participants could speak and hear one another.

Mr. Zyngier, presiding as Chairman of the meeting, called the meeting to order and reviewed the agenda for the meeting.  Mr. Nehama acted as Secretary of the meeting.

### Review of Financing Proposals

Mr. Palmer provided an overview of the financing transaction proposals from Atalaya and Upfront.  A discussion ensued.

Mr. Palmer reviewed the commercial terms of the financing proposals from National Entertainment Collectables Association, Inc. ("*NECA*") and Bioworld.  A discussion ensued.

A further discussion ensued with respect to indebtedness under the transaction proposals.

### Adjournment

There being no further business to come before the meeting, the meeting was adjourned.

12410644.2

DRAFT

# LOOT CRATE PARENT, INC.

Telephonic Meeting of the Board of Directors

August 1, 2018

A telephonic meeting of the Board of Directors (the "*Board*") of Loot Crate Parent, Inc., a Delaware corporation (the "*Company*"), was held on the above date at 7:00 p.m. PST following notice duly given to all of the directors.  Present were the following directors:  Chris Davis, Alex Zyngier, Osman Khan, Saif Mansour, Eric Beckman, Darrick Geant, Joe Kaczorowski, Aamir Amdani and Dana Kibler.  Also present were Linda Menzel and Mark Palmer of the Company, Andrew Schoulder and Serge Nehama of Bryan Cave Leighton Paisner LLP, special counsel to the Company, Bruce Gersh [and Sarah White] of Meredith, Fredrick Eisenbiegler of Morgan Lewis & Bockius LLP, Will Chuchawat of Sheppard Mullin LLP, and Jeffrey Reisner and Craig Varnen of Irell & Manella LLP, counsel to independent directors.   All participants could speak and hear one another.

Mr. Davis, presiding as Chairman of the meeting, called the meeting to order and reviewed the agenda for the meeting.  Mr. Nehama acted as Secretary of the meeting.

## Review of Financing Transaction Process

Mr. Zyngier provided a status update on the Strategic Transactions Committee's ("*STC*") review of potential transaction proposals from various investors.  A discussion ensued.

Mr. Schoulder reviewed the status of subordinated note financing negotiations.

A discussion ensued regarding Atalaya proposal, including sources and uses, covenant compliance and the structure of the warrant issuance.  Questions were asked about the Upfront proposal, and a discussion ensued.

## Discussion regarding Final Approval Process

A discussion ensued regarding the approval process for a financing transaction.  The Board members agree to have the transaction approved by the STC.

## Adjournment

There being no further business to come before the meeting, the meeting was adjourned.

12412267.2

DRAFT

## LOOT CRATE PARENT, INC.

Telephonic Meeting of the Board of Directors and
Strategic Transactions Committee of the Board of Directors

August 2, 2018

A telephonic meeting of the Board of Directors (the "*Board*") and the Strategic Transactions Committee of the Board (the "*Committee*") of Loot Crate Parent, Inc., a Delaware corporation (the "*Company*"), was held on the above date at 7:00 p.m. PST following notice duly given to all of the directors.  Present were the following directors:  Chris Davis, Alexandre (Alex) Zyngier, Osman Khan, Saif Mansour, Eric Beckman, Darrick Geant, Joe Kaczorowski, Aamir Amdani and Dana Kibler.  Also present were Linda Menzel, David Chang and Mark Palmer of the Company, Andrew Schoulder and Serge Nehama of Bryan Cave Leighton Paisner LLP, special counsel to the Company, Fredrick Eisenbiegler of Morgan Lewis & Bockius LLP, Will Chuchawat of Sheppard Mullin LLP, Jeffrey Reisner and Craig Varnen of Irell & Manella LLP, counsel to independent directors, and Geoff Arens of Dendera Capital.  All participants could speak and hear one another.

Mr. Davis, presiding as Chairman of the meeting, called the meeting to order and reviewed the agenda for the meeting.  Mr. Nehama acted as Secretary of the meeting.

### Review of Financing Transaction

The Breakwater designees on the Board were in attendance at the request of the Committee and stated that they were ready to recuse themselves and leave the meeting at the appropriate time.

Mr. Palmer confirmed to Mr. Zyngier that at the moment the entire Board is in attendance together with certain stakeholders and that the Committee meeting had not yet begun.

Mr. Palmer reviewed the status of the subordinated debt financing and the Atalaya transaction.  Mr. Schoulder then provided a summary of organizational consents required to approve the financing.

Mr. Palmer discussed the third party contingencies with respect to the transaction proposals from Atalaya and Upfront.  A discussion ensued.

Questions were asked and a discussion ensued regarding the applicable standard for the Committee to use in approving a financing transaction.

The Breakwater Board designees and representatives, including Mr. Eisenbiegler, left the meeting.

Mr. Palmer asked if the parties are ready to recuse themselves.  Mr. Davis appointed Mr. Zyngier as Chairman of meeting, and then Mr. Davis recused himself and left the meeting.

Ms. Kibler reiterated (in her capacity representing Upfront as a stakeholder) Upfront's concern with the structure of the warrant and reserved their rights to pursue action.  Ms. Kibler noted (in her capacity as a director) concerns that the Atalaya financing would not solve liquidity issues and could result in default with the new lender within a short amount of time.

12413780.3

The following participants then left the meeting: Mses. Kibler and Menzel and Messrs. Palmer, Chang, and Arens.

The following participants remained in the meeting: Messrs. Zyngier, Khan, Shoulder, Nehama, Reisner, Varnen and Chuchawat.

Mr. Khan gave an overview of the severe liquidity constraints of the business, the management time spent on dealing with liquidity issues and how the business has suffered. Mr. Khan then summarized the Atalaya transaction process.

Mr. Khan reviewed the Upfront financing proposal, noting that although the Committee worked with Upfront, the proposal did not come to fruition because of the number of open items remaining.

Mr. Zyngier provided a summary of the Upfront financing proposal, including a discussion of the advantages and disadvantages of the proposal. Mr. Zyngier reviewed factors including transaction uncertainty, treatment of the Breakwater debt, status of transaction document negotiations and uncertainty with respect to the committed lenders and funds available.

Mr. Zyngier summarized the Atalaya financing proposal, including a discussion of the advantages and disadvantages of the proposal. Mr. Zyngier reviewed factors including transaction certainty, satisfaction of Breakwater debt, commitments from junior investors, that the proposal was expensive, covenant compliance risk and the impact of the transaction on leverage.

A discussion ensued regarding the attractive features of the proposals and the responsibilities with respect to creditors.

Mr. Shoulder discussed the directors' fiduciary duties to the Company and its stockholders.

Upon a motion duly made by Mr. Zyngier to approve the Atalaya transaction and seconded by Mr. Khan, the following preamble and resolutions were adopted:

### CREDIT AGREEMENT

**WHEREAS**, Loot Crate Parent, Inc., a Delaware corporation ("*Parent*"), is the sole stockholder of LC Funding, Inc., a Delaware corporation ("*Funding*"), which in turn is the sole stockholder of Loot Crate Holdings, Inc., a Delaware corporation ("*Holdings*"), which in turn is the sole stockholder of Loot Crate, Inc., a Delaware corporation (the "*Company*" and, together with Parent, Funding and Holdings, the "*LC Entities*");

**WHEREAS**, at a meeting of the Board of Directors of Parent (the "*Board*") held on July 16, 2018, the Board authorized the entry into transactions contemplated by a Credit Agreement among Parent, as Parent and Guarantor, the Company, as Borrower, any Subsidiaries of Parent that are Guarantors or become Guarantors pursuant to Section 8.10 therein, the Lenders (the "*Senior Lenders*") from time to time party thereto, and Midtown Madison Management LLC ("*Agent*"), as Administrative Agent and Collateral Agent (the "*Senior Credit Agreement*"), pursuant to which (i) the Senior Lenders will extend certain credit facilities to the Company in an initial aggregate principal amount of up to $21,000,000, with the right of Agent to increase the facilities under certain circumstances in any available increments as it determines appropriate, with the total amount of principal increase under such increase not to exceed an additional $21,000,000 (collectively, the "*Loans*") and the LC Entities (other than the Company) will guaranty the obligations of the Company thereunder, and (ii) the Company will issue a warrant to Agent or its designee (the "*Senior Warrant*");

-2-

UFV-000711

801

00000800

WHEREAS, the Board has been presented with substantially final forms of (i) the Senior Credit Agreement, (ii) a Security Agreement to be entered into by the LC Entities (the "*Security Agreement*"), pursuant to which the LC Entities will grant to Agent on behalf of the Senior Lenders a security interest in and to all or substantially all of their respective assets, and (iii) the Senior Warrant;

WHEREAS, the Board has reviewed the Senior Credit Agreement, the Security Agreement and the Senior Warrant, and discussed in detail the merits and risks associated therewith;

WHEREAS, the LC Entities are engaged in related businesses, and each of Parent, Funding, Holdings and the Company will derive substantial direct and indirect benefit from the making of the Loans and other financial accommodations under the Senior Credit Agreement, the Security Agreement and the Senior Warrant; and

WHEREAS, after a quorum of the Board was established, the interested members of the Board recused themselves, and the disinterested and independent members of the Strategic Transaction Committee, acting in its duly authorized capacity to conduct and complete a refinance, capital raise and/or sale review process relative to the shares of capital stock and/or assets of the Parent, deemed it to be in the best interest of Parent for Parent to execute and deliver the Senior Credit Agreement, the Security Agreement and the Senior Warrant.

NOW, THEREFORE, BE IT RESOLVED, that the terms and conditions of the Senior Credit Agreement, the Security Agreement and Senior Warrant, and the transactions contemplated thereby (including the borrowing under the Senior Credit Agreement and the grant of security under the Security Agreement) be, and hereby are, approved and ratified in all respects.

RESOLVED, that the officers of Parent (each of the foregoing, individually, an "*Authorized Signatory*" and, collectively, the "*Authorized Signatories*") be, and each of them individually hereby is, authorized, empowered and directed, by and on behalf of Parent and in its name, to execute and deliver the Senior Credit Agreement, the Security Agreement, the Senior Warrant and all other agreements, promissory notes, certificates, instruments, collateral assignments and other documents related thereto and the transactions contemplated thereby (collectively, the "*Financing Documents*") with such additions, deletions or changes therein as the Authorized Signatory executing the same shall approve (the execution and delivery thereof by any such Authorized Signatory to be conclusive evidence of his or her approval of any such additions, deletions or changes).

RESOLVED, that any of the Authorized Signatories, and each of them, are hereby authorized, directed and empowered, either jointly or severally, for and on behalf of and in the name of Parent to assign, hypothecate, set over, grant security interests in and lien upon or grant a continuing security interest in, mortgage or pledge any or all of the assets and properties of Parent, real, personal or mixed, tangible or intangible, now owned or hereafter acquired, and all proceeds of the foregoing, as security for the obligations of the Company under the Senior Credit Agreement and to authorize Agent at any time and from time to time, to file or record financing statements, amendments thereto, and other filing or recording documents or instruments with respect to any Collateral (as defined in the Senior Credit Agreement) in such form and in such offices as Agent reasonably determines appropriate to perfect the security interests of Agent under the applicable Financing Documents.

## SECURITIES PURCHASE AGREEMENTS

WHEREAS, at a meeting of the Board held on June 22, 2018, the Board approved proceeding with the offer, sale and issuance by Parent and the Company of up to $6,700,000 aggregate principal amount of convertible debt securities and warrants to "accredited investors" (as such persons are defined under

-3-

Regulation D of the Securities Act of 1933, as amended (the "*Securities Act*")) and certain other investors acceptable to Parent (collectively, the "*Investors*"), in accordance with the requirements of Regulation D of the Securities Act, as contemplated by and in accordance with a non-binding term sheet, dated as of June 18, 2018, between Parent and potential investors, and to negotiate definitive documents consistent therewith;

**WHEREAS**, the Board has been presented with substantially final forms of Securities Purchase Agreements among Parent, the Company, and each Investor (collectively, the "*Purchase Agreements*"), whereby Parent and the Company will sell and/or issue the Securities (as defined in the Purchase Agreements) to the persons listed on the signature pages of such Purchase Agreements;

**WHEREAS**, Parent considers it necessary, appropriate and desirable that (i) the Company offer for sale, and to sell, convertible promissory notes (the "*Junior Notes*") and (ii) the Parent offer for sale, and to sell, warrants (the "*Junior Warrants*"), each substantially in the form that has been presented to the Board, in offerings intended to be exempt from registration under the Securities Act pursuant to Regulation D of the Securities Act; and to authorize the increase of the amount of such offering to up to $7,000,000 aggregate principal amount of Junior Notes and Junior Warrants;

**WHEREAS**, the Board has reviewed the Purchase Agreements, Junior Notes and Junior Warrants, and discussed in detail the merits and risks associated therewith; and

**WHEREAS,** after a quorum of the Board was established, the interested members of the Board recused themselves, and the disinterested and independent members of the Strategic Transaction Committee, acting in its duly authorized capacity to conduct and complete a refinance, capital raise and/or sale review process relative to the shares of capital stock and/or assets of the Parent, deemed it to be in the best interest of Parent for Parent to execute and deliver the Purchase Agreements, Junior Notes and Junior Warrants.

**NOW, THEREFORE, BE IT RESOLVED**, that the offer, sale and issuance by Parent of up to $7,000,000 in aggregate principal amount of the Junior Notes and the Junior Warrants pursuant to the terms of the Purchase Agreements be, and the same hereby are, approved.

**RESOLVED**, that the terms and conditions of the Purchase Agreements, Junior Notes and Junior Warrants, and the transactions contemplated thereby be, and hereby are, approved and ratified in all respects.

**RESOLVED**, that Parent be, and hereby is, authorized and empowered to perform all of its obligations under the Purchase Agreements.

**RESOLVED**, that the Authorized Signatories be, and each of them individually hereby is, authorized, empowered and directed, by and on behalf of Parent and in its name, to execute and deliver the Purchase Agreements, Junior Notes, Junior Warrants and all other agreements, promissory notes, certificates, instruments and other documents related thereto and the transactions contemplated thereby, with such additions, deletions or changes therein as the Authorized Signatory executing the same shall approve (the execution and delivery thereof by any such Authorized Signatory to be conclusive evidence of his or her approval of any such additions, deletions or changes).

**RESOLVED**, that the Authorized Signatories be, and each of them individually hereby is, authorized, empowered and directed, by and on behalf of Parent and in its name, to take any and all actions which any of them may deem necessary or advisable in order to obtain a permit, register or qualify the Junior Notes and the Junior Warrants, and the securities issuable upon conversion of the

UFV-000713
803

00000800

Junior Notes or exercise of the Junior Warrants for issuance and sale or to make a notice filing with respect to, or request an exemption from registration of, the Junior Notes and the Junior Warrants, and the securities issuable upon conversion of the Junior Notes or exercise of the Junior Warrants, as the Authorized Signatories may deem advisable, and in connection with such permits, registrations, qualifications, notice filings and exemptions, to execute, acknowledge, verify, deliver, file and publish all such applications, reports, notices, resolutions, irrevocable consents to service of process, powers of attorney and other papers and instruments and pay all such fees and expenses as may be required under such laws, and to take any and all further action which they may deem necessary or advisable in order to maintain any such registration in effect for as long as they deem to be in the best interests of Parent.

## GENERAL

**RESOLVED FURTHER,** that any and all actions, whether previously or subsequently taken by any Authorized Signatory which are consistent with the intent and purposes of the foregoing resolutions, be, and the same hereby are, ratified, approved and confirmed in all respects.

**RESOLVED FURTHER,** that the Authorized Signatories, and such persons, if any, appointed to act on their behalf pursuant to the foregoing resolutions, are hereby authorized, empowered and directed, in the name of Parent and on its behalf, to execute any additional agreements, instruments or documents, or any amendments or supplements thereto, or to do or to cause to be done any and all other acts as they shall deem necessary, appropriate or in furtherance of the full effectuation of the purposes of each of the foregoing resolutions and the transactions contemplated therein.

Discussion ensues on how to communicate approval of transaction. It is concluded that BCLP will send an email transmittal.

## Adjournment

There being no further business to come before the meeting, the meeting was adjourned.

UFV-000714
804

00000800

DRAFT

LOOT CRATE PARENT, INC.

Telephonic Meeting of the Board of Directors and
Strategic Transactions Committee of the Board of Directors

August 2, 2018

A telephonic meeting of the Board of Directors (the "***Board***") and the Strategic Transactions Committee of the Board (the "***Committee***") of Loot Crate Parent, Inc., a Delaware corporation (the "***Company***"), was held on the above date at 7:00 p.m. PST following notice duly given to all of the directors.  Present were the following directors:  Chris Davis, Alexandre (Alex) Zyngier, Osman Khan, Saif Mansour, Eric Beckman, Darrick Geant, Joe Kaczorowski, Aamir Amdani and Dana Kibler.  Also present were Linda Menzel, David Chang and Mark Palmer of the Company, Andrew Schoulder and Serge Nehama of Bryan Cave Leighton Paisner LLP, special counsel to the Company, Fredrick Eisenbiegler of Morgan Lewis & Bockius LLP, Will Chuchawat of Sheppard Mullin LLP, Jeffrey Reisner and Craig Varnen of Irell & Manella LLP, counsel to independent directors, and Geoff Arens of Dendera Capital.  All participants could speak and hear one another.

Mr. Davis, presiding as Chairman of the meeting, called the meeting to order and reviewed the agenda for the meeting.  Mr. Nehama acted as Secretary of the meeting.

## Review of Financing Transaction

The Breakwater designees on the Board were in attendance at the request of the Committee and stated that they were ready to recuse themselves and leave the meeting at the appropriate time.

Mr. Palmer confirmed to Mr. Zyngier that at the moment the entire Board is in attendance together with certain stakeholders and that the Committee meeting had not yet begun.

Mr. Palmer reviewed the status of the subordinated debt financing and the Atalaya transaction.  Mr. Schoulder then provided a summary of organizational consents required to approve the financing.

Mr. Palmer discussed the third party contingencies with respect to the transaction proposals from Atalaya and Upfront.  A discussion ensued.

Questions were asked and a discussion ensued regarding the applicable standard for the Committee to use in approving a financing transaction.

The Breakwater Board designees and representatives, including Mr. Eisenbiegler, left the meeting.

Mr. Palmer asked if the parties are ready to recuse themselves.  Mr. Davis appointed Mr. Zyngier as Chairman of meeting, and then Mr. Davis recused himself and left the meeting.

Ms. Kibler reiterated (in her capacity representing Upfront as a stakeholder) Upfront's concern with the structure of the warrant and reserved their rights to pursue action.  Ms. Kibler noted (in her capacity as a director) concerns that the Atalaya financing would not solve liquidity issues and could result in default with the new lender within a short amount of time.

UFV-000715
805
00000805

The following participants then left the meeting: Mses. Kibler and Menzel and Messrs. Palmer, Chang, and Arens.

The following participants remained in the meeting: Messrs. Zyngier, Khan, Shoulder, Nehama, Reisner, Varnen and Chuchawat.

Mr. Khan gave an overview of the severe liquidity constraints of the business, the management time spent on dealing with liquidity issues and how the business has suffered. Mr. Khan then summarized the Atalaya transaction process.

Mr. Khan reviewed the Upfront financing proposal, noting that although the Committee worked with Upfront, the proposal did not come to fruition because of the number of open items remaining.

Mr. Zyngier provided a summary of the Upfront financing proposal, including a discussion of the advantages and disadvantages of the proposal. Mr. Zyngier reviewed factors including transaction uncertainty, treatment of the Breakwater debt, status of transaction document negotiations and uncertainty with respect to the committed lenders and funds available.

Mr. Zyngier summarized the Atalaya financing proposal, including a discussion of the advantages and disadvantages of the proposal. Mr. Zyngier reviewed factors including transaction certainty, satisfaction of Breakwater debt, commitments from junior investors, that the proposal was expensive, covenant compliance risk and the impact of the transaction on leverage.

A discussion ensued regarding the attractive features of the proposals and the responsibilities with respect to creditors.

Mr. Shoulder discussed the directors' fiduciary duties to the Company and its stockholders.

Upon a motion duly made by Mr. Zyngier to approve the Atalaya transaction and seconded by Mr. Khan, the following preamble and resolutions were adopted:

### CREDIT AGREEMENT

      **WHEREAS**, Loot Crate Parent, Inc., a Delaware corporation ("*Parent*"), is the sole stockholder of LC Funding, Inc., a Delaware corporation ("*Funding*"), which in turn is the sole stockholder of Loot Crate Holdings, Inc., a Delaware corporation ("*Holdings*"), which in turn is the sole stockholder of Loot Crate, Inc., a Delaware corporation (the "*Company*" and, together with Parent, Funding and Holdings, the "*LC Entities*");

      **WHEREAS**, at a meeting of the Board of Directors of Parent (the "*Board*") held on July 16, 2018, the Board authorized the entry into transactions contemplated by a Credit Agreement among Parent, as Parent and Guarantor, the Company, as Borrower, any Subsidiaries of Parent that are Guarantors or become Guarantors pursuant to Section 8.10 therein, the Lenders (the "*Senior Lenders*") from time to time party thereto, and Midtown Madison Management LLC ("*Agent*"), as Administrative Agent and Collateral Agent (the "*Senior Credit Agreement*"), pursuant to which (i) the Senior Lenders will extend certain credit facilities to the Company in an initial aggregate principal amount of up to $21,000,000, with the right of Agent to increase the facilities under certain circumstances in any available increments as it determines appropriate, with the total amount of principal increase under such increase not to exceed an additional $21,000,000 (collectively, the "*Loans*") and the LC Entities (other than the Company) will guaranty the obligations of the Company thereunder, and (ii) the Company will issue a warrant to Agent or its designee (the "*Senior Warrant*");

-2-

UFV-000716

806

00000805

WHEREAS, the Board has been presented with substantially final forms of (i) the Senior Credit Agreement, (ii) a Security Agreement to be entered into by the LC Entities (the "*Security Agreement*"), pursuant to which the LC Entities will grant to Agent on behalf of the Senior Lenders a security interest in and to all or substantially all of their respective assets, and (iii) the Senior Warrant;

WHEREAS, the Board has reviewed the Senior Credit Agreement, the Security Agreement and the Senior Warrant, and discussed in detail the merits and risks associated therewith;

WHEREAS, the LC Entities are engaged in related businesses, and each of Parent, Funding, Holdings and the Company will derive substantial direct and indirect benefit from the making of the Loans and other financial accommodations under the Senior Credit Agreement, the Security Agreement and the Senior Warrant; and

WHEREAS, after a quorum of the Board was established, the interested members of the Board recused themselves, and the disinterested and independent members of the Strategic Transaction Committee, acting in its duly authorized capacity to conduct and complete a refinance, capital raise and/or sale review process relative to the shares of capital stock and/or assets of the Parent, deemed it to be in the best interest of Parent for Parent to execute and deliver the Senior Credit Agreement, the Security Agreement and the Senior Warrant.

NOW, THEREFORE, BE IT RESOLVED, that the terms and conditions of the Senior Credit Agreement, the Security Agreement and Senior Warrant, and the transactions contemplated thereby (including the borrowing under the Senior Credit Agreement and the grant of security under the Security Agreement) be, and hereby are, approved and ratified in all respects.

RESOLVED, that the officers of Parent (each of the foregoing, individually, an "*Authorized Signatory*" and, collectively, the "*Authorized Signatories*") be, and each of them individually hereby is, authorized, empowered and directed, by and on behalf of Parent and in its name, to execute and deliver the Senior Credit Agreement, the Security Agreement, the Senior Warrant and all other agreements, promissory notes, certificates, instruments, collateral assignments and other documents related thereto and the transactions contemplated thereby (collectively, the "*Financing Documents*") with such additions, deletions or changes therein as the Authorized Signatory executing the same shall approve (the execution and delivery thereof by any such Authorized Signatory to be conclusive evidence of his or her approval of any such additions, deletions or changes).

RESOLVED, that any of the Authorized Signatories, and each of them, are hereby authorized, directed and empowered, either jointly or severally, for and on behalf of and in the name of Parent to assign, hypothecate, set over, grant security interests in and lien upon or grant a continuing security interest in, mortgage or pledge any or all of the assets and properties of Parent, real, personal or mixed, tangible or intangible, now owned or hereafter acquired, and all proceeds of the foregoing, as security for the obligations of the Company under the Senior Credit Agreement and to authorize Agent at any time and from time to time, to file or record financing statements, amendments thereto, and other filing or recording documents or instruments with respect to any Collateral (as defined in the Senior Credit Agreement) in such form and in such offices as Agent reasonably determines appropriate to perfect the security interests of Agent under the applicable Financing Documents.

## SECURITIES PURCHASE AGREEMENTS

WHEREAS, at a meeting of the Board held on June 22, 2018, the Board approved proceeding with the offer, sale and issuance by Parent and the Company of up to $6,700,000 aggregate principal amount of convertible debt securities and warrants to "accredited investors" (as such persons are defined

UFV-000717
807
00000805

under Regulation D of the Securities Act of 1933, as amended (the "*Securities Act*")) and certain other investors acceptable to Parent (collectively, the "*Investors*"), in accordance with the requirements of Regulation D of the Securities Act, as contemplated by and in accordance with a non-binding term sheet, dated as of June 18, 2018, between Parent and potential investors, and to negotiate definitive documents consistent therewith;

**WHEREAS**, the Board has been presented with substantially final forms of Securities Purchase Agreements among Parent, the Company, and each Investor (collectively, the "*Purchase Agreements*"), whereby Parent and the Company will sell and/or issue the Securities (as defined in the Purchase Agreements) to the persons listed on the signature pages of such Purchase Agreements;

**WHEREAS**, Parent considers it necessary, appropriate and desirable that (i) the Company offer for sale, and to sell, convertible promissory notes (the "*Junior Notes*") and (ii) the Parent offer for sale, and to sell, warrants (the "*Junior Warrants*"), each substantially in the form that has been presented to the Board, in offerings intended to be exempt from registration under the Securities Act pursuant to Regulation D of the Securities Act; and to authorize the increase of the amount of such offering to up to $7,000,000 aggregate principal amount of Junior Notes and Junior Warrants;

**WHEREAS**, the Board has reviewed the Purchase Agreements, Junior Notes and Junior Warrants, and discussed in detail the merits and risks associated therewith; and

**WHEREAS,** after a quorum of the Board was established, the interested members of the Board recused themselves, and the disinterested and independent members of the Strategic Transaction Committee, acting in its duly authorized capacity to conduct and complete a refinance, capital raise and/or sale review process relative to the shares of capital stock and/or assets of the Parent, deemed it to be in the best interest of Parent for Parent to execute and deliver the Purchase Agreements, Junior Notes and Junior Warrants.

**NOW, THEREFORE, BE IT RESOLVED**, that the offer, sale and issuance by Parent of up to $7,000,000 in aggregate principal amount of the Junior Notes and the Junior Warrants pursuant to the terms of the Purchase Agreements be, and the same hereby are, approved.

**RESOLVED**, that the terms and conditions of the Purchase Agreements, Junior Notes and Junior Warrants, and the transactions contemplated thereby be, and hereby are, approved and ratified in all respects.

**RESOLVED**, that Parent be, and hereby is, authorized and empowered to perform all of its obligations under the Purchase Agreements.

**RESOLVED**, that the Authorized Signatories be, and each of them individually hereby is, authorized, empowered and directed, by and on behalf of Parent and in its name, to execute and deliver the Purchase Agreements, Junior Notes, Junior Warrants and all other agreements, promissory notes, certificates, instruments and other documents related thereto and the transactions contemplated thereby, with such additions, deletions or changes therein as the Authorized Signatory executing the same shall approve (the execution and delivery thereof by any such Authorized Signatory to be conclusive evidence of his or her approval of any such additions, deletions or changes).

**RESOLVED**, that the Authorized Signatories be, and each of them individually hereby is, authorized, empowered and directed, by and on behalf of Parent and in its name, to take any and all actions which any of them may deem necessary or advisable in order to obtain a permit, register or qualify the Junior Notes and the Junior Warrants, and the securities issuable upon conversion of the

-4-

Junior Notes or exercise of the Junior Warrants for issuance and sale or to make a notice filing with respect to, or request an exemption from registration of, the Junior Notes and the Junior Warrants, and the securities issuable upon conversion of the Junior Notes or exercise of the Junior Warrants, as the Authorized Signatories may deem advisable, and in connection with such permits, registrations, qualifications, notice filings and exemptions, to execute, acknowledge, verify, deliver, file and publish all such applications, reports, notices, resolutions, irrevocable consents to service of process, powers of attorney and other papers and instruments and pay all such fees and expenses as may be required under such laws, and to take any and all further action which they may deem necessary or advisable in order to maintain any such registration in effect for as long as they deem to be in the best interests of Parent.

### GENERAL

     **RESOLVED FURTHER,** that any and all actions, whether previously or subsequently taken by any Authorized Signatory which are consistent with the intent and purposes of the foregoing resolutions, be, and the same hereby are, ratified, approved and confirmed in all respects.

     **RESOLVED FURTHER,** that the Authorized Signatories, and such persons, if any, appointed to act on their behalf pursuant to the foregoing resolutions, are hereby authorized, empowered and directed, in the name of Parent and on its behalf, to execute any additional agreements, instruments or documents, or any amendments or supplements thereto, or to do or to cause to be done any and all other acts as they shall deem necessary, appropriate or in furtherance of the full effectuation of the purposes of each of the foregoing resolutions and the transactions contemplated therein.

Discussion ensues on how to communicate approval of transaction.  It is concluded that BCLP will send an email transmittal.

### Adjournment

There being no further business to come before the meeting, the meeting was adjourned.

-5-

UFV-000719
809
00000805