**From:** Greg Bettinelli <greg@upfront.com>
**To:** Christopher Davis <chris@lootcrate.com>
**Cc:** Linda Menzel <linda.menzel@lootcrate.com>, Terry Boyle <terry.boyle@hautelook.com>
**Subject:** Re: Response to Breakwater Credit Opportunities Fund, L.P.
**Date:** Thu, 23 Feb 2017 10:02:24 -0800
**Importance:** Normal

---

Shit. Oh no. My bad. I thought that was our counsel!

I will reach-out to Morgan Lewis ASAP.

On Thu, Feb 23, 2017 at 10:01 AM, <chris@lootcrate.com> wrote:

Morgan Lewis is Saif's attorney, please share your thoughts on another chain. Cooley is our new law firm and DLA Piper is handling all the details surrounding our loan.

This is our formal reply to Breakwater that we do not believe there was a default. Breakwater formally notified us that they believe their was one.

This has no impact on whether or not we all agree Saif should have a board seat. I also do not understand why this turns Saif into an adversary. Let's jump on a call this afternoon to discuss.


Sent from my iPhone

On Feb 23, 2017, at 8:22 AM, Greg Bettinelli <greg@upfront.com> wrote:


Chris and Morgan Lewis team - I was forwarded this today from Saif Mansour at Breakwater this morning asking for thoughts and questioning the rationale of the Company.

Regardless of what the letter says (which I am on record for not agreeing rejecting the claim is the right strategy) - how is it possible that the specific contents of this reply letter to Breakwater were not formally shared with the Loot Crate Board of Directors prior to it being sent out? Why was there not a specific Board of Directors discussion about the strategies and options regarding a response and how this is going to be dealt with? Lastly, why were we not even copied on the send?

This is an exact example of why there is a Board of Directors and there is a responsibility of the company and management is to involve the Board in addressing these matters. Corporate governance exists for a reason and I am extremely disappointed with how this has resulted.

My feelings in regards to this and many similar issues are not a secret and this example is just another one that concerns me. We must do better and respect the responsibilities and rights of all Loot Crate stakeholders. In addition I do not believe this terse response to Breakwater is the best way to resolve our issues and now feel they will shift from a potential ally to an adversary. I suppose these points could have been made if there was proper discussion.

Sincerely,
Greg


---------- Forwarded message ----------
From: **Saif Mansour** <smansour@breakwaterfunds.com>



EXHIBIT

M

exhibitsticker.com

Date: Thu, Feb 23, 2017 at 7:31 AM
Subject: FW: Response to Breakwater Credit Opportunities Fund, L.P.
To: Greg Bettinelli <greg@upfront.com>

---

**From:** Chris Davis <Chris@lootcrate.com>
**Date:** Wednesday, February 22, 2017 at 5:33 PM
**To:** Saif Mansour <smansour@breakwaterfunds.com>
**Cc:** Frederick Eisenbiegler <frederick.eisenbiegler@morganlewis.com>, "Curtis L. Mo (curtis.mo@dlapiper.com)" <Curtis.Mo@dlapiper.com>, Craig Tighe <Craig.tighe@dlapiper.com>, Linda Menzel <linda.menzel@lootcrate.com>
**Subject:** Response to Breakwater Credit Opportunities Fund, L.P.

Hi Saif,

Attached, please find Loot Crate's response to Breakwater's letter dated January 31, 2017.

Best,

Chris

--

**Chris Davis**
Loot Crate | Co-Founder & CEO | M: 408.464.0111
3401 Pasadena Avenue, Los Angeles, CA 90031

--
Greg Bettinelli, Partner

Upfront Ventures

  Tel: 310.785.5110

upfront.com

@gregbettinelli

#LongLA

<Response to Breakwater.pdf>

--
Greg Bettinelli, Partner

Upfront Ventures

  Tel: 310.785.5110

upfront.com

UFV-010836

@gregbettinelli

#LongLA

UFV-010837

**From:** Greg Bettinelli <greg@upfront.com>
**To:** Saif Mansour <smansour@breakwaterfunds.com>
**Subject:** Re: Loot Crate
**Date:** Mon, 20 Feb 2017 17:08:24 -0800
**Importance:** Normal

---

Hi Saif - as an update to our recent conversations in regards to Loot Crate, I wanted to keep you in the loop on an email I sent to Chris over the weekend. Chris acknowledged receipt of the email and I am hoping to speak with him tomorrow. Also, I have kept Terry Boyle in the loop.  Obviously, you play a big part in this as well, in regards to the treatment of the current loan as well as providing additional near-term capital.

In effect, I wanted to communicate to him some high-level thoughts in regards to what Upfront Ventures is thinking would be the preferred solution which is in the best interests of all Loot Crate stakeholders. We would like to collectively work together on a specific plan of action that immediately seeks out an experienced senior leader (CEO) who can help quell the company's near-term issues while putting ourselves in position for overall success over the longer term. We believe the only course forward is the commitment to a transition of Loot Crate leadership as quickly as possible.

1) Agree to immediately search for a new CEO whom will lead the day-to-day operations of Loot Crate and whom will instantly add credibility and standing to the overall organization and our market position. Our thoughts are someone like Ynon Kreiz would be a great fit (again this is in the concept stage but obviously someone we know and have worked with in the past). We are working on a list at this time and are happy to share it.

2) We would like you to transition Chris to the role of Chairman of the Board of the Loot Crate, serving as the Board member representing the common equity holders. This is not an uncommon transition of day-to-day operating leadership that many tech executives have been made, including recently by the likes of Keith Krach at Docusign, Phil Libin at Evernote and Dennis Crowley at Foursquare (to name a few).

3) Collectively, we would work to immediately resolve the company's issues w/ the Breakwater loan related to the Loot Crate debt covenant breach(es) claims.

4) Work to raise additional capital from inside and external sources at a fair market valuation (we will use 3rd parties to get to a fair equity valuation factoring all the current aspects of the business) which should enable Loot Crate to resolve our near-term liquidity issues and put in a stronger executional position over the coming quarters. The new capital raise would likely be directly tied to the recruitment of a new senior level CEO taking over the day-to-day operations of the business.

5) Create a new material and repriced option pool to enable the company to recruit the new CEO and attract / retain needed leadership and operating team members.

Let's reconnect early this week.

Best,
Greg



EXHIBIT

N

**From:** Greg Bettinelli <greg@upfront.com>
**To:** Saif Mansour <smansour@breakwaterfunds.com>
**Subject:** Fwd: Proposal made to Chris
**Date:** Sat, 11 Mar 2017 19:07:04 -0800
**Importance:** Normal

---

Hi Saif, good to connect yesterday. I appreciate you keeping me in the loop on everything. Sorry to bother you on a Saturday night, but I wanted to let you know that I connected with Chris today in regards to resolving our near-term governance and leadership concerns at Loot Crate.

In short, I proposed bringing in Ynon Kreiz as a new Board Member and Chairman to help provide immediate high-level leadership guidance and business oversight while enabling Chris to retain his role as CEO of the company. This was also shared with Cooley (outside company counsel) and Terry Boyle (independent board member).

Chris seemed receptive to the idea, but I do think there is needed push that needs to occur. We are connecting again on Monday to discuss. I let him know that I was going to broadly communicate to key stakeholders that such a proposal was made, but would ask not to be proactive with him over the next couple of days. Also, there are a lot of moving parts here and it will take some work to get a deal done with Ynon if Chris were to formally agree, but I am hopefully his experience with our firm and his relationship with my partner Mark will also help us get there.

Ynon would be active in the Company and provide Chris and the Board with high-level leadership guidance and additional oversight around business matters like budgeting and resource allocation, strategic prioritization, organization stabilization, as well as taking a leadership and ownership role in the pursuit of new and expanded business partners and finding additional outside capital opportunities. Importantly, Ynon will be able to take some of the burden off Chris' shoulders and provide him with a true business mentor and partner. Having Ynon involved with the business also adds instant credibility to the company, make stakeholders including more comfortable, and will elevate the excitement of team members and business partners about the long-term Loot Crate opportunity.

As you all know, in our minds the status quo is a not an option and some sort of action needs to occur in the near-term. This is a solution that feels amicable and positively impactful to all Loot Crate stakeholders, bringing instant credibility, business and organizational stability and likely much needed financial security to the business. Obviously, Breakwater plays a key role here and as these discussions proceed we will need to iron out near/medium term issues/opportunities with you.

I am happy to discuss further 1-1 over the next couple of days if needed. Please feel free to ping with questions. I will let you know as we learn more.

Thanks,
Greg



EXHIBIT

O

**From:** Mark Suster <mss@upfront.com>
**To:** Saif Mansour <smansour@breakwaterfunds.com>
**Bcc:** "Yves@upfront.com" <Yves@upfront.com>
**Subject:** For Discussion: Upfront / Breakwater
**Date:** Sun, 22 Oct 2017 13:16:02 -0700
**Importance:** Normal



Saif,

As follows is our proposal to fund LootCrate. We have not shared this and don't want to until and unless we know that Breakwater would like to be our partner in this funding. In it you'll see that I talk about Chris's role vs. Peter. I actually think the best case scenario that I'd like to play to:

* Ynon as Executive Chairman, commits 2 days / week
* Eric as SVP of Business Operations (runs finance, marketing, tech, business development) - my plan would be to offer Eric 3% stock options. I have spoken with him and he's considering it.
* Peter as COO (runs warehouse, logistics, supply chain) - my plan would be to offer Peter 3% stock options
* Chris as CEO (runs board, capital markets, PR, industry relations, transformational biz dev deals). But he has no direct reports. He works directly with Ynon and me
* I would play an active role on the board as I did with Maker Studios working side-by-side with Ynon
* At the end of the deal there would still be 9% unallocated options in the company

All three report execs to Ynon who reports to the board and who would need to commit to 2 days / week working for LootCrate.

Breakwater currently owns 2.3% of the fully diluted share capital of LootCrate with a 1x liquidation preference. Subject to the renegotiation of the debt, Breakwater would own 10% (if it writes the full $3.75m) post deal with a 2x participating preferred liquidation preference and would have a board seat. I believe these economics are greatly improved for Breakwater.

Discussion on Breakwater debt:

* In order for me to write more checks into LootCrate I have to see Breakwater as my equity partner and governance partner and not the company's debt provider. I know you have that but we need to be aligned on reducing dependency on debt
* I would like a payment holiday until June 30th 2018 to allow the company that time to raise more capital and generate cashflow. This is only in place in case we don't raise outside capital
* If the company raises outside capital of no less than $10 million then the payments on BW debt begin the day that round closes (my goal is to have this completed by the end of the year)
* I want to get rid of any PIKs or conversion rights of your debt. That is replaced with 2% of the company granted to you in penny warrants, full ratchet on your equity, investment at a $75m post-money alongside Upfront, a board seat and 2x participating preferred liquidation preference (which gives you huge upside and downside protection, which neither of us have today)
* I would like to see "resetting of the clock" such that the start of the new payment schedule is considering "year 1: and that repayment of debt being 10% of the value of the loan in year 1, year 2 = 20%, year 3 = 30% so before interest it would equal monthly payments of $120k, $240k, $360k respectively with a balloon payment due after 42 months of the restart of payments.
* I would like not to have a penalty for prepayment. My rational is simple. If I can get your debt taken out (repayment or new bank provided credit) then you're made whole on your loan, have no more risk and you own both 10% of the company and huge upside and downside protection on an exit (plus a board seat).

UFV-000374

Again, I want to treat you as my equity partner to go make a ton of money by creating a $1bn company. At the board level if we think we can get better commercial terms on the debt for the company I want to be sure you'd agree with me to vote for that (but I don't have any reason to take out your debt and interest on it on normal commercial terms if both parties are amenable).

* I don't want a minimum cash covenant. I am opposed to them in principle. I am ok to agree some light covenants but my goal is that we control the cash situation through the board, through Ynon and through active and tight management of the company's spend. My fear is that covenants add risks to my equity investment if they could theoretically be used to undermine my ownership.

I will get you a simple spreadsheet on the deal by tonight. But below is what I'd plan to send to Chris and the board. It doesn't mention Eric because that's still an unknown and you and I should keep that in our back pocket until we know.

Mark

***************

Upfront is willing to submit one final offer to finance LootCrate but in light of the past 2 weeks observations it will be on a different basis than the two previous offers.

**Expiration**: This offer will be valid until October 30th at 8pm PT. If a term sheet isn't signed by then, Upfront rescinds it offer and will not submit any further offers to fund LootCrate.

**Outlook**: Given the dire situation of LootCrate, Upfront would be happy to let somebody else finance the company provided that the funding is not less than $10 million. Upfront would also be willing to sell its current stock at cost for $12.5 million if you have a buyer for it at the time of your financing. We submit this offer in good faith as we believe that without our money it is highly likely that all shareholders, creditors, customers and employees will lose money.

**Negotiations**: This offer is fixed and firm and non-negotiable. If you accept our terms we will move expediently to finance the company. If you don't accept any term then we will be happy to have you pursue other financing options. We will not change any terms in this offer. We've been down that road before and this is the only deal we will finance.

**Terms**:
A. Upfront will financing $3.75 million of a $10 million round of financing alongside Breakwater who, along with their LPs would be expected also to financing $3.75 million. The company must find $2.5 million in other investors at these terms.

B. The price of Upfront's financing will be a $75 million post-money valuation.

C. Any existing preferred stockholder who participates pro rata in this $10 million financing will given a "full ratchet" on their previous investment such that their previous stock will be converted to the current share price and they will be awarded the number of shares that they would have received had they invested at this current price.

D. All of this preferred stock (last round and this round) by those who participate will have a 2x liquidation preference and participating preferred stock. All preferred stock of those who participate in this round will be senior in liquidation preference to other preferred stock holders.

[I want to make this clear. Your previous stockholders seemed fine with rushing the sale of LootCrate and helping Upfront and Breakwater get 1x their money back in a sale. This is not acceptable. Upfront took extreme risks in backing LootCrate and our normal target return profile is 10x. Our minimum return expected by our investors is 3x and if we deliver less than this it is considered failure. Knowing how much risk you were willing to place in the company to seek a sale for your personal gain and that of your

UFV-000375

earlier investors at the expense of more recent investors means that we could never fund you without a 2x return legally guaranteed.]

E. The board will consist of 5 people: Ynon Kreiz and Terry Boyle as independent directors. Upfront and Breakwater as your major preferred stockholders and one role for the CEO of the company, who shall initially be you.

F. All of the functions of LootCrate will immediately report to Peter Lai as the COO who will report to Ynon Kreiz as the Executive Chairman. The objective is that you as CEO will focus 100% of your time, attention and care to those areas which the major investors would like to see you focused on: capital markets (raising more capital), PR (improving the public perception of LootCrate), transformational business development (getting a limited number of company-defining deals done) and being the company evangelist at events. For the avoidance of doubt, you will not have day-to-day operational responsibilities for the company other than working with Peter, Ynon and the Board. We do not intend for all of these functions to report directly to Peter indefinitely. We plan to hire senior executives in Marketing, Technology and Finance. When we do, as a board we will determine whether these functions report to you, Peter or somebody else in the company.

[As part of our diligence for this finance we talked to most of your current and previous direct reports and to nearly every financial shareholder of the company. They all shared positive views of your ability to inspire the market and represent the company but were also nearly unanimous that they didn't feel it was appropriate for you to run the daily operations of the business.]

G. The company will set a target of achieving no less than 38% gross margin on every crate it sells and will be held accountable for reporting against this and managing to this number. The company will commit to generate $1 million of free cashflow from operations per month and in any event never less than $500,000 in any single month. The company will reduce US employment costs by no less than $250,000 / month to hit the Income Statement no later than January 1st 2018 (i.e. cuts must happen sooner).

H. The company will investigate any and all acts of sexual misconduct that have happened in the past or will happen in future and will have a zero tolerance policy managed by HR. If anybody in the past or future is found to violate any offenses as deemed by the board these individuals will be removed from the company and should not set foot on LootCrate premises.

I. Upfront would like to communicate that our goal is to work with you to help you act as a true CEO of LootCrate and help the company get through it's very dire financial situation. We do want to make it clear before any financing would be accepted that if the company violates clause G or H or if Upfront generally feels that you aren't upholding your duties as the CEO of the company we would vote our board vote on brining on a senior CEO who could achieve this outcome.

--
_____

MARK SUSTER, Partner

Upfront Ventures

 Tel: 310.785.5181

www.upfront.com

www.BothSidesoftheTable.com <http://www.bothsidesofthetable.com/>

UFV-000376

**From:** Nick Grouf <ngrouf@gmail.com>
**To:** Mark Suster <mss@upfront.com>
**Cc:** David Waxman <david@tenoneten.net>, terry.boyle@gmail.com, Christopher Davis <chris@lootcrate.com>, Ryan Hibbard <ryan@lootcrate.com>, Ynon Kreiz <ynon@kreiz.com>, Saif Mansour <smansour@breakwaterfunds.com>
**Subject:** LC Discussion
**Date:** Fri, 3 Nov 2017 00:10:27 -0700
**Importance:** Normal

Dear Mark

Over the last few weeks, we've been made aware of various offers from Upfront to finance the ongoing operations of Lootcrate. Because we haven't spoken, and Chris has been acting as an intermediary, it's unclear to us whether you understand our position on these deals, the state of the company, or how we believe the company should proceed. Doubtless, we probably do not fully understand your perspective either. We suspect that we probably have more areas of agreement than disagreement: the company desperately needs cash, management needs to change, and Chris cannot have responsibility for company finances. There are other parts of your offers, though, that unfairly favor Upfront over all other shareholders. This is why we are supportive of the offer presented yesterday, which we believe is significantly more favorable to the company, existing shareholders, and Series B investors.

We have spoken to other board members and debt holders who have asked us to have a conversation with hopes that we could align around a single deal. That is why we reached out to you earlier today. We still believe it would be constructive to speak before the board meeting tomorrow. Assuming you agree, please let us know when you are available.

Best

David and Nick



From: Nick Grouf <ngrouf@gmail.com>
To: Mark Suster <mss@upfront.com>
Cc: David Waxman <david@tenoneten.net>, Terry Boyle <terry.boyle@gmail.com>,
Christopher Davis <chris@lootcrate.com>, Ryan Hibbard <ryan@lootcrate.com>, Ynon
Kreiz <ynon@kreiz.com>, Saif Mansour <smansour@breakwaterfunds.com>, Michael
Carney <michael@upfront.com>
Subject: Re: LC Discussion
Date: Fri, 3 Nov 2017 09:28:49 -0700
Importance: Normal

Mark

So there is no confusion, we are trying to be respectful and supportive of you, the board and the company by reaching out.

Further to be clear, it is at the request of your board members and your debt holder - and our desire to be constructive - that we have attempted to speak with you. Lets agree to disagree on your characterizations when time is less pressing, but we do appreciate that this is how you currently perceive this interaction.

While you may consider our holdings to be of little consequence, we hold roughly 1/3 of the preferred shares of the company, only slightly less than your holdings (which we remind you are also a minority of the Series A). Each share has the same face value, so to be clear, we too have millions at stake in the business, and far more years.

Any proposal this board reviews must take into consideration the impact on all shareholders, not simply the investors. And there are more bona fide offers on the table then the ones Upfront has presented.

For the record, the management proposal and yours will reduce Chris' span of control and his role. Only your proposal drastically dilutes all shareholders to the benefit of certain shareholders with significant participation - as well as certain board members. It is the management proposal that more fairly treats all shareholders and the company as a whole.

Our requests of whichever deal is selected are as follows:
It should sufficiently capitalize the business
it should reduce Chris' span of control
It should not include a ratchet that hurts all shareholders, including the hard working employees of the company
It should not include an exclusivity clause so as to maintain flexibility for the Board to get the best deal done to the benefit of all stockholders.

It is your prerogative to not speak to us now. But we will be watching the proceedings of the board meeting carefully, and trust that it will be conducted with fiduciary obligations and a Duty of Care and Duty of Loyalty prioritized. We hope it is a successful process.

Respectfully yours,
David and Nick

UFV-019470

**EXHIBIT**

**R**

On Fri, Nov 3, 2017 at 7:37 AM, Mark Suster <mss@upfront.com> wrote:

To correct the record, I did call you. I also called David. I called you at the time of our last offer in which you said, "The company should be sold now. If it isn't sold you risk losing your money now. If we sell then Upfront and Breakwater would at least get their money back." Under that scenario you and David who had collectively risked about $110,000 would make millions while Breakwater, who had risked $14 million, would get 1x their money. When I asked you, "Who on Earth would fund the Company to a sale? They have $43 million in debt and $400,000 in cash. You responded that you thought Breakwater would happily lend the company more money to get to a sale." I didn't act on this comment because knowing Breakwater's concerns about the business I didn't think this accurately reflected the situation on the ground.

As the largest investment in our entire fund that was not an outcome we would support. That one comment is what drove Upfront to reconsider its "downside protection" in "middling outcomes" to make sure that in any sale we were being accommodated not only for the $14 million we had collectively invested but also the highly risky $6 million we were prepared to invest. In each of these scenarios the $110,000 you guys risked would still earn millions while we would earn between 2-3x return on our then $20.5 million (Upfront and Breakwater) investments.

At every stage I have told Chris, "If Nick and David want to write $6 million into the Company we will gladly look at the terms they have put forth and find a way to work together." This includes the "Management Offer" submitted at the last minute before our last offer expired. We immediately changed our terms to accommodate your new offer.

To address your specific comments:

"There are other parts of your offers, though, that unfairly favor Upfront over all other shareholders" - I disagree entirely. Every investor has been offered to get the exact same terms as us in this round of financing and adjust their previous position provided they at least write a minimum check. In order not to be unfair to you and David we set your level at just $250,000 each while we are writing $5 million. Objectively that isn't unfair. Objectively we are facing much more risk. Objectively we getting up to 3x return while you make 20-30x return on your $110,000 isn't "unfair." Our capital will be used to save what is otherwise a bankrupt company that has breached its debt covenants. We care about each and every shareholder, large and small. But in a complex and highly risky situation I hope you can understand why I must focus my time and energy on the largest shareholders (founder), the largest debt holders (Breakwater), the largest financiers (my partners at Upfront who need to be persuaded why they should risk more of our capital" and the board members of LootCrate whom I call daily.

"That is why we reached out to you earlier today." ... I am aware you reached out. Perhaps you may not be aware but we spent the entire morning working on a revised offer to help bridge the gap between our offer and your "management offer." We then spent 2 hours with Chris and Ryan. I cancelled meetings and took two full time resources to do this. I also spent part of my dinner and time seeing Hamilton last night on the phone and texting with Chris and also working with our associate Michael to see if we could make more changes to the offer. I have also now spent my entire morning on this.

Given the need to work with management for a 4-hour board meeting we have today and given the need to finish our work you'll excuse me from not having the time to negotiate with each and every small shareholder but please understand that I am working with the CEO, the board and the $15 million debt holder to save the company.

Mark

On Fri, Nov 3, 2017 at 12:10 AM, Nick Grouf <ngrouf@gmail.com> wrote:

UFV-019471

Dear Mark

Over the last few weeks, we've been made aware of various offers from Upfront to finance the ongoing operations of Lootcrate. Because we haven't spoken, and Chris has been acting as an intermediary, it's unclear to us whether you understand our position on these deals, the state of the company, or how we believe the company should proceed. Doubtless, we probably do not fully understand your perspective either. We suspect that we probably have more areas of agreement than disagreement: the company desperately needs cash, management needs to change, and Chris cannot have responsibility for company finances. There are other parts of your offers, though, that unfairly favor Upfront over all other shareholders. This is why we are supportive of the offer presented yesterday, which we believe is significantly more favorable to the company, existing shareholders, and Series B investors.

We have spoken to other board members and debt holders who have asked us to have a conversation with hopes that we could align around a single deal. That is why we reached out to you earlier today. We still believe it would be constructive to speak before the board meeting tomorrow. Assuming you agree, please let us know when you are available.

Best

David and Nick

--
_____

MARK SUSTER, Partner
Upfront Ventures
Tel: 310.785.5181
www.upfront.com
www.BothSidesoftheTable.com <http://www.bothsidesofthetable.com/>

--

Nick

***NOTICE***

This e-mail message is confidential, is intended only for the named recipient(s) above, and may contain information that is privileged, attorney work product or exempt from disclosure under applicable law.  If you

UFV-019472

have received this message in error, or are not a named recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail is strictly prohibited.  If you have received this message in error, please immediately notify the sender by return e-mail and delete this e-mail message from your computer.  Thank you.
UFV-019473

From: Michael Carney <michael@upfront.com>
To: Saif Mansour <smansour@breakwaterfunds.com>
Subject: Mechanics of acceleration / default
Date: Tue, 14 Nov 2017 16:12:31 -0800
Importance: Normal

Saif,

Mark and I were just talking and we feel like we didn't get a clear enough understanding yesterday of the mechanics and implications of what happens once (if) you accelerate the loan and the company is unable to pay.

Given the non-zero chance that we find ourselves in this situation in the near future, I'd like to make sure we have a thorough understanding the full "if / then decision tree" around what obligations the company has and when, what steps Breakwater can/will take and when, etc. Is this something you or someone on your team could talk through with me or possibly your counsel at Morgan Lewis?

Thanks

—

Michael Carney
Upfront Ventures

UFV-023370

EXHIBIT

S

# LOOTCRATE A-2 PLAYBOOK

EXHIBIT

T

exhibitsticker.com

## Wednesday 11/15
- 2:30pm – BOD Call
  - Review the current liquidity crisis
  - Upfront & Breakwater offer to fund their full $6M A-2 commitment on Friday
  - Saif informs the company that if the A-2 does not close on Friday, Breakwater will accelerate the loan and begin seeking remedies at 8am on Monday
  - BOD votes and instructs Chris to drop all tasks and focus 100% of his time an attention on resolving any outstanding issues related to the A-2 docs with the intent of closing on Friday.
    - All concerns must be surfaced no later than 2pm on Thursday for resolution by 11:59pm Thursday
  - Ynon calls for a subsequent BOD meeting on Friday at 8:00am to vote on and approve final A-2 terms to be signed and closed by EOD Friday
  - BOD instructs Cooley to begin drafting a Rights Offering for distribution on Monday
- Following BOD Call – Upfront (Carney) & LKP to review any outstanding issues in A-2 docs in preparation for Thursday negotiation & resolution (note: Cooley & LKP scheduled to review via call at 10:30am today)

## Thursday 11/16
- Cooley, LKP, Chris Davis, Upfront to negotiate all final A-2 terms by EOD

## Friday 11/17
- 8:00am – BOD Call
  - BOD votes on final A-2 terms and instructs Chris to sign and close
- If A-2 signed
  - Cooley immediately files rush Charter with DE
  - Upfront & Breakwater prepare to wire by 2pm, pending receipt of Charter otherwise first thing Monday

## Monday 11/20
- If A-2 not signed
  - 9:00am – Breakwater formally notices the company that the loan is due in full by 5:00pm on Monday
  - By 10:00am – Ynon calls for a BOD call on Tuesday morning
  - Upfront engages litigation counsel in preparation for Wednesday notices to Chris, *et. al* of intent to sue
- Irrespective of A-2 status
  - At BOD's request, Cooley issues Rights Offering to all preferred shareholders (20 days to respond)

## Tuesday 11/21
- 9:00am – Breakwater formally notices the company of intent to seize LC bank accounts, and does so immediately
- 10:00am – BOD Call
  - BOD says to Chris, you were instructed to close and didn't, you are in breach of your fiduciary duties. BOD reiterates its demand that the company accept financing on the terms offered in light of the worsening financial situation

<u>Wednesday 11/22</u>
- 9:00am – Breakwater formally notices the company of intent to seize its warehouses and all inventory, and instructs the company to cease and desist from disposing of any inventory without express written approval of the lender. Breakwater also expresses intent to begin liquidating inventory at its discretion
- 9:00am – Upfront notices key parties of intent to pursue legal action
  - Chris Davis
    - Upfront notices of intent to sue Chris Davis personallyh for breach of fiduciary duty
  - Nick Grouf
    - Upfront informs Nick of its intent to pursue legal action against Chris Davis, and instructs Nick to preserve all records of communication with Chris Davis and the company
  - David Waxman
    - Upfront informs David of its intent to pursue legal action against Chris Davis, and instructs David to preserve all records of communication with Chris Davis and the company
  - George Davis
    - Upfront informs George of its intent to pursue legal action against Chris Davis, and instructs Nick to preserve all records of communication with Chris Davis and the company
    - Implies, subtly / politely that this is likely to be a very public, protracted battle in which he would be involved

UFV-045997

From: Christopher Davis <chris@lootcrate.com>
To: Terry Boyle <terry.boyle@hautelook.com>, Mark Suster <mss@upfront.com>, Ynon Kreiz
<ynon@kreiz.com>, Ryan Hibbard <ryan@lootcrate.com>
Cc: Linda Menzel <linda.menzel@lootcrate.com>, "Hobson, Nick" <nhobson@cooley.com>
Subject: A-2 Financing Update
Date: Thu, 16 Nov 2017 13:29:10 -0800
Importance: Normal
Board,

I am writing to raise very serious issues that I have with the process that led to the approval of the Series A-2
Term Sheet at our November 3 Board meeting and, in particular, acceptance of the Term Sheet's
Exclusivity Provision and to respond to the proposal that Upfront's portion of the proposed Series A-2
financing close this Friday, November 17.

Addressing the November 17 closing first, I have spoken with Cooley and Linda and understand that the
documents for the proposed Series A-2 financing are not finalized. I am not comfortable agreeing to any
transaction of this type without having the opportunity to do a full review of the agreements. Therefore, I
cannot agree to closing the proposed financing on November 17, even if I were able to conclude that
a financing along the terms set out in the Series A-2 Term Sheet was in the best interests of the Company and
its shareholders.

As for the Series A-2 Term Sheet more generally, we all have a continuing fiduciary duty to work for the
benefit of the company and its shareholders. At the November 3 Board meeting, there were three financing
proposals considered. Consequently, we were not in a situation where there was only one possible
path. Even if the Management Proposal and BioWorld Proposal were not acceptable on their proposed terms
at the time, there was no basis for determining that they could not be improved, or that other financing
sources would not be available. Nevertheless, the Board was presented with the Series A-2 Term Sheet, with
its Exclusivity Provision, and was not advised by Cooley as to the potential breach of fiduciary duty inherent
in contracting away the Company's right to seek better financing terms from another party or parties.
Additionally, Upfront has failed to provide the $1.5 million of bridge financing at reasonable terms that was
promised in connection with the Term Sheet and has sought other changes to the terms, including the
accelerated closing. Therefore the financing that we are now being asked to approve and close on Friday is
not even what was approved on November 3.

I cannot agree at this time, either as a director or a shareholder, to a financing under the terms currently
proposed. I also believe that we have a fiduciary duty to see if there is an alternative financing proposal
available that provides better terms to the Company and its shareholders and that can close by the
Term Sheet's December 4 closing date. I have consulted with my own counsel in California and in Delaware
and understand that, because it interferes with that fiduciary duty, the Exclusivity Provision is likely not
enforceable under Delaware law.

I am now working to obtain a financing proposal that provides the Company the money it needs on better
terms for the Company and its shareholders than the Term Sheet. Given the Company's cash needs, I
understand that any alternative must be presented ASAP. Therefore, I propose that we set a Board meeting
for Monday, November 27, at which time I will present the results of my efforts for the Board's
consideration.

UFV-027886

**EXHIBIT**

_____ U _____

Best Regards,
--
Chris Davis
Loot Crate | CEO/Co-Founder | M: 408.464.0111
3401 Pasadena Avenue, Los Angeles, CA 90031
UFV-027887

From: Saif Mansour <smansour@breakwaterfunds.com>
To: Mark Suster <mss@upfront.com>
Subject: Re: Upfront's Position on LootCrate's Forbearance Agreement
Date: Fri, 25 May 2018 19:04:38 +0000
Importance: Normal

sorry we keep missing one another. still want to connect to discuss alternative approaches to capital raise. am traveling out of country for the weekend but happy to jump on a quick call.

sm

-- sent from my breakwater wireless device. please excuse any typos.

On May 25, 2018, at 1:38 PM, Mark Suster <mss@upfront.com> wrote:

Chris, Linda,

We were expecting a response by the end of last week as promised. We know how busy you are so we gave you an additional week but still haven't heard anything. We'd be grateful if you would provide us feedback on where things stand on our requests.

Mark

On Wed, May 16, 2018 at 8:06 AM, Christopher Davis <chris@lootcrate.com> wrote:

We'll review your requests and respond with next steps by the end of this week.

--

Chris Davis
Loot Crate | CEO/Co-Founder | M: 408.464.0111
3401 Pasadena Avenue, Los Angeles, CA 90031

On May 15, 2018, at 10:38 PM, Mark Suster <mss@upfront.com> wrote:

Loot Crate Directors,

I'm not sure the extent to which you're aware, but Upfront has been asked to agree certain changes to the Voting Agreement we have with Loot Crate so that Breakwater's proposed Forbearance Agreement can take effect. These changes affect our rights & economics so while we're willing to engage in a reasonable dialog, it cannot be expected that we just accept further erosion of our position.

The Company has pursued a financing strategy in which it hasn't properly been capitalized from an equity perspective. Several existing preferred stockholders offered to invest to improve the balance sheet but our offer was rebuffed. In order not to create conflict that would distract the executives Upfront temporarily took a more hands-off approach to allow management to figure out how to finance the company. Despite claiming to have two bona fide, competing offers for equity financing and despite spending countless hours and money on a Bioworld debt financing none of this came to fruition.

UFV-030115

EXHIBIT

V

exhibitsticker.com

Nevertheless we want to continue to be supportive and find a mutually agreeable way to enable the company to close on Breakwater's Forbearance Agreement.

With this in mind and despite the amendment to the Voting Agreement not being in our interest, we will agree to the changes being requested on the condition that we are treated fairly and get the Company's agreement on each of the following points:

1. We request that the legal fees incurred over the last year in connection with our proposed financing be reimbursed. We understand that the company has agreed to reimburse both Breakwater and Bryan Cave for their legal fees so it is only fair that we are treated in the same way. Our legal fees were $231,380 and we would propose that they be repaid on the same payment schedule that has been agreed with Breakwater and Bryan Cave.

2. When Ynon Kreiz joined the company as Chairman in July 2017 he entered into a $250,000 Note which the company has agreed to repay. We were also asked to enter into a $250,000 Note at the same time and request that it be repaid by the company, with Breakwater's consent, at the same time and on the same basis as Ynon is being repaid.

3. As the Board will be aware, Chris, acting in his position as the largest shareholder in the company has promised several stock allocations to third-parties that never had the consent of Upfront, other preferred stockholders or the Board. These grants include, but may not be limited to, Dendera and Breakwater. To the extent that Chris made decisions on dilution for the company in association with rejecting a legitimate equity financing offer made by the preferred stockholders, we require that the dilution from these grants he unilaterally initiated be borne solely by the common stockholders.

4. Given our limited role with the company and our reduced rights we think it is reasonable that we be part of any decision process to take on additional debt.  We therefore request that should the company increase its loan amount or take on any other indebtedness our prior approval will be sought.

5. We are opposed to adding to the principle amount of Breakwater loan by $2 million because this has a direct impact on the distribution of assets to shareholders and because there is no sound economic reason for the company to accept this. The company was offered equity financing and its shareholders should not be forced to suffer this irrational economic consequence. Is the board aware that management has proposed misallocating shareholder money towards this cause?

We hope the Board will agree that these are reasonable and fair requests for Upfront's continued support of the business through difficult times and that any monetary reimbursements requested are exactly the same as have been agreed with others.

Please let us know if this is acceptable and we will draft a letter agreement reflecting the above.

Best regards,

Mark

--

_____
MARK SUSTER, Partner
Upfront Ventures
Tel: 310.785.5181
www.upfront.com
www.BothSidesoftheTable.com <http://www.bothsidesofthetable.com/>
UFV-030116

\--

_____
MARK SUSTER, Partner
Upfront Ventures
Tel: 310.785.5181
www.upfront.com
www.BothSidesoftheTable.com <http://www.bothsidesofthetable.com/>
UFV-030117

EXECUTION VERSION

Loot Crate, Inc.
3401 Pasadena Avenue
Los Angeles, CA 90031

June 1, 2016

Breakwater Credit Opportunities Fund, L.P.
1999 Avenue of the Stars, Suite 3430
Los Angeles, CA 90067
Attn: Saif Mansour

Re:    Investor Rights.

Dear Saif:

Loot Crate, Inc., a Delaware corporation (the "**Company**"), and Breakwater Credit Opportunities Fund, L.P. ("**Investor**") are entering into this letter agreement (this "**Agreement**") in connection with the purchase by Investor and/or one or more of its Affiliates (as defined below) from the Company of shares of the Series A Preferred Stock, par value $0.001 per share, of the Company ("**Series A Preferred Stock**") and the extension by Investor of a credit facility to the Company pursuant to the Loan and Security Agreement, dated as of the date hereof, between the Company and Investor (the "**Loan Agreement**").   In connection therewith, the parties hereby agree as follows:

1.    Board Observer Right.  The Company hereby grants to Investor the right to have a single representative of Investor attend all meetings of the Company's Board of Directors (the "**Board**") and the committees of the Board in a nonvoting observer capacity and, in this respect, shall give such representative copies of all notices, minutes, consents, and other materials that it provides to its directors at the same time and in the same manner as provided to such directors; provided, however, that such representative shall agree to hold in confidence and trust and to act in a fiduciary manner with respect to all information so provided; and provided further, that the Company reserves the right to withhold any information and to exclude such representative from any meeting or portion thereof if it determines in good faith, upon advice from counsel, that access to such information or attendance at such meeting c ould adversely affect the attorney-client privilege between the Company and its counsel or result in disclosure of trade secrets. Investor's rights under this Section 1 shall not be exercisable at any time that Investor is exercising its board observation rights under Section 6.10 of the Loan Agreement.

2.    Term.  The right set forth in Section 1 is not transferable (other than to Affiliates of Investor) and shall terminate upon the earliest of (such date, the "**Rights Termination Date**"): (a) the date that Investor and its Affiliates collectively own less twenty-five percent (25%) of the Series A Preferred Stock that they purchased on or about the date of this Agreement, (b)

**EXHIBIT**

**W**

immediately before the consummation of a Qualified IPO, or (c) upon a Liquidation Event, as each such term is defined in the Company's Amended and Restated Certificate of Incorporation.

      3.    <u>Tag-Along Right</u>.  If any of the undersigned holders of capital stock of the Company or any of their respective Affiliates (each, a "**Key Stockholder**") shall propose to transfer (excluding any transfers to Affiliates or for bona fide estate planning purposes and Special Exempt Transfers, as defined in the Right of First Refusal and Co-Sale Agreement, dated as of May 10, 2016, by and among the Company and the Company stockholders named therein (the "**ROFR Agreement**")) any shares of capital stock of the Company held by such Key Stockholder (in each case, the "**Offered Shares**") to a third party (the "**Offeree**"), then Investor shall have the right to require that the Key Stockholder cause the Offeree (for this purpose Offeree shall include the Company and the Major Investors, as defined in the ROFR Agreement, to the extent that they exercise their co-sale rights with respect to the Offered Shares pursuant to the ROFR Agreement) to purchase from Investor up to that number of shares equal to the product obtained by multiplying (i) the total number of Offered Shares proposed to be transferred by the Key Stockholder by (ii) a fraction, the numerator of which is the total number of shares of capital stock of the Company held by the Investor immediately before the proposed transfer (including the shares subject to the Warrant held by Investor and the shares issued pursuant to exercise thereof (collectively the "**Warrant Shares**")) (the "**Number of Investor Shares**"), and the denominator of which is the sum of (x) the Number of Investor Shares, (y) the number of shares of capital stock held by the Key Stockholder and (z) the aggregate number of shares of capital stock held by all Major Investors exercising their co-sale rights with respect to the Offered Shares pursuant to the ROFR Agreement.  Such Investor Shares to be purchased by the Offeree from Investor shall be purchased at the same price and on the same terms and conditions as offered to the Key Stockholder (such right hereinafter called the "**Tag-Along Right**"); provided that if the Investor or its Affiliates wishes to sell Series A Preferred Stock and the Key Stockholder proposes to sell common stock of the Company, the price shall be appropriately adjusted based on the conversion ratio of the Series A Preferred Stock into common stock.  The Investor shall receive notice of a transfer subject to this Section 3 no later than fifteen (15) days prior to the consummation of such transaction.  The Investor must deliver a written notice with respect to its exercise of its Tag-Along Right under this Section 3 within ten (10) days after delivery of the notice referenced in the immediately preceding sentence.  Any transfer by Investor pursuant to this Section 3 shall be on the same terms and conditions (including, time of payment and form of consideration) as to be paid to the Key Stockholder, and the Investor and its Affiliates must agree to the same conditions to such transfer as the Key Stockholder agrees, including representations, warranties, covenants, indemnities and other agreements; provided, however, (i) neither Investor nor its Affiliates shall be subject to any non-competition or similar agreements or covenants that would bind the Investor; and (ii) the liability for indemnification, if any, of Investor or its Affiliates in such transfer and for the inaccuracy of any representations and warranties made by the Company or its stockholders in connection with such transfer, is several and not joint with any other stockholder, is pro rata in proportion to, and does not exceed, the amount of consideration paid to Investor in connection with such transfer.

      4.    <u>Preemptive Rights</u>.  The Company acknowledges and agrees that the Investor shall constitute a Major Investor for purposes of Section 3 of the IRA, and in connection with the issuance of any Equity Securities (as defined in the IRA), the Company shall reserve sufficient Equity Securities to permit the Investor to purchase its pro rata share of the Equity Securities

DB1/ 87757100.4

based on the Outstanding Common Equivalents (as defined in the IRA, but excluding the Warrant Shares) held by the Investor.  The rights set forth in this Section 4 shall terminate upon the applicable Rights Termination Date.  Notwithstanding anything to the contrary herein, the Company acknowledges and agrees that the Investor and its Affiliates may purchase up to an aggregate of $1,500,000 of additional shares of Series A Preferred Stock within thirty (30) days of the date hereof, subject to such terms and conditions mutually agreed by the Company and the Investor.

5.     <u>Loan Documents</u>.  Nothing herein is intended to affect the respective rights and remedies that Investor shall have, as lender, which rights are governed by the Loan Agreement.  Notwithstanding any provision herein to the contrary, nothing herein shall be construed to limit, waive, amend or alter the terms and provisions of the Loan Agreement or any rights or remedies available to the lenders thereunder and their Affiliates as creditors of the Company.

6.     <u>Miscellaneous</u>.

(a)  This Agreement shall be governed by the General Corporation Law of the State of Delaware as to matters within the scope thereof, and as to matters of contract law, by internal laws of the State of California applicable to contracts and without regard to any conflict of law principles.

(b)  This Agreement may be executed in counterparts, each of which when so executed shall be deemed an original, but both of which when taken together shall constitute one and the same instrument.

(c)  For purposes of this Agreement, the term "Affiliate" means, with respect to any specified person or entity, any other person or entity who, directly or indirectly, controls, is controlled by, or is under common control with such person or entity, including without limitation any general partner, managing member, officer or director of such person or entity or any investment fund now or hereafter existing that is controlled by one or more general partners or managing members of, or shares the same management company with, such person or entity.

[Signature Page Follows]

DB1/ 87757100.4

CONFIDENTIAL                                                                  BM0016571

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

LOOT CRATE, INC.

By
Name: Christopher Davis
Title: Chief Executive Officer

KEY STOCKHOLDERS

By
Name:  Christopher Davis

By
Name: Matthew Arevalo

Side Letter

CONFIDENTIAL

BM0016572

INVESTOR

BREAKWATER CREDIT OPPORTUNITIES
FUND, L.P.

By:_____
Name: SAID MANSOUR
Title: MANAGING PARTNER

Side Letter

CONFIDENTIAL