

**Exhibit**

**A**

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| OLD LC, INC., *et al.*,[1] | Case No. 19-11791 (BLS) |
| Debtors. | Jointly Administered |
| Official Committee of Unsecured Creditors of Old LC, Inc., et al., for and on behalf of the estates of Old LC, Inc., et al.; | Adv. No. 20-51002 (BLS) |
| Plaintiff, | |
| v. | |
| Upfront V, LP, Breakwater Credit Opportunities Fund, L.P.; Upfront GP V, LLC; Mark Suster; Dana Kibler; Gregory Bettinelli; Saif Mansour; Aamir Amdani; Eric Beckman; Darrick Geant; and Joseph Kaczorowski | |

### REPLY OF UPFRONT V, L.P., UPFRONT GP V, LLC, MARK SUSTER, DANA KIBLER AND GREGORY BETTINELLI TO PLAINTIFF'S OPPOSITION TO UPFRONT DEFENDANTS' MOTION TO DISMISS

Defendants Upfront V, L.P., Upfront GP V, LLC, Mark Suster, Dana Kibler and

Gregory Bettinelli (collectively, the "Upfront Defendants") hereby reply (the "Reply") to

*Plaintiff's Memorandum of Law in Opposition to Upfront Defendants' Motion to Dismiss*

[Docket No. 38] (the "Opposition").[2]  In support of the Reply, Defendants respectfully state as

follows:

---

[1]  The Debtors are the following four entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Old LC, Inc. (7119), Old LC Holdings, Inc., Old LCF, Inc. and Old LC Parent, Inc. The Debtors' noticing address in these Chapter 11 cases is 3401 Pasadena Ave, Los Angeles, CA 90031.

[2]  Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the *Motion of Upfront V. L.P., Upfront GP V, LLC, Mark Suster, Dana Kibler and Gregory Bettinelli to Dismiss First Amended Complaint and Objection to Claims and Motion to Strike Prayer for Compensatory Damages* [Docket No. 35].

**Carney Deposition Exhibit**

**57**

dismissed as ***to the breach of fiduciary duty claim*** with respect to that Individual Upfront Defendant.

**E.    Insufficient Allegations of Breaches of Fiduciary Duties.**

31.    While the Opposition is correct that the Motion to Dismiss inadvertently omitted the standard for breach of the duty of loyalty, the deficiencies in the Complaint with respect to the fiduciary duty counts do not relate to a particular element of a breach of any duty, whether of care, loyalty, good faith or candor, but rather that the claims themselves are implausible and unsupported by factual allegations.  The Complaint lists each alleged act constituting a breach: (i.e., (a) creation of a cash crisis; (b) preclusion of alternative funding; (c) coercion of board into unfavorable funding terms; (d) sabotaging compliance with forbearance agreement; (e) secret meetings and the "Playbook"); (f) failing to disclose dual loyalties; and (g) threats of litigation) [Complaint ¶241(a)-(g)], and the Motion to Dismiss addressed each of these alleged acts and set forth the reasons they were pleaded insufficiently and did not state a cause of action.[4]

32.    The Opposition has now reframed the issues as follows: (i) breach of duty of loyalty through bad faith pursuit of own interests (and specifying their pursuit of a scheme to obtain either a self-interested funding deal or total control of the board); and (ii) breach of duty of loyalty by engaging in self-dealing by pursuing self-dealing transactions.  However, for all the

---

[4] To summarize the arguments in the Motion to Dismiss: (a) creation of cash crisis: insufficiently pleaded; no specific allegations of when or how "cash crisis" was created or what anyone at Upfront did to create such; conclusory allegation with nothing more; (b) preclusion of alternative funding: no evidence that consideration of alternative financing was precluded and, in fact, the Complaint makes clear alternative financing **was** considered; (c) coercion of board into unfavorable funding terms: board was not coerced because it, in fact, did not proceed with the A-2 financing;  (d) sabotaging compliance with forbearance agreement: insufficiently pleaded in that it is unclear what Kibler did to sabotage or when; it appears Kibler was not even on the board (nor was any other Individual Upfront Defendant) at the time any sabotage could even occurred; (e) secret meetings and the "Playbook": Complaint states the Playbook to obtain more board seats did not succeed and alleged "secret meetings" do not provide sufficient factual detail to enable Upfront Defendants to respond and are not alleged to have caused any damage; (f) failing to disclose dual loyalties: there can be no doubt all parties knew of Bettinelli, Suster, and Kibler's roles at Upfront; and (g) antagonistic behavior and threats of litigation: party entitled to state its intent to pursue legal rights and no allegation that damages resulted.

11



**Exhibit**

**B**

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| OLD LC, INC., *et al.*,[1] | Case No. 19-11791 (BLS) |
| Debtors. | Jointly Administered |
| Official Committee of Unsecured Creditors of Old LC, Inc., et al., for and on behalf of the estates of Old LC, Inc., et al.; | Adv. No. 20-51002 (BLS) |
| Plaintiff, | |
| v. | |
| Upfront V, LP, Breakwater Credit Opportunities Fund, L.P.; Upfront GP V, LLC; Mark Suster; Dana Kibler; Gregory Bettinelli; Saif Mansour; Aamir Amdani; Eric Beckman; Darrick Geant; and Joseph Kaczorowski | |

**MOTION OF UPFRONT V, L.P., UPFRONT GP V, LLC, MARK SUSTER, DANA KIBLER AND GREGORY BETTINELLI TO DISMISS FIRST AMENDED COMPLAINT AND OBJECTION TO CLAIMS AND MOTION TO STRIKE PRAYER FOR COMPENSATORY DAMAGES**

Pursuant to Rules 12(b)(6), 12(e) and 12(f) of the Federal Rules of Civil Procedure, made applicable to adversary proceedings by Rule 7012 of the Federal Rules of Bankruptcy Procedure, defendants Upfront V, L.P., Upfront GP V, LLC, Mark Suster, Dana Kibler and Gregory Bettinelli (collectively, the "Upfront Defendants") hereby move to (1) dismiss Counts I, II, III, IV, and IX (collectively, the "Upfront Counts") of that certain *First*

---

[1]  The Debtors are the following four entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Old LC, Inc. (7119), Old LC Holdings, Inc., Old LCF, Inc. and Old LC Parent, Inc. The Debtors' noticing address in these Chapter 11 cases is 3401 Pasadena Ave, Los Angeles, CA 90031.



**Carney Deposition Exhibit**

**58**

Complaint alleges no facts to support that Kreiz was somehow not independent; it only alleges that Kreiz had a pre-existing relationship with Upfront and Suster.  Further, even if the Complaint had pleaded facts to support its allegation that Kreiz was not independent and he acted as Upfront's "lackey," Kreiz's alleged support on the Board could not constitute Upfront's actual control over the Board, as Kreiz and Suster, acting together, would still never have had control over the five-person Board.

31.    In an attempt to overcome this hurdle, the Complaint alleges that a third director, Terry Boyle, "compromise[d] the disinterestedness and independence of the Board." Complaint, at ¶ 229.  There is no allegation that Boyle had any pre-existing relationship with Upfront or any of the Defendants, nor that he acted on the instruction of Upfront.

32.    Accordingly, the Complaint's conclusion that Upfront controlled the Board is insufficient.   Upfront cannot be found to owe fiduciary duties as a "controller" of the Board based on the facts alleged.

### b.   Development of Playbook Not an Exercise of Control.

33.    The Complaint alleges that "developing the Playbook" was an act of actual control giving rise to fiduciary duties.  Complaint, at ¶ 36.  The Complaint describes the Playbook as a detailed, coordinated plan "to block the Board from considering other financing options and to force Davis and the company to consummate the A-2 Proposal."  Complaint, at ¶ 36.  On its face, the "development" of a plan cannot be considered an act of actual control.  To the extent such a plan existed and Upfront attempted to implement it, it did not succeed.  The Company did not, in fact, fail to consider other financing options, nor was the A-2 Proposal ever consummated.   Accordingly, the Playbook does not constitute a factual allegation of actual control on the part of Upfront.

14

34.     More significantly, the Complaint itself concedes that Upfront and Breakwater did not succeed in implementing the Playbook:

> 95.    On or about November 9, 2017, Upfront and Breakwater informed Loot Crate that they would not provide the additional $1.5 million in bridge financing that had been previously offered unless Davis provided an irrevocable power of attorney over his common stock in Loot Crate.
>
> 95.    By this condition, Upfront and Breakwater placed Davis exactly where they wanted him in their scheme: Between a rock and a hard place. **If Davis agreed, Upfront and Breakwater would obtain even greater, unfettered control of Loot Crate.** If Davis refused, the lack of additional bridge financing would leave Loot Crate without sufficient working capital.
>
> 96.    **Davis did not consent to the additional demand.**

Complaint, at ¶¶ 94-96 (emphasis added).

### c.   Preventing Quorum Not an Exercise of Control.

35.     The Complaint additionally alleges that Upfront controlled Loot Crate by Suster's "refus[al] to attend meetings to preclude the existence of a quorum."  Complaint, at ¶¶ 231.  Attendance (or refusing to attend) board meetings was an act taken by Suster rather than by Upfront, and thus it does not constitute control on the part of *Upfront* over the Debtors.  Further, an *attempt* to exercise control by preventing a quorum does not constitute actual control sufficient to create fiduciary duties, as set forth, *supra*, ¶ 30.

36.     The Complaint does not adequately allege that the lack of quorum allowed Upfront to exercise control on the part of Upfront during the limited time a quorum was not achieved.  The Complaint deceptively *suggests* that Suster's absence resulted in the withdrawal of the "New BioWorld Proposal," but does not identify the date that this occurred.  Complaint, ¶ 149 ("Eventually, Upfront's and Breakwater's tactics achieved their goal.  Despite spending close to two months of time and effort to advance the financing transaction, BioWorld withdrew its proposals.").  This is <u>not</u> an allegation that the failure to obtain a quorum during that brief

15

or she served on the Board.  Accordingly, to the extent any alleged breach occurred at a time

when the individual Upfront Director was not on the Board, the Complaint must be dismissed as

to that claim.  To the extent any individual managed *Upfront's* affairs, that does not form the

basis for a fiduciary duty owed to Loot Crate.

> **b.      Insufficient Allegations of Breaches of Fiduciary Duties.**

42.      A complaint fails to state a claim against an alleged fiduciary for breach of

fiduciary duty when it fails to allege facts demonstrating that (1) the fiduciary took part in the

challenged conduct and (2) failed to demonstrate the due care attendant to its particular office in

doing so. *See Bridge Holding, Inc. Liquidating Trust v. Boyer (In re Bridgeport Holdings, LLC)*,

388 B.R. 548, 573 (Bankr. D. Del. 2008).

43.      In a single count, the Complaint lists the following actions as breaches of

the individual Upfront Defendants' alleged fiduciary duties:

> (a) intentionally creating a cash crisis within Loot Crate for the purpose of
> reinforcing Upfront and Breakwater's effective control over Loot Crate
> (Bettinelli, Suster);
>
> (b) preventing the Board from considering or seeking out alternative funding
> options, rendering the Board incapable of negotiating meaningfully in connection
> with the A-2, BioWorld, or Management Proposals (Bettinelli, Suster);
>
> (c) aggressively and threateningly attempting to coerce the Board under duress
> into palpably unfavorable funding terms that would benefit Upfront and
> Breakwater at Loot Crate's expense (Bettinelli, Suster);
>
> (d) intentionally sabotaging Loot Crate's efforts to comply under the Breakwater
> forbearance agreement in order to wrest Board control from Davis and other
> independent directors (Kibler);
>
> (e) surreptitiously manipulating Loot Crate's financing efforts, including through:
> (i) creating and executing the Playbook, a secret and coordinated plan among
> ostensibly independent directors, interested directors, and dominant shareholders
> to force financing on Loot Crate that would solely benefit Upfront and
> Breakwater; and (ii) having secret meetings and communications with Loot
> Crate's former and existing management to sow seeds of disloyalty and apply
> additional pressure on Davis to act against his fiduciary duties (Bettinelli, Suster);

### 5.   Manipulating Financing Efforts (Bettinelli, Suster).

53.    The Complaint does not plead any facts sufficient to support a breach of fiduciary duty on the part of Bettinelli or Suster for "surreptitiously manipulating Loot Crate's financing efforts, including through: (i) creating and executing the <mark>Playbook,</mark> a secret and coordinated plan among ostensibly independent directors, interested directors, and dominant shareholders to force financing on Loot Crate that would solely benefit Upfront and Breakwater; and (ii) having secret meetings and communications with Loot Crate's former and existing management to sow seeds of disloyalty and apply additional pressure on Davis to act against his fiduciary duties." Complaint, at ¶ 241(e).

### a.   The <mark>Playbook.</mark>

54.    The Complaint describes the <mark>Playbook</mark> as a detailed, coordinated plan "to block the Board from considering other financing options and to force Davis and the company to consummate the A-2 Proposal."   Complaint, at ¶ 98.   The Playbook is described as a plan developed prior to the "November 15 meeting," during Suster's tenure as the Series A Director and well after he replaced Bettinelli in that role.   Accordingly, Bettinelli did not owe fiduciary duties during the applicable time period, and the Complaint must be dismissed as Bettinelli in connection with this claim.

55.    Further, to the extent such a plan existed, the Complaint concedes it did not succeed.  *See*, *supra*, ¶¶ 36-37; Complaint, at ¶¶ 94-96. Without the allegation that the Board agreed to and consummated such unfavorable terms, there can be no damage therefrom.  Further, the "financing . . . that would solely benefit Upfront" is the A-2 Proposal that is not alleged to be harmful to Loot Crate.  Instead, the A-2 Proposal included anti-dilution preferences with respect to Upfront and Breakwater, which "would create a materially negative economic impact on the majority of Loot Crate's other shareholders."  Complaint, at ¶ 67.  As the proposed funding was

23

**Exhibit**

**C**

exhibitsticker.com

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | Chapter 11 Case |
| | § | |
| Old LC, Inc., *et al.*[1] | § | Case No. 19-11791 (BLS) |
| | § | |
| Debtors. | § | Jointly Administered |

| | | |
|---|---|---|
| | § | |
| Official Committee of Unsecured Creditors | § | |
| of Old LC, Inc., et al., for and on behalf of | § | |
| the estates of Old LC, Inc., *et al.*; | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Adv. No. 20-51002 (BLS) |
| | § | |
| Upfront V, LP, Breakwater Credit | § | |
| Opportunities Fund, L.P.; Upfront GP V, | § | |
| LLC; Mark Suster; Dana Kibler; Gregory | § | |
| Bettinelli; Saif Mansour; Aamir Amdani; | § | |
| Eric Beckman; Darrick Geant; and Joseph | § | |
| Kaczorowski | § | |
| | § | |
| *Defendants.* | § | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO BREAKWATER DEFENDANTS' MOTION FOR PROTECTIVE ORDER

---

[1] The Debtors are the following four entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Old LC, Inc. (7119), Old LC Holdings, Inc., Old LCF, Inc., and Old LC Parent, Inc.  The Debtors' noticing address in these Chapter 11 cases is c/o Bryan Cave Leighton Paisner LLP, Attn: Mark I. Duedall, 1201 W. Peachtree Street, 14th Floor, Atlanta, Georgia 30309.

**Carney Deposition Exhibit**

**59**

2.     Pursuant to the Private Equity Agreements, Upfront designated one member of Loot Crate's Board.  Pursuant to the Loan and Security Agreement, through which Breakwater provided debt financing, Breakwater designated a "Board Observer."  Although the Board Observer was not a director, the Board Observer still agreed to "hold in confidence and trust and to act in a fiduciary manner with respect to all information" provided to the Board Observer.[5]

3.     Almost immediately, Defendants began conspiring together to gain control of the Company and improperly extract value and benefit for themselves at Loot Crate's expense.  In 2017, Defendants discussed using Breakwater's "leverage" to effect "changes" at Loot Crate, including appointing additional board members to serve their interests.[6]

4.     Defendants shared otherwise privileged communications with one another in order to coordinate their strategies and how one group could "carry the water" in order to further their own interests while concealing their self-serving motives.[7]

5.     Despite objectively superior financing offers, Defendants conspired together and shared a "Playbook" to ensure that their objectively inferior financing proposal was accepted even if it was not in the best interest of Loot Crate.[8]  Other investors voiced concerns regarding how Defendants' financing offer "unfairly favor[ed] Upfront over all other shareholders."[9]  Yet, the Breakwater Defendants admit that neither the Upfront director nor the Breakwater Board Observer recused themselves from the board meeting considering the financing proposals.[10]

---

[5] *See* Ex. B.
[6] *See* Ex. C.
[7] *See* Ex. D.
[8] *See* Ex. E.
[9] *See* Ex. F.
[10] [D.I. 34, at ¶ 89].

4

Agreement and the Loan and Security Agreement. (Motion, at 1). In reality, Plaintiff's First Amended Complaint describes substantially more breaches of fiduciary duties and many more actions taken by the Breakwater Defendants than the strawman argument pushed by the Breakwater Defendants. For example, Paragraph 241 of the First Amended Complaint identifies a litany of exemplary breaches of fiduciary duty, including the following:

(a)   intentionally creating a cash crisis within Loot Crate for the purpose of reinforcing Upfront and Breakwater's effective control over Loot Crate (Bettinelli, Suster, Mansour);

(b)   preventing the Board from considering or seeking out alternative funding options, rendering the Board incapable of negotiating meaningfully in connection with the A-2, BioWorld, or Management Proposals (Bettinelli, Suster, Mansour);

(c)   aggressively and threateningly attempting to coerce the Board under duress into palpably unfavorable funding terms that would benefit Upfront and Breakwater at Loot Crate's expense (Bettinelli, Suster, Mansour);

(d)   intentionally sabotaging Loot Crate's efforts to comply under the Breakwater forbearance agreement in order to wrest Board control from Davis and other independent directors (Mansour, Kibler, Amdani, Beckman, Geant, Kaczorowski)

(e)   surreptitiously manipulating Loot Crate's financing efforts, including through: (i) creating and executing the Playbook, a secret and coordinated plan among ostensibly independent directors, interested directors, and dominant shareholders to force financing on Loot Crate that would solely benefit Upfront and Breakwater; and (ii) having secret meetings and communications with Loot Crate's former and existing management to sow seeds of disloyalty and apply additional pressure on Davis to act against his fiduciary duties (Bettinelli, Suster, Mansour);

(f)   failing to disclose dual loyalties (Bettinelli, Suster, Kibler, Mansour); and

(g)   using serial threats of litigation and other threats and antagonistic behavior directed at Davis, the Board, Loot Crate management, and other Loot Crate shareholders (Bettinelli, Suster, Mansour).

Here, Plaintiff's fiduciary duty claims reach far more misconduct than the strawman argument set-up by the Breakwater Defendants. The case law described in the sections below demonstrate the nature, extent, and validity of Plaintiff's theory premised upon the series of

of their coordination and conspiracy to verbal discussions rather than written discussions.  Indeed, many of the communications surrounding the <mark>"Playbook"</mark> appear to have occurred verbally rather than in writing.[21]  To the extent they were not (suspiciously) destroyed,[22] the text message conversations produced by Defendants substantially decrease in number during highly relevant time periods, raising a clear suggestion that most discussions occurred orally.  Accordingly, depositions are critical in order to understand the facts, claims, and defenses in this case.  As the court in *Dieckman* explained in reference to evaluating whether directors believed some action was in the best interest of the Company:

> [O]bjective factors may inform an analysis of a defendant's subjective belief to the extent they bear on the defendant's credibility when asserting he believed a transaction was in the best interests of the partnership.  When a court undertakes such an analysis, the directors' personal knowledge and experience will be relevant to a subjective good faith determination, which must focus on measuring the directors' approval of a transaction against their knowledge of the facts and circumstances surrounding the transaction.

*Dieckman v. Regency GP LP*, No. CV 11130-CB, 2018 WL 1006558, at *3 (Del. Ch. Feb. 20, 2018).  Given the claims at issue, documents alone will not provide a complete story concerning Defendants' misconduct.

The Breakwater Defendants' attempt to limit Plaintiff's claims to one "boiled down" theory also fails based on language from the Motion itself.  Specifically, the Motion asserts that, "[e]ach alleged recapitalization opportunity required a compromise **by one or both institutional defendants** of its contractual rights."  (Motion, at 3) (emphasis added).  Setting all other issues with the Breakwater Defendants' position aside, this litigation does not involve only Plaintiff's claims against "institutional defendants" that had certain contractual rights.  Rather, the litigation

---

[21] Ex. E.
[22] Plaintiff expressly reserves its right to seek sanctions for spoliation by the Defendants.

# LOOTCRATE A-2 <mark>PLAYBOOK</mark>

## Wednesday 11/15
- 2:30pm – BOD Call
  - Review the current liquidity crisis
  - Upfront & Breakwater offer to fund their full $6M A-2 commitment on Friday
  - Saif informs the company that if the A-2 does not close on Friday, Breakwater will accelerate the loan and begin seeking remedies at 8am on Monday
  - BOD votes and instructs Chris to drop all tasks and focus 100% of his time an attention on resolving any outstanding issues related to the A-2 docs with the intent of closing on Friday.
    - All concerns must be surfaced no later than 2pm on Thursday for resolution by 11:59pm Thursday
  - Ynon calls for a subsequent BOD meeting on Friday at 8:00am to vote on and approve final A-2 terms to be signed and closed by EOD Friday
  - BOD instructs Cooley to begin drafting a Rights Offering for distribution on Monday
- Following BOD Call – Upfront (Carney) & LKP to review any outstanding issues in A-2 docs in preparation for Thursday negotiation & resolution (note: Cooley & LKP scheduled to review via call at 10:30am today)

## Thursday 11/16
- Cooley, LKP, Chris Davis, Upfront to negotiate all final A-2 terms by EOD

## Friday 11/17
- 8:00am – BOD Call
  - BOD votes on final A-2 terms and instructs Chris to sign and close
- If A-2 signed
  - Cooley immediately files rush Charter with DE
  - Upfront & Breakwater prepare to wire by 2pm, pending receipt of Charter otherwise first thing Monday

## Monday 11/20
- If A-2 not signed
  - 9:00am – Breakwater formally notices the company that the loan is due in full by 5:00pm on Monday
  - By 10:00am – Ynon calls for a BOD call on Tuesday morning
  - Upfront engages litigation counsel in preparation for Wednesday notices to Chris, *et. al* of intent to sue
- Irrespective of A-2 status
  - At BOD's request, Cooley issues Rights Offering to all preferred shareholders (20 days to respond)

## Tuesday 11/21
- 9:00am – Breakwater formally notices the company of intent to seize LC bank accounts, and does so immediately
- 10:00am – BOD Call
  - BOD says to Chris, you were instructed to close and didn't, you are in breach of your fiduciary duties. BOD reiterates its demand that the company accept financing on the terms offered in light of the worsening financial situation

**Exhibit**

**D**

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| OLD LC, INC., *et al.*,[1] | Case No. 19-11791 (BLS) |
| Debtors. | Jointly Administered |
| Official Committee of Unsecured Creditors of Old LC, Inc., et al., for and on behalf of the estates of Old LC, Inc., et al.; | Adv. No. 20-51002 (BLS) |
| Plaintiff, | |
| v. | |
| Upfront V, LP, Breakwater Credit Opportunities Fund, L.P.; Upfront GP V, LLC; Mark Suster; Dana Kibler; Gregory Bettinelli; Saif Mansour; Aamir Amdani; Eric Beckman; Darrick Geant; and Joseph Kaczorowski | |

**MOTION OF UPFRONT V, L.P., UPFRONT GP V, LLC, MARK SUSTER, DANA KIBLER AND GREGORY BETTINELLI TO DISMISS COMPLAINT AND OBJECTION TO CLAIMS**

Pursuant to Rules 12(b)(6) and 12(e) of the Federal Rules of Civil Procedure, made applicable to adversary proceedings by Rule 7012 of the Federal Rules of Bankruptcy Procedure, defendants Upfront V, L.P., Upfront GP V, LLC, Mark Suster, Dana Kibler and Gregory Bettinelli (collectively, the "Upfront Defendants") hereby move to dismiss Counts I, III, IV, and IX (collectively, the "Upfront Counts") of that certain *Complaint and Objection to Claims* (the "Complaint")[2] filed by the Official Committee of Unsecured Creditors of Old LC,

---

[1]  The Debtors are the following four entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Old LC, Inc. (7119), Old LC Holdings, Inc., Old LCF, Inc. and Old LC Parent, Inc. The Debtors' noticing address in these Chapter 11 cases is 3401 Pasadena Ave, Los Angeles, CA 90031.

[2]  Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Complaint.

1



**Carney Deposition Exhibit**

**60**

29.    The Complaint conclusorily alleges that Upfront exercised control over Loot Crate:

> Defendant Upfront exercised actual control over Loot Crate and its governance apparatus through its active cooperation with Breakwater and, which placed Upfront in a position no different than if Upfront had majority voting control. Such actual control included, but is not limited to, taking steps with Breakwater to reconstitute the Board in its favor and to do its bidding, developing the ==Playbook== to suffocate the Company, installing purportedly "independent" directors that would only do Upfront's and Breakwater's bidding, blocking favorable financing proposals in favor of their own, and refusing to attend meetings to preclude the existence of a quorum.

Complaint, at ¶ 204.  However, on their face most of these examples do not constitute acts of control even if facts were alleged to support them, nor are any facts alleged to support any actual exercise of control.

### a.  Complaint Does Not Adequately Allege That Upfront Controlled Board.

30.    The Complaint alleges that Upfront "[took] steps with Breakwater [in 2017] to reconstitute the Board in its favor and to do its bidding" and "install[ed] purportedly "independent" directors that would only do Upfront's and Breakwater's bidding."  However, the Complaint acknowledges no reconstitution resulted from its 2017 alleged coordination with Breakwater.  Complaint, at ¶ 53 (describing Upfront and Breakwater's actions as an "attempt").  Accordingly, any such alleged, unsuccessful "attempt" cannot be deemed to constitute Upfront exercising actual control over the Debtors.[7]

---

[7] Moreover, the addition of Breakwater as a designee of a board seat would not have even provided Upfront and Breakwater with control over the board.  That certain Voting Rights Agreement referenced in the Complaint for Upfront's right to designate a board seat provides for the following board composition:

(a) One person designated by Upfront to serve as the Series A Director;

(b) One person designated by Christopher Davis to serve as a Common Director;

(c) The Company's Chief Executive Officer, to serve as a Common Director;

(d) Two At-Large Directors, persons not otherwise an Affiliate of the Company or any Investor who are, in each case, mutually acceptable to the Series A Director (if then serving) and the holders a majority of the issued and outstanding shares of the Common Stock.

13

31.     Further, even if Breakwater and Upfront had been successful at installing a Breakwater-designated director in 2017 as alleged, that would not have provided Breakwater and Upfront with control over the Board, which had five members.  In short, the alleged attempted reconstitution of the Board, even if it occurred, would not have provided Upfront and Breakwater with actual control over Loot Crate.

32.     The Complaint further alleges that Upfront installed a "lackey" on the Board to "reconstitute the Board in [its] favor," referring to Ynon Kreiz.  Complaint, at ¶ 53.  However, the Complaint alleges no facts to support that Mr. Kreiz was somehow not independent; it only alleges that Mr. Kreiz had a pre-existing relationship with Upfront and Mr. Suster.  Further, even if the Complaint had pleaded facts to support its allegation that Mr. Kreiz was not independent and he acted as Upfront's "lackey," Mr. Kreiz's alleged support on the Board could not constitute Upfront's actual control over the Board, as Mr. Kreiz and Mr. Suster, acting together, would still never have had control over the five-person Board.

### b.  Development of Playbook Not an Exercise of Control.

33.     The Complaint alleges that "developing the Playbook" was an act of actual control.  The Complaint describes the Playbook as a detailed, coordinated plan "to block the Board from considering other financing options and to force Davis and the company to consummate the A-2 Proposal."  Complaint, at ¶ 36.  On its face, the "development" of a plan cannot be considered an act of actual control.  To the extent such a plan existed and Upfront attempted to implement it, it did not succeed.  The Company did not, in fact, fail to consider other financing options, nor was the A-2 Proposal ever consummated.  Accordingly, this example does not constitute a factual allegation of actual control.

*See* Voting Rights Agreement, § 2.2.

34.     More significantly, the Complaint itself concedes that Upfront and Breakwater did not succeed in implementing the Playbook:

> 84.     On or about November 9, 2017, Upfront and Breakwater informed Loot Crate that they would not provide the additional $1.5 million in bridge financing that had been previously offered unless Davis provided an irrevocable power of attorney over his common stock in Loot Crate.
>
> 85.     By this condition, Upfront and Breakwater placed Davis exactly where they wanted him in their scheme: Between a rock and a hard place. **If Davis agreed, Upfront and Breakwater would obtain effective control of Loot Crate.** If Davis refused, the lack of additional bridge financing would leave Loot Crate without sufficient working capital.
>
> 86.     **Davis did not consent to the additional demand.**

Complaint, at ¶¶ 84-86 (emphasis added).

### c.  Exercise of Blocking Rights Does Not Create Fiduciary Duty.

35.     The Complaint alleges that Upfront and Breakwater together controlled the Debtors by "blocking favorable financing proposals in favor of their own," it alleges no facts to support that Upfront actually blocked other financing proposals.  In fact, the Complaint focuses on Upfront's potential *ability* to "control" Loot Crate's financing, stating:

> In separate agreements dated on or about May 10, 2016 (the "Private Equity Agreements"), in exchange for their equity funding, Upfront received approximately 45% of the newly-issued Series A Preferred Stock of Loot Crate and Breakwater received approximately 10% of the newly-issued Series A Preferred Stock for a total of 55% of the issued and outstanding Series A Preferred Stock.
>
> . . .
>
> Also, under the terms of the Private Equity Agreements, a majority of the class of Series A Preferred Shares was required to approve any new preferred equity issuances for Loot Crate. Together, Upfront and Breakwater held a majority of the Series A Preferred Shares and therefore had the power veto any subsequent financing for Loot Crate.
>
> . . .

DOCS_LA:334843.3

(d) intentionally sabotaging Loot Crate's efforts to comply under the Breakwater forbearance agreement in order to wrest Board control from Davis and other independent directors;

(e) surreptitiously manipulating Loot Crate's financing efforts, including through: (i) creating and executing the Playbook, a secret and coordinated plan among ostensibly independent directors, interested directors, and dominant shareholders to force financing on Loot Crate that would solely benefit Upfront and Breakwater; and (ii) having secret meetings and communications with Loot Crate's former and existing management to sow seeds of disloyalty and apply additional pressure on Davis to act against his fiduciary duties;

(f) failing to disclose dual loyalties; and

(g) using serial threats of litigation and other threats and antagonistic behavior directed at Davis, the Board, Loot Crate management, and other Loot Crate shareholders.

Complaint, at ¶ 209.  None of these states a claim for a breach of a fiduciary duty on the part of any Upfront Defendant.

### i.  Creation of Cash Crisis.

51.    The Complaint does not allege any facts sufficient to adequately plead that any Upfront Defendant "intentionally creat[ed] a cash crisis within Loot Crate for the purpose of reinforcing Upfront and Breakwater's effective control over Loot Crate."  In fact, the basis for such an allegation is entirely unclear from the Complaint.  To the extent the Committee is referencing Upfront's refusal to provide an "additional $1.5 million in bridge financing that had previously been offered unless Davis provided an irrevocable power of attorney over his common stock in Loot Crate," this allegation does not state a claim for breach of fiduciary duty. Complaint, at ¶ 84.

52.    Upfront had every right to condition its funding on whatever conditions it wanted, or decline to provide financing entirely.  *Odyssey P'rs, L.P. v. Fleming Cos., Inc.*, 735 A.2d 386, 411 (Del. Ch. 1999) (holding that controlling stockholder was under no fiduciary

22

Defendant "surreptitiously manipulat[ed] Loot Crate's financing efforts, including through: (i) creating and executing the Playbook, a secret and coordinated plan among ostensibly independent directors, interested directors, and dominant shareholders to force financing on Loot Crate that would solely benefit Upfront and Breakwater; and (ii) having secret meetings and communications with Loot Crate's former and existing management to sow seeds of disloyalty and apply additional pressure on Davis to act against his fiduciary duties."

58.    The Complaint describes the Playbook as a detailed, coordinated plan "to block the Board from considering other financing options and to force Davis and the company to consummate the A-2 Proposal."  Complaint, at ¶ 36.  However, to the extent such a plan existed, the Complaint concedes it did not succeed.  *See*, *supra*, ¶¶ 33-34; Complaint, at ¶¶ 84-86. Further, the Complaint does not allege any facts to support its contention that Upfront sowed seeds of disloyalty.

### vi.  Failing to Disclose Dual Loyalties.

59.    The Complaint does not allege any facts to adequately plead that any Upfront Defendant "fail[ed] to disclose dual loyalties."  To the extent the Complaint suggests that any Series A Director held dual loyalties, there can be no doubt the Debtors were aware of the positions of the Bettinelli, Suster and Kibler within Upfront.

### vii.  Antagonistic Behavior.

60.    The Complaint does not allege any facts to adequately plead a breach of fiduciary duty based on any Upfront Defendant's alleged use of "serial threats of litigation and other threats and antagonistic behavior."  Upfront cannot be prohibited from taking acts or stating its intent to preserve its legal rights, nor do such actions constitute a breach of fiduciary duty.

61.    The Complaint provides a laundry list of vague and unsupported

**Exhibit**

**E**

exhibitsticker.com

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | Chapter 11 Case |
| | § | |
| Old LC, Inc., *et al.*[1] | § | Case No. 19-11791 (BLS) |
| | § | |
| Debtors. | § | Jointly Administered |

| | | |
|---|---|---|
| | § | |
| Official Committee of Unsecured Creditors | § | |
| of Old LC, Inc., et al., for and on behalf of | § | |
| the estates of Old LC, Inc., et al.; | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Adv. No. 20-51002 (BLS) |
| | § | |
| Upfront V, LP, Breakwater Credit | § | |
| Opportunities Fund, L.P.; Upfront GP V, | § | |
| LLC; Mark Suster; Dana Kibler; Gregory | § | |
| Bettinelli; Saif Mansour; Aamir Amdani; | § | |
| Eric Beckman; Darrick Geant; and Joseph | § | |
| Kaczorowski | § | |
| | § | |
| *Defendants.* | § | |

## FIRST AMENDED COMPLAINT AND OBJECTION TO CLAIMS

---

[1]	The Debtors are the following four entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Old LC, Inc. (7119), Old LC Holdings, Inc., Old LCF, Inc., and Old LC Parent, Inc.  The Debtors' noticing address in these Chapter 11 cases is c/o Bryan Cave Leighton Paisner LLP, Attn: Mark I. Duedall, 1201 W. Peachtree Street, 14th Floor, Atlanta, Georgia 30309.

**Carney Deposition Exhibit**

**61**

exhibitsticker.com

3.     Upfront and Breakwater used both overt and covert tactics in furtherance of their concerted plan, including: (i) prewritten scripts and "playbooks" (containing speaking lines and even planned facial reactions) where board actions and the exercise of loan remedies were pre-ordained; (ii) secret, subversive meetings with members of Loot Crate's management to whom Upfront and Breakwater promised promotions and equity in exchange for their loyalties; and (iii) threats of personal lawsuits and reputational harm to those who opposed them.  Relying on their collective power held pursuant to consent rights, board control, and Breakwater's role as Loot Crate's senior secured lender, Upfront and Breakwater devised and implemented a series of bad-faith, disloyal acts to delay or outright block Loot Crate from pursuing financing alternatives at a time when the company was running out of cash reserves.  Thus, Upfront and Breakwater accomplished their own selfish goals by choking Loot Crate into accepting burdensome financing from Upfront and Breakwater.

4.     Through Suster, Kibler, Bettinelli, and Mansour, as well as Upfront and Breakwater's other representatives and enablers, Upfront and Breakwater committed serial fiduciary breaches in expropriating hard control over Loot Crate while pursuing self-interested goals in direct conflict with the company's interests.  These breaches damaged Loot Crate, causing the company a catastrophic loss of enterprise value and materially undermining its ability to continue as a going concern.  Because of Defendants' misconduct and breach of fiduciary duties, Loot Crate went from having revenues of $145 million, gross profits in excess of $40 million, and an estimated enterprise value of more than $100 million at the end of 2017, to being forced to file for protection under chapter 11 and selling its assets in the bankruptcy proceedings less than two years later.

5.     This is a suit to recover from Upfront, Breakwater, and certain of their agents and representatives, including several former members of the board of directors of Old LC, Inc., money damages sustained by the Debtors as a result of the Defendants' concerted efforts to exercise dominion and control over the Debtors' business in direct violation of their respective fiduciary and other obligations to the Debtors.  In addition, Plaintiff seeks to avoid and recover a $1 million payment to Breakwater as a constructively

### D.    Upfront and Breakwater Create and Execute "Playbook" to Block Other Financing Options.

97.    On November 15, 2017, the Board called a meeting to approve the minutes of the previous November 3 Board meeting; however, Suster and Mansour used the November 15 meeting as an opportunity to further the individual agendas of Upfront and Breakwater at Loot Crate's expense.

98.    Prior to the November 15 meeting, Upfront and Breakwater prepared a detailed, coordinated plan (described by them in emails as the "*Playbook*") for Upfront and Breakwater representatives, Kreiz, and Boyle to block the Board from considering other financing options and to force Davis and the company to consummate the A-2 Proposal.

99.    Like the Carry the Water Email, the Playbook contained a scripted plan—this time, for the November 15 Board meeting.  As part of that coordinated plan, (i)  Upfront and Breakwater would offer to close on the A-2 Proposal and fund by Friday, November 17, 2017, as opposed to the December 4 date contained in the A-2 Term Sheet; (ii) Mansour would threaten to accelerate the Loan and begin seeking remedies on November 20 if the A-2 Proposal was not closed by November 17; (iii) the Board would vote to instruct Davis to focus 100% of his time to close the A-2 Proposal by November 17; (iv)  Kreiz would call for a subsequent Board meeting on November 17 to approve the final terms of the A-2 Proposal for close that same day; and (v) on November 22nd, Upfront would notify key parties of its intent to pursue litigation against Davis, and would notify George Davis (Christopher Davis's father) of their intent to pursue legal action and "impl[y] subtly / politely that this is likely to be a very public, protracted battle in which he would be involved."

100.    Despite the efforts of Upfront and Breakwater to conceal the Playbook, an Upfront employee, Michael Carney ("*Carney*"), revealed its existence in separate emails on November 14, 2017.

101.    On November 14, 2017, Carney emailed Mansour using the subject line "Mechanics of acceleration / default" to say that he and Suster "feel like we didn't get a clear enough understanding yesterday of the

mechanics and implications of what happens once (if) you accelerate the loan and the company is able to unable to pay."

102.    In that November 14, 2017 email, Carney said, I'd like to make sure we have a thorough understanding [of] the full 'if / then decision tree' around what obligations the company has and when, what steps Breakwater can/will take and when, etc.  Is this something you or someone on your team could talk through with me or possibly your counsel at Morgan Lewis?"

103.    Presumably after receiving the clarification he needed, Carney wrote up the Playbook and sent it to Suster later on November 14—the night before the scheduled November 15 Board meeting.

104.    In his cover email to Suster on November 14, 2017, Carney wrote: "I think I have a good handle on this, but figured it's best to talk through this verbally tomorrow."

105.    Declining to answer substantively in writing, Suster replied in an email dated November 14, 2017, "No emails.  Talk in Am."

106.    In another email dated November 21, 2017, Suster wrote to Upfront representatives: "I can update anybody verbally.   Carney can confirm it was another tense board meeting.  But he should do so verbally.  I fear there are enough threats of legal action to know this is a possibility.  I will do my best to avoid a legal situation."

107.    Upfront and Breakwater representatives, and Kreiz and Boyle, also used text message communications during this period to conceal their activities.   Despite anticipating litigation, Suster failed to appropriately preserve many text messages relevant to the disputes, a convenient assertion given Suster's desire to keep communications verbal.

108.    When the November 15 Board meeting commenced, Suster and Mansour acted consistently with their Playbook strategy.

E.    **Suster and Mansour Begin Implementing the <mark>Playbook</mark> Strategy During the November 15 Meeting.**

109.    At the November 15 Board meeting, Suster and Mansour informed Loot Crate that they wanted to accelerate the planned closing of the A-2 Term Sheet from December 4 to November 17 even though the transaction documents were still in draft form.    Otherwise, Suster and Mansour said, Breakwater would accelerate the Loan and commence enforcement actions.

110.    On November 16, 2017, Davis emailed the Board to respond to Breakwater's demand to accelerate the A-2 Term Sheet closing and to raise the "very serious issues" he had "with the process that led to the approval of" the A-2 Term Sheet at the November 3, 2017 Board meeting and, "in particular, acceptance of the Term Sheet's Exclusivity Provision."

111.    In that November 16 e-mail, Davis stated:

> [W]e all have a continuing fiduciary duty to work for the benefit of the company and its shareholders.  At the November 3 Board meeting, there were three financing proposals considered.  Consequently, we were not in a situation where there was only one possible path.  Even if the Management Proposal and [Original] BioWorld Proposal were not acceptable on their proposed terms at the time, there was no basis for determining that they could not be improved, or that other financing sources would not be available.  Nevertheless, the Board was presented with the [A-2] Term Sheet, with its Exclusivity Provision, and was not advised by Cooley [Loot Crate's counsel] as to the potential breach of fiduciary duty inherent in contracting away the Company's right to seek better financing terms from another party or parties.
>
> Additionally, Upfront has failed to provide the $1.5 million of bridge financing at reasonable terms that was promised in connection with the [A-2] Term Sheet and has sought other changes to the terms, including the accelerated closing.  Therefore the financing that we are

now being asked to approve and close on Friday is not
even what was approved on November 3.

112.   On November 16, 2017, Suster responded to Davis's
November 16, 2017 email by following the strategy laid out in the Playbook.
Specifically, Suster responded to Davis's email, replying to the full Board
stating: "You signed a legal contract.  If you violate the terms we will begin
immediate legal proceedings."

113.   On November 16, 2017, Suster forwarded Davis's email to
members of Loot Crate's management team, including those with whom
Upfront and Breakwater had been discussing employment opportunities and
equity compensation, with the subject line to "Your company faces the
potential of bankruptcy next week."  In that email, Suster called on them to
pressure Davis to close the A-2 Term Sheet.

114.   On November 16, 2017, Suster separately forwarded his initial
exchange with Davis (including his litigation threats) to Davis's father, this
time changing the subject line to "Loot Crate Bankruptcy & Lawsuit," and
stating that Loot Crate would have to file bankruptcy, as "Break Water is
threatening to call their $15 million loan on Monday."

115.   In a fourth email on November 16, 2017 to Davis and the full
Board, Suster wrote, among other things, that if "you're thinking your
secured creditor [Breakwater] is bluffing I hope you understand they're not
– you will lose control of your financial situation next week and possibly face
bankruptcy by Thanksgiving."

116.   On November 16, 2017, Suster then forwarded this last email
to the Loot Crate management team.

117.   On November 16, 2017, Suster sent another email to Davis and
the Board stating: "With respect to other financing options, you signed a
legally binding 'no shop' agreement and on that basis I have spent countless
hours and tens of thousands of dollars on legal bills to provide financing
before you become bankrupt. I will protect the legal rights in that agreement
vociferously."

118.    On November 17, 2017, Suster sent an email to the company's purportedly "independent" directors, Kreiz and Boyle, as well as Mansour and Carney, in which Suster directed Kreiz and Boyle to approve the A-2 Term Sheet transaction document.

119.    Continuing to follow the steps laid out in the Playbook, on November 17 and November 20, Breakwater issued to Loot Crate two separate notices of alleged covenant defaults.  In the November 20 notice, Breakwater announced that it would accelerate the loan unless Loot Crate addressed the alleged defaults to Breakwater's satisfaction.

120.    Through the actions described above, Suster, Mansour, Kreiz, and Boyle acted for the benefit of Upfront and Breakwater to the detriment of Loot Crate.

121.    Further proof of Upfront and Breakwater's dominance and control of the Board with respect to Loot Crate's financing efforts is the absence of any evidence that Kreiz or Boyle attempted to negotiate any of the terms of the A-2 Proposal or give any consideration to the BioWorld or Management Proposals.  In fact, Kreiz and Boyle emailed Upfront's counsel seeking advice on the different financing proposals.

122.    The existence of the Playbook and the actions of Suster and Mansour in furtherance of the steps described in it—as well as the absence of any evidence of independent action on the part of Kreiz and Boyle— demonstrate that Upfront and Breakwater acted in concert to force Loot Crate to take actions that were in Upfront and Breakwater's best interest, yet detrimental to Loot Crate and its shareholders.

123.    Had Suster, Mansour, Kreiz, and Boyle acted in accordance with their fiduciary duties to Loot Crate, rather than in the best interests of Upfront and Breakwater, and had Upfront and Breakwater not colluded to veto alternative financing options, Loot Crate could have consummated one or more forms of equity financing beneficial to Loot Crate in early November 2017.

| Kaczorowski | Breakwater | July 2018 – August 2018 |

228.   At all relevant times, Defendant Upfront exercised actual and pervasive control over Loot Crate and its governance apparatus through its active coordination and scheming with Breakwater, which placed Upfront in a position no different than if Upfront had majority voting control.  Between the two of them, Upfront and Breakwater held a majority (55%) of the issued and outstanding Series A Preferred Stock.  The Series A Preferred Stock provided certain rights, preferences, privileges, and restrictions in favor of Upfront and Breakwater involving dividends, liquidation preferences, conversion rights, and voting rights.  Moreover, Loot Crate was unable to take certain actions (such as increasing or decreasing the number of authorized common or preferred shares and/or changing the number of directors) without obtaining an affirmative vote or written consent of a majority of the voting power of the Preferred Stock.

229.   Additionally, Upfront maintained control over the Board by exercising its right to designate one Board member (such as Bettinelli, Suster, and Kibler), and by influencing and forcing the appointment of purportedly "independent" directors that Upfront knew would do Upfront's bidding rather than Loot Crate (such as Ynon Kreiz and Terry Boyle).  Thus, Upfront—through Bettinelli, Suster, and Kibler—used their relationships with particular directors such as Kreiz and Boyle to compromise the disinterestedness and independence of the Board in connection with the transactions described herein.  Upfront further utilized and coordinated with Breakwater to ensure purportedly "independent" directors were appointed to the Board.

230.   Upfront's actual control also included developing the Playbook in coordination with Breakwater to suffocate Loot Crate and to block or restrict other, more advantageous, options for financing and raising capital.

231.   Upfront—through Suster—further exercised control over Loot Crate by refusing to attend meetings to preclude the existence of a quorum.

subsequently to designate directors on the Board (Mansour, Amdani, Beckman, Geant, and Kaczorowski). Although only a Board observer until 2018, Breakwater—through the Breakwater Defendants—texted and coordinated with the Upfront Defendants to obtain company information and to influence and force the appointment of purportedly "independent" directors that Breakwater knew would do Breakwater's bidding rather than Loot Crate (such as Ynon Kreiz and Terry Boyle). Thus, the Breakwater Defendants routinely texted and emailed with one another and, at times, with Upfront to ensure that Breakwater's interests were protected at Loot Crate's expense.

237. Breakwater's actual control also included developing the Playbook in coordination with Upfront to suffocate Loot Crate and to block or restrict other, more advantageous, options for financing and raising capital.

238. Further, Breakwater exercised its influence as lender and shareholder to block and/or restrict Loot Crate's ability to obtain financing from South River, including by refusing to consent to the financing even though the financing satisfied all requirements imposed by Breakwater. By blocking the financing, Breakwater utilized its control to declare that it was entitled to the $2 million OID.

239. Through the confluence of these multiple sources and instances of control, Breakwater exercised actual control over Loot Crate. Thus, Breakwater owed Loot Crate and each Loot Crate shareholder the fiduciary duties of due care and loyalty, and good faith and candor.

240. In accordance with the dates reflected in the chart above, each of Defendants Suster, Kibler, Bettinelli, Mansour, Amdani, Beckman, Geant, and Kaczorowski was a Loot Crate director, and owed Loot Crate and each Loot Crate shareholder the fiduciary duties of due care and loyalty, and good faith and candor.

241. The following defendants breached their obligations and duties owed to Loot Crate and its shareholders by, among other things:

(a)     intentionally creating a cash crisis within Loot Crate for the purpose of reinforcing Upfront and Breakwater's effective control over Loot Crate (Bettinelli, Suster, Mansour);

(b)     preventing the Board from considering or seeking out alternative funding options, rendering the Board incapable of negotiating meaningfully in connection with the A-2, BioWorld, or Management Proposals (Bettinelli, Suster, Mansour);

(c)     aggressively and threateningly attempting to coerce the Board under duress into palpably unfavorable funding terms that would benefit Upfront and Breakwater at Loot Crate's expense (Bettinelli, Suster, Mansour);

(d)     intentionally sabotaging Loot Crate's efforts to comply under the Breakwater forbearance agreement in order to wrest Board control from Davis and other independent directors (Mansour, Kibler, Amdani, Beckman, Geant, Kaczorowski)

(e)     surreptitiously manipulating Loot Crate's financing efforts, including through: (i) creating and executing the Playbook, a secret and coordinated plan among ostensibly independent directors, interested directors, and dominant shareholders to force financing on Loot Crate that would solely benefit Upfront and Breakwater; and (ii) having secret meetings and communications with Loot Crate's former and existing management to sow seeds of disloyalty and apply additional pressure on Davis to act against his fiduciary duties (Bettinelli, Suster, Mansour);

(f)     failing to disclose dual loyalties (Bettinelli, Suster, Kibler, Mansour); and

(g)     using serial threats of litigation and other threats and antagonistic behavior directed at Davis, the Board, Loot Crate management, and other Loot Crate shareholders (Bettinelli, Suster, Mansour).

242.    These breaches of their fiduciary duties and the direct and reasonably foreseeable consequences of these breaches caused substantial damage to Loot Crate and its shareholders, and substantially benefitted Upfront and Breakwater.

259.   Upfront's and Breakwater's misconduct breached the implied covenant of good faith and fair dealing that governed these contracts, causing substantial damage to Loot Crate and its shareholders.

## COUNT IV
### Civil Conspiracy (Against All Defendants)

260.   Plaintiff realleges and incorporate by reference each of the allegations contained in the preceding paragraphs of this complaint as though fully set forth herein.

261.   During all relevant times, Defendants combined and coordinated their actions, inactions, and misconduct, and unlawful activity. Defendants' conspiracy is shown, for example, in the sharing of the Carry the Water Email and the exchange and coordination surrounding the Playbook. Defendants regularly and routinely texted or emailed one another concerning their strategies with respect to Loot Crate and how they could work together to further their own interests at the expense of Loot Crate's interest.

262.   In accordance with the dates reflected in the chart above, each of Defendants Suster, Kibler, Bettinelli, Mansour, Amdani, Beckman, Geant, and Kaczorowski served as a Loot Crate director, and owed Loot Crate and each Loot Crate shareholder the fiduciary duties of due care and loyalty, and good faith and candor at various times identified above.

263.   Mansour, Amdani, Beckman, Geant, and Kaczorowski individually or through Breakwater knowingly and intentionally worked in concert with Upfront and its representatives to assist or encourage Upfront, Suster, Kibler, and Bettinelli to breach their fiduciary duties to Loot Crate in the ways enumerated in Count I above.

264.   Bettinelli, Suster, and Kibler individually or through Upfront knowingly and intentionally worked in concert with Breakwater and its representatives to assist or encourage Breakwater, Mansour, Amdani, Beckman, Geant, and Kaczorowski to breach their fiduciary duties to Loot Crate in the ways enumerated in Count I above.

**Exhibit**

**F**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | Chapter 11 Case |
| | § | |
| Old LC, Inc., *et al.*[1] | § | Case No. 19-11791 (BLS) |
| | § | |
| Debtors. | § | Jointly Administered |

| | | |
|---|---|---|
| Official Committee of Unsecured Creditors | § | |
| of Old LC, Inc., et al., for and on behalf of | § | |
| the estates of Old LC, Inc., *et al.*; | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Adv. No. 20-51002 (BLS) |
| | § | |
| Upfront V, LP, Breakwater Credit | § | |
| Opportunities Fund, L.P.; Upfront GP V, | § | |
| LLC; Mark Suster; Dana Kibler; Gregory | § | |
| Bettinelli; Saif Mansour; Aamir Amdani; | § | |
| Eric Beckman; Darrick Geant; and Joseph | § | |
| Kaczorowski | § | |
| | § | |
| *Defendants.* | § | |

## <u>PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO UPFRONT DEFENDANTS' MOTION TO DISMISS</u>

---

[1]  The Debtors are the following four entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Old LC, Inc. (7119), Old LC Holdings, Inc., Old LCF, Inc., and Old LC Parent, Inc. The Debtors' noticing address in these Chapter 11 cases is c/o Bryan Cave Leighton Paisner LLP, Attn: Mark I. Duedall, 1201 W. Peachtree Street, 14th Floor, Atlanta, Georgia 30309.

12802219/1

**Carney Deposition Exhibit**

**62**

management proposals did not include the same anti-dilution provision, making their proposals more advantageous for the company. *Id.* ¶ 76-81.

Recognizing that the proposals made by BioWorld and the management team posed a threat to their own plan to force through their own self-interested funding proposal, Upfront and Breakwater, together with their self-appointed board members and the Individual Defendants, used their blocking rights to threaten to veto any funding other than the A-2 Proposal. *Id.* ¶¶ 82-89. Given Upfront and Breakwater's stranglehold on the ability to raise additional funding, Loot Crate had no option but to agree to the A-2 Proposal, and Loot Crate signed the A-2 Term Sheet. *Id.* ¶¶ 90-92.

The A-2 Term Sheet included an exclusivity provision prohibiting Loot Crate and its board from pursuing other proposals. *Id.* ¶ 93. Upfront and Breakwater used this exclusivity provision to dangle a bridge loan, (a bridge loan both Upfront and Breakwater knew that Loot Crate desperately needed), to obtain control of Davis's common shares in Loot Crate. *See id.* ¶¶ 94-96. When Davis refused, Upfront and Breakwater developed a "Playbook," in which Breakwater would threaten to accelerate the amounts due under the Loan Agreement unless Loot Crate expedited a final agreement consummating the A-2 Proposal and the A-2 Term Sheet. *Id.* ¶¶ 97-108. Upfront and Breakwater carried through with the plan laid out in the Playbook, forcing through Loot Crate's acceptance of the A-2 Term Sheet. *Id.* ¶¶ 109-23. Upfront's control and influence over two board members, Kreiz and Boyle, along with its own self-appointed board member, played a critical role in allowing Upfront to push through its plan. *Id.* Upfront also used numerous threats of litigation against Davis, Davis's father, and Loot Crate in order to exert control over Loot Crate's acceptance of the A-2 Proposal and A-2 Term Sheet. *Id.*

4

relationship with Kreiz "will also help us get there"), 98-99 (explaining Kreiz's role in Upfront's scripted plan), 107, 161 (describing Upfront's belief that Kreiz would act in the best interests of the preferred shareholders).  Upfront also viewed Boyle as a board member over whom it had influence and control.  *See id.* ¶ 50 (describing Upfront's belief that it had influence over Boyle), 98 (describing Boyle's role in the ==Playbook),== 107.

And Upfront's expectation of control and influence over Kreiz and Boyle was correct. When Upfront presented the A-2 Term Sheet, Kreiz and Boyle not only failed to negotiate any terms, but affirmatively sought out counsel from Upfront's own lawyer.  *See id.* ¶¶ 118-23.  Kreiz and Boyle would go on to play central roles in carrying out the ==Playbook,== *see id.* ¶¶ 98-99, and obtaining approval for the A-2 Term Sheet, *id.* ¶¶ 118-23.

Upfront also had extensive influence over the Breakwater-appointed directors.  Upfront itself believed that its influence over Breakwater and any board designee it chose to appoint was so strong that it coordinated efforts with Breakwater to obtain a Breakwater board seat.  *See id.* ¶¶ 46-57.  When Breakwater eventually gained the ability to appoint a director, it appointed Mansour, who was Suster's partner in the parties' scheme.  *See, e.g.*, *id.* ¶¶ 58-65 (discussing Mansour's coordination with Bettinelli and Suster to obtain a board seat for Kreiz), 82-92 (detailing Mansour's role in assisting Upfront with jamming through the A-2 Proposal), 97-23 (explaining Suster's used of Mansour in carrying out the ==Playbook),== 200-01 (describing Mansour's relationship with Upfront and the Individual Defendants).  And when presented opportunity to control the board under the May 2018 Forbearance Agreement, Upfront played an active role in sabotaging Loot Crate's ability to comply with the agreement in order to trigger Breakwater's ability to fill the majority of board positions.  *See id.* ¶¶ 168-77.  Accordingly, Upfront's control over the board supports a pleading-stage inference that it was a controlling shareholder.

13

*See* Complaint ¶¶ 66-67; *see also id.* ¶ 137.  From that point on, Suster chose to "focus [his] time on the largest shareholders (founders) . . . [and] the largest financiers (my partners at Upfront . . . .)." *Id.* ¶ 78.  With this goal in mind and his attention focused on Upfront's interests, Suster threatened to veto financing proposals in order to leave the A-2 Proposal as the only viable option for the cash-strapped Loot Crate, *id.* ¶¶ 82-92, and later implemented the <mark>Playbook</mark> in order to force Loot Crate's hand into accepting the A-2 Proposal, *id.* ¶¶ 97-123.  In the process, Suster resorted to threats of litigation and forcing Loot Crate into bankruptcy in order to strong-arm Loot Crate's decision makers into favoring Upfront's funding proposal.  *See, e.g.*, *id.* ¶¶ 99, 109, 112-17, 132-34, 201-03.  And when Loot Crate attempted to consider debt funding, which Upfront was unable to block with its Preferred Shares, Suster did Upfront's bidding by depriving the board of a quorum, which prevented the board from considering non-Upfront funding proposals necessary to avoid Loot Crate's imminent collapse.  *Id.* ¶¶ 140-41, 148-59.

Bettinelli similarly breached his fiduciary duties during his time on the Loot Crate board by pursuing the interests of Upfront, rather than Loot Crate.  For example, Bettinelli participated the scheme laid out in the Carry the Water Email to use a pretextual default under the Loan Agreement to further Upfront and Breakwater's control over the board, *see* Complaint ¶¶ 46-57, and obtaining the appointment of Kreiz and Boyle without disclosing their pre-existing relationships with Upfront, *see id.* ¶¶ 46-51, 58-62.  And Bettinelli intentionally interfered with Loot Crate's management through lies and deceit.  *See id.* ¶¶ 51-57, 200, 203.

Finally, Kibler took an active role in disrupting Loot Crate's funding efforts during her time on the board in order to achieve Upfront's end goal of either obtaining a sweetheart deal or forcing Loot Crate's sale.  Specifically, Kibler engaged Atalaya along with Upfront's general counsel in order to force to withdraw its proposal.  *See id.* ¶¶ 207-13.  And Kibler refused to recuse

21

herself from deliberations over Upfront's proposal.  *Id.*  Kibler also failed to disclose Upfront's plans to pursue its own interests in an eventual bankruptcy reorganization.  *Id.* ¶¶ 220-23.  In sum, all of these allegations are more than enough to meet Loot Crate's pleading-stage burden of supporting a cause of action against the Individual Defendants for their breach of the duty of loyalty.[22]  *See Klein*, 2019 WL 2296027, at *5-7.

With respect to Upfront itself, the Motion makes a single, deceptive argument that the Complaint only identifies alleged breaches by the Individual Defendants and not Upfront.  *See* Motion ¶ 44.  Even a cursory review of the Complaint makes clear that Upfront, along with Breakwater, was the driving force behind all of the events outlined therein.  Indeed, the allegations make clear that the plan to suffocate Loot Crate's cash flow in order to jam through a self-interested transaction or to force a sale was developed and carried out by Upfront along with Breakwater. *See, e.g.*, *id.* ¶¶ 2-5, 46-65 (describing Upfront's use of its control to wrest seats on the board), 66-92 (walking through Upfront's freeze-out of third-party investors in order to push the A-2 Proposal), 93-123 (recounting Upfront's development and use of the Playbook), 124-59 (chronicling Upfront's blocking of debt investments), 160-96 (relating Upfront's role in the abuse of the May 2018 Forbearance Agreement), 197-203 (detailing Upfront's interference with Loot Crate's management), 204-225 (setting out Upfront's final pre-bankruptcy bid to force through its own funding proposals).  And to the extent the Complaint details specific actors, it likewise makes clear Upfront was acting through its self-appointed board members and the Individual

---

[22] At the motion to dismiss stage, courts must analyze allegations of bad faith "collectively." *Dieckman*, 2018 WL 1006558, at *3.  The Upfront Defendants "merely isolate[] one allegation" at a time, but at the pleadings stage the Court must look to the allegations as a whole to determine whether Loot Crate has sufficiently alleged that the Upfront Defendants acted in bad faith.  *In re Autobacs Strauss, Inc.*, 473 B.R. 525, 563 (Bankr. D. Del. 2012); *see also Klein*, 2019 WL 2296027, at *5 ("At the pleadings stage, this Court does not review in piecemeal fashion, but rather, reads the allegations as a whole.").  Viewing their actions as a whole, Loot Crate has sufficiently alleged a claim for breach of fiduciary duty against each of the Upfront Defendants.

Defendants.[23]  *See, e.g.*, Complaint ¶¶ 229-33; *see also id.* ¶¶ 4, 16-18, 41. Taken as a whole, the

entirety of the Complaint pleads more than sufficient facts to carry the pleading-stage burden of

alleging Upfront's breach of its fiduciary duties.

> *b.*    *The Upfront Defendants Breached the Duty of Loyalty by Engaging in Self-Dealing.*

From the A-2 Proposal, *see* Complaint ¶¶ 69-71, 76-81, to the A-2 Term Sheet, *see id.* ¶¶

90-95, to its final pre-bankruptcy attempts to force through additional funding, *see id.* ¶¶ 193-96,

204-25, Upfront sought and obtained a number of terms and pursued a number of proposed deals

in which it stood on both sides of the transaction as a controlling shareholder and financier.  Each

of these funding attempts, proposed and considered by the Individual Defendants during their time

on the board,[24] is a classic example of a self-dealing transaction in that Upfront appeared on both

sides of the transaction and received a benefit.  *See In re W.J. Bradley Mortg. Cap., LLC*, 598 B.R.

150, 163 (Bankr. D. Del. 2019); *Emerald Partners v. Berlin*, 726 A.2d 1215 (Del. 1999).

Under the entire fairness standard,[25] the burden of proof shifts the burden of proof to the

defendants, who must prove the self-dealing transaction was fair in both price and dealing.

---

[23] Upfront is liable for the actions carried out on Upfront's behalf by the Individual Defendants.  *See Daimler AG v. Bauman*, 571 U.S. 117, 135 (2014) (recognizing that a corporation is "a distinct legal entity" that "can act only through its agents"); *see also* DEL. CODE ANN. tit. 6, § 15-301 ("Each partner is an agent of the partnership for the purpose of its business, purposes or activities."); *In re Am. Int'l Grp., Inc.*, 965 A.2d 763, 823 (Del. Ch. 2009), *aff'd sub nom. Teachers' Ret. Sys. of Louisiana v. PricewaterhouseCoopers LLP*, 11 A.3d 228 (Del. 2011) ("Under that traditional principle, a corporation can be held liable for wrongful acts of its directors and officers on behalf of the corporation that injure third parties."); *Buckley v. O'Hanlon*, No. 04-955GMS, 2007 WL 956947, at *5 (D. Del. Mar. 28, 2007) (approving grouping by collective action and decision making in complaint).

[24] For example, Bettinelli served on the board while Loot Crate sought additional financing, *see* Complaint ¶¶ 66-68, which would go on to include the A-2 Proposal Suster presented in both his capacity as a Loot Crate director and a representative of Upfront, *see id.* ¶ 69; *see also id.* ¶ 88.  Similarly, Suster also had an active role in Upfront's effort to jam through the A-2 Term Sheet using the ==Playbook== while also serving on Loot Crate's board.  *See id.* ¶¶ 77-92, 97-123.  And Kibler actively participated on Upfront's behalf in its final bids to obtain a funding deal during her tenure on the Loot Crate board.  *See id.* ¶¶ 204-13, 220-25.

[25] While the entire fairness standard applies, the self-dealing transactions engaged in by the Upfront Defendants would still fail under the business judgment rule.  But because each of these deals was self-interested, the business judgment rule does not save the Upfront Defendants. *See In re Walk Disney Co. Derivative Litig.*, 906 A.2d 27, 52 (Del. 2006). Self-interested transactions are subject to the entire fairness standard of review, which is "Delaware's most onerous standard."  *In re Hansen Med.*, 2018 WL 3025525, at *9 (quoting *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 44

*Americas Mining Corp. v. Theriault*, 51 A.3d 1213, 1239 (Del. 2012); *Basho*, 2018 WL 3326693, at *23. At the pleading stage, dismissal is not proper under the entire fairness standard "because defendants do not have the luxury of arguing facts that would counter the plaintiffs' well-pled allegations that are assumed as true." *In re Ezcorp Consulting Agreement Deriv. Litig.*, No. 9962-VCL, 2016 WL 301245, at *30 (Del. Ch. Jan. 25, 2016) (citing *Orman v. Cullman*, 794 A.2d 5, 20 n.36 (Del. Ch. 2002)).

In the Motion, the Upfront Defendants do not once reference or mention the entire fairness standard or the business judgment rule, making the Motion insufficient to carry the Upfront Defendants' burden to obtain dismissal. Nor do the Upfront Defendants escape liability because Upfront never provided funding under any of its proposals. *See OTK Assocs, LLC v. Friedman*, 85 A.3d 696, 724 (Del. Ch. 2014) (refusing to find an abandoned self-dealing transaction by a controlling shareholder rendered case moot); *accord Klein*, 2019 WL 2296027, at *7.

Nevertheless, the A-2 Proposal and the A-2 Term Sheet were neither fair in price nor process. First, each transaction was inferior in price to other options. The A-2 Proposal included an anti-dilution provision favorable to Upfront, *see* Complaint ¶¶ 75-76, and was unfairly favorable to Upfront, *id.* ¶¶ 77-81. The A-2 Term Sheet was similarly unfair in price. *See id.* ¶¶ 93 (delineating exclusivity provision), 124 (outlining detrimental effect of exclusivity provision). With respect to process, each proposal was jammed through in the course of Upfront's manufactured cash crisis. *See id.* ¶¶ 69-71 (explaining the bridge loan promised by Upfront), ¶¶ 82-92 (detailing the circumstances surrounding the A-2 Proposal, Suster's refusal to recuse, and Upfront's control over Kreiz and Boyle), 97-123 (describing the Defendants'[26] use of the Playbook

---

(Del. Ch. 2013)); *see also Kahn v. Tremont Corp.*, 694 A.2d 422, 428 (Del. 1997); *Sinclair Oil Corporation v. Levien*, 280 A.2d 717, 723 (Del. 1971).

[26] "Defendants" shall collectively refer to Upfront, Breakwater, and the Individual Defendants.

**Exhibit**

**G**

**Carney Deposition Exhibit**

**63**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | § Chapter 11 Case |
| | § |
| Old LC, Inc., *et al.*[1] | § Case No. 19-11791 (BLS) |
| | § |
| Debtors. | § Jointly Administered |

_____

| | |
|---|---|
| Official Committee of Unsecured Creditors of Old LC, Inc., et al., for and on behalf of the estates of Old LC, Inc., *et al.*; | § § § § |
| | § |
| *Plaintiff,* | § |
| | § |
| v. | § Adv. No. 20-51002 (BLS) |
| | § |
| Upfront V, LP, Breakwater Credit Opportunities Fund, L.P.; Upfront GP V, LLC; Mark Suster; Dana Kibler; Gregory Bettinelli; Saif Mansour; Aamir Amdani; Eric Beckman; Darrick Geant; and Joseph Kaczorowski | § § § § § § § § |
| | § |
| *Defendants.* | § |

## PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO DENY OR CONTINUE BREAKWATER DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT TO PERMIT DISCOVERY AND MOTION TO COMPEL DEPOSITIONS

Plaintiff Official Committee of Unsecured Creditors of Old LC, Inc. ("**Plaintiff**") files this

*Reply in Support of its Motion to Deny or Continue Breakwater Defendants' Motion for Partial*

*Summary Judgment to Permit Discovery and Motion to Compel Depositions*[2] (the "**Reply**").  In

support thereof, Plaintiff respectfully shows the Court as follows:

---

[1] The Debtors are the following four entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Old LC, Inc. (7119), Old LC Holdings, Inc., Old LCF, Inc., and Old LC Parent, Inc.  The Debtors' noticing address in these Chapter 11 cases is c/o Bryan Cave Leighton Paisner LLP, Attn: Mark I. Duedall, 1201 W. Peachtree Street, 14th Floor, Atlanta, Georgia 30309.

[2] The term "**Breakwater Defendants**" collectively refers to Breakwater Credit Opportunities Fund, L.P. "**Breakwater**"; Saif Mansour; Aamir Amdani; Eric Beckman; Darrick Geant; and Joseph Kaczorowski. The term "**Upfront Defendants**" or "**Upfront**" collectively refers to Upfront V, LP; Upfront GP V, LLC; Mark Suster; Dana

First, the misconduct and breach of fiduciary duty alleged in the Amended Complaint concerns more than their contractual rights. Indeed, the Breakwater Defendants had a contractual right to commit any of the many breaches of fiduciary duty at issue in this case. Simply stated,

(a)     The Breakwater Defendants did not have a contractual right to intentionally create a cash crisis within Loot Crate for the purpose of reinforcing Upfront and Breakwater's effective control over Loot Crate;

(b)     The Breakwater Defendants did not have a contractual right to prevent the Board from considering or seeking out alternative funding options, rendering the Board incapable of negotiating meaningfully in connection with the A-2, BioWorld, or Management Proposals;

(c)     The Breakwater Defendants did not have a contractual right to threaten or coerce the Board under duress into palpably unfavorable funding terms that would benefit Upfront and Breakwater at Loot Crate's expense;

(d)     The Breakwater Defendants did not have a contractual right to intentionally sabotage Loot Crate's efforts to comply under the Breakwater forbearance agreement to wrest Board control from Davis and other independent directors;

(e)     The Breakwater Defendants did not have a contractual right to surreptitiously manipulate Loot Crate's financing efforts, including through: (i) creating and executing the Playbook, a secret and coordinated plan among ostensibly independent directors, interested directors, and dominant shareholders to force financing on Loot Crate that would solely benefit Upfront and Breakwater; and (ii) having secret meetings and communications with Loot Crate's former and existing management to sow seeds of disloyalty and apply additional pressure on Davis to act against his fiduciary duties;

(f)     The Breakwater Defendants did not have a contractual right to fail to disclose dual loyalties; and

(g)     The Breakwater Defendants did not have a contractual right to use serial threats of litigation and other threats and antagonistic behavior directed at Davis, the Board, Loot Crate management, and other Loot Crate shareholders.

The Breakwater Defendants' misconduct reaches far beyond the exercise of Breakwater's (the entity) contractual rights, and Plaintiff's fiduciary duty claims extend beyond the strawman contractual argument set-up by the Breakwater Defendants.

**Exhibit**

**H**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | Chapter 11 Case |
| | § | |
| Old LC, Inc., *et al.*[1] | § | Case No. 19-11791 (BLS) |
| | § | |
| Debtors. | § | Jointly Administered |

| | | |
|---|---|---|
| | § | |
| Official Committee of Unsecured Creditors | § | |
| of Old LC, Inc., et al., for and on behalf of | § | |
| the estates of Old LC, Inc., et al.; | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Adv. No. 20-51002 (BLS) |
| | § | |
| Upfront V, LP, Breakwater Credit | § | |
| Opportunities Fund, L.P.; Upfront GP V, | § | |
| LLC; Mark Suster; Dana Kibler; Gregory | § | |
| Bettinelli; Saif Mansour; Aamir Amdani; | § | |
| Eric Beckman; Darrick Geant; and Joseph | § | |
| Kaczorowski | § | |
| | § | |
| *Defendants.* | § | |

## PLAINTIFF'S FEDERAL RULE 26(a)(1) INITIAL DISCLOSURES

In accordance with Federal Rule of Civil Procedure 26(a)(1), Plaintiff Official Committee

of Unsecured Creditors of Old LC, Inc. (the "Committee" or "Plaintiff"), submits the following

initial disclosures:

**A.     The name, and if known, address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless solely for impeachment, identifying the subjects of the information.**

---

[1]      The Debtors are the following four entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Old LC, Inc. (7119), Old LC Holdings, Inc., Old LCF, Inc., and Old LC Parent, Inc.  The Debtors' noticing address in these Chapter 11 cases is c/o Bryan Cave Leighton Paisner LLP, Attn: Mark I. Duedall, 1201 W. Peachtree Street, 14th Floor, Atlanta, Georgia 30309.[2] Undefined, capitalized terms have the meaning ascribed to them in the Complaint and Objection to Claims [D.I. 1].

12634611/1

**Carney Deposition Exhibit**

**64**

| **Persons with Knowledge** | **Subjects of Knowledge** |
|---|---|
| **Alexandre Zyngier**<br>c/o Mark I. Duedall<br>Bryan Cave Leighton Paisner LLP<br>1201 W. Peachtree Street, 14th Floor<br>Atlanta, Georgia 30309 | Alexander Zyngier is an individual who served as an officer and/or director of the Debtors during the pendency of the bankruptcy proceeding and may have knowledge concerning the misconduct alleged in the Original Complaint relating to Defendants. |
| **Osman Khan**<br>c/o Mark I. Duedall<br>Bryan Cave Leighton Paisner LLP<br>1201 W. Peachtree Street, 14th Floor<br>Atlanta, Georgia 30309 | Osman Khan is an individual who served as an officer and/or director of the Debtors during the pendency of the bankruptcy proceeding and may have knowledge concerning the misconduct alleged in the Original Complaint relating to Defendants. |
| **Stuart Kaufman**<br>c/o Mark I. Duedall<br>Bryan Cave Leighton Paisner LLP<br>1201 W. Peachtree Street, 14th Floor<br>Atlanta, Georgia 30309 | Stuart Kaufman is an individual who served as an officer and/or director of the Debtors during the pendency of the bankruptcy proceeding and may have knowledge concerning the misconduct alleged in the Original Complaint relating to Defendants. |
| **Terry Boyle**<br>Contact information presently unknown | Terry Boyle is a former director and/or officer with Loot Crate who has knowledge concerning the Upfront Defendants and Breakwater Defendants' efforts to seize control of the company and the Defendants' breaches of fiduciary duties and other misconduct. |
| **Michael Carney**<br>c/o Dean A. Ziehl<br>Pachulski Stang Ziehl & Jones LLP<br>10100 Santa Monica Boulevard, 11th Floor<br>Los Angeles, CA 90067<br>Telephone: 302-652-4400 | Michael Carney is Partner at Upfront who worked closely with Mark Suster and Saif Mansour to analyze and implement Defendants misconduct and breach of fiduciary duties, including through the review and development of the "Playbook" |

7

documents produced by Plaintiff during the course of discovery in this proceeding are incorporated by reference into this list of documents.

**C.      A computation of any category of damages claimed by the disclosing party, making available for inspection and copying under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered.**

As of May 31, 2016, Debtors received a valuation of their equity class of $89,276,692.00. *See* UFV-024064.  By the end of December 2016, Debtors had a market value of invested capital of $108,756,607.07.   *See id.*   Because of Defendants' misconduct, Debtors' market value plummeted, resulting in the present bankruptcy proceeding and the elimination of any meaningful market value.  As more fully alleged in Plaintiff's Original Complaint, Defendants breached their fiduciary duties from 2016 to the Petition Date including, but not limited to,

(a)      intentionally creating a cash crisis within Loot Crate for the purpose of reinforcing Upfront and Breakwater's effective control over Loot Crate;

(b)      preventing the Board from considering or seeking out alternative funding options, rendering the Board incapable of negotiating meaningfully in connection with the A-2, BioWorld, or Management Proposals;

(c)      aggressively and threateningly attempting to coerce the Board under duress into palpably unfavorable funding terms that would benefit Upfront and Breakwater at Loot Crate's expense;

(d)      intentionally sabotaging Loot Crate's efforts to comply under the Breakwater forbearance agreement in order to wrest Board control from Davis and other independent directors.

(e)      surreptitiously manipulating Loot Crate's financing efforts, including through: (i) creating and executing the Playbook, a secret and coordinated plan among ostensibly independent directors, interested directors, and dominant shareholders to force financing on Loot Crate that would solely benefit Upfront and Breakwater; and (ii) having secret meetings and communications with Loot Crate's former and existing management to sow seeds of disloyalty and apply additional pressure on Davis to act against his fiduciary duties;

(f)      failing to disclose dual loyalties; and

(g)      using serial threats of litigation and other threats and antagonistic behavior directed at Davis, the Board, Loot Crate management, and other Loot Crate shareholders.

Based on Defendants' breach of fiduciary duties, and based on the investigation to date, Plaintiff seeks the difference between the market value of Debtors at the end of 2016 and the market value of Debtors at the time of the bankruptcy filing.  Thus, Plaintiff's seeks damages in the range of $89,276,692.00 - $108,756,607.07 in accordance with applicable law.  *See, e.g., Basho*



**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | § | Chapter 11 Case |
| | § | |
| Old LC, Inc., *et al.*[1] | § | Case No. 19-11791 (BLS) |
| | § | |
| Debtors. | § | Jointly Administered |

| | | |
|---|---|---|
| | § | |
| Official Committee of Unsecured Creditors | § | |
| of Old LC, Inc., et al., for and on behalf of | § | |
| the estates of Old LC, Inc., *et al.*; | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Adv. No. 20-51002 (BLS) |
| | § | |
| Upfront V, LP, Breakwater Credit | § | |
| Opportunities Fund, L.P.; Upfront GP V, | § | |
| LLC; Mark Suster; Dana Kibler; Gregory | § | |
| Bettinelli; Saif Mansour; Aamir Amdani; | § | |
| Eric Beckman; Darrick Geant; and Joseph | § | |
| Kaczorowski | § | |
| | § | |
| *Defendants.* | § | |

**PLAINTIFF'S MOTION TO DENY OR CONTINUE BREAKWATER'S MOTION FOR
PARTIAL SUMMARY JUDGMENT TO PERMIT NECESSARY DISCOVERY AND
MOTION TO COMPEL DEPOSITIONS**

---

[1] The Debtors are the following four entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Old LC, Inc. (7119), Old LC Holdings, Inc., Old LCF, Inc., and Old LC Parent, Inc. The Debtors' noticing address in these Chapter 11 cases is c/o Bryan Cave Leighton Paisner LLP, Attn: Mark I. Duedall, 1201 W. Peachtree Street, 14th Floor, Atlanta, Georgia 30309.

Carney Deposition
Exhibit

65

of contractual rights. These assumptions are incorrect and demonstrate the need for depositions prior to ruling on summary judgment. As demonstrated through the list above, there are numerous factual issues that can only be explored through the pending document discovery and through depositions of all Defendants. While the document discovery conducted to date reveals a conspiracy and scheme by Breakwater and Upfront to work together to improperly influence and control the Company in a way that caused its ultimate demise, there is more to the story that can only be uncovered through depositions.

As explained in the First Amended Complaint, and as will be demonstrated in Plaintiff's response to the MSJ, the document discovery reveals numerous instances of actions, coordination, and cooperation by and between both Breakwater and Upfront: their agreement in the Carry the Water Email, their coordination to install Kreiz and Boyle on the board, the collective use of their Preferred Shares to block funding proposals from BioWorld and Loot Crate's management team, the development and implementation of the Playbook, the use of Breakwater's Loan Agreement and May 2018 Forbearance Agreement to wrest total control of the board, and their coordinated campaign to interfere with Loot Crate's management. *See, e.g.,* Exhibits J-V.

Although Plaintiff has documents to support its claims and theories, Defendants' deposition will be critical for understanding the motive, mindset, and collaboration concerning these events. Therefore, ruling on the summary judgment without first allowing depositions and written discovery would be counter to Rule 56(d).

## V.
## CONCLUSION

For each of these reasons, Plaintiff respectfully requests that the Court grant this Motion, deny Breakwater's MSJ pursuant to Rule 56(d), compel the necessary depositions and grant Plaintiff all relief to which it is entitled, whether at law or in equity.

11

LOOTCRATE A-2 <mark>PLAYBOOK</mark>



**EXHIBIT**

T
_____

Underline**Wednesday 11/15**

- 2:30pm – BOD Call
  - Review the current liquidity crisis
  - Upfront & Breakwater offer to fund their full $6M A-2 commitment on Friday
  - Saif informs the company that if the A-2 does not close on Friday, Breakwater will accelerate the loan and begin seeking remedies at 8am on Monday
  - BOD votes and instructs Chris to drop all tasks and focus 100% of his time an attention on resolving any outstanding issues related to the A-2 docs with the intent of closing on Friday.
    - All concerns must be surfaced no later than 2pm on Thursday for resolution by 11:59pm Thursday
  - Ynon calls for a subsequent BOD meeting on Friday at 8:00am to vote on and approve final A-2 terms to be signed and closed by EOD Friday
  - BOD instructs Cooley to begin drafting a Rights Offering for distribution on Monday
- Following BOD Call – Upfront (Carney) & LKP to review any outstanding issues in A-2 docs in preparation for Thursday negotiation & resolution (note: Cooley & LKP scheduled to review via call at 10:30am today)

**Thursday 11/16**

- Cooley, LKP, Chris Davis, Upfront to negotiate all final A-2 terms by EOD

**Friday 11/17**

- 8:00am – BOD Call
  - BOD votes on final A-2 terms and instructs Chris to sign and close
- If A-2 signed
  - Cooley immediately files rush Charter with DE
  - Upfront & Breakwater prepare to wire by 2pm, pending receipt of Charter otherwise first thing Monday

**Monday 11/20**

- If A-2 not signed
  - 9:00am – Breakwater formally notices the company that the loan is due in full by 5:00pm on Monday
  - By 10:00am – Ynon calls for a BOD call on Tuesday morning
  - Upfront engages litigation counsel in preparation for Wednesday notices to Chris, *et. al* of intent to sue
- Irrespective of A-2 status
  - At BOD's request, Cooley issues Rights Offering to all preferred shareholders (20 days to respond)

**Tuesday 11/21**

- 9:00am – Breakwater formally notices the company of intent to seize LC bank accounts, and does so immediately
- 10:00am – BOD Call
  - BOD says to Chris, you were instructed to close and didn't, you are in breach of your fiduciary duties. BOD reiterates its demand that the company accept financing on the terms offered in light of the worsening financial situation

UFV-045996

Exhibit

J

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | Chapter 11 Case |
| | § | |
| Old LC, Inc., *et al.*[1] | § | Case No. 19-11791 (BLS) |
| | § | |
| Debtors. | § | Jointly Administered |

---

| | | |
|---|---|---|
| | § | |
| Official Committee of Unsecured Creditors | § | |
| of Old LC, Inc., et al., for and on behalf of | § | |
| the estates of Old LC, Inc., et al.; | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Adv. No. 20-_____ (BLS) |
| | § | |
| Upfront V, LP, Breakwater Credit | § | |
| Opportunities Fund, L.P.; Upfront GP V, | § | |
| LLC; Mark Suster; Dana Kibler; Gregory | § | |
| Bettinelli; Saif Mansour; Aamir Amdani; | § | |
| Eric Beckman; Darrick Geant; and Joseph | § | |
| Kaczorowski | § | |
| | § | |
| *Defendants.* | § | |

## COMPLAINT AND OBJECTION TO CLAIMS

---

[1] The Debtors are the following four entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Old LC, Inc. (7119), Old LC Holdings, Inc., Old LCF, Inc., and Old LC Parent, Inc. The Debtors' noticing address in these Chapter 11 cases is c/o Bryan Cave Leighton Paisner LLP, Attn: Mark I. Duedall, 1201 W. Peachtree Street, 14th Floor, Atlanta, Georgia 30309.

Carney Deposition
Exhibit

66

The Official Committee of Unsecured Creditors (the "***Committee***") of Old LC, Inc.; Old LC Holdings, Inc.; Old LCF, Inc.; and Old LC Parent, Inc. (collectively, "***Loot Crate***" or the "***Debtors***")[2] bring this action on behalf of and for the benefit of the Debtors' estate and respectfully alleges as follows:

## Nature of the Action

1.      From 2012 to 2019, Loot Crate operated a subscription box service that catered to fandom and enthusiasts through "crates" curated with "geek and gamer products" each month.  Loot Crate partnered with industry leaders in entertainment, gaming, sports, and pop culture to deliver monthly themed crates, create interactive experiences and digital content, and film original video productions.  Products included exclusive shirts, gear, and gadgets, as well as limited edition collectibles.  Loot Crate became the worldwide leader in pop culture subscription boxes with over 250,000 recurring subscribers.

2.      Unfortunately, from early 2017 through mid-2019, Loot Crate's investors and senior secured lender suffocated Loot Crate into bankruptcy at by working in concert to seize control of the company by blocking Loot Crate's access to alternative sources of funding.  Defendants Upfront V, LP (individually and with its board designees, including defendants Mark Suster, Dana Kibler, and Gregory Bettinelli, "***Upfront***") and Breakwater Credit Opportunities Fund, L.P. (individually and with its board designees, including Saif Mansour, "***Breakwater***") engaged in a concerted pattern of behavior and conspiracy to benefit themselves at Loot Crate's ultimately fatal expense.

3.      Upfront and Breakwater used both overt and covert tactics in furtherance of their concerted plan, including: (i) prewritten scripts and "playbooks" (containing speaking lines and even planned facial reactions) where board actions and the exercise of loan remedies were pre-ordained; (ii) secret, subversive meetings with members of Loot Crate's management to whom Upfront and Breakwater promised promotions and equity in exchange for their loyalties; and (iii) threats of personal lawsuits and reputational harm to those who opposed them.  Relying on their collective power held pursuant to consent rights,

---

[2]      The Debtors were formerly named Loot Crate, Inc., Loot Crate Holdings, Inc., LC Funding, Inc., and Loot Crate Parent, Inc.  Following the closing of the sale of substantially all of the Debtors' assets completed in the administrative bankruptcy case, no. 19-11791 (the "***Admin Case***"), the Debtors filed the necessary documentation in the applicable jurisdictions to change their corporate names and filed the *Notice of Changes of Debtors' Names and Case Caption* [Admin Case D.I. 265] with the Court, all in accordance with the terms of the sale and the order approving the same [Admin Case D.I. 254].

2

search for financing. Breakwater also exerted control over the Debtors as the company's senior secured lender.

88.     Suster also consistently refused to recuse himself from conference calls with the Board during discussions and negotiations related to the A-2 Proposal.  In numerous emails throughout November and December 2017, Suster directed Loot Crate's independent directors on the structure and strategy for the A-2 Proposal.

**E.     Upfront and Breakwater Create and Execute "Playbook" to Block Other Financing Options.**

89.     On November 15, 2017, the Board called a meeting, the purpose of which was to approve the minutes of the previous November 3 Board meeting; however, Suster and Mansour used the November 15 meeting as an opportunity to further the individual agendas of Upfront and Breakwater at Loot Crate's expense.

90.     Prior to the November 15 meeting, Upfront and Breakwater prepared a detailed, coordinated plan (described by them in emails as the "*Playbook*") for Upfront and Breakwater representatives, Kreiz, and Boyle to block the Board from considering other financing options and to force Davis and the company to consummate the A-2 Proposal.

91.     Like the Carry the Water Email, the Playbook contained a scripted plan— this time, for the November 15 Board meeting.  As part of that coordinated plan, (i)  Upfront and Breakwater would offer to close on the A-2 Proposal and fund by Friday, November 17, 2017, as opposed to the December 4 date contained in the A-2 Term Sheet; (ii) Mansour would threaten to accelerate the Loan and begin seeking remedies on November 20 if the A-2 Proposal was not closed by November 17; (iii) the Board would vote to instruct Davis to focus 100% of his time to close the A-2 Proposal by November 17; (iv)  Kreiz would call for a subsequent Board meeting on November 17 to approve the final terms of the A-2 Proposal for close that same day; and (v) on November 22nd, Upfront would notify key parties of its intent to pursue litigation against Davis, and would notify George Davis (Christopher Davis's father) of their intent to pursue legal action and "impl[y] subtly / politely that this is likely to be a very public, protracted battle in which he would be involved."

92.     Despite the efforts of Upfront and Breakwater to conceal the Playbook, an Upfront employee, Michael Carney ("*Carney*"), revealed its existence in separate emails on November 14, 2017.

93.     On November 14, 2017, Carney emailed Mansour using the subject line "Mechanics of acceleration / default" to say that he and Suster "feel like we didn't get a clear enough understanding yesterday of the mechanics and implications of what happens once (if) you accelerate the loan and the company is able to unable to pay."

94.     In that November 14, 2017 email, Carney said, I'd like to make sure we have a thorough understanding [of] the full 'if / then decision tree' around what obligations the company has and when, what steps Breakwater can/will take and when, etc.  Is this something you or someone on your team could talk through with me or possibly your counsel at Morgan Lewis?"

95.     Presumably after receiving the clarification he needed, Carney wrote up the Playbook and sent it to Suster later on November 14—the night before the scheduled November 15 Board meeting.

96.     In his cover email to Suster on November 14, 2017, Carney wrote: "I think I have a good handle on this, but figured it's best to talk through this verbally tomorrow."

97.     Declining to answer substantively in writing, Suster replied in an email dated November 14, 2017, "No emails.  Talk in Am."

98.     In another email dated November 21, 2017, Suster wrote to Upfront representatives: "I can update anybody verbally.  Carney can confirm it was another tense board meeting.  But he should do so verbally.  I fear there are enough threats of legal action to know this is a possibility.  I will do my best to avoid a legal situation."

99.     Upfront and Breakwater representatives, and Kreiz and Boyle, also used text message communications during this period to conceal their activities.  Despite anticipating litigation, Suster failed to appropriately preserve many text messages relevant to the disputes, a convenient assertion given Suster's desire to keep communications verbal.

100.    When the November 15 Board meeting commenced, Suster and Mansour acted consistently with their Playbook strategy.

F.      **Suster and Mansour Begin Implementing the Playbook Strategy During the November 15 Meeting.**

101.    At the November 15 Board meeting, Suster and Mansour informed Loot Crate that they wanted to accelerate the planned closing of the A-2 Term Sheet from

17

December 4 to November 17 even though the transaction documents were still in draft form. Otherwise, Suster and Mansour said, Breakwater would accelerate the Loan and commence enforcement actions.

102.    On November 16, 2017, Davis emailed the Board to respond to Breakwater's demand to accelerate the A-2 Term Sheet closing and to raise the "very serious issues" he had "with the process that led to the approval of" the A-2 Term Sheet at the November 3, 2017 Board meeting and, "in particular, acceptance of the Term Sheet's Exclusivity Provision."

103.    In that November 16 e-mail, Davis stated:

> [W]e all have a continuing fiduciary duty to work for the benefit of the company and its shareholders. At the November 3 Board meeting, there were three financing proposals considered. Consequently, we were not in a situation where there was only one possible path. Even if the Management Proposal and [Original] BioWorld Proposal were not acceptable on their proposed terms at the time, there was no basis for determining that they could not be improved, or that other financing sources would not be available. Nevertheless, the Board was presented with the [A-2] Term Sheet, with its Exclusivity Provision, and was not advised by Cooley [Loot Crate's counsel] as to the potential breach of fiduciary duty inherent in contracting away the Company's right to seek better financing terms from another party or parties.

> Additionally, Upfront has failed to provide the $1.5 million of bridge financing at reasonable terms that was promised in connection with the [A-2] Term Sheet and has sought other changes to the terms, including the accelerated closing. Therefore the financing that we are now being asked to approve and close on Friday is not even what was approved on November 3.

104.    On November 16, 2017, Suster responded to Davis's November 16, 2017 email by following the strategy laid out in the Playbook. Specifically, Suster responded to Davis's email, replying to the full Board stating: "You signed a legal contract. If you violate the terms we will begin immediate legal proceedings."

105.    On November 16, 2017, Suster forwarded Davis's email to members of Loot Crate's management team, including those with whom Upfront and Breakwater had been discussing employment opportunities and equity compensation, with the subject line to

18

"Your company faces the potential of bankruptcy next week." In that email, Suster called on them to pressure Davis to close the A-2 Term Sheet.

106.  On November 16, 2017, Suster separately forwarded his initial exchange with Davis (including his litigation threats) to Davis's father, this time changing the subject line to "Loot Crate Bankruptcy & Lawsuit," and stating that Loot Crate would have to file bankruptcy, as "Break Water is threatening to call their $15 million loan on Monday."

107.  In a fourth email on November 16, 2017 to Davis and the full Board, Suster wrote, among other things, that if "you're thinking your secured creditor [Breakwater] is bluffing I hope you understand they're not – you will lose control of your financial situation next week and possibly face bankruptcy by Thanksgiving."

108.  On November 16, 2017, Suster then forwarded this last email to the Loot Crate management team.

109.  On November 16, 2017, Suster sent another email to Davis and the Board stating: "With respect to other financing options, you signed a legally binding 'no shop' agreement and on that basis I have spent countless hours and tens of thousands of dollars on legal bills to provide financing before you become bankrupt. I will protect the legal rights in that agreement vociferously."

110.  On November 17, 2017, Suster sent an email to the company's purportedly "independent" directors, Kreiz and Boyle, as well as Mansour and Carney, in which Suster directed Kreiz and Boyle to approve the A-2 Term Sheet transaction document.

111.  Continuing to follow the steps laid out in the Playbook, on November 17 and November 20, Breakwater issued to Loot Crate two separate notices of alleged covenant defaults. In the November 20 notice, Breakwater announced that it would accelerate the loan unless Loot Crate addressed the alleged defaults to Breakwater's satisfaction.

112.  Through the actions described above, Suster, Mansour, Kreiz, and Boyle acted for the benefit of Upfront and Breakwater to the detriment of Loot Crate.

113.  Further proof of Upfront and Breakwater's dominance and control of the Board with respect to Loot Crate's financing efforts is the absence of any evidence that Kreiz or Boyle attempted to negotiate any of the terms of the A-2 Proposal or give any consideration to the BioWorld or Management Proposals.

114.    The existence of the Playbook and the actions of Suster and Mansour in furtherance of the steps described in it—as well as the absence of any evidence of independent action on the part of Kreiz and Boyle—further demonstrate that Upfront and Breakwater acted in concert to force Loot Crate to take actions that were in Upfront and Breakwater's best interest, yet detrimental to Loot Crate and its shareholders.

115.    Had Suster, Mansour, Kreiz, and Boyle acted in accordance with their fiduciary duties to Loot Crate, rather than in the best interests of Upfront and Breakwater, and had Upfront and Breakwater not colluded to veto alternative financing options, Loot Crate could have consummated one or more forms of equity financing beneficial to Loot Crate in early November 2017.

**G.    Upfront and Breakwater's Campaign to Thwart Financing from BioWorld.**

116.    So long as Upfront and Breakwater continued to exercise their veto right, and in light of the A-2 Term Sheet's exclusivity provision, Loot Crate could not pursue the Management Proposal, the Original BioWorld Proposal, or any other financing alternatives without the risk of litigation from Upfront and Breakwater.

117.    Loot Crate needed additional financing by the end of December 2017, and the absence of such financing had already created liquidity problems for the company. Although Loot Crate had positive cash flow in December 2017, its ability to maintain and expand its business operations was hampered by its inability to obtain proper financing.

118.    The uncertainty created by Upfront and Breakwater caused a number of Loot Crate's vendors, including Federal Express, to insist on prepayment.  Consequently, Loot Crate's shipments were delayed until it could accumulate the cash necessary to pay in advance for needed shipments.

119.    In late November and early December 2017, Loot Crate continued to seek additional debt financing, entering into further negotiations with BioWorld that culminated in a new proposal for debt financing from BioWorld (the "***New BioWorld Proposal***").

120.    BioWorld thus remained a viable financing alternative in November 2017 that the Board could have pursued absent Upfront and Breakwater's continued obstruction.

199.    Ultimately, Upfront withdrew from the transaction.

200.    Although Kibler was still a member of the Board at that time, she never disclosed the occurrence of, or the content of, these discussions to the Board.

201.    By this point, the damage to Loot Crate caused by the Defendants' collusive, obstructionist acts during Loot Crate's 2017 and 2018 refinancing efforts was done.  The company was trapped in a negative financial cycle, with each negative event causing other negative events, again and again, and liquidity problems continued.

202.    On August 11 and 12, 2019 (the "**_Petition Date_**"), the four Loot Crate entities each sought bankruptcy protection by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

## COUNT I
### Breach of Fiduciary Duty (Against All Defendants)

203.    Plaintiff realleges and incorporate by reference each of the allegations contained in the preceding paragraphs of this complaint as though fully set forth herein.

204.    At all relevant times, Defendant Upfront exercised actual control over Loot Crate and its governance apparatus through its active cooperation with Breakwater and, which placed Upfront in a position no different than if Upfront had majority voting control. Such actual control included, but is not limited to, taking steps with Breakwater to reconstitute the Board in its favor and to do its bidding, developing the Playbook to suffocate the Company, installing purportedly "independent" directors that would only do Upfront's and Breakwater's bidding, blocking favorable financing proposals in favor of their own, and refusing to attend meetings to preclude the existence of a quorum.

205.    At all relevant times, Upfront owed Loot Crate and each Loot Crate shareholder the fiduciary duties of due care and loyalty, and good faith and candor.

206.    At all relevant times, Defendant Breakwater exercised actual control over Loot Crate and its governance apparatus through its active cooperation with Upfront and through the power it wielded pursuant to its role as Loot Crate's senior secured lender. This placed Breakwater in a position no different than if Breakwater had majority voting control.  Such actual control included, but is not limited to, taking steps with Upfront to reconstitute the Board in its favor and to do its bidding, developing the Playbook to

suffocate the Company, installing purportedly "independent" directors that would only do Upfront's and Breakwater's bidding, and blocking favorable financing proposals in favor of their own.

207.    At all relevant times, Breakwater owed Loot Crate and each Loot Crate shareholder the fiduciary duties of due care and loyalty, and good faith and candor.

208.    At all relevant times, each of Defendants Suster, Kibler, Bettinelli, Mansour, Amdani, Beckman, Geant, and Kaczorowski was a Loot Crate director, and owed Loot Crate and each Loot Crate shareholder the fiduciary duties of due care and loyalty, and good faith and candor.

209.    All Defendants, together and individually, breached the obligations and duties owed to Loot Crate and its shareholders by, among other things:

(a)    intentionally creating a cash crisis within Loot Crate for the purpose of reinforcing Upfront and Breakwater's effective control over Loot Crate;

(b)    preventing the Board from considering or seeking out alternative funding options, rendering the Board incapable of negotiating meaningfully in connection with the A-2, BioWorld, or Management Proposals;

(c)    aggressively and threateningly attempting to coerce the Board under duress into palpably unfavorable funding terms that would benefit Upfront and Breakwater at Loot Crate's expense;

(d)    intentionally sabotaging Loot Crate's efforts to comply under the Breakwater forbearance agreement in order to wrest Board control from Davis and other independent directors.

(e)    surreptitiously manipulating Loot Crate's financing efforts, including through: (i) creating and executing the Playbook, a secret and coordinated plan among ostensibly independent directors, interested directors, and dominant shareholders to force financing on Loot Crate that would solely benefit Upfront and Breakwater; and (ii) having secret meetings and communications with Loot Crate's former and existing management to sow seeds of disloyalty and apply additional pressure on Davis to act against his fiduciary duties;

(f)    failing to disclose dual loyalties; and

31

# LOOTCRATE A-2 PLAYBOOK

**Exhibit**

**K**

<u>Wednesday 11/15</u>
- 2:30pm – BOD Call
  - Review the current liquidity crisis
  - Upfront & Breakwater offer to fund their full $6M A-2 commitment on Friday
  - Saif informs the company that if the A-2 does not close on Friday, Breakwater will accelerate the loan and begin seeking remedies at 8am on Monday
  - BOD votes and instructs Chris to drop all tasks and focus 100% of his time an attention on resolving any outstanding issues related to the A-2 docs with the intent of closing on Friday.
    - All concerns must be surfaced no later than 2pm on Thursday for resolution by 11:59pm Thursday
  - Ynon calls for a subsequent BOD meeting on Friday at 8:00am to vote on and approve final A-2 terms to be signed and closed by EOD Friday
  - BOD instructs Cooley to begin drafting a Rights Offering for distribution on Monday
- Following BOD Call – Upfront (Carney) & LKP to review any outstanding issues in A-2 docs in preparation for Thursday negotiation & resolution (note: Cooley & LKP scheduled to review via call at 10:30am today)

<u>Thursday 11/16</u>
- Cooley, LKP, Chris Davis, Upfront to negotiate all final A-2 terms by EOD

<u>Friday 11/17</u>
- 8:00am – BOD Call
  - BOD votes on final A-2 terms and instructs Chris to sign and close
- If A-2 signed
  - Cooley immediately files rush Charter with DE
  - Upfront & Breakwater prepare to wire by 2pm, pending receipt of Charter otherwise first thing Monday

<u>Monday 11/20</u>
- If A-2 not signed
  - 9:00am – Breakwater formally notices the company that the loan is due in full by 5:00pm on Monday
  - By 10:00am – Ynon calls for a BOD call on Tuesday morning
  - Upfront engages litigation counsel in preparation for Wednesday notices to Chris, *et. al* of intent to sue
- Irrespective of A-2 status
  - At BOD's request, Cooley issues Rights Offering to all preferred shareholders (20 days to respond)

<u>Tuesday 11/21</u>
- 9:00am – Breakwater formally notices the company of intent to seize LC bank accounts, and does so immediately
- 10:00am – BOD Call
  - BOD says to Chris, you were instructed to close and didn't, you are in breach of your fiduciary duties. BOD reiterates its demand that the company accept financing on the terms offered in light of the worsening financial situation



**Geant Exhibit**

**1**

UFV-045996

<u>Wednesday 11/22</u>

- 9:00am – Breakwater formally notices the company of intent to seize its warehouses and all inventory, and instructs the company to cease and desist from disposing of any inventory without express written approval of the lender. Breakwater also expresses intent to begin liquidating inventory at its discretion
- 9:00am – Upfront notices key parties of intent to pursue legal action
  - Chris Davis
    - Upfront notices of intent to sue Chris Davis personallyh for breach of fiduciary duty
  - Nick Grouf
    - Upfront informs Nick of its intent to pursue legal action against Chris Davis, and instructs Nick to preserve all records of communication with Chris Davis and the company
  - David Waxman
    - Upfront informs David of its intent to pursue legal action against Chris Davis, and instructs David to preserve all records of communication with Chris Davis and the company
  - George Davis
    - Upfront informs George of its intent to pursue legal action against Chris Davis, and instructs Nick to preserve all records of communication with Chris Davis and the company
    - Implies, subtly / politely that this is likely to be a very public, protracted battle in which he would be involved

UFV-045997

1          IN THE UNITED STATES BANKRUPTCY COURT

2          FOR THE DISTRICT OF DELAWARE

3                    ---oOo---

4    In re:  Chapter 11 Case                :
     Old LC, Inc., et al., Debtors.         :
5    Jointly Administered                   :
                                            :
6                                           :
     OFFICIAL COMMITTEE OF UNSECURED        :
7    CREDITORS OF OLD LC, INC., et          :
     al.,                                   :
8                                           :
                Plaintiff,                  :
9                                           :
          vs.                               : No. 19-11791 (BLS)
10                                          :
     UPFRONT V, LP, BREAKWATER CREDIT       :
11   OPPORTUNITIES FUND, L.P.; UPFRONT      :
     GP V, LLC; MARK SUSTER, DANA           :
12   KIBLER, GREGORY BETTINELLI, SAIF       :
     MANSOUR, AAMIR AMDANI; ERIC            :
13   BECKMAN; DARRICK GEANT; and            :
     JOSEPH KACZOROWSKI,                    :
14                                          :
                                            :
15              Defendants.                 :
     _____:

16

17

18              REMOTE VIDEO-RECORDED

19         DEPOSITION OF DARRICK GEANT

20              September 7, 2021

21

22

23   Job No. 198331

24   Stenographically reported by:
     LAURA AXELSEN, CSR NO. 6173
25      RMR, CCRR, CRR, CRC

**Exhibit**

**L**

1    Should have just given you the ability to scroll

2    through that document.  This is going to be used as

3    Exhibit 1.  I've dropped it in the chat box for

4    counsel.

5               (EXHIBIT 1 WAS MARKED FOR IDENTIFICATION.)

6               MR. FRITSCHE:   Q.  Have you ever seen that

7    document before?

8         A.  I have not.

9         Q.  How familiar were you in 2017 and 2018 with

10   the management team at LootCrate?

11        A.  I had heard anecdotally about the gentleman

12   named Chris Davis.

13        Q.  What did you hear about Mr. Davis?

14        A.  That he had built very high-flying company.

15   I think it would -- it made headlines as the fastest

16   growing company at some point in -- in -- prior my

17   joining Breakwater.  And that they had grown

18   significantly, and he thought that he was creating

19   the next unicorn.

20        Q.  Who did you hear that from?

21        A.  I think I heard that from Mr. Amdani.

22        Q.  Anything else that you heard about

23   Mr. Davis?

24        A.  I heard that Mr. Davis was not particularly

25   responsive to the request of the board.  I heard one

Page 1

 1          IN THE UNITED STATES BANKRUPTCY COURT

 2            FOR THE DISTRICT OF DELAWARE

 3                  ---oOo---

 4   In re:  Chapter 11 Case                :
     Old LC, Inc., et al., Debtors.         :
 5   Jointly Administered                   :
                                            :
 6                                          :
     OFFICIAL COMMITTEE OF UNSECURED        :
 7   CREDITORS OF OLD LC, INC., et          :
     al.,                                   :
 8                                          :
                    Plaintiff,              :
 9                                          :
             vs.                            : No. 19-11791 (BLS)
10                                          :
     UPFRONT V, LP, BREAKWATER CREDIT :
11   OPPORTUNITIES FUND, L.P.; UPFRONT:
     GP V, LLC; MARK SUSTER, DANA           :
12   KIBLER, GREGORY BETTINELLI, SAIF       :
     MANSOUR, AAMIR AMDANI; ERIC            :
13   BECKMAN; DARRICK GEANT; and            :
     JOSEPH KACZOROWSKI,                    :
14                                          :
                                            :
15                  Defendants.             :
     _____ :
16

17

18              REMOTE VIDEO-RECORDED

19        DEPOSITION OF JOSEPH KACZOROWSKI

20              September 8, 2021

21

22

23   Job No. 198335

24   Stenographically reported by:
     LAURA AXELSEN, CSR NO. 6173
25      RMR, CCRR, CRR, CRC

1      Q.  Okay.  You were copied on this e-mail from

2   Mr. Mansour to the directors and others on

3   July 22nd, 2018, right?

4      A.  Yep.

5      Q.  Okay.  Staying with the top, do you know

6   who Frederick Eisenbiegler is?

7      A.  I do.

8      Q.  I don't want to know about substance, but

9   what is his role -- what do you understand his role

10  to be?

11     A.  Rick, as we call him Rick, is counsel to

12  the company and a partner at Morgan Lewis, and

13  specifically worked on the LootCrate matter.

14     Q.  Are you familiar with -- with what has been

15  called the Carry the Water E-mail?

16     A.  I'm not specifically familiar with that,

17  no.

18     Q.  Okay.  Are you familiar with what's been

19  called the A2 playbook?

20     A.  I'm not specifically familiar with that

21  either, no.

22     Q.  If you look here, this attaches -- this

23  e-mail, which is Exhibit 2, attaches certain

24  letters.  And I'll show you the July 17th, 2018

25  letter, page 3 of the PDF.  Did -- what's the

1   approval process at Breakwater to send letters out

2   like the one dated July 17th, 2018?  Does it go

3   through the investment committee, or what's --

4   what's the process?

5        A.  I'm not sure what the letter says.  Uhm,

6   voting agreement.  What is this letter doing?

7        Q.  I'll direct you to the second paragraph.

8   Feel free to read as much as --

9        A.  Okay.  I see what it says.  I see what it

10  says.  Yeah, it's basically saying appointed

11  directors.  So is your question what is the process

12  for sending out one of these types of letters?

13       Q.  Right.

14       A.  Uhm, there's not a formal process.  Uhm,

15  this would be, you know, handled by the lead

16  partner, uhm, managing the process if the documents

17  laid out that if certain criteria weren't met, that

18  certain -- certain people, then this is just more of

19  a memorandum to say, Yeah, here are the people that,

20  you know, you didn't do what you said you were going

21  to do, and here are the people.  There's not a, you

22  know, formal playbook for something like that.

23       Q.  We looked earlier at the forbearance

24  agreements that had certain requirements for the

25  company to meet.  We looked, for example, at the new

**Exhibit**

**N**

exhibitsticker.com

PRO BANKRUPTCY BANKRUPTCY

# Investors in Loot Crate Face Suit Over Alleged Hardball Tactics

Creditors who lost money on Loot Crate say venture-capital investors used hardball tactics, such as acting out scripted confrontations, to tighten their grip on the company, making moves that eventually pushed it into bankruptcy, according to court documents.

*By Becky Yerak*

Creditors who lost money on Loot Crate Inc. say venture-capital investors used hardball tactics, such as acting out scripted confrontations, to tighten their grip on the company, making moves that

of the company, making moves that eventually pushed it into bankruptcy, according to court documents.

Loot Crate, which markets itself as a subscription service for "gamers and nerds," filed for chapter 11 last year.

A lawsuit filed by the Loot Crate creditors in bankruptcy court last week contains excerpts of emails involving executives at investors Upfront Ventures and Breakwater Management LP. The suit alleges the venture-capital firms used a playbook they created, as well as acting advice from a law firm, to use during boardroom negotiations with Loot Crate management.

The investment firms also threatened to pressure Loot Crate co-founder Christopher Davis through his father, a Fortune 500 executive, according to an email cited in the lawsuit. The Davises couldn't be reached for comment.

Upfront and Breakwater didn't respond to requests for comment. A legal representative for Upfront and some of its executives declined to comment.Loot Crate raised $18.5 million in 2016 from investors including Upfront, Breakwater and Robert Downey Jr.'s venture-capital firm, Downey Ventures, which isn't named in the complaint. Loot Crate owed more than $50 million to creditors when it filed for bankruptcy.A committee of unsecured creditors, including Major League Baseball, is seeking

compensation of at least $10 million for the loss of value surrounding Loot Crate.More From WSJ Pro BankruptcyBoy Scouts Press Ahead With Chapter 11 Bankruptcy Plan

Staffing and Trucking Industry Lender Flexible Funding Files for Bankruptcy

Justice Department Fights Settlement That Would Shield Sacklers From Opioid Lawsuits

In the lawsuit, the committee said Upfront and Breakwater conspired to seize control of Loot Crate by hindering the company's access to alternative sources of financing. The complaint also says Upfront and Breakwater sought to increase their clout on Loot Crate's board to pursue their own goals at the company's expense.

In a January 2017 email cited in the lawsuit, Upfront's Greg Bettinelli, who had been tapped for a seat on Loot Crate's board, and Breakwater Managing Partner Saif Mansour discussed using an alleged loan default by the e-commerce company to get Mr. Mansour, then a board observer, a full board seat.Messrs. Bettinelli and Mansour couldn't be reached for comment.Breakwater asked law firm Morgan, Lewis & Bockius LLP for advice on obtaining the board seat. The suggestion made was for Upfront to "carry the heavy water" by pressing Mr. Davis, the Loot Crate co-founder, about how the alleged loan default would get addressed.

"Upfront should tease out of Davis the possibility of a waiver of defaults in exchange for a board seat," an unidentified Morgan Lewis attorney said, according to an email cited in the complaint.

The advice in the email, according to the complaint, was to "carefully listen, ask questions as appropriate, and ask for a few minutes to discuss with your partners."

"Don't want it to seem like this was pre-wired," the lawyer said, according to the complaint. "Say you have concerns and are considering options."Morgan Lewis, which isn't a party in the lawsuit, didn't respond to a request for comment.

The lawsuit said the investors tried to further tighten their grip over Loot Crate in November 2017, when the company needed a financial lifeline. At a board meeting, directors from Upfront and Breakwater said they would veto any financing proposals other than one they had offered and gave Loot Crate until the end of the meeting to accept, according to the complaint.

The investors then drew up a playbook for forcing the board to accept the financing they offered, according to the complaint. As part of the strategy, they indicated they would take legal action against Mr. Davis if he didn't take their offer, the complaint said.

They also discussed making the planned litigation known to his father, George Davis, a Loot Crate equity holder who was then the chief financial officer of Qualcomm Inc.

"Imply subtly/politely that this is likely to be a public, protracted battle in which he would be involved," the firms' <mark>playbook</mark> said, according to the lawsuit.

Peg Brickley contributed to this article.

Write to Becky Yerak at becky.yerak@wsj.com

**Exhibit O**

## [EXTERNAL] Loot Crate - Privilege Clawback Notification

Cia H. Mackle <cmackle@pszjlaw.com>

Wed 9/15/2021 6:06 PM

To: Jeff Waxman <JWaxman@morrisjames.com>; Joel Bailey <Joel@hedrickkring.com>; Eric Monzo <emonzo@morrisjames.com>; Sam Stricklin <sam.stricklin@stricklaw.pro>; Josh Hedrick <Josh@hedrickkring.com>; Mark Fritsche <Mark@hedrickkring.com>; Barillare, Jody C. <jody.barillare@morganlewis.com>; 'Wolf, Shannon B.' <shannon.wolf@morganlewis.com>; Willett, P. Sabin <sabin.willett@morganlewis.com>
Cc: Dean A. Ziehl <dziehl@pszjlaw.com>; James Hunter <jhunter@pszjlaw.com>; Colin R. Robinson <crobinson@pszjlaw.com>

Dear Counsel:

We have recently learned based on a conversation with Michael Carney that the document marked as Bates No. UFV-045996 is protected by the attorney-client and work product privileges and we are hereby clawing back this document on that basis; its prior production was inadvertent.

Specifically, Mr. Carney informed us earlier today that he prepared the "Lootcrate A-2 Playbook" based on a conversation he had with Upfront's outside counsel Donald Lee, and that the substance of the document was conveyed by Mr. Lee to Mr. Carney verbally, Mr. Carney transcribed the information provided and memorialized that conversation as the "Lootcrate A-2 Playbook."

It appears that a loose copy of the document was on Upfront's document system, and it is this loose copy that was inadvertently produced. In addition, Mr. Carney transmitted the "Lootcrate A-2 Playbook" to the Upfront partners and Mr. Lee, and marked the communication as "Attorney-Client Privileged" on Mr. Lee's advice. This email communication, with the attachment, was designated as privileged and included in Upfront's privilege log (as UFV-032035 and UFV-032036). However, as the loose copy that was inadvertently produced was not associated with the cover email, we were unaware of its privileged nature prior to today.

Based on the other version being clearly designated as privileged, and Mr. Carney's confirmation that it the document was drafted as a transcription and memorialization of conversation with Mr. Lee, the document is entitled to protection on the basis of attorney-client and work product privilege and we hereby instruct you to return or destroy all copies thereof.

Regards,

**Cia H. Mackle**
Pachulski Stang Ziehl & Jones LLP
Tel: 310.277.6910 | Fax: 310.201.0760
cmackle@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | San Francisco | Wilmington, DE | New York | Houston



**From:** Saif Mansour <smansour@breakwaterfunds.com>
**To:** Greg Bettinelli <greg@upfront.com>
**Subject:** Fwd: Loot Crate - Attorney Client Privilege
**Date:** Wed, 8 Feb 2017 19:30:52 +0000
**Importance:** Normal

---

see below

-- sent from my breakwater wireless device

Begin forwarded message:

**From:** "Eisenbiegler, Rick" <frederick.eisenbiegler@morganlewis.com>
**Date:** February 8, 2017 at 10:28:24 AM PST
**To:** Saif Mansour <smansour@breakwaterfunds.com>
**Cc:** Aamir Amdani <aamdani@breakwaterfunds.com>, "Schernecke, Matthew Edward" <matthew.schernecke@morganlewis.com>, "Grant, Kevin M." <kevin.grant@morganlewis.com>
**Subject: RE: Loot Crate - Attorney Client Privilege**

Here are some thoughts:

1. Any update on the disagreement between Loot and BW on whether the minimum subscription covenant was breached? Has Loot reported on compliance with financial covenants yet (I understand Loot has until 2/14 or 2/15 to deliver its compliance certificate)?

2. Assuming you are comfortable that a default is continuing, we recommend that you ask for an agenda for the board meeting. The agenda should include discussion of the continuing default, remedies the lender is entitled to exercise and steps the company is taking and plans to take to resolve the default. The agenda should focus on these issues, not a possible waiver of the default in exchange for a board seat.

3. Note that , as an observer,

   (i) you are entitled to all materials distributed to board members (subject to exceptions which include information related to the LSA and information subject to attorney-client privilege) and

   (ii) you may be excluded from portions of board meetings that relate to the LSA.

4. I would not suggest that you have further discussions with Davis about the board seat for waiver trade if you have already floated that idea.

5. Up Front should carry the heavy water before and during the meeting in terms of pressing Davis on how to address the continuing defaults. The best way forward is like this:

   Up Front presses Davis prior to the meeting and in the meeting on the defaults and the company's strategy to address. Up Front should press Davis to describe the remedies BW could now take and how damaging those remedies could be to the company.

   Up Front should tease out of Davis the possibility of a waiver of defaults in exchange for a board seat for you.

Up Front should aggressively support that outcome. It costs the Company nothing, it avoids potentially crippling consequences of remedies.

Up Front should push these issues aggressively at the board meeting, not you/Breakwater. Remember, you may be asked to leave the meeting when these issues are discussed.

If Davis or the board or both invite you back into the room to consider waiving the defaults in exchange for a board seat, I would suggest that you carefully listen, ask questions as appropriate, and then ask for a few minutes to discuss with your partners (or something like that). Don't say ok right away. Be deliberate. Don't want it to seem like this was all pre wired. Then say ok.

Before you get the offer to take the seat in exchange for the waiver, don't show your hand. Say you have a lot of concerns and are considering all your options.

I think this approach is the best strategy. I also think it sets you up best for what happens after you get on the board.

I'm available to discuss further.

**Rick Eisenbiegler**
**Morgan, Lewis & Bockius LLP**
101 Park Avenue | New York, NY 10178-0060
Direct: 1.212.309.6720 | Main: 1.212.309.6000 | Cell: 1.917.912.3753
frederick.eisenbiegler@morganlewis.com | www.morganlewis.com
Assistant: Kerri Anne Cambria | 1.212.309.6255 | kerri.cambria@morganlewis.com

UFV-011037



**From:** Cia H. Mackle <cmackle@pszjlaw.com>
**Sent:** Monday, September 14, 2020 9:20 PM
**To:** Berhorst, Jennifer <Jennifer.Berhorst@bryancave.com>; Jeremy Richards <jrichards@pszjlaw.com>; Whitehead, Martin <mgwhitehead@BryanCave.com>
**Subject:** RE: Loot Crate - 2004 Subpoenas

Hi Jennifer: I'm attaching a privilege log of the withheld documents, and a link to download 23 additional emails/documents (initially marked privileged but should not have been, which I remarked when finalizing privilege log). Access link is here:

https://app.everlaw.com/9173/dl/wEZ5yjvEL9K12yv9PGWXlOL3_Z0oNoURV48kX2093R85

The link before and above includes all emails, including personal emails (of which we confirmed there were none). I do expect to have a small supplemental production of additional non-email files. My apologies that they were not included in today's production, but I am working to make sure you receive them as soon as possible.

Please let me know if you have any questions or access issues.

Thanks,

**Cia H. Mackle**
Pachulski Stang Ziehl & Jones LLP
Tel: 310.277.6910 | Fax: 310.201.0760
cmackle@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | San Francisco | Wilmington, DE | New York | Costa Mesa

**From:** Berhorst, Jennifer [mailto:jennifer.berhorst@bclplaw.com]
**Sent:** Monday, September 14, 2020 11:19 AM
**To:** Cia H. Mackle; Jeremy Richards; Whitehead, Martin
**Subject:** RE: Loot Crate - 2004 Subpoenas

Thanks, Cia. We will try again and I will let you know if we continue to have issues.



JENNIFER BERHORST
Partner
BRYAN CAVE LEIGHTON PAISNER LLP - Kansas City, MO USA
jennifer.berhorst@bclplaw.com
T: +1 816 374 3203 M: +1 816 854 0395

**From:** Cia H. Mackle
**Sent:** Monday, September 14, 2020 1:13 PM
**To:** Berhorst, Jennifer ; Jeremy Richards ; Whitehead, Martin
**Subject:** RE: Loot Crate - 2004 Subpoenas

I was able to download and open this on my computer using the link below with no password required. Do you want to have your IT department contact ours? Not sure what the issue would be.

**Cia H. Mackle**
Pachulski Stang Ziehl & Jones LLP
Tel: 310.277.6910 | Fax: 310.201.0760
cmackle@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | San Francisco | Wilmington, DE | New York | Costa Mesa

**From:** Berhorst, Jennifer [mailto:jennifer.berhorst@bclplaw.com]
**Sent:** Monday, September 14, 2020 11:03 AM
**To:** Jeremy Richards; Whitehead, Martin

**Cc:** Cia H. Mackle
**Subject:** RE: Loot Crate - 2004 Subpoenas


Jeremy,

The files appear to be password protected. Can you please provide the passwords? Thanks!




JENNIFER BERHORST
Partner
BRYAN CAVE LEIGHTON PAISNER LLP - Kansas City, MO USA
jennifer.berhorst@bclplaw.com
T: +1 816 374 3203 M: +1 816 854 0395

---

**From:** Jeremy Richards <jrichards@pszjlaw.com>
**Sent:** Monday, September 14, 2020 10:52 AM
**To:** Berhorst, Jennifer <jennifer.berhorst@bryancave.com>; Whitehead, Martin <mgwhitehead@bryancave.com>
**Cc:** Cia H. Mackle <cmackle@pszjlaw.com>
**Subject:** FW: Loot Crate - 2004 Subpoenas

Below please find a link to the documents being produced pursuant to the subpoenas served on Upfront, Mark Suster and Dana Kibler.
Our written objections will follow in a separate e mail.
Please let me know if you have any problems accessing the link.
Thank you.


Production link is here:


https://app.everlaw.com/9173/dl/uF_Z3qWcT4qYc-0zrjm784NM-eMAHMQfdx06LD683EqV




**Jeremy Richards**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 310.772.2346
Tel: 310.277.6910 | Fax: 310.201.0760
jrichards@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | San Francisco | Wilmington, DE | New York | Costa Mesa

---

**From:** Berhorst, Jennifer [mailto:jennifer.berhorst@bclplaw.com]
**Sent:** Monday, August 31, 2020 8:44 AM
**To:** Jeremy Richards; Colin R. Robinson
**Cc:** 'Edmonson, Jamie L.' (JEdmonson@rc.com); Duedall, Mark; Schoulder, Andrew; Fiorenza McNeill, Leah; Hoffman, Robert; Tarazi, Khaled
**Subject:** Loot Crate - 2004 Subpoena


Jeremy,

Attached please find the 2004 Subpoenas to Upfront, Suster and Kibler. Please let me know immediately if you will accept service on their behalf.

While the subpoenas note the depositions will take place on September 14, we expect that the documents responsive to the subpoena will be produced that day, but will work with you on a mutually agreeable date and time for depositions for any witnesses that we require following review of the documents produced.

Thanks.

JENNIFER BERHORST
Partner
jennifer.berhorst@bclplaw.com
T: +1 816 374 3203 F: +1 816 855 3203 M: +1 816 854 0395
BRYAN CAVE LEIGHTON PAISNER LLP
One Kansas City Place, 1200 Main Street, Suite 3800, Kansas City, MO 64105-2122

**bclplaw.com**

http://BCLPAtWork.com/

This electronic message is from a law firm. It may contain confidential or privileged information. If you received this transmission in error, please reply to the sender to advise of the error and delete this transmission and any attachments.

4

We may monitor and record electronic communications in accordance with applicable laws and regulations. Where appropriate we may also share certain information you give us with our other offices (including in other countries) and select third parties. For further information (including details of your privacy rights and how to exercise them), see our updated Privacy Notice at www.bclplaw.com.

CONFIDENTIALITY
This e-mail message and any attachments thereto is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail message, you are hereby notified that any dissemination, distribution or copying of this e-mail message, and any attachments thereto is strictly prohibited. If you have received this e-mail message in error, please immediately notify me by telephone and permanently delete the original and any copies of this email and any prints thereof.

NOT INTENDED AS A SUBSTITUTE FOR A WRITING
Notwithstanding the Uniform Electronic Transactions Act or the applicability of any other law of similar substance and effect, absent an express statement to the contrary hereinabove, this e-mail message, its contents, and any attachments hereto are not intended to represent an offer or acceptance to enter into a contract and are not otherwise intended to bind the sender, Pachulski Stang Ziehl & Jones LLP, any of its clients, or any other person or entity.

This electronic message is from a law firm. It may contain confidential or privileged information. If you received this transmission in error, please reply to the sender to advise of the error and delete this transmission and any attachments.

We may monitor and record electronic communications in accordance with applicable laws and regulations. Where appropriate we may also share certain information you give us with our other offices (including in other countries) and select third parties. For further information (including details of your privacy rights and how to exercise them), see our updated Privacy Notice at www.bclplaw.com.

CONFIDENTIALITY
This e-mail message and any attachments thereto is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail message, you are hereby notified that any dissemination, distribution or copying of this e-mail message, and any attachments thereto is strictly prohibited. If you have received this e-mail message in error, please immediately notify me by telephone and permanently delete the original and any copies of this email and any prints thereof.

NOT INTENDED AS A SUBSTITUTE FOR A WRITING
Notwithstanding the Uniform Electronic Transactions Act or the applicability of any other law of similar substance and effect, absent an express statement to the contrary hereinabove, this e-mail message, its contents, and any attachments hereto are not intended to represent an offer or acceptance to enter into a contract and are not otherwise intended to bind the sender, Pachulski Stang Ziehl & Jones LLP, any of its clients, or any other person or entity.

This electronic message is from a law firm. It may contain confidential or privileged information. If you received this transmission in error, please reply to the sender to advise of the error and delete this transmission and any attachments.

We may monitor and record electronic communications in accordance with applicable laws and regulations. Where appropriate we may also share certain information you give us with our other offices (including in other countries) and select third parties. For further information (including details of your privacy rights and how to exercise them), see our updated Privacy Notice at www.bclplaw.com.

CONFIDENTIALITY
This e-mail message and any attachments thereto is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail message, you are hereby notified that any dissemination, distribution or copying of this e-mail message, and any attachments thereto is strictly prohibited. If you have received this e-mail message in error, please immediately notify me by telephone and permanently delete the original and any copies of this email and any prints thereof.

NOT INTENDED AS A SUBSTITUTE FOR A WRITING
Notwithstanding the Uniform Electronic Transactions Act or the applicability of any other law of similar substance and effect, absent an express statement to the contrary hereinabove, this e-mail message, its contents, and any attachments hereto are not intended to represent an offer or acceptance to enter into a contract and are not otherwise intended to bind the sender, Pachulski Stang Ziehl & Jones LLP, any of its clients, or any other person or entity.