IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | Chapter 11 Case |
| | § | |
| Old LC, Inc., *et al.*[1] | § | Case No. 19-11791 (BLS) |
| | § | |
| Debtors. | § | Jointly Administered |

| | | |
|---|---|---|
| | § | |
| Official Committee of Unsecured Creditors | § | |
| of Old LC, Inc., et al., for and on behalf of | § | |
| the estates of Old LC, Inc., *et al.*; | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Adv. No. 20-51002 (BLS) |
| | § | |
| Upfront V, LP, Breakwater Credit | § | |
| Opportunities Fund, L.P.; Upfront GP V, | § | |
| LLC; Mark Suster; Dana Kibler; Gregory | § | |
| Bettinelli; Saif Mansour; Aamir Amdani; | § | |
| Eric Beckman; Darrick Geant; and Joseph | § | |
| Kaczorowski | § | |
| | § | |
| *Defendants.* | § | |

## NOTICE OF A LAWSUIT AND REQUEST TO WAIVE SERVICE OF A SUMMONS

To: Erika Mansour, as Executor of the Estate of Saif Mansour, c/o Joshua Dorchak, Morgan, Lewis & Bockius LLP, 101 Park Avenue, New York, NY 10178.

**Why are you getting this?**

A lawsuit has been filed against you, or the entity you represent, in this court under the number shown above. A copy of the complaint is attached.

This is not a summons, or an official notice from the court. It is a request that, to avoid expenses, you waive formal service of a summons by signing and returning the enclosed waiver. To avoid these expenses, you must return the signed waiver within 30 days from the date shown below, which is the date this notice was sent. Two copies of the waiver form are enclosed, along with a

---

[1] The Debtors are the following four entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Old LC, Inc. (7119), Old LC Holdings, Inc., Old LCF, Inc., and Old LC Parent, Inc. The Debtors' noticing address in these Chapter 11 cases is c/o Bryan Cave Leighton Paisner LLP, Attn: Mark I. Duedall, 1201 W. Peachtree Street, 14th Floor, Atlanta, Georgia 30309.

stamped, self-addressed envelope or other prepaid means for returning one copy. You may keep the other copy.

**What happens next?**

If you return the signed waiver, I will file it with the court. The action will then proceed as if you had been served on the date the waiver is filed, but no summons will be served on you and you will have 60 days from the date this notice is sent (see the date below) to answer the complaint (or 90 days if this notice is sent to you outside any judicial district of the United States).

If you do not return the signed waiver within the time indicated, I will arrange to have the summons and complaint served on you. And I will ask the court to require you, or the entity you represent, to pay the expenses of making service.

Please read the enclosed statement about the duty to avoid unnecessary expenses.

I certify that this request is being sent to you on the date below.

Dated: April 14, 2022
Wilmington, Delaware

Respectfully submitted,

**MORRIS JAMES LLP**

*/s/ Jeffrey R. Waxman*
Jeffrey R. Waxman (DE Bar No. 4159)
Eric J. Monzo (DE Bar No. 5214)
Brya M. Keilson (DE Bar No. 4643)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
E-mail: jwaxman@morrisjames.com
E-mail: emonzo@morrisjames.com
E-mail: bkeilson@morrisjames.com

-   and   -

Joel B. Bailey, Esquire  (*proc hac vice*)
Joshua L. Hedrick, Esquire (*proc hac vice*)
Mark A. Fritsche, Esquire (*proc hac vice*)
**HEDRICK KRING, PLLC**
1700 Pacific Avenue, Suite 4650
Dallas, Texas 75201
Telephone: (214) 880-9625
Facsimile:  (214) 481-1844

E-mail: Josh@HedrickKring.com
E-mail: Joel@HedrickKring.com
E-Mail: Mark@HedrickKring.com

-   and   -

Samuel M. Stricklin, Esquire (*pro hac vice*)
**STRICKLIN LAW FIRM, P.C.**
Palisade Central II
2435 North Central Expressway
Suite 1200
Richardson, Texas 75080
Telephone 972-2388687
E-mail: Sam.stricklin@stricklaw.pro

*Counsel for Plaintiffs*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | Chapter 11 Case |
| | § | |
| Old LC, Inc., *et al.*[2] | § | Case No. 19-11791 (BLS) |
| | § | |
| Debtors. | § | Jointly Administered |

| | | |
|---|---|---|
| | § | |
| Official Committee of Unsecured Creditors | § | |
| of Old LC, Inc., *et al.*, for and on behalf of | § | |
| the estates of Old LC, Inc., *et al.*; | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Adv. No. 20-51002 (BLS) |
| | § | |
| Upfront V, LP, Breakwater Credit | § | |
| Opportunities Fund, L.P.; Upfront GP V, | § | |
| LLC; Mark Suster; Dana Kibler; Gregory | § | |
| Bettinelli; Saif Mansour; Aamir Amdani; | § | |
| Eric Beckman; Darrick Geant; and Joseph | § | |
| Kaczorowski | § | |
| | § | |
| *Defendants.* | § | |

## <u>WAIVER OF THE SERVICE OF SUMMONS</u>

To: Official Committee of Unsecured Creditors of Old LC, Inc., *et al.*, c/o Jeffrey R. Waxman, Morris James LLP, 500 Delaware Avenue, Suite 1500, Wilmington, DE 19801.

I have received your request to waive service of a summons in this action along with a copy of the complaint, two copies of this waiver form, and a prepaid means of returning one signed copy of the form to you.

I, or the entity I represent, agree to save the expense of serving a summons and complaint in this case.

---

[2]      The Debtors are the following four entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Old LC, Inc. (7119), Old LC Holdings, Inc., Old LCF, Inc., and Old LC Parent, Inc.  The Debtors' noticing address in these Chapter 11 cases is c/o Bryan Cave Leighton Paisner LLP, Attn: Mark I. Duedall, 1201 W. Peachtree Street, 14th Floor, Atlanta, Georgia 30309.

I understand that I, or the entity I represent, will keep all defenses or objections to the lawsuit, the court's jurisdiction, and the venue of the action, but that I waive any objections to the absence of a summons or of service.

I also understand that I, or the entity I represent, must file and serve an answer or a motion under Rule 12 within 60 days from ___April 14, 2022___, the date when this request was sent. If I fail to do so, a default judgment will be entered against me or the entity I represent.

Dated: ___April 18, 2022___

_____
(Signature of the attorney or unrepresented party)

_Joshua Dorchak, for Erika Mansour, as Executor_
(Printed name)

_Morgan, Lewis & Bockius LLP_
(Address)

_joshua.dorchak@morganlewis.com_
(E-mail address)

_212.309.6700_
(Telephone number)

**WAIVER OF THE SERVICE OF SUMMONS**                                **PAGE 2**

## DUTY TO AVOID UNNECESSARY EXPENSES OF SERVING A SUMMONS

Rule 4 of the Federal Rules of Civil Procedure requires certain defendants to cooperate in saving unnecessary expenses of serving a summons and complaint. A defendant who is located in the United States and who fails to return a signed waiver of service requested by a plaintiff located in the United States will be required to pay the expenses of service, unless the defendant shows good cause for the failure.

"Good cause" does not include a belief that the lawsuit is groundless, or that it has been brought in an improper venue, or that the court has no jurisdiction over this matter or over the defendant or the defendant's property.
 If the waiver is signed and returned, you can still make these and all other defenses and objections, but you cannot object to the absence of a summons or of service.

If you waive service, then you must, within the time specified on the waiver form, serve an answer or a motion under <u>Rule 12</u> on the plaintiff and file a copy with the court. By signing and returning the waiver form, you are allowed more time to respond than if a summons had been served.

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | Chapter 11 Case |
| | § | |
| Old LC, Inc., *et al.*[1] | § | Case No. 19-11791 (BLS) |
| | § | |
| Debtors. | § | Jointly Administered |

---

| | | |
|---|---|---|
| | § | |
| Official Committee of Unsecured Creditors | § | |
| of Old LC, Inc., et al., for and on behalf of | § | |
| the estates of Old LC, Inc., et al.; | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Adv. No. 20-51002 (BLS) |
| | § | |
| Upfront V, LP, Breakwater Credit | § | |
| Opportunities Fund, L.P.; Upfront GP V, | § | |
| LLC; Mark Suster; Dana Kibler; Gregory | § | |
| Bettinelli; Saif Mansour; Aamir Amdani; | § | |
| Eric Beckman; Darrick Geant; and Joseph | § | |
| Kaczorowski | § | |
| | § | |
| *Defendants.* | § | |

## FIRST AMENDED COMPLAINT AND OBJECTION TO CLAIMS

---

[1]     The Debtors are the following four entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Old LC, Inc. (7119), Old LC Holdings, Inc., Old LCF, Inc., and Old LC Parent, Inc.  The Debtors' noticing address in these Chapter 11 cases is c/o Bryan Cave Leighton Paisner LLP, Attn: Mark I. Duedall, 1201 W. Peachtree Street, 14th Floor, Atlanta, Georgia 30309.

The Official Committee of Unsecured Creditors (the "*Committee*") of Old LC, Inc.; Old LC Holdings, Inc.; Old LCF, Inc.; and Old LC Parent, Inc. (collectively, "***Loot Crate***" or the "***Debtors***")[2] bring this action on behalf of and for the benefit of the Debtors' estate and respectfully alleges as follows:

### Nature of the Action

1.     From 2012 to 2019, Loot Crate operated a subscription box service that catered to fandom and enthusiasts through "crates" curated with "geek and gamer products" each month.  Loot Crate partnered with industry leaders in entertainment, gaming, sports, and pop culture to deliver monthly themed crates, create interactive experiences and digital content, and film original video productions.  Products included exclusive shirts, gear, and gadgets, as well as limited edition collectibles.  Loot Crate became the worldwide leader in pop culture subscription boxes with over 250,000 recurring subscribers.

2.     Unfortunately, from early 2017 through mid-2019, Loot Crate's investors and senior secured lender suffocated Loot Crate into bankruptcy by working in concert to seize control of the company by blocking Loot Crate's access to alternative sources of funding and insisting on its own onerous, commercially unreasonable terms.  Defendants Upfront V, LP (individually and with its board designees, including defendants Mark Suster, Dana Kibler, and Gregory Bettinelli, "***Upfront***") and Breakwater Credit Opportunities Fund, L.P. (individually and with its board designees, including Saif Mansour, "***Breakwater***") engaged in a concerted pattern of behavior and conspiracy to benefit themselves at Loot Crate's ultimately fatal expense.

---

[2]     The Debtors were formerly named Loot Crate, Inc., Loot Crate Holdings, Inc., LC Funding, Inc., and Loot Crate Parent, Inc.  Following the closing of the sale of substantially all of the Debtors' assets completed in the administrative bankruptcy case, no. 19-11791 (the "***Admin Case***"), the Debtors filed the necessary documentation in the applicable jurisdictions to change their corporate names and filed the *Notice of Changes of Debtors' Names and Case Caption* [Admin Case D.I. 265] with the Court, all in accordance with the terms of the sale and the order approving the same [Admin Case D.I. 254].

3.     Upfront and Breakwater used both overt and covert tactics in furtherance of their concerted plan, including: (i) prewritten scripts and "playbooks" (containing speaking lines and even planned facial reactions) where board actions and the exercise of loan remedies were pre-ordained; (ii) secret, subversive meetings with members of Loot Crate's management to whom Upfront and Breakwater promised promotions and equity in exchange for their loyalties; and (iii) threats of personal lawsuits and reputational harm to those who opposed them.  Relying on their collective power held pursuant to consent rights, board control, and Breakwater's role as Loot Crate's senior secured lender, Upfront and Breakwater devised and implemented a series of bad-faith, disloyal acts to delay or outright block Loot Crate from pursuing financing alternatives at a time when the company was running out of cash reserves.  Thus, Upfront and Breakwater accomplished their own selfish goals by choking Loot Crate into accepting burdensome financing from Upfront and Breakwater.

4.     Through Suster, Kibler, Bettinelli, and Mansour, as well as Upfront and Breakwater's other representatives and enablers, Upfront and Breakwater committed serial fiduciary breaches in expropriating hard control over Loot Crate while pursuing self-interested goals in direct conflict with the company's interests.  These breaches damaged Loot Crate, causing the company a catastrophic loss of enterprise value and materially undermining its ability to continue as a going concern.  Because of Defendants' misconduct and breach of fiduciary duties, Loot Crate went from having revenues of $145 million, gross profits in excess of $40 million, and an estimated enterprise value of more than $100 million at the end of 2017, to being forced to file for protection under chapter 11 and selling its assets in the bankruptcy proceedings less than two years later.

5.     This is a suit to recover from Upfront, Breakwater, and certain of their agents and representatives, including several former members of the board of directors of Old LC, Inc., money damages sustained by the Debtors as a result of the Defendants' concerted efforts to exercise dominion and control over the Debtors' business in direct violation of their respective fiduciary and other obligations to the Debtors.  In addition, Plaintiff seeks to avoid and recover a $1 million payment to Breakwater as a constructively

fraudulent transfer under 11 U.S.C. §§ 544, 548, and applicable provisions of Delaware statutory law.

6.      For the foregoing reasons and those stated below, the Plaintiffs seek money damages and/or disgorgement to compensate them for losses to the company's enterprise value.  Because the actions complained of were taken in bad faith, in violation of the duty of loyalty owed to Loot Crate and its stakeholders by each of the Defendants, the claims asserted fall outside of the exculpatory scope of 8 Del C. §102(b)(7).  Further, for the reasons explained herein, the business judgment rule does not apply to the transactions/dealings at issue; rather, entire fairness applies.

## Jurisdiction and Venue

7.      This adversary proceeding arises in and relates to the Debtors' chapter 11 cases (the "**_Chapter 11 Cases_**").

8.      This Court has jurisdiction over the adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 1335.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (E), (H), and (O).  To the extent any part of this adversary proceeding is determined not to be a core proceeding, Plaintiff consents to the entry of final orders or judgments by the Court.

9.      Venue is proper under 28 U.S.C. § 1409 because this adversary proceeding arises under title 11 or arises in or relates to the Chapter 11 Cases.

10.     The statutory predicate for the relief requested herein is found in §§ 544, 548, and 550 of title 11 of the United States Code (the "Bankruptcy Code"), as well as 6 Del. Code §§ 1304, 1305, and 1307.

## The Parties

11.     In accordance with 11 U.S.C. § 1102(a)(1), the Committee was duly formed by the Office of the United States Trustee on August 22, 2019. The Committee is vested with all of the powers of a committee under 11 U.S.C. § 1103.

12.     By order of this Court dated October 21, 2020 [Admin Case D.I. 714], the Committee was granted standing and authority to assert and

prosecute the claims set forth herein on behalf of and for the benefit of the Debtors' estates.

13.    Defendant Upfront is a private equity fund that focuses on debt and equity investments in start-up companies.  Upon information and belief, Upfront GP V, LLC is the general partner of, and operates, Upfront.  Upon information and belief, Upfront is, and at all relevant times was, a Delaware limited partnership with its principal place of business in the County of Los Angeles, in the State of California.  At all times relevant to the claims in this complaint, Upfront was a shareholder of Loot Crate.

14.    Defendant Breakwater is a private equity fund that focuses on debt and equity investments in start-up companies.  Upon information and belief, Breakwater is, and at all relevant times was, a Delaware limited partnership with its principal place of business in the County of Los Angeles, in the State of California.  At all times relevant to the claims in this complaint, Breakwater was a shareholder and lender of Loot Crate.

15.    Upfront and Breakwater are private equity funds that, among other business, focus on debt and equity investments in start-ups and young companies.

16.    Defendant Mark Suster ("***Suster***") is the Managing Partner of Upfront and is a resident of the State of California.  At all times relevant to the claims in this complaint, Suster was either a member of the Loot Crate's board of directors (the "***Board***") and/or managing Upfront's affairs with respect to its position as a shareholder of Loot Crate.

17.    Defendant Dana Kibler ("***Kibler***") is a Partner and Chief Financial Officer of Upfront and is a resident of the State of California.  At all times relevant to the claims in this complaint, Kibler was either a member of the Board and/or managing Upfront's affairs with respect to its position as a shareholder of Loot Crate.

18.    Defendant Gregory Bettinelli ("***Bettinelli***") is a Partner at Upfront and is a resident of the State of California.  At all times relevant to the claims in this complaint, Bettinelli was either a member of the Board

and/or managing Upfront's affairs with respect to its position as a shareholder of Loot Crate.

19.   Defendant Saif Mansour ("**Mansour**") is a Managing Partner of Breakwater and is a resident of the State of California. At all times relevant to the claims in this complaint, Mansour was either a member of the Board, a Board observer, and/or managing Breakwater's affairs with respect to its position as a shareholder and lender of Loot Crate.

20.   Defendant Aamir Amdani ("**Amdani**") is Director at Breakwater and is a resident of the State of California. At all times relevant to the claims in this complaint, Amdani was either a member of the Board, a Board observer, and/or managing Breakwater's affairs with respect to its position as a shareholder and lender of Loot Crate.

21.   Defendant Eric Beckman ("**Beckman**") is a Managing Partner of Breakwater and is a resident of the State of California. At all times relevant to the claims in this complaint, Beckman was either a member of the Board, a Board observer, and/or managing Breakwater's affairs with respect to its position as a shareholder and lender of Loot Crate.

22.   Defendant Darrick Geant ("**Geant**") is a Partner at Breakwater and is a resident of the State of California. At all times relevant to the claims in this complaint, Geant was either a member of the Board, a Board observer, and/or managing Breakwater's affairs with respect to its position as a shareholder and lender of Loot Crate.

23.   Defendant Joseph Kaczorowski ("**Kaczorowski**") is a Partner and Chief Financial Officer at Breakwater and is a resident of the State of California. At all times relevant to the claims in this complaint, Kaczorowski was either a member of the Board, a Board observer, and/or managing Breakwater's affairs with respect to its position as a shareholder and lender of Loot Crate.

24.   Upfront, Breakwater, Suster, Kibler, Bettinelli, Mansour, Amdani, Beckman, Geant, and Kaczorowski are referred to collectively herein as the "**Defendants**."

**Factual Background**

I.      **Loot Crate Begins as a Small Start-Up in 2012, and Grows to a Nine-Figure Company in Just Five Years.**

25.     Loot Crate was an eCommerce subscription company specializing in providing its customers with curated boxes (or "crates") of "geek and gamer products" each month.  These products consisted of exclusive figurines, shirts, gear, and gadgets, as well as limited edition collectibles.

26.     Combining his entrepreneurial spirit with his interest in video games, comics, and science fiction, Christopher Davis created Loot Crate in 2012 along with his business partner, Matthew Arevalo.  As a small start-up company, Loot Crate grew quickly.

27.     Loot Crate developed, designed, and sourced popular merchandise from over 350 distinct entertainment properties, each of which used Loot Crate and its innovative business model as a key intellectual property monetization partner.

28.     Approximately 97% of Loot Crate's merchandise was exclusive to Loot Crate, driving fan enthusiasm and loyalty for these "must-have" collectibles.  Accordingly, Loot Crate enjoyed a loyal customer base that returned again and again to buy Loot Crate's products.

29.     Loot Crate's business also benefitted from other companies' desire to use Loot Crate to expand their own product offerings and cross-market television, film, and other popular media with fun-filled items, toys, collectibles, clothes, and other unique accoutrements.

30.     As of November 2017, Loot Crate had approximately 190 full-time employees and approximately another 200 temporary or part-time employees involved in packing the crates.

31.     At year-end 2017, Loot Crate had revenues of $145,000,000, gross profits in excess of $40,000,000 and an estimated enterprise value of more than $100,000,000.

32.     Loot Crate grew quickly and, by mid-2019, had shipped more than 32 million crates of customized merchandise across the world.

33.     In 2018, Loot Crate was voted #1 Geek Box by over 250,000 users, voted #3 for customer service for Subscription Box Services, and was the 2018 Subscription Trade Association CUBE award winner for "Best Overall Box."

34.     Davis was also repeatedly recognized in the industry as an up-and-coming entrepreneur.  In 2016, Davis was named as a finalist for the Ernst & Young Entrepreneur of the Year Award for the Greater Los Angeles area.  In 2016, Davis was also named as an Entrepreneur Superstar by Inc. Magazine.



35.     In addition to its founders' recognized skill as entrepreneurs, Loot Crate and Davis were consistently surrounded by reputable consulting companies focused exclusively on positioning Loot Crate for success (unlike

Defendants who had ulterior motives).  Specifically, Loot Crate retained consultants from Dendera Advisory, LLC and McKinsey & Company, Mark Palmer of Theseus Strategy Group, and law firms such as Bryan Cave.

36.     As a result of its rapid success, Loot Crate became the worldwide leader in fan subscription boxes, partnering with industry leaders in entertainment, gaming, sports, and pop culture to deliver monthly and limited-edition themed crates, interactive experiences and digital content, and original video content.

37.     Together with Loot Crate's entrepreneurial founders and expert advisors and consultants, Loot Crate was well-positioned for long-term success.  Unfortunately, when the time came for Loot Crate to obtain capital to support its growth, Loot Crate chose Defendants without knowing they would be more focused on enriching themselves at Loot Crate's expense, rather than fulfilling their duties of care, loyalty, and good faith. Therefore, because of Defendants' breach of their fiduciary duties, the wheels began to come apart at Loot Crate when Defendants got involved.

## II.     Loot Crate Obtains Financing from Upfront and Breakwater.

38.     To meet the needs of its rapidly growing customer base, Loot Crate required access to capital.  Therefore, in the summer of 2016, Loot Crate led its Series A funding round and obtained $18.599 million in equity funding, including approximately $12.499 million in equity funding from Upfront and approximately $1.99 million in equity funding from Breakwater.

39.     On or about May 10, 2016 (the "***Private Equity Agreements***"), in exchange for their equity funding, Upfront received approximately 45% of the newly-issued Series A Preferred Stock of Loot Crate, and Breakwater received approximately 10% of the newly-issued Series A Preferred Stock. Thus, Upfront and Breakwater held 55% of the issued and outstanding Series A Preferred Stock.

40.     Under the terms of Upfront's Private Equity Agreement, Upfront was granted the right to designate a member of the Board, and designated Bettinelli to initially fill that role.

41.     From May 10, 2016, and at all relevant times thereafter, Bettinelli (along with Suster and Kibler) were principals at Upfront.

42.     Under the terms of Breakwater's Private Equity Agreement, Breakwater was granted the right to designate an observer to the Board, and designated Mansour to fill that role.

43.     Although Breakwater's board observer could not vote, the observer still had the right to be fully apprised of all of Loot Crate's financial and business affairs, and could actively participate in and direct discussions of Loot Crate's affairs.

44.     Also, under the terms of the Private Equity Agreements, a majority of the class of Series A Preferred Shares was required to approve any new preferred equity issuances for Loot Crate.  Together, Upfront and Breakwater held a majority of the Series A Preferred Shares and therefore had the power veto any subsequent financing for Loot Crate.

45.     On or about June 1, 2016, Loot Crate entered into a $20 million credit facility with Breakwater, as lender and agent, under the terms of that certain Loan and Security Agreement, dated on or about June 1, 2016 (the "***Loan Agreement***").  Under the Loan Agreement, Breakwater and the other lenders funded a $15 million loan to Loot Crate (the "***Loan***").

## III.    Upfront and Breakwater Collude and Conspire to Suffocate Loot Crate by Blocking Financing Proposals.

### A.    Upfront and Breakwater Develop a Scheme to Reconstitute the Board in their Favor.

46.     As early as January 2017, Upfront and Breakwater conspired to obtain control over Loot Crate's Board so they could force financing through that would benefit their own companies at Loot Crate's detriment.

47.     In an email exchange on January 2, 2017 between Upfront's then-Board designee (Bettinelli) and Breakwater's designated observer (Mansour), Bettinelli and Mansour discussed their scheme of using alleged breaches under the Loan Agreement as "leverage" to effect "changes" at Loot

Crate. Their plot included using the pretext of defaults under the Loan Agreement to trigger Breakwater's right to designate a full Board seat.

48. As Bettinelli and Mansour discussed in their January 2, 2017 emails, the first step in the plan to obtain a Board seat for Mansour was for Breakwater to find a pretext to notice a default under the Loan Agreement to use as leverage. So, they alleged a covenant default against Loot Crate for allegedly failing to maintain a certain minimum number of subscribers.

49. However, the number of subscribers that Breakwater based this alleged default upon came from a presentation Davis gave to the Board on January 5, 2017. The presentation did not include certain categories of subscribers. Regardless, on January 31, 2017, without seeking any clarification from the company, Breakwater took the extraordinary step of formally declaring a covenant default.

50. Further evidence of their conspiracy can be found in an email exchange between Bettinelli and Mansour on January 13, 2017 with the subject line "Terry Boyle Update." The first email is from the company to Bettinelli informing him that the company was finalizing the addition of Terry Boyle to the Board. Bettinelli and Mansour viewed Boyle as a potential ally on the Board once Mansour was also added. Bettinelli then forwarded this Board communication to Mansour (who was not then a Board member), and Mansour responded "one down one to go," referring to Boyle and himself, respectively.

51. Mansour and Bettinelli routinely communicated and coordinated their plans via text messages as well. Although only a board observer, Mansour informed Bettinelli of conversations he had with Eric Chan—a Loot Crate employee—concerning operations at Loot Crate. In coordinating operations of the business to benefit Upfront and Breakwater, Mansour and Bettinelli shared with each other their plans to deceive Chris Davis during any negotiations. Mansour and Bettinelli discussed how they could slow-play Davis on various issues to protect their interests and how they could dupe and mislead Davis by acting as if they were under duress in negotiations.

11

**B.      Breakwater Utilizes its Law Firm to Further the Scheme Against Loot Crate.**

52.      Breakwater also turned to its counsel, Morgan, Lewis & Bockius LLP ("***Morgan Lewis***") for recommendations regarding how to obtain a Board seat for itself.

53.      In an email dated February 8, 2017 (the "***Carry the Water Email***"), Morgan Lewis outlined "some thoughts" on a strategy for Breakwater to leverage its relationship with Upfront to gain a full voting Board seat, including:

> 4. I would not suggest that you have further discussions with Davis about the board seat for waiver trade if you have already floated that idea
>
> 5. Up Front [sic][3] should carry the heavy water before and during the meeting in terms of pressing Davis on how to address the continuing defaults.  The best way forward is like this:
>
> Up Front presses Davis prior to the meeting and in the meeting on the defaults and the company's strategies to address.  Upfront should press Davis to describe the remedies [Breakwater] could now take and how damaging those remedies could be to the company.
>
> Up Front should tease out of Davis the possibility of a waiver of defaults in exchange for a board seat for you.
>
> Up Front should aggressively support that outcome.  It costs the Company nothing, it avoids potentially crippling consequences of remedies.
>
> Upfront should push these issues aggressively at the board meeting, not you/Breakwater
>
> If Davis or the board or both invite you back into the room to consider waiving the defaults in exchange for a board seat, I would suggest that you carefully listen, ask

---

[3] Morgan Lewis inadvertently refers to Upfront incorrectly as "Up Front" in the Carry the Water Email.

questions as appropriate, and then ask for a few minutes to discuss with your partners (or something like that). *Don't say ok right away. Be deliberate. Don't want it to seem like this was all pre wired. Then say ok.*

Before you get the offer to take the seat in exchange for the waiver, don't show your hand. Say you have a lot of concerns and are considering all your options.

[emphasis added]

54.     An hour after receiving the Carry the Water Email from Morgan Lewis, Mansour forwarded it to Bettinelli at Upfront.

55.     Consistent with the recommendations of Breakwater's counsel, on February 13, 2017, Bettinelli sent Davis an email (the "***February 13 Email***") "strongly" recommending that Mansour be immediately appointed to the Board in exchange for certain conditions, including waiver of the alleged Loan default.

56.     In the February 13 email, Bettinelli did not disclose that Upfront and Breakwater had previously discussed the possibility of Breakwater's appointment to the Board, nor that the email was sent at Breakwater's urging.

57.     Upfront's inability to remember which law firm represented which entities further highlights Upfront's and Breakwater's joint coordination to harm Loot Crate. For example, when Breakwater sent a default letter on January 31, 2017, Loot Crate responded on February 22, 2017 denying the existence of any default. After Mansour forwarded Loot Crate's response to Bettinelli, Bettinelli sent an email to "Chris [Davis] and Morgan Lewis team" furious that the response letter had been sent to Breakwater without his approval (presumably as it disrupted the plans outlined in the Carry the Water Email). Of course, Morgan Lewis represented Breakwater and not Loot Crate, but Bettinelli could not keep his allegiances straight. When he realized his error, Bettinelli wrote, "Shit. Oh no. My bad. I thought that was our counsel!"

**C. Upfront and Breakwater Install a Lackey on the Board as a Purported "Independent" Director.**

58. Upfront's and Breakwater's efforts to reconstitute the Board in their favor were not limited to attempting to install a Breakwater representative on the Board. Instead, their scheme extended to installing purportedly "independent" directors who would, in reality, be nothing more than an extension of Upfront and/or Breakwater.

59. In early 2017, Mansour and Bettinelli sought to add Ynon Kreiz ("Kreiz") to the Board.

60. Although Kreiz may have appeared to be an independent director and officer, communications between Upfront and Mansour both prior to Kreiz's appointment in May 2017 and after his removal in December 2017 reveal that Kreiz had a pre-existing relationship with both Suster and Upfront.

61. In an email dated February 20, 2017, Bettinelli wrote to Mansour: "Ynon Kreiz would be a great fit (again this is in the concept stage but obviously someone we know and have worked with in the past)." On February 29, 2017, Mansour instructed Bettinelli ensure he was onboard as executive chair."

62. In an email dated March 11, 2017, Bettinelli wrote to Mansour: "it will take some work to get a deal done with Ynon if Chris [Davis] were to formally agree, but I am hopefully [sic] his experience with our firm [Upfront] and his relationship with my partner Mark [Suster] will also help get us there."

63. In an email dated October 22, 2017, Suster wrote to Mansour regarding his vision for the Board, including with Kreiz as Executive Chairman: "I would play an active role on the board as I did with Maker Studios working side-by-side with Ynon."

64. On August 26, 2019, Suster posted in his blog a story about how, "[e]xactly six years ago today [2013] I received an email from *my friend* Ynon Kreiz introducing me to Andrew Stalbow and Petri Järvilehto.

14

Ynon had been the CEO of Maker Studios and ***I trust his opinion a great deal*** so of course I took the meeting." *See* [https://bothsidesofthetable.com/some-seriously-great-news-no-seriously-c57936f1f61c](https://bothsidesofthetable.com/some-seriously-great-news-no-seriously-c57936f1f61c).

65. Upfront never disclosed the prior relationship between it and Kreiz or the prior relationship between Suster and Kreiz.[4] Appointing Kreiz to the Board thwarted the Board's independence with respect to Loot Crate's financing efforts. As described below, Kreiz's appointment allowed Upfront and Breakwater to successfully manipulate board independence in their favor (and at the company's detriment) with respect to Loot Crate's financing efforts.

## IV. Upfront and Breakwater Breached their Fiduciary Duties in Connection with Loot Crate's 2017-18 Financing Efforts.

### A. Loot Crate Receives Three Financing Offers.

66. By October 2017, Suster, Bettinelli, and Upfront no longer cared about fulfilling their fiduciary duties to Loot Crate; rather, Suster, Bettinelli, and Upfront were solely interested in protecting their own interests at Loot Crate's expense. To achieve their desired outcome, they decided that a sale would be the only way to achieve a return for Upfront. Accordingly, rather than exploring ways for the company to thrive, on October 10, 2017, Suster wrote to Bettinelli and others at Upfront, "[a]fter a full day review I've concluded that LootCrate [*sic*] is fucked unless it sells immediately. I told the board today."

67. To implement their desired outcome, Suster, Bettinelli, and Upfront knew they needed to exploit Loot Crate's need for additional financing to seize further control of the company and, ultimately, force a sale. Thus, the Upfront Defendants and the Breakwater Defendants continued their coordinated attack on Loot Crate to seize control and force a sale in

---

[4] The relationship and allegiances evidence between Upfront, Suster, and Kreiz are also demonstrated after Kreiz was removed from the Board. Following Kreiz's removal from the Board, Upfront lobbied Loot Crate to pay Kreiz a $250,000 subordinated note to avoid Upfront's obligation to pay it. In an email dated January 3, 2018, Suster wrote to Mansour: "We believe in supporting partners so in bringing Ynon on board we agreed to [the note] to give him comfort."

order to further their own interests. Every action taken by the Upfront Defendants discussed below was taken with the "laser focus" intent to sell Loot Crate so Defendants could profit.

68. Loot Crate sought additional financing in the summer of 2017 to normalize operations and for additional working capital. In late 2017, Loot Crate received three financing proposals (the "*2017 Proposals*").

69. The first proposal came from Upfront and Breakwater in October 2017. Suster, both in his capacity as a Loot Crate director and as a representative of Upfront, presented a term sheet for a Series A-2 preferred equity financing to Loot Crate (the "*A-2 Proposal*").

70. Under the A-2 Proposal, Upfront would commit only $5 million in cash and Breakwater committed up to $1 million.

71. In response to the A-2 Proposal, Loot Crate requested approximately $1.5 million of additional bridge financing from Upfront and Breakwater. Suster informed Loot Crate that Upfront and Breakwater would provide such bridge financing under certain conditions.

72. The second proposal came from one of Loot Crate's vendors, BioWorld Merchandising, Inc. ("*BioWorld*") on November 2, 2017. BioWorld presented a term sheet proposal for between $10 and $15 million in financing through a combination of preferred equity and subordinated convertible notes (the "*Original BioWorld Proposal*").

73. No officer, director, or other insider of Loot Crate was affiliated with BioWorld or the Original BioWorld Proposal.

74. The third proposal also came on November 2, 2017, from certain members of Loot Crate's management team (together with certain of their friends and family). This third proposal was for between $7.25 and 10 million in financing through issuance of new preferred equity (the "*Management Proposal*").

75.     The Original BioWorld Proposal and the Management Proposal were objectively superior to the financing contemplated by the A-2 Proposal.

76.     For example, the A-2 Proposal included anti-dilution protections with respect to Upfront and Breakwater's Series A Preferred Shares and the same liquidation preference being given to the new capital (the "***Anti-Dilution Provisions***").    These Anti-Dilution Provisions were favorable to Upfront and Breakwater, but created a materially negative economic impact on the majority of Loot Crate's other shareholders.    The Management Proposal and the Original BioWorld Proposal did not contain these same onerous, Anti-Dilution Provisions.

77.     Email communications by and between Upfront and a separate Loot Crate investor demonstrated the onerous, unreasonable terms presented in the A-2 Proposal, including how A-2 Proposal prioritized Upfront and Breakwater over Loot Crate and its other shareholders.    On the eve of the November 3, 2017 board meeting discussed below, the investor wrote to Suster, "[t]here are parts of your offers, though, that ***unfairly favor Upfront over all other shareholders***.    That is why we are supportive of the offer presented yesterday, which we believe is significantly more favorable to the company, existing shareholders, and Series B investors."

78.     In response, Suster admitted to his actual allegiances and his unwillingness to fulfill his fiduciary duties to Loot Crate.    Suster responded, "I hope you can understand why I must focus my time and energy on the largest shareholders (founder), the largest debt holders (Breakwater), the largest financiers (my partners at Upfront who need to be persuaded why they should risk more of our capital) and the board members of LootCrate whom I call daily."    Further, "you'll excuse me from not having the time to negotiate with each and every small shareholder . . .."

79.     Given these startling statements from Suster, the investor responded by reminding Suster, "[a]ny proposal this board reviews must take into consideration the impact on all shareholders, not simply investors.    And there are more bona fide offers on the table then [*sic*] the ones Upfront has presented."

80.     The investor even identified the ways in which the Series A-2 Proposal was inferior to the other proposals by stating, "[o]nly your proposal drastically dilutes all shareholders to the benefit of certain shareholders with significant participation – as well as certain board members.   It is the management proposal that more fairly treats all shareholders and the company as a whole."  The investor concluded his email by reminding Suster of his fiduciary obligations, the duty of care, and the duty of loyalty.[5]

81.     As the holders of a majority of Series A Preferred Stock, and without any consideration of fiduciary duties, Upfront and Breakwater collaborated to veto any alternatives to the A-2 Proposal through coercion and subversion of the Board's fiduciary duties.

**B.     Upfront and Breakwater Force the Board's Acceptance of the A-2 Proposal Despite its Inferior Terms in Order to Further Upfront's and Breakwater's Interests.**

82.     Beginning in October 2017, Suster made multiple threats to Loot Crate that it would suffer severe financial distress unless Loot Crate complied with Upfront's demands, including, in particular, acceptance and consummation of the financing transaction described in the A-2 Proposal.

83.     On November 3, 2017, Loot Crate held a board meeting to consider the three 2017 Proposals described above.  At the November 3, 2017 meeting, Suster and Mansour informed the Board that Upfront and Breakwater would veto any financing alternative other than the A-2 Proposal.

84.     Davis suggested to Suster and Mansour in the meeting that he and his team be permitted to consider all three 2017 Proposals and to conduct appropriate due diligence consistent with the Board's fiduciary duty.

85.     With no interest or consideration of their fiduciary obligations, Suster and Mansour refused Davis's suggestion at the meeting.   Instead,

---

[5] Ironically, when Loot Crate considered a transaction that could harm Upfront's position in mid-2018, Suster utilized the very same approach he scolded the investor above for using by writing to the board, "[y]ou have the power and the responsibility to protect shareholders and stop a major legal battle from ensuing."  So, when Upfront could benefit at the expense of Loot Crate, Suster ignored other shareholders, but when Upfront's position could be legally reduced, Suster expected all shareholders to be considered.

Suster and Mansour insisted that Loot Crate immediately enter into the A-2 Proposal.

86.     The minutes of the November 3 Board meeting reflect that Loot Crate was under duress caused by Upfront and Breakwater to accept the A-2 Proposal before the conclusion of the meeting because: (i) the BioWorld and Management Proposals for new equity required the approval of the preferred shareholders (controlled by Upfront and Breakwater's combined consent rights); (ii) Suster and Mansour advised the Board that neither Upfront nor Breakwater would approve the BioWorld or Management Proposals without the same Anti-Dilution Provisions as were in the A-2 Proposal; and (iii) the deadline for Loot Crate to accept the A-2 Proposal (with its Anti-Dilution Provisions that benefitted Upfront and Breakwater to the detriment of all other Loot Crate Shareholders) was the end of that November 3 meeting.

87.     The minutes of the November 3 Board meeting are accurate.

88.     Suster and Mansour had a self-interest with respect to the A-2 Proposal.

89.     The November 3 Board meeting lasted more than six hours. Neither Suster nor Mansour recused themselves at any time from the discussion or negotiation of the self-interested transaction during the November 3 Board meeting.  Instead, Suster and Mansour collaborated to negotiate the A-2 Proposal on behalf of, and for the benefit of, Upfront and Breakwater.

90.     With no other option to ensure Loot Crate received much-needed financing, Loot Crate accepted the A-2 Proposal and executed a term sheet with Upfront and Breakwater (the "*A-2 Term Sheet*") at the end of the November 3 Board meeting.

91.     As a director, Suster owed a duty to advance Loot Crate's interests independently from the interests of any individual shareholder, and to refrain from any conduct that would harm Loot Crate.  Upfront and Breakwater also owed a duty to Loot Crate in connection with its financing

efforts, and Suster and Mansour had the obligation to recuse themselves from board meetings during any negotiations of the A-2 Proposal. Although Upfront and Breakwater individually were minority shareholders, their combined ownership of 55% of the Series A Preferred Stock gave them control over Loot Crate's search for financing. Breakwater also exerted control over the Debtors as the company's senior secured lender.

92.     Suster also consistently refused to recuse himself from conference calls with the Board during discussions and negotiations related to the A-2 Proposal.  In numerous emails throughout November and December 2017, Suster directed Loot Crate's independent directors on the structure and strategy for the A-2 Proposal.

### C.     Upfront and Breakwater Utilize the A-2 Term Sheet to Attempt an Ouster of the CEO to Gain Further Control.

93.     The A-2 Term Sheet contained purportedly binding exclusivity and confidentiality provisions (the "*Exclusivity Provisions*").   The Exclusivity Provisions prohibited Loot Crate and its Board from pursuing any other proposal regardless of whether any other proposal might be in the best interests of Loot Crate or its shareholders.

94.     On or about November 9, 2017, Upfront and Breakwater informed Loot Crate that they would not provide the additional $1.5 million in bridge financing that had been previously offered unless Davis provided an irrevocable power of attorney over his common stock in Loot Crate.

95.     By this condition, Upfront and Breakwater placed Davis exactly where they wanted him in their scheme: Between a rock and a hard place. If Davis agreed, Upfront and Breakwater would obtain even greater, unfettered control of Loot Crate.  If Davis refused, the lack of additional bridge financing would leave Loot Crate without sufficient working capital.

96.     Davis did not consent to the additional demand.

**D.** **Upfront and Breakwater Create and Execute "Playbook" to Block Other Financing Options.**

97.    On November 15, 2017, the Board called a meeting to approve the minutes of the previous November 3 Board meeting; however, Suster and Mansour used the November 15 meeting as an opportunity to further the individual agendas of Upfront and Breakwater at Loot Crate's expense.

98.    Prior to the November 15 meeting, Upfront and Breakwater prepared a detailed, coordinated plan (described by them in emails as the "***Playbook***") for Upfront and Breakwater representatives, Kreiz, and Boyle to block the Board from considering other financing options and to force Davis and the company to consummate the A-2 Proposal.

99.    Like the Carry the Water Email, the Playbook contained a scripted plan—this time, for the November 15 Board meeting.  As part of that coordinated plan, (i)  Upfront and Breakwater would offer to close on the A-2 Proposal and fund by Friday, November 17, 2017, as opposed to the December 4 date contained in the A-2 Term Sheet; (ii) Mansour would threaten to accelerate the Loan and begin seeking remedies on November 20 if the A-2 Proposal was not closed by November 17; (iii) the Board would vote to instruct Davis to focus 100% of his time to close the A-2 Proposal by November 17; (iv)  Kreiz would call for a subsequent Board meeting on November 17 to approve the final terms of the A-2 Proposal for close that same day; and (v) on November 22nd, Upfront would notify key parties of its intent to pursue litigation against Davis, and would notify George Davis (Christopher Davis's father) of their intent to pursue legal action and "impl[y] subtly / politely that this is likely to be a very public, protracted battle in which he would be involved."

100.    Despite the efforts of Upfront and Breakwater to conceal the Playbook, an Upfront employee, Michael Carney ("***Carney***"), revealed its existence in separate emails on November 14, 2017.

101.    On November 14, 2017, Carney emailed Mansour using the subject line "Mechanics of acceleration / default" to say that he and Suster "feel like we didn't get a clear enough understanding yesterday of the

mechanics and implications of what happens once (if) you accelerate the loan and the company is able to unable to pay."

102. In that November 14, 2017 email, Carney said, I'd like to make sure we have a thorough understanding [of] the full 'if / then decision tree' around what obligations the company has and when, what steps Breakwater can/will take and when, etc. Is this something you or someone on your team could talk through with me or possibly your counsel at Morgan Lewis?"

103. Presumably after receiving the clarification he needed, Carney wrote up the Playbook and sent it to Suster later on November 14—the night before the scheduled November 15 Board meeting.

104. In his cover email to Suster on November 14, 2017, Carney wrote: "I think I have a good handle on this, but figured it's best to talk through this verbally tomorrow."

105. Declining to answer substantively in writing, Suster replied in an email dated November 14, 2017, "No emails. Talk in Am."

106. In another email dated November 21, 2017, Suster wrote to Upfront representatives: "I can update anybody verbally. Carney can confirm it was another tense board meeting. But he should do so verbally. I fear there are enough threats of legal action to know this is a possibility. I will do my best to avoid a legal situation."

107. Upfront and Breakwater representatives, and Kreiz and Boyle, also used text message communications during this period to conceal their activities. Despite anticipating litigation, Suster failed to appropriately preserve many text messages relevant to the disputes, a convenient assertion given Suster's desire to keep communications verbal.

108. When the November 15 Board meeting commenced, Suster and Mansour acted consistently with their Playbook strategy.

### E. Suster and Mansour Begin Implementing the Playbook Strategy During the November 15 Meeting.

109. At the November 15 Board meeting, Suster and Mansour informed Loot Crate that they wanted to accelerate the planned closing of the A-2 Term Sheet from December 4 to November 17 even though the transaction documents were still in draft form. Otherwise, Suster and Mansour said, Breakwater would accelerate the Loan and commence enforcement actions.

110. On November 16, 2017, Davis emailed the Board to respond to Breakwater's demand to accelerate the A-2 Term Sheet closing and to raise the "very serious issues" he had "with the process that led to the approval of" the A-2 Term Sheet at the November 3, 2017 Board meeting and, "in particular, acceptance of the Term Sheet's Exclusivity Provision."

111. In that November 16 e-mail, Davis stated:

> [W]e all have a continuing fiduciary duty to work for the benefit of the company and its shareholders. At the November 3 Board meeting, there were three financing proposals considered. Consequently, we were not in a situation where there was only one possible path. Even if the Management Proposal and [Original] BioWorld Proposal were not acceptable on their proposed terms at the time, there was no basis for determining that they could not be improved, or that other financing sources would not be available. Nevertheless, the Board was presented with the [A-2] Term Sheet, with its Exclusivity Provision, and was not advised by Cooley [Loot Crate's counsel] as to the potential breach of fiduciary duty inherent in contracting away the Company's right to seek better financing terms from another party or parties.
>
> Additionally, Upfront has failed to provide the $1.5 million of bridge financing at reasonable terms that was promised in connection with the [A-2] Term Sheet and has sought other changes to the terms, including the accelerated closing. Therefore the financing that we are

now being asked to approve and close on Friday is not
even what was approved on November 3.

112.   On November 16, 2017, Suster responded to Davis's
November 16, 2017 email by following the strategy laid out in the Playbook.
Specifically, Suster responded to Davis's email, replying to the full Board
stating: "You signed a legal contract.  If you violate the terms we will begin
immediate legal proceedings."

113.   On November 16, 2017, Suster forwarded Davis's email to
members of Loot Crate's management team, including those with whom
Upfront and Breakwater had been discussing employment opportunities and
equity compensation, with the subject line to "Your company faces the
potential of bankruptcy next week."  In that email, Suster called on them to
pressure Davis to close the A-2 Term Sheet.

114.   On November 16, 2017, Suster separately forwarded his initial
exchange with Davis (including his litigation threats) to Davis's father, this
time changing the subject line to "Loot Crate Bankruptcy & Lawsuit," and
stating that Loot Crate would have to file bankruptcy, as "Break Water is
threatening to call their $15 million loan on Monday."

115.   In a fourth email on November 16, 2017 to Davis and the full
Board, Suster wrote, among other things, that if "you're thinking your
secured creditor [Breakwater] is bluffing I hope you understand they're not
– you will lose control of your financial situation next week and possibly face
bankruptcy by Thanksgiving."

116.   On November 16, 2017, Suster then forwarded this last email
to the Loot Crate management team.

117.   On November 16, 2017, Suster sent another email to Davis and
the Board stating: "With respect to other financing options, you signed a
legally binding 'no shop' agreement and on that basis I have spent countless
hours and tens of thousands of dollars on legal bills to provide financing
before you become bankrupt. I will protect the legal rights in that agreement
vociferously."

118.    On November 17, 2017, Suster sent an email to the company's purportedly "independent" directors, Kreiz and Boyle, as well as Mansour and Carney, in which Suster directed Kreiz and Boyle to approve the A-2 Term Sheet transaction document.

119.    Continuing to follow the steps laid out in the Playbook, on November 17 and November 20, Breakwater issued to Loot Crate two separate notices of alleged covenant defaults.  In the November 20 notice, Breakwater announced that it would accelerate the loan unless Loot Crate addressed the alleged defaults to Breakwater's satisfaction.

120.    Through the actions described above, Suster, Mansour, Kreiz, and Boyle acted for the benefit of Upfront and Breakwater to the detriment of Loot Crate.

121.    Further proof of Upfront and Breakwater's dominance and control of the Board with respect to Loot Crate's financing efforts is the absence of any evidence that Kreiz or Boyle attempted to negotiate any of the terms of the A-2 Proposal or give any consideration to the BioWorld or Management Proposals.  In fact, Kreiz and Boyle emailed Upfront's counsel seeking advice on the different financing proposals.

122.    The existence of the Playbook and the actions of Suster and Mansour in furtherance of the steps described in it—as well as the absence of any evidence of independent action on the part of Kreiz and Boyle— demonstrate that Upfront and Breakwater acted in concert to force Loot Crate to take actions that were in Upfront and Breakwater's best interest, yet detrimental to Loot Crate and its shareholders.

123.    Had Suster, Mansour, Kreiz, and Boyle acted in accordance with their fiduciary duties to Loot Crate, rather than in the best interests of Upfront and Breakwater, and had Upfront and Breakwater not colluded to veto alternative financing options, Loot Crate could have consummated one or more forms of equity financing beneficial to Loot Crate in early November 2017.

### F.     Upfront and Breakwater's Campaign to Thwart Financing from BioWorld.

124.    So long as Upfront and Breakwater continued to exercise their veto right, and in light of the A-2 Term Sheet's exclusivity provision, Loot Crate could not pursue the Management Proposal, the Original BioWorld Proposal, or any other financing alternatives without the risk of litigation from Upfront and Breakwater.

125.    Loot Crate needed additional financing by the end of December 2017, and the absence of such financing had already created liquidity problems for the company.  Although Loot Crate had positive cash flow in December 2017, its ability to maintain and expand its business operations was hampered by its inability to obtain proper financing.

126.    The uncertainty created by Upfront and Breakwater caused a number of Loot Crate's vendors, including Federal Express, to insist on prepayment.  Consequently, Loot Crate's shipments were delayed until it could accumulate the cash necessary to pay in advance for needed shipments.

127.    In late November and early December 2017, Loot Crate continued to seek additional debt financing, entering into further negotiations with BioWorld that culminated in a new proposal for debt financing from BioWorld (the "***New BioWorld Proposal***").

128.    BioWorld thus remained a viable financing alternative in November 2017 that the Board could have pursued absent Upfront and Breakwater's continued obstruction.

129.    Regardless, and given his own conflicted interest, Suster insisted that the A-2 Proposal was preferable to the New BioWorld Proposal and that Loot Crate should pursue equity financing, rather than pure debt financing.

130.    In email exchanges Bettinelli and Mansour agreed that both equity and debt options were valid "options worth pursuit."

131.   Upfront and Breakwater did not oppose debt financing for the company; they simply opposed debt financing for the company that was provided by anyone other than Upfront and Breakwater and blocked any effort by Loot Crate to secure such third-party financing.

132.   On December 3, 2017, Suster sent an email to Davis and the other Board members, stating:

> you completing the Bio World deal against our interests and against my will as a Director and as a shareholder will possibly lead to years of public legal battles between us that will costs us each millions and lead us to both spend countless hours of non-productive time that may damage reputations and won't benefit any of us. I don't want to spend my time on this. You shouldn't want to spend your time like you have had to in the past 30 days and a legal battle will be even worse. It's not good for either of us.

133.   Suster sent similar communications during this time threatening to commence litigation against Davis and the Board and to bankrupt the company.

134.   Suster also threatened that, in a Loot Crate bankruptcy, Breakwater would "jam in a DIP loan," and the company would have no option but to accept super-priority debtor in possession financing from Upfront and Breakwater.

135.   On December 4, 2017, Davis explained Suster's misconduct to the Board,

> It is extremely unfortunate that Mark, Upfront's designated director, has decided that his interest in continuing pushing for a financing would benefit Upfront to the detriment of the Company and the great majority of its shareholders, is superior to his fiduciary duty of loyalty to the Company. That is the only reason I can see for why he would send a communication which (a) ignores/misstates the Company's current financial state, (b) places the Company's efforts to obtain a forbearance from its current lender, Breakwater, at great risk, and (c) makes statements and accusations that are not accurate but will, just

27

by their being made, create difficulties for the Company's efforts to either go public itself or be acquired by a public company. I am advised by counsel that when a director takes steps such as these to try to put a company in jeopardy just so the director can, through a self-interested transaction, "save the company," that is a direct breach of the director 's fiduciary duty.

136.   Davis ended his email by stating, "Mark is advocating for a transaction that would benefit Upfront (on whose behalf he is acting) and likely himself, personally."

137.   To remove any doubt of Suster's allegiances and disloyalty to Loot Crate, on December 25, 2017, Suster wrote an email to himself with the subject line "Business Objectives Regarding Loot Crate" in which he stated:

> We [Upfront] have $12.75 million invested in the company.  Our primary goal is to recover as much of this as possible, in the shortest period of time, while spending the least possible to recover it. . . .  We theoretically have the ability to block more board appointments (like Bioworld board seat) and block issuances of new equity except that Dendera knows how to structure deals around our rights (debt from Bioworld, convertible note proposal, which is senior to us and can convert later … need to understand ability to block this. . . .  We believe that Dendera will construct a financing structure that makes it harder for Upfront to make money.  Upfront still has a reasonable chance of financial recovery in a future sale if it's $50 million or greater.

138.   Two hours later, Suster sent a "Christmas Peace Offering" to Davis deceptively hiding Suster's actual motives to protect Upfront at Loot Crate's expense.  The "Christmas Peace Offering" was nothing more than a demand to give Suster and Upfront everything it wanted and, in return, for Upfront to agree to give nothing.  Suster ended his email to Davis by writing, "[w]e hope you will stop to consider a peace offering before we go off to war.  Our expectation is that we hear back from you today, December 25th."

139. Upon information and belief, Suster and Upfront considered one of Loot Crates' advisors, Dendera (and their inability to control Dendera), to be a formidable foil to Upfront's interests.

## G. Suster Takes His Bat and Ball and Goes Home, Refusing to Attend Board Meetings to Avoid the Necessary Quorum

140. Knowing that Upfront's rights as a preferred shareholder could not block the incurrence of debt, Suster instead refused to attend that and other Board meetings in order to deprive the Board of achieving the necessary quorum to act.

141. During this time period, the Board remained deadlocked on financing matters and other business matters because of Upfront's and Breakwater's improper and disloyal actions, tactics, and overall scheme.

142. To break the deadlock and avoid Loot Crate's imminent financial collapse, on December 8, 2017, Davis, as majority shareholder, removed Kreiz from the Board and appointed Alex Zyngier to replace Kreiz as the common shareholder's Board designee and an independent director with extensive turnaround experience.

143. Prior to the removal of Kreiz and appointment of Zyngier, Loot Crate consulted on the proper corporate formalities and requirements with Richards, Layton, & Finger, PA, a preeminent Delaware firm known for its expertise in corporate governance.

144. Suster refused to accept Zyngier's appointment as an independent director.

145. Shortly after Kreiz's replacement, Boyle resigned. Upon information and belief, Boyle resigned because of the litigiousness of Upfront and Breakwater and the ensuing strife this had created on the Board.

146. On December 11, 2017, Upfront, through counsel, sent a letter to the Board demanding an independent investigation into a variety of matters, including Loot Crate's refusal to consummate the A-2 Proposal. Upon information and belief, the letter was not sent with the goal of actually

prompting the requested investigation, but only to further delay Loot Crate's progress in obtaining financing from BioWorld and thereby compel Loot Crate to consummate the A-2 Proposal.

147.   On December 12, 2017, Loot Crate called another board meeting to, among other things, receive comments on the New BioWorld Proposal term sheet.

148.   Suster again refused to attend the board meeting, thus denying the Board the ability to form a quorum.

149.   In a contemporaneous email, Suster complained to the Board about Kreiz's removal and demanded Kreiz's reinstatement.

150.   On December 13, 2017, Upfront, through counsel, sent a letter to Davis, complaining that Kreiz's removal was not permitted and demanding his reinstatement.

151.   At the same time, Suster sent emails to the Board echoing the complaints in the letter from Upfront's counsel.

152.   On December 13, 2017, Loot Crate again called for a Board meeting, and Suster again declined to attend.

153.   Suster knew exactly what he was doing, what the results would be, and thereby acted with actual intent to protect Upfront at the expense of Loot Crate.  As confirmed in Suster's emails, on December 13, 2017, Suster wrote, "I will not attend the board meeting scheduled for later today.  This means that there will be no quorum (as at most only 2 of 5 authorized directors will be present) and the Board will therefore be unable to pass any valid resolutions."

154.   On December 19, 2017, Loot Crate again called for a Board meeting, this time to address the New BioWorld Proposal and other financing, and also to address general Loot Crate operations and the investigation that Upfront and Suster had requested.  Prior to the meeting, Loot Crate even circulated a proposed unanimous written consent to allow the independent investigation demanded by Upfront to begin.

155.     Regardless, Suster again refused to attend the Board meeting and refused to sign the unanimous written consent that would have authorized the independent investigation that he and Upfront previously demanded.

156.     On December 20, 2017, Loot Crate again called for a Board meeting and Suster refused to attend.

157.     On December 21, 2017, Loot Crate, through counsel, sent a letter to Upfront's counsel, stating that Loot Crate intended to pursue the independent investigation requested by Upfront, but could not do so because Suster had both failed to attend the last four duly-noticed Board meetings and had declined to sign the proposed unanimous written consent that would have permitted the requested investigation to begin.

158.     By engaging in a letter writing campaign against the Board and CEO and actively working to deny the Board the quorum necessary for it to conduct business, Upfront and Breakwater's concerted actions delayed Loot Crate's consideration and potential consummation of the New BioWorld Proposal or any other financing transaction proposed by any party other than Upfront and Breakwater.

159.     Eventually, Upfront's and Breakwater's tactics achieved their goal.  Despite spending close to two months of time and effort to advance the financing transaction, BioWorld withdrew its proposals.

**H.     Upfront and Breakwater Use Obstructionist Tactics to Maintain Control and Assure Loot Crate's Demise.**

160.     On January 4, 2018, Suster resigned from the Board shortly before the commencement of a duly scheduled Board meeting.

161.     Suster's reasons for his resignation demonstrate his breach of the duty of loyalty, including his intent to protect preferred stockholders like Upfront at the expense of common shareholders.  On January 13, 2018, Suster informed an investor that he resigned because, in Suster's mind, the removal of Ynon was "against the ***best interests of preferred stockholders***." [emphasis added].

162.    Suster's resignation also furthered Upfront's interest at Loot Crate's expense, including by (i) creating uncertainty around the formation of a quorum so that the legitimacy of decisions made at the January 4 meeting and thereafter could be challenged; and (ii) allowing Upfront the ability to sue the company and the Board without the risk of claims against Suster or Upfront for breaches of loyalty associated with commencing a lawsuit.

163.    In fact, in January 2018, Mansour confirmed to Davis that Suster stepped down from the board in preparation for filing a lawsuit.

164.    Although Suster was no longer on the Board, over the next few months, Upfront and Breakwater used Breakwater's leverage as Loot Crate's lender to obtain control of the Board.   Simultaneously, Breakwater improperly utilized its position to force Loot Crate to hand over the business.

165.    On February 9, 2018, Breakwater and Loot Crate entered into an initial forbearance agreement.   However, that agreement was not fully consummated because the reorganization of Loot Crate's holding company that was required by Breakwater did not occur until March 21, 2018.

166.    On May 8, 2018, Breakwater and Loot Crate entered into a second forbearance agreement (the "***May 2018 Forbearance***") that granted Breakwater the right to a $2 million original issue discount ("***OID***") on the 60th day following the effective date of the forbearance (the "***Breakwater Trigger Date***") that would be reduced to $1 million if the Breakwater Loan was refinanced by September 30, 2018.

167.    In addition, the May 2018 Forbearance permitted Breakwater the right to appoint one designee to the Board and also required the creation of a Strategic Transaction Committee comprising two independent directors and Mansour, who was Breakwater's Board designee under the forbearance agreement.

168.    The May 2018 Forbearance also required Loot Crate to raise $3 million of subordinated debt or equity in a form and substance satisfactory to Breakwater, in its sole discretion.   If Loot Crate failed to raise the $3 million of junior capital within 60 days, the Board would expand to seven members and Breakwater would have the right to appoint a majority of the

members of both the expanded board and the Strategic Transaction Committee.

169. At roughly the same time it was negotiating the May 2018 Forbearance, Loot Crate was negotiating the terms of a letter of intent with Atalaya Capital Management ("*Atalaya*") to provide Loot Crate with a new loan facility that would both repay Breakwater and offer Loot Crate some incremental liquidity.

170. At the time, Loot Crate's goal was to refinance Breakwater before the Breakwater Trigger Date to avoid the added financial burden of the full $2 million OID.

171. Loot Crate and Atalaya executed the letter of intent (the "*Atalaya Letter of Intent*") on May 9, 2018, the day after the execution of the May 2018 Forbearance.

172. In late May 2018, Atalaya's principal, Matt Spiro ("*Spiro*"), emailed his contact at Upfront, Kobie Fuller, to request a meeting with Suster in connection with Atalaya's due diligence efforts for its financing commitment. When Kiber received word of this inquiry, she immediately sought to protect Upfront's interests over Loot Crate's interests. On May 22, 2018, Kiber wrote Fuller, "either they [Atalaya] are proposing something that Breakwater won't approve because it requires them to roll over a portion of their debt or it's a structure that *would likely not end well for us*."

173. Accordingly, Suster, on behalf of Upfront, attempted to poison Atalaya's financing efforts. In May 2018, Amdani—Mansour's right-hand man and future Loot Crate director—summarized Suster's efforts to torpedo the deal by directly contacting Atalaya and alleging that Loot Crate's management was not trustworthy as well as threatening litigation if the deal moved forward.

174. Upon information and belief, following Suster's threat to Spiro, Atalaya notified Loot Crate that it would no longer provide the financing in the face of litigation risk posed by Upfront and therefore intended to withdraw its offer.

175.    After learning of Suster's, Kibler's and Upfront's efforts to interfere with the financing efforts, Loot Crate's counsel sent Upfront's counsel a letter on May 26, 2018 demanding that Upfront cease and desist from any further interference.

176.    In response, Suster referred to the letter as "baseless and completely & verifiably inaccurate and untrue." Among other things, Suster represented that Upfront, "would never and have never threatened legal action against Atalaya," and that he would "never and have never said to Atalaya that I would in any way block a debt financing."

177.    Yet, two months later, Suster did exactly what he said he would not do: threaten litigation against Atalaya. On July 31, 2018, Suster wrote to Spiro, "I hear rumblings that you are close to completing a deal. It is being done with a structure designed to avoid shareholder approval. We have both a litigator and Delaware counsel who make it clear we have a strong case to challenge and to hold all parties involved responsible for knowingly subverting our rights." Further, "I know you guys have lawyers saying you can ram this through. I'm sure they're telling you it's not black and white. . . . But we certainly will not be intentionally screwed by you and the company and simply roll over."

178.    Upon information and belief, although Loot Crate was able to persuade Atalaya not to withdraw, Atalaya only agreed to continue negotiations based upon significantly increased pricing and other terms to account for the litigation risk of providing the loan.

179.    On June 5, 2018, Loot Crate delivered a signed term sheet to Breakwater for $3.2 million of subordinated note financing by South River Capital, LLC ("*South River*") to meet Loot Crate's continuing working capital needs (the "*South River Proposal*").

180.    Breakwater rejected the South River Proposal, citing five requirements that the South River Proposal did not address or satisfy.

181.    Loot Crate worked with South River to address these issues and, on June 16, 2018, delivered a second signed term sheet from South River that resolved all five of Breakwater's enumerated issues.

182.   Breakwater nevertheless rejected this revised term sheet on the alleged basis that it still failed to satisfy the five enumerated issues, but did not provide any explanation as to the defects allegedly remaining.

183.   Between June 16 and 19, 2018, Loot Crate's independent directors made multiple efforts to demonstrate to Breakwater that the five enumerated issues had in fact been resolved.

184.   For example, one of Breakwater's five enumerated requirements was that the South River debt had to be "deeply subordinated." Accordingly, the South River term sheet included customary term sheet language providing for the subordination of the proposed South River loan to the Breakwater Loan on customary terms to be provided in definitive documents acceptable to Breakwater.

185.   Despite these attempts to resolve Breakwater's complaints with the South River Proposal, Breakwater refused to engage in further discussions.

186.   On June 21, 2018, Suster once again re-inserted himself to try to derail the South River Proposal by sending an email to the board comparing the South River Proposal with a proposal purportedly made by Upfront in 2017.  In response, Davis reminded Suster, "[Loot Crate] doesn't disagree we would have performed better with a +$10mm in equity financing in November, we disagreed with a full change of control, $78mm of total liquidation preference, and the pricing you set.  We also would have performed better without accruing $3mm in legal fees."

187.   At the June 22, 2018 Board meeting called to consider the approval of the South River Proposal, Mansour voted against the proposed financing rather than recusing himself from the vote.

188.   At the time of the June 22 Board meeting, Breakwater had a clear and express interest in the failure of the South River Proposal because Loot Crate's inability to obtain additional financing would ultimately trigger the full $2 million OID accrual and Breakwater's alleged right to Board control on the terms set forth in the May 2018 Forbearance.

189. Mansour and Breakwater knew that the funding under the South River Proposal was a necessary condition to consummation of the Atalaya financing.

190. On June 28, 2018, Spiro attempted to engage Mansour to reach a resolution with Breakwater. Mansour declined and stated that he would be happy to partner with Atalaya "once [Breakwater] ha[s] secured equity interests."

191. On July 17, 2018, Breakwater sent Loot Crate a letter, through counsel, prematurely noticing a default under the forbearance agreement, thereby attempting to exercise its rights to the full OID and appointment of a majority of the Board while the company was attempting to finalize the transactions with Atalaya and South River.

192. Breakwater only agreed to back down from its premature effort after receiving a cease and desist letter from Loot Crate's counsel.

193. On July 23, 2018, Suster called Zyngier to advise that if Breakwater acquired majority control of the Board, Upfront would make a proposal to provide up to $7 million of equity financing.

194. As a result of the various delays in renegotiating the South River Proposal caused by the actions of Upfront and Breakwater, Loot Crate missed its 60-day deadline under the May 2018 Forbearance to raise the needed junior capital.

195. As a result, on July 24, 2018, Breakwater triggered its right to receive the full $2 million OID and appointed four new directors to the Board (Beckman, Geant, Kaczorowski, and Amdani), thereby giving Breakwater majority control of the Board.

196. Around the same time, Upfront appointed Kibler to refill the Upfront Board seat previously held by Suster.

I.     **Upfront and Breakwater Undermine Loot Crate through Meetings with Existing Management.**

197.   Throughout this time period, including leading up to and following the negotiations around the A-2 Proposal, Upfront and Breakwater had numerous communications with Loot Crate's existing and former management team, including holding several secret, undisclosed meetings.

198.   The purpose of these communications was to further Upfront's and Breakwater's own agendas to Loot Crate's detriment.

199.   In communications between and among Upfront directors, Breakwater representatives, and Loot Crate's existing and former management team, Upfront and Breakwater discussed prospective employment opportunities and equity compensation with these existing and former members of the Loot Crate management team in the event that Upfront and Breakwater were able to wrest control of the Board, including specific plans to oust and replace Davis as CEO.

200.   For example, in February 2017, Bettinelli admitted to an executive that Upfront and Breakwater were working behind the scenes on a scheme to ensure scenarios that benefitted Upfront and Breakwater over any others. Mansour confirmed Bettinelli's admissions along with Breakwater's active and consistent participation with current and former executives at Loot Crate to undermine the company. Specifically, Mansour and Bettinelli covertly discussed plans with Eric Chan to further their own interests while simultaneously lying and/or deceiving the CEO about what needed to occur for the company to succeed.

201.   Upfront and Breakwater routinely shared their plans and status of meetings with current and prior executives at Loot Crate, and confirmed their coordination with one another to achieve their goals at Loot Crate's expense. On November 6, 2017, Suster characterized Mansour a true partner in their schemes and regularly shared with Mansour his plans for meeting with numerous current and former executives at Loot Crate to get their way. On November 8, 2017, Suster emailed Eric Chan and Peter Lai concerning

Defendants' scheme to seize control of the company and place its own hand-picked officers in charge.

202.    Although Suster was a director of the time and Eric Chan was a former employee, Suster transparently shared Loot Crate's confidential information and strategy concerning potential organizational changes. Suster went so far as to make actual proposals to Eric Chan of what the company would offer in terms of a compensation package, offering "3% of the fully diluted share capital."  Sensing the inappropriateness of a director making unapproved offers to a future executive, Suster wrote to Chan on November 6, 2017 (in the midst of negotiating the A-2 Proposal), "These are HIGHLY confidential documents so I am obviously trusting you greatly through a FrieNDA.  I would love to work with you.  It's not risk free by [*sic*] my ass would be on the line as much as yours would be."

203.    At the same time these communications occurred, (i) the Upfront representatives were interested directors due to Upfront's participation in the A-2 Proposal; (ii) Breakwater was a shareholder and the company's senior secured lender with a vested interest in the consummation of the A-2 Proposal; and (iii) the current employees being courted by Upfront and Breakwater in these communications were the same individuals that were, in part, responsible for providing unbiased financial analysis and reporting to the Board.

### J.    Loot Crate Cannot Recover from Upfront and Breakwater's Serial Fiduciary Breaches.

204.    On July 25, 2018, with Breakwater holding control of a majority of the Loot Crate Board, Upfront proposed to lead a $7.5 million Series B financing to be closed in just three weeks.  The Breakwater proposal required the commitment of other parties, as well as Breakwater's commitment to restructure its debt.

205.    In late July 2018, however, Breakwater would not commit to permit the refinancing of its debt.

206.    On August 1, 2018, Upfront revised its offer in response to feedback from Loot Crate and the Board.

207. During the course of the ensuing Board meetings to discuss Loot Crate's pending financing proposals, including the Breakwater Series B financing proposal, neither Kibler nor the Breakwater Board members recused themselves from Board discussions.

208. Shortly before the scheduled closing of the Atalaya financing, Kibler and Upfront's general counsel called Spiro to persuade him that Atalaya should not move forward with its proposed transaction.

209. In the weeks prior to the Atalaya closing in August 2018, Upfront attempted to convince Atalaya to join with Upfront to complete an alternative transaction in which Upfront would provide equity capital and Atalaya would provide debt financing with minimal covenant protection and 5% interest.

210. Although Atalaya initially engaged in discussions with Upfront to see if a realistic deal could be achieved, it soon became apparent that Upfront would not negotiate reasonable debt terms.

211. In the Board meetings that followed, Kibler continued to refuse to recuse herself from any of the discussions involving the Upfront proposal and its comparison to the Atalaya and other financing proposals.

212. Even while a special committee of the Board moved to a closed-door session with special counsel to the Board and Loot Crate's counsel to evaluate the Upfront proposal against the Atalaya subordinated debt proposal, Kibler refused to recuse herself from most of the deliberation.

213. Kibler's disruptions of the Atalaya financing for the benefit of Upfront were clear breaches of her fiduciary duties to the company.

214. On August 6, 2018, Loot Crate finally closed the Atalaya and South River transactions.

215. On August 18, 2018, Breakwater's designees resigned from the Board.

216. Despite the success in closing the Atalaya and South River transactions, Loot Crate continued to struggle because the resulting

transactions still did not provide Loot Crate with sufficient working capital, and because the Atalaya debt was more expensive than originally proposed because of Atalaya's renegotiated terms in response to the added difficulties, delay, and litigation risks imposed by Upfront.

217.   In connection with the closing of the Atalaya and South River transactions, on August 6, 2018, Loot Crate paid Breakwater all amounts due and owing under the Loan Agreement, including the OID in the amount of $1,000,000.00 (the "*OID Payment*").

218.   While the August 2018 financing provided Loot Crate with a slight liquidity reprieve, the fees and expenses that had to be repaid to Breakwater—including $1 million of the OID—made this amount far less than expected and necessary to improve marketing and pay vendors.  As a result, Loot Crate continued to experience challenges with vendors after the transaction, resulting in difficulties with fulfilling orders due to missing custom items, causing subscriber chargebacks and cancellations.

219.   Likewise, because the financing provided less than the expected liquidity injection, Loot Crate's credit card processor began withholding funds from Loot Crate.  Between marketing shortfalls, vendor pressure, and credit card withholdings, Loot Crate's liquidity issues began to worsen each passing week and month.

220.   In July 2019, Breakwater, Upfront, and Atalaya engaged in discussions regarding the potential acquisition of Loot Crate by the three of them through a chapter 11 bankruptcy reorganization.

221.   Initially, their discussions contemplated that Upfront and Breakwater would each own 40% of the equity of a reorganized Loot Crate, and Atalaya would own the remaining 20% and have its outstanding loans to Loot Crate assumed by the reorganized Loot Crate post-bankruptcy.

222.   Ultimately, Upfront withdrew from the transaction.

223.   Although Kibler was still a member of the Board at that time, she never disclosed the occurrence of, or the content of, these discussions to the Board.

40

224.   By this point, the damage to Loot Crate caused by the Defendants' collusive, obstructionist acts during Loot Crate's 2017 and 2018 refinancing efforts was done.   The company was trapped in a negative financial cycle, with each negative event causing other negative events, again and again, and liquidity problems continued.

225.   On August 11 and 12, 2019 (the "***Petition Date***"), the four Loot Crate entities each sought bankruptcy protection by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.   Because of Defendants' misconduct, the enterprise value of the company fell to zero and its shares were worthless.

<u>**COUNT I**</u>
**Breach of Fiduciary Duty (Against All Defendants)**

226.   Plaintiff realleges and incorporate by reference each of the allegations contained in the preceding paragraphs of this complaint as though fully set forth herein.

227.   The individual defendants served as directors during the following time periods:

| Defendant | Entity | Dates as Director |
|---|---|---|
| Bettinelli | Upfront | May 2016 – October 2017 |
| Suster | Upfront | October 2017 – January 2018 |
| Kibler | Upfront | July 2018 – July 2019 |
| Mansour | Breakwater | Director: May 2018 – August 2018  Observer: June 2016 – May 2018 |
| Amdani | Breakwater | July 2018 – August 2018 |
| Beckman | Breakwater | July 2018 – August 2018 |
| Geant | Breakwater | July 2018 – August 2018 |

| Kaczorowski | Breakwater | July 2018 – August 2018 |

228.    At all relevant times, Defendant Upfront exercised actual and pervasive control over Loot Crate and its governance apparatus through its active coordination and scheming with Breakwater, which placed Upfront in a position no different than if Upfront had majority voting control.  Between the two of them, Upfront and Breakwater held a majority (55%) of the issued and outstanding Series A Preferred Stock.  The Series A Preferred Stock provided certain rights, preferences, privileges, and restrictions in favor of Upfront and Breakwater involving dividends, liquidation preferences, conversion rights, and voting rights.  Moreover, Loot Crate was unable to take certain actions (such as increasing or decreasing the number of authorized common or preferred shares and/or changing the number of directors) without obtaining an affirmative vote or written consent of a majority of the voting power of the Preferred Stock.

229.    Additionally, Upfront maintained control over the Board by exercising its right to designate one Board member (such as Bettinelli, Suster, and Kibler), and by influencing and forcing the appointment of purportedly "independent" directors that Upfront knew would do Upfront's bidding rather than Loot Crate (such as Ynon Kreiz and Terry Boyle).  Thus, Upfront—through Bettinelli, Suster, and Kibler—used their relationships with particular directors such as Kreiz and Boyle to compromise the disinterestedness and independence of the Board in connection with the transactions described herein.  Upfront further utilized and coordinated with Breakwater to ensure purportedly "independent" directors were appointed to the Board.

230.    Upfront's actual control also included developing the Playbook in coordination with Breakwater to suffocate Loot Crate and to block or restrict other, more advantageous, options for financing and raising capital.

231.    Upfront—through Suster—further exercised control over Loot Crate by refusing to attend meetings to preclude the existence of a quorum.

As confirmed in Suster's emails, on December 13, 2017, Suster wrote, "I will not attend the board meeting scheduled for later today.  This means that there will be no quorum (as at most only 2 of 5 authorized directors will be present) and the Board will therefore be unable to pass any valid resolutions."

232.    To exercise more control, Upfront—through Suster and Kibler—used its position and relationships in the industry to attempt to convince Atalaya and/or South River from completing its financing proposals, including by threatening litigation.

233.    Upfront—through Bettinelli, Suster, and Kibler—also held secret meetings with current and/or former Loot Crate employees and executives.  Upfront discussed confidential company information with these employees and devised schemes to replace current management (without informing management even though they were members of the Board).

234.    Through the confluence of these multiple sources and instances of control, Upfront exercised actual control over Loot Crate.  Thus, at all relevant times, Upfront owed Loot Crate and each Loot Crate shareholder the fiduciary duties of due care and loyalty, and good faith and candor.

235.    At all relevant times, Defendant Breakwater exercised actual and pervasive control over Loot Crate and its governance apparatus through its active coordination and scheming with Upfront, which placed Breakwater in a position no different than if Breakwater had majority voting control.  Between the two of them, Upfront and Breakwater held a majority (55%) of the issued and outstanding Series A Preferred Stock.  The Series A Preferred Stock provided certain rights, preferences, privileges, and restrictions in favor of Upfront and Breakwater involving dividends, liquidation preferences, conversion rights, and voting rights.  Moreover, Loot Crate was unable to take certain actions (such as increasing or decreasing the number of authorized common or preferred shares and/or changing the number of directors) without obtaining an affirmative vote or written consent of a majority of the voting power of the Preferred Stock.

236.    Additionally, Breakwater maintained control over the Board by exercising its right to initially designate a Board observer (Mansour), and

subsequently to designate directors on the Board (Mansour, Amdani, Beckman, Geant, and Kaczorowski). Although only a Board observer until 2018, Breakwater—through the Breakwater Defendants—texted and coordinated with the Upfront Defendants to obtain company information and to influence and force the appointment of purportedly "independent" directors that Breakwater knew would do Breakwater's bidding rather than Loot Crate (such as Ynon Kreiz and Terry Boyle). Thus, the Breakwater Defendants routinely texted and emailed with one another and, at times, with Upfront to ensure that Breakwater's interests were protected at Loot Crate's expense.

237. Breakwater's actual control also included developing the Playbook in coordination with Upfront to suffocate Loot Crate and to block or restrict other, more advantageous, options for financing and raising capital.

238. Further, Breakwater exercised its influence as lender and shareholder to block and/or restrict Loot Crate's ability to obtain financing from South River, including by refusing to consent to the financing even though the financing satisfied all requirements imposed by Breakwater. By blocking the financing, Breakwater utilized its control to declare that it was entitled to the $2 million OID.

239. Through the confluence of these multiple sources and instances of control, Breakwater exercised actual control over Loot Crate. Thus, Breakwater owed Loot Crate and each Loot Crate shareholder the fiduciary duties of due care and loyalty, and good faith and candor.

240. In accordance with the dates reflected in the chart above, each of Defendants Suster, Kibler, Bettinelli, Mansour, Amdani, Beckman, Geant, and Kaczorowski was a Loot Crate director, and owed Loot Crate and each Loot Crate shareholder the fiduciary duties of due care and loyalty, and good faith and candor.

241. The following defendants breached their obligations and duties owed to Loot Crate and its shareholders by, among other things:

(a)     intentionally creating a cash crisis within Loot Crate for the purpose of reinforcing Upfront and Breakwater's effective control over Loot Crate (Bettinelli, Suster, Mansour);

(b)     preventing the Board from considering or seeking out alternative funding options, rendering the Board incapable of negotiating meaningfully in connection with the A-2, BioWorld, or Management Proposals (Bettinelli, Suster, Mansour);

(c)     aggressively and threateningly attempting to coerce the Board under duress into palpably unfavorable funding terms that would benefit Upfront and Breakwater at Loot Crate's expense (Bettinelli, Suster, Mansour);

(d)     intentionally sabotaging Loot Crate's efforts to comply under the Breakwater forbearance agreement in order to wrest Board control from Davis and other independent directors (Mansour, Kibler, Amdani, Beckman, Geant, Kaczorowski)

(e)     surreptitiously manipulating Loot Crate's financing efforts, including through: (i) creating and executing the Playbook, a secret and coordinated plan among ostensibly independent directors, interested directors, and dominant shareholders to force financing on Loot Crate that would solely benefit Upfront and Breakwater; and (ii) having secret meetings and communications with Loot Crate's former and existing management to sow seeds of disloyalty and apply additional pressure on Davis to act against his fiduciary duties (Bettinelli, Suster, Mansour);

(f)     failing to disclose dual loyalties (Bettinelli, Suster, Kibler, Mansour); and

(g)     using serial threats of litigation and other threats and antagonistic behavior directed at Davis, the Board, Loot Crate management, and other Loot Crate shareholders (Bettinelli, Suster, Mansour).

242.    These breaches of their fiduciary duties and the direct and reasonably foreseeable consequences of these breaches caused substantial damage to Loot Crate and its shareholders, and substantially benefitted Upfront and Breakwater.

243.   The Defendants' misconduct was perpetrated in bad faith and violated their respective fiduciary duties of loyalty and otherwise falls outside the exculpatory scope of 8 Del. C. § 102(b)(7).  Given the lack of independence and numerous instances of disloyalty, the entire fairness doctrine applies to the matters in dispute.

## COUNT II
### Aiding and Abetting Breach of Fiduciary Duty (Against
### All Defendants)

244.   Plaintiff realleges and incorporate by reference each of the allegations contained in the preceding paragraphs of this complaint as though fully set forth herein.

245.   At all relevant times, Defendant Upfront exercised effective control over Loot Crate and its governance apparatus through its active coordination and scheming with Breakwater, which placed Upfront in a position no different than if Upfront had majority voting control.

246.   At all relevant times, Upfront owed Loot Crate and each Loot Crate shareholder the fiduciary duties of due care and loyalty, and good faith and candor.

247.   At all relevant times, Breakwater exercised effective control over Loot Crate and its governance apparatus through its active coordination and scheming with Upfront and through the power it wielded pursuant to its role as Loot Crate's senior secured lender.  This placed Breakwater in a position no different than if Breakwater had majority voting control.

248.   At all relevant times, Breakwater owed Loot Crate and each Loot Crate shareholder the fiduciary duties of due care and loyalty, and good faith and candor.

249.   In accordance with the dates reflected in the chart above, each of Defendants Suster, Kibler, Bettinelli, Mansour, Amdani, Beckman, Geant, and Kaczorowski served as a Loot Crate director, and owed Loot Crate and each Loot Crate shareholder the fiduciary duties of due care and loyalty, and good faith and candor at various times identified above.

250. Mansour, Amdani, Beckman, Geant, and Kaczorowski individually or through Breakwater knowingly and intentionally worked in concert with Upfront and its representatives to assist or encourage Upfront, Suster, Kibler, and Bettinelli to breach their fiduciary duties to Loot Crate in the ways enumerated in Count I above.

251. Bettinelli, Suster, and Kibler individually or through Upfront knowingly and intentionally worked in concert with Breakwater and its representatives to assist or encourage Breakwater, Mansour, Amdani, Beckman, Geant, and Kaczorowski to breach their fiduciary duties to Loot Crate in the ways enumerated in Count I above.

252. Based on internal email and text communications during the relevant time period, each of Bettinelli, Suster, and Kibler knowingly and intentionally worked in concert with one another when one of them was on the Board to breach their fiduciary duties to Loot Crate in the ways enumerated in Count I above. For example, while Bettinelli was on the Board, Suster and Kibler intentionally worked in concert with him to aid and abet him in breaching his fiduciary duties.

253. Based on internal email and text communications during the relevant timer period, each of Mansour, Amdani, Beckman, Geant, and Kaczorowski knowingly and intentionally worked in concert with one another when one of them was on the Board to breach their fiduciary duties to Loot Crate in the ways enumerated in Count I above. For example, while Mansour was on the Board, Amdani, Beckman, Geant, and Kaczorowski intentionally worked in concert with him to aid and abet him in breaching his fiduciary duties. For example, in one text message conversation from April 2018, Amdani informed Mansour that Beckman was against a proposal being considered at Loot Crate. Specifically, Beckman "was a pretty quick no on dendera's proposal. His initial thought was that I call Palmer and say, 'Eric said…Are you fucking kidding me? We bend over backwards and allow you to bring the proceeds in the form of debt and you have the audacity to ask us to subordinate any of our forbearance shares? Just hand us the keys to the business.'" Amdani finished his text by asking Mansour how he wanted to proceed. Similarly, text messages by and between Mansour, Kaczorowski, and Beckman in June 2018 reflect discussions and strategy with respect to

delaying the Atalaya financing in order to protect Breakwater's interests. Mansour repeatedly informed Beckman, Kaczorowski, Geant, and Amdani of Upfront's plans and inquired of their thoughts on various proposals in connection with protecting Breakwater's interests at Loot Crate's expense. These breaches, and the direct and reasonably foreseeable consequences of these breaches, caused substantial damage to Loot Crate and its shareholders.

## COUNT III
### Breach of the Implied Covenant of Good Faith and Fair Dealing
### (Against Upfront and Breakwater)

254.    Plaintiff realleges and incorporate by reference each of the allegations contained in the preceding paragraphs of this complaint as though fully set forth herein.

255.    Loot Crate entered into the Private Equity Agreements and the A-2 Term Sheet with Upfront and Breakwater.  Section 8.2 of that certain *Series A Preferred Stock Purchase Agreement* states that the agreement "shall be governed in all respect by the internal laws of the State of California, without reference to principles of conflicts of law."  Even if Delaware law applies to this claim, Delaware similarly recognizes a claim for breach of the implied covenant of good faith and fair dealing

256.    Loot Crate further entered into the Loan Agreement and May 2018 Forbearance Agreement with Breakwater.

257.    Loot Crate performed all or substantially all of the things these contracts required it to do and all conditions for Upfront's and Breakwater's performance occurred.

258.    Upfront and Breakwater unfairly interfered with Loot Crate's right to receive the benefits of these contracts by preventing the consideration or pursuit of alternative funding/financing options, threatening coercing Loot Crate to accept more onerous financing terms than needed, and intentionally sabotaging Loot Crate's efforts to comply under the May 2018 Forbearance Agreement in order to obtain further control from Davis and other Board members.

259.   Upfront's and Breakwater's misconduct breached the implied covenant of good faith and fair dealing that governed these contracts, causing substantial damage to Loot Crate and its shareholders.

## COUNT IV
### Civil Conspiracy (Against All Defendants)

260.   Plaintiff realleges and incorporate by reference each of the allegations contained in the preceding paragraphs of this complaint as though fully set forth herein.

261.   During all relevant times, Defendants combined and coordinated their actions, inactions, and misconduct, and unlawful activity. Defendants' conspiracy is shown, for example, in the sharing of the Carry the Water Email and the exchange and coordination surrounding the Playbook.  Defendants regularly and routinely texted or emailed one another concerning their strategies with respect to Loot Crate and how they could work together to further their own interests at the expense of Loot Crate's interest.

262.   In accordance with the dates reflected in the chart above, each of Defendants Suster, Kibler, Bettinelli, Mansour, Amdani, Beckman, Geant, and Kaczorowski served as a Loot Crate director, and owed Loot Crate and each Loot Crate shareholder the fiduciary duties of due care and loyalty, and good faith and candor at various times identified above.

263.   Mansour, Amdani, Beckman, Geant, and Kaczorowski individually or through Breakwater knowingly and intentionally worked in concert with Upfront and its representatives to assist or encourage Upfront, Suster, Kibler, and Bettinelli to breach their fiduciary duties to Loot Crate in the ways enumerated in Count I above.

264.   Bettinelli, Suster, and Kibler individually or through Upfront knowingly and intentionally worked in concert with Breakwater and its representatives to assist or encourage Breakwater, Mansour, Amdani, Beckman, Geant, and Kaczorowski to breach their fiduciary duties to Loot Crate in the ways enumerated in Count I above.

265.    Based on internal email and text communications during the relevant time period, each of Bettinelli, Suster, and Kibler knowingly and intentionally worked in concert with one another when one of them was on the Board to breach their fiduciary duties to Loot Crate in the ways enumerated in Count I above.  For example, while Bettinelli was on the Board, Suster and Kibler intentionally worked in concert with him to aid and abet him in breaching his fiduciary duties.

266.    Based on internal email and text communications during the relevant timer period, each of Mansour, Amdani, Beckman, Geant, and Kaczorowski knowingly and intentionally worked in concert with one another when one of them was on the Board to breach their fiduciary duties to Loot Crate in the ways enumerated in Count I above.  For example, while Mansour was on the Board, Amdani, Beckman, Geant, and Kaczorowski intentionally worked in concert with him to aid and abet him in breaching his fiduciary duties.  For example, in one text message conversation from April 2018, Amdani informed Mansour that Beckman was against a proposal being considered at Loot Crate.  Specifically, Beckman "was a pretty quick no on dendera's proposal.  His initial thought was that I call Palmer and say, 'Eric said…Are you fucking kidding me?  We bend over backwards and allow you to bring the proceeds in the form of debt and you have the audacity to ask us to subordinate any of our forbearance shares?  Just hand us the keys to the business.'"  Amdani finished his text by asking Mansour how he wanted to proceed.  Similarly, text messages by and between Mansour, Kaczorowski, and Beckman in June 2018 reflect discussions and strategy with respect to delaying the Atalaya financing in order to protect Breakwater's interests.  Mansour repeatedly informed Beckman, Kaczorowski, Geant, and Amdani of Upfront's plans and inquired of their thoughts on various proposals in connection with protecting Breakwater's interests at Loot Crate's expense.  These breaches, and the direct and reasonably foreseeable consequences of these breaches, caused substantial damage to Loot Crate and its shareholders.

267.    Defendants' civil conspiracy caused substantial damage to Loot Crate and its shareholders.

## COUNT V
**Fraudulent Transfer – The OID**
**11 U.S.C. § 544(b); 6 Delaware Code §§ 1304(a) and 1307 (Against Breakwater)**

268.    Plaintiff realleges and incorporate by reference each of the allegations contained in the preceding paragraphs of this complaint as though fully set forth herein.

269.    Pursuant to section 544(b) of the Bankruptcy Code, a trustee may avoid any transfer of an interest of the debtor in property that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of the Bankruptcy Code.

270.    By order of this Court dated October 21, 2020 [Admin Case D.I. 714], the Committee was granted standing and authority to assert and prosecute the claims set forth herein on behalf of and for the benefit of the Debtors' estates.

271.    On May 8, 2018, Loot Crate and Breakwater entered into the May 2018 Forbearance whereby Loot Crate granted Breakwater the right to a $2 million OID via term loans that increased the total principal payment amount outstanding to Breakwater by $2 million.  Loot Crate paid and transferred the $1 million OID Payment to or for the benefit of Breakwater on August 6, 2018,[6] which is within four years before the Petition Date.

272.    Loot Crate received less than reasonably equivalent value in exchange for incurring the $2 million OID obligation and in exchange for making the OID Payment to Breakwater.

273.    At the time of the incurrence of the $2 million OID obligation and subsequent OID Payment, Loot Crate was engaged or about to engage in a business or a transaction for which Loot Crate's remaining assets were unreasonably small in relation to its business.

---

[6]    Due to delays in issuing wires, Loot Crate was not able to fully fund payments to Breakwater on the August 3, 2018 closing.  The remaining amounts, plus additional interest, were paid on August 6, 2018.

274.    At all relevant times, Loot Crate had one or more actual creditors holding unsecured claims allowable within the meanings of sections 502 and 544(b) of the Bankruptcy Code and section 1301 of Title 6 of the Delaware Code (the "**Delaware Code**").

275.    Accordingly, the OID Payment must be avoided as a fraudulent transfer in accordance with section 544(b) of the Bankruptcy Code and sections 1304(a) and section 1307 of the Delaware Code.

## COUNT VI
### Fraudulent Transfer – The OID
### 11 U.S.C. § 544(b); 6 Delaware Code §§ 1305 and 1307 (Against Breakwater)

276.    Plaintiff realleges and incorporate by reference each of the allegations contained in the preceding paragraphs of this complaint as though fully set forth herein.

277.    On or within four years before the Petition Date, the Debtors made one or more transfers of an interest of the Debtors in property to or for the benefit of Breakwater, including the $1 million OID Payment.

278.    The Debtors received less than reasonably equivalent value in exchange for the OID Payment.

279.    At the time of the OID Payment, Loot Crate was insolvent or became insolvent as a result of the OID Payment within the meaning of section 1305 of the Delaware Code.

280.    At all relevant times, Loot Crate had one or more actual creditors holding an unsecured claim allowable within the meanings of sections 502 and 544(b) of the Bankruptcy Code and section 1301 of the Delaware Code.

281.    Accordingly, the OID Payment must be avoided as a fraudulent transfer in accordance with section 544(b) of the Bankruptcy Code, and sections 1305 and 1307 of the Delaware Code.

## COUNT VII
### Fraudulent Transfer – The OID
### 11 U.S.C. § 548 (Against Breakwater)

282.   Plaintiff realleges and incorporate by reference each of the allegations contained in the preceding paragraphs of this complaint as though fully set forth herein.

283.   On or within two years before the Petition Date, the Debtors made one or more transfers of an interest of the Debtors in property to or for the benefit of Breakwater, including the $1 million OID Payment.

284.   The Debtors received less than reasonably equivalent value in exchange for the OID Payment.

285.   At the time the OID Payment was made, and as alleged above, each of the Debtors either (i) was insolvent on the date the OID Payment was made or became insolvent as a result of such transfer; (ii) was engaged in was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Loot Crate was an unreasonably small capital; or (iii) intended to incur, or believed that Loot Crate would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

286.   Accordingly, the OID Payment must be avoided as a fraudulent transfer in accordance with section 548 of the Bankruptcy Code.

## COUNT VIII
### Recovery of Avoided Transfers – The OID
### 11 U.S.C. § 550 (Against Breakwater)

287.   Plaintiff realleges and incorporate by reference each of the allegations contained in the preceding paragraphs of this complaint as though fully set forth herein.

288.   Pursuant to 11 U.S.C. § 550(a), Plaintiff is entitled to recover, for the benefit of the estate, the property transferred and avoided under

sections 544 and 548 of the Bankruptcy Code from the initial transferee of such transfer or the entity for whose benefit such transfer was made.

289.    Pursuant to § 550(a), Plaintiff is entitled to recover the value of any and all property transferred and avoided under section 548, plus interest thereon to the date of payment and the costs of this action from Breakwater as either initial transferee or subsequent transferee.

<div align="center">

**COUNT IX**
**Objection to Claims (Against All Defendants)**

</div>

290.    Plaintiff realleges and incorporate by reference each of the allegations contained in the preceding paragraphs of this complaint as though fully set forth herein.

291.    One or more of the Defendants assert claims against the estate based either on information provided in the Debtors' *Schedules of Assets and Liabilities* filed in the Chapter 11 Cases or asserted in one or more proofs of claim filed in the Chapter 11 Cases.

292.    In particular, Upfront filed a proof of claim asserting an unsecured claim against Old LC, Inc. in the amount of $250,000 (this and any other claim asserted by any Defendant against a Debtor, the "Defendants' Claims").

293.    Section 502(a) of the Bankruptcy Code states that "[a] claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest…objects." 11 U.S.C. § 502(a).

294.    Section 502(b) of the Bankruptcy Code states that, if an objection is made, then the Court must disallow any claim which is not enforceable against the debtor and property of the debtor." 11 U.S.C. § 502(b)(1).

295.    Pursuant to section 502(b)(1), Plaintiff objects to the allowance of the Defendants' Claims:

    a.  the Defendants' Claims do not represent an actual, authorized liability of any of the Debtors;

<div align="center">54</div>

b.  even if any part of any Defendants' Claim is enforceable, the Debtors are entitled to offset for amounts or credits due and owing by Defendants, including amounts owing for damages owed to the Debtors on account of one or more of the claims for relief identified herein;

c.  As authorized under section 502(d) of the Bankruptcy Code, any Defendants' Claims must be disallowed to the extent the corresponding Defendant is a transferee of a transfers avoidable under 11 U.S.C. § 548 and a person from whom property is recoverable under § 550.

296.  Accordingly, the Defendants' Claims must be disallowed in their entirety.

## DEMAND FOR JURY

297.  Pursuant to Federal Rule of Bankruptcy Procedure 9015 and Federal Rules of Civil Procedure 38, Plaintiff hereby demands a jury trial.

## RESERVATION OF RIGHTS

298.  In accordance with the Federal Rules of Bankruptcy Procedure and Federal Rules of Civil Procedure, the Committee reserves any and all rights to amend or otherwise supplement this Complaint with additional claims, parties, and allegations, including but not limited to additional claims for violation of the any party's breach of fiduciary duty, and avoidance and recovery of any transfers made to any defendant under sections 544, 547, 548, 549 and/or  550 or applicable non-bankruptcy law.

## RELIEF REQUESTED

WHEREFORE Plaintiffs demand judgment in their favor and request the following relief:

(a)  money damages to compensate in an amount of not less than $100 million for their losses and to restore enterprise value;

(b)     disgorgement of any amounts illicitly received by Defendants in connection with their misconduct;

(c)     entry of an order avoiding the OID Payment as a constructively fraudulent transfer and recovering the OID Payment from Breakwater;

(d)     entry of an order disallowing the Defendants' Claims; and

(e)     Such other and further relief, including legal costs and fees, as is just.

*[This space left intentionally blank.]*

Dated: February 5, 2021
Wilmington, Delaware

Respectfully submitted,

**MORRIS JAMES LLP**


*/s/ Jeffrey R. Waxman*
Jeffrey R. Waxman (DE Bar No. 4159)
Eric J. Monzo (DE Bar No. 5214)
Brya M. Keilson (DE Bar No. 4643)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
E-mail: jwaxman@morrisjames.com
E-mail: emonzo@morrisjames.com
E-mail: bkeilson@morrisjames.com

- and -

Joel B. Bailey, Esquire
Joshua L. Hedrick, Esquire
**HEDRICK KRING, PLLC**
1700 Pacific Avenue, Suite 4650
Dallas, Texas 75201
Telephone: (214) 880-9625
Facsimile: (214) 481-1844
E-mail: Josh@HedrickKring.com
E-mail: Joel@HedrickKring.com

- and -

Samuel M. Stricklin, Esquire
**STRICKLIN LAW FIRM, P.C.**
Palisade Central II
2435 North Central Expressway
Suite 1200
Richardson, Texas 75080
Telephone 972-2388687
E-mail: Sam.stricklin@stricklaw.pro

*Counsel for Plaintiff*

57

## CERTIFICATE OF SERVICE

I, Jeffrey R. Waxman, certify that I am, and at all times during the service of process was, not less than 18 years of age and not a party to the matter concerning which service of process was made. I further certify that the service of this amended complaint was made February 5, 2021 by:

☒    E-Mail Service: SEE ATTACHED LIST

☐    Personal Service: By leaving the process with defendant or with an officer or agent of defendant at:

☐    Residence Service: By leaving the process with the following adult at:

☐    Certified Mail Service on an Insured Depository Institution: By sending the process by certified mail addressed to the following officer of the defendant at:

       ☐    Publication: The defendant was served as follows: [Describe briefly]

☐    State Law: The defendant was served pursuant to the laws of the State of _____, as follows: [Describe briefly]

Under penalty of perjury, I declare that the foregoing is true and correct.

February 5, 2021                          */s/ Jeffrey R. Waxman* _____
Date                                       Signature

      Print Name: Jeffrey R. Waxman, Esq.

Business Address: 500 Delaware Avenue, Suite 1500

City: Wilmington      State: DE      Zip: 19801

## SERVICE LIST

Dean A. Ziehl, Esquire
Jeremy V. Richards, Esquire
Colin R. Robinson, Esquire
Pachulski Stang Ziehl & Jones LLP
919 North Market Street, 17th Floor
Wilmington, DE 19801
*dziehl@pszjlaw.com*
*jrichards@pszjlaw.com*
*crobinson@pszjlaw.com*

*Counsel for Upfront V, LP, Upfront GP V, LLC,*
*Mark Suster, Dana Kibler, and Gregory Bettinelli*

Craig A. Wolfe, Esquire
Jason R. Alderson, Esquire
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178-0060
*craig.wolfe@morganlewis.com*
*jason.alderson@morganlewis.com*

-and-

John V. Gorman, Esquire
Jody C. Barillare Esquire
Kelsey A. Bomar Esquire
Morgan, Lewis & Bockius LLP
The Nemours Building
1007 N. Orange Street, Suite 501
Wilmington, DE 19801
*john.gorman@morganlewis.com*
*jody.barillare@morganlewis.com*
*kelsey.bomar@morganlewis.com*

*Counsel for Breakwater Credit Opportunities Fund, L.P.,*
*Saif Mansour, Aamir Amdani, Eric Beckman,*
*Darrick Geant, and Joseph Kaczorowski*

12670007/1/134180-0001

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | Chapter 11 Case |
| | § | |
| Old LC, Inc., *et al.*[1] | § | Case No. 19-11791 (BLS) |
| | § | |
| Debtors. | § | Jointly Administered |

| | | |
|---|---|---|
| | § | |
| Official Committee of Unsecured Creditors | § | |
| of Old LC, Inc., et al., for and on behalf of | § | |
| the estates of Old LC, Inc., *et al.*; | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Adv. No. 20-51002 (BLS) |
| | § | |
| Upfront V, LP, Breakwater Credit | § | |
| Opportunities Fund, L.P.; Upfront GP V, | § | |
| LLC; Mark Suster; Dana Kibler; Gregory | § | |
| Bettinelli; Saif Mansour; Aamir Amdani; | § | |
| Eric Beckman; Darrick Geant; and Joseph | § | |
| Kaczorowski | § | |
| | § | |
| *Defendants.* | § | |

## PLAINTIFF'S UNOPPOSED MOTION TO SUBSTITUTE DEFENDANT SAIF MANSOUR'S EXECUTOR AS DEFENDANT

Pursuant to Rule 25 of the Federal Rules of Civil Procedure, made applicable to this proceeding by Rule 7025 of the Federal Rules of Bankruptcy Procedure, Plaintiff Official Committee of Unsecured Creditors of Old LC, Inc. ("**Plaintiff**") files this Unopposed Motion to Substitute Defendant Saif Mansour's Executor as Defendant (the "**Motion**"). As explained in Paragraph 7, this Motion is unopposed.  In support thereof, Plaintiff respectfully submits as follows:

---

[1]      The Debtors are the following four entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Old LC, Inc. (7119), Old LC Holdings, Inc., Old LCF, Inc., and Old LC Parent, Inc.  The Debtors' noticing address in these Chapter 11 cases is c/o Bryan Cave Leighton Paisner LLP, Attn: Mark I. Duedall, 1201 W. Peachtree Street, 14th Floor, Atlanta, Georgia 30309.

## BACKGROUND

1. On November 2, 2020, Plaintiff brought this action against a number of defendants, including Defendant Saif Mansour ("**Mansour**"). [D.I. 1]. Plaintiff's current pleading is the First Amended Complaint and Objection to Claims ("**First Amended Complaint**"). [D.I. 28].

2. On October 27, 2021, Mansour passed away, and counsel for Defendants Breakwater Credit Opportunities Fund, L.P., Saif Mansour, Aamir Amdani, Eric Beckman, Darrick Geant, and Joseph Kaczorowski filed a *Suggestion of Death* on November 5, 2021 ("**Suggestion of Death**"). [D.I. 113]. The Suggestion of Death did not identify a successor or representative of Mansour. *Id.*

3. By agreement of the parties [D.I. 121, 125], the Court twice extended the deadline to file a motion to substitute the executor of Mansour's estate or other proper party under Federal Rule of Civil Procedure 25. [D.I. 122, 126]. The current deadline to file a motion to substitute the executor of Mansour's estate or the proper party in the place of Mansour is April 7, 2022. [D.I. 126].

4. Since the Court last extended the deadline to substitute the executor of Mansour's estate or another proper party in the place of Mansour, Mansour's representative provided Plaintiff with Letters Testamentary. *See* Exhibit A. The Letters Testamentary, issued by the Superior Court of California, Los Angeles County, California on March 3, 2022, appoint Erika Mansour ("**Executor**") as the executor of Mansour's estate with full authority to act on the estate's behalf. *Id.* Pursuant to the Letters Testamentary, Executor commenced acting and is still acting in her capacity as executor for Mansour's estate.

5. Plaintiff has filed a Creditor's Claim in the proceeding in which Executor is probating Mansour's estate. *See* Exhibit B.

6.      Plaintiff now brings this Motion to substitute Executor in the place of Mansour.

7.      Executor's counsel has represented that Executor (i) has no objection to the Court substituting Erika Mansour, as Executor of the Estate of Saif Mansour, in place of Defendant Saif Mansour, while reserving all of her rights on substantive issues, and (ii) waives formal service of this Motion.

<u>BASIS FOR RELIEF REQUESTED</u>

8.      Under Federal Rule of Civil Procedure 25, made applicable to this case by Rule 7025 of the Federal Rules of Bankruptcy Procedure, the Court may order substitution of a proper party in the place of a party that dies during a pending suit. *See* FED. R. CIV. P. 25(a)(1). The threshold consideration is whether the claims against the decedent are extinguished. *Giles v. Campbell*, 698 F.3d 153, 155-56 (3d Cir. 2012). If the claims are not extinguished, then the Court looks to determine whether the successor is the property party. *In re Baycol Prod. Litig.*, 616 F.3d 778, 788 (8th Cir. 2010).

9.      First, none of the claims in the First Amended Complaint brought against Mansour were extinguished by Mansour's death. Both Delaware and California have broad survival statutes with limited exceptions, none of which is applicable to the claims against Mansour in the First Amended Complaint. *See* DEL. CODE ANN. tit. 10, § 3701; CAL. CIV. PROC. CODE § 377.20(a). Accordingly, the claims in the First Amended Complaint against Mansour survive his death and have not been extinguished.

10.     Second, Executor is the proper party to substitute in the place of Mansour. "In the typical case, the proper party [for substitution] would be 'the representative of the decedent's estate who has been appointed under state law.'" *In re Baycol Prod. Litig.*, 616 F.3d at 788. Pursuant to the Letters Testamentary, Executor has been appointed as the executor of Mansour's estate under

13550239.v1

the law of the State of California, making Exector a property party for substitution in the place of Mansour.  *See* Exhibit A.

<p style="text-align:center">**SERVICE**</p>

11.     Finally, all parties and non-parties must be served with this Motion as provided for in Rule 25(a)(3).  *See* FED. R. CIV. P. 25(a)(3).  All parties will be served with this Motion through electronic service on their counsel of record in compliance with Rule 5.  *See id.* (incorporating Federal Rule of Civil Procedure 5 for parties).  In addition, Plaintiff will request that Executor, who is a non-party, waive service under Rule 4(d).  *See id.* (incorporating Federal Rule of Civil Procedure 4 for non-parties).  Executor's counsel has indicated Executor will waive formal service.  Service pursuant to Rule 4 will confer personal jurisdiction in this Court over Executor.  *See Giles*, 698 F.3d at 158.  Although Rule 25 requires service of a notice of hearing, the Local Rules of this Court expressly provide that no hearing will be scheduled unless ordered otherwise.  *See* LOCAL R. BANK. D. DEL. 7007-3.  In the event the Court orders a hearing on the Motion, Plaintiff will serve Executor in compliance with Rule 4.

<p style="text-align:center">**CONCLUSION**</p>

For the foregoing reasons, Plaintiff respectfully requests that the Court enter an Order, a copy of which is attached hereto as Exhibit C, (i) granting the Motion, (ii) substituting Erika Mansour, in her capacity as Executor of the Estate of Saif Mansour, in place of Defendant Saif

Mansour, and (iii) granting to Plaintiff such other relief as is just and proper.

Dated: April 7, 2022
Wilmington, Delaware         Respectfully submitted,

        **MORRIS JAMES LLP**

        */s/ Jeffrey R. Waxman*
        Jeffrey R. Waxman (DE Bar No. 4159)
        Eric J. Monzo (DE Bar No. 5214)
        Brya M. Keilson (DE Bar No. 4643)
        500 Delaware Avenue, Suite 1500
        Wilmington, DE 19801
        Telephone: (302) 888-6800
        Facsimile: (302) 571-1750
        E-mail: jwaxman@morrisjames.com
        E-mail: emonzo@morrisjames.com
        E-mail: bkeilson@morrisjames.com

            -    and   -

        Joel B. Bailey, Esquire  (*proc hac vice*)
        Joshua L. Hedrick, Esquire (*proc hac vice*)
        Mark A. Fritsche, Esquire (*proc hac vice*)
        **HEDRICK KRING, PLLC**
        1700 Pacific Avenue, Suite 4650
        Dallas, Texas 75201
        Telephone: (214) 880-9625
        Facsimile:  (214) 481-1844
        E-mail: Josh@HedrickKring.com
        E-mail: Joel@HedrickKring.com
        E-Mail: Mark@HedrickKring.com

            -    and   -

        Samuel M. Stricklin, Esquire (*proc hac vice*)
        **STRICKLIN LAW FIRM, P.C.**
        Palisade Central II
        2435 North Central Expressway
        Suite 1200
        Richardson, Texas 75080
        Telephone 972-2388687
        E-mail: Sam.stricklin@stricklaw.pro

        *Counsel for Plaintiffs*

13550239.v1

# EXHIBIT A

DE-150

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, state bar number, and address): | TELEPHONE AND FAX NOS.: | FOR COURT USE ONLY |
|---|---|---|

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, state bar number, and address):
Rodney C. Lee (217840); Alexandra A. Letzel (280138)
LOEB & LOEB LLP
10100 Santa Monica, Blvd. Suite 2200
Los Angeles, CA 90067

TELEPHONE AND FAX NOS.:
310.282.2000
310.282.2200

ATTORNEY FOR (Name): Erika Mansour, Petitioner

**FILED**
Superior Court of California
County of Los Angeles

MAR 03 2022

Sherri R. Carter, Executive Officer/Clerk of Court

By: T. Quinn, Deputy

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
STREET ADDRESS: 111 N. Hill Street
MAILING ADDRESS: Same
CITY AND ZIP CODE: Los Angeles, CA 90012
BRANCH NAME: Central District

ESTATE OF (Name):
SAIF MANSOUR

DECEDENT

## LETTERS

☒ **TESTAMENTARY**
☐ **OF ADMINISTRATION WITH WILL ANNEXED**
☐ OF ADMINISTRATION
☐ SPECIAL ADMINISTRATION

CASE NUMBER:
22STPB00003

### LETTERS

1. ☒ The last will of the decedent named above having been proved, the court appoints (name):
Erika Mansour
  a. ☒ executor.
  b. ☐ administrator with will annexed.

2. ☐ The court appoints (name):

  a. ☐ administrator of the decedent's estate.
  b. ☐ special administrator of decedent's estate
    (1) ☐ with the special powers specified in the Order for Probate.
    (2) ☐ with the powers of a general administrator.
    (3) ☐ letters will expire on (date):

3. ☒ The personal representative is authorized to administer the estate under the Independent Administration of Estates Act ☒ **with full authority**
  ☐ **with limited authority** (no authority, without court supervision, to (1) sell or exchange real property or (2) grant an option to purchase real property or (3) borrow money with the loan secured by an encumbrance upon real property).

4. ☐ The personal representative is not authorized to take possession of money or any other property without a specific court order.

### AFFIRMATION

1. ☐ PUBLIC ADMINISTRATOR: No affirmation required (Prob. Code, § 7621(c)).

2. ☒ INDIVIDUAL: I **solemnly affirm** that I will perform the duties of personal representative according to law.

3. ☐ INSTITUTIONAL FIDUCIARY (name):

  I **solemnly affirm** that the institution will perform the duties of personal representative according to law. I make this affirmation for myself as an individual and on behalf of the institution as an officer.
(Name and title):

4. Executed on (date): January 18 , 2022
at (place): Phoenix , Arizona.

▶ Erika Mansour _(signature)_
(SIGNATURE)

### CERTIFICATION

I certify that this document is a correct copy of the original on file in my office and the letters issued the personal representative appointed above have not been revoked, annulled, or set aside, and are still in full force and effect.

WITNESS, clerk of the court, with seal of the court affixed.

Date: MAR 03 2022

Clerk, by _Tonya Quinn_
(DEPUTY)

Date MAR 03 2022

Clerk, SHERRI R. CARTER
_Tonya Quinn_ (DEPUTY)

**LETTERS**
**(Probate)**

Probate Code, §§ 1001, 8403,
8405, 8544, 8545;
Code of Civil Procedure, § 2015.6


American LegalNet, Inc.
www.FormsWorkFlow.com

# EXHIBIT B

Electronically FILED by Superior Court of California, County of Los Angeles 4/6/2022 11:28 AM Sherri R. Carter, Executive Officer/Clerk, By A. Villarino, Deputy Clerk

Case 20-51002-BLS Doc 129-2 Filed 04/19/22 Page 42 of 124

**DE-172**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, state bar number, and address):* | TELEPHONE AND FAX NOS.: |
|---|---|
| Jeffrey Waxman, Esquire, DE Bar No. 4159<br>Morris James LLP<br>500 Delaware Ave., Suite 1500<br>Wilmington, DE 19801 | |

ATTORNEY FOR *(Name):* Official Committee of Unsecured Creditors of Old LC, Inc.

**To keep other people from seeing what you entered on your form, please press the Clear This Form button at the end of the form when finished.**

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** Los Angeles

STREET ADDRESS: 111 N. Hill St. Room 426P
MAILING ADDRESS: 111 N. Hill St. Room 426P
CITY AND ZIP CODE: Los Angeles, CA 90012
BRANCH NAME: Central District, Probate Court: Department 79

ESTATE OF *(Name):*

Saif Mansour

DECEDENT

| **CREDITOR'S CLAIM** | CASE NUMBER:<br>22STPB00003 |
|---|---|

> You must file this claim with the court clerk at the court address above before the LATER of (a) four months after the date letters (authority to act for the estate) were first issued to the personal representative, or (b) sixty days after the date the *Notice of Administration* was given to the creditor, if notice was given as provided in Probate Code section 9051. You must also mail or deliver a copy of this claim to the personal representative and his or her attorney. A proof of service is on the reverse.
> **WARNING:** Your claim will in most instances be invalid if you do not properly complete this form, file it on time with the court, and mail or deliver a copy to the personal representative and his or her attorney.

1. Total amount of the claim: $ Contingent/Not yet ascertainable
2. Claimant *(name):* Official Committee of Unsecured Creditors of Old LC, Inc.
   a. ☐ an individual
   b. ☐ an individual or entity doing business under the fictitious name of *(specify):*
   c. ☐ a partnership. The person signing has authority to sign on behalf of the partnership.
   d. ☐ a corporation. The person signing has authority to sign on behalf of the corporation.
   e. ☑ other (specify): Official Committee of Unsecured Creditors of Old LC, Inc.
3. Address of claimant *(specify):* c/o Jeffrey Waxman, Morris James, LLP, 500 Delaware Ave., Ste. 1500, Wilmington, DE 19801
4. Claimant is ☑ the creditor ☐ a person acting on behalf of creditor *(state reason):*

5. ☐ Claimant is ☐ the personal representative ☐ the attorney for the personal representative.
6. I am authorized to make this claim which is just and due or may become due. All payments on or offsets to the claim have been credited. Facts supporting the claim are ☐ on reverse ☑ attached.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: 04/06/2022

Jeffrey R. Waxman

(TYPE OR PRINT NAME AND TITLE) ▶ _____ (SIGNATURE OF CLAIMANT)

**INSTRUCTIONS TO CLAIMANT**

A. On the reverse, itemize the claim and show the date the service was rendered or the debt incurred. Describe the item or service in detail, and indicate the amount claimed for each item. Do not include debts incurred after the date of death, except funeral claims.

B. If the claim is not due or contingent, or the amount is not yet ascertainable, state the facts supporting the claim.

C. If the claim is secured by a note or other written instrument, the original or a copy must be attached *(state why original is unavailable.)* If secured by mortgage, deed of trust, or other lien on property that is of record, it is sufficient to describe the security and refer to the date or volume and page, and county where recorded. *(See Prob. Code, § 9152.)*

D. Mail or take this original claim to the court clerk's office for filing. If mailed, use certified mail, with return receipt requested.

E. Mail or deliver a copy to the personal representative and his or her attorney. Complete the *Proof of Mailing or Personal Delivery* on the reverse.

F. The personal representative or his or her attorney will notify you when your claim is allowed or rejected.

G. Claims against the estate by the personal representative and the attorney for the personal representative must be filed within the claim period allowed in Probate Code section 9100. See the notice box above.

*(Continued on reverse)*

| Form Approved by the<br>Judicial Council of California<br>DE-172 [Rev. January 1, 1998] | **CREDITOR'S CLAIM**<br>**(Probate)** | Probate Code, §§ 9000 et seq., 9153 |
|---|---|---|

| ESTATE OF *(Name)*: | | CASE NUMBER: |
|---|---|---|
| Saif Mansour | DECEDENT | 22STPB00003 |

## FACTS SUPPORTING THE CREDITOR'S CLAIM
☑ See attachment *(if space is insufficient)*

| Date of item | Item and supporting facts | Amount claimed |
|---|---|---|
| | | |
| | **TOTAL:** | $ |

## PROOF OF ☑ MAILING ☐ PERSONAL DELIVERY  TO PERSONAL REPRESENTATIVE
*(Be sure to mail or take the original to the court clerk's office for filing)*

1. I am the creditor or a person acting on behalf of the creditor.  At the time of mailing or delivery I was at least 18 years of age.

2. My residence or business address is *(specify)*: 500 Delaware Ave., Ste. 1500, Wilmington, DE 19801

3. I mailed or personally delivered a copy of this *Creditor's Claim* to the personal representative as follows *(check either a or b below)*:

  a. ☑ **Mail**. I am a resident of or employed in the county where the mailing occurred.
    (1) I enclosed a copy in an envelope AND
      (a) ☐ **deposited** the sealed envelope with the United States Postal Service with the postage fully prepaid.
      (b) ☑ **placed** the envelope for collection and mailing on the date and at the place shown in items below following our ordinary business practices. I am readily familiar with this business' practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service in a sealed envelope with postage fully prepaid.
    (2) The envelope was addressed and mailed first-class as follows:
      (a) Name of personal representative served: Erika Mansour
      (b) Address on envelope: c/o Rodney C. Lee, Loeb & Loeb LLP, 10100 Santa Monica Blvd. Ste. 2200, Los Angeles, CA 90067
      (c) Date of mailing: 04/6/2022
      (d) Place of mailing *(city and state)*: Wilmington, DE

  b. ☐ **Personal delivery**. I personally delivered a copy of the claim to the personal representative as follows:
    (1) Name of personal representative served:
    (2) Address where delivered:

    (3) Date delivered:
    (4) Time delivered:

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: 04/06/2022

| Jeffrey R. Waxman | | |
|---|---|---|
| (TYPE OR PRINT NAME OF CLAIMANT) | ▶ | (SIGNATURE OF CLAIMANT) |

**CREDITOR'S CLAIM**
**(Probate)**

Jeffrey R. Waxman (DE Bar No. 4159)
**MORRIS JAMES LLP**
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Telephone: (302) 888 6800
Email: jwaxman@morrisjames.com

<div align="center">

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**FOR THE COUNTY OF LOS ANGELES**

</div>

| | |
|---|---|
| **In the Matter of the Estate of** ) | |
| ) | **Case No. 22STPB0003** |
| **SAIF MANSOUR,** ) | |
| ) | |
| **Deceased.** ) | |

<div align="center">

**ATTACHMENT TO CLAIM**

</div>

The undersigned is counsel to the Official Committee of Unsecured Creditors of Official Committee of Unsecured Creditors (the "Committee") of Old LC, Inc., et al., for and on behalf of the estates of Old LC, Inc., et al. ("Loot Crate" or the Debtors") in the jointly administered bankruptcy cases pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") pending at Case No. 19-11791 (collectively, the "Bankruptcy Case"), and in support of its claim against the estate of Saif Mansour ("Mr. Mansour"), the Committee states as follows:

Between 2017 and mid-2019, Mr. Mansour served as a managing partner of Breakwater Credit Opportunities Fund, L.P. ("Breakwater") and served as either a member of the board of directors of Loot Crate, a board observer, and/or managing Breakwater's affairs with respect to its position as a shareholder and lender of Loot Crate.

On August 11 and 12, 2019, the Debtors each filed voluntary bankruptcy petitions in the Bankruptcy Court, and on August 22, 2019, the Office of the United States Trustee appointed the Committee.

On October 1, 2019, the Bankruptcy Court entered an Order (the "Sale Order"): (A) Approving the Sale of Debtors' Assets, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Certain Related Relief, by and through which, it sold substantially all of the Debtors' assets to The Loot Company, f/k/a Loot Crate Acquisition LLC (the "Purchaser").   While the Debtors' estates retained all title and ownership to certain claims against the Debtors' former directors and officers (the "D&O Claims"), among the assets sold to the Purchaser were a portion of the proceeds from the prosecution of the D&O Claims.

On or about November 12, 2020, the Debtors, the Committee and the Purchaser entered into an agreement for, among other things, the prosecution of the D&O Claims by the Committee on behalf of the Debtors' estates.   On October 12, 2020, the Committee filed a motion for approval of the agreement, and on October 21, 2020, the Court granted the Committee's motion.

On November 2, 2020, the Committee commenced adversary proceeding 20-51002 (the "Adversary Proceeding"), by and through which the Committee sought more than $100 million from the defendants for, among other things, breach of fiduciary duty.   Mr. Mansour was named a defendant in the Adversary Proceeding.    A copy of the Amended Complaint filed in the Adversary Proceeding is attached hereto as **Exhibit A**.

On or about November 5, 2021, Counsel for Mr. Mansour filed a Suggestion of Death in the Adversary Proceeding.   Counsel for the Committee and counsel for Mr. Mansour's counsel

2

subsequently entered into two separate stipulations extending the deadline for the Committee to file a motion to substitute a part in response to the suggestion of death.

The Adversary Proceeding remains pending, and the Committee anticipates that the Bankruptcy Court will enter a judgment against the defendants, including Mr. Mansour's estate, for which Mr. Mansour will likely be jointly and severally liable.

The Committee expressly reserves its right to supplement or amend this claim, including to seek payment from any third party who received payment from Mr. Mansour's estate.

April 6, 2022                                    **MORRIS JAMES LLP**

                                                */s/ Jeffrey R. Waxman*_____
                                                Jeffrey R. Waxman (DE Bar No. 4159)
                                                500 Delaware Avenue, Suite 1500
                                                Wilmington, DE 19801
                                                Telephone: (302) 888 6800
                                                Email:  jwaxman@morrisjames.com

                                                *Counsel to the Committee*

3

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | Chapter 11 Case |
| | § | |
| Old LC, Inc., *et al.*[1] | § | Case No. 19-11791 (BLS) |
| | § | |
| Debtors. | § | Jointly Administered |

_____

| | | |
|---|---|---|
| | § | |
| Old LC, Inc. (f/k/a Loot Crate, Inc.), Old | § | |
| LC Holdings, Inc., Old LCF, Inc., and | § | |
| Old LC Parent, Inc., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Adv. No. 22-50107 (BLS) |
| | § | |
| The Loot Company (f/k/a Loot Crate | § | |
| Acquisition LLC), Loot (Assignment | § | |
| for the Benefit of Creditors), LLC, and | § | |
| John Doe, | § | |
| | § | |
| Defendants. | § | |

## FIRST AMENDED COMPLAINT

Plaintiffs Old LC, Inc.; Old LC Holdings, Inc.; Old LCF, Inc.; and Old LC Parent, Inc.

(collectively, "***Debtors***" or "***Plaintiffs***")[2] bring this action and respectfully allege as follows:

---

[1] Debtors are the following four entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Old LC, Inc. (7119), Old LC Holdings, Inc., Old LCF, Inc., and Old LC Parent, Inc. Debtors' noticing address in their Bankruptcy Cases is c/o Bryan Cave Leighton Paisner LLP, Attn: Mark I. Duedall, 1201 W. Peachtree Street, 14th Floor, Atlanta, Georgia 30309.

[2] Debtors were formerly named Loot Crate, Inc., Loot Crate Holdings, Inc., LC Funding, Inc., and Loot Crate Parent, Inc. Following the closing of the sale of substantially all of Debtors' assets, Debtors filed the necessary documentation in the applicable jurisdictions to change their corporate names and filed the *Notice of Changes of Debtors' Names and Case Caption* [D.I. 265 in the Bankruptcy Cases] with the Court, all in accordance with the terms of the Sale (as defined below) and this Court's order approving the same [D.I. 254 in the Bankruptcy Cases].

### Nature of the Action

1.     Debtors bring this action to vindicate their rights and those of their bankruptcy estates against the company that purchased their assets in a Court-approved sale under Section 363 of the Bankruptcy Code.  Because Purchaser (as defined below) has repudiated its agreement to pay certain pre-petition sales taxes, which was a fundamental component of the purchase price (and indeed, the very agreement) in the prior transaction between Debtors and Purchaser, Debtors seek specific performance, damages for breach of contract, equitable subordination, setoff, and related relief.  In addition, because Purchaser has made known its intent to transfer part or all the business it acquired from Debtors to one or more affiliates, evidently to protect itself against a judgment in favor of Debtors, Debtors seek to avoid and recover fraudulent transfers by Purchaser. Indeed, and as discussed below, due to the breach of the term sheet, the Purchase Agreement (as defined below), and Sales Tax Funding Commitment (as defined below), neither Purchaser nor Loot ABC (as defined below) is entitled to the benefits thereof.

2.     An original version of this First Amended Complaint was filed on February 2, 2022, initiating this Adversary Proceeding.  *See* D.I. 1 in this Adversary Proceeding.  However, at or near the same date, Purchaser assigned substantially all of its assets to Loot (Assignment for the Benefit of Creditors), LLC ("***Loot ABC***").  Loot ABC and Purchaser have agreed that Loot ABC is now the owner of an interest in property of Debtors.  Specifically, as discussed below, Purchaser had a claim to property of Debtors:  a portion of certain proceeds of litigation being brought on behalf of Debtors' estates against Debtors' former directors and their affiliates, under a binding term sheet as approved by this Court.  As such, and because Loot ABC is now the holder of that interest and claim, Loot ABC is joined as a party to this action as to certain counts, including Debtors' right of setoff, and breach of the term sheet.  Due to breach of the term sheet, neither

Purchaser nor Loot ABC is entitled to the benefits thereof. And further, to the extent that **despite** Purchaser's prior breach of the binding term sheet, Purchaser is entitled to any amounts from such litigation, Debtors may set off against such recovery the amounts Purchaser owes under the Sales Tax Funding Commitment (as defined below). And so, if Loot ABC is now the holder of any claim to litigation proceeds, it would be subject to the same setoff Debtors seek against Purchaser.

## Jurisdiction and Venue

3.     This adversary proceeding arises in and relates to Debtors' Chapter 11 cases (the "***Bankruptcy Cases***").

4.     This Court has jurisdiction over the adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (C), (E), (H), and (O). To the extent any part of this adversary proceeding is determined not to be a core proceeding, Plaintiffs consent to the entry of final orders or judgments by the Court.

5.     Venue is proper under 28 U.S.C. § 1409 because this adversary proceeding arises under title 11 or arises in or relates to the Bankruptcy Cases.

6.     The statutory predicates for the relief requested herein are found in §§ 105 and 510(c) of Title 11 of the United States Code (the "***Bankruptcy Code***"), as well as the Delaware Uniform Fraudulent Transfer Act and Federal Rules of Bankruptcy Procedure 6004, 6009, and 7001(1), (7), and (8).

## The Parties

7.     Plaintiffs are Chapter 11 debtors and debtors-in-possession in the above-captioned jointly administered Bankruptcy Cases.

8.      The Loot Company, f/k/a Loot Crate Acquisition LLC ("**Purchaser**") is a Delaware limited liability company with its principal offices located in New York, New York.  Pursuant to Section 12.1 of the Purchase Agreement (defined below), Purchaser does not identify any address but instead lists the offices of Cooley LLP c/o Cathy Hershcopf and Robert Winning (although Mr. Winning appears no longer to be affiliated with the Cooley law firm), 55 Hudson Yards, New York, New York 10001.  Purchaser's registered agent is The Delaware Corporation Agency, Inc., 600 N. King Street, Suite 400, Wilmington, Delaware.

9.      Upon information and belief, and as further discussed below, Debtors have grounds to believe that multiple parties may have benefited from (and/or continuing to benefit from) certain conduct complained herein.  Likewise, upon information and belief, Purchaser does not have any direct employees but is instead directed by employees of an affiliate shared-services entity that houses employees that direct and oversee the operations of both Purchaser and other affiliated entities owned by Mr. Joel Weinshanker ("**Weinshanker**").  As such, upon further discovery, Debtors will seek to further amend this First Amended Complaint to include all persons and parties that authorized, directed, aided and abetted, intentionally omitted disclosure of and/or falsely represented material information, and/or benefited from certain conduct complained herein.

10.     Loot ABC is a California limited liability company, formed on January 20, 2022.  Loot ABC's mailing address is 3945 Freedom Circle, Suite 560, Santa Clara, California  95054, and its agent for service of process is c/o Michael Maidy, at that same address.

**General Allegations**

11.     On August 11 and 12, 2019 (the "**Petition Date**"), each of Plaintiffs filed a voluntary petition with this Court under Chapter 11 of Title 11 of the United States Code (the

"**Bankruptcy Code**"), to initiate the Bankruptcy Cases.  The Bankruptcy Cases are consolidated for procedural purposes only and administered jointly.

12.     Plaintiffs are authorized to continue to operate and manage their businesses and assets as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

### Purchaser's and Its Affiliates' Conduct and Structure in Relation to Debtors

13.     Purchaser was not a stranger to Debtors when Debtors filed their Bankruptcy Cases. To the contrary, on August 3, 2018, a little more than a year before the Petition Date, Money Chest LLC ("**Money Chest**"), which is an affiliate of Purchaser, loaned Debtors $2.5 million in subordinated debt.  The promissory note for this debt was signed by Weinshanker, who is and was a principal of Money Chest, and of Purchaser.

14.     Weinshanker is also a principal of National Entertainment Collectibles Association, Inc. ("**NECA**").  NECA makes and manufactures a variety of licensed toys, figurines, and trinkets that appeal to the typical pop culture or fantasy enthusiast.  As such items would be a natural outlet for Debtors' loot boxes and collectible sets, the investment by Money Chest, as an affiliate of NECA, made sense to both parties.

15.     Just prior to the Petition Date, Money Chest acquired the then-existing senior debt owed by Loot Crate, from a lender known as Midtown Madison Management LLC.  This acquisition of the so-called "First Lien Loan Agreement Claims" was to facilitate a credit bid for Debtors' assets in their bankruptcy case.

16.     In addition, contemporaneously with the Petition Date, Weinshanker formed Purchaser, under its original name of Loot Crate Acquisition LLC.  In the meantime, Money Chest made a post-petition loan (the "**DIP Loan**") to Debtors, approved by this Court, of up to $10 million.

**The Sale of Debtors' Assets to Purchaser**

17.     On October 1, 2019, the Court entered the *Order (A) Approving the Sale of Debtors' Assets, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Certain Related Relief* [D.I. 254 in the Bankruptcy Cases] (the "***Sale Order***").  The Sale Order approved the sale of substantially all of Debtors' assets to Purchaser pursuant to that certain Asset Purchase Agreement, dated as of September 27, 2019, and as amended (the "***Purchase Agreement***," a copy of which is attached as Exhibit A to the Sale Order), and the transaction closed as of October 1, 2019 (the "***Sale***").

18.     It appears that NECA, Purchaser, and Money Chest, all controlled by Weinshanker, were more or less intertwined for purposes of the Sale.  Specifically, Purchaser used **Money Chest's** claims against Debtors to fund part of **Purchaser's** consideration.  Section 2.6 of the Purchase Agreement reflects that **Purchaser** is surrendering **its** claims under the First Lien Loan Agreement (although such claims had been originally bought by Money Chest), and Purchaser is surrendering **its** claims under the DIP Loan (although such claims were originally owed to Money Chest).  The surrender of such claims was collectively up to a total amount of $30 million.

19.     Moreover, as Debtors' Bankruptcy Cases progressed post-sale, Purchaser and Money Chest always acted as if they were the same, at least in terms of holding any remaining claims against or rights in Debtors.  For example, in the months leading up to the global settlement embodied by the term sheet among Debtors, Purchaser, and the Committee (as defined below), various draft term sheets among the parties indicated that Purchaser and Money Chest treated their rights and interests jointly.  The term sheets were subject to heavy review and commentary by the law firm of Cooley LLP, which was counsel to all of Purchaser, Money Chest, NECA, and Weinshanker.  Moreover, in the final term sheet approved by this Court allocating the interests in

Debtors' D&O action, "TLC" (aka The Loot Company, which is the Purchaser) is used as the collective term for any claims or rights of Purchaser and of Money Chest. In all events, it appeared that Purchaser and Money Chest treated themselves, and Cooley treated them as well, as more or less interchangeable.

20. Regardless, pursuant to the Purchase Agreement, Debtors agreed to the transfer of substantially all of their assets in exchange for Purchaser's agreement to, among other things, pay the following Purchase Price: (i) as noted above, $30 million payable in the form of a credit bid; (ii) a cash component described as the Budgeted Reserve; and (iii) "the aggregate amounts payable by [Purchaser] pursuant to Section 8.5 in respect of [Debtors'] Sales Taxes, including those expenses advanced or reimbursed in connection with the negotiation and settlement of certain Sales Tax obligations of [Debtors]" (the "***Purchase Price***"). *See* Purchase Agreement § 2.6(a).

21. Purchaser satisfied items (i) and (ii) of the Purchase Price.

## The Sales Tax Funding Commitment

22. As noted above, as a condition to closing and in order to satisfy item (iii) of the Purchase Price, Debtors and Purchaser entered into a funding commitment agreement at the closing of the Sale (the "***Sales Tax Funding Commitment***"). *See* Purchase Agreement §8.5(e). A true and correct copy of the Sales Tax Funding Commitment, as amended and supplemented from time to time, is attached hereto as Exhibit A.[3]

23. Pursuant to the Sales Tax Funding Commitment, and assuming the Payment Plan Protocols set forth in the Purchase Agreement and Sales Tax Funding Commitment were met, Purchaser committed to pay (directly or indirectly) the payments arising under payment plans

---

[3] The exhibits to the Sales Tax Funding Commitment – the actual payment plans – were authorized to be filed under seal, *see* D.I. 26 in this Adversary Proceeding, and so to avoid undue re-filing and docket clutter, only the Sales Tax Funding Commitment itself is attached.

Debtors finalized with various taxing jurisdictions on account of Debtors' pre-petition sales-tax obligations (the "***Payment Plans***").  *See* Purchase Agreement § 8.5(e)-(f).

24.     In order for the Payment Plans to become a funding obligation under the Purchase Agreement, the Payment Plans were to meet the criteria of the Payment Plan Protocols.  *See* Purchase Agreement § 8.5(b), (f).  The Payment Plan Protocols provided detailed parameters within which the Payment Plans had to remain.  Generally speaking, if the total amount owed to the state taxing authority was $50,000 or less, the Payment Plan could be comprised of payments over a period of up to six (6) months, but if the total amount owed to the state taxing authority was greater than $50,000 then the Payment Plan had to be comprised of payments over a thirty-six (36) month period and the total amount (excluding applicable interest and penalties) could be no greater than one hundred ten present (110%) of the estimated amount set forth on the Sales Taxes Schedule, which is attached to the Purchase Agreement at Schedule 8.5(a)(i).  *See* Purchase Agreement § 1.1(xx); Schedule 8.5(a)(i).

25.     Debtors originally had up to nine (9) months after the Sale closed to enter into Payment Plans pursuant to the Payment Plan Protocols.  Purchase Agreement §8.5(f).  Due to the COVID-19 pandemic, many state agencies shut down making it impossible for Debtors to finalize Payment Plans with those states.  Even with the hurdles associated with the COVID-19 pandemic, Debtors were able to finalize Payment Plans with all but four (4) states' taxing authorities prior to expiration of the original nine (9) month deadline.  At Debtors' request, Purchaser provided Debtors a short extension to enter into Payment Plans with the remaining state taxing authorities.  *See* Amendment of Section 8.5(f) of the Purchase Agreement.[4]

---

[4]     The Amendment of Section 8.5(f) of the Purchase Agreement (the "***Amendment***") lists six (6) states for which Debtors were to receive an extension.  This is because at the time Debtors

26.     In accordance with the Purchase Agreement, the Sales Tax Funding Commitment, and the *Court's Order Granting Motion of Debtors for Omnibus Procedures By Which The Debtors Will Be Authorized to Negotiate and Settle Certain Tax Claims* [D.I. 369 in the Bankruptcy Cases], Debtors and their professionals negotiated with twenty nine (29)[5] state taxing authorities.

27.     After expending an inordinate amount of time and resources towards finalizing the Payment Plans, Debtors were able to include twenty six (26) Payment Plans as additional funding obligations under the Sales Tax Funding Commitment.  *See* Purchase Agreement § 8.5; Sales Tax Funding Commitment § 1.  The Payment Plans that became additional funding obligations under the Sales Tax Funding Commitment are the following taxing jurisdictions: Alabama, Arizona, California, Colorado, Connecticut, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Kentucky, Louisiana, Maine, Maryland, Michigan, Mississippi, Nebraska, New York, North Carolina, Pennsylvania, Texas, Utah, Vermont, Washington, and Wisconsin.

28.     The twenty six (26) Payment Plans totaled more than four million ($4,000,000) in additional funding obligations under the Sales Tax Funding Commitment; most of these amounts were being paid over time by Purchaser pursuant to the Sales Tax Funding Commitment.

29.     Accordingly, pursuant to Section 8.5 of the Purchase Agreement and Section 1 of the Sales Tax Funding Commitment, Purchaser "commit[ted] to fund, directly or indirectly, an amount in cash in immediately available funds necessary to fully discharge the payment

---

began negotiating the Amendment, there were six (6) states remaining; however, upon execution of the Amendment, Debtors had finalized Payment Plans with two (2) of those six (6) states.

[5]     This number is larger than the number of Payment Plans Debtors ultimately entered into. This is because Debtors were unsuccessful in their attempts to enter into a Payment Plan with South Carolina, and during Debtors' negotiations with North Dakota and New Jersey, Debtors determined no sales taxes were owed to either taxing jurisdiction.

obligations of the [Debtors] . . . as such individual payments [became] due under the Payment Plans." Sales Tax Funding Commitment § 1.

30.     To the extent that Purchaser elected to satisfy a Payment Plan by direct payment to the applicable taxing authority, Section 2 of the Sales Tax Funding Commitment required Purchaser to provide to Debtors written documentation evidencing such payment was made to the applicable state.

31.     Given the materiality of the Sales Tax Funding Commitment obligation as a condition to the Sale, Debtors specifically negotiated for the right of specific performance by which Debtors maintain the right to cause Purchaser to satisfy its obligations under the Sales Tax Funding Commitment, plus the costs and expenses incurred by Debtors in seeking such relief. Sales Tax Funding Commitment § 4.

32.     Debtors fully performed their obligations under the Purchase Agreement and the Sales Tax Funding Commitment and all conditions precedent to Purchaser's obligations have been satisfied

**<u>Purchaser's Breach of the Purchase Agreement and Sales Tax Funding Commitment</u>**

33.     Between the closing of the Sale and approximately November 1, 2021, Debtors and Purchaser maintained regular communications regarding, among other things, the pending litigation being pursued by the Official Committee of Unsecured Creditors of Debtors (the "***Committee***") against certain directors and their affiliates (the "***D&O Litigation***"), as well as Purchaser's commitment to fund $75,000 as liquidating trust costs for certain operating costs pursuant to that certain binding term sheet approved by the Court's Order Granting Motion of the Official Committee of Unsecured Creditors (I) Granting Standing and for Authority for the

Creditors Committee to Prosecute Certain Claims, and (II) Approving a Term Sheet Among Debtors, Committee, and Purchaser [D.I. 714 in the Bankruptcy Cases] ("***Term Sheet Order***").

34.     Pursuant to the Term Sheet Order, Purchaser will receive (or would have received, to the extent its breach affects its rights, or alternatively now that Purchaser is purportedly insolvent, Loot ABC may or may not be entitled to) D&O Litigation proceeds at different levels in the priority waterfall in exchange for Purchaser's assignment and transfer of any and all claims it purchased via the Purchase Agreement (the "***Claim for D&O Litigation Proceeds***").  As noted above, Purchaser (either on its own or jointly with Money Chest) held an unsecured deficiency claim under the First Lien Loan Agreement and the original Money Chest pre-petition $2.5 million note owed by Debtors, both of which were converted into claims under the term sheet waterfall to property of Debtors.

35.     To date, Purchaser's funding of the $75,000 for liquidation trust costs pursuant to the Term Sheet has not been triggered, so Purchaser does not currently have any rights to the First Tier Obligations (as defined in the Term Sheet).  Purchaser (or Loot ABC) may, however, have rights to the Fourth, Sixth, and Seventh Tier Obligations.

36.     On November 18, 2021, Debtors received a notice of default from the Attorney General's Office for the State of Texas.  Specifically, the notice of default explained that the Comptroller had not received a tax payment pursuant to the Texas Payment Plan since on or about August 9, 2021 (the "***Texas Default***").

37.     Prior to receiving the Texas Default, Purchaser had not provided to Debtors nor their professionals any previous notice of such breach.

38.     Upon receipt of the Texas Default communication, Debtors' counsel, Bryan Cave Leighton Paisner LLP ("***BCLP***") immediately contacted counsel for Purchaser at Cooley LLP

("**Cooley**"), Cathy Hershcopf and Lauren Reichardt, requesting that Purchaser immediately look into and cure the default. Additionally, Debtors' counsel requested that Purchaser also confirm that Purchaser is compliant with the Payment Plans for other states.

39.     Cooley confirmed receipt of BCLP's request that same day.

40.     On November 23, 2021, BCLP emailed Cooley again to confirm whether Cooley or Purchaser was in communication with the Office of the Attorney General for the State of Texas to address the Texas Default. In response, Cooley stated "We have contacted our client, but have no intention of talking directly to TX."

41.     Following this response, BCLP emailed Cooley again for clarification on November 23, 2021, as follows, "Cooley has not [sic] intention and [Purchaser] has no intention? OR Cooley has no intention? Has someone paid the bill? We can't ignore the Texas in light of the default – SOMEONE needs to tell them something. So at minimum, we need to know what is being done to cure." In response, Cooley indicated, "Lauren promptly contacted the client about the delayed payment. **I will reach out personally to Joel [Weinshanker]** before the holiday, but not until my deposition is over. **Neither Cooley, nor [Purchaser] will contact Texas**" (emphasis added).

42.     On November 30, 2021, after receiving an inquiry from the State of Texas, BCLP again contacted Cooley on the status of their inquiry and were told, "I reached out to **Joel [Weinshanker] again**" (emphasis added).

43.     After still not receiving an update from Cooley or Purchaser, BCLP again contacted Cooley, on December 2, 2021, for an update, stating:

> Hi Cathy and Lauren – any update?
>
> Chris Murphy from the Texas Comptroller called me this afternoon to see where things stand. He indicated that he is not looking to accelerate and

unwind the settlement, but his discretion is going to slowly slip way unless things are resolved and brought back into compliance.

**I understand that you don't want Cooley and [Purchaser] directly interfacing with Texas, that's okay. I'm happy to do it. But in making me the middle man, I just ask that you help me out here so I'm not in a very awkward and compromising position. Hope you can appreciate that.**

(emphasis added).

44.     By virtue of the foregoing, Cooley and Purchaser had express knowledge that BCLP was relying on the accuracy of information provided by Cooley and Purchaser to update the State of Texas in light of the refusal by Cooley and Purchaser to do so.  BCLP, in reliance on the updates from Cooley, assured the State of Texas that Cooley and Purchaser were looking into the Texas Default.

45.     In response, that same day on December 2, 2021, Cathy Hershcopf again responded, stating "I pinged **Joel [Weinshanker]** again and Lauren reached out [Purchaser]" (emphasis added).

46.     During this period, in addition to the repeated requests for Cooley to provide an update on the status of the Texas Default, BCLP also requested confirmation as to whether or not Purchaser was in compliance with other Payment Plans.

47.     On December 10, 2021, BCLP asked Cooley for an update on the status of Purchaser's review.  In this communication, BCLP reemphasized that this information was being conveyed to the State of Texas in order to keep the Attorney General's Office apprised of the situation, stating, "Cathy/Lauren – I was able to preempt Texas from asking for a status update by reporting that you were meeting with [Purchaser]. Do you have an update? I rather not get on the phone with Texas next week until I have something substantive to him. Thanks."

48.     That same day, Lauren Reichardt at Cooley responded, "Long story short is that there has been a lot of turnover at the company over the past months.  Ruby is no longer there and I don't think everything got communicated that should have before she left.  **They are working to become current and I will follow up next week as well**" (the "*December 10th Communication*") (emphasis added).

49.     In reliance on the December 10th Communication, BCLP explained via phone and email to the Attorney General's Office for the State of Texas that the person who had the institutional knowledge and was responsible for making the Payment Plan payments at Purchaser was no longer with Purchaser, which is why payments came to a halt and no one identified the issue.  BCLP also advised the Attorney General's Office of Purchaser's stated intent to become current on the payment plan.

50.     Between December 17, 2021 and January 3, 2022, BCLP continued to follow up with Cooley on the status of the Texas Default.  BCLP was told by Cooley that Purchaser was still going through the documents and knew that it owed Debtors a response on December 17, 2021; that Cooley would follow up again on December 20, 2021; and that Cooley would try to follow up with Purchaser on January 3, 2022.

51.     In further reliance of the December 10th Communication and these subsequent communications from Cooley, BCLP continued to act as the "middle man" and pass along the Cooley reports to the State of Texas.

52.     On January 7, 2022, Chris Davis, a member of Debtors' board of directors and former consultant to Purchaser, contacted Janna Deal at Purchaser to verify that this information was correct.  Mrs. Deal, who is the director of accounting at Purchaser, told Mr. Davis that

Purchaser had not made any payments pursuant to the Payment Plans for any state since August 2021.

53.     In light of the foregoing, on January 10, 2022, Mark Palmer (Debtors' Chief Transformation Officer) and Alexandre Zyngier (Debtors' Lead Independent Director) contacted Weinshanker, the primary principal of Purchaser and its affiliates, including parent company, National Entertainment Collectables Association, Inc. (as noted above, "**NECA**").

54.     During that conversation, Weinshanker acknowledged Purchaser's current breach of the Purchase Agreement and the Sales Tax Funding Commitment and indicated that Purchaser had no current intention of curing these breaches.  Weinshanker stated that he had been taking certain measures to "wind down" Purchaser's business. When specifically pressed, Weinshanker confirmed that he was not ceasing the whole business of Purchaser, but was instead "shifting" parts of the business to other entities controlled by NECA.  Weinshanker also stated that he intended to use Purchaser's revenues and inventory to repay his capital injections into Purchaser, which Weinshanker characterized as secured loans that he and/or NECA had advanced to Purchaser.

55.     Based upon information provided by Cooley on January 14, 2022 at 3:30 pm and January 18, 2022 at 3:30 pm (EST), Debtors understand that Purchaser owed approximately $2.6 million under the Payment Plans, of which approximately $800,000 in payments was delinquent.

56.     On January 19, 2022, Debtors and their Boards of Directors (the "**Board**") sent a letter to Purchaser demanding that Purchaser cure all breaches under each of the Payment Plans and maintain compliance with such obligations while Debtors and Purchaser discuss a path forward in good faith (the "**Notice of Defaults**").  The Notice of Defaults also cautioned that any party taking part in any diversion or distribution of assets from Purchaser to any affiliates of

Weinshanker should be on notice that they may be personally liable for aiding and abetting fraud, fraudulent conveyances or other causes of action available to creditors of an entity is having its assets diminished or "wound down" for the benefit of insiders.

57.     In the Notice of Defaults, Debtors reminded Purchaser that pursuant to Section 2.6(a)(iii) of the Purchase Agreement, Purchaser's performance of its Sales Tax Funding Commitment obligations was ***and continues to be*** a material component of the "Purchase Price." Specifically, the Notices of Default stated:

> Moreover, anyone taking part in any diversion or distribution of assets from [Purchaser] to any affiliates of Mr. Weinshanker or NECA should be on notice that they may be personally liable for aiding and abetting fraud, fraudulent conveyances or other causes of action available to creditors of an entity that is having its assets diminished or "wound down" for the benefit of insiders, as Mr. Weinshanker indicated is occurring.

58.     Debtors further noted that Section 7 of the Sales Tax Funding Commitment  was not intended to (nor does it) absolve Purchaser from its payment obligations under the Purchase Agreement and Weinshanker or his affiliates or constituents from fraud, fraudulent transfers, or asset stripping while transferring Purchaser's assets and/or business to affiliates to prevent Debtors and other Purchaser creditors from seeking redress.

## The Current Status of Purchaser, and Loot ABC

59.     Debtors are informed and believe that approximately $30 million of billings ran through Purchaser in 2021.

60.     Debtors are informed and believe that, on average, Purchaser had $2 million of billings per month in the second half of 2021.

61.     Debtors are informed and believe that as of January 2022, Purchaser had approximately 60,000 active subscribers.

62.     Debtors are informed and believe that as of January 26, 2022, Purchaser was still the merchant of record for customer credit card billings with Stripe, PayPal and Amazon.

63.     Debtors are informed and believe that the total outstanding obligations under the Payment Plans is approximately $2.6 million, with at least $800,000 in default as of December 31, 2021.

64.     As of the time of the original complaint in this matter, Debtors were informed and believed that Purchaser was terminating the employment of various of its employees and advising them that Purchaser was "dissolving."  However, Purchaser also acknowledged to at least one terminated employee that Purchaser's e-commerce and subscription business would continue to operate through Purchaser's sister companies.

65.     As noted above, on or about February 2, 2022, contemporaneously with the filing of this Adversary Proceeding, Purchaser commenced an assignment for the benefit of creditors (the "**ABC**").

66.     Loot ABC is the assignee in the ABC matter.

67.     Loot ABC succeeded to any rights and claims held by Purchaser against Debtors. This includes whatever claims Money Chest has or may have had under the First Lien Loan Agreement, to the extent Money Chest is in fact or in practice the same entity as Purchaser.  This also includes whatever claims Money Chest has or may have had under its original subordinated note, owed by Debtors, to that same extent.  This also includes the Claim for D&O Litigation Proceeds, to which such claims were converted under the Term Sheet Order.

<div align="center">

COUNT I

**Breach of Contract against Purchaser – Asset Purchase Agreement**

</div>

68.     Plaintiffs reallege and incorporate by reference each of the allegations contained in the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

69.     Plaintiffs and Purchaser are parties to the Purchase Agreement, which is a valid contract.

70.     Pursuant to the Purchase Agreement, Purchaser agreed to pay the Purchase Price in exchange for substantially all of Plaintiffs' assets.

71.     The Purchase Price included, among other things, the following: (i) $30 million payable in the form of a credit bid; (ii) a cash component described as the Budgeted Reserve; and (iii) "the aggregate amounts payable by [Purchaser] pursuant to Section 8.5 in respect of [Debtors'] Sales Taxes, including those expenses advanced or reimbursed in connection with the negotiation and settlement of certain Sales Tax obligations of [Debtors]." *See* Purchase Agreement § 2.6(a).

72.     As a condition to closing and in order to satisfy the third component of the Purchase Price, Plaintiffs and Purchaser entered into the Sales Tax Funding Commitment.  *See* Purchase Agreement §8.5(e).

73.     Plaintiffs have fully performed their obligations under the Purchase Agreement and the Sales Tax Funding Commitment and all conditions precedent have been satisfied.

74.     The Purchase Agreement is a binding contract that imposed the Sales Tax Funding Commitment obligations on Purchaser.

75.     Purchaser fulfilled the first two obligations of the Purchase Price.

76.     Purchaser failed to perform the third obligation of the Purchase Price and thus has failed to fully perform its obligations under the Purchase Agreement and the Sales Tax Funding Commitment obligations by failing to make the monthly payments under the Texas Payment Plan and failing to make similar payments owed to other state taxing authorities under their respective Payment Plans, resulting in Plaintiffs' defaults under the Texas Payment Plan and similar defaults with other state taxing authorities.

77.     Purchaser failed to cure the Texas Default within a reasonable time after being notified of such breach on November 18, 2021.

78.     Even after being provided additional time to cure the Texas Default, Purchaser failed to cure.

79.     As a result of the material breaches of the Purchase Agreement, Plaintiffs have suffered damages in an amount to be proven at trial.  On information and belief, Plaintiffs' damages will exceed $3.5 million, which includes expenses, costs, and past due sales tax payments.

<div align="center">COUNT II</div>
<div align="center"><strong>Breach of Contract against Purchaser – Sales Tax Funding Commitment</strong></div>

80.     Plaintiffs reallege and incorporate by reference each of the allegations contained in the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

81.     Plaintiffs and Purchaser entered into the Sales Tax Funding Commitment.

82.     The Sales Tax Funding Commitment is a valid contract that requires Purchaser fund, directly or indirectly, the payments due under the Payment Plans.

83.     Plaintiffs have fully performed their obligations under the Purchase Agreement and the Sales Tax Funding Commitment and all conditions precedent have been satisfied.

84.     Purchaser failed to fully perform its obligations under the Sales Tax Funding Commitment obligations by failing to make the monthly payments under the Texas Payment Plan and failing to make similar payments owed to other state taxing authorities under their respective Payment Plans, resulting in Plaintiffs' defaults under the Texas Payment Plan and similar defaults with other state taxing authorities.

85.     Purchaser failed to cure the Texas Default within a reasonable time after being notified of such breach on November 18, 2021.

86.     Even after being provided additional time to cure the Texas Default, Purchaser failed to cure.

87.     As a result of the material breaches of the Sales Tax Funding Commitment, Plaintiffs have suffered damages in an amount to be proven at trial.  Debtors are informed and believe that Plaintiffs' damages will exceed $3.5 million, which includes expenses, costs, and past due payments owed under the Payment Plans.

COUNT III

**Breach of Contract against Purchaser – Sales Tax Funding Commitment**

88.     Plaintiffs reallege and incorporate by reference each of the allegations contained in the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

89.     As a condition to closing and in order to satisfy a component of the Purchase Price, Plaintiffs and Purchaser entered into the Sales Tax Funding Commitment.

90.     The Sales Tax Funding Commitment is a valid contract that requires Purchaser fund, directly or indirectly, the payments due under the Payment Plans.

91.     Plaintiffs have fully performed their obligations under the Purchase Agreement and the Sales Tax Funding Commitment and all conditions precedent have been satisfied.

92.     Purchaser failed to fully perform its obligations under the Sales Tax Funding Commitment obligations by failing to provide evidence of payments made to each of the state taxing authorities pursuant to the Payment Plans, even after Debtors demanded such written documentation evidencing payments were made.

93.     As a result of the material breaches of the Sales Tax Funding Commitment, Plaintiffs have suffered damages in an amount to be proven at trial.

## COUNT IV
### Specific Performance against Purchaser

94.     Plaintiffs reallege and incorporate by reference each of the allegations contained in the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

95.     Plaintiffs and Purchaser are parties to the Purchase Agreement and the Sales Tax Funding Commitment.

96.     Plaintiffs have fully performed their obligations under the Purchase Agreement and the sales Tax Funding Commitment, which are valid contracts.

97.     Purchaser failed to perform the third obligation of the Purchase Price and thus has failed to fully perform its obligations under the Purchase Agreement and the Sales Tax Funding Commitment by failing to make the monthly payments under the Texas Payment Plan and failing to make similar payments owed to other state taxing authorities under their respective Payment Plans, resulting in Plaintiffs' defaults under the Texas Payment Plan and similar defaults with other state taxing authorities.

98.     Purchaser failed to cure the Texas Default within a reasonable time after being notified of such breach on November 18, 2021.

99.     Even after being provided additional time to cure the Texas Default, Purchaser failed to cure.

100.    The conduct of Purchaser, as described above, constitutes material and uncured breaches of the express terms of the Purchase Agreement and Sales Tax Funding Commitment.

101.    The parties to the Sales Tax Funding Commitment expressly agreed that Plaintiffs are "entitled to seek specific performance against [Purchaser] to cause [Purchaser] to satisfy its obligations [there]under." Sales Tax Funding Commitment § 4.

102.     Furthermore, it is patently inequitable for Purchaser to retain the benefit of the bargain without performing its obligations under the Sales Tax Funding Commitment.

103.     Purchaser should, therefore, be required to specifically perform its obligations under the Sales Tax Funding Commitment, including its obligations to pay all past-due and future installments owing under each Payment Plan.

104.     Under the terms of the Sales Tax Funding Commitment, Plaintiffs are entitled to an award of costs and expenses incurred in prosecuting this action.

<div align="center">COUNT V<br>
<strong>Equitable Subordination Against Purchaser and Loot ABC</strong></div>

105.     Plaintiffs reallege and incorporate by reference each of the allegations contained in the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

106.     Pursuant to Section 510(c) of the Bankruptcy Code, a court may, under principles of equitable subordination, subordinate all or part of an allowed claim to all or part of another allowed claim or interest.

107.     Purchaser knew of the breach of the Sales Tax Funding Commitment obligations as early as May 2021 with respect to the state of Texas.

108.     Purchaser did not disclose this breach to Debtors.

109.     Debtors relied on their belief that Purchaser was continuing to perform under the Sales Tax Funding Commitment and continued to pursue the D&O Litigation, of which some of the proceeds will benefit (or now, would have formerly benefitted) Purchaser or Loot ABC, and did not enforce specific performance rights against Purchaser pursuant to the Sales Tax Funding Commitment in such reliance.

110.    Upon notification of the Texas Default on November 18, 2021, Purchaser prolonged the façade that other payments were being made pursuant to the Sales Tax Funding Commitment.

111.    In fact, Purchaser intentionally mislead Debtors by stating, "Long story short is that there has been a lot of turnover at the company over the past months.  Ruby is no longer there and I don't think everything got communicated that should have before she left.  **They are working to become current and I will follow up next week as well**"  This statement was made even though Purchaser had no intention of becoming current on the past-due payments owed to Texas.

112.    Not until December 2021 did Purchaser acknowledge that there may have been a default in payments under the Texas Payment Plan; however, at no point did Purchaser give notice to Debtors of any other breaches.

113.    The actions of Purchaser, as described above, constitute unfair and inequitable conduct.

114.    Loot ABC, as assignee of the claims of Purchaser against Debtor, including the Claim for D&O Litigation Proceeds, must step into the shoes of its assignor.  If its assignor, Purchaser, acted inequitably to create this Count, then Loot ABC cannot whitewash any rights it has by virtue of taking the assignment of Purchaser's assets.

115.    Moreover, such inequitable conduct by Purchaser has harmed creditors of Debtors, including Debtors' general unsecured creditors.  Assuming the Payment Plan breaches are not cured, any proceeds from the D&O Litigation will first be applied to satisfy the outstanding priority tax claims that Purchaser was supposed to satisfy as part of the Purchase Price, many of which are likely to be priority claims under Section 507(a)(8) of the Bankruptcy Code.  Such additional priority obligation are likely to significantly reduce any distribution to general unsecured creditors.

116. Also, the pre-assignment stripping of assets of Purchaser is both highly inequitable and threatens to render a judgment in favor of Plaintiffs for damages an inadequate legal remedy.

117. Such inequitable conduct has also provided an unfair advantage to Purchaser, which received Debtors' assets for less than the bargained-for Purchase Price and may otherwise, but for this Adversary Proceeding and the breaches of the Term Sheet Order, receive its ratable share of the D&O Litigation via Purchaser's acquisition of the proceeds of the D&O Litigation, or now via Purchaser's (and now Loot ABC's) Claim for D&O Litigation Proceeds.

118. The balance of equities clearly weigh in Plaintiffs' favor because the failure to make the payments pursuant to the Payment Plans does not solely result in monetary damages; instead, a breach of the Payment Plans could also lead to personal liability of certain officers and directors of Debtors.

119. As noted above, at various times before and since the Sale of Debtors' assets to Purchaser, it appeared that either (i) Purchaser and its affiliates treated Purchaser as the holders of Money Chest's claims against Debtors, or (ii) Purchaser's counsel, which also represented Money Chest, conflated Purchaser and Money Chest (or ignored any legal or practical difference between them) such that the Money Chest claims are either owned by Purchaser, owned jointly by Purchaser and Money Chest, or had been transferred to Purchaser.

120. In addition, the Claim for D&O Litigation Proceeds (as well as the original right to proceeds of the D&O Litigation, under the Purchase Agreement) is a claim against property of Debtors. The D&O Litigation claims are owned by Debtors. *See* Purchase Agreement § 2.1(u). A claim against property of a debtor is a claim against a debtor. *See* 11 U.S.C. § 102(2). As such, this claim as well (again, to the extent it remains, despite Purchaser's breach of the Sale Agreement, and the Term Sheet Order and the term sheet), is subject to equitable subordination.

121.    As noted above, Loot ABC is the holder of the Claim for D&O Litigation Proceeds. Indeed, both Loot ABC has stated this, and Purchaser has confirmed it.

122.    Pursuant to Section 510(c) of the Bankruptcy Code, any claims of Purchaser, whether held by it or held by Loot ABC, should be subordinated to the claims of other creditors in Debtors' Bankruptcy Cases.

<div align="center">

COUNT VI

**Fraud Against Purchaser**

</div>

123.    Plaintiffs reallege and incorporate by reference each of the allegations contained in the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

124.    Purchaser knew of the breach of the Sales Tax Funding Commitment obligations since May 2021.

125.    Purchaser intentionally did not disclose this breach to Debtors.

126.    Upon Debtors' notification of the Texas Default, Purchaser falsely represented to Debtors that "**[Purchaser is] working to become current and I will follow up next week as well**" This statement was made even though Purchaser had no intention of becoming current on the past-due payments owed to Texas.

127.    Purchaser knew that its statement that it was working to become current on the Texas Payment Plan was false.

128.    Purchaser intended Debtors to rely on its statement that it was working to become current on the Texas Payment Plan.

129.    Plaintiffs relied upon Purchaser's false statement that it was working to become current on the Texas Payment Plan by relaying the false representation to Texas authorities and continuing not to take any actions to specifically enforce Debtors' rights under the Purchase

Agreement and Sales Tax Funding Commitment. Plaintiffs' reliance upon Purchaser's representation was reasonable and justifiable.

130. Plaintiffs have incurred damages as a result of their reliance on Purchaser's false representation.

131. Purchaser's actions were undertaken with malice, moral turpitude, and wantonness.

132. Accordingly, Plaintiffs are entitled to an award of compensatory and punitive damages in an amount to be determined at trial.

<div align="center">

COUNT VII

**Unjust Enrichment Against Purchaser and Loot ABC**

</div>

133. Plaintiffs reallege and incorporate by reference each of the allegations contained in the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

134. Plaintiffs conferred a benefit upon Purchaser by transferring substantially all of their assets to Purchaser in exchange for Purchaser's agreement to pay the Purchase Price. Additional benefits were conferred on Purchaser when Debtors agreed to defer payment of the sales-tax portion of the Purchase Price by allowing Purchaser to satisfy it over time and when Debtors have pursued the D&O Litigation, of which some of the proceeds will benefit Purchaser.

135. Purchaser's breach of the Sales Tax Funding Commitment and its attempt to abandon its Purchase Price obligation while retaining the full benefit of Debtors' assets and business opportunities and transferring assets and operations to its affiliates, violate fundamental principles of justice, equity, and good conscience, and Purchaser equitably ought to compensate Plaintiffs for the benefits conferred upon it.

136. Unless Purchaser is required to compensate Plaintiffs for the benefits conferred upon it, Purchaser will be unjustly enriched at the expense of Plaintiffs.

137.    Moreover, the Term Sheet Order imposed various obligations on Purchaser, and conferred enormous **potential** financial benefits on Purchaser.

138.    Specifically, Purchaser could recover a great deal, if it had funded the costs of the D&O Litigation as required by the Term Sheet Order.

139.    The term sheet attached to the Term Sheet Order is, by its terms, binding.

140.    Neither Debtors nor Committee are in breach of the term sheet attached to the Term Sheet Order.

141.    Purchaser failed to fund the costs of the D&O Litigation as required by the Term Sheet Order.

142.    To date, Loot ABC has also not funded the costs of the D&O Litigation.

143.    In addition, by failing to honor the Sales Tax Funding Commitment, Purchaser has made confirmation of a plan in this case – assuming there are D&O Litigation proceeds – substantially harder and more expensive, if the underlying tax claims are priority claims against Debtors.

144.    In this context, even aside from the breach of the Sales Tax Funding Commitment, the breach of the Term Sheet Order would, if Purchaser or Loot ABC still obtained any recovery on the Claim for D&O Litigation Proceeds.

145.    In other words, Purchaser and Loot ABC are treating the Term Sheet Order as a lottery ticket, purchased using non-recourse credit.  If the ticket wins, then they can cover their obligations under the Term Sheet Order, but if the ticket is worthless, then they simply point to their empty pockets when it comes to their obligations under the Term Sheet Order, the Purchase Agreement, and the Sales Tax Funding Commitment.

146.     Plaintiffs are entitled to an order of this Court requiring Purchaser, and Loot ABC, to compensate Plaintiffs for the benefits conferred upon them, in an amount to be determined at trial.

## COUNT VIII
## Avoidance of Transfers to John Doe

147.     Plaintiffs reallege and incorporate by reference each of the allegations contained in the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

148.     Purchaser's transfer of assets to one or more of its affiliates (the "*Transfers*") is fraudulent under Section 1304 of Title 6 of the Delaware Code (the "*Delaware Code*")

149.     Purchaser made the Transfers with actual intent to hinder, delay, and/or defraud Debtors, in particular in their ability to enforce its specific performance rights or to recover damages under the Sales Tax Funding Commitment.

150.     Alternatively, Purchaser made the Transfers without receiving reasonably equivalent value in exchange for the Transfers, and at the time of the Transfers Purchaser was insolvent, was rendered insolvent, or was engaged in a business for which its remaining assets were unreasonably small.

151.     Alternatively, Purchaser made the Transfers to an insider for an antecedent debt, Purchaser was insolvent at the time, and the insider had reasonable cause to believe that Purchaser was insolvent at the time.

152.     At all relevant times, Plaintiffs were creditors of Purchaser holding claims within the meaning of Section 1301 of the Delaware Code.

153.     Accordingly, the Transfers should be avoided as fraudulent in accordance with Section 1307 of the Delaware Code.

## COUNT IX
### Recovery of Avoided Transfers from John Doe

154.    Plaintiffs reallege and incorporate by reference each of the allegations contained in the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

155.    Plaintiffs are entitled to recover, for the benefit of their estates, the property included in the Transfers from the initial transferee of the Transfers or the entity for whose benefit the Transfers were made.

## COUNT X
### Setoff, against Purchaser and Loot ABC

156.    Plaintiffs reallege and incorporate by reference each of the allegations contained in the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

157.    Purchaser did not make all required payments under the Sales Tax Funding Commitment.

158.    Loot ABC has made no payments under the Sales Tax Funding Commitment.

159.    Purchaser did not fund the required litigation expenses under the Term Sheet Order.

160.    Loot ABC has not funded the required litigation expenses under the Term Sheet Order.

161.    These failures have caused Debtors and their estates monetary damages, including the costs of this action (including legal fees), and the eventual amounts due to the taxing authorities that Purchaser was to pay.

162.    As set forth above, Purchaser's breaches and Loot ABC's breaches excuse further performance by Debtors under the Sale Agreement, and eliminates Purchaser's or Loot ABC's rights under the Sale Agreement.  This includes, to the extent such rights are not replaced by the

term sheet and the right to recovery on account of the Claim for D&O Litigation Proceeds, any rights to the proceeds of the D&O Litigation.

163. But in the alternative, if Purchaser is entitled to any recovery through the proceeds of the D&O Litigation or on account of the Claim for D&O Litigation Proceeds, Debtors may set off against such recovery its claims against Purchaser as set forth above.

164. If Loot ABC is entitled to any recovery through the proceeds of the D&O Litigation or on account of the Claim for D&O Litigation Proceeds, Debtors may set off against such recovery its claims against Purchaser as set forth above. Loot ABC cannot take an assignment of a claim potentially owed by a party (here, Debtors), but disavow or cleanse that claim from setoff rights arising from amounts owed to that party.

165. Plaintiffs are entitled to recover, for the benefit of their estates, any and all amounts owed to them for the matters above, against any amounts to which Purchaser or Loot ABC would be entitled for the Claim for D&O Litigation Proceeds.

<div align="center">

COUNT XI
**The Remedy of Constructive Trust**

</div>

166. Plaintiffs reallege and incorporate by reference each of the allegations contained in the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

167. A constructive trust is an equitable remedy whereby the court determines whether, due to a defendant's wrongdoing, equitable title to property properly lies in the plaintiff and, if so, deems the defendant to have been simply holding the property as a constructive trustee for the plaintiff.

168. A claim for imposition of a constructive trust requires a showing that (i) there was an enrichment; (ii) an impoverishment; (iii) a relation between the enrichment and the

impoverishment; (iv) the absence of justification; and (v) the absence of a remedy provided by law.

169.    In this case, Purchaser's failure to honor the Sales Tax Funding Commitment enriched Purchaser.

170.    Likewise, Purchaser's failure to honor the term sheet, by failing to fund the litigation expenses required of it, enriched Purchaser.

171.    Loot ABC, as assignee of all or substantially all of Purchaser's assets, was likewise enriched, as its collection of assets was greater than it would have been had Purchaser paid the amounts it was required to pay.

172.    Debtors' estate was impoverished by these same amounts.  Debtors estate is now burdened with greater tax liabilities than they would have had.  Likewise, Debtors and the Committee are in the process of finding another source to cover the costs of the D&O Litigation.

173.    The enrichment and the impoverishment are related – the term sheet was the basis for a liquidating plan, and it contemplated the performance of Purchaser, and the reward of Purchaser from a portion of the D&O Litigation proceeds.  Likewise, the tax payment Purchaser was to pay would have possibly allowed for a liquidating plan (by relieving Debtors' estates of priority claims), and such plan was then the subject of the term sheet.

174.    As such, Purchaser's breaches are completely intertwined with the damages being suffered by Debtors.

175.    Moreover, Purchaser, Committee, and Debtors were partners via the term sheet – each contributed something to the potential successful resolution of this case, and a return to all creditors, and the term sheet reflected a partnership among them, through a careful allocation of proceeds, obligations, and the like.

176.     Purchaser has provided no justification for its actions.  Indeed, Purchaser indicated that it simply would refuse to make the required tax payments, once it was confronted, and after Debtors were deceived through Purchasers' lawyers for some months.

177.     To the extent the remedies above do not make Debtors' whole, then a constructive trust exists as to Purchaser's assets, and such trust carries over to Loot ABC's assets (all of which were obtained from Purchaser).

## **Relief Requested**

WHEREFORE Plaintiffs demand judgment in their favor and request the following relief:

(a)     Entry of a decree of specific performance of Purchaser's obligations under the Sales Tax Funding Commitment, including reimbursement of Plaintiffs' costs and expenses incurred in bringing this action, and requiring pre-funding of an escrow for use in paying the remaining payments for the Payment Plans;

(b)     In the alternative, entry of a judgment for money damages in an amount to be proven at trial, or a finding that Purchaser's and Loot ABC's breaches render them not entitled to the benefit of their bargain in respect of any proceeds of the D&O litigation, including any recovery on the Claim for D&O Litigation Proceeds;

(c)     Entry of a decree equitably subordinating Purchaser's or Loot ABC's Claims and extinguishing their right to any proceeds of the D&O Litigation, including any recovery on the Claim for D&O Litigation Proceeds;

(d)     Entry of a judgment avoiding the Transfers and directing recovery of the associated assets for the benefit of Debtors and their estates;

(e)     Entry of a judgment authorizing Debtors to setoff any amounts to which Purchaser or Loot ABC would be entitled from the D&O Litigation, including any recovery on the Claim for D&O Litigation Proceeds, against the claims held by Debtors for the causes of action above;

(f)     Imposition of a constructive trust on the assets of Purchaser and Loot ABC; and

(g)     such other and further relief as is just.

*[This space left intentionally blank.]*

Dated: March 21, 2022

**BRYAN CAVE LEIGHTON PAISNER LLP**

*/s/ Mark I. Duedall*
Mark I. Duedall (No. 3346)
Brian C. Walsh (*Admitted pro hac vice*)
Leah Fiorenza McNeill (*Admitted pro hac vice*)
1201 W. Peachtree Street, NW, 14th Floor
Atlanta, Georgia 30309-3471
Telephone: (404) 572-6600
Facsimile:  (404) 572-6999
Email: mark.duedall@bclplaw.com
        Brian.walsh@bclplaw.com
        leah.fiorenza@bclplaw.com

**BRYAN CAVE LEIGHTON PAISNER LLP**

Andrew J. Schoulder (*Admitted pro hac vice*)
1290 Avenue of the Americas
New York, New York 10104-3300
Telephone: (212) 541-2000
Facsimile:  (212) 541-4630
Email: andrew.schoulder@bclplaw.com

-and-

**ROBINSON & COLE LLP**

Natalie D. Ramsey (No. 5378)
Jamie L. Edmonson (No. 4247)
Mark A. Fink (No. 3946)
1201 North Market Street
Suite 1406
Wilmington, Delaware 19801
Telephone: (302) 516-1700
Facsimile:   (302) 516-1699
Email: nramsey@rc.com
        jedmonson@rc.com
        mfink@rc.com

*Co-Counsel to Plaintiffs*

## EXHIBIT A

**Sales Tax Funding Commitment**

STRICTLY CONFIDENTIAL

Loot Crate Acquisition LLC
603 Sweetland Avenue
Hillside, NJ 07205

October 1, 2019

Loot Crate, Inc.
Loot Crate Holdings, Inc.
LC Funding, Inc.
Loot Crate Parent, Inc.
3401 Pasadena Avenue
Los Angeles, CA 90031-1929
Attention: Stuart Kaufman

> Re:     Sales Tax Funding Commitment

Ladies and Gentlemen:

Reference is hereby made to that certain Amended and Restated Asset Purchase Agreement, dated as of September 27, 2019 (the "**Purchase Agreement**") by and among Loot Crate, Inc., Loot Crate Holdings, Inc., LC Funding, Inc. and Loot Crate Parent, Inc. (collectively, the "**Sellers**"), and Loot Crate Acquisition LLC ("**Purchaser**"). This letter agreement (this "**Agreement**") sets forth the commitment of Purchaser, subject to the terms and conditions hereof, to make certain payments on behalf of the Sellers to the applicable Taxing Authorities under the Payment Plans in accordance with Section 8.5 of the Purchase Agreement. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Purchase Agreement.

1.     Upon the terms and subject to the conditions set forth herein, concurrently with the Closing, Purchaser hereby commits to fund, directly or indirectly, an amount in cash in immediately available funds necessary to fully discharge the payment obligations of the Sellers and any Successor Entity (each, a "**Seller Entity**" and collectively, the "**Seller Entities**") arising in the states listed on <u>Appendix A</u> attached hereto (the "**States**") as such individual payments become due under the Payment Plans attached hereto as <u>Appendix B</u> (as updated from time to time after the date hereof in accordance with the Purchase Agreement and this Agreement) entered into by the applicable Seller Entities with the Taxing Authorities of the States (collectively, as updated from time to time in accordance with the Purchase Agreement and this Agreement, the "**Sales Tax Funding Commitment**"); <u>provided</u>, <u>however</u>, that Purchaser shall have no obligation to fund, directly or indirectly, any amounts upon the termination of this Agreement other than Defaulted Payments. Upon the finalization of each Post-Closing Payment Plan after the Closing in accordance with Section 8.5 of the Purchase Agreement, <u>Appendix B</u> hereto will be updated to include such Post-Closing Payment Plan, and this Agreement will then cover such payment obligations.

2.     Purchaser shall make Sales Tax Funding Commitment payments under a Payment Plan either, in Purchaser's discretion (unless an applicable State directs otherwise), directly to the applicable State Taxing Authority or to the applicable Seller Entity for its payment to the

applicable State Taxing Authority in accordance with the Payment Plan; provided that with respect to any payments made by Purchaser directly to a State Taxing Authority, Purchaser shall provide to the Seller Entities written documentation evidencing such payment was made.

3.      This Agreement shall terminate, automatically and without any need for any action by any Person, upon the earliest to occur of the following:

(a)      Purchaser's establishment of a Material Breach as follows:

i.      On or before (x) February 29, 2020 (i.e., 60 days after December 31, 2019) in the event that the Closing under the Purchase Agreement occurs on or before October 1, 2019 or (y) the date that is on the six-month anniversary of the Closing in the event that the Closing occurs after October 1, 2019 (the date of the applicable notice deadline, the "**Notice Date**"), Purchaser shall have (A) delivered written notice with reasonable detail (it being agreed, however, that any claim by Sellers regarding any alleged lack of reasonable detail shall not be grounds for disqualifying any notice provided on or before the Notice Date) to the Seller Entities describing (I) the material inaccuracies in the financial information listed on Schedule I attached hereto and made available to Purchaser prior to the Closing in the Merrill Data Site folder titled "2 Financial" (the "**Financial Data**") or (II) the material breaches of, the Sellers' representations and warranties set forth in Section 3.3 of the Purchase Agreement, that have caused a "Material Adverse Effect" (as defined below) ((I) or (II), a "**Material Breach**"), and (B) deposited, by wire transfer of immediately available funds, an amount equal to $150,000 in a reserve account designated by the Seller Entities to fund certain costs and expenses as set forth herein (the "**Fee Reserve**").

ii.      Purchaser shall establish a Material Breach has occurred by obtaining, at its election, either (A) an entry of a final judgment by the Bankruptcy Court, which shall have exclusive jurisdiction with respect thereto (the "**Material Breach Order**"), or (B) a final determination by Sheila Enriquez of Briggs & Veselka Co. (the "**Independent Auditor**") upon review of the Financial Data and related materials reasonably requested by the Independent Auditor to make such determination. In the event Purchaser elects to seek a Material Breach Order, each of the Parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the Bankruptcy Court or that any such suit, action or proceeding which is brought in the Bankruptcy Court has been brought in an inconvenient forum. The Parties acknowledge and agree that in the event Purchaser elects to seek a determination by an Independent Auditor, any determination by the Independent Auditor shall be final, binding and non-appealable and non-reviewable.

iii.      The Seller Entities shall use the funds in the Fee Reserve to pay all costs and expenses arising from either the Seller Entities' Representatives (in the event Purchaser elects to obtain a Material Breach Order) or the Independent Auditor, including, without limitation, promptly funding a retainer for the Independent Auditor

(the "**Establishment Costs**").  In the event Purchaser is unable to establish a Material Breach, Purchaser shall (A) reimburse the Seller Entities for all additional Establishment Costs in excess of $150,000 and (B) be responsible for any additional interest or penalties payable under the Payment Plans, in excess of the Fee Reserve.  The unused portion of the Fee Reserve, if any, shall be promptly paid to Purchaser.

iv.     For the avoidance of doubt, (A) the obligations of Purchaser to fund the Sales Tax Funding Commitment shall continue unless and until Purchaser has established a Material Breach in accordance with the terms hereof; (B) any failure by Purchaser to fund amounts due to the Taxing Authorities under the Sales Tax Funding Commitment prior to Purchaser's establishment of a Material Breach shall constitute a material default by Purchaser under this Agreement ("**Defaulted Payments**"); and (iii) if a Material Breach is established by Purchaser, Purchaser shall remain liable for and satisfy any portion of the Sales Tax Funding Commitment that came due and remains unpaid prior to the establishment of the Material Breach as a condition to the effectiveness of this Section 3(a).

v.     For purposes of this Agreement, a "**Material Adverse Effect**" means any material adverse effect on the Purchased Assets or the Business; provided that none of the following shall constitute, or be taken into account in determining whether or not there has been, a Material Adverse Effect:  (A) changes in general business or economic conditions affecting the industry in which the Sellers operate the Business, (B) changes in national or international political or social conditions, including the engagement by the United States in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, terrorist attack upon the United States, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, asset, equipment or personnel of the United States, (C) changes in, GAAP after the date hereof, (D) changes in applicable Laws after the date hereof, (E) changes resulting from the public announcement of this Agreement or the Transactions, (F) the failure, in and of itself, of the Sellers to achieve any budgets, projections or forecasts (but, excluding, for the avoidance of doubt, the underlying causes of any such failure), (G) changes to the extent resulting from the actions or omissions of Purchaser after the Closing Date with respect to the Purchased Assets or the Business, (H) any event, change, occurrence, circumstance, development or effect resulting from any action with respect to which the Sellers obtained the consent of the DIP Lender to take, and (I) any increase in subscriber churn, reduction in new sign ups or loss or non-assignment of vendor/licensor relationships to the extent caused by (1) a reduction in marketing spend from and after the filing of the Bankruptcy Cases, (2) the announcement or filing of the Bankruptcy Cases, (3) any action taken by Sellers with the prior written consent of Purchaser or with due care and in accordance with the directions of Purchaser pursuant to the Purchase Agreement or Transition Services Agreement or (4) any action not taken by the Sellers (x) at Purchaser's written request or (y) as a result of Purchaser's refusal to grant consent to such action after Sellers' written request pursuant to the Purchase Agreement or Transition Services Agreement.

(b)     the date that any Seller Entity or any of their Representatives (i) asserts in any Action, litigation or other proceeding (x) that one or more of the provisions in Section 7 of this Agreement are illegal, invalid or unenforceable in whole or in part, (y) that Purchaser has any liability under this Agreement other than to fund cash payments (including penalties and interest with respect to any Defaulted Payments) with respect to the Sales Tax Funding Commitment in accordance with the Payment Plans or (z) any claim or theory of liability against the Non-Recourse Parties (as defined below) relating to this Agreement, the Purchase Agreement or any of the transactions contemplated by this Agreement or the Purchase Agreement or (ii) asserts, or threatens to assert, any claim against a Non-Recourse Party (as defined below) in connection with this Agreement, the Purchase Agreement or any of the transactions contemplated by this Agreement or the Purchase Agreement (including in respect of any oral representations made or alleged to be made in connection therewith), whether in any Action, litigation or other proceeding, through counsel or in any other way; and

(c)     the date that Purchaser has fulfilled its payments obligations under Section 1 of this Agreement (including penalties and interest with respect to any Defaulted Payments).

4.      The Seller Entities shall be entitled to seek specific performance against Purchaser to cause Purchaser to satisfy its obligations hereunder, with the costs and expenses of the Seller Entities in seeking such relief being an obligation of the Purchaser.

5.      Each party hereto acknowledges and agrees that this Agreement is not intended to, and does not, create any agency, partnership, fiduciary or joint venture relationship between or among any of the Parties hereto and neither this Agreement nor any other document or agreement entered into by any Party hereto relating to the subject matter hereof shall be construed to suggest otherwise.

6.      Purchaser acknowledges and agrees that this Agreement may be assigned by the Sellers to the Successor Entity in connection with the Successor Entity's assumption from the Sellers of all Liabilities arising from Pre-Petition Sales Taxes and the Payment Plans. Upon such assignment, this Agreement shall inure to the benefit of the Successor Entity and shall be enforceable by the Successor Entity as if it was the Sellers under this Agreement.

7.      Notwithstanding anything that may be expressed or implied in this Agreement or any document or instrument delivered in connection herewith or otherwise, each of the Sellers, by its acceptance of the benefits hereof, covenants, agrees and acknowledges for itself and its Affiliates, and any Person claiming on its or their behalf, from time to time (including, without limitation, the Seller Entities), that no person other than Purchaser has any liabilities, obligations or commitments of any nature (whether known or unknown, whether due or to become due, absolute, contingent or otherwise) hereunder (in each case subject to the limitations provided herein) or in connection with the transactions contemplated hereby and that, notwithstanding that Purchaser is a limited liability company, no Person other than Purchaser shall have any obligation hereunder or under any document or instrument delivered in connection herewith, against, or any claim (whether in bankruptcy, tort, contract or otherwise) based on, in respect of, or by reason of, this Agreement or arising out of or in connection with the transactions

4

contemplated hereby, and that no recourse hereunder or under any documents or instruments delivered in connection herewith or in respect of any oral representations made or alleged to be made in connection herewith or therewith, shall be had against, and no personal liability with respect thereto shall attach to, be imposed upon or otherwise be incurred by (a) any former, current or future equity holder, controlling person, director, officer, employee, agent, Affiliate, member, manager, general or limited partner, Representative or successor or assignee of Purchaser or (b) any former, current or future equity holder, controlling person, director, officer, employee, agent, affiliate, member, manager, general or limited partner, Representative or successor or assignee of the foregoing (such Persons, collectively, but excluding Purchaser, the "**Non-Recourse Parties**"), whether by or through attempted piercing of the corporate veil, limited partnership or limited liability company veil, by the enforcement of any assessment or by any legal or equitable proceeding, by virtue of any statute, regulation or applicable Law. Notwithstanding anything to the contrary in this Agreement, this Section 7 shall survive the termination and expiration of this Agreement.

8.      None of the Sellers may assign or delegate its rights, interests or obligations under this Agreement (by operation of law or otherwise) to any other Person (other than a Successor Entity or Bankruptcy Successor in accordance with Section 6) without the prior written consent of Purchaser.  The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns, including with respect to the Sellers, any chapter 7 trustee, plan administrator, trustee of a liquidating trust, or other successor arising from the pendency of the Bankruptcy Cases.  Any purported assignment of this Agreement in contravention of this Sections 6 and 8 shall be null and void.

9.      The directors and officers listed on Schedule II hereto will be express third party beneficiaries of this Agreement if and to the extent (and solely to the extent) that such person seeks specific performance of Purchaser's obligation to fund a payment in respect of the Sales Tax Funding Commitment, in each case, if and only to the extent permitted by, and subject to the limitations set forth in, the next sentence and for no other purpose (including, without limitation, any claim for monetary damages hereunder).  In the event that (i) Purchaser fails to timely fund a payment required to be made under the Sales Tax Funding Commitment and (ii) Purchaser fails to cure such failure within ten (10) Business Days of written notice from an officer or directed listed on Schedule II, then the directors and officers listed on Schedule II shall be entitled to seek specific performance of Purchaser's obligation to fund such payment under Section 1 of this Agreement.  Except for the directors and officers listed on Schedule II (pursuant to the first two sentence of Section 9 of this Agreement) and the Non-Recourse Parties (pursuant to Section 7 of this Agreement) and any rights assigned to a permitted assignee (pursuant to Sections 6 and 8 of this Agreement), no Person shall be entitled to rely upon this Agreement, and this Agreement shall be binding upon and inure solely to the benefit of each Party hereto and nothing herein or in any other agreement (including, without limitation, the Purchase Agreement), express or implied, is intended to or shall confer upon any other Person any rights, benefits or remedies whatsoever under or by reason of this Agreement.

10.     Sections 12.1 (Notice), 12.2 (Waivers), 12.4 (Governing Law) and 12.5 (Jurisdiction) shall apply to this Agreement and are incorporated herein by reference.

11.     This Agreement constitutes the entire agreement, and supersedes any and all prior or contemporaneous agreements (other than the Purchase Agreement), whether written or oral, with regard to the subject matter herein.   Notwithstanding the foregoing, this Agreement is subject in all respects to the terms and conditions of the Purchase Agreement and nothing herein, express or implied, is intended to or shall be construed to modify, expand or limit in any way the terms, representations and warranties or covenants contained in the Purchase Agreement.   No amendment, modification or waiver of any of the provisions of this Agreement will be valid unless set forth in a written instrument signed by the party to be bound.   An executed copy of this Agreement may be delivered by means of a facsimile machine or other electronic transmission (including .pdf., tif, .gif, .jpeg or similar attachment to electronic mail files), and shall be treated in all manner and respects and for all purposes as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

*     *     *     *     *

If this Agreement is agreeable to you, please so indicate by signing in the space indicated below.

Very truly yours,

Loot Crate Acquisition LLC

By: _____

Name: Joel Weinshanker

Its:   Sole Member

SELLERS:

Loot Crate, Inc.

By: _____

Name:

Its:

Loot Crate Holdings, Inc.

By: _____

Name:

Its:

LC Funding, Inc.

By: _____

Name:

Its:

Loot Crate Parent, Inc.

By: _____

Name:

Its:

If this Agreement is agreeable to you, please so indicate by signing in the space indicated below.

Very truly yours,

Loot Crate Acquisition LLC

By: _____
Name: Joel Weinshanker
Its:   Sole Member


SELLERS:

Loot Crate, Inc.

By: _____
Name:  Mark Palmer
Its:       Chief Transformation Officer

Loot Crate Holdings, Inc.

By: _____
Name:  Mark Palmer
Its:       Chief Transformation Officer

LC Funding, Inc.

By: _____
Name:  Mark Palmer
Its:       Chief Transformation Officer


Loot Crate Parent, Inc.

By: _____
Name:  Mark Palmer
Its:       Chief Transformation Officer

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | Chapter 11 Case |
| | § | |
| Old LC, Inc., *et al.,*[6] | § | Case No. 19-11791 (BLS) |
| | § | |
| Debtors. | § | Jointly Administered |

| | | |
|---|---|---|
| Old LC, Inc. (f/k/a Loot Crate, Inc.), Old | § | |
| LC Holdings, Inc., Old LCF, Inc., and | § | |
| Old LC Parent, Inc., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Adv. No. 22-50107 (BLS) |
| | § | |
| The Loot Company (f/k/a Loot Crate | § | |
| Acquisition LLC) and John Doe, | § | |
| | § | |
| Defendants. | § | |

## CERTIFICATE OF SERVICE

This is to certify that I have on this day electronically filed the *First Amended Complaint*

using the Court's CM/ECF filing system, which generated an email notice of the filing, linked to

this document, to the following parties:

| | |
|---|---|
| Erin R. Fay | Cathy Hershcopf |
| Steven D. Adler | Lauren A. Reichardt |
| Bayard, P.A. | Cooley LLP |
| 600 N. King Street, Suite 400 | 55 Hudson Yards |
| Wilmington, DE 19801 | New York, NY10001-2157 |

---

[6]     Debtors are the following four entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Old LC, Inc. (7119), Old LC Holdings, Inc., Old LCF, Inc., and Old LC Parent, Inc.  Debtors' noticing address in these Chapter 11 cases is c/o Bryan Cave Leighton Paisner LLP, Attn: Mark I. Duedall, 1201 W. Peachtree Street, 14th Floor, Atlanta, Georgia 30309.

Morris James
Jefferey R. Waxman
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801

I further certify that on March 21, 2022, I caused a copy of the *First Amended Complaint*

to be served via electronic mail to the party listed below.

Ron Bender
Levene, Neale, Bender, Yoo & Golubchik, LLP
2818 La Cienega Avenue
Los Angeles, CA 90034
Email: rb@lnbyg.com

Dated: March 21, 2022

**BRYAN CAVE LEIGHTON PAISNER LLP**

_/s/ Mark I. Duedall_
Mark I. Duedall (No. 3346)
Leah Fiorenza McNeill *(Admitted pro hac vice)*
1201 W. Peachtree Street, NW, 14th Floor
Atlanta, Georgia 30309-3471
Telephone: (404) 572-6600
Facsimile:  (404) 572-6999
Email: mark.duedall@bclplaw.com
        leah.fiorenza@bclplaw.com

*Counsel to Plaintiffs*

604736388

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Old LC, Inc., *et al.*[1] | § | Case No. 19-11791 (BLS) |
| | § | |
| Debtors. | § | (Jointly Administered) |

_____

| | | |
|---|---|---|
| | § | |
| Official Committee of Unsecured Creditors | § | |
| of Old LC, Inc., et al., for and on behalf of | § | |
| the estates of Old LC, Inc., et al., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Adv. No. 20-51002 (BLS) |
| | § | |
| Upfront V, LP, Breakwater Credit | § | |
| Opportunities Fund, L.P.; Upfront GP V, | § | |
| LLC; Mark Suster; Dana Kibler; Gregory | § | |
| Bettinelli; Saif Mansour; Aamir Amdani; | § | |
| Eric Beckman; Darrick Geant; and Joseph | § | |
| Kaczorowski, | § | |
| | § | |
| *Defendants.* | § | |

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of April, 2022, I caused to be filed with the Court electronically, and I caused to be served a true and correct copy of the *Plaintiff's Unopposed Motion to Substitute Defendant Saif Mansour's Executor as Defendant* upon the parties that are registered to receive notice via the Court's CM/ECF notification system, and additional service was competed via electronic mail on the parties listed on the attached service list.

/s/ Jeffrey R. Waxman
Jeffrey R. Waxman (DE Bar No. 4159)

---

[1] The Debtors are the following four entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Old LC, Inc. (7119), Old LC Holdings, Inc., Old LCF, Inc., and Old LC Parent, Inc. The Debtors' noticing address in these Chapter 11 cases is c/o Bryan Cave Leighton Paisner LLP, Attn: Mark I. Duedall, 1201 W. Peachtree Street, 14th Floor, Atlanta, Georgia 30309.

## <u>SERVICE LIST</u>

Dean A. Ziehl, Esquire
James K.T. Hunter, Esquire
Colin R. Robinson, Esquire
Pachulski Stang Ziehl & Jones LLP
919 North Market Street, 17th Floor
Wilmington, DE 19801
dziehl@pszjlaw.com
jhunter@pszjlaw.com
crobinson@pszjlaw.com

*Counsel for Upfront V, LP, Upfront GP V, LLC,*
*Mark Suster, Dana Kibler, and Gregory Bettinelli*


Jody C. Barillare, Esquire
Morgan, Lewis & Bockius LLP
1201 N. Market Street, Suite 2201
Wilmington, DE 19801
jody.barillare@morganlewis.com

Sabin Willett, Esquire
Morgan, Lewis & Bockius LLP
One Federal Street
Boston, MA 02110-1726
sabin.willett@morganlewis.com

Joshua Dorchak, Esquire
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178-0060
joshua.dorchak@morganlewis.com

*Counsel for Breakwater Credit Opportunities Fund, L.P.,*
*Saif Mansour, Aamir Amdani, Eric Beckman,*
*Darrick Geant, and Joseph Kaczorowski*