IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | Chapter 11 Case |
| | § | |
| Old LC, Inc., *et al.*[1] | § | Case No. 19-11791 (BLS) |
| | § | |
| Debtors. | § | Jointly Administered |

_____

| | | |
|---|---|---|
| | § | |
| Official Committee of Unsecured Creditors | § | |
| of Old LC, Inc., et al., for and on behalf of | § | |
| the estates of Old LC, Inc., *et al.*; | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Adv. No. 20-51002 (BLS) |
| | § | |
| Upfront V, LP, Breakwater Credit | § | |
| Opportunities Fund, L.P.; Upfront GP V, | § | |
| LLC; Mark Suster; Dana Kibler; Gregory | § | |
| Bettinelli; Saif Mansour; Aamir Amdani; | § | |
| Eric Beckman; Darrick Geant; and Joseph | § | |
| Kaczorowski | § | |
| | § | |
| *Defendants.* | § | |

## DEBTORS' REPLY IN SUPPORT OF JOINT MOTION OF THE DEBTORS AND THE OFFICIAL COMMITTEEOF UNSECURED CREDITORS FOR ENTRY OF AN ORDER (I) PURSUANT TO RULE 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND 11 U.S.C. § 105(A) APPROVING A SETTLEMENT, AND (II) AUTHORIZING PAYMENT OF LEGAL FEES AND EXPENSES OF CONTINGENCY <u>COUNSEL AND US TRUSTEE FEES</u>

The Debtors hereby file this *Reply in Support of (A) Joint Motion of the Debtors and the*

*Official Committee of Unsecured Creditors for Entry of an Order (I) Pursuant to Rule 9019 of the*

*Federal Rules of Bankruptcy Procedure and 11 U.S.C. § 105(a) Approving a Settlement, and (II)*

---

[1]    The Debtors are the following four entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Old LC, Inc. (7119), Old LC Holdings, Inc., Old LCF, Inc., and Old LC Parent, Inc.  The Debtors' noticing address in these Chapter 11 cases is c/o Bryan Cave Leighton Paisner LLP, Attn: Mark I. Duedall, 1201 W. Peachtree Street, 14th Floor, Atlanta, Georgia 30309.

*Authorizing Payment of Legal Fees and expenses of Contingency Counsel and US Trustee Fees* (the "**Reply**").

## INTRODUCTION

Loot (Assignment for the Benefit of Creditors), LLC ("**Loot ABC**") was among the parties which negotiated at great length over the precise language in the *Joint Motion of the Debtors and the Official Committee of Unsecured Creditors for Entry of an Order (I) Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure and 11 U.S.C. § 105(a) Approving a Settlement, and (II) Authorizing Payment of Legal Fees and expenses of Contingency Counsel and US Trustee Fees* (the "**9019 Motion**"), and the settlement agreement attached thereto.  Yet, now Loot ABC objects to the negotiated language with respect to the Escrow Account in an inappropriate attempt to interject issues being litigated in a separate adversary proceeding.[2]

Loot ABC's objection should not be overlooked as cosmetic or immaterial – it was tactically briefed by Loot ABC in the context of the 9019 Motion to undermine the Debtors' primary remedy under Delaware law for the material breach of the Purchase Agreement: that the Purchaser's material breach of the executory Purchase Agreement excuses the Debtors, as the non-breaching party, from further performance under the Purchase Agreement (*i.e.*, Debtors' obligation to remit the D&O Proceeds).  If this Court were to grant Loot ABC's objection, Loot ABC would

---

[2]     Loot ABC also states in its objection that the Debtors may abscond with the settlement proceeds, or use such proceeds to bring current an overdue account. [D.I. 870 in the Bankruptcy Cases at pages 5-6]. Such a statement is absolutely false – and Loot ABC knows it.  It is true that the Debtors have an overdrawn DIP account.  This is because the estates have been bereft of funds for well over a year as they have spent all resources to pursue the D&O Claims, yet bank account maintenance fees, which are always substantial in any Chapter 11, continue to accrue.  For that reason, the settlement agreement plainly contemplates, as Loot ABC well knows, that the proceeds will be deposited in an **escrow account**, and not distributed at all **absent written stipulation by the parties or an order of this Court**.  To suggest that the Debtors may misuse these funds, to frankly, disappointing, a further attempt to create issues where none exist, and is not something the settlement agreement would contemplate at all – the settlement agreement contemplates exactly the opposite.  Loot ABC should not misstate facts or present false arguments to this Court.

presumably assert in future proceedings that the Purchase Agreement is no longer executory and, consequently, the Debtors' remedies are limited to money damages.

Loot ABC is playing games with these Estates and their constituents by attempting to litigate its purported ownership rights through the 9019 Motion while those same purported rights are already subject to challenge in a pending adversary proceeding. This is not the first time that Loot ABC has engaged in these tactics, as evidenced by the *Objection of Loot (Assignment for the Benefit of Creditors), LLC to Joint Motion of the Debtors and the Official Committee of Unsecured Creditors for Authority Pursuant to 11 U.S.C. § 363 and 105 and Federal Rule of Bankruptcy Procedure 6004 to Enter into a Postpetition Agreement with Stratera Capital, LLC.* [D.I. 837 in the Bankruptcy Cases].

Not only has Loot ABC inaptly placed the dispute over ownership of the D&O Proceeds at issue here, but Loot ABC also makes the demonstrably inaccurate assertion that it owns not only D&O Proceeds, but also "100% of the D&O Claims." [D.I. 870 in the Bankruptcy Cases at page 4, paragraph 3]. This disappointing (at best) assertion was never true under any reading of the Purchase Agreement, particularly the language emphasized in footnote 4 below, clearly stating that the D&O Claims would only be Purchased Assets if the Purchaser (as defined below) elected to assume them within six months of the Closing Date. This election was never made, and no one has ever pointed to a shred of evidence that it was. Indeed, if the election had been made, the Committee could never have been granted standing by this Court to litigate the D&O Claims on behalf of the estate.

Loot ABC has made this inaccurate assertion in prior pleadings, signed by counsel. *See, e.g.*, *Defendant Loot (Assignment for the Benefit of Creditors), LLC's Motion to Dismiss Plaintiffs' First Amended Complaint*, D.I. 62 in the adversary proceeding, at ¶2. While the Debtors can

forgive inadvertent inaccuracies, there is a line between advocacy and knowingly pleading false information.  On September 1, 2022, Loot ABC's counsel participated in a conference call (for the purpose of finalizing the 9019 Motion and Proposed Order) with, among others, counsel to the Committee, counsel to the Debtors, and counsel to the Purchaser – Cooley LLP.  Calling attention to Loot ABC's prior assertions in pleadings of ownership of the D&O Claims, counsel to the Debtors specifically asked Cooley LLP's representative to confirm whether the Purchaser acquired the D&O Claims.  In response, Cooley LLP's representative confirmed that the Purchaser did not acquire the D&O Claims, but only the right to the D&O Proceeds.  Yet, even after receiving this disclosure, Loot ABC has not only failed to correct previously filed false pleadings, but has knowingly reasserted this known fiction in its objection to the 9019 Motion.[3]  The Debtors defer to this Court as to the appropriate remedy to address Loot ABC's knowingly pleading false facts and assertions.

Moreover, Loot ABC's position on 100% ownership of the D&O Proceeds is tantamount to a proposition that this Court flatly rejected.  *See* Transcript of June 17, 2020 Hearing, attached hereto as <u>Exhibit A</u>, at 14:9 – 19:12.  Specifically, in connection with the Debtors' motion to conduct Rule 2004 investigations into the D&O Claims and the related supplemental retention application of Bryan Cave Leighton Paisner LLP, this Court made it clear that it was unwilling to permit prosecution of the D&O Claim, as an estate cause of action, if there would be no benefit to the estate.  If the Purchaser's material breach of the Purchase Agreement and Term Sheet were not

---

[3]    This is all the more egregious in light of the fact that, less than a week prior to the false assertion in Loot ABC's motion to dismiss, Loot ABC demonstrated full mastery of the correct facts in the *Objection of Loot (Assignment for the Benefit of Creditors), LLC to Joint Motion of the Debtors and the Official Committee of Unsecured Creditors for Autohrity Pursuant to 11 U.S.C. § 363 and 105 and Federal Rule of Bankruptcy Procedure 6004 to Enter Into a Postpetition Agreement with Stratera Capital, LLC,* D.I. 837 in the Bankruptcy Cases, at ¶13.

enough, almost 2.5 years later, Purchaser and Loot ABC are proposing that exact result – they get everything, the estates and creditors get nothing.[4]

By its misplaced assertion of ownership, Loot ABC has (once again) placed the issue squarely before the Court in connection with the 9019 Motion, making it necessary for a ruling on a fundamental legal issue, with regard to which the dispositive facts are undisputed – whether, under well-established Delaware law for breach of contract, the Purchaser's material breach of the Purchase Agreement excuses the Debtors from further performance with respect to Purchaser's rights to all or a portion of the D&O Proceeds:

1.      It is undisputed that, on October 1, 2019, the Debtors and The Loot Company, f/k/a Loot Crate Acquisition LLC (the "*Purchaser*"), entered into an agreement (the "*Purchase Agreement*," attached as Exhibit B) selling substantially all of the Debtors' assets (the "*Sale*"), including the right to pursue certain claims against the Debtors' former directors and officers (the "*D&O Claims*"), contingent upon the Purchaser bringing the claims within six months after closing of the sale.[5]  The consideration for the assets included, among other things, the future payment of certain sales taxes that totaled approximately $5 million.  The mechanics for making the future tax payments were memorialized in an agreement (the "*Sales Tax Funding*

---

[4]       It should not go unnoticed by this Court that the Purchaser's parent company or "affiliate" is believed to be the largest creditor of the Loot ABC estate.  Consequently, if Loot ABC were to receive 100% of the D&O Proceeds, as it currently seeks, the largest beneficiary of this inequitable result would be the very same parties responsible for the Purchaser's election to materially breach its obligations under the Purchase Agreement that created the mess that has imposed a significant administrative burden on the Debtors' estates.  In short, the "Purchaser" will have its cake and eat it too.

[5]       Section 2.1(u) of the Purchase Agreement provided, in relevant part, that the Purchaser was purchasing "all rights, claims or causes of action of Sellers, and proceeds thereof, of whatever kind or nature, and whether asserted or unasserted, including, without limitation any causes of action against current and former directors and officers of [Debtors] and any affiliates of such directors and officers (collectively, the "*D&O Claim Rights*") *if Purchaser elects, in its sole discretion, to assume such D&O Claim Rights within six (6) months of the Closing Date*, provided, however, the [Debtors] may only pursue such D&O Claim Rights with Purchaser's written consent and at Purchaser's direction, as the proceeds thereof would remain Purchased Assets...." (emphasis added).

*Commitment*," attached as <u>Exhibit C</u>)[6], executed with the Purchase Agreement.  On October 1,

2019, the Court entered an Order approving the Sale [D.I. 254 in the Bankruptcy Cases] (the "***Sale***

***Order***").  After closing, the Purchase Agreement was, and remains, an executory contract, in that

further performance was due to, and from, both parties post-closing.  To be clear, the contract is

***not*** executory in the sense that it may be assumed or rejected under Section 365 of the Bankruptcy

Code – it is a post-petition contract – but in the common-law sense that further performance was,

and is, required by both the Purchaser – which was required to make the payments under the Sales

Tax Funding Commitment – and the Debtors – which were required to, *inter alia*, provide

transition services, negotiate settlements with various state taxing authorities, pursue the D&O

Claim Rights, and finally turn over any proceeds thereof.

2.      It is undisputed that when the Purchaser bought substantially all of the Debtors'

assets, including any right or interest in the claims (or proceeds) of the bankruptcy estates against

former officers and directors (the "***D&O Proceeds***"), the Purchaser was required to ***pay*** the taxes

referenced above, into the future as tax settlements were achieved.  Not required to make best

efforts to pay, not required to simply oblige itself to pay, but instead, part of the consideration of

the deal by which the Purchaser acquired ***anything – including any rights in the D&O Proceeds***,

was an obligation to ***actually pay*** the taxes at issue.  That is in the Purchase Agreement, in plain

language.  The very definition of "Purchase Price" in the Purchase Agreement included the

***payments*** under the Sales Tax Funding Commitment.

3.      It is undisputed that, between the closing of the sale and approximately August of

2021, the Purchaser remitted certain payments to the taxing entities.

---

[6]      The Sales Tax Funding Commitment was to include as exhibits all of the state sales tax settlements that were subsequently negotiated and executed.  For simplification, rather than including all such executed settlements here, a sample executed settlement – with the State of Texas – is attached to Exhibit C.

4.      It is undisputed that the Purchaser did not commence any action on account of the D&O Claims within the six months immediately after the closing of the sale.  Instead, the Purchaser and its counsel expressed that they thought it better for the Debtors' estates to pursue the D&O Claims; the Debtors agreed, and then the Committee did as well, as discussed immediately below.

5.      It is undisputed that on October 21, 2020, after months of hard-fought negotiation and litigation, the Debtors, the Official Committee of Unsecured Creditors (the "***Committee***"), and the Purchaser entered into a term sheet (the "***Term Sheet***"), approved by this court (the "***Term Sheet Order***," attached as <u>Exhibit D</u>, including the Term Sheet).  Among other things, the Term Sheet provided for (i) the Committee to bring an action to prosecute the D&O Claims, (ii) the retention of contingency counsel for the Committee to bring the D&O Claims, (iii) payment by the Purchaser of all out-of-pocket expenses in connection with the D&O Claims, and (iv) ultimately, the allocation of the D&O Proceeds.  In reliance upon the Term Sheet and the parties' obligations therein, on November 2, 2020, the Committee commenced Adversary Proceeding No. 20-51002 in this court (the "***D&O Action***").

6.      It is undisputed that after the sale to the Purchaser closed, the Debtors shipped millions of dollars of "Loot Crates" to long-delayed customers, at the Purchaser's request and pursuant to a written and court-approved transition services agreement.  Indeed, these shipments helped crystallize the very tax liability the Purchaser was supposed to pay – once a "crate" is shipped, then the consumer is no longer entitled to a refund, and the taxes previously collected from the customer can and should be paid to the state taxing authorities.  Yet despite these efforts, which the Debtors were bound to undertake, the resulting crystallized tax liability has gone unpaid by the Purchaser.  In effect, through the post-closing transition services agreement, the Purchaser

required Debtors to crystallize these tax liabilities, and after receiving the benefits, subsequently breached the obligation to satisfy the resulting sales tax liabilities.  If that was not enough, the Purchaser (and its assignee, Loot ABC) believe they should now also receive all of the D&O Proceeds, and remaining estate constituents should be left behind like lost orphans.

7.      It is further undisputed that, beginning in the summer of 2021, the Purchaser breached its contractual obligation to the Debtors to pay the sales taxes.  The Purchaser's counsel admitted as much in a hearing before this Court:

> MS. HERSHCOPF:  This is just a breach of contract … It's not very often that a debtor enters into bankruptcy at all with sales tax unpaid …
>
> THE COURT: … and it was dealt with during the case, right, by an agreement that was submitted to me for approval which I did which was, effectively, part of the sale consideration …
>
> MS. HERSHCOPF:  So there are three parts of the sale consideration and the third part is **… the purchaser's obligation to pay under the sales tax funding agreement**.  Had this business actually performed well … then this company would have been in the position to pay under that contract … They don't have any more money to fund … They are in this ABC in order for these assets to be sold for the benefit of all creditors of which the debtor is one … the purchaser actually made payments during the last two years … Our client came to us and said no more, okay … everything that Cooley relayed to debtors' counsel was true to the best of our knowledge and not stated to intentionally mislead any party.

Transcript of February 4, 2022 Hearing, attached hereto as <u>Exhibit E</u>, at 16:10 – 18:2. (emphasis added).

The sales-tax amounts were fixed, the payment obligation was unconditional, and the Purchaser breached.  This damaged the Debtors by at least $2.6 million.  It is undisputed that the Debtors and the Committee – until they learned, after months of obfuscation (or worse), that the Purchaser had not made many of the tax payments and would not pay any further – were ready, willing, and able to comply with the Term Sheet once the D&O Claims were settled or brought to a successful judgment.

8.      In addition to the Purchaser's failure to pay the taxes, the Purchaser apparently fell behind on many other debts, including funds advanced to the Purchaser by its affiliates, and the Purchaser's obligations to pay out-of-pocket expenses incurred in connection with the D&O Action.  On February 2, 2022, the Purchaser effectuated an assignment for the benefit of creditors, thereby creating Loot ABC.  It is axiomatic that Loot ABC's rights are wholly derivative of those of the Purchaser, and Loot ABC now has only the entitlements that the Purchaser would have had.

These undisputed facts would, in any normal action approached by rational parties, lead to some simple results:

A.      The Purchase Agreement was and remains an executory contract.  Immediately after the Closing Date, and over the course of at least nine months thereafter, the Debtors executed on their obligations to provide transition services and negotiate settlements with state taxing agencies as required by the Purchase Agreement.  Moreover, and most importantly, the prosecution of the D&O Claims and the very filing of the 9019 Motion, without which there can be no D&O Proceeds, represents yet another instance of the Debtors' continuing to execute their obligations under the Purchase Agreement.  If the foregoing were insufficient to establish the executory nature of the Purchase Agreement, the mere existence of a "specific performance" clause within the Sales Tax Funding Commitment should more than sufficiently demonstrate the intent of the parties for the Purchase Agreement to remain as an executory contract.  To this day, the Debtors are continuing to enforce that specific performance right in connection with the pending adversary proceeding against the Purchaser and Loot ABC.

B.      Failure by the Purchaser to pay the taxes is a material breach of the Purchase Agreement.  A material breach gives rise to many remedies under well-established Delaware law, including excusing the non-breaching party – here, the Debtors – from further performing.

C.      If the Debtors no longer must perform in light of the Purchaser's material breach of the executory Purchase Agreement, then the Debtors may refuse to turn over to the Purchaser (or to Loot ABC, its assignee) any of the D&O Proceeds.  ***If this is true, based on these undisputed facts and basic legal principles, then the Purchaser is entitled to nothing in respect of the D&O Proceeds – it did not provide the remaining consideration required by the Purchase Agreement, and so it cannot continue to assert these unenforceable rights to impede the administration of the Debtors' estates and collect on the remaining benefit it would have received in exchange had it performed its contractual obligations.***

D.      The imposition of Loot ABC does not alter these outcomes at all.  Loot ABC took an assignment of almost every asset of the Purchaser – but that assignment is not untethered from obligations and defects encumbering those assets.  If Loot ABC had taken an assignment of a car encumbered by a lien, Loot ABC would not own the car outright.  And if Loot ABC took an assignment of a consumer's obligation to pay monthly subscription charges into the future, Loot ABC could not argue "Consumer you must pay now and in the future – but I don't have to ship the goods now or in the future."  Assets of all kinds, ***and especially assets that arise from an executory contract***, carry with them certain ongoing obligations.  Loot ABC cannot have greater rights than the Purchaser in the D&O Proceeds, and those rights cannot be untethered from the ongoing contractual obligations – as the Purchase Agreement provides and Cooley's counsel admitted, actually paying the taxes  – that created them or the defects arising from the breaches.

E.      Even putting aside the dispositive breach of the Purchase Agreement by the Purchaser, the Purchaser (and, since its creation, Loot ABC) also breached the Term Sheet.  Specifically, the Purchaser agreed to pay the out-of-pocket expenses in the D&O Action.  The Purchaser initially remitted a paltry $14,125 on account of the out-of-pocket expenses.  However,

the Purchaser stopped paying litigation expenses in the fall of 2021, at a critical juncture of the litigation when the deposition and expert phase of the case began.  Ultimately, as a direct and proximate result of the Purchaser's breach of its obligations under the Term Sheet, the Committee's contingency counsel advanced almost $180,000 for expenses.[7]

In short, Loot ABC does not own the D&O Proceeds, but it has once again placed the issue of their ownership front and center in a contested matter set for hearing, such that a ruling on the issue is now necessary in order to resolve the 9019 Motion.  The D&O proceeds belong to the estate, on whose behalf the Committee litigated the D&O Claims, and any rights of any other party to those proceeds based on a materially breached executory contract are of no force and effect.

While this matter could have been litigated in the adversary proceeding, Loot ABC's interjection of pages of argument and analysis in its 9019 objection means this issue can and should be decided right now.  As noted above, the parties spent weeks negotiating the language of the 9019 Motion that was finally accepted by Loot ABC; indeed Loot ABC is an actual party to the settlement agreement and signed it.  Thus, Loot ABC had the choice to allow the 9019 Motion to

---

[7]      The Purchaser's breach of its Term Sheet obligations caused enormous stress and expense upon the Committee with respect to the litigation of the D&O Claims, and frankly gave the Defendants in that action an undue advantage by knowing their opponent was not able to fund the litigation.  The Purchaser agreed to the terms of the compensation to be received by contingency counsel (which terms were approved by the Bankruptcy Court), which included that contingency counsel would not have to advance out-of-pocket expenses in connection with litigation; the Purchaser would pay such amounts.  At the time of the mediation of the D&O Claims, the Committee's contingency counsel (fairly) stated that it was not willing to advance any more expenses.

Notably, after the commencement of the assignment for the benefit of creditors, the Committee and the Debtors conferred with Loot ABC as to the out-of-pocket expenses and the unpaid taxes.  Loot ABC made an offer to pay the out-of-pocket expenses up to a certain dollar limit, however it did not – and could not – offer to pay the unpaid taxes or even United States Trustee Fees.  Yet Loot ABC still expected to receive the full amount of its entitlement to the D&O Proceeds.

Because of the need to pay expenses for the D&O Action, the Committee reached an agreement with a third party for litigation financing.  To that end, the Debtors and the Committee filed a motion to approve such financing.  Loot ABC and the Purchaser filed objections to the motion, asserting, among other things, purported ownership rights in the D&O Claims and the D&O Proceeds.  Ultimately, rather than incurring further costs, the Committee went forward with the mediation of the D&O Claims without additional financing.

proceed without objection like every other party who contributed to the terms of the 9019 Motion and settlement agreement. However, Loot ABC chose a different path. Instead, through its objection, Loot ABC opted to put its purported ownership rights to the D&O Proceeds before this Court in connection with the 9019 Motion, making it ripe for this Court's consideration. Therefore, in light of Loot ABC's objection, the Debtors believe it is only just, fair, and appropriate for this Court to determine whether Loot ABC has any interest whatsoever in the D&O Proceeds as a threshold matter before considering the substance of its objection. Based on the undisputed facts and applicable authority below, the Debtors believe the answer is, **no**.

## AUTHORITY

Under Delaware law, which governs the Purchase Agreement:[8]

> [a] party is excused from performance under a contract if the other party is in material breach thereof. … "The question whether the breach is of sufficient importance to justify non-performance by the non-breaching party is one of degree and is determined by 'weighing the consequences in the light of the actual custom of men in the performance of contracts similar to the one that is involved in the specific case.'"

*BioLife Sols., Inc. v. Endocare, Inc.*, 838 A.2d 268, 278 (Del. Ch. 2003), *as revised* (Oct. 6, 2003).

> Substantial failure to live up to the material terms of a valid contract nullifies that contract. A party may terminate or rescind a contract because of substantial nonperformance or breach by the other party. Not all breaches will authorize the other party to abandon or refuse further performance. To justify termination, it is necessary that the failure of performance on the part of the other go to the substance of the contract. Modern courts, and the Restatement (Second) of Contracts, recognize that something more than mere default is ordinarily necessary to excuse the other party's performance in the typical situation, subscribing to the general rule that where the performance of one party is due before that of the other party, such as when the former party's performance requires a period of time, an uncured failure of performance by the former can suspend or discharge the latter's duty of performance only if the failure is *material or substantial*.

*DeMarie v. Neff*, No. CIV.A. 2077-S, 2005 WL 89403, at *4 (Del. Ch. Jan. 12, 2005) (emphasis in original) (internal quotations and citations omitted).

---

[8]    *See* Section 12.4 of the Purchase Agreement.

In *Endocare*, the Delaware Chancery Court cited Section 241 of the *Restatement (Second) of Contracts* for the factors to consider when determining whether a breach is material. These factors include:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; and (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*Endocare*, 838 A.2d at 278.

Here, every factor weighs in favor of a finding that the breach is material: (a) the injured party (the Debtors) will be deprived of the reasonably expected benefit of the payments under the Purchase Agreement and the Sales Tax Funding Commitment; (b) the injured party here is unlikely to be adequately compensated for that benefit; (c) the party failing to perform (the Purchaser) will not suffer a forfeiture since it is not now in possession of the D&O Proceeds and, prior to the Purchase Agreement, never had any entitlement to such proceeds; (d) the breaching party has no intention to cure; and (e) the behavior of the breaching party does not conform with standards of good faith and fair dealing.

*In re Woodbridge Grp. of Companies, LLC*, 590 B.R. 99 (Bankr. D. Del. 2018), *aff'd*, 606 B.R. 201 (D. Del. 2019) is illustrative. In *Woodbridge*, a debtor investment fund issued three promissory notes to Elissa and Joseph Berlinger in the principal amount of $25,000 each. *Woodbridge*, 590 B.R. at 102. Each of the notes contained an anti-assignment clause. *Id.* The notes were nevertheless transferred, and the debtors objected to the proofs of claim filed by the transferee. *Id.*

The transferee argued, among other things, that the debtors could not enforce the anti-assignment clause because of their prior breach of the promissory notes. *Id*. at 105. In rejecting this argument, the Court noted that "[i]t is axiomatic that a non-breaching party may not emerge post-breach with more rights than it had pre-breach." *Id*. at 106. The Court then distinguished the cases relied upon by the transferee.

First, the Court noted that the transferee's reliance on *Endocare* was inapt, by pointing out that materiality was not at issue in the case. *Id*. Thus, *Endocare* was inapplicable because "it could hardly be argued that the failure to make interest payments is an immaterial breach." *Id*. Similarly, here it could hardly be argued that a failure to make millions of dollars of payments under the Purchase Agreement and the Sales Tax Funding Commitment was an immaterial breach – it was one of three components of one of the most material provisions of an asset purchase agreement – the "Purchase Price." Nevertheless, as in *Woodbridge*, materiality is not necessarily the final analysis.

The Court then turned to *Hipcricket, Inc. v. mGage, LLC*, No. CV 11135-CB, 2016 WL 3910837 (Del. Ch. July 15, 2016), *judgment entered,* (Del. Ch. 2016), a case in which a material breach of a commission agreement rendered its non-solicitation and confidentiality provisions unenforceable. In *Hipcricket*, the employer was a debtor that had rejected the employment contract in bankruptcy, and the Court held that it would be inequitable for the debtor to enforce a contract that it had materially breached through rejection. *Hipcricket*, 2016 WL 3910837 at *13.

> The *Woodbridge* court distinguished *Hipcricket* thus:
>
> A non-compete clause is much different from an anti-assignment provision. Before entering into an agreement containing a non-compete clause, a prospective employee is free to pursue employment without restriction; post-entrance, she is restrained. However, before entering into an agreement containing an anti-assignment provision, a party necessarily has nothing to assign. So, these devices are significantly dissimilar.

*In re Woodbridge Grp. of Companies, LLC*, 590 B.R. 99, 106–07 (Bankr. D. Del. 2018), *aff'd*, 606

B.R. 201 (D. Del. 2019).

Analogously to *Hipcricket* and distinct from *Woodbridge*, the Debtors were free to pursue

the D&O Claims before approval of and closing under the Purchase Agreement.  Post-closing, the

Debtors were restrained.  Thus, a provision like Section 2.1(u) of the Purchase Agreement is clearly

distinguishable from the anti-assignment provision in *Woodbridge* – that the transferee could not

get out of despite the debtor's material breach – because rescinding the Purchaser's right to the

D&O Proceeds would not allow the seller "to emerge post-breach with more rights than it had pre-

breach."  Rather, the Debtors' right to now retain the D&O Proceeds due to the Purchaser's breach

is akin to the *Hipcricket* employee's right to pursue employment due to the employer's breach; it

simply restores a right that the non-breaching party had before entering into the contract.

*Segovia v. Equities First Holdings, LLC*, No. CIV.A.06C09-149-JRS, 2008 WL 2251218

(Del. Super. Ct. May 30, 2008), offers another example.  In that case, the lender, Equities First

Holdings, LLC ("***EFH***"), sold shares of stock pledged as loan collateral allegedly without the

authorization of the borrower, Grupo Empresarial Seser, S.A. De C.V., ("***Empresarial***"), or the

pledgor, Teresa Serrano Segovia ("***Mrs. Segovia***").  *Segovia* at *1.  The Court determined that "the

clear unambiguous terms of the operative contracts reflect[ed] secured loan transactions pursuant

to which EFH was to preserve the pledged collateral until the borrower either defaulted or repaid

the loans."  *Id.*  So EFH's sale of the pledged stock breached its contracts with Empresarial and

Mrs. Segovia.  *Id.*

Both plaintiffs sought a declaration from the Court that they were excused from further

performance of the various loan documents because of EFH's material breach.  *Id.* at *23.  The

Court agreed, noting that "[t]he concept of cancelling contracts upon a material breach is well-settled in Delaware law:

> [A] party may terminate or rescind a contract because of substantial nonperformance or breach by the other party. Not all breaches will authorize the other party to abandon or refuse further performance. To justify termination it is necessary that the failure of performance on the part of the other go to the substance of the contract."

*Id.* (quoting *DeMarie v. Neff*, No. CIV.A. 2077-S, 2005 WL 89403 (Del. Ch. Jan. 12, 2005)).

The Court held that EFH's breaches of the pledge and loan agreements were material breaches that would justify termination of the contracts because the unauthorized sale of the pledged stock went to the "substance of the pledge agreement." *Id.* As a result, the Court held that Mrs. Segovia was entitled to a declaratory judgment that she was no longer required to perform under the pledge agreement and irrevocable proxies, and Empresarial was entitled to a declaratory judgment that it was no longer required to perform under the loan agreement and the nonrecourse notes. *Id.*

Because the Purchaser's breach here is material, prevailing law supports a finding that the Debtors, like Mrs. Segovia and Empresarial, are no longer required to perform under the Purchase Agreement. *See also Medicalgorithmics S.A. v. AMI Monitoring, Inc.*, No. CV 10948-CB, 2016 WL 4401038 (Del. Ch. Aug. 18, 2016) (concluding that the plaintiff was entitled to a declaratory judgment that it validly terminated its agreement with the defendant after the defendant's material breach).

In another example, *Alpha Beta Cap. Partners, L.P. v. Pursuit Inv. Mgmt., LLC*, 193 Conn. App. 381, 409 (2019), the court applied substantially similar New York law, under which, "[a] party's prior material breach relieves the nonbreaching party from performing its remaining obligations under the contract." *Alpha Beta* 193. Conn. App. at 409. This case is noteworthy because it involved the remittance of litigation proceeds.

The plaintiff in *Alpha Beta* had filed suit against the defendants "seeking damages for their failure to remit to the plaintiff its proportionate share of the [] litigation proceeds as secured under § 4 of the [settlement agreement]." *Id.* at 398.  The defendants responded with a counterclaim, "alleging, among other things, that the plaintiff [was] liable to the defendants for breach of contract and was not entitled to any portion of the [] litigation proceeds." *Id.* at 398-99.  The trial court concluded that the defendants "were liable for breach of contract and breach of the covenant of good faith and fair dealing for their intentional failure to remit to the plaintiff its proportionate share of the [] litigation proceeds as secured by the [settlement agreement]." *Id.* at 400.

The defendants argued on appeal that the trial court "improperly rejected their breach of contract counterclaim, which alleged that ***they were relieved of their obligation to remit the [] litigation proceeds*** because the plaintiff had breached the [settlement agreement]." *Id.* at 409. (emphasis added).  The Court rejected the defendants' argument on the grounds that the breach was not material, holding that the plaintiff's violation of a confidentiality provision in a settlement agreement did not materially breach the purpose of the settlement agreement, "which was to resolve the then existing disputes among the parties." *Id.* at 412.  While the Court in *Alpha Beta* rejected the defendant's arguments on the basis that a breach of the confidentiality provision was not material to the purpose of the settlement agreement, ***Alpha Beta is informative in that the court considered excusing the defendant from delivering litigation proceeds as an appropriate remedy***.  The threshold finding of "materiality" required for application of the remedy was simply lacking.

A final example of the consequences of material breach under Delaware law is *College Health & Investment v. Diamondhead Casino Corporation*:

> This is the case of a casino receiving $150,000, executing a note for that amount, paying nothing on the principal, defaulting and then asserting that they have

complied with the terms of the note by converting it to their common stock that has little or no value. If the Court was to find their argument had merit it would truly be declaring that they had hit the "Jackpot". Unfortunately for them, the Court will not play with their dice and finds the defendant's position is not supported by any reasonable reading of the terms of the note and their Motion will be denied.

*Coll. Health & Inv., L.P. v. Diamondhead Casino Corp.*, No. CV N15C-01-119 WCC, 2015 WL

5138093, at *2 (Del. Super. Ct. July 2, 2015).

The Court went on to hold:

> It is also well settled in contract law that a "party who first commits a material breach of a contract cannot enforce the contract going forward." … By failing to perform its obligations under the contract, Defendant defaulted on the Note and defeated the essential purpose of the contract. Therefore, ***Defendant has materially breached the Note, and cannot now ask the Court to enforce Section 2.1 of the Note against the Plaintiff***.

*Id*. at *3 (emphasis added).

Similarly, any result in this case that allows the Purchaser or Loot ABC to enforce the right to the D&O Proceeds purchased under a contract the Purchaser has willfully and materially breached would be playing with the Purchaser's dice, and it would be an inequitable "jackpot" were Loot ABC allowed to claim the D&O Proceeds after the Purchaser's failure to fulfill its ongoing obligations under the Purchase Agreement and the Sales Tax Funding Commitment.

Furthermore, the Purchaser breached its obligations under the Term Sheet, specifically, the obligation to pay the out-of-pocket expenses in connection with the D&O Action. Notwithstanding the Purchaser's refusal to pay those expenses (and Loot ABC's inability to commit to the payment of all out-of-pocket expenses in connection with the litigation), the Purchaser and Loot ABC seek to retain the benefit of the Term Sheet.

## CONCLUSION

Loot ABC has (again) inappropriately interjected the issue of ownership of the D&O Proceeds in an objection to a motion to which Loot ABC agreed to after extensive negotiations,

and now that legal issue requires a ruling before the Court rules on the 9019 Motion. This gamesmanship appears designed to preempt the Debtors' argument that the Purchase Agreement requires further performance (*i.e.*, turning over the D&O Proceeds of the D&O Claim that the Committee litigated on their behalf), which the Debtors are excused from by the Purchaser's material breach.

It seems likely that, if the D&O Proceeds are placed in an Escrow Account that is not in the Debtors' name, Loot ABC will argue that no further performance is required from the Debtors so their only remedy is money damages, which means the Debtors will receive nothing, while Loot ABC reaps the benefit of the Purchaser's contract despite the Purchaser's material breach by deliberately failing to pay a major component of the Purchase Price. The Court should not permit that result, and instead because Loot ABC once again wants to litigate in a contested matter that it owns or is entitled to the D&O Proceeds, then Loot ABC should have its wish, and the Debtors believe they should prevail for the reasons set forth above.

## **REQUEST FOR RELIEF**

WHEREFORE, the Debtors respectfully request that this Court rule that Loot ABC has no right to the D&O Proceeds and direct that all further Net Settlement Proceeds from the Settlement Agreement be held in an Escrow Account solely in the Debtors' name.

In the alternative, if the Court rules that the D&O Proceeds be placed in an Escrow Account that is not solely in the Debtors' name, the Debtors reserve their rights as to the ownership of the D&O Proceeds and respectfully request that the Court provide that such placement does not prejudice the Debtors' right to the D&O Proceeds.[9]

---

[9]    As an aside, the Debtors have resolved a portion of the U.S. Trustee's objection to the 9019 Motion. The modified language below was negotiated and agreed to prior to this filing, to clarify that the Debtor agrees with the

Dated: November 11, 2022

**BRYAN CAVE LEIGHTON PAISNER LLP**

*/s/ Mark I. Duedall*
Mark I. Duedall (No. 3346)
Brian C. Walsh (*Admitted pro hac vice*)
1201 W. Peachtree Street, NW, 14th Floor
Atlanta, Georgia 30309-3471
Telephone: (404) 572-6600
Facsimile:  (404) 572-6999
Email: mark.duedall@bclplaw.com
            brian.walsh@bclplaw.com

Andrew J. Schoulder (*Admitted pro hac vice*)
1290 Avenue of the Americas
New York, New York 10104-3300
Telephone: (212) 541-2000
Facsimile:  (212) 541-4630
Email: andrew.schoulder@bclplaw.com

**ROBINSON & COLE LLP**
Jamie L. Edmonson (No. 4247)
1201 North Market Street
Suite 1406
Wilmington, Delaware 19801
Telephone: (302) 516-1700
Facsimile:  (302) 516-1699
Email: jedmonson@rc.com

*Counsel for the Debtors and Debtors in Possession*

---

United States Trustee's objection that the Proposed Order should not impose a cap on U.S Trustee fees.  This language
is as follows:

> **ORDERED** that the Debtors are authorized and directed to deduct amounts from the Escrow
> Account necessary to pay the Debtors' current outstanding fees pursuant to 28 U.S.C. § 1930, and
> future amounts incurred and owed, <u>provided</u> the aggregate amount withdrawn by the Debtors from
> the Escrow Account shall not exceed $45,000<u>*, and provided further that (i) nothing in this Order*</u>
> <u>*and/or the Settlement Agreement shall have the effect of limiting or capping the amount of*</u>
> <u>*quarterly fees that are payable in the Debtors' bankruptcy cases, and (ii) entry of this Order shall*</u>
> <u>*neither address nor affect the U.S. Trustee's rights to be paid from the estates' share of the*</u>
> <u>*settlement proceeds*</u>;

## CERTIFICATE OF SERVICE

I hereby certify that on November 11, 2022, I caused the *Reply in Support of (A) Joint Motion of the Debtors and the Official Committee of Unsecured Creditors for Entry of an Order (I) Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure and 11 U.S.C. § 105(a) Approving a Settlement, and (II) Authorizing Payment of Legal Fees and expenses of Contingency Counsel and US Trustee Fees* (the "***Reply***") to be electronically filed with the Court and served upon the parties that are registered to receive notice via the Court's CM/ECF notification system.

I further certify that on November 11, 2022, I caused the Reply to be served, via electronic mail and United States Mail as noted, upon the parties listed below.

Jeffrey R. Waxman
Morris James LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801

Via electronic mail to:
jwaxman@morrisjames.com

*Counsel for Plaintiff*


Samuel M. Stricklin
Stricklin Law Firm, P.C.
Palisade Central II
2435 North Central Expressway
Suite 1200
Richardson, TX 75080

Via electronic mail to:
sam.stricklin@stricklaw.pro

*Contingency Counsel for Plaintiff*

Joel B. Bailey
Joshua L. Hedrick
Hedrick Kring, PLLC
1700 Pacific Avenue, Suite 4650
Dallas, TX 75201

Via electronic mail to:
josh@HedrickKring.comjoel@HedrickKring.com

*Contingency Counsel for Plaintiff*


Joshua Dorchak
T. Charlie Liu
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178-0060

Via electronic mail to:
charlie.liu@morganlewis.com
joshua.dorchak@morganlewis.com

*Counsel for Breakwater Credit Opportunities Fund, L.P., the Estate of Saif Mansour, Aamir Amdani, Eric Beckman, Darrick Geant and Joseph Kaczorowski*

Dean A. Ziehl
James K. T. Hunter
Colin R. Robinson
Cia H. Mackle
Pachulski Stang Ziehl & Jones LLP
919 North Market Street, 17th Floor
Wilmington, DE 19801

Via electronic mail to:
dziehl@pszjlaw.com
jhunter @pszjlaw.com
crobinson@pszjlaw.com
cmackle@pszjlaw.com

*Counsel for Upfront V, LP, Upfront GP V,
LLC, Mark Suster, Dana Kibler and
Gregory Bettinelli*

Sabin Willett
Morgan, Lewis & Bockius LLP
One Federal Street
Boston, MA 02110-1726

Via electronic mail to:
sabin.willett@morganlewis.com

*Counsel for Breakwater Credit
Opportunities Fund, L.P., the Estate of
Saif Mansour, Aamir Amdani, Eric
Beckman, Darrick Geant and Joseph
Kaczorowski*

The Loot Company (fka Loot Crate
Acquisition LLC)
c/o The Delaware Corporation Agency,
Inc.
600 North King Street, Suite 400
Wilmington, DE 19801

Via United States Mail

*Purchaser*

Jody C. Barillare
Morgan, Lewis & Bockius LLP
1201 North Market Street, Suite 2201
Wilmington, DE 19801

Via electronic mail to:
jody.barillare@morganlewis.com

*Counsel for Breakwater Credit Opportunities
Fund, L.P., the Estate of Saif Mansour, Aamir
Amdani, Eric Beckman, Darrick Geant and
Joseph Kaczorowski*

Benjamin A. Hackman
Office of the United States Trustee
844 King Street, Room 2207
Lockbox #35
Wilmington, DE 19899-0035

Via electronic mail to:
benjamin.a.hackman@usdoj.gov

*United States Trustee*

Erin R. Fay
Steven D. Adler
Bayard, P.A.
600 North King Street, Suite 400
Wilmington, DE 19801

Via electronic mail to:
efay@bayardlaw.com
sadler@bayardlaw.com

*Counsel to The Loot Company (fka Loot Crate
Acquisition LLC)*

Cathy Hershcopf
Lauren Reichardt
Cooley LLP
55 Hudson Yards
New York, NY 10001

Via electronic mail to:
chershcopf@cooley.com
lreichardt@cooley.com

*Counsel to The Loot Company (fka Loot Crate Acquisition LLC)*

David A. Vogel
Cooley LLP
One Freedom Square
Reston Town Center
11951 Freedom Drive, 14th Floor
Reston, VA 20190-5656

Via electronic mail to:
dvogel@cooley.com

*Counsel to The Loot Company (fka Loot Crate Acquisition LLC)*

Ira L. Herman
Blank Rome LLP
1271 Avenue of the Americas
New York, NY 10020

Via electronic mail to:
Ira.herman@blankrome.com

*Counsel to The Loot Company (fka Loot Crate Acquisition LLC)*

Ronald Bender
Beth Ann R. Young
Levene Neale Bender Yoo & Golubchik, LLP
2818 La Cienega Avenue
Los Angeles, CA 90034

Via electronic mail to:
RB@LNBYG.com
BRY@LNBYG.com

*Counsel to Loot (Assignment for the Benefit of Creditors, LLC*

Josef W. Mintz
Blank Rome LLP
1201 Market Street, Suite 800
Wilmington, DE 19801

Via electronic mail to:
Joseg.mintz@blankrome.com

*Counsel to The Loot Company (fka Loot Crate Acquisition LLC)*

**BRYAN CAVE LEIGHTON PAISNER LLP**

*/s/ Mark I. Duedall*

Mark I. Duedall (No. 3346)
1201 W. Peachtree Street, NW, 14th Floor
Atlanta, Georgia 30309-3471
Telephone: (404) 572-6600
Facsimile:  (404) 572-6999
Email: mark.duedall@bclplaw.com

*Counsel for the Debtors and Debtors in Possession*

**Exhibit A**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
                                .  Chapter 11
IN RE:                          .
                                .  Case No. 19-11791(BLS)
OLD LC, INC., et al,            .
                                .
                                .  824 Market Street
                                .  Wilmington, Delaware 19801
              Debtors.  .
. . . . . . . . . . . . . . .  Wednesday, June 17, 2020
```

TRANSCRIPT OF TELEPHONIC HEARING
BEFORE THE HONORABLE BRENDAN L. SHANNON
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES VIA TELEPHONE:

```
For the Debtors:              Jamie L. Edmonson, Esq.
                              ROBINSON & COLE, LLP

                              Mark I. Duedall, Esq.
                              Jennifer Berhorst, Esq.
                              Khaled Tarazi, Esq.
                              Stefani Thomas, Esq.
                              BRYAN CAVE LEIGHTON PAISNER, LLP

For the Official Committee
of Unsecured Creditors:       Eric J. Monzo, Esq.
                              Jeffrey Waxman, Esq.
                              MORRIS JAMES, LLP

For the Breakwater
Parties:                      Jason Alderson, Esq.
                              Kelsey Bomar, Esq.
                              MORGAN, LEWIS & BOCKIUS, LLP
(Appearances Continued)

Audio Operator:               Electronically Recorded
                              by CourtSmart
                              and Dana L. Moore, ECRO

Transcription Company:        Reliable
                              1007 N. Orange Street
                              Wilmington, Delaware 19801
                              (302)654-8080
                              Email:  gmatthews@reliable-co.com
```

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES VIA TELEPHONE:   (Continued)

For Up-front V, et al:      Jeremy V. Richards, Esq.
                            Colin R. Robinson, Esq.
                            PACHULSKI, STANG, ZIEHL
                             & JONES, LLP

Also Appearing:             Chris Davis, Esq.

1            If we had been in front of you on March 15th, I

2    would have said, yes, Your Honor, I -- we don't belong here,

3    it's not an -- it's not an -- it's an estate asset subject to

4    divestiture --

5            THE COURT:  So --

6            MR. DUEDALL:  -- it is no --

7            THE COURT:  Well --

8            MR. DUEDALL:  -- long such.

9            THE COURT:  Okay.  Well, again, my question would

10   be -- let's simplify our fact pattern and we'll take all the

11   APA stuff out, and we'll just say we've got a debtor that has

12   a lawsuit, and an unsecured secured creditor has every -- has

13   an undeniable right to every penny of the proceeds.  It is

14   clearly the debtors' cause of action.  The lender is entitled

15   to any economic value.  And I'm faced with an application by

16   debtors' counsel or by the debtor to have their counsel

17   investigate and pursue that, and I have objections that are

18   filed.  I understand.

19           I guess what I'm saying is:  In the absence of the

20   -- of a deal or a termsheet or an agreement that you

21   described -- and I expect that it's in the offing.  I mean,

22   again, these are able people and serious people and it's a

23   complicated negotiation.  I get that, I'm not being critical.

24   But in the absence of that, regardless of whether the estate

25   owns the clam, I can't -- I don't believe that I can find

1    that it is reasonable or appropriate.

2          So you're right, while I may have jurisdiction over

3    it, I'm struggling to see why I would have -- take it one

4    step further.  We spend three hours this afternoon on this

5    hearing.  Okay?  And I give you a full, good day.  You

6    prevail, I overrule all of the objections, and then I grant

7    the Rule 2004 motion.  Okay?  On Friday, the purchaser

8    responds I don't feel like sharing any of the proceeds.  That

9    is the end of the exercise, right?

10          MR. DUEDALL:  That would absolutely be the end of

11   the exercise.  The point is, Your Honor, we -- the

12   investigation will allow -- so we've done a great deal of

13   work already.  We've shared it with the buyer, a

14   comprehensive memo on everything we know and on the law,

15   we've shared that exact same memo with the committee.  We

16   operate in a manner where all parties with economic

17   interests, however attenuated, know what we know.

18          But the investigation is required, Your Honor, for

19   us to really put some meat on the bone and finalize the

20   sharing, Your Honor.  And we are very concerned that, with

21   how long things have taken -- which is no one's fault, it's

22   COVID.  I mean, it's -- there was discussions in January

23   about producing documents; and then, in February, things got

24   kind of a little bit nuts; and March, things got really nuts.

25          And you know, we have statutes of limitation

1    coming.  We've extended our insurance coverage with this in

2    mind because we want to make sure we can make a claim on the

3    insurance coverage, and we did that with the knowledge and

4    consent of all economic parties in this case.  We believe it

5    would not be harmful at all for this estate asset -- and it

6    is an estate asset, that is critical.  It does belong to the

7    estate.  While the proceeds -- while the proceeds do not, the

8    asset does.  We believe it would be appropriate for us to

9    conduct this investigation and allow this process to take its

10   course.

11           And Your Honor, you're right.  As soon as the buyer

12   says there shall be no proceeds to this estate, I'll be the

13   first one to say that sounds good, we need about 30 days to

14   get our motion to convert to a 7 or motion to dismiss ready.

15   It won't be hard.  There's not a lot of loose ends in this

16   case. I'll be the first one to say that, I'll be the first

17   one to draft it.  But that has not taken place.

18           What has taken place is the opposite, which is

19   parties and their counsel thinking very hard about how to

20   carve up the proceeds of this asset, if it proves fruitful.

21   But I'm very concerned the "if it proves fruitful" further is

22   only going to stall, as well, the allocation discussions that

23   have been going on in earnest.  That is my concern, Your

24   Honor.

25           THE COURT:  So I guess I'm trying to figure out how

1    this string plays out then.  I think you're telling me that

2    the parties don't have enough information to sit down and

3    hammer out a sharing arrangement to give the estate some skin

4    in this particular game, which it currently does not have.

5    Is it your expectation then that I would have to hear and

6    grant the 2004 motions, you would conduct the discovery under

7    2004, take your depositions, get the documents, sit down

8    again with the buyer and say this is what we found, now let's

9    talk about it?

10          MR. DUEDALL:  Your Honor, it will not be a cart

11   before the horse.  The two are very much linked.  That I --

12   that is my contention, the two are very much linked.  I

13   believe we can arrive there without the investigation being

14   done, maybe.  It really -- maybe.  It depends on what each

15   party -- well, we know what each party wants.  I've heard

16   exactly the bid and the ask and the counterbid and the

17   counter-ask.  I just believe it would be fruitful for us to

18   be doing them both at the same time.

19          But I -- no, Your Honor.  The answer to your --

20   that question is no.  It would not be the investigation is

21   now going on, plan discussions sit tight for three months,

22   that's not the way we do things.

23          THE COURT:  Well, because I guess -- look, I mean,

24   I would -- we've got a hearing that I've adjourned at least

25   once, this is a retention application, I'm sensitive to that.

1    But I actually think that the estate needs to show me that

2    they've got an interest in this.  The committee has actually

3    said they do not support this transaction if there's no

4    demonstrated benefit to the estate.

5         And while I don't want to put you in a position of

6    cart before the horse, I guess I would say that, unlike, for

7    example, a Chapter 7 Trustee or some other player, my

8    expectation is that you probably already have a great deal of

9    information.  These are estate claims and estate causes of

10   action regarding conduct at the corporate level.  Your Rule

11   2004 motion says I would like to see what the defense -- or

12   what the targets' personal emails say, and stuff like that,

13   and documents that they may have.  But these are, you know,

14   about financing and funding the company over the past -- over

15   the years leading up to its bankruptcy case.  There is an in

16   -- there is a not insignificant amount of information that I

17   assume must already be in hand.

18        I'll start with the proposition that I'm not trying

19   to complicate this, but I'm not confident that I can hear and

20   approve your retention application until I know that the

21   estate has some interest in it because, again, here's the

22   other problem I have.  Suppose that we do go through today

23   and I approve it.  And again, in two weeks time, that deal is

24   cut and Mr. Waxman comes in and says this deal is terrible,

25   why are we doing this, I'm opposed to this, I want to convert

1    this case or I want to dismiss or I want to -- I want to

2    suspend, et cetera.  I think we're shooting at a bogie.

3           And again, I -- there are issues that have been

4    raised by the objectors that require a hearing with respect

5    to the retention, and I've heard back and forth and I've seen

6    the reply, all of which I think is grist for the mill and I'm

7    happy to have that hearing.  But I believe it is incumbent

8    upon the debtor to say -- because it's the debtors'

9    application.  And it's incumbent upon the debtor to say I

10   want to travel this path because there is a benefit that I

11   see for the estate.  And right now, my concern is that it is,

12   in fact, too hypothetical.

13          I would ask to hear from the committee.  Mr.

14   Waxman.

15          MR. WAXMAN:  Thank you.  Thank you, Your Honor.

16   Jeff Waxman of Morris James, on behalf of the creditors'

17   committee.

18          First, Your Honor, I would like to start off by

19   saying I'd like to commend the debtors and Bryan Cave, in

20   particular Mr. Duedall and his colleagues.  They've been

21   forthright with the committee, they've shared documents,

22   their analysis at every turn.

23          Second, just to go back to an issue that you had

24   addressed earlier.  I'd just like to say the purchaser can't

25   do the litigation at this point, that window has passed.

## Exhibit B

**EXECUTION VERSION**

**AMENDED AND RESTATED**

**ASSET PURCHASE AGREEMENT**

**by and among**

**EACH SELLER LISTED ON THE SIGNATURE PAGES HERETO**
**as Sellers**

**AND**

**LOOT CRATE ACQUISITION LLC**
**as Purchaser**

**September 27, 2019**

# TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| **1.** | **DEFINITIONS.** | 1 |
| | 1.1 Definitions | 1 |
| | 1.2 Cross References | 8 |
| **2.** | **PURCHASE AND SALE** | 9 |
| | 2.1 Purchase and Sale | 9 |
| | 2.2 Excluded Assets | 13 |
| | 2.3 Assumed Liabilities | 14 |
| | 2.4 Excluded Liabilities | 15 |
| | 2.5 Assumption/Assignment of Contracts and Rights; Executory Contract Designation | 16 |
| | 2.6 Consideration; Allocation of Consideration. | 18 |
| | 2.7 Closing | 19 |
| | 2.8 Deliveries by Sellers | 19 |
| | 2.9 Deliveries by Purchaser | 20 |
| | 2.10 Cash Transfer | 20 |
| **3.** | **REPRESENTATIONS AND WARRANTIES OF SELLERS** | 20 |
| | 3.1 Organization | 20 |
| | 3.2 Corporate Authorization | 20 |
| | 3.3 Financial Information | 21 |
| | 3.4 Governmental Authorization | 21 |
| | 3.5 Noncontravention | 21 |
| | 3.6 Required Consents | 22 |
| | 3.7 Litigation | 22 |
| | 3.8 Permits | 22 |
| | 3.9 Compliance with Laws and Court Orders | 22 |
| | 3.10 Intellectual Property Rights | 22 |
| | 3.11 Environmental Matters | 23 |
| | 3.12 Real Property | 23 |
| | 3.13 Employee Benefits | 23 |
| | 3.14 Employment and Personnel Matters | 25 |
| | 3.15 Taxes | 26 |
| | 3.16 Title to the Purchased Assets | 26 |
| | 3.17 Transactions with Affiliates | 26 |
| | 3.18 Insurance | 26 |
| | 3.19 Service of Bankruptcy Documents | 27 |
| | 3.20 Certain Fees | 27 |
| | 3.21 Material Contracts | 27 |
| | 3.22 Licensing Matters | 27 |
| | 3.23 Data Privacy | 28 |
| | 3.24 Customer Lists; Customer Data | 28 |
| | 3.25 No Other Representations or Warranties; Schedules | 28 |
| **4.** | **REPRESENTATIONS AND WARRANTIES OF PURCHASER** | 29 |
| | 4.1 Organization | 29 |
| | 4.2 Corporate Authorization | 29 |
| | 4.3 Governmental Authorization | 29 |
| | 4.4 Noncontravention | 29 |
| | 4.5 Availability of Purchase Price | 29 |
| | 4.6 Certain Fees | 29 |
| | 4.7 Litigation | 30 |

**TABLE OF CONTENTS**
(continued)

Page

| | | |
|---|---|---|
| **5.** | **COVENANTS OF SELLER** | 30 |
| 5.1 | Conduct of the Business | 30 |
| 5.2 | Access to Information | 31 |
| 5.3 | Notices of Certain Events | 31 |
| 5.4 | Name Change | 32 |
| 5.5 | Intellectual Property Rights Assignment | 32 |
| **6.** | **COVENANTS OF PURCHASER** | 32 |
| 6.1 | Books and Records | 32 |
| **7.** | **COVENANTS OF PURCHASER AND SELLER** | 32 |
| 7.1 | Efforts; Further Assurances | 32 |
| 7.2 | Certain Filings | 33 |
| 7.3 | Public Announcements | 33 |
| 7.4 | DIP Loan Documents | 33 |
| 7.5 | Bankruptcy Issues | 33 |
| 7.6 | Transition Services | 34 |
| 7.7 | Wrong Pockets | 34 |
| 7.8 | Notices | 34 |
| 7.9 | Confidentiality | 35 |
| 7.10 | Budgeted Reserve | 35 |
| **8.** | **TAX MATTERS** | 35 |
| 8.1 | Tax Cooperation | 35 |
| 8.2 | Transfer Taxes | 36 |
| 8.3 | Property Taxes | 36 |
| 8.4 | Certain Tax Reporting for Employees | 36 |
| 8.5 | Sales Taxes and Sales Taxes Account | 36 |
| **9.** | **EMPLOYEE MATTERS** | 38 |
| 9.1 | Employees and Offers of Employment | 38 |
| 9.2 | Employee Plans | 39 |
| 9.3 | Workers' Compensation | 40 |
| 9.4 | WARN Act | 40 |
| **10.** | **CLOSING CONDITIONS** | 40 |
| 10.1 | Conditions to Obligations of Purchaser and Sellers | 40 |
| 10.2 | Conditions to Obligations of Purchaser | 41 |
| 10.3 | Conditions to Obligations of Sellers | 42 |
| **11.** | **TERMINATION** | 42 |
| 11.1 | Grounds for Termination | 42 |
| 11.2 | Effect of Termination | 43 |
| 11.3 | Fees and Expenses | 43 |
| 11.4 | Certain Limitations | 43 |
| **12.** | **MISCELLANEOUS** | 43 |
| 12.1 | Notices | 43 |
| 12.2 | Waivers | 44 |
| 12.3 | Successors and Assigns | 44 |
| 12.4 | Governing Law | 44 |
| 12.5 | Jurisdiction | 45 |
| 12.6 | Waiver of Jury Trial | 45 |
| 12.7 | No Third Party Beneficiaries | 45 |
| 12.8 | Entire Agreement; Amendments; Counterparts | 45 |
| 12.9 | Headings; Interpretation | 46 |
| 12.10 | Disclosure Schedules | 46 |

**TABLE OF CONTENTS**
(continued)

**Page**

**12.11    No Survival of Representations**..................................................................46

**TABLE OF CONTENTS**
(continued)

**EXHIBITS**

Exhibit A – Form of Assignment and Assumption Agreement

Exhibit B – Form of Trademark Assignment Agreement

Exhibit C – Form of Power of Attorney

Exhibit D – Form of Leased Real Property Assignment Agreement

Exhibit E – Form of Sales Tax Funding Commitment

600688115.35

**AMENDED AND RESTATED ASSET PURCHASE AGREEMENT**

THIS AMENDED AND RESTATED ASSET PURCHASE AGREEMENT, dated as of September 27, 2019 (this "*Agreement*"), is by and among the seller parties listed on the signature pages hereto (each a "*Seller*" or "*Debtor*"), and LOOT CRATE ACQUISITION LLC, a Delaware limited liability company ("*Purchaser*") and amends and restates in its entirety that certain Asset Purchase Agreement (the "*Original Agreement*") dated as of September 6, 2019 (the "*Original Agreement Date*") by and among Sellers and Purchaser.  Each of Purchaser and Sellers is referred to individually in this Agreement as a "*Party*" and collectively as the "*Parties*."

**RECITALS:**

WHEREAS, Sellers own and operate an E-Commerce subscription company that specializes in providing customers with curated boxes containing consumer products each month (such businesses and all other businesses conducted by Sellers, the "*Business*");

WHEREAS, Sellers desire to sell, transfer, convey, assign and deliver the Purchased Assets and to assign the Assumed Liabilities to Purchaser, and Purchaser desires to purchase, take delivery of, and acquire such Purchased Assets and to assume such Assumed Liabilities, upon the terms and subject to the conditions set forth herein;

WHEREAS, on August 11, 2019 as to certain Sellers and August 12, 2019 as to the other Sellers (collectively, the "*Petition Date*"), Debtors filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "*Bankruptcy Code*") in the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*");

WHEREAS, Debtors' chapter 11 bankruptcy cases are being jointly administered under Case No. 19-11791-BLS in the Bankruptcy Court (the "*Bankruptcy Cases*"); and

WHEREAS, the consummation of the transactions contemplated by this Agreement (the "*Transactions*") are subject to, among other things, the entry of an Approval Order in the Bankruptcy Cases under Sections 105, 363, 365 and other applicable provisions of the Bankruptcy Code, and the Transactions and this Agreement are subject to the approval of the Bankruptcy Court.

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements, covenants, representations, warranties and promises set forth herein, and in order to prescribe the terms and conditions of such purchase and sale, intending to be legally bound, the Parties agree as follows:

1.    DEFINITIONS.

    1.1    **Definitions**.  The following terms, as used herein, have the following meanings:

        (a)    "*Accounts Receivable*" means all accounts and notes receivable (whether current or non-current) of Sellers in respect of goods shipped, products sold or services rendered (including those billed pursuant to Subscriber Orders).

        (b)    "*Action*" means any action, suit, arbitration, claim, inquiry, proceeding, mediation, hearing, audit, examination, investigation or other proceeding of any nature, in each case, by or before any Governmental Authority.

        (c)    "*Affiliate*" means, with respect to any Person, any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or

indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by Contract, as trustee, executor or otherwise.

(d)    "**Budgeted Reserve**" means an amount equal to (i) the accrued, valid and allowed administrative claims that are both expressly contemplated by, and within the terms of, the DIP Budget and not assumed by Purchaser pursuant to Section 2.3(e), *plus* (ii) any other allowed administrative claims to be incurred prior to Closing with Purchaser's express consent in the ordinary course of business which become due after Closing *plus* (iii) $65,000, *plus* (iv) any amounts required to be added pursuant to Section 2.5(d) (if any), *plus* (v) any additional amounts agreed to be added by Purchaser in writing in its sole and absolute discretion, *less* (vi) the aggregate amount of cash retained by the Sellers pursuant to Section 2.2(b).

(e)    "**Bulk Sales Laws**" means (a) the bulk-transfer provisions of the Uniform Commercial Code or any similar Laws in jurisdictions in which any Seller conducts the Business and (b) any Tax-related Laws, or requirements of any jurisdiction relating to bulk sales, or requiring similar notification, certification or withholding requirements, in respect of a sale or transfer of assets, which Laws are applicable to the sale of the Purchased Assets.

(f)    "**Business Day**" means a day other than Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by Law to close.

(g)    "**Cash and Cash Equivalents**" means, as of any applicable time, all cash and cash equivalents (including all undeposited checks) of the Sellers determined in accordance with GAAP, but shall exclude any cash and cash equivalents held in the Sales Taxes Account.

(h)    "**CERCLA**" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. § 9601 et seq.), and any Laws promulgated thereunder.

(i)    "**Claim**" means a "**claim**" as defined in Section 101 of the Bankruptcy Code.

(j)    "**Closing Date**" means the date of the Closing.

(k)    "**Code**" means the Internal Revenue Code of 1986, as amended.

(l)    "**Contract**" means any written or oral agreement, contract, subcontract, settlement agreement, lease, sublease, instrument, permit, concession, franchise, binding understanding, note, option, bond, mortgage, indenture, trust document, loan or credit agreement, license, sublicense, insurance policy or other legally binding commitment or undertaking of any nature.

(m)    "**Cure Costs**" means all amounts that must be paid pursuant to Sections 365 of the Bankruptcy Code in connection with the assumption or assignment of the Assumed Contracts to Purchaser as provided herein and in the Approval Order.

(n)    "**Customer Lists**" means any and all customer and subscriber lists and databases, files and other customer records and information maintained by the Sellers in any format whatsoever.

600688115.35

(o)    "*D&O Policy*" means the directors and officers liability insurance policies set forth on <u>Schedule 1.1(o)</u>.

(p)    "*DIP Budget*" means the budget as defined in the DIP Order.

(q)    "*DIP Lender*" means Money Chest LLC, a Nevada limited liability company.

(r)    "*DIP Liens*" means the Liens granted to the DIP Lender pursuant to the DIP Order.

(s)    "*DIP Loan*" means the loan of up to Ten Million Dollars ($10,000,000) which is made by the DIP Lender to Loot Crate, Inc., as borrower, Loot Crate Parent, Inc., as parent, and the remaining Debtors as guarantors, as evidenced by the DIP Loan Documents.

(t)    "*DIP Loan Documents*" means the Loan Agreement and any agreements, documents or instruments executed or delivered in connection with the DIP Loan and the financing contemplated by the DIP Order, as the same may be amended, modified, supplemented or restated from time to time.

(u)    "*DIP Order*" means the interim Order or final Order, as applicable, of the Bankruptcy Court in each case in form and substance satisfactory to the DIP Lender approving the DIP Loan and authorizing Sellers' incurrence of post-petition secured financing under Section 364 of the Bankruptcy Code and use of cash collateral under Section 363 of the Bankruptcy Code.

(v)    "*E-Commerce Platform*" means the series of software and hardware applications, including computer hardware and cloud servers, that are integrated into, and through which Sellers transact with customers who enter into subscriptions or place orders for inventory through https://www.lootcrate.com/ (and similar permutations thereof), including the Assumed Contracts set forth on <u>Schedule 2.1(a)</u> pursuant to which such software and hardware applications are owned or licensed by Sellers.

(w)    "*Employee*" means an individual who is employed by any Seller, whether on a full-time or a part-time basis, whether active or inactive, and includes an employee on short-term or long-term disability leave.

(x)    "*Employee Benefit Plan*" means any "employee benefit plan" (as defined in ERISA § 3(3)) and any other benefit or compensation plan, program, agreement, arrangement or payroll practice (whether written or unwritten) maintained, sponsored, or contributed or required to be contributed to by a Seller or any ERISA Affiliate or with respect to which a Seller or any ERISA Affiliate has any liability, other than a Multiemployer Plan, as set froth on <u>Schedule 3.13(a)</u>.

(y)    "*Environmental Laws*" means, all federal, state, and local Laws and other provisions having the force or effect of Law, all judicial and administrative Orders and determinations, all contractual obligations and all common Law, in each case concerning public or employee health and safety, pollution or protection of the environment, including all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, processing, discharge, Release, threatened Release, control or cleanup of any Hazardous Substances or wastes (including CERCLA and analogous state Laws).

3.

**(z)** "*Environmental Liabilities and Obligations*" means all Liabilities arising from any impairment or damage to the environment or failure to comply with Environmental Laws in any way relating to the prior or current ownership or operation of the Business, including Liabilities related to:    (i) the transportation, storage, use, arrangement for disposal or disposal of Hazardous Substances or waste; (ii) the Release of Hazardous Substances or waste; (iii) any other pollution or contamination of the surface, substrata, soil, air, ground water, surface water or marine environments; (iv) any other obligations imposed under Environmental Laws with respect to the Business; and (v) all obligations with respect to personal injury, property damage, wrongful death and other damages and losses arising under applicable Law as a result of any of the matters identified in clauses (i)-(iv) of this definition.

**(aa)** "*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended, and all Laws issued thereunder.

**(bb)** "*ERISA Affiliate*" means any Person that, at any relevant time, is or was treated as a single employer with Sellers for purposes of Code § 414.

**(cc)** "*First Lien Loan Agreement*" means that certain prepetition credit agreement, dated as of August 3, 2018 (as it may have been amended, restated, modified, supplemented, or replaced from time to time prior to the Petition Date), among Loot Crate, Inc., as borrower, Loot Crate Parent, Inc., as ultimate parent, the other guarantors which are parties thereto, and Purchaser, as successor in interest to Midtown Madison Management LLC, as administrative agent and collateral agent for the lenders party thereto.

**(dd)** "*GAAP*" means, at a given time, United States generally accepted accounting principles, and, where applicable, consistently applied throughout the periods involved.

**(ee)** "*Governmental Authority*" means any federal, state, local, municipal, foreign, supranational or other governmental or quasi-governmental authority of any nature (including any governmental agency, branch, bureau, commission, department, official or entity and any court or other tribunal), or any administrative, executive, judicial, legislative, police, regulatory, taxing or arbitral body.

**(ff)** "*Hazardous Substances*" means any substance, material or waste which is regulated by any Governmental Authority, including any material, substance or waste which is defined as a "hazardous waste," "hazardous material," "hazardous substance," "extremely hazardous waste," "restricted hazardous waste," "contaminant," "toxic waste," "pollutant" or "toxic substance" under any provision of Environmental Law, and including petroleum, petroleum products, asbestos, presumed asbestos-containing material or asbestos-containing material, urea formaldehyde and polychlorinated biphenyls.

**(gg)** "*Intellectual Property Rights*" means intellectual property rights in any jurisdiction, including: (i) rights in, arising out of or associated with works of authorship, including rights granted under the Copyright Act and including all applications and registrations for any of the foregoing; (ii) rights in, arising out of or associated with databases; (iii) rights in, arising out of, or associated with inventions, including rights granted under the Patent Act, and including all applications and registrations for any of the foregoing; (iv) rights in, arising out of or associated with trademarks, service marks and trade names including common law rights, rights granted under the Lanham Act and all applications and registrations for any of the foregoing ("*Trademarks*"); (v) rights in, arising out of, or associated with confidential information and trade secrets, including rights described under the Uniform Trade Secrets Act; (vi) rights of attribution and

4.

integrity and other moral rights of an author; (vii) rights in, arising out of or associated with a person's name, voice, signature, photograph, or likeness, including rights of personality, publicity or similar rights; and (viii) rights in, arising out of, or associated with domain names and uniform resource locators ("***Domain Names***").

(hh)    "***Knowledge of Sellers***" or any other similar knowledge qualification in this Agreement means the actual or constructive (i.e., that which a reasonable person should know) knowledge of Christopher Davis, Stuart Kaufman or Mark Palmer, in each case, after due inquiry.

(ii)    "***Law***" means any law, statute, regulation, rule, code, decree, constitution, ordinance, treaty, rule of common law, or Order of, administered or enforced by or on behalf of, any Governmental Authority.

(jj)    "***Leased Real Property***" means real property leased by any Seller and used in connection with the Business.

(kk)    "***Liability***" means any claim, debt, liability, obligation, Tax or commitment of any nature whatsoever (whether known or unknown, asserted or unasserted, fixed, absolute or contingent, matured or unmatured, accrued or unaccrued, liquidated or unliquidated or due or to become due), whenever or however arising (including those arising out of any contract or tort, whether based on negligence, strict liability or otherwise), and including all costs and expenses related thereto.

(ll)    "***Lien***" means, with respect to any property or asset, any mortgage, lien (statutory or otherwise), pledge, security interest, Claim, encumbrance, restriction, charge, instrument, preference, priority, option, or right of first refusal, of any kind or nature, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, recorded or unrecorded, contingent or non- contingent, material or non-material, known or unknown.

(mm)    "***Loan Agreement***" means collectively, that certain Debtor-in-Possession Credit Agreement, dated as of August 14, 2019, among Loot Crate, Inc., as borrower, Loot Crate Parent, Inc., as ultimate parent, each other entity that becomes a guarantor party thereto from time to time, the lenders party thereto from time to time and the DIP Lender, as administrative agent and collateral agent (as amended, modified, restated or supplemented from time to time).

(nn)    "***Material Adverse Effect***" means: any (x) event, change, occurrence, circumstance, development or effect (each, an "***Effect***") that, individually or in the aggregate with all other Effects, has had, or would reasonably be expected to have, a material adverse effect on the Purchased Assets, Assumed Liabilities, the Business or the condition of the Sellers (financial or otherwise) taken as a whole; <u>provided</u> that none of the following shall constitute, or be taken into account in determining whether or not there has been, a Material Adverse Effect:  (i) changes in general business or economic conditions affecting the industry in which the Sellers operate, (ii) changes in national or international political or social conditions, including the engagement by the United States in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, terrorist attack upon the United States, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, asset, equipment or personnel of the United States, (iii) changes in, GAAP after the Original Agreement Date, (iv) changes in applicable Laws after the Original Agreement Date, (v) changes resulting from the public announcement of this Agreement or the Transactions (other than for purposes of any representation or warranty contained in <u>Section 3.6</u>), (vi) the failure, in and of itself, of the Sellers to achieve any budgets, projections or forecasts (but, excluding, for the avoidance

of doubt, the underlying causes of any such failure), and (vii) any changes resulting from the public announcement of the filing of the Bankruptcy Cases; or (y) any Effect that would be reasonably likely to prevent, impair or materially delay the Sellers from consummating the Transactions.

(oo)    "*Multiemployer Plan*" means any "*multiemployer plan*" as defined in Section 3(37) of ERISA set forth on Schedule 3.13(b).

(pp)    "*Order*" means any award, decision, decree, order, directive, injunction, ruling, judgment, or consent of or entered, issued, made or rendered by any Governmental Authority.

(qq)    "*Permits*" means licenses, permits, approvals, certificates of occupancy, authorizations, operating permits, registrations, plans and other similar documents and authorizations issued by any Governmental Authority to any Seller.

(rr)    "*Permitted Liens*" means (i) Liens granted by Purchaser at or after the Closing or pursuant to the Loan Agreement and the loan documents related thereto; (ii) non-Tax Liens that arise under zoning, building codes, land use and other similar Laws, none of which would materially interfere with the ownership or operation by Purchaser of the Purchased Assets following the Closing in substantially the manner as owned and operated immediately prior to the Original Agreement Date; and (iii) any Lien that arises as a result of a non-exclusive license or other non-exclusive grant of rights under Intellectual Property Rights pursuant to Assumed Contracts to use products and services in the ordinary course of business consistent with past practice.

(ss)    "*Person*" means a natural person, corporation, partnership, limited liability company, association, joint venture, trust or other entity or organization, including a Governmental Authority.

(tt)    "*Post-Petition Subscriber Orders*" means all Subscriber Orders for which Sellers have actually received payment in a Seller bank account after the Petition Date.

(uu)    "*Post-Retirement Liabilities*" means with respect to all Employees and retirees, all Liabilities for the post-retirement benefits, including those provided under the Employee Benefit Plans, as applicable.

(vv)    "*PPP*" means Portage Point Partners.

(ww)    "*Property Taxes*" means all real and personal property Taxes levied with respect to the Purchased Assets for any taxable period or portion thereof.

(xx)    "*Qualified Settlement*" means a settlement entered into with an applicable Taxing Authority for Pre-Petition Sales Taxes that is comprised of (i) payments over a thirty-six (36) month period in an amount (excluding applicable interest and penalties for states other than California and Texas) no greater than one hundred ten percent (110%) of the estimated amount set forth on the Sales Taxes Schedule with respect to such Taxing Authority; provided, however, that the Pre-Closing Payment Plan for California set forth on the Sales Taxes Schedule and the proposed Payment Plan for Texas set forth on the Sales Taxes Schedule, in each case, are each deemed a Qualified Settlement; or (ii) payments over a period of up to six (6) months in an amount no greater than $50,000 in the aggregate with respect to such Taxing Authority.

6.

(yy)    "*Real Property Leases*" means all of Sellers' right, title and interest in all leases, subleases, licenses, concessions and other agreements and all amendments, extensions, renewals, guaranties and other agreements with respect thereto and including the right to all security deposits and other amounts and instruments deposited by or on behalf of any Seller thereunder, pursuant to which such Seller holds a leasehold or subleasehold estate in, or is granted a license or right to use, the Leased Real Property.

(zz)    "*Release*" has the meaning set forth in CERCLA.

(aaa)    "*Representative*" shall mean, with respect to any Person, such Person's officers, directors, managers, employees, agents, representatives and financing sources (including any investment banker, financial advisor, accountant, legal counsel, consultant, other advisor, agent, representative or expert retained by or acting on behalf of such Person or its subsidiaries).

(bbb)    "*Sales Taxes Account*" means the segregated bank account established by Sellers to retain Sales Taxes (i) due in respect of, or arising in connection with, customer transactions occurring in the ordinary course of the Business after the Petition Date and (ii) any Sales Taxes transferred, remitted or released by any Person, including any bank, insurance company, or credit card processor, to any Seller, irrespective of whether such funds relate to Sales Taxes of Sellers that arose before, on or after the Petition Date.

(ccc)    "*Schedules*" means the Schedules delivered by Sellers concurrently with the execution and delivery of the Original Agreement.

(ddd)    "*Subscriber Orders*" means all purchase orders or other similar forms or agreements with customers for the provision of a curated box or curated boxes.

(eee)    "*Successor Entity*" means a successor-in-interest to one or more of the Sellers established after the Original Agreement Date in accordance with the Bankruptcy Code and Orders of the Bankruptcy Court.

(fff)    "*Tax*" means (i) any federal, state, provincial, territorial, municipal, local or foreign income, profits, franchise, gross receipts, environmental (including taxes under Code Section 59A), customs, duties, net worth, sales, use, goods and services, withholding, value added, ad valorem, employment, social security, disability, occupation, pension, real property, personal property (tangible and intangible), stamp, transfer, conveyance, severance, production, excise and other taxes, withholdings, duties, levies, imposts and other similar charges and assessments (including any and all fines, penalties and additions attributable to or otherwise imposed on or with respect to any such taxes, charges, fees, levies or other assessments, and interest thereon) imposed by or on behalf of any Governmental Authority (a "*Taxing Authority*") responsible for the imposition thereof (whether domestic or foreign), whether or not disputed, and (ii) Liability for the payment of any amounts of the type described in clause (i) as a result of being a transferee, party to any agreement or any express or implied obligation to indemnify any other Person.

(ggg)    "*Tax Returns*" means any report, return, declaration, claim for refund, information report or return or statement required to be supplied to a Taxing Authority in connection with Taxes, including any schedule or attachment thereto or amendment thereof.

(hhh)   "*Technology*" means technology and all other tangible embodiments of Intellectual Property Rights, whether statutory, common law or otherwise, in any jurisdiction throughout the world, including all: (i) inventions and discoveries, whether or not patentable; (ii) trademarks, service marks, trade dress, logos, slogans, brand names, trade names, Internet domain names and corporate names (whether or not registered), and other identifiers and indicia of origin, and all applications and registrations in connection therewith; (iii) all works of authorship, including audiovisual works, collective works, computer programs, compilations, databases, derivative works, literary works, mask works, and sound recordings; (iv) software, including all computer programs, databases and compilations, descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing and all user documentation, including user manuals and training materials, relating to any of the foregoing; (v) mask works and industrial designs; (vi) trade secrets and other confidential and proprietary information (including inventions, ideas, research and development information, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, drawings, schematics, specifications, research records, test information, financial, marketing and business data, customer, subscriber and supplier lists, algorithms and information, pricing and cost information, business and marketing plans and proposals, and databases and compilations, including any and all data and collections of data); and (vii) without limitation to the generality of the foregoing, the E-Commerce Platform.

(iii)   "*Transaction Document*" means this Agreement, the Conveyance Agreements, the Transition Services Agreement (as applicable) and the Sales Tax Funding Commitment, together with such other agreements, certificates, and documents, and any exhibits, annexes, schedules, or other attachments thereto, delivered or caused to be delivered incident to or in connection with the Transactions.

(jjj)   "*Transferred Employee*" means any Employee who accepts Purchaser's offer of employment after the Closing Date.

1.2    **Cross References**.  Each of the following terms is defined in the Section set forth opposite such term:

| Term | Section |
|------|---------|
| Adjustment Date | 8.3 |
| Agreement | Preamble |
| Allocation Schedule | 2.6(b) |
| Approval Order | 7.5(b) |
| Assignment and Assumption Agreement | 2.8(b) |
| Assumed Contracts | 2.1(a) |
| Assumed Liabilities | 2.3 |
| Assumed Plans | 9.2(c) |
| Avoidance Actions | 2.1(u) |
| Bankruptcy Cases | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Business | Recitals |
| Closing | 2.7 |
| Closing Statement | 7.10 |
| Conveyance Agreements | 2.8(f) |
| Credit Bid and Release | 2.6(a) |
| Customer Data | 2.1(n) |
| Debtor or Debtors | Recitals |
| Disputed Contract | 2.5(d) |
| Disputed Contract Order | 2.5(d) |

8.

| Term | Section |
|------|---------|
| D&O Claim Rights | 2.1(u) |
| End Date | 11.1(c) |
| Excluded Accounts Receivable | 2.1(c) |
| Excluded Assets | 2.2 |
| Excluded Liabilities | 2.4 |
| Expense Reimbursement | 7.5(a) |
| Expired IP | 3.10 |
| Financial Information | 3.3(a) |
| Leased Real Property Assignment Agreements | 2.8(f) |
| License Agreements | 2.1(l) |
| M&A Qualified Beneficiary | 9.2(f) |
| Material Contracts | 3.21(a) |
| Necessary Consent | 2.5(c) |
| Original Agreement | Preamble |
| Original Agreement Date | Preamble |
| Party or Parties | Preamble |
| Payment Plan Protocols | 8.5(b) |
| Personal Information | 3.23 |
| Petition Date | Recitals |
| Pre-Closing Payment Plans | 8.5(b) |
| Pre-Closing States | 8.5(b) |
| Pre-Petition Sales Taxes | 8.5(a) |
| Post-Closing Payment Plans | 8.5(f) |
| Post-Petition Sales Taxes | 2.3(f) |
| Previously Omitted Contract | 2.5(a) |
| Previously Omitted Contract Notice | 2.5(a) |
| Power of Attorney | 2.8(d) |
| Purchase Price | 2.6(a) |
| Purchased Assets | 2.1 |
| Purchaser | Preamble |
| Purchaser Previously Omitted Contract | 2.5(a) |
| Registered IP | 2.1(f) |
| Sales Tax Funding Commitment | 8.5(e) |
| Sales Taxes | 8.5(g) |
| Sales Taxes Payments | 8.5(a) |
| Sales Taxes Schedule | 8.5(a) |
| Seller or Sellers | Preamble |
| Sellers' Previously Omitted Contract | 2.5(a) |
| Sellers' Property Taxes | 8.3 |
| Straddle Period | 8.3 |
| Tax Claim | 8.1 |
| Taxing Authority | 1.1(fff) |
| Trademark Assignment Agreement | 2.8(c) |
| Transactions | Recitals |
| Transferred Intellectual Property Rights | 2.1(f) |
| Transfer Taxes | 8.2 |
| Transition Services Agreement | 7.6 |

2.    PURCHASE AND SALE.

    2.1    **Purchase and Sale**.  Subject to the terms and conditions set forth in this Agreement, at the Closing, Sellers agree to sell, assign, transfer, convey and deliver to Purchaser, and Purchaser agrees to purchase, acquire and accept from Sellers, all right, title and interest of Sellers as of the Closing Date in and to all of Sellers' properties and assets, real, personal or mixed, tangible and intangible, of every kind and description, wherever located and

whether or not carried or reflected on the books and records of Sellers that are now, or at the time of Closing will be, used or held for use in or otherwise related to, useful in or necessary for the conduct of, the Business, other than the Excluded Assets (the "***Purchased Assets***"), free and clear of all Liens (other than Permitted Liens and the Assumed Liabilities) to the maximum extent permitted by Section 363 of the Bankruptcy Code.  Subject to <u>Section 2.2</u>, the Purchased Assets purchased hereunder shall include, but shall not be limited to, the following:

      **(a)**     all rights of Sellers in or under the Contracts that are set forth on <u>Schedule 2.1(a)</u>; <u>provided</u>, that, notwithstanding any other provision of this Agreement, Purchaser may, in its sole discretion, add or delete any Contracts set forth on <u>Schedule 2.1(a)</u> until two (2) Business Days prior to the Closing Date (or later as provided for herein) and shall promptly notify Sellers of any such addition or deletion by delivery of an updated copy of <u>Schedule 2.1(a)</u> (the Contracts set forth on the <u>Schedule 2.1(a)</u> as of two (2) Business Days prior to the Closing Date or subsequently added thereto, collectively, the "***Assumed Contracts***");

      **(b)**     all inventory of any kind and nature, including all raw materials, works-in-process of any type (including semi-finished goods), finished goods, consigned goods, merchandise (including, any toys, action figures, clothing and apparel, gear, books, DVDs, video games, memorabilia, collectibles, dolls, figurines, gadgets and board and card games), inventory owned by any Seller but which remains in the possession or control of a third party or which is undelivered or in transit, inventory located at a distribution center and other inventories to which the Sellers have title that are in the possession of the Sellers or any third party and used or held for use in connection with the Business;

      **(c)**     all Accounts Receivable (other than Excluded Accounts Receivable), and any and all amounts paid by, payable from, due and owing, or otherwise recoverable from any Governmental Authority, including any customs authority, customs agency, or customs broker, including, but not limited to, any customs drawback rights under the Trade Facilitation and Trade Enforcement Act of 2015, in each case to the extent that such rights are assignable to Purchaser under applicable Law;

      **(d)**     all tangible personal property, including, all machinery, equipment, tools, vehicles, computers, mobile phones, personal digital assistants, computer equipment, hardware, peripherals, information technology infrastructure, telephone systems, furniture, fixtures, furnishings, office supplies, production supplies, spare parts, shipping and packaging materials, storeroom contents, other miscellaneous supplies, and other tangible personal property of any kind owned by Sellers (including any of the foregoing property that is subject to a lease, but only to the extent that Purchaser assumes such lease as an Assumed Contract) wherever located, including all such items which are located in any building, warehouse, office or other space leased, owned or occupied by Sellers or any other space where Sellers' properties or any other assets may be situated;

      **(e)**     all Permits, including those set forth on <u>Schedule 2.1(e)</u> to the extent the same may be transferred or assigned consistent with their terms;

      **(f)**     all of Sellers' right, title and interest in and to any Intellectual Property Rights, including (i) all Intellectual Property Rights of Sellers that are the subject of an application, certificate, filing, registration, or other document issued by, filed with, or recorded by, any state, government or other public legal authority (the "*Registered IP*"), including the items set forth on <u>Schedule 2.1(f)</u>, and including, trademark applications and registrations worldwide for "***Loot Crate***" (for all languages and whether translated, transliterated or phoneticized and any derivation thereof); (ii) other unregistered Intellectual Property Rights of Sellers embodied by or associated with any assets listed or described in this <u>Section 2.1</u>, including Intellectual Property Rights embodied by or

associated with any assets referenced in subsections 2.1(a) through (cc) of this Section 2.1, and (iii) the right to sue for and recover damages, profits and any other remedy in connection therewith, for past, present or future infringement, misappropriation or other violation related to any of the foregoing assets (collectively, the "***Transferred Intellectual Property Rights***");

(g) to the extent transferrable, the registrations to the social media accounts of Sellers, including those listed on Schedule 2.1(g), and all content stored thereon; provided, that to the extent transfer is not permissible with respect to any social media account, the Parties shall enter into such alternative arrangement so as to allow Purchaser to access and use such social media account and the content stored thereon to the extent administratively feasible;

(h) all of Sellers' right, title and interest in and to any Domain Names, including those listed on Schedule 2.1(h);

(i) all past, present and future claims, asserted or unasserted, contingent or fixed, known or unknown, against third parties (but no liabilities arising therefrom) related to any warranties, representations and licensing agreements arising out of the operation of the Purchased Assets and the right to collect proceeds and damages therefrom;

(j) all warranties and guarantees related to the Purchased Assets, to the extent assignable, including warranties and guarantees made by suppliers, manufacturers and contractors with respect to the Purchased Assets, and claims against suppliers and other third parties in connection with the Assumed Contracts;

(k) all rights of Sellers under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees and agents of Sellers or with third parties to the extent relating to the Business or the Purchased Assets (or any portion thereof);

(l) all rights of Sellers under or pursuant to the license agreements, sublicense agreements or other arrangements with licensors, including all current statement of works and amendments thereto, that are specifically set forth on Schedule 2.1(a), as may be amended from time to time (the agreements described in this Section 2.1(l) shall be referred to herein as the "***License Agreements***");

(m) all Customer Lists and all other books, records, files and papers of Sellers to the extent related to the Business or the Purchased Assets, including vendor files, equipment logs, operating guides and manuals, creative materials, advertising materials, promotional materials, studies, reports, correspondence, financial and accounting records, personnel files for Employees, Tax records and other similar documents and records (all in the state in which such records and information currently exist), but excluding from the foregoing any information to the extent prohibited by Law for transfer hereunder;

(n) all subscriber and customer data, information, analysis and modelling derived from any Customer List and branded loyalty promotion programs and other similar information including personal information (such as name, address, telephone number, e-mail address, website and any other database information), customer consents and opt-in/opt-outs, product hierarchy, segmentation (life cycle), customer lifetime value, predictive modeling scores and models used, loyalty information and data, private label programs (including credit card) information and data, offers, coupons and discount information and data, and customer purchase and transaction history at a transaction level (including dollar amounts, dates, and items purchased, but excluding from the foregoing any credit card numbers or related customer payment source, social security numbers, or other information to the extent prohibited by Law for transfer

hereunder) relating to customers of, or collected through or used in the operation of (i) the Business, (ii) the E-Commerce Platform or any similar e-commerce platform owned, operated or controlled by Sellers, (iii) any catalog sales, other online or print mailing or similar distribution channels, (iv) partner e-commerce platforms or retail stores and (v) any Customer Lists (collectively, the "***Customer Data***");

(o)  (i) all artwork and other graphic media used in connection with the Purchased Assets in the marketing of products for Sellers' past and present customers to the extent Sellers have the right, title and interest to such artwork and media and (ii) all content, graphics, literary, audiovisual and artistic works displayed on the websites or boxes to the extent Sellers have the right, title or interest thereto;

(p)  the E-Commerce Platform and all other Technology of Sellers, including the Technology set forth on Schedule 2.1(p);

(q)  except as set forth on Schedule 2.2(b) below, all utility deposits, security deposits, deposits held by parties to the Assumed Contracts, deposits held by vendors or trade creditors, and other deposits of any kind or nature whatsoever;

(r)  the rights described under Section 2.5(b) below;

(s)  all prepaid expenses of any Seller relating to any of the Assumed Contracts;

(t)  Cash and Cash Equivalents in excess of the Budgeted Reserve;

(u)  (i) all rights, claims or causes of action of Sellers, and proceeds thereof, of whatever kind or nature, and whether asserted or unasserted, including, without limitation any causes of action against current and former directors and officers of Sellers and any affiliates of such directors and officers (collectively, the "***D&O Claim Rights***") if Purchaser elects, in its sole discretion, to assume such D&O Claim Rights within six (6) months of the Closing Date, provided, however, the Sellers may only pursue such D&O Claim Rights with Purchaser's written consent and at Purchaser's direction, as the proceeds thereof would remain Purchased Assets; and (ii) all causes of action arising under chapter 5 of the Bankruptcy Code (the "***Avoidance Actions***"); provided, however, that causes of action arising under section 547 of the Bankruptcy Code shall not be affirmatively pursued by Purchaser but may be used in a manner and for the purposes set forth in Section 2.3(e); provided further, however, that with respect to the D&O Claim Rights, such rights shall remain assets of the estates of Sellers until such time as the Purchaser makes its election;

(v)  all of Sellers' right, title and interest in any reserves held by any bank, insurance company, or credit card processor, including those reserves scheduled on Schedule 2.1(v);

(w)  all insurance policies relating to the Business (other than the D&O Policy) including those policies scheduled on Schedule 2.1(w);

(x)  all claims, and proceeds thereof, arising under any insurance policies relating to the Business, and all credits, premium refunds, proceeds, causes of action or rights thereunder, except for any defense costs and expenses payable under the D&O Policy to Employees, directors or officers of any Seller;

(y)  all rights (but none of the obligations, if any) of any Seller related to the current or future assignment to any Seller (or enforcement or registration by any Seller) of

any Intellectual Property Rights (e.g., proprietary information agreements between a Seller, on the one hand, and any Employee, on the other hand);

(z)  all (i) Post-Petition Subscriber Orders, (ii) Subscriber Orders entered into prior to the Petition Date by a customer using PayPal, Inc., and (iii) Subscriber Orders entered into prior to the Petition Date that Purchaser, in its sole discretion, agrees to fulfill;

(aa)  the Sales Taxes Account and all cash deposited therein and any deposits in transit with respect to such account;

(bb)  all goodwill directly arising from, related to or resulting from the Business or the Purchased Assets; and

(cc)  any other assets, whether tangible or intangible, related to, used in or held for use by, the Business, except for any Excluded Assets.

**2.2  Excluded Assets**.  Notwithstanding any other provision of this Agreement to the contrary, the following assets (the "***Excluded Assets***") shall not be transferred, conveyed, sold or assigned to Purchaser, and the Purchased Assets shall not include any of the following assets:

(a)  a Seller's corporate seals, stock record books, minute books and organizational documents;

(b)  any Contract (other than an Assumed Contract) and, as set forth on Schedule 2.2(b), deposits made in respect of professional fee retainers but solely to the extent that such deposit is used to satisfy allowed professional or advisory fees or expenses of professionals or advisors retained under Section 327 or Section 363 of the Bankruptcy Code, including allowed fees or expenses of PPP or Theseus Strategy Group LLP;

(c)  the D&O Policy and any defense costs and expenses payable under the D&O Policy to Employees, directors or officers of any Seller;

(d)  all rights of Sellers arising under this Agreement, and under any other agreement between Sellers and Purchaser entered into in connection with this Agreement or the Transactions;

(e)  all amounts owed to any Seller by any other Seller;

(f)  any shares of stock or other equity interests in any Seller or any subsidiary of any Seller and any Contracts entered into in connection with the sale or ownership of such shares of stock or other equity interests to the extent not set forth on Section 2.1(a);

(g)  all assets listed on Schedule 2.2(g) by Purchaser in its sole discretion as of two (2) Business Days before the Closing Date;

(h)  all bank accounts, deposit accounts, securities accounts, brokerage accounts and other accounts holding any cash, cash equivalents or securities belonging to Sellers set forth on Schedule 2.2(h);

(i)  all of Sellers' cash and cash equivalents on hand (including all undeposited checks) and in banks or other financial institutions in an amount equal to the Budgeted Reserve;

**(j)**       all Employee Benefit Plans and any assets thereof or relating thereto;

**(k)**       (i) all attorney-client privilege and attorney work-product protection of the Sellers or associated with the Business as a result of legal counsel representing the Sellers or the Business to the extent relating to the structuring, preparation and negotiation of the transactions contemplated by this Agreement (except for any attorney-client privilege and attorney work-product protection relating to Sales Taxes in furtherance of Purchaser's obligations set forth in Section 8.5); (ii) all documents subject to the attorney-client privilege and work-product protection described in subsection (i) (excluding, for the avoidance of doubt, documents subject to the attorney-client privilege and work-product protection relating to Sales Taxes in furtherance of Purchaser's obligations set forth in Section 8.5); and (iii) all documents maintained by Sellers to the extent relating to the structuring, preparation and negotiation of the transactions contemplated by this Agreement (excluding any documents relating to Sales Taxes in furtherance of Purchaser's obligations set forth in Section 8.5);

**(l)**       the Accounts Receivable listed on Schedule 2.2(l) (the "***Excluded Accounts Receivable***"); and

**(m)**       all good faith or other bid deposits submitted by a third party under the terms of the bid procedures.

**2.3     Assumed Liabilities**.   Upon the terms and subject to the conditions of this Agreement, Purchaser agrees, effective at the time of the Closing, to assume, pay, perform and discharge, promptly when payment or performance is due or required, the Assumed Liabilities. "***Assumed Liabilities***" shall mean solely the following liabilities:

**(a)**       all liabilities and obligations of Sellers exclusively related to or arising out of Purchaser's ownership of the Purchased Assets (other than the Assumed Contracts) from and after the Closing Date, including, with respect to the Subscriber Orders included in the Purchased Assets, all amounts billed to any customer by Sellers' prior to the Closing Date that are attributable to services not yet provided and to be rendered by Purchaser after the Closing Date;

**(b)**       all liabilities of Sellers under each of the Assumed Contracts that become due from and after the Closing Date;

**(c)**       all costs, expenses and liabilities pro-rated to Purchaser as expenses and liabilities arising on or after the Closing Date as set forth pursuant to the express terms of this Agreement;

**(d)**       all Cure Costs required in connection with the assumption and assignment of any Assumed Contracts;

**(e)**       (i) the administrative claims set forth on Schedule 2.3(e)(i), provided, that, Purchaser may, in its sole discretion, modify the administrative claims set forth on Schedule 2.3(e)(i) until two (2) Business Days prior to the Closing Date solely to remove any unpaid administrative claims and expenses that are not provided for in the DIP Budget; and (ii) valid Claims arising under section 503(b)(9) of the Bankruptcy Code as set forth on Schedule 2.3(e)(ii), which Purchaser may reduce dollar for dollar by the amount of any claim Sellers could have asserted against any such Claim holder pursuant to section 547 of the Bankruptcy Code on a creditor-by-creditor basis, provided that the holder of a 503(b)(9) claim may assert all valid defenses thereto.  In the event that the Purchaser and the holder of a 503(b)(9) claim cannot agree upon the amount of such 503(b)(9) claim to be assumed and paid by the Purchaser as set forth herein, such

14.

503(b)(9) claimant may petition the Court to increase the amount of its 503(b)(9) claim assumed by Purchaser or to adjudicate such 503(b)(9) claimant's hypothetical liability under section 547 of the Bankruptcy Code for the purposes described herein;

**(f)** all liabilities for Sales Taxes arising after the Petition Date with respect to the operation of the Business payable to certain Taxing Authorities ("***Post-Petition Sales Taxes***"); and

**(g)** the Transfer Taxes described in <u>Section 8.2</u>.

In no event shall an Assumed Liability include any Liabilities or obligations of any Seller or its Affiliates that relate to any breach of representation, warranty, covenant or agreement that arose on or prior to the Closing Date. Notwithstanding the foregoing and for the avoidance of doubt, Assumed Liabilities shall not include any Liability that constitutes an "Excluded Liability" or any Liability relating to or arising out of any violation of Law by, or any Claim against, any Seller or any breach, default or violation by any Seller of or under any Assumed Contracts, other than the Cure Costs.

**2.4 Excluded Liabilities**. Notwithstanding any other provision of this Agreement to the contrary, Purchaser is assuming only the Assumed Liabilities and is not assuming any other Claim against or Liability or other obligation of Sellers or any predecessor of any Seller of whatever nature, whether presently in existence or arising hereafter. All such other claims, Liabilities and other obligations, whether known or unknown, direct or contingent, in litigation or threatened, or not yet asserted, shall be retained by and remain claims, Liabilities and other obligations of Sellers (all such claims, Liabilities and other obligations not being assumed being herein referred to as the "***Excluded Liabilities***"). Without limiting the generality of the foregoing, the Excluded Liabilities shall include the following:

**(a)** all Liabilities related to any Excluded Assets;

**(b)** administrative claims not explicitly set forth on <u>Schedule 2.3(e)</u>;

**(c)** all Liabilities (including Taxes (other than the Transfer Taxes and Post-Petition Sales Taxes)) for or arising in respect of (i) any and all Taxes (other than the Transfer Taxes), irrespective of when asserted, of the Business of one or more Sellers, any of their respective stockholders or equityholders of any Affiliate of any of the foregoing for any taxable period (including any such Taxes or related liabilities that may be imposed on or asserted against Purchaser or any of its Affiliates as a transferee or successor as a result of the transactions contemplated by this Agreement), (ii) any and all Taxes (other than the Post-Petition Sales Taxes) related to or arising from the Business, any of the Assumed Liabilities or any of the Purchased Assets, in each case, for any taxable period (or portion thereof) ending on or before the Closing Date (including any Taxes (other than the Post-Petition Sales Taxes) of any other Person imposed on or required to be paid by Purchaser as a successor or transferee, pursuant to any Assumed Contract, by operation of Law or otherwise to the extent relating to the Business and arising from an event or transaction occurring prior to the Closing or as a result of the failure to comply with any Bulk Sales Laws) and (iii) any Taxes or liabilities arising from the failure to comply with or obtain a certificate under any Bulk Sales Laws (including in respect of the transactions contemplated by this Agreement);

**(d)** all Liabilities relating to the Transferred Employees and all other Employees arising prior to the Closing Date, including Liabilities relating to such Transferred Employees and other Employees employment with any Seller or otherwise arising under the Employee Benefit Plans;

**(e)**      all Post-Retirement Liabilities;

**(f)**      all Liabilities under any collective bargaining agreement with any bargaining representative for Sellers' employees;

**(g)**      all claims for withdrawal liability or contributions related to Seller's participation in any Multiemployer Plan, including those set forth on <u>Schedule 3.13(b)</u>;

**(h)**      all Liabilities relating to Employees, including all Liabilities of Sellers with respect to Employee Benefit Plans and all Liabilities thereunder, accrued and unpaid wages, accrued and unused vacation, sick days and personal days, any severance pay or benefits arising with respect to Transferred Employees, other payments earned but not paid under any incentive or bonus plan or arrangement of the Sellers, and the Employee's share and the employer's share of any payroll Taxes of all Employees of Sellers incurred through the Closing Date;

**(i)**      all Environmental Liabilities and Obligations, and all other Liabilities relating to any Laws in connection with any environmental, health or safety matters based on facts arising or existing during Sellers' operation of the Business prior to the Closing Date; provided, that nothing in this Agreement shall in any way (x) diminish the obligation of any entity to comply with Environmental Laws, or (y) diminish the obligations of Sellers to comply with Environmental Laws consistent with their rights and obligations as debtors in possession under the Bankruptcy Code;

**(j)**      all Liabilities relating to any claims for infringement, dilution, misappropriation or any other violation of or by Sellers' intellectual property and Intellectual Property Rights arising from Sellers' operation of the Business, or ownership or use of the Purchased Assets or Excluded Assets, prior to the Closing Date, including all Actions or claims in respect of any violation of any intellectual property rights, whether arising under a Contract or otherwise;

**(k)**      except with respect to Cure Costs, all Liabilities arising as a result of any Claim initiated at any time, to the extent related to the Business or the Purchased Assets on or prior to the Closing Date, including any stockholder or shareholder actions, actions for breach of contract, or any tort actions;

**(l)**      all Liabilities with respect to any costs and expenses (including all legal, accounting, financial advisory, valuation, investment banking and other third party advisory or consulting fees and expenses) incurred by or on behalf of each Seller or its Affiliates in connection with the Bankruptcy Cases or the Transactions;

**(m)**      all Liabilities incurred in the businesses of Sellers prior to the filing of the Bankruptcy Cases other than Assumed Liabilities, including all Liabilities and obligations of Sellers relating to or arising out of Subscriber Orders that are not included in the Purchased Assets;

**(n)**      all Liabilities for any funded indebtedness;

**(o)**      any Liability based on successor liability theories, including, product liability claims; and

**(p)**      any Liability based on any personal injury claims.

      **2.5**      **Assumption/Assignment of Contracts and Rights; Executory Contract Designation**.

16.

(a)      **Assumption/Assignment of Contracts and Rights**.  To the maximum extent permitted by the Bankruptcy Code, the Assumed Contracts (and such other Contracts intended to be Assumed Contracts subsequently identified by Purchaser after the Closing Date) shall be assumed by Sellers and assigned to Purchaser at the Closing pursuant to Section 365 of the Bankruptcy Code.   Sellers shall use commercially reasonable efforts to cooperate with Purchaser in its efforts to reduce any Cure Costs and negotiate rent reductions with respect to Real Property Leases that are Assumed Contracts.   Purchaser shall have sole responsibility for paying any Cure Costs due in connection with the assumption and assignment of the Assumed Contracts.  Such efforts shall include, without limitation, providing Purchaser with reasonable access to relevant business records, personnel, equipment, and Purchaser's other reasonable requests in order to allow Purchaser to assist with evaluating the Cure Costs.   Purchaser shall cooperate with Sellers to provide "***adequate assurance***" of Purchaser's future performance under the Assumed Contracts.  If prior to or following Closing, it is discovered that a Contract was not previously provided to Purchaser and, accordingly, such Contract is not listed <u>Schedule 2.1(a)</u> (any such Contract, a "***Sellers' Previously Omitted Contract***"), Sellers shall, promptly following the discovery thereof, notify Purchaser in writing of such Sellers' Previously Omitted Contract.   Purchaser shall thereafter deliver written notice to Sellers, no later than five (5) Business Days following notification of such Sellers' Previously Omitted Contract from Sellers, designating such Sellers' Previously Omitted Contract as "Assumed" or "Rejected."  If at any point following Closing, Purchaser elects to add any additional Contract to <u>Schedule 2.1(a)</u> that was not (i) listed on <u>Schedule 2.1(a)</u> as of Closing and (ii) rejected pursuant to a bankruptcy court order (any such Contract, a "***Purchaser Previously Omitted Contract***" and together with any Sellers' Previously Omitted Contract, a "***Previously Omitted Contract***"), Purchaser shall notify Sellers in writing of its designation of such Purchaser Previously Omitted Contract as "Assumed."  If Purchaser designates a Seller Previously Omitted Contract as "Assumed," (A) <u>Schedule 2.1(a)</u> shall be amended to include such Previously Omitted Contract and (B) Sellers shall, at Purchaser's expense, serve a notice (the "***Previously Omitted Contract Notice***") on the counterparties to such Previously Omitted Contract such counterparties of the Cure Costs with respect to such Previously Omitted Contract and Sellers' intention to assume and assign such Previously Omitted Contract in accordance with this Agreement.  The Previously  Omitted Contract Notice shall provide the counterparties to such Previously Omitted Contract with ten (10) days to object, in writing to Sellers and Purchaser, to the Cure Costs or the assumption of its Contract; and if the counterparties, Sellers and Purchaser are unable to reach a consensual resolution with respect to such objection, Sellers will, at Purchaser's expense, file all pleadings required to seek a timely hearing before the Bankruptcy Court to determine the applicable Cure Costs (to the extent not previously determined) and obtain approval the assumption of the Previously Omitted Contract and payment by Purchaser of such applicable Cure Cost.  If Purchaser designates a Purchaser Previously Omitted Contract as "Assumed," Sellers shall amend <u>Schedule 2.1(a)</u> and, at Purchaser's expense, take all other steps necessary to assume and assign the Purchaser Previously Omitted Contract to Purchaser.  None of the representations or warranties applicable to contracts by this Agreement shall apply to any Purchaser Previously Omitted Contract.

(b)      **Executory Contract Designation**.  On the terms and conditions set forth in this Agreement, Purchaser shall have the sole and exclusive right to select, identify and designate the Assumed Contracts.

(c)      **Non-Assignment of Assumed Contracts**. Notwithstanding anything in this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any Assumed Contract which, after giving effect to the provisions of Section 365 of the Bankruptcy Code, is not assignable or transferable without the consent of any Person, other than the Sellers, any of their respective Affiliates or Purchaser, to the extent that such consent shall not have been given prior to the Closing; <u>provided</u>,

however, that (i) the Sellers shall use, whether before or after the Closing (at Purchaser's expense, if after Closing), its commercially reasonable efforts to obtain all necessary consents (each, a "***Necessary Consent***") to the assignment and transfer thereof, it being understood that, to the extent the foregoing shall require any action by the Sellers that would, or would continue to, have an adverse effect on the business of Purchaser or any of its Affiliates after the Closing, such action shall require the prior written consent of Purchaser, and (ii) in the event that any Assumed Contract is deemed not to be assigned pursuant to clause (i) of this Section 2.5(c), the Sellers shall, at Purchaser's expense, (A) use commercially reasonable efforts to obtain such necessary consents as promptly as practicable after the Closing to the extent administratively feasible and (B) cooperate in good faith in any lawful and commercially reasonable arrangement reasonably proposed by Purchaser, including subcontracting, licensing or sublicensing to Purchaser any or all of any Seller's rights and obligations with respect to any such Assumed Contract, under which Purchaser shall obtain (without infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits under such Assumed Contract with respect to which such Necessary Consent has not been obtained to the extent administratively feasible. Upon satisfying any requisite consent requirement applicable to such Assumed Contract after the Closing, such Assumed Contract shall promptly be transferred and assigned to Purchaser in accordance with the terms of this Agreement. These commercially reasonable efforts shall not require any material payment or other material consideration from the Sellers or Purchaser (other than the Cure Costs, which shall be the responsibility of Purchaser), and any such consent shall contain terms and conditions reasonably acceptable to Purchaser. For the avoidance of doubt, the term "material" in the prior sentence means material in the context of the relevant Assumed Contract.

(d)     Upon objection by the non-debtor Contract counterparty to the proposed Cure Costs asserted by Sellers with regard to any Contract (such contract, a "***Disputed Contract***") Sellers shall, at Purchaser's prior written direction, either settle the objection of such party or shall litigate such objection (at Purchaser's expense if after Closing, or with the fees and expenses incurred being added to the Budgeted Reserve if prior to Closing). In no event shall any Seller settle a Cure Costs objection with regard to any Contract without the express written consent of Purchaser (with an email consent being sufficient). Upon entry of an Order determining any Cure Costs regarding any Disputed Contract (the "***Disputed Contract Order***"), Purchaser shall have the option to designate the Disputed Contract as an Excluded Asset, in which case, for the avoidance of doubt, Purchaser shall not assume the Disputed Contract and shall not be responsible for the associated Cure Costs, if any, with such Disputed Contract.  Each Seller agrees that it will promptly take such commercially reasonable actions as are necessary to obtain a final Order of the Bankruptcy Court providing for the assumption and assignment of Assumed Contracts.

**2.6     Consideration; Allocation of Consideration**.

(a)     In addition to the assumption of the Assumed Liabilities and the Cure Costs, the aggregate consideration (the "***Purchase Price***") for the sale, transfer and delivery of the Purchased Assets, at the Closing, shall be an amount equal to (i) thirty million dollars ($30,000,000) payable in the form of credit bid rights under Section 363(k) of the Bankruptcy Code consisting of the surrender and release by Purchaser of a portion of the Liabilities arising under, or otherwise relating to, the DIP Loan Agreement and First Lien Loan Agreement in an aggregate amount equal to thirty million dollars ($30,000,000) (the "***Credit Bid and Release***") (provided that the Credit Bid and Release shall be reduced dollar for dollar to the extent that Purchaser assumes (in its sole discretion) any portion of the indebtedness under the DIP Loan Agreement or First Lien Loan Agreement), *plus* (ii) the amount of cash payable by Purchaser in respect of the Budgeted Reserve, *plus* (iii) the aggregate amounts payable by Purchaser pursuant to

Section 8.5 in respect of Sellers' Sales Taxes, including those expenses advanced or reimbursed in connection with the negotiation and settlement of certain Sales Tax obligations of Sellers.

(b)     Purchaser and Sellers agree that the Purchase Price, applicable Assumed Liabilities and other relevant items shall be allocated in accordance with the allocation schedule (the "*Allocation Schedule*"), which shall be delivered by Purchaser to Sellers within ninety (90) days following the Closing Date.  Purchaser and Sellers shall (and shall cause their respective Affiliates to) file all Tax Returns (including IRS Form 8954 (as and to the extent applicable)) and other Tax-related information reports in a manner consistent with the allocation schedule and not take any position inconsistent with such allocation schedule in any Tax-related audit, examination or other proceeding (whether administrative or judicial) unless required by applicable Law.  If any Party receives any notice from a Taxing Authority in respect of an audit, examination or other proceeding (whether administrative or judicial) regarding any allocation of the Purchase Price or otherwise proposing an allocation different from the Allocation Schedule, such Party shall notify the other Parties of such notice and provide such other Parties with a copy of such notice, and the Parties hereto shall cooperate with each other in good faith regarding the resolution of any such matter.

(c)     Notwithstanding anything to the contrary herein, Purchaser and its Affiliates shall have the right to withhold any Taxes required by applicable Law (including any Bulk Sales Law) to be withheld or deducted from any payments made by it or its Affiliates pursuant to the terms hereof.  Any such withheld or deducted amounts shall be treated for purposes of this Agreement as having been paid to the Person in respect of whom such withholding or deduction was made.

2.7     **Closing**.  The closing (the "*Closing*") of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities shall take place at the offices of Cooley LLP, 55 Hudson Yards, New York, New York 10001, no later than three (3) Business Days after satisfaction of the conditions set forth in Section 10 (other than those conditions that by their nature are to be satisfied at the Closing (provided that such conditions are capable of being satisfied)), or at such other time or place as Purchaser and Sellers may mutually agree in writing.  The Parties may consummate the Closing electronically.

2.8     **Deliveries by Sellers**.  At the Closing, Sellers will deliver or cause to be delivered to Purchaser (unless delivered previously) the following:

(a)     the Approval Order;

(b)     a duly executed bill of sale and assignment and assumption agreement substantially in the form attached hereto as **Exhibit A** (the "*Assignment and Assumption Agreement*");

(c)     a duly executed trademark assignment agreement substantially in the form attached hereto as **Exhibit B** (the "*Trademark Assignment Agreement*"), duly executed by the applicable Seller;

(d)     a duly executed power of attorney substantially in the form attached hereto as **Exhibit C** (the "*Power of Attorney*");

(e)     an affidavit from Seller, sworn under penalty of perjury and dated as of the Closing Date, in form and substance satisfactory to Purchaser, issued pursuant to Section 1445 of the Code and the Treasury regulations thereunder stating that Seller is not a foreign person as defined in Section 1445 of the Code;

19.

**(f)** in the event that any Real Property Lease is set forth on <u>Schedule 2.1(a)</u> on the date that is two (2) Business Days prior to the Closing Date, a duly executed assignment and assumption agreement substantially in the form attached hereto as **Exhibit D** with respect to each such Real Property Lease (the "***Leased Real Property Assignment Agreements***" and, together with the Assignment and Assumption Agreement, the Trademark Assignment Agreement and the Leased Real Property Assignment Agreements, the "***Conveyance Agreements***");

**(g)** a duly executed counterpart to the Transition Services Agreement (if requested by Purchaser and to the extent administratively feasible);

**(h)** a duly executed counterpart to the Sales Tax Funding Commitment; and

**(i)** all other documents, assignments, instruments and writings reasonably requested by Purchaser to be delivered by Seller at or prior to the Closing pursuant to this Agreement, in each case in form and substance reasonably acceptable to Sellers.

**2.9 Deliveries by Purchaser**. At the Closing, Purchaser will deliver or cause to be delivered to Seller (unless previously delivered) the following:

**(a)** evidence of the Credit Bid and Release in form and substance reasonably satisfactory to Sellers;

**(b)** duly executed counterparts to the Conveyance Agreements;

**(c)** a duly executed counterpart to the Transition Services Agreement (if requested by Purchaser and to the extent administratively feasible);

**(d)** a duly executed counterpart to the Sales Tax Funding Commitment; and

**(e)** all other documents, instruments and writings reasonably requested by Sellers to be delivered by Purchaser at or prior to the Closing pursuant to this Agreement.

**2.10 Cash Transfer**. At the Closing, Sellers shall pay, or cause to be paid, to Purchaser an amount in cash equal to all cash and cash equivalents on hand as of the Closing Date in excess of the Budgeted Reserve by wire transfer of immediately available funds, to the account or accounts designated in writing by Purchaser to Sellers at least two (2) Business Days prior to the Closing.

**3. REPRESENTATIONS AND WARRANTIES OF SELLERS.** Except as set forth in the Schedules, each of the Sellers hereby represents and warrants to Purchaser as of the Original Agreement Date and as of the Closing Date as follows:

**3.1 Organization**. Each Seller is (a) an entity duly incorporated or organized and validly existing under the Laws of its jurisdiction of incorporation or organization, as applicable, (b) has all requisite corporate or limited liability company power and authority to own and operate its properties and to carry on its businesses as now conducted, subject to the provisions of the Bankruptcy Code, and (c) is qualified to do business and is in good standing (or its equivalent) under the Laws of its jurisdiction of incorporation or organization, as applicable, and in every jurisdiction in which its ownership of property or the conduct of the Business as now conducted requires it to qualify, except where the failure to be so qualified would not reasonably be expected to have a Material Adverse Effect.

**3.2 Corporate Authorization**. The execution, delivery and performance of this Agreement by each Seller, and the consummation by such Seller of the Transactions, subject to

requisite Bankruptcy Court approvals, have been duly and validly authorized by all requisite corporate or similar organizational action, and no other corporate or similar organizational proceedings on its part are necessary to authorize the execution, delivery or performance of this Agreement by such Seller.  This Agreement has been duly and validly executed and delivered by such Seller, and, assuming this Agreement is a valid and binding obligation of Purchaser, this Agreement constitutes a valid and binding obligation of such Seller, enforceable against such Seller in accordance with its terms, upon approval of the Bankruptcy Court.

3.3     **Financial Information**.

(a)     Schedule 3.3(a) sets forth (i) the unaudited financial statements of the Business for the year ended December 31, 2018, consisting of the consolidated balance sheet of Sellers as of December 31, 2018 and the related statements of income and retained earnings, stockholders' equity and cash flow for the years then ended and (ii) an unaudited interim balance sheet for the six-months ended June 30, 2019 (such interim financial statements, together with the financial information described in the preceding clause (i), the "***Financial Information***").   The Financial Information (A) has been prepared from, and is consistent with, the books and records of Sellers, and, except as noted therein, has been prepared in accordance with GAAP, (B) except as noted therein, has been prepared on a basis consistent with prior accounting periods of Sellers, (C) presents fairly, individually and in the aggregate, in all material respects the balances of the specified accounts of the Business for the period covered thereby, and (D) except as noted therein, reflects and fairly presents, individually and in the aggregate, in all material respects the total revenue generated in respect of the Business for each period for which such Financial Information was provided.

(b)     There are no Liabilities of the Business (whether accrued, absolute, contingent or otherwise) required under GAAP to be reflected in the Financial Information that are not reflected therein other than (i) Liabilities for Taxes, (ii) other Liabilities, in each case, incurred in the ordinary course of business since June 30, 2019 and (iii) Liabilities that are not, or would not reasonably be expected to be, individually or in the aggregate, material to the Business.

(c)     Sellers' books and records contain records that reflect, in reasonable detail and in all material respects, the transactions and dispositions of the assets of the Business.  Sellers' system of internal controls over financial reporting is sufficient to provide reasonable assurance (i) that transactions in respect of the Business are recorded as necessary to permit preparation of financial statements in conformity with GAAP, consistently applied, and to derive from such financial statements, financial statements in conformity with GAAP, (ii) that transactions in respect of the Business are executed only in accordance with the fiscal authorization policies of Sellers and (iii) regarding prevention or timely detection of the unauthorized acquisition, use or disposition of the assets of the Business.

(d)     All Accounts Receivables are valid receivables and were incurred in the ordinary course of business consistent with past practice for bona fide products delivered or services rendered and, to the Knowledge of Sellers, are current and collectible.

3.4     **Governmental Authorization**.  The execution, delivery and performance by Sellers of this Agreement and the consummation of the Transactions by Sellers require no action by or in respect of, or filing with, any Governmental Authority other than consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court.

3.5     **Noncontravention**.  Subject to entry by the Bankruptcy Court of the bid procedures order and the Approval Order in the Bankruptcy Cases, the execution, delivery and performance by Sellers of this Agreement and the consummation of the Transactions do not and

21.

will not (a) violate any Seller's articles or certificates of incorporation or formation, as amended, or bylaws or operating agreements, (b) assuming compliance with the matters referred to in <u>Section 3.4</u>, violate any applicable Law, or (c) result in the creation or imposition of any Lien on any Purchased Asset, except for Permitted Liens and Assumed Liabilities or Liens that will be released at or prior to Closing.

**3.6    Required Consents**.

**(a)**    Except as set forth on <u>Schedule 3.6(a)</u> and assuming that (x) requisite Bankruptcy Court approvals are obtained and (y) the notices, authorizations, approvals, Orders, permits or consents set forth on <u>Schedule 3.6(a)</u> are made, given or obtained, as applicable, the execution, delivery and performance by Sellers of this Agreement and the consummation by Sellers of the transactions contemplated hereby, do not: (i) violate the certificate of incorporation or formation, bylaws or limited liability company agreement or equivalent organizational documents of any of the Sellers; (ii) violate any Law applicable to any of the Purchased Assets or by which the Purchased Assets are bound; or (iii) result in any breach of, constitute a default (or an event that, with notice or lapse of time or both, would become a default) under, create in any party thereto the right to terminate or cancel, or require any consent under, or result in the creation or imposition of any Lien (other than a Permitted Lien) on any Purchased Asset under, any Contract, except, in the case of clauses (ii) and (iii), for any such violations, breaches, defaults or other occurrences that would not reasonably be expected to have a Material Adverse Effect.

**(b)**    Except as set forth on <u>Schedule 3.6(b)</u>, Sellers are not required to file, seek or obtain any notice, authorization, approval, Order, permit or consent of or with any Governmental Authority in connection with the execution, delivery and performance by Sellers of this Agreement or the consummation by Sellers of the Transactions, except (i) requisite Bankruptcy Court approvals or (ii) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not reasonably be expected to prevent or materially impair or delay the Transactions.

**3.7    Litigation**.  Except as disclosed on <u>Schedule 3.7</u>, as of the Original Agreement Date and subject to entry by the Bankruptcy Court of the bid procedures order and the Approval Order in the Bankruptcy Cases, there is no action, suit, investigation or legal or administrative proceeding pending or, to the Knowledge of Sellers, threatened against or affecting, the Purchased Assets, the Assumed Liabilities or the Business.  There are no material unsatisfied judgements, penalties or awards against or affecting the Business, the Purchased Assets or the Assumed Liabilities.

**3.8    Permits**.  <u>Schedule 2.1(e)</u> sets forth a list of all Permits required to conduct and operate the Business in a manner consistent with the current practices of Sellers.  <u>Except as set forth on Schedule 3.8</u>, (a) each Seller is in material compliance with the terms and requirements of each such Permit; and (b) no written notice of violation of any Permit has been received from any Governmental Authority and no proceeding is pending seeking to revoke or limit any such Permit.

**3.9    Compliance with Laws and Court Orders**.  Each Seller is not in material violation of any Law applicable to the ownership and use of the Purchased Assets or the conduct of the Business as currently conducted and to the Knowledge of Sellers, for the past three (3) years, has been in material compliance with all Laws applicable to it or its Business, properties or assets, except where such failure to comply has been cured without any continuing Liability on the part of a Seller or set forth in a Schedule to this Agreement.

**3.10    Intellectual Property Rights**.  <u>Schedule 2.1(f)(i)</u> sets forth an accurate and complete list of all Registered IP, unregistered trademarks included in the Transferred Intellectual

Property Rights and any other Intellectual Property Rights included in the Transferred Intellectual Property Rights that is material to the Business, taken as a whole. One or more Sellers own all Transferred Intellectual Property Rights free and clear of all Liens (other than Permitted Liens) and have valid rights to assign, transfer and convey all rights, title and interest associated therewith pursuant to this Agreement. Schedule 2.1(f)(ii) sets forth an accurate and complete list of all Registered IP that, to the Knowledge of Sellers, has been abandoned, cancelled or expired within the past three (3) years (the "**_Expired IP_**"). Except with respect to the Expired IP, all Registered IP remains pending or in full force and effect and has not expired or been cancelled. Except with respect to the Expired IP, the Registered IP is valid and enforceable except as enforceability may be limited by applicable bankruptcy, insolvency or similar Laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability and the past three (3) years of use and current use by Sellers of the Technology owned by or, to the Knowledge of Sellers, licensed by, the Sellers does not infringe or otherwise violate any Intellectual Property Rights of any other Person, except as would not, individually or in the aggregate, be, or reasonably be expected to be material. To the Knowledge of Sellers, no Person is infringing or otherwise violating the Transferred Intellectual Property Rights.

**3.11    Environmental Matters**.    (a) Other than as described on part (a) of Schedule 3.11, in the last three (3) years, to the Knowledge of Sellers, each Seller has not received any notice from any Governmental Authority or third party of any violation of or failure to comply with any Environmental Laws with respect to the Leased Real Property which remains uncorrected, or of any obligation to undertake or bear the cost of any remediation with respect to the Leased Real Property which remains unperformed, and (b) other than as described on part (b) of Schedule 3.11, to the Knowledge of Sellers, the Leased Real Property is in compliance, in all material respects, with applicable Environmental Laws. The representations and warranties set forth in this Section 3.11 are the Sellers' sole and exclusive representations and warranties regarding environmental matters.

**3.12    Real Property**. Seller has made available to Purchaser a true and complete copy of every Real Property Lease. Except as set forth on Schedule 3.12, (a) each Real Property Lease that is an Assumed Contract is a legal, valid and binding obligation of Seller, and is enforceable against Seller, and is in full force and effect, (b) there are no leases, subleases, licenses, disputes, forbearance programs, concessions, or other agreements, written or oral, granting to any Person the right of use or occupancy of any portion of such Leased Real Property; (c) there are no outstanding options, rights of first offer or rights of first refusal to purchase such Leased Real Property (other than the right of Purchaser pursuant to this Agreement), or any portion thereof or interest therein; (d) Seller has not assigned, transferred, conveyed, mortgaged, deeded in trust or encumbered any interest in any Real Property Lease that is an Assumed Contract; and (e) there are no condemnation or eminent domain proceedings pending or threatened with respect to all or any part of the Leased Real Property. Neither Seller nor, to the Knowledge of Sellers, any other party to a Real Property Lease that is an Assumed Contract is in default under such Real Property Lease and no event has occurred or circumstance exists which, with the delivery of notice, the passage of time or both, would constitute such a material default, or permit the termination, modification or acceleration of rent under such Real Property Lease that is an Assumed Contract. The Leased Real Property constitutes all of the real estate used or occupied for the Business, and no other real estate is necessary for the continued conduct of the Business in its ordinary course. Each of the Real Property Leases that is an Assumed Contract will continue to be legal, valid, binding, enforceable, and will continue to be in full force and effect on identical terms following the consummation of the transactions contemplated hereby, and, except as set forth on Schedule 3.6(a), no consent of any landlord under any of the Real Property Leases that is an Assumed Contract are required in order for Seller to assign to Purchaser all of its interest under each Real Property Lease that is an Assumed Contract.

**3.13    Employee Benefits**.

(a)     Schedule 3.13(a) sets forth a complete and accurate list of the Employee Benefit Plans.  Sellers have provided to, or made available to, Purchaser true and correct copies of (i) each Employee Benefit Plan (including all plan documents and amendments thereto), (ii) all current trust documents, investment management contracts, custodial agreements and insurance contracts relating thereto, (iii) the current summary plan description and each summary of material modifications thereto, (iv) the annual report (Form 5500 and all schedules thereto) for the most recent plan year, (v) the most recent Internal Revenue Service determination or opinion letter, if applicable, and (vi) the annual report, actuarial report, financial statement and trustee report for the most recent plan year.

(b)     Schedule 3.13(b) sets forth a complete and accurate list of all Multiemployer Plans to which any Seller contributes on behalf of any Employees.  Sellers represent that they have not contributed to any Multiemployer Plan other than those listed on Schedule 3.13(b) during the past five (5) years.

(c)     Each Employee Benefit Plan complies in both form and operation and has been established, maintained, funded and administered in all material respects in compliance with its terms, all applicable requirements of ERISA, the Code and other applicable Laws.  Each Employee Benefit Plan which is intended to be qualified within the meaning of Code § 401(a) has received a favorable determination letter from the Internal Revenue Service upon which it may rely, or is comprised of a master or prototype plan that has received a favorable opinion letter from the Internal Revenue Service, and nothing has occurred that is reasonably likely to adversely affect the qualified status of such Employee Benefit Plan.  None of the Purchased Assets is subject to any Lien under ERISA or the Code.  No Seller has any Liability with respect to any "**employee benefit plan**" (as defined in Section 3(3) of ERISA) that is subject to Section 302 or Title IV of ERISA, or Section 412 of the Code.  The transactions contemplated by this Agreement are not transactions to evade or avoid liability (as described in Section 4069(a) or 4212(c) of ERISA).

(d)     There are no pending audits or investigations by any Governmental Authority involving any Employee Benefit Plan, and there are no pending or, to the Knowledge of Sellers, threatened claims (except for individual claims for benefits payable in the normal operation of the Employee Benefit Plans), suits or proceedings involving any Employee Benefit Plan, any trust or other funding medium thereof, fiduciary thereof or service provider thereto, nor is there any reasonable basis for any such claim, suit or proceeding.

(e)     With respect to each Employee Benefit Plan, all payments, premiums, contributions, distributions, reimbursements or accruals for all periods (or partial periods) ending prior to or as of the Closing Date shall have been timely made in accordance with the terms of the applicable Employee Benefit Plan and applicable Law.

(f)     No Employee Benefit Plan provides benefits, including, death or medical benefits, beyond termination of service or retirement other than (i) coverage mandated by law or (ii) death or retirement benefits under an Employee Benefit Plan qualified under Section 401(a) of the Code.

(g)     Each Seller's execution of, and performance of the transactions contemplated by, this Agreement will not: (i) except as set forth on Schedule 3.13(g)(i), result in any payment or benefit, or increase in payments or benefits or acceleration in the timing of payments or benefits becoming due to any current or former employee, director, officer or independent contractor of such Seller; (ii) except as set forth on Schedule 3.13(g)(ii), limit the right to merge, amend or terminate any Employee Benefit

24.

Plan; or (iii) result in the payment or provision of an "excess parachute payment" under Section 280G of the Code, whether under an Employee Benefit Plan or otherwise.

**(h)**    Each Employee Benefit Plan that constitutes a "non-qualified deferred compensation plan" within the meaning of Section 409A of the Code complies in both form and operation with the requirements of Section 409A of the Code in all material respects.

**(i)**    Except as would not reasonably be expected to result in material Liability to the Sellers, no individual who performs or has performed services for the Sellers has been improperly excluded from participation in any Employee Benefit Plan.

**(j)**    Except as set forth on Schedule 3.13(j), Sellers have performed all material obligations required to be performed by them and are not in any material respect in default under or in violation of any Employee Benefit Plan, nor, to the Knowledge of Sellers, has there been any such material default or violation by any other party to any Employee Benefit Plan.

**3.14    Employment and Personnel Matters**.

**(a)**    Schedule 3.14(a) contains an accurate and complete list as of the date set forth on Schedule 3.14 of the names, job classifications, dates of hire, base compensation or wage rate, work location, exempt or non-exempt classification for wage-hour purposes, annual bonus opportunity, accrued but unused sick and vacation leave or paid time off entitlements, and any supplemental or bonus compensation (including any retention bonus arrangements) for all Employees.

**(b)**    The Contracts listed on Schedule 3.14(b) include all individual written employment, retention, change in control bonus or severance agreements to which, as of the Original Agreement Date, the Sellers are a party with respect to any Employee.

**(c)**    There are no complaints, charges or claims against the Sellers pending or, to the Knowledge of Sellers, threatened with any Governmental Authority or based on, arising out of, in connection with or otherwise relating to the employment or termination of employment or failure to employ by the Sellers, of any individual.  The Sellers are and for the past three (3) years, to the Knowledge of the Sellers, have been in material compliance with all Laws relating to wages, hours, severance pay, WARN and any similar state or local "mass layoff" or "plant closing" Law, collective bargaining, discrimination, civil rights, safety and health, immigration, classification of workers as exempt or non-exempt, discrimination, workers compensation, and the collection and withholding of social security taxes and any similar tax.

**(d)**    The Sellers have not incurred and do not expect to incur any Liability with respect to any misclassification of any person as an independent contractor rather than as an employee, or as exempt rather than non-exempt for wage and hour purposes.

**(e)**    All current Employees and other individual service providers are located in and have a place of employment in the United States, and have authorization and appropriate documentation to work in the United States. Sellers are not party to any collective bargaining agreement with any labor union.  There has not been any labor dispute, other than individual grievances, or any activity or proceeding by a labor union or representative thereof to organize any employees of Sellers.  Each Seller has not suffered any work stoppage, strike, lockout or other material labor dispute within the past three (3) years, and no such activities are underway or threatened.

**(f)**    Except as set forth on <u>Schedule 3.14(f)</u>, the Sellers have not taken any action which would constitute a "plant closing" or "mass layoff" within the meaning of the Worker Adjustment and Retraining Notification Act of 1988, as amended (the "WARN Act") or similar state of local law, issued any notification of a plant closing or mass layoff required by the WARN Act or similar state or local law, or incurred any liability or obligation under WARN or any similar state or local law that remains unsatisfied.  Except as set forth on <u>Schedule 3.14(f)</u>, no terminations prior to the Closing would trigger any notice or other obligations under the WARN Act or similar state or local law.

**3.15**    **Taxes**.  Except as set forth on part (a) of Schedule 3.15, all Tax Returns (including any IRS Forms W-2 or Forms 1099) required to be filed by or on behalf of each Seller (or any predecessor of a Seller) and all Tax Returns required to be filed in respect of any Purchased Asset, in each case, have been timely filed, and when filed all such Tax Returns were true and correct in all material respects.  Except as set forth on part (b) of <u>Schedule 3.15</u>, all Taxes of each Seller (or any predecessor of a Seller) and all Taxes relating to any Purchased Asset required to have been paid were timely paid or (in respect of withholding or payroll Taxes) duly withheld and paid over.  Except as set forth on part (c) of <u>Schedule 3.15</u>, during the last three (3) tax years, no written claim has been made by any Taxing Authority in a jurisdiction where a Seller does not file Tax Returns that such Seller is or may be subject to taxation by that jurisdiction with respect to the Purchased Assets, Business or the Assumed Liabilities.  Except as set forth on part (d) of <u>Schedule 3.15</u>, no audit, administrative proceeding or judicial proceeding, that involves any amount of Tax and the Business is pending or threatened in writing.  True and complete copies of all Tax Returns filed by each Seller for each of its three (3) most recent taxable years have been delivered to Purchaser.  None of the Purchased Assets includes any equity interests, securities, stock, shares or other ownership interest in any Person (including any Person that is not a "***United States person***" within the meaning of Code Section 7701(a)(30)).  None of the Purchased Assets includes any "***United States real property interest***" within the meaning of Code Section 897.  Except as set forth on part (e) of <u>Schedule 3.15</u>, no Seller is required to file any Tax Return in any jurisdiction other than a jurisdiction within the United States.  There are no liens on any of the Purchased Assets that arose in connection with any failure (or alleged failure) to pay any Taxes.  Purchaser will not be required to include any income in, or exclude any deduction from income with respect to the Purchased Assets for any taxable period ending after the Closing Date as a result of any action by the Seller in a pre-closing tax period including any change in any method of accounting; any installment sale, open transaction, prepaid amount, or intercompany transaction; or any agreement with any Taxing Authority.

**3.16**    **Title to the Purchased Assets**.  Each Seller will have at Closing good and marketable title to, or a valid leasehold interest in (or license or other right to use), all the Purchased Assets free and clear of all Liens (other than Permitted Liens and Assumed Liabilities).

**3.17**    **Transactions with Affiliates**.  Except as disclosed on <u>Schedule 3.17</u>, there are no Assumed Contracts between any Seller with respect to the Business, on the one hand, and any Affiliate of any Seller, on the other, including any loan, guarantee or purchase or sales agreement, other than contracts or agreements which will be terminated prior to the Closing.

**3.18**    **Insurance**.  As of the Original Agreement Date, all material property and liability insurance policies covering any of the Purchased Assets are in full force and effect, and no written notice of cancellation, termination or revocation or other written notice that any such insurance policy is no longer in full force or effect or that the issuer of any such insurance policy is not willing or able to perform its obligations thereunder has been received by any Seller.  Such policies provide for coverage in amounts deemed by Sellers to be adequate, and all premiums due and payable thereon have been paid in full.

**3.19    Service of Bankruptcy Documents**.  Each Seller has appropriately and timely served all parties in interest with copies of the sale and bid procedures motion and applicable notices in accordance with the bid procedures order.

**3.20    Certain Fees**.    Except as set forth on <u>Schedule 3.20</u>, no agent, broker, investment banker or other person or firm acting on behalf of any Seller or under its authority is or will be entitled to any broker's or finder's fee or any other commission or similar fee or the reimbursement of expenses, directly or indirectly, from any Seller in connection with this Agreement or the Transactions.

**3.21    Material Contracts**.

**(a)**    <u>Schedule 3.21(a)</u> sets forth a true, correct and complete list of the following types of Contracts to which any Seller is a party or by which any Seller is bound or by which the Purchased Assets may be bound or affected (the "***Material Contracts***"):

**(i)**    Assumed Contracts with any Affiliate or current or former officer or director of a Seller;

**(ii)**    the License Agreements;

**(iii)**    any Contract, to the Knowledge of Sellers, containing a covenant that restricts a Seller or any Affiliate of a Seller from engaging in any line of business, conducting the Business in any geographic area, competing with any Person or hiring any Person;

**(iv)**    any Assumed Contract, to the Knowledge of Sellers, granting to any Person an option or a first refusal or similar preferential right to purchase or acquire any material Purchased Assets of the Sellers;

**(v)**    any Contract relating to incurrence of indebtedness or the making of any loans, in each case involving amounts in excess of One Hundred Thousand Dollars ($100,000);

**(vi)**    any Assumed Contract, to the Knowledge of Sellers, granting any "most favored nation" pricing, discounts or benefits to any Person; and

**(vii)**    Contracts relating to a joint venture of the Business or any Seller.

**(b)**    Each of the Material Contracts that is an Assumed Contracts is in full force and effect and is the legal, valid and binding obligation of a Seller, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

**(c)**    Prior to the Original Agreement Date, Sellers used reasonable best efforts to deliver to Purchaser a true, complete and accurate copy of (i) each Material Contract (including all amendments thereto) and (ii) each other Contract (including all amendments thereto) that involves amounts in excess of $10,000.

**3.22    Licensing Matters**.  All of the License Agreements are in full force and effect and are valid and binding obligations of a Seller and enforceable against it and the other parties thereto in accordance with their respective terms, subject to certain equitable and other defenses by counterparties to certain of such License Agreements.  Except as set forth in <u>Schedule</u>

27.

3.21(a), all License Agreements comply in all material respects with all applicable Laws, and no party to a License Agreement has asserted any right of rescission or set-off, counterclaim or defense.

**3.23    Data Privacy**.    In connection with its collection, storage, transfer (including transfer across national borders) or use of any personally identifiable information from any individuals, including any customers, prospective customers, employees or other third parties (collectively "***Personal Information***"), each Seller is and, during the last three (3) years, has been in compliance with all applicable Laws in all relevant jurisdictions except as would not, individually or in the aggregate, be, or would reasonably be expected to be, material to the Business taken as a whole and has obtained all necessary rights from third parties and complied in all material respects with all other requirements under applicable Laws to enable the collection, storage, transfer or use of such Personal Information for the purposes of the Business (as is customary in the retail and e-commerce industries) following Closing.  Each Seller has complied in all material respects with the opt-out provisions of its privacy policies and any and all requests of customers to opt out of receipt of marketing messages.  Each Seller has commercially reasonable physical, technical, organizational and administrative security measures in place to protect all Personal Information collected by it or on its behalf from and against unauthorized access, use or disclosure in accordance with applicable Laws and there have been no security incidents which have resulted in the accidental or unlawful destruction, loss, alteration or unauthorized disclosure of or access to Personal Information during the last three (3) years.

**3.24    Customer Lists; Customer Data**.    The Customer Lists maintained by the Sellers are true, correct and complete in all material respects, and are the only lists of the customers of the Business, and the Sellers have no other or separate list of the customers of the Business.  None of the Sellers has sold, licensed or made available any information or rights contained in any Customer List or any Customer Data (or any portion thereof) to any Person (other than the making available of a Customer List or Customer Data to an Employee in the ordinary course of such Employee's duties for use in connection with services rendered to the Business, or the provision of the Customer Lists under seal in the Bankruptcy Cases).

**3.25    No Other Representations or Warranties; Schedules**.    Except for the representations and warranties contained in Section 3 (as modified by the Schedules hereto) or any Transaction Document, none of Sellers nor any other Person makes any other express or implied representation or warranty with respect to Sellers, the Purchased Assets, the Assumed Liabilities or the Transactions, and each Seller disclaims any other representations or warranties, whether made by Sellers, any Affiliate of Sellers, or any of Sellers' or their Affiliates' respective Representatives.  Except for the representations and warranties contained in Section 3 (as modified by the Schedules hereto) or any Transaction Document, each Seller (a) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Purchased Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) and (b) disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Purchaser or its Affiliates or Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Purchaser by any Representative of Sellers or any of its Affiliates).  Sellers make no representations or warranties to Purchaser regarding the probable success or profitability of the Business.  The disclosure of any matter or item in any Section of the Schedule will, if not otherwise required to be set forth thereon by the terms of this Agreement, not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter could result in a Material Adverse Effect with respect to the Sellers.  Sellers acknowledge that except for the representations and warranties made by Purchaser in Section 4, Purchaser does not make (and neither Sellers nor any other Person has not relied upon) any representations or warranties on behalf of Purchaser.  Sellers acknowledge and agree that they (i) have been afforded the opportunity to ask questions of and receive answers from officers and

other key employees of Purchaser and (ii) have conducted their own independent investigation of Purchaser, and have not relied on any representation, warranty or other statement by any Person on behalf of Purchaser, other than the representations and warranties of Purchaser expressly contained in <u>Section 4</u>, and that all other representations and warranties are specifically disclaimed.  Notwithstanding the foregoing, nothing contained in this Section shall limit or otherwise impair in any manner Sellers' right to make a claim for breach of any Transaction Document, actual fraud or willful misconduct.

**4.**     **REPRESENTATIONS AND WARRANTIES OF PURCHASER.**  Purchaser represents and warrants to each Seller as follows:

**4.1     Organization**.  Purchaser is a Delaware limited liability company duly organized, validly existing and in good standing and has all requisite authority to carry on its business.

**4.2     Corporate Authorization**.  The execution, delivery and performance of this Agreement by Purchaser, and the consummation by Purchaser of the Transactions, subject to requisite Bankruptcy Court approvals, have been duly and validly authorized by all requisite organizational action, and no other proceedings on its part are necessary to authorize the execution, delivery or performance of this Agreement by it.  This Agreement has been duly and validly executed and delivered by Purchaser, and, assuming this Agreement is a valid and binding obligation of each Seller, this Agreement constitutes a valid and binding obligation of Purchaser, enforceable against it in accordance with its terms, upon approval of the Bankruptcy Court.

**4.3     Governmental Authorization**.  The execution, delivery and performance by Purchaser of this Agreement and the consummation of the Transactions by Purchaser require no action by or in respect of, or filing with, any Governmental Authority other than (a) consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court, and (b) any such action or filing as to which the failure to make or obtain would not have a material effect on Purchaser or its ability to consummate the Transactions.

**4.4     Noncontravention**.  Neither the execution and delivery of this Agreement nor the consummation of the Transactions will (a) conflict with or result in any breach of any provision of organizational documents of Purchaser; (b) require any filing with, or the obtaining of any permit, authorization, consent or approval of, any Governmental Authority; (c) violate, conflict with or result in a default (or any event which, with notice or lapse of time or both, would constitute a default) under, or give rise to any right of termination, cancellation or acceleration under, any of the terms, conditions or provisions of any note, mortgage, other evidence of indebtedness, guarantee, license, agreement, lease or other contract, instrument or obligation to which Purchaser is a party or by which Purchaser or any of its assets may be bound; or (d) violate any Law applicable to Purchaser, excluding from the foregoing clauses (b), (c) and (d) such requirements, violations, conflicts, defaults or rights (i) which would not adversely affect the ability of Purchaser to consummate the Transactions, or (ii) which become applicable as a result of any acts or omissions by, or the status of or any facts pertaining to, any Seller.

**4.5     Availability of Purchase Price**.  Purchaser has provided to Sellers true and correct copies of documentation evidencing Purchaser's empowerment as of the Closing Date to deliver the Credit Bid and Release.  Purchaser has sufficient funds available to it in cash to pay or cause to be paid any cash portion of the Purchase Price, and the Assumed Liabilities.  Upon the consummation of the Transactions, (a) Purchaser will not be insolvent as defined in Section 101 of the Bankruptcy Code, (b) Purchaser will not be left with unreasonably small capital, (c) Purchaser will not have incurred debts beyond its ability to pay such debts as they mature, and (d) the capital of Purchaser will not be impaired.

**4.6     Certain Fees**.  Purchaser has not employed any broker, finder, investment banker or other intermediary or incurred any Liability for any investment banking fees, financial

600688115.35

advisory fees, brokerage fees, finders' fees or other similar fees in connection with this Agreement or the Transactions.

**4.7    Litigation**.  There is no action, suit, investigation or proceeding pending against or, to the knowledge of Purchaser, threatened against Purchaser before any Governmental Authority which in any manner challenges or seeks to prevent, enjoin, materially alter or materially delay the Transactions.

**5.    COVENANTS OF SELLER.**  Sellers agree that:

**5.1    Conduct of the Business**.  From the Original Agreement Date until the earlier of the termination of this Agreement pursuant to <u>Section 11.1</u> or the Closing Date, except (a) as disclosed on <u>Schedule 5.1</u>, (b) consented to in writing by Purchaser, (c) as may be required by the Bankruptcy Court (<u>provided</u> that no Seller petitioned, sought, requested or moved for such order of the Bankruptcy Court or authorized, supported or directed any other Person to petition, seek, request or move for such order of the Bankruptcy Court) or (d) for any action expressly required to be taken pursuant to this Agreement, (i) each Seller shall use commercially reasonable efforts to (A) conduct its Business in the ordinary course consistent with past practice since the Petition Date, (B) comply in all material respects with all applicable Laws (including, maintaining any Permits held by each Seller and required for the current operation of the Business) and all Assumed Contracts and (C) preserve the Business (including the E-Commerce Platform and all systems necessary to maintain the condition and availability of such E-Commerce Platform) intact and preserve the goodwill of and relationships with Governmental Authorities, customers, suppliers, employees and others having business dealings with the Business; and (ii) without limiting the generality of the foregoing, each Seller will not:

> **(a)**    with respect to the Business, acquire a material amount of assets (including any inventory) from any other Person (including by merger, share exchange, joint venture or other extraordinary transaction);

> **(b)**    sell, transfer, lease, license, mortgage, encumber (unless such Lien is removed prior to the Closing, except for the DIP Liens) or otherwise dispose of any Purchased Assets;

> **(c)**    amend, modify or terminate any Material Contract without Purchaser's prior written consent;

> **(d)**    fail to maintain, or allow to lapse, or abandon any Registered IP;

> **(e)**    fail to maintain any Customer Lists or other books and records of the Business in the ordinary course of business;

> **(f)**    destroy or fail to preserve any Customer Data except to the extent required by applicable Law and in the ordinary course of the Business consistent with past practice;

> **(g)**    hire or engage any new Employee or consultant or terminate any Employee (other than a termination for cause);

> **(h)**    increase the compensation, severance or fringe benefits of any Employee;

> **(i)**    change or revoke any method of accounting for tax purposes;

**(j)** (i) make or change any Tax election or change any method of tax accounting, (ii) settle or compromise or enter into any contractual arrangement in respect of any federal, state, local or foreign Tax liability other than a Qualified Settlement (<u>provided</u>, that Purchaser's consent to any settlement with a Taxing Authority in respect of Sales Taxes shall not be unreasonably conditioned, withheld or delayed), (iii) file an amended Tax Return (other than the Tax Return for fiscal year 2018 only if (x) required by the Office of the U.S. Trustee and (y) all costs, expenses, obligations and Liabilities of such filing are Excluded Liabilities), (iv) enter into any closing agreement relating to any Tax, (v) enter into any voluntary disclosure or similar program with respect to any Tax, (vi) agree to any extension of a statute of limitations, or (vii) surrender any right to claim a Tax refund with respect to the Purchased Assets;

**(k)** change or modify any material accounting practice, policy or procedure, except as required by GAAP or applicable Law;

**(l)** enter into any purchase order unless the terms and conditions applicable thereto have been previously approved by Purchaser;

**(m)** make any broad-based communication to customers of the Business (<u>provided</u> that such consent shall not be unreasonably withheld, condition or delayed in the event that such communication is required by the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure);

**(n)** make any debits from, or otherwise withdraw any cash from, the Sales Taxes Account, except to pay Sales Taxes as they come due;

**(o)** agree or commit to do any of the foregoing; or

**(p)** take any action that would reasonably be expected to cause the failure of any condition contained in <u>Section 10.2</u> (other than actions taken by each Seller in connection with the discharge of its fiduciary duties during the Bankruptcy Cases).

**5.2    Access to Information**.  Subject to applicable Law and except as doing so would violate any fiduciary duty or contractual obligation or would waive any attorney-client privilege of Sellers included in the Excluded Assets (<u>provided</u>, <u>however</u>, in any such case, Sellers and Purchaser shall use commercially reasonable efforts to identify and pursue a permissible method of providing such disclosure without violating such Laws or obligations and without resulting in a loss of such privileges), from the Original Agreement Date until the earlier of the termination of this Agreement pursuant to <u>Section 11.1</u> or the Closing Date, Sellers (a) shall give Purchaser and its Representatives reasonable access during normal business hours to the offices, properties, officers, employees, accountants, auditors, counsel and other representatives, books and records of Sellers in each case to the extent relating to the Purchased Assets, as Purchaser reasonably deems necessary in connection with effectuating the Transactions, (b) shall furnish to Purchaser and its Representatives such information as Purchaser and its Representatives reasonably request and (c) shall cooperate reasonably with Purchaser in its investigation of the Purchased Assets or the Business.

**5.3    Notices of Certain Events**.  From the Original Agreement Date until the earlier of the termination of this Agreement pursuant to <u>Section 11.1</u> or the Closing Date, each Seller shall promptly notify Purchaser of:

**(a)** any notice or other written communication from any Person alleging that the consent of such Person is or may be required in connection with the consummation of the Transactions;

**(b)**    any material written communication from any Governmental Authority in connection with or relating to the Transactions; and

**(c)**    the commencement of any actions, suits, investigations or proceedings relating to such Seller, any Purchased Asset or the Business that, if pending on the Original Agreement Date, would have been required to have been disclosed pursuant to Section 3.7 or would have resulted in a breach of any representation contained in Section 3.15.

**5.4    Name Change**.  At the closing or within ten (10) Business Days of the Closing Date, Sellers shall use commercially reasonable efforts to take such corporate and other actions necessary to change their company names to ones that are not similar to, or confusing with, their current names, including any necessary filings required by the law of the state of their respective organization, and shall promptly thereafter provide Purchaser with written evidence of such name changes.  Sellers shall also prepare and file a motion with the Bankruptcy Court to change the caption of the Bankruptcy Cases to reflect such names changes.

**5.5    Intellectual Property Rights Assignment**.  To the extent any Intellectual Property Rights used by the Business are owned by any directors or officers of the Sellers prior to the Closing, the Sellers shall (a) with respect to any current directors and officers, cause such current directors and officers to assign their entire interest in such Intellectual Property Rights to the Sellers prior to the Closing, and (b) with respect to any former directors and officers, use reasonable best efforts to cause such former directors and officers to assign their entire interest in such Intellectual Property Rights to the Sellers prior to the Closing.  At or prior to the Closing, with respect to certain social media sites identified on Schedule 2.1(g), the Sellers shall make a Person identified by Purchaser a moderator of such accounts in order to provide Purchaser access to such accounts.

**6.    COVENANTS OF PURCHASER.**

**6.1    Books and Records**.  After the Closing Date, Purchaser shall provide to Sellers and their respective Affiliates and Representatives (after reasonable notice and during normal business hours and without charge to Sellers other than the costs of copying, if any) reasonable access to, including the right to make copies of, all books and records included in and otherwise related to the Purchased Assets, to the extent necessary to permit Sellers to determine any matter relating to its rights and obligations hereunder or to any period ending on or before the Closing Date (for example, for purposes of any Tax or accounting audit, any claim or litigation matter or for purposes of the Bankruptcy Cases, but not for any dispute or claim between Purchaser and Seller in connection with this Agreement, the Transaction Documents or otherwise), for periods prior to the Closing and shall preserve such books and records until the later of (i) such period as shall be consistent with Purchaser's records retention policy in effect from time to time, (ii) the retention period required by applicable Law or (iii) in the case of books and records relating to Taxes, the expiration of the statute of limitations applicable to such Taxes. Such access shall include access to any information in electronic form to the extent reasonably available. Purchaser acknowledges that Sellers have the right to retain originals or copies of all of books and records included in or related to the Purchased Assets for periods prior to the Closing.

**7.    COVENANTS OF PURCHASER AND SELLER.**  Purchaser and each Seller agree that:

**7.1    Efforts; Further Assurances**.  Subject to the terms and conditions of this Agreement, Purchaser and each Seller will use their respective commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary under applicable Laws to consummate the Transactions contemplated by this Agreement including: (a) the delivery by Sellers to Purchaser of originals (or, to the extent originals are not available, copies) of all Assumed Contracts (together with all material amendments, supplements or modifications thereto) to the extent not already located at the Leased Real Property, (b) at

32.

Purchaser's expense, acting as Purchaser's agent in order to obtain for Purchaser the benefits under any non-assignable Purchased Assets and cooperating with Purchaser in any other reasonable arrangement designed to provide the benefits of such non-assignable Purchased Assets to Purchaser and (c) at Purchaser's request, physical possession of any Purchased Assets identified by Purchaser that is capable of passing by delivery, with the intent that title in such Purchased Assets shall pass by and upon delivery; provided, however, each Seller shall be entitled to take such actions as are required in connection with the discharge of its fiduciary duties during the Bankruptcy Cases (including soliciting higher or better offers for the Purchased Assets).  Each Seller and Purchaser agree to execute and deliver such other documents, assignments, certificates, agreements and other writings and to take such other actions as may be necessary in order to vest in Purchaser good title to the Purchased Assets or to evidence the assumption by Purchaser of the Assumed Liabilities.

      **7.2**    **Certain Filings**.  Each Seller and Purchaser shall cooperate with one another in good faith (a) in determining whether any action by or in respect of, or filing with, any Governmental Authority is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any Assumed Contracts or Intellectual Property Rights, in connection with the consummation of the Transactions, and (b) in taking such actions or making any such filings, furnishing information required in connection therewith and seeking to timely obtain any such actions, consents, approvals or waivers.

      **7.3**    **Public Announcements**.  Prior to the Closing, Purchaser may make any public announcements or statements concerning the Transactions without the prior written consent of Sellers.  Purchaser acknowledges and agrees that Sellers may provide copies of this Agreement to parties in interest in the Bankruptcy Cases and to those parties to whom any Seller determines it is necessary to provide copies in connection with soliciting higher or better bids for the Purchased Assets or as otherwise necessary or desirable in connection with the Bankruptcy Cases.  Sellers also shall be entitled to file copies with the Bankruptcy Court or as otherwise required by Law and shall be entitled to publish notice of the contemplated Transactions in any newspaper selected by Sellers.

      **7.4**    **DIP Loan Documents**.  Notwithstanding anything in this Agreement to the contrary, between the Original Agreement Date and the Closing Date, it shall not be a breach of this Agreement for, and nothing in this Agreement shall (or shall be deemed to) limit or affect the ability of, Sellers to incur indebtedness, encumber the Purchased Assets with the DIP Liens, or borrow funds under the DIP Loan Documents.

      **7.5**    **Bankruptcy Issues**.

      **(a)**    **Expense Reimbursement**.  Upon consummation of a sale of all or substantially all of the Purchased Assets to any third party (or third parties) (other than Purchaser), or if any Seller commits a material breach of this Agreement or unilaterally abandons consummation of the transactions contemplated by this Agreement, Sellers shall pay to Purchaser cash or other immediately available funds in an amount equal to seven hundred and fifty thousand dollars ($750,000) (the "***Expense Reimbursement***"); provided, however, the Expense Reimbursement shall not be due and payable solely if this Agreement is terminated pursuant to Section 11.1(h).  The provisions of this Section 7.5(a) shall survive any termination of this Agreement.  The Expense Reimbursement shall be paid to Purchaser directly from the proceeds of the closing of such sale(s) to any third party, and shall be paid to Purchaser prior to the payment of the proceeds of such sale to any third party asserting a Lien on the Purchased Assets (and no Lien of any third party shall attach to the portion of the sale proceeds representing the Expense Reimbursement).  The obligation to pay the Expense Reimbursement under this Agreement shall be absolute and unconditional and shall not be subject to any defense, claim, counterclaim, offset, recoupment or reduction of any kind whatsoever.

600688115.35

(b)     **Bankruptcy Court Approval of Sale**.  Sellers and Purchaser shall each use their commercially reasonable efforts, and shall cooperate, assist and consult with each other, to secure the entry of an Order (the "***Approval Order***") of the Bankruptcy Court in the Bankruptcy Cases in form and substance acceptable to Purchaser containing provisions, including, (i) approve, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, (A) the execution, delivery and performance by Sellers of this Agreement, (B) the sale of the Purchased Assets to Purchaser on the terms set forth herein and free and clear of all Liens, Claims, or other encumbrances (other than Assumed Liabilities and Permitted Liens), and (C) the performance by Sellers of their respective obligations under this Agreement; (ii) authorize and empower Sellers to assign to Purchaser the Assumed Contracts; (iii) find that Purchaser is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code, not a successor to any Seller and grant Purchaser the protections of Section 363(m) of the Bankruptcy Code; (iv) find that Purchaser shall have no Liability or responsibility for any Liability or other obligation of any Seller arising under or related to the Purchased Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor or transferee Liability, labor law, de facto merger or substantial continuity; and (v) find that Purchaser shall have no Liability for any Excluded Liability.  Purchaser agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining Bankruptcy Court approval of the Approval Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (x) demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code and (y) establishing adequate assurance of future performance within the meaning of Section 365 of the Bankruptcy Code.

**7.6     Transition Services**.  If requested by Purchaser, in connection with the consummation of the Transactions, the Parties will negotiate in good faith, prior to the Closing, a transition services agreement in form and substance (a) customary for transaction of the type contemplated by this Agreement and (b) reasonably acceptable to the Sellers and Purchaser in their respective reasonable discretion (the "***Transition Services Agreement***"), which will provide for the provision of transition services by the Sellers to the extent administratively feasible to operate the Business in substantially the same manner as currently conducted in accordance with the term set forth therein.

**7.7     Wrong Pockets**.  In the event that either Purchaser or Seller becomes aware that any of the Purchased Assets has not been transferred to Purchaser or that any of the Excluded Assets has been transferred to Purchaser, it shall promptly notify the other and the Parties shall, as soon as reasonably practicable, ensure that such property is transferred, and with any necessary prior third-party consent or approval, to (a) Purchaser, in the case of any Purchased Asset that was not transferred to Purchaser at the Closing, with such costs to do so being at the expense of Sellers; or (b) any Seller, in the case of any Excluded Asset that was transferred to Purchaser at the Closing, with such costs to do so being at the expense of Sellers, except if such Excluded Asset was identified by Purchaser in accordance with the next sentence, in which case, such costs being at the expense of Purchaser.  If, on or after the Closing Date, Purchaser may determine, in its sole discretion, to designate any Assumed Contract as an Excluded Asset and, notwithstanding anything to the contrary herein, such Contract shall be deemed to be an Excluded Asset for all purposes of this Agreement, including the immediately preceding sentence.  In addition, if on or after the Closing Date, either Party shall receive any payments or other funds due to the other pursuant to the terms of this Agreement or any other Transaction Document, then the Party receiving such funds shall, within 30 days after receipt of such funds, forward such funds to the proper Party.

**7.8     Notices**.  If at any time (a) Purchaser becomes aware of any material breach by any Seller of any representation, warranty, covenant or agreement contained herein and such breach is capable of being cured by Sellers, or (b) Sellers become aware of any breach by

34.

Purchaser of any representation, warranty, covenant or agreement contained herein and such breach is capable of being cured by Purchaser, the Party becoming aware of such breach shall promptly notify the other Party, in accordance with Section 12.1, in writing of such breach.  Upon such notice of breach, the breaching Party shall have until the earlier of (y) ten (10) days after receiving such notice, and (z) the End Date, to cure such breach prior to the exercise of any remedies in connection therewith.

**7.9    Confidentiality**.  From and after the Closing, Sellers shall hold in confidence any and all information, whether written or oral, concerning the Purchased Assets or the Business, except to the extent that such information (a) is generally available to and known by the public through no fault of Sellers or (b) is lawfully acquired by any Seller, any of its Affiliates or their respective Representatives from and after the Closing from sources which are not prohibited from disclosing such information by a legal, contractual or fiduciary obligation.  If any Seller is compelled to disclose any information by any Action or by other requirements of Law or Order, Sellers shall promptly notify Purchaser in writing and shall disclose only that portion of such information which Sellers are, based on advice of counsel, legally required to be disclosed, provided that Sellers shall, at Purchaser's expense, use commercially reasonable efforts to obtain an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.

**7.10    Budgeted Reserve**.  Five (5) Business Days prior to the Closing Date, Sellers shall deliver to Purchaser a certificate signed by a duly authorized representative of each Seller setting forth: (a) a statement setting forth Sellers' good faith estimate of the Budgeted Reserve (including each component thereof) and Sellers' good faith estimate of the Cash and Cash Equivalents as of the Closing Date (the "***Closing Statement***"); and (b) all supporting documentation reasonably necessary to calculate the estimate of the Budgeted Reserve and the Cash and Cash Equivalents as of the Closing Date.  From the delivery of the Closing Statement until one (1) Business Day prior to the Closing, Purchaser shall have an opportunity to discuss the calculation of the Budgeted Reserve and the Cash and Cash Equivalents as of the Closing Date with the Sellers and its Representatives, Sellers shall consider in good faith any comments on the Closing Statement submitted by Purchaser, and Sellers may redeliver such statement to reflect any such comments; provided, that even if Sellers and Purchaser do not mutually agree upon the calculations to be included in the Closing Statement, the last statement delivered by Sellers to Purchaser shall be used at Closing as the basis for determining any payment that may need to be made by Purchaser and shall be deemed to be the "Closing Statement"; provided, however, the Sellers agree that such opportunity to review and comment on such calculations shall not (x) limit or otherwise affect Purchaser's remedies under this Agreement or otherwise, or constitute an acknowledgment by Purchaser of the accuracy of the amounts reflected thereon or (y) affect whether Sellers have fulfilled its obligation to deliver a good faith calculation of the Budgeted Reserve pursuant to this Section 7.10.  In addition, notwithstanding anything to the contrary contained herein, Sellers agree that neither Purchaser nor any of its Representatives shall have any obligation to confirm or verify the amounts set forth in the Budgeted Reserve and Purchaser shall be entitled to rely on such calculations.

**8.    TAX MATTERS**.

**8.1    Tax Cooperation**.  Purchaser and Seller agree to reasonably cooperate with each other in connection with the preparation of any Tax Return or filing relating to the Purchased Assets or the Assumed Liabilities, which cooperation shall include furnishing or causing to be furnished to each other, upon reasonable request, as promptly as practicable, such information relating to the Business and the Purchased Assets (including access to books and records) as is reasonably necessary for the preparation and filing of any such Tax Returns to the extent such information is in the relevant party's possession, cooperation in the preparation for any audit or examination by any Taxing Authority and the prosecution or defense of any claim, suit or proceeding relating to any Tax.  Seller and Purchaser shall cooperate with each other in good faith in the conduct of any audit or other proceeding relating to Taxes involving the Purchased

Assets or the Business (each, a "***Tax Claim***"), provided that Seller shall (and shall cause its Affiliates to) (a) promptly notify Purchaser of any notice received in respect to any Tax Claim, (b) promptly notify Purchaser of any significant developments regarding such Tax Claim, (c) permit Purchaser (if Purchaser so chooses) to control the defense and/or resolution of any Tax Claim if any resolution or settlement of such Tax Claim reasonably could be expected to have an effect on Purchaser, any of Purchaser's Affiliates or any Purchased Asset for any taxable period, (d) take all actions and cooperation reasonably necessary in furtherance of the immediately preceding clause (c), and (e) not settle or otherwise resolve any Tax Claim without the prior written consent of Purchaser.

      **8.2**    **Transfer Taxes**.  Any and all sales, use, transfer, stamp, recording or other similar taxes or charges assessed at Closing or at any time thereafter on the transfer of any Purchased Assets (the "***Transfer Taxes***") shall be paid by, and the responsibility of, Purchaser, taking into consideration any exemptions that are available; provided, however, Sellers shall, at their own expense, prepare all Tax Returns required to be filed in respect of any such Transfer Taxes, provided that, with respect to any such Tax Return for which Purchaser is required to join or otherwise execute pursuant to applicable Law, Purchaser (upon Sellers' request) shall join in the filing of such Tax Return, and Sellers shall provide a copy of each such Tax Return to Purchaser.  Purchaser and Sellers shall reasonably cooperate in providing each other with any appropriate resale exemption certifications and other similar documentation in respect of any Transfer Taxes arising from the Transactions.

      **8.3**    **Property Taxes**.  All unpaid real and personal property taxes and assessments on the Purchased Assets for any taxable period commencing on or prior to the Closing Date (the "***Adjustment Date***") and ending on or after the Adjustment Date (a "***Straddle Period***") shall be prorated between Purchaser and Sellers as of the close of business on the Adjustment Date based on the best information then available with (a) Sellers being liable for such Taxes attributable to any portion of a Straddle Period ending on the day prior to the Adjustment Date (such amounts, "***Sellers' Property Taxes***") and (b) Purchaser being liable for such Taxes attributable to any portion of a Straddle Period on or after the Adjustment Date.  Information available after the Adjustment Date that alters the amount of Taxes due with respect to the Straddle Period will be taken into account and any change in the amount of such Taxes shall be prorated between Purchaser and Sellers as set forth in the next sentence.  All such prorations shall be allocated so that items relating to the portion of a Straddle Period ending on the day prior to the Adjustment Date shall be allocated to Sellers based upon the number of days in the Straddle Period prior to the Adjustment Date and items related to the portion of a Straddle Period on and after the Adjustment Date shall be allocated to Purchaser based upon the number of days in the Straddle Period from and after the Adjustment Date.  For purposes of determining Sellers' Property Taxes on the Closing Date under this Agreement, with respect to any real or personal property Taxes for a Straddle Period for which a written assessment or bill has not yet been received from the applicable taxing authority, such amounts shall be determined by assuming that the relevant Tax owed for such period equals no less than one hundred thirty percent (130%) of the amount of such Tax as set forth on the most recent bill or notice that is available.  Notwithstanding anything to the contrary herein, neither Purchaser nor any of its Affiliates shall have any liability for or otherwise be required to pay any real or personal property Taxes or other similar Taxes which are liabilities or obligations under any lease or Contract of a Seller to the extent such lease or contract is not an Assumed Contract.

      **8.4**    **Certain Tax Reporting for Employees**.  Notwithstanding anything to the contrary herein, unless otherwise directed by Purchaser, the Parties agree to use the "***standard***" method of IRS Revenue Procedure 2004-53 for income and payroll Tax reporting.

      **8.5**    **Sales Taxes and Sales Taxes Account**.

          **(a)**    Schedule 8.5(a) (the "***Sales Taxes Schedule***") sets forth (i) a true, correct and accurate list of potential (whether asserted or unasserted) Liabilities for Sales

Taxes arising prior to the Petition Date with respect to the operation of the Business (the "**Pre-Petition Sales Taxes**") and (ii) a true, correct and accurate list of binding settlements or binding payment plans entered into by the applicable Sellers (or their Representatives) with any Taxing Authority in respect of Sales Taxes (each, a "**Payment Plan**"), as of the Original Agreement Date, together with the applicable payment schedule, which shall include the amount of each payment and the due date of each payment (such payments and, together with any Sales Taxes payments added in accordance with this Section 8.5, collectively the "**Sales Taxes Payments**").  Part (iii) of the Sales Taxes Schedule sets forth a true, correct and accurate description, as of the Original Agreement Date, of the proposed terms of the Payment Plan being negotiated with the Taxing Authority in Texas.

(b)     Prior to the Closing, the applicable Sellers will use best efforts to negotiate and finalize Payment Plans with the Taxing Authorities of the following states (collectively, the "**Pre-Closing States**"):  Florida, New York, Pennsylvania, Texas and Washington (any such Payment Plans entered into after the Original Agreement Date but prior to the Closing, together with the Payment Plans with the Taxing Authorities of California and Washington, the "**Pre-Closing Payment Plans**").  The Sales Taxes Schedule shall be updated by the Sellers on a weekly basis and such updated schedule shall be delivered to Purchaser; provided, that any additional Pre-Closing Payment Plan, including any Payment Plan with a Pre-Closing State, and the applicable payment schedules may be added to the Sales Taxes Schedule if, and only if, (i) such Pre-Closing Payment Plan is either (x) approved by Purchaser under Section 5.1(j) or (y) a Qualified Settlement and (ii) prior to the entry of any such settlement or payment plan, Sellers (x) promptly notified Purchaser of any communication between a Taxing Authority and Sellers regarding such Pre-Petition Sales Taxes and (y) promptly notified Purchaser of any significant developments regarding such Pre-Petition Sales Taxes ((i) and (ii), collectively, the "**Payment Plan Protocols**").

(c)     At least three (3) Business Days prior to the Closing Date, the Sales Taxes Schedule shall be updated by Sellers to include all Pre-Closing Payment Plans and delivered to Purchaser.

(d)     If necessary and desirable to form the Successor Entity, prior to the entry of a sale Order by the Bankruptcy Court approving the Transactions, the Sellers and Purchaser will mutually agree upon the form and structure (including timing for implementation and governance) of the Successor Entity that will be established to assume from the Sellers all Liabilities arising from Pre-Petition Sales Taxes and the Payment Plans.

(e)     On or before the Closing and as a condition thereto, Purchaser and the Sellers will enter into a funding commitment agreement, in the form attached hereto as **Exhibit E** (the "**Sales Tax Funding Commitment**"), pursuant to which Purchaser shall commit to pay (directly or indirectly) the payments arising under the Pre-Closing Payment Plans on behalf of the Sellers, as applicable, and any Post-Closing Payment Plans in accordance with Section 8.5(f), provided that Purchaser shall have no other obligations under such Sales Tax Funding Commitment; provided, further, that Purchaser, Sellers and the Successor Entity (as applicable), consistent with the applicable requirements set forth in Section 8.1, will cooperate with each other in good faith in the conduct of negotiations with the applicable Taxing Authorities with respect to the Pre-Closing Payment Plans and comply with the Payment Plan Protocols.  Purchaser agrees that the Sellers or the Successor Entity, as applicable, shall be a third party beneficiary under the Sales Tax Funding Commitment.

(f)     Following the Closing Date, the Sellers or the Successor Entity, as applicable, will continue to negotiate and finalize Payment Plans (with the finalization of

such Payment Plans to occur no later than nine (9) months after the Closing Date) and if, and only if, such Payment Plans are finalized in accordance with the Payment Plan Protocols with the applicable Taxing Authorities of the remaining states set forth on Schedule 8.5(a)(i) (the "**_Post-Closing Payment Plans_**"), then Purchaser and Sellers or the Successor Entity, as applicable, shall take such actions as necessary or required herein and under the Sales Tax Funding Commitment to include such Post-Closing Payment Plan as an additional funding obligation thereunder.  Purchaser shall advance or reimburse Sellers and the Successor Entity for the costs and expenses of an accounting firm retained to assist in the negotiation, settlement, finalization and execution of the Post-Closing Payment Plans in an amount not to exceed $50,000 in the aggregate.

**(g)**    From and after the Petition Date through the Closing Date, all of the sales, excise, gross receipts and other Taxes of the Sellers attributable to sales of curated boxes containing consumer products, or any other products of the Business, payable to any Taxing Authority having jurisdiction over any Seller (collectively, "**_Sales Taxes_**") shall be added to the sales price of such items and collected by the applicable Seller, and all Sales Taxes shall be deposited into the Sales Taxes Account. Notwithstanding anything to the contrary herein, Purchaser shall be given access to the computation of gross receipts for verification of all such tax collections.  In addition to the Sales Tax deposited above, if, at any time prior to the Closing, any Seller receives any funds from any Person in respect of Sales Taxes (whether such Sales Taxes arose before, or after the Petition Date), such Seller shall deposit such funds in the Sales Taxes Account or, only if directed in writing by Purchaser to do so, pay the applicable Taxing Authority in accordance with applicable Law to the extent such Sales Taxes are due. Purchaser agrees that any amounts deposited into the Sales Taxes Account shall be used to pay any Post-Petition Sales Taxes before such amounts are used for any other purpose.  For the avoidance of doubt, after the Closing, in the event that any Person remits any payment to any Seller or the Successor Entity (if applicable) in respect of Sales Taxes, such Seller or the Successor Entity (if applicable) shall promptly notify, and pay such amount to, the applicable Taxing Authority in accordance with applicable Law to the extent such Sales Taxes are due or otherwise to Purchaser.

9.    **EMPLOYEE MATTERS.**

    **9.1**    **Employees and Offers of Employment.**

**(a)**    Purchaser is under no obligation to employ any Employee.  Prior to the Closing Date, each Seller shall notify all of its Employees that their employment will end immediately prior to the Closing unless otherwise agreed to between Sellers and Purchaser.  No Employee will become an employee of Purchaser unless Purchaser makes that Employee a written offer of employment based on initial terms and conditions of employment established solely by Purchaser and the offer is accepted.

**(b)**    Prior to, on or after the Closing Date, Purchaser may, in its sole discretion, elect to make offers of employment to and employ Employees as provided above based on initial terms and conditions of employment established solely by Purchaser. Each Seller shall retain all obligations and liabilities, if any, for (i) any Claim (including, for unpaid wages, unemployment compensation, employee contract or severance agreement, or resolved but unpaid legal claims, or employee benefits matters) relating to any Transferred Employee's employment by such Seller prior to the Closing Date or separation from employment prior to the Closing, (ii) any lawsuit, administrative charge, arbitration, proceeding, or written demand or notice pertaining to any Transferred Employee and arising out of such Transferred Employee's employment with such Seller prior to the Closing Date, and (iii) any worker's compensation or other claims arising from any injury or illness occurring prior to the Closing Date.

**(c)**      Purchaser shall maintain employee records transferred to Purchaser hereunder for a period of not less than four (4) years and during that period will afford Sellers reasonable access to such records during Purchaser's normal business hours. Purchaser shall maintain the confidentiality of such records and limit access thereto in a manner consistent with Purchaser's treatment of its employee records and applicable Law.

**(d)**      For the avoidance of doubt, Purchaser acknowledges that it will be responsible for all liabilities, obligations and claims arising out of the employment by Purchaser of any Transferred Employee with respect to Purchaser's employment of such Transferred Employee on and after the date of employment of such Transferred Employee with Purchaser.

**9.2**      **Employee Plans**.

**(a)**      Purchaser shall have no obligation to assume any of Sellers' Employee Benefit Plans. Unless expressly assumed in writing subsequent to the execution of this Agreement, but prior to Closing, all of Sellers' Employee Benefit Plans and any related liabilities are the responsibility of Sellers.

**(b)**      Purchaser shall have no obligation to continue contributions to any Multiemployer Plan and expressly disclaims any obligation to assume or continue contributing to any Multiemployer Plan following Closing. All liabilities, including any claims for withdrawal liability or contributions, are solely the responsibility of Sellers.

**(c)**      At Purchaser's option, Purchaser may agree in writing subsequent to the Original Agreement Date, but prior to Closing, to assume some or all of Sellers' Employee Benefit Plans (the "***Assumed Plans***"). By agreeing to assume any such plan, Purchaser assumes all rights, liabilities and obligations arising from and after the Closing for any Assumed Plans. Purchaser and Sellers shall take such actions as are necessary and reasonably requested by the other Party to cause Purchaser to assume sponsorship of any Assumed Plans as of the Closing Date and to effect the transfer of all assets and benefit liabilities of any Assumed Plans together with all related trust, insurance policies and administrative services agreements, effective as soon as practicable following the Closing Date; provided, however, that Purchaser shall not be assuming or be responsible for any liabilities or obligations arising with respect to or in connection with any Assumed Plans to the extent such liabilities or obligations arose prior to the Closing Date or with respect to any Employee or former Employee of Sellers who does not become a Transferred Employee (except to cause payment for any claim appropriately covered by a transferred insurance policy or any other payment under an Assumed Plan to which such Employee or former Employee is otherwise entitled by Law).

**(d)**      With respect to any Assumed Plans, each Seller will agree to warrant that any Assumed Plan has been established, maintained, funded and administered in material compliance with its terms, ERISA, the Code, and all applicable laws.

**(e)**      On and following the Closing Date, each Seller and Purchaser shall reasonably cooperate in all matters reasonably necessary to effect the transactions contemplated by Section 9.2(a), including exchanging information and data relating to employee benefits and employee benefit plan coverage, except as would result in the violation of any Law.

**(f)**      Each Seller shall be responsible for the payment of any severance payment or benefits that become due to any current or former Employee, officer, director, member, partner or independent contractor as a result of the termination of such individual by such Seller or Affiliate thereof. Sellers shall be responsible for providing the

notices and continuation coverage required by Section 4980B of the Code to each individual who is or becomes an "***M&A Qualified Beneficiary***" (as defined in Treas. Reg. Section 54.4980B09) as a result of, or in connection with, the consummation of the transactions contemplated by this Agreement.

**(g)** Notwithstanding anything to the contrary in this Agreement, the provisions of this <u>Section 9.2</u> are solely for the benefit of the Parties to this Agreement, and no current or former Employee or any other individual associated therewith shall be regarded for any purpose as a third-party beneficiary of this Agreement, and nothing in this <u>Section 9.2</u> shall be deemed an amendment of any Employee Benefit Plan or be construed to limit the right of Purchaser to amend or terminate any Assumed Plan or other employee benefit plan, program or arrangement, to the extent such amendment or termination is permitted by the terms of the applicable plan. Nothing herein, expressed or implied, shall confer upon any employee any rights or remedies of any nature or kind whatsoever in regard to an Assumed Plan, under or by reason of any provision of this Agreement.

**9.3    Workers' Compensation**. Each Seller shall be liable for all workers' compensation claims arising out of injuries with an identifiable date of occurrence sustained by such Seller's employees prior to the Closing Date. Each Seller shall be liable for all workers' compensation claims arising out of injuries or occupational diseases without an identifiable date of occurrence or exposure, originating from within such Seller's facilities and which are alleged to have been sustained or contracted prior to the Closing Date, provided such claims are filed with the appropriate workers' compensation authority within forty-five (45) days after the Transferred Employees' employment date.

**9.4    WARN Act**.

**(a)** To the extent required by law, each Seller shall provide notice to all of its Employees that complies with all provisions of (i) the US Worker Adjustment and Retraining Notification Act of 1988, as amended, and (ii) all other applicable Law, including those prohibiting discrimination and requiring notice to employees that their employment will end prior to the Closing regardless of whether Purchaser makes a written offer of employment to any of the Employees.

**(b)** Purchaser will not be responsible for and will not assume any Liability for any notices, payments, fines or assessments due to any Person or Governmental Authority pursuant to any applicable Law with respect to the termination, discharge or layoff of employees by Sellers on or before the Closing.

**(c)** On Closing, Sellers will provide Purchaser with the books and records (or true and complete copies thereof) relating to the Transferred Employees and such other data and information relating to the Transferred Employees in the possession of Sellers as Purchaser may reasonably require.

**10.    CLOSING CONDITIONS.**

**10.1    Conditions to Obligations of Purchaser and Sellers**. The obligations of Purchaser and Sellers to consummate the Closing are subject to the satisfaction at or before Closing of each and every one of the following conditions:

**(a)** the Bankruptcy Court shall have entered the Approval Order in the Bankruptcy Cases, and the Bankruptcy Court shall have waived the stay imposed by Rule 6004(h) of the Federal Rules of Bankruptcy Procedure as to the Approval Order, authorizing the Transactions and approving this Agreement under Sections 105(a), 363

40.

and 365 of the Bankruptcy Code, in form and substance acceptable to Purchaser, and the Approval Order shall contain findings that Purchaser acquired the Purchased Assets in good faith, for fair value, in an arm's length transaction, and as of the Closing Date the Approval Order shall be in full force and effect, shall not then be stayed, and shall not have been vacated or reversed;

**(b)**     Sellers shall have negotiated with the DIP Lender under the DIP Loan for the continued use of cash collateral after Closing such that Sellers may use the Budgeted Reserve to pay all amounts that comprise the Budgeted Reserve; and

**(c)**     no injunction, stay or similar Order issued by any Governmental Authority shall be in effect that restrains, enjoins, stays or prohibits the consummation of the Transactions.

**10.2    Conditions to Obligations of Purchaser**.   The obligation of Purchaser to consummate the Closing is subject to the satisfaction (or waiver by Purchaser) of the following further conditions:

**(a)**     each Seller shall have performed in all material respects all of its obligations and agreements hereunder required to be performed by such Seller on or prior to the Closing Date;

**(b)**     the representations and warranties of Seller set forth in <u>Section 3</u> (i) that are not qualified by Material Adverse Effect or other materiality qualifiers will be true and correct in all material respects as of the Closing Date as if made at and as of the Closing Date (except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty will be true and correct in all material respects as of such earlier date) and (ii) that are qualified by Material Adverse Effect or other materiality qualifiers will be true and correct in all respects (without disregarding such Material Adverse Effect or other materiality qualifiers qualifications) as of the Closing Date as if made at and as of the Closing Date (except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty will be true and correct in all respects as of such earlier date);

**(c)**     each Seller shall not be in default in any material respect under the provisions of this Agreement;

**(d)**     no Material Adverse Effect shall have occurred;

**(e)**     Purchaser shall have received an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of each Seller certifying that the conditions set forth in <u>Sections 10.2(b)</u>, <u>10.2(c)</u> and <u>10.2(d)</u> have been satisfied;

**(f)**     Sellers shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in <u>Section 2.8</u>;

**(g)**     no party in interest has filed an adversary proceeding or commenced a contested matter challenging the amount, validity, enforceability, perfection or priority of Purchaser's Liens on collateral of the Debtors or obligations owed by the Debtors to Purchaser; and

**(h)**     none of the information contained in any Customer List shall be publicly available or shall have been required to be disclosed in a non-confidential manner.

**10.3    Conditions to Obligations of Sellers**.  The obligation of Sellers to consummate the Closing is subject to the satisfaction (or waiver by Seller) of the following further conditions:

**(a)**    Purchaser shall have performed in all respects all of its obligations and agreements hereunder required to be performed by it at or prior to the Closing Date;

**(b)**    the representations and warranties of Purchaser set forth in <u>Section 4</u> (i) that are not qualified by materiality qualifiers will be true and correct in all material respects as of the Closing Date as if made at and as of the Closing Date (except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty will be true and correct in all material respects as of such earlier date) and (ii) that are qualified by materiality qualifiers will be true and correct in all respects (without disregarding such Material Adverse Effect or other materiality qualifiers qualifications) as of the Closing Date as if made at and as of the Closing Date (except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty will be true and correct in all respects as of such earlier date);

**(c)**    Purchaser shall have delivered to Sellers all of the items set forth in <u>Section 2.9</u>;

**(d)**    Sellers shall have received an amount in cash sufficient to fund the Budgeted Reserve to the extent Sellers' cash on hand at closing is insufficient to fund the Budgeted Reserve; and

**(e)**    Sellers shall have received all documents they may reasonably request relating to the existence of Purchaser and the authority of Purchaser for this Agreement, all in form and substance reasonably satisfactory to Sellers.

**11.    TERMINATION.**

**11.1    Grounds for Termination**.  This Agreement may be terminated at any time prior to the Closing:

**(a)**    by mutual written agreement of Sellers and Purchaser;

**(b)**    by Purchaser if the Bankruptcy Cases are converted to Chapter 7 cases, or if Bankruptcy Court appoints a trustee or examiner;

**(c)**    by Sellers or Purchaser, if the Closing shall not have been consummated on or before October 1, 2019 (the "***End Date***");

**(d)**    by Purchaser, upon the occurrence of any default or event of default under the DIP Loan that has not been waived in writing by the DIP Lender;

**(e)**    by Purchaser, in the event that Sellers accept a successful bid from a Person other than Purchaser;

**(f)**    by Purchaser if (i) there shall have been a breach by any Seller of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in <u>Section 10.2</u>, or (ii) any other event or condition shall result in any Seller being incapable of satisfying one or more conditions set forth in <u>Section 10.2</u>, and in either case such breach or other event or condition shall be incapable of being cured or, if capable of

42.

being cured, shall not have been cured within the earlier of twenty (20) days after written notice thereof shall have been received by Sellers and the End Date;

(g)    by Sellers or Purchaser, if there shall be any Law that makes consummation of the Transactions illegal or otherwise prohibited, or if any Order permanently restraining, prohibiting or enjoining Purchaser or Sellers from consummating the Transactions is entered and such Order shall become final;

(h)    by Seller if (i) there shall have been a breach by Purchaser of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in Section 10.3, or (ii) any other event or condition shall result in any Seller being incapable of satisfying one or more conditions set forth in Section 10.3, and in either case such breach or other event or condition shall be incapable of being cured or, if capable of being cured, shall not have been cured within the earlier of twenty (20) days after written notice thereof shall have been received by Purchaser and the End Date; or

(i)    by Sellers, if (i) Sellers execute a definitive agreement with a third party (other than Purchaser) for the acquisition of all or substantially all the Purchased Assets, and (ii) the Bankruptcy Court enters an Order in the Bankruptcy Cases approving such definitive agreement.

The Party desiring to terminate this Agreement pursuant to this Section 11.1 (other than pursuant to Section 11.1(a)) shall give notice of such termination to the other Party in accordance with Section 12.1.

**11.2    Effect of Termination**.  If this Agreement is terminated as permitted by Section 11.1, such termination shall be without Liability of any Party (or any stockholder, director, officer, employee, agent, consultant or other Representative of such Party) to the other Party to this Agreement except as expressly provided in Sections 7.5(a) and 11.4.  The provisions of Sections 7.5(a), 11.2, 11.3, 11.4, 12.1, 12.4, 12.5, 12.6, 12.8, 12.9, 12.10 and 12.11 shall survive any termination hereof pursuant to Section 11.1.

**11.3    Fees and Expenses**.  Except as otherwise set forth expressly herein, all costs and expenses incurred by the Parties in connection with obtaining Bankruptcy Court approval and consummation of this Agreement and the Transactions contemplated hereby shall be paid by the Party incurring such cost or expense.

**11.4    Certain Limitations**.  IN NO EVENT SHALL EITHER PARTY BE LIABLE, WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, FOR ANY LOSSES ARISING FROM OR RELATED TO THIS AGREEMENT THAT ARE IN THE NATURE OF LOST PROFITS OR INDIRECT, SPECIAL, CONSEQUENTIAL, PUNITIVE, SPECULATIVE OR INCIDENTAL DAMAGES, REGARDLESS OF WHETHER SUCH DAMAGE WAS FORESEEABLE AND WHETHER EITHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

**12.    MISCELLANEOUS.**

**12.1    Notices**.  All notices, requests and other communications to any Party hereunder shall be in writing (including email transmission) and shall be given,

if to Purchaser, to:

Loot Crate Acquisition LLC
c/o Cathy Hershcopf and Robert Winning
55 Hudson Yards

New York, New York 10001
Attention:  Authorized Representatives
email:      chershcopf@cooley.com
            rwinning@cooley.com

with a copy to (which shall not constitute notice):

Cooley LLP
55 Hudson Yards
New York, New York 10001
Attention: Cathy Hershcopf
           Robert Winning
email:      chershcopf@cooley.com
            rwinning@cooley.com

if to Sellers, to:

Loot Crate, Inc.
3401 Pasadena Avenue
Los Angeles, CA 90031-1929
Attention: Mark Palmer
email: Mark@TheseusStrategy.com

with a copy to (which shall not constitute notice):

Bryan Cave Leighton Paisner LLP
1290 Avenue of the Americas
New York, NY 10104-3300
Attention: Andrew Schoulder
email: andrew.schoulder@bclplaw.com

All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. in the place of receipt and such day is a Business Day in the place of receipt.  Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding Business Day in the place of receipt.

**12.2    Waivers**.  No failure or delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies herein provided shall be cumulative.

**12.3    Successors and Assigns**.  The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns, including with respect to the Sellers, any chapter 7 trustee, plan administrator, trustee of a liquidating trust, or other successor arising from the pendency of the Bankruptcy Cases (each a "***Bankruptcy Successor***"); provided, however, that no Party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the written consent of the other Party (other than a Bankruptcy Successor).

**12.4    Governing Law**.  This Agreement shall be governed by and construed in accordance with the Laws of the State of Delaware and any applicable provisions of the Bankruptcy Code, without regard to the principles of conflicts of Law that would provide for application of another Law.

600688115.35

**12.5    Jurisdiction**.

(a)    Prior to the closing of the Bankruptcy Cases, the Parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the Transactions shall be brought exclusively in the Bankruptcy Court, and each of the Parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the Bankruptcy Court or that any such suit, action or proceeding which is brought in the Bankruptcy Court has been brought in an inconvenient forum.  Process in any such suit, action or proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of the Bankruptcy Court.  To the extent the Bankruptcy Court declines, or is otherwise unable to, exercise jurisdiction, then the Parties agree that the state or federal courts in the County of New Castle, State of Delaware, shall have jurisdiction.  Without limiting the foregoing, each Party agrees that service of process on such Party as provided in Section 12.1 shall be deemed effective service of process on such Party.

(b)    After the closing of the Bankruptcy Cases, except as otherwise expressly provided in this Agreement, the Parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the Transactions may be brought in any state or federal court located in New Castle County, Delaware having subject matter jurisdiction over such suit, action or proceeding, and that any cause of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Delaware, and each of the Parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum.  Process in any such suit, action or proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of any such court.  Without limiting the foregoing, each Party agrees that service of process on such Party as provided in <u>Section 12.1</u> shall be deemed effective service of process on such Party.

**12.6    Waiver of Jury Trial**.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS.

**12.7    No Third Party Beneficiaries**.  No provision of this Agreement is intended to confer upon any Person other than the Parties hereto any rights or remedies hereunder.

**12.8    Entire Agreement; Amendments; Counterparts**.  This Agreement (including the Schedules and Exhibits hereto) sets forth the entire agreement among the Parties with respect to the subject matter hereof, supersedes in its entirety the Original Agreement and may be amended only by a writing executed by Purchaser and Sellers.  This Agreement may be executed in counterparts, each of which when taken together shall constitute an original.  A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.  This Agreement shall become effective when each Party hereto shall have received a counterpart hereof signed by the other Party hereto.  In the event of any conflict or inconsistency between the statements in this Agreement and the bid procedures, the statements in this Agreement shall control.

**12.9    Headings; Interpretation**.  The headings contained in this Agreement are for convenience of reference only and shall not affect the meaning or interpretation of this Agreement.  Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." The word "extent" and the phrase "to the extent" when used in this Agreement shall mean the degree to which a subject or other things extends, and such word or phrase shall not merely mean "if." The term "or" is not exclusive, and shall be interpreted as "and/or." The phrases "the date of this Agreement," "the date hereof," "of even date herewith" and terms of similar import, shall be deemed to refer to the date set forth in the preamble to this Agreement.  A reference to any specific Law or to any provision of any Law, whether or not followed by the phrase "as amended," includes any amendment to, and any modification, re-enactment or successor thereof, any legislative provision substituted therefor and all rules, regulations and statutory instruments issued thereunder or pursuant thereto, except that, for purposes of any representations and warranties in this Agreement that are made as a specific date, references to any specific Law will be deemed to refer to such legislation or provision (and all rules, regulations and statutory instruments issued thereunder or pursuant thereto) as of such date. The Parties agree that they have been represented by counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any Law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document will be construed against the party drafting such agreement or document.

**12.10    Disclosure Schedules**.  The Parties acknowledge and agree that (a) the Schedules to this Agreement may include certain items and information solely for informational purposes for the convenience of Purchaser and (b) the disclosure by Sellers of any matter in the Schedules shall not be deemed to constitute an acknowledgment by Sellers that the matter is required to be disclosed by the terms of this Agreement or that the matter is material.  If any Schedule discloses an item or information, the matter shall be deemed to have been disclosed in all other Schedules to the extent reasonably apparent on the face of such disclosure, notwithstanding the omission of an appropriate cross-reference to such other Schedules.

**12.11    No Survival of Representations**.  Purchaser and Sellers acknowledge and agree that Sellers' representations and warranties set forth in this Agreement shall expire on the Closing Date or upon the earlier termination of this Agreement pursuant to its terms, and be of no further force and effect after such date.  The Parties hereto agree that the covenants contained in this Agreement to be performed at or after the Closing shall survive the Closing hereunder for such period expressly set forth in this Agreement, or if not expressly set forth for a period no greater than the earlier of (x) twenty four (24) months after the Closing Date and (y) the date that all of the Sellers have been dissolved.

[Signature pages follow]

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

PURCHASER:

**Loot Crate Acquisition LLC**

By: _____
Name:  Cathy Hershcopf
Title:   Authorized Signatory

[*Signature Page to Amended and Restated Asset Purchase Agreement*]

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

SELLERS:

**Loot Crate, Inc.**

By:_____
Name: Mark Palmer
Title:     Chief Transformation Officer

**Loot Crate Holdings, Inc.**

By:_____
Name: Mark Palmer
Title:     Chief Transformation Officer

**LC Funding, Inc.**

By:_____
Name: Mark Palmer
Title:     Chief Transformation Officer

**Loot Crate Parent, Inc.**

By:_____
Name: Mark Palmer
Title:     Chief Transformation Officer

[*Signature Page to Amended and Restated Asset Purchase Agreement*]

**EXHIBIT A**

**Form of Assignment and Assumption Agreement**

**EXHIBIT B**

**Form of Trademark Assignment Agreement**

**EXHIBIT C**

**Form of Power of Attorney**

**EXHIBIT D**

**Form of Leased Real Property Assignment Agreement**

**EXHIBIT E**

**Form of Sales Tax Funding Commitment**

# Exhibit C

**STRICTLY CONFIDENTIAL**

Loot Crate Acquisition LLC
603 Sweetland Avenue
Hillside, NJ 07205

October 1, 2019

Loot Crate, Inc.
Loot Crate Holdings, Inc.
LC Funding, Inc.
Loot Crate Parent, Inc.
3401 Pasadena Avenue
Los Angeles, CA 90031-1929
Attention: Stuart Kaufman

      Re:     Sales Tax Funding Commitment

Ladies and Gentlemen:

      Reference is hereby made to that certain Amended and Restated Asset Purchase Agreement, dated as of September 27, 2019 (the "**Purchase Agreement**") by and among Loot Crate, Inc., Loot Crate Holdings, Inc., LC Funding, Inc. and Loot Crate Parent, Inc. (collectively, the "**Sellers**"), and Loot Crate Acquisition LLC ("**Purchaser**"). This letter agreement (this "**Agreement**") sets forth the commitment of Purchaser, subject to the terms and conditions hereof, to make certain payments on behalf of the Sellers to the applicable Taxing Authorities under the Payment Plans in accordance with Section 8.5 of the Purchase Agreement. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Purchase Agreement.

      1.     Upon the terms and subject to the conditions set forth herein, concurrently with the Closing, Purchaser hereby commits to fund, directly or indirectly, an amount in cash in immediately available funds necessary to fully discharge the payment obligations of the Sellers and any Successor Entity (each, a "**Seller Entity**" and collectively, the "**Seller Entities**") arising in the states listed on Appendix A attached hereto (the "**States**") as such individual payments become due under the Payment Plans attached hereto as Appendix B (as updated from time to time after the date hereof in accordance with the Purchase Agreement and this Agreement) entered into by the applicable Seller Entities with the Taxing Authorities of the States (collectively, as updated from time to time in accordance with the Purchase Agreement and this Agreement, the "**Sales Tax Funding Commitment**"); provided, however, that Purchaser shall have no obligation to fund, directly or indirectly, any amounts upon the termination of this Agreement other than Defaulted Payments. Upon the finalization of each Post-Closing Payment Plan after the Closing in accordance with Section 8.5 of the Purchase Agreement, Appendix B hereto will be updated to include such Post-Closing Payment Plan, and this Agreement will then cover such payment obligations.

      2.     Purchaser shall make Sales Tax Funding Commitment payments under a Payment Plan either, in Purchaser's discretion (unless an applicable State directs otherwise), directly to the applicable State Taxing Authority or to the applicable Seller Entity for its payment to the

applicable State Taxing Authority in accordance with the Payment Plan; <u>provided</u> that with respect to any payments made by Purchaser directly to a State Taxing Authority, Purchaser shall provide to the Seller Entities written documentation evidencing such payment was made.

3.  This Agreement shall terminate, automatically and without any need for any action by any Person, upon the earliest to occur of the following:

(a)  Purchaser's establishment of a Material Breach as follows:

i.  On or before (x) February 29, 2020 (i.e., 60 days after December 31, 2019) in the event that the Closing under the Purchase Agreement occurs on or before October 1, 2019 or (y) the date that is on the six-month anniversary of the Closing in the event that the Closing occurs after October 1, 2019 (the date of the applicable notice deadline, the "**Notice Date**"), Purchaser shall have (A) delivered written notice with reasonable detail (it being agreed, however, that any claim by Sellers regarding any alleged lack of reasonable detail shall not be grounds for disqualifying any notice provided on or before the Notice Date) to the Seller Entities describing (I) the material inaccuracies in the financial information listed on <u>Schedule I</u> attached hereto and made available to Purchaser prior to the Closing in the Merrill Data Site folder titled "2 Financial" (the "**Financial Data**") or (II) the material breaches of, the Sellers' representations and warranties set forth in Section 3.3 of the Purchase Agreement, that have caused a "Material Adverse Effect" (as defined below) ((I) or (II), a "**Material Breach**"), and (B) deposited, by wire transfer of immediately available funds, an amount equal to $150,000 in a reserve account designated by the Seller Entities to fund certain costs and expenses as set forth herein (the "**Fee Reserve**").

ii.  Purchaser shall establish a Material Breach has occurred by obtaining, at its election, either (A) an entry of a final judgment by the Bankruptcy Court, which shall have exclusive jurisdiction with respect thereto (the "**Material Breach Order**"), or (B) a final determination by Sheila Enriquez of Briggs & Veselka Co. (the "**Independent Auditor**") upon review of the Financial Data and related materials reasonably requested by the Independent Auditor to make such determination.  In the event Purchaser elects to seek a Material Breach Order, each of the Parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the Bankruptcy Court or that any such suit, action or proceeding which is brought in the Bankruptcy Court has been brought in an inconvenient forum. The Parties acknowledge and agree that in the event Purchaser elects to seek a determination by an Independent Auditor, any determination by the Independent Auditor shall be final, binding and non-appealable and non-reviewable.

iii.  The Seller Entities shall use the funds in the Fee Reserve to pay all costs and expenses arising from either the Seller Entities' Representatives (in the event Purchaser elects to obtain a Material Breach Order) or the Independent Auditor, including, without limitation, promptly funding a retainer for the Independent Auditor

(the "**Establishment Costs**").  In the event Purchaser is unable to establish a Material Breach, Purchaser shall (A) reimburse the Seller Entities for all additional Establishment Costs in excess of $150,000 and (B) be responsible for any additional interest or penalties payable under the Payment Plans, in excess of the Fee Reserve.  The unused portion of the Fee Reserve, if any, shall be promptly paid to Purchaser.

iv.    For the avoidance of doubt, (A) the obligations of Purchaser to fund the Sales Tax Funding Commitment shall continue unless and until Purchaser has established a Material Breach in accordance with the terms hereof; (B) any failure by Purchaser to fund amounts due to the Taxing Authorities under the Sales Tax Funding Commitment prior to Purchaser's establishment of a Material Breach shall constitute a material default by Purchaser under this Agreement ("**Defaulted Payments**"); and (iii) if a Material Breach is established by Purchaser, Purchaser shall remain liable for and satisfy any portion of the Sales Tax Funding Commitment that came due and remains unpaid prior to the establishment of the Material Breach as a condition to the effectiveness of this Section 3(a).

v.    For purposes of this Agreement, a "**Material Adverse Effect**" means any material adverse effect on the Purchased Assets or the Business; provided that none of the following shall constitute, or be taken into account in determining whether or not there has been, a Material Adverse Effect:  (A) changes in general business or economic conditions affecting the industry in which the Sellers operate the Business, (B) changes in national or international political or social conditions, including the engagement by the United States in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, terrorist attack upon the United States, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, asset, equipment or personnel of the United States, (C) changes in, GAAP after the date hereof, (D) changes in applicable Laws after the date hereof, (E) changes resulting from the public announcement of this Agreement or the Transactions, (F) the failure, in and of itself, of the Sellers to achieve any budgets, projections or forecasts (but, excluding, for the avoidance of doubt, the underlying causes of any such failure), (G) changes to the extent resulting from the actions or omissions of Purchaser after the Closing Date with respect to the Purchased Assets or the Business, (H) any event, change, occurrence, circumstance, development or effect resulting from any action with respect to which the Sellers obtained the consent of the DIP Lender to take, and (I) any increase in subscriber churn, reduction in new sign ups or loss or non-assignment of vendor/licensor relationships to the extent caused by (1) a reduction in marketing spend from and after the filing of the Bankruptcy Cases, (2) the announcement or filing of the Bankruptcy Cases, (3) any action taken by Sellers with the prior written consent of Purchaser or with due care and in accordance with the directions of Purchaser pursuant to the Purchase Agreement or Transition Services Agreement or (4) any action not taken by the Sellers (x) at Purchaser's written request or (y) as a result of Purchaser's refusal to grant consent to such action after Sellers' written request pursuant to the Purchase Agreement or Transition Services Agreement.

(b)    the date that any Seller Entity or any of their Representatives (i) asserts in any Action, litigation or other proceeding (x) that one or more of the provisions in Section 7 of this Agreement are illegal, invalid or unenforceable in whole or in part, (y) that Purchaser has any liability under this Agreement other than to fund cash payments (including penalties and interest with respect to any Defaulted Payments) with respect to the Sales Tax Funding Commitment in accordance with the Payment Plans or (z) any claim or theory of liability against the Non-Recourse Parties (as defined below) relating to this Agreement, the Purchase Agreement or any of the transactions contemplated by this Agreement or the Purchase Agreement or (ii) asserts, or threatens to assert, any claim against a Non-Recourse Party (as defined below) in connection with this Agreement, the Purchase Agreement or any of the transactions contemplated by this Agreement or the Purchase Agreement (including in respect of any oral representations made or alleged to be made in connection therewith), whether in any Action, litigation or other proceeding, through counsel or in any other way; and

(c)    the date that Purchaser has fulfilled its payments obligations under Section 1 of this Agreement (including penalties and interest with respect to any Defaulted Payments).

4.    The Seller Entities shall be entitled to seek specific performance against Purchaser to cause Purchaser to satisfy its obligations hereunder, with the costs and expenses of the Seller Entities in seeking such relief being an obligation of the Purchaser.

5.    Each party hereto acknowledges and agrees that this Agreement is not intended to, and does not, create any agency, partnership, fiduciary or joint venture relationship between or among any of the Parties hereto and neither this Agreement nor any other document or agreement entered into by any Party hereto relating to the subject matter hereof shall be construed to suggest otherwise.

6.    Purchaser acknowledges and agrees that this Agreement may be assigned by the Sellers to the Successor Entity in connection with the Successor Entity's assumption from the Sellers of all Liabilities arising from Pre-Petition Sales Taxes and the Payment Plans.  Upon such assignment, this Agreement shall inure to the benefit of the Successor Entity and shall be enforceable by the Successor Entity as if it was the Sellers under this Agreement.

7.    Notwithstanding anything that may be expressed or implied in this Agreement or any document or instrument delivered in connection herewith or otherwise, each of the Sellers, by its acceptance of the benefits hereof, covenants, agrees and acknowledges for itself and its Affiliates, and any Person claiming on its or their behalf, from time to time (including, without limitation, the Seller Entities), that no person other than Purchaser has any liabilities, obligations or commitments of any nature (whether known or unknown, whether due or to become due, absolute, contingent or otherwise) hereunder (in each case subject to the limitations provided herein) or in connection with the transactions contemplated hereby and that, notwithstanding that Purchaser is a limited liability company, no Person other than Purchaser shall have any obligation hereunder or under any document or instrument delivered in connection herewith, against, or any claim (whether in bankruptcy, tort, contract or otherwise) based on, in respect of, or by reason of, this Agreement or arising out of or in connection with the transactions

4

contemplated hereby, and that no recourse hereunder or under any documents or instruments delivered in connection herewith or in respect of any oral representations made or alleged to be made in connection herewith or therewith, shall be had against, and no personal liability with respect thereto shall attach to, be imposed upon or otherwise be incurred by (a) any former, current or future equity holder, controlling person, director, officer, employee, agent, Affiliate, member, manager, general or limited partner, Representative or successor or assignee of Purchaser or (b) any former, current or future equity holder, controlling person, director, officer, employee, agent, affiliate, member, manager, general or limited partner, Representative or successor or assignee of the foregoing (such Persons, collectively, but excluding Purchaser, the "**Non-Recourse Parties**"), whether by or through attempted piercing of the corporate veil, limited partnership or limited liability company veil, by the enforcement of any assessment or by any legal or equitable proceeding, by virtue of any statute, regulation or applicable Law. Notwithstanding anything to the contrary in this Agreement, this Section 7 shall survive the termination and expiration of this Agreement.

8.    None of the Sellers may assign or delegate its rights, interests or obligations under this Agreement (by operation of law or otherwise) to any other Person (other than a Successor Entity or Bankruptcy Successor in accordance with Section 6) without the prior written consent of Purchaser.  The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns, including with respect to the Sellers, any chapter 7 trustee, plan administrator, trustee of a liquidating trust, or other successor arising from the pendency of the Bankruptcy Cases.  Any purported assignment of this Agreement in contravention of this Sections 6 and 8 shall be null and void.

9.    The directors and officers listed on <u>Schedule II</u> hereto will be express third party beneficiaries of this Agreement if and to the extent (and solely to the extent) that such person seeks specific performance of Purchaser's obligation to fund a payment in respect of the Sales Tax Funding Commitment, in each case, if and only to the extent permitted by, and subject to the limitations set forth in, the next sentence and for no other purpose (including, without limitation, any claim for monetary damages hereunder).  In the event that (i) Purchaser fails to timely fund a payment required to be made under the Sales Tax Funding Commitment and (ii) Purchaser fails to cure such failure within ten (10) Business Days of written notice from an officer or directed listed on <u>Schedule II</u>, then the directors and officers listed on <u>Schedule II</u> shall be entitled to seek specific performance of Purchaser's obligation to fund such payment under Section 1 of this Agreement.  Except for the directors and officers listed on <u>Schedule II</u> (pursuant to the first two sentence of Section 9 of this Agreement) and the Non-Recourse Parties (pursuant to Section 7 of this Agreement) and any rights assigned to a permitted assignee (pursuant to Sections 6 and 8 of this Agreement), no Person shall be entitled to rely upon this Agreement, and this Agreement shall be binding upon and inure solely to the benefit of each Party hereto and nothing herein or in any other agreement (including, without limitation, the Purchase Agreement), express or implied, is intended to or shall confer upon any other Person any rights, benefits or remedies whatsoever under or by reason of this Agreement.

10.    Sections 12.1 (Notice), 12.2 (Waivers), 12.4 (Governing Law) and 12.5 (Jurisdiction) shall apply to this Agreement and are incorporated herein by reference.

5

11.     This Agreement constitutes the entire agreement, and supersedes any and all prior or contemporaneous agreements (other than the Purchase Agreement), whether written or oral, with regard to the subject matter herein.    Notwithstanding the foregoing, this Agreement is subject in all respects to the terms and conditions of the Purchase Agreement and nothing herein, express or implied, is intended to or shall be construed to modify, expand or limit in any way the terms, representations and warranties or covenants contained in the Purchase Agreement.    No amendment, modification or waiver of any of the provisions of this Agreement will be valid unless set forth in a written instrument signed by the party to be bound.    An executed copy of this Agreement may be delivered by means of a facsimile machine or other electronic transmission (including .pdf., tif, .gif, .jpeg or similar attachment to electronic mail files), and shall be treated in all manner and respects and for all purposes as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

*       *       *       *       *

If this Agreement is agreeable to you, please so indicate by signing in the space indicated below.

Very truly yours,

Loot Crate Acquisition LLC

By: _____
Name: Joel Weinshanker
Its:   Sole Member

SELLERS:

Loot Crate, Inc.

By: _____
Name:
Its:

Loot Crate Holdings, Inc.

By: _____
Name:
Its:

LC Funding, Inc.

By: _____
Name:
Its:

Loot Crate Parent, Inc.

By: _____
Name:
Its:

If this Agreement is agreeable to you, please so indicate by signing in the space indicated below.

Very truly yours,

Loot Crate Acquisition LLC

By: _____
Name: Joel Weinshanker
Its:   Sole Member

SELLERS:

Loot Crate, Inc.

By: _____
Name:  Mark Palmer
Its:        Chief Transformation Officer

Loot Crate Holdings, Inc.

By: _____
Name:  Mark Palmer
Its:        Chief Transformation Officer

LC Funding, Inc.

By: _____
Name:  Mark Palmer
Its:        Chief Transformation Officer

Loot Crate Parent, Inc.

By: _____
Name:  Mark Palmer
Its:        Chief Transformation Officer

*Signature Page to Sales Tax Funding Commitment Letter*

Appendix A

**State / Jurisdiction**

Alabama
Arizona
California
Colorado
Connecticut
Florida
Georgia
Hawaii
Illinois
Indiana
Iowa
Kentucky
Louisiana
Maine
Maryland
Michigan
Mississippi
Nebraska
New Jersey
New York
North Carolina
North Dakota
Pennsylvania
South Carolina
Texas
Utah
Vermont
Washington
Wisconsin

Australia GST

Appendix B

Payment Plans
(as of October 1, 2019)

[See attached]



**KEN PAXTON**

ATTORNEY GENERAL OF TEXAS

## SETTLEMENT AGREEMENT

RE:     *In re: Old LC, Inc. (f/k/a Loot Crate, Inc.), et al.*
Bankruptcy Case No. 19-11791-BLS, United States Bankruptcy Court for the District of
Delaware

The Debtors in the above-referenced jointly administered case (the "**Bankruptcy Case**")
and the Texas Comptroller of Public Accounts (the "**Comptroller**"), have agreed to resolve the
Comptroller's Claim No. 9 (the "**Claim**"), timely filed on August 20, 2019, under the following
terms of this Settlement / Payment Agreement (the "**Agreement**"):

## AGREED BACKGROUND FACTS AND INFORMATION

A.      On August 11, 2019, Loot Crate, Inc., Loot Crate Holdings, Inc., LC Funding,
Inc. and Loot Crate Parent, Inc. (collectively, the "**Debtors**") filed voluntary petitions with the
United States Bankruptcy Court for the District of Delaware under Chapter 11 of Title 11 of the
United States Code (the "**Bankruptcy Code**").

B.      On August 14, 2019, the Court entered an Order Approving Motion for Joint
Administration directing joint administration of the Debtors' bankruptcy cases for procedural
purposes [D.I. 38].

C.      On September 19, 2019, a Final Order was entered authorizing the Debtors to pay
prepetition sales, use trust fund, and other taxes and related obligations [D.I. 187].

D.      On September 11, 2019, the Court entered an Order (A) Approving Bid
Procedures for the Sale of Substantially All of the Debtors' Assets, (B) Approving Related
Contract Assumption and Assignment Procedures, (C) Authorizing the Debtors to Enter Into
Stalking Horse Agreements and Approving Certain Bid Protections, Subject to a Further
Hearing, (D) Scheduling a Sale Hearing, and (E) Granting Certain Related Relief; and (II) an
Order (A) Approving the Sale of the Debtors' Assets, (B) Approving the Assumption and
Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Certain
Related Relief [D.I. 147].

E.      On October 1, 2019, the Court entered an Order approving the sale of
substantially all of the Debtors' assets [D.I. 254].

F.      On October 8, 2019, the Debtors filed a Notice of Name Change noting that the
Debtors changed their corporate names from the aforementioned Debtors to Old LC, Inc., Old
LC Holdings, Inc., Old LCF, Inc., and Old LC Parent, Inc. [D.I. 265] with no effect on the

administration of the Bankruptcy Case, which remained jointly administered pursuant to prior Order [D.I. 38].

G.      On January 8, 2020, an Order was entered approving the motion of the Debtors for omnibus procedures by which the Debtors are authorized to negotiate and settle certain tax claims [D.I. 369]. Pursuant to the January 8, 2020 Order [D.I. 369], the Comptroller and Debtors have reached agreement on the resolution of the Comptroller's Claim.

## TERMS OF THE AGREEMENT

1.      The Debtors agree to pay, and the Comptroller agrees to accept, the total sum of **$1,055,156.70** in delinquent sales tax plus statutory interest which continues to accrue pursuant to Texas Tax Code 111.060 in full and complete satisfaction of the Comptroller's Claim (the "**Settlement Amount**").

Claim 1 – 1910 AE - $863.92
Claim 2 – 153-1812
    Tax (audit) $857,671.99
    Interest (audit) $77,590.40

    1808-1910
      Tax $115,502.65
      Interest $3,527.74

    Total:  $1,055,156.70

2.      The Debtors and the Comptroller (collectively, the "**Parties**") agree that the Settlement Amount shall be paid according to the following terms: payment of total outstanding tax and statutory interest (which continues to accrue pursuant to Texas Tax Code 111.060) over thirty-six (36) months in equal monthly installments, subject to monthly recalculation to account for statutory interest. Payments shall be due on the 15th of each month beginning on **August 15, 2020** and continuing each consecutive month thereafter until the Settlement Amount and all interest is paid in full.

3.      The Parties agree that the Comptroller shall have an allowed general unsecured claim in the Bankruptcy Case for penalties in connection with delinquent sales tax in the amount of **$111,924.35**.

4.      The Parties agree that within five (5) business days after the date on which this Agreement is dated, the Debtors shall agree to dismissal of all currently pending redetermination hearings.

5.      Any claims of the Texas Comptroller for sales tax principle and interest shall be nondischargeable. Interest shall continue to accrue on the outstanding claims of the Texas Comptroller at the statutory rate as set forth in Texas Tax Code 111.060. Upon default of payment of such claims by Debtors, the Texas Comptroller shall provide notice and the

opportunity to cure to the Debtors. If any such default is not timely cured within five (5) business days after notice, the Texas Comptroller shall be entitled to enforce its claims pursuant to state law without any further order of the court and the automatic stay shall be deemed lifted without further order of the Court to enable enforcement. Notwithstanding anything to the contrary herein, the Texas Comptroller shall have the right of specific performance against the Debtors' estate or the trust (as applicable) if any amounts due under this Agreement are not timely received by the Texas Comptroller.

6.      Notwithstanding anything to the contrary in this Agreement, the Parties expressly acknowledge and agree that, consistent with Section 111.015 of the Texas Tax Code, the Texas Comptroller preserves and maintains its right to pursue any available claims of derivative liability against any potentially liable persons, including but not limited to those created by Sections 111.016, 111.0611, 111.020, 111.024, and 171.255 of the Texas Tax Code, and any other remedy available at law or in equity. The Parties agree that the Debtors' liability for the Settlement Amount is for payment of priority sales taxes and associated interest. The Parties agree that any responsible parties under Texas Tax Code 111.016 are jointly and severally liable with the Debtors for the Settlement Amount.

4.      Payments under this Agreement must be made by check, cashier's check, or money order payable to the "Texas Comptroller of Public Accounts" with "Taxpayer ID 32073419973" appearing in the memo portion of the instrument. Payments shall be delivered as follows:

> If payment is sent via U.S. Mail:
> Texas Attorney General
> Bankruptcy & Collections Division
> c/o Christopher Murphy
> P.O. Box 12548
> MC-008
> Austin, TX 78711-2548
>
> If payment is sent via FedEx, UPS, or another private parcel-delivery service:
> Texas Attorney General
> Bankruptcy & Collections Division
> c/o Christopher Murphy
> 300 W. 15th Street, 8th Floor
> Austin, Texas 78701

5.      Payments must be post-marked by no later than the 15th day of the month in which they are due for such payment to be considered timely.

6.      Debtors' failure to make a payment to the Comptroller as required by this Agreement shall be an event of default (an "**Event of Default**"). The Comptroller shall send notice of the Event of Default to Debtors as follows:

Bryan Cave Leighton Paisner LLP

c/o Leah Fiorenza McNeill
1201 W. Peachtree Street, NW
14th Floor
Atlanta, GA 30309
leah.fiorenza@bclplaw.com

7.      A payment to cure an Event of Default (a "**Cure Payment**") must be made by cash, cashier's check, or by wire transfer. Cashier checks should be made payable to the Texas Comptroller of Public Accounts and include the Debtors' taxpayer number. Cure Payments, or if by wire transfer, confirmation of payment, must be mailed to: Texas Attorney General, Bankruptcy and Collections Division MC 008, Attn: Christopher Murphy, P. O. Box 12548, Austin, Texas 78711-2548.

8.      Debtors shall be allowed to cure up to two (2) defaults. Upon a third default, the Comptroller, at its option, may declare the default non-curable and proceed to collect the remainder of the debt as provided herein.

9.      Debtors, by this Agreement, expressly agree to release the State of Texas, the Texas Comptroller of Public Accounts, the Office of the Attorney General of Texas, and their employees and agents from any and all causes of action, suits, debts, controversies, judgments, claims, demands, damages, costs, liens, and liabilities whatsoever, at law or in equity, known or unknown, existing, or hereafter arising, related to the claims at issue in the Bankruptcy Case.

10.     Upon payment of the Settlement Amount in accordance with the above terms, the Comptroller will forever release, acquit, and discharge Debtors from all claims, demands, charges, costs of court, attorney fees, and causes of action of whatever nature on any legal theory arising out of the circumstances which lead to the filing of the Comptroller's Claim in the Bankruptcy Case.

11.     Debtors, by this Agreement, expressly agree to waive any potential refund claims that may exist now or in the future for all periods at issue in the Bankruptcy Case, including all periods at issue in connection with the Comptroller's Claim in the Bankruptcy Case.

12.     Once the Agreement is executed by the Parties, neither Debtors nor the Comptroller may assert any claims or defenses in connection with the Claim to avoid compliance with and/or enforcement of this Agreement. The Parties further agree that the Comptroller, in its sole discretion, may allocate the settlement proceeds to the Claim in any manner at the Comptroller's sole election.

13.     The Agreement has been fully read and understood by the Parties, and the Parties have had the opportunity to retain independent legal counsel to obtain advice as to the effect and import of its provisions. The Agreement constitutes a good faith settlement of the Claim and is entered into freely and voluntarily.

14.     Each Party and/or its counsel has participated in the drafting and negotiation of this Agreement and for all purposes it shall be deemed that the Parties jointly drafted this Agreement.

15.     The Agreement constitutes the sole and entire agreement between the Parties and supersedes all prior agreements, negotiations, and discussions among them, with respect to the subject matter covered in it.  It is expressly understood and agreed that this Agreement may not be altered, amended, waived, modified, or otherwise changed in any respect or particular whatsoever except by writing duly executed by authorized representatives of the respective Parties. The Parties further acknowledge and agree that they will make no claims at any time or place that this Agreement has been orally supplemented, modified, or altered in any respect whatsoever.

16.     This Agreement is being made in and shall be deemed to be performed in the State of Texas, County of Travis.

17.     Should any provision of this Agreement be held invalid or illegal, such invalidity or illegality shall not invalidate the whole of this Agreement, but, rather the Agreement shall be construed as if it did not contain the invalid or illegal part, and the rights and obligations of the Parties shall be construed and enforced accordingly.

18.     The Parties agree that this Agreement may be executed in two or more counterparts and via facsimile or email, each such counterpart and facsimile or email to be deemed an original, and taken together, shall constitute one and the same instrument.

*[Signatures on the following pages]*

**AGREED TO:**

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

RYAN L. BANGERT
Deputy First Assistant Attorney General

DARREN L. MCCARTY
Deputy Attorney General for Civil Litigation


_____          _____
CHRISTOPHER S. MURPHY                                             DATE
Texas State Bar No. 24079031
Assistant Attorney General
Bankruptcy & Collections Division MC 008
P. O. Box 12548
Austin, TX 78711-2548
Telephone: (512) 475-4867
Facsimile: (512) 936-1409
christopher.murphy@oag.texas.gov

ATTORNEYS FOR THE TEXAS
COMPTROLLER OF PUBLIC ACCOUNTS

**AGREED TO:**

_____

AUTHORIZED REPRESENTATIVE FOR DEBTORS

7/9/20

DATE

Print:    Christopher Davis

Title:         CEO

**AND:**

_____

OFFICER / DIRECTOR OF DEBTORS

7/9/20

DATE

Print:    Christopher Davis

Title:    CEO

602189502.2

**AGREED TO:**

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

RYAN L. BANGERT
Deputy First Assistant Attorney General

DARREN L. MCCARTY
Deputy Attorney General for Civil Litigation

_____    7/17/20
CHRISTOPHER S. MURPHY                 DATE
Texas State Bar No. 24079031
Assistant Attorney General
Bankruptcy & Collections Division MC 008
P. O. Box 12548
Austin, TX 78711-2548
Telephone: (512) 475-4867
Facsimile: (512) 936-1409
christopher.murphy@oag.texas.gov

ATTORNEYS FOR THE TEXAS
COMPTROLLER OF PUBLIC ACCOUNTS

602189502.2

## SCHEDULE I*

2.1.1 – Loot Crate – AP Summary_3.31.19

2.1.2 – Loot Crate – Vendor summary_3.31.19

2.1.3 – Loot Crate – Vendor summary_3.31.19 (By Country & Type)

2.2.1 – Loot Crate – AR summary_3.31.19

2.3.1 – Legendary – Deferred Revenue Recognition Waterfall

2.4.1 – Loot Crate – Inventory Aging_3.31.19

2.5.1 – Loot Crate – Operating Model_3.31.19

2.6.1 – Loot Crate – Crate Costs_Jan 2019

2.6.2 – Loot Crate – COGS Breakout_2018

2.7.1 – Loot Crate – Critical Vendor Summary

2.7.2 – Loot Crate – 13 Week Cash Flow

2.7.3 - Loot Crate – Unfunded Deferred Revenue

2.7.4 – Break-Even Analysis – 6.5.19

2.7.7 – Washington Sales Tax Payment Plan – August 19

2.7.8 – California Sales Tax Payment Plan

2.7.9 – California Sales Tax Payment Plan – Confirmation Letter

2.7.10 – California Sales Tax Payment Plan and Related Info

2.7.12 – Financial Statement 06-2019

2.7.13 – Loot Crate 503(b)(9) Claim List

2.7.17 – Schedule Attachment 3.3(a)(i) – Financial Statements - 2018

Schedule 8.5(a)(i) of the Asset Purchase Agreement (Sales Taxes Schedule)

*It is understood and agreed that: (a) the failure, in and of itself, of the Sellers to achieve any budgets, projections or forecasts (but, excluding, for the avoidance of doubt, the underlying

causes of any such failure) included in the Financial Data are excluded from determining whether there are (I) material inaccuracies in the Financial Data or (II) material breaches of, the Sellers' representations and warranties set forth in Section 3.3 of the Purchase Agreement, that have caused a "Material Adverse Effect" (as defined in the Sales Tax Funding Commitment to which this Schedule I is attached); (b) the accuracy of the Financial Data is as of the date such Financial Data was prepared; and (c) 2.7.1 – Loot Crate – Critical Vendor Summary was prepared in April 2019 for purposes of marketing a traditional out-of-court sale of the Business and not for use in the context of a chapter 11 case, and any "critical vendor" references therein do not refer to "critical vendors" as such term is used in the context of a chapter 11 case.

## SCHEDULE II

**Directors and Officers as Third Party Beneficiaries**

Christopher Davis
Alexandre Zyngier
Osman Khan
Mark Palmer
Stuart Kaufman

# **<u>Exhibit D</u>**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter: 11 |
| OLD LC, INC., *et al.*, | Case No. 19-11791 (BLS) |
| Debtor. [1] | **D.I. 695** |

### ORDER GRANTNG MOTION
### OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
### (I) GRANTING STANDING AND FOR AUTHORITY FOR THE CREDITORS
### COMMITTEE TO PROSECUTE CERTAIN CLAIMS, AND (II) APPROVING A TERM
### SHEET AMONG THE DEBTORS, THE COMMITTEE, AND THE PURCHASER

Upon consideration of the *Motion of the Official Committee of Unsecured Creditors to (I) Grant Standing and for Authority for the Creditors Committee to Prosecute Certain Claims, and (II) Approve a Term Sheet Among the Debtors, the Committee, and the Purchaser* (the "Motion")[2] and the Term Sheet attached hereto, and the Court having determined that good cause exists for approval of the Term Sheet and granting the Motion,

IT IS HEREBY ORDERED that the Motion is GRANTED; and it is further

ORDERED that the Official Committee of Unsecured Creditors is granted non-exclusive standing and authority to prosecute the D&O Claims;

ORDERED, that given the binding intent of the Committee, the Debtors, and the Purchaser under the Term Sheet with respect to the direction and prosecution of the D&O Claims, (i) the Committee, in its prosecution, shall provide reasonable consultation with the other

---

[1] The Debtors are the following four entities (the last four digits of their respective taxpayer identification number, if any, follow in parentheses): Old LC, Inc. (7119), Old LC Holdings, Inc., Old LCF, Inc., and Old LC Parent, Inc. The Debtors' noticing address in these Chapter 11 cases is 3401 Pasadena Avenue, Los Angeles, CA 90031.

[2] Capitalized terms used but not otherwise defined herein shall have those meanings ascribed to them in the Motion.

parties to the Term Sheet and (ii) upon confirmation of a plan that is consistent with the Term Sheet, the Committee shall immediately assign the D&O Claims and associated rights and privileges to the Liquidating Trust, which shall be the successor to the Committee for all prosecution efforts related to the D&O Claims; and it is further

ORDERED that, without limiting the binding nature of the Term Sheet, at any point in time prior to confirmation of a plan that is consistent with the Term Sheet, Purchaser in its sole discretion may withdraw its consent with respect to the continued prosecution of the D&O Claims; and it is further

ORDERED that the Term Sheet, a copy of which is attached hereto as Exhibit 1, is approved; and it is further

ORDERED that this Court retains jurisdiction over any and all matters arising from or related to the implementation or interpretation of the stipulation or this Order.

**Dated: October 21st, 2020 Wilmington, Delaware**

**BRENDAN L. SHANNON UNITED STATES BANKRUPTCY JUDGE**

**EXHIBIT 1**

## IN RE OLD LC, INC., CASE NO. 19-11791

## JOINT LIQUIDATING PLAN TERM SHEET

This term sheet (the "**Term Sheet**"), dated October 12, 2020, is a summary of the proposed terms for the resolution of certain issues and claims with respect to the chapter 11 cases of Old LC, Inc. and its affiliated debtors (collectively, the "**Debtors**"), jointly administered under Case Number 19-11791 (the "**Cases**") in the U.S. Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") through a joint chapter 11 plan of liquidation (the "**Liquidating Plan**"). This term sheet is binding on: (i) the Debtors; (ii) Money Chest, LLC, the Debtors' lender (the "**Lender**") under (a) that certain Credit Agreement, dated as of August 3, 2018 (as amended, the "**Pre-Petition Facility**"), and (b) that certain Debtor in Possession Credit Agreement approved by the Bankruptcy Court on a final basis by order dated September 25, 2019 (the "**DIP Facility**"); (iii) the purchaser of substantially all of the Debtors' assets pursuant to that certain Asset Purchase Agreement, dated as of September 27, 2019, and as amended (the "**APA**"), and effective as of October 1, 2019 (the "**Sale**"), The Loot Company f/k/a Loot Crate Acquisition LLC formed to operate those assets (collectively, with the Lender, "**TLC**"); and (iv) the Official Committee of Unsecured Creditors appointed in the Debtors' Cases (the "**Committee**"). This term sheet shall be binding until the earlier of (x) confirmation of the Liquidating Plan and (y) dismissal of these Cases or conversion of these Cases to chapter 7, and in no event shall be binding later than the earliest of (x) and (y) without the written consent of TLC. The Debtors, TLC, and the Committee are collectively referred to herein as the "**Parties**."

This Term Sheet is not an offer or a solicitation with respect to any securities of the Debtors or a solicitation of acceptances of a chapter 11 plan within the meaning of section 1125 of the Bankruptcy Code. Nothing herein shall be deemed to be the solicitation of an acceptance or rejection of a chapter 11 plan.

This Term Sheet does not include a description of all of the terms, conditions, and other provisions that are to be contained in the Liquidating Plan. This Term Sheet is being provided as part of a proposed comprehensive compromise and settlement amongst the Parties (the "**Global Settlement**"). The statements contained herein are therefore protected by Rule 408 of the Federal Rules of Evidence and other similar applicable rules under federal and state law, and nothing in this Term Sheet shall constitute or be construed as an admission of any fact or liability, a stipulation, or a waiver, and each statement contained herein is made without prejudice, with a full reservation of all rights, remedies, claims, and defenses.

## I.    THE LIQUIDATING TRUST

| TERM | DESCRIPTION |
|------|-------------|
| **Liquidating Trust** | The Liquidating Plan will provide for the assignment and the Liquidating Trust's assumption of certain claims, causes of action, defenses, and other rights, including, among other things:<br><br>• D&O Claims: As part of the Global Settlement, the Debtors will assign and transfer all breach of fiduciary duty and other |

commercial tort claims against, among others: (i) Upfront V, L.P. ("**Upfront**") and its affiliates, including Mark Suster and Dana Kibler, in their affiliate and individual capacities; (ii) Breakwater Credit Opportunity Fund, L.P. ("**Breakwater**") and its affiliates, including Saif Mansour, Eric Beckman, Darrick Geant, Aamir Amdani, and Joe Kaczorowski, in their affiliate and individual capacities; and (iii) subject to completion of an investigation, any other former director or officer of the Debtors (collectively, the "**D&O Claims**");

- Fraudulent Conveyance and Other Avoidable Transfers: As part of the Global Settlement, TLC will reassign and transfer any and all claims it purchased and assumed pursuant to the APA relating to fraudulent conveyances, preferences or other chapter 5 causes of action, or under corresponding state law, against, among others: (i) Breakwater and its affiliates (the "**Breakwater Avoidance Claim**"); and (ii) certain other former directors subject to completion of an investigation (collectively, the "**Avoidance Claims**" and together with the D&O Claims, the "**Claims**").

- Sales Tax Funding Commitment Agreement: The Liquidating Trust will succeed to the rights and obligations of the Debtors with respect to pre-Closing Sales Tax Funding Commitment Agreements and shall be the counter-party for all post-Closing Sales Tax Funding Commitment Agreements.

- Supplemental Engagement Letter: The Liquidating Trust Agreement shall provide for engagement of counsel consistent with or more favorable than the terms of the supplemental engagement letter between the Debtors, Bryan Cave Leighton Paisner LLP ("**BCLP**"), and TLC, dated as of January 10, 2020 (the "**Supplemental Engagement Letter**"). The Liquidating Trust Agreement shall provide the Liquidating Trustee with authority to retain such additional counsel and professional advisors as the Liquidating Trustee deems necessary and appropriate.

Following the effective date of the Liquidating Plan (the "**Effective Date**") and upon completion of all preliminary investigation efforts through Bankruptcy Rule 2004 or otherwise, the Liquidating Trustee (discussed below) will take such steps as necessary, including the commencement of litigation, to prosecute the Claims to settlement and/or judgment (any such proceeds of the Claims, the

| | "*Litigation Proceeds*"). |
|---|---|
| **Liquidating Trust Funding** | TLC will be a co-party to the Liquidating Trust Agreement (defined below) for the limited purpose of, among other things: (i) funding the Liquidating Trust's operating costs, which shall be funded with the sum of $75,000, including without limitation, accounting fees for quarterly post-confirmation reports, non-contingency attorneys' fees, postage and shipping expenses, supplies, storage expenses, and bank fees (the "*Operating Costs*"); and (ii) consistent with and in furtherance of the terms of the Supplemental Engagement Letter, funding reasonable costs and expenses incurred in connection with prosecuting the Claims, which shall be funded initially with the sum of $102,250 and subject to replenishment to a balance of $50,000 upon request by the Liquidating Trustee when the balance drops below $10,000, including without limitation, e-discovery management, airfare, hotels, meals, witnesses transportation services, and other similar services provided by third party vendors associated with the Claims, subject to the terms of the Supplemental Engagement Letter, except with respect to the Liquidating Trustee Compensation (as defined below) ("*Third Party Costs*") and Statutory Fees (discussed below), <u>provided</u> that and for the avoidance of doubt, the Third Party Costs shall not include the fees of other professionals incurred in connection with the prosecution of the Claims, including the fee compensation of BCLP and other counsel (including Delaware co-counsel), the Trust Fiduciary Compensation (defined below), and other retained professionals, which shall be subject to specific engagement letters with the Liquidating Trustee or except as expressly agreed otherwise in writing by TLC. <br><br>TLC's funding of such advanced Operating Costs shall be subject to reimbursement in accordance with the terms of the Liquidating Trust Waterfall described below. <br><br>TLC's funding of any advanced Third Party Costs shall also be subject to reimbursement in accordance with the terms of the Liquidating Trust Waterfall described below, prior to payment of any and all other fees, expenses, and distributions by the Liquidating Trust (i.e., attorneys' fees and distributions to general unsecured creditors or other beneficiaries of the Liquidating Trust) (such advances, the "*TLC Third Party Advances*"). <br><br>For the avoidance of doubt, the Parties agree that the fees and expenses of the Debtors and the Committee incurred in connection with the pending Cases shall continue to be incurred and paid pursuant to the terms of the interim compensation procedures approved by the Bankruptcy Court in the Cases, and applicable |

| | Bankruptcy Court orders approving such payments, subject to the DIP Budget. |
|---|---|
| **Liquidating Trustee** | Theseus Strategy Group, subject to Bankruptcy Court approval, to be identified as the Liquidating Trustee and provided in the Liquidating Plan or Liquidating Plan Supplement prior to Liquidating Plan Confirmation.<br><br>The Liquidating Trustee shall receive a fee of 3% of the Litigation Proceeds in accordance with the Liquidating Trust Waterfall (the "***Liquidating Trustee Compensation***"), <u>provided</u> that the expenses of the Liquidating Trustee shall be included as Third Party Costs. |
| **Liquidating Trust Advisory Board** | The Plan shall establish a trust advisory comprised of three members, at least two of which shall be appointed by TLC (the "***Advisory Board***"). As compensation for service on the Advisory Board, the Advisory Board will receive a fee of 2%, in the aggregate, of the Litigation Proceeds being allocated among the Advisory Board members in accordance with the Liquidating Trust Waterfall (together with the Liquidating Trustee Compensation, the "***Trust Fiduciary Compensation***"). |
| **Liquidating Trust Waterfall** | The Litigation Proceeds will be distributed in accordance with the following priority waterfall:<br><br><u>First Tier Obligations</u>: $225,000 to TLC for recovery of three times its advance funding of the Operating Costs;<br><br><u>Second Tier Obligations</u>: up to $250,000 for pro rata distributions to holders of allowed General Unsecured Claims (the "***Second Tier General Unsecured Distribution***"), which, for the avoidance of doubt, shall not include any distribution to TLC;<br><br>Third Tier Obligations up to $525,000 to the holders of Deferred Professional Fee Claims (defined below), to be paid pro rata among the professionals holding such claims until paid in full (with the balance of any Deferred Professional Fee Claims being paid out of ½ of the Sixth Tier 15% Allocation, also pro rata among the professionals holding such claims until paid in full);<br><br><u>Fourth Tier Obligations</u>: to each of the following, until paid in full: (i) TLC in respect of the TLC Third Party Advances; and (ii) to the extent not satisfied by TLC, any unpaid and accrued Third Party Costs;<br><br><u>Fifth Tier Obligations</u>: to each of the following, pro rata, until paid in full: (i) contingency compensation to counsel, which is up to |

|   | 30% of the Litigation Proceeds as further outlined in the Supplemental Engagement Letter or otherwise agreed by the Liquidating Trustee; (ii) the Trust Fiduciary Compensation; (iii) the unpaid reasonable fees and expenses of Delaware co-counsel for the Liquidating Trust, on terms to be mutually agreed by the Debtors and/or the Liquidating Trustee and TLC; and (iv) the fees and expenses of any other retained professional for the Liquidating Trust, on terms to be mutually agreed by the Debtors and/or the Liquidating Trustee and TLC; |
|---|---|
|   | Sixth Tier Obligations: to TLC, until TLC has received $1.5 million; and |
|   | Seventh Tier Obligations: once TLC has received $1.5 million, Litigation Proceeds in excess of such amount shall be allocated as follows: <ul><li>85% to TLC (together with the Sixth Tier Obligations, the "**TLC Distributions**"), and<br>15% (the "**Seventh Tier 15% Allocation**") for equal allocation as follows: (i) 7.5% to holders of any remaining unpaid Deferred Professional Fee Claims, pro rata among the holders of such claims until paid in full; and (ii) 7.5% for pro rata distributions to holders of allowed General Unsecured Claims (together with the Second Tier General Unsecured Distribution, the "**General Unsecured Distributions**"). For the avoidance of doubt, the split of the Seventh Tier 15% Allocation applies to each and every dollar which comprises the Seventh Tier 15% Allocation until Deferred Professional Fees are paid in full, following which, all amounts in the Seventh Tier 15% Allocation shall be paid to holders of allowed General Unsecured Claims</li></ul> |
| **TLC Deficiency Waiver** | Solely for purposes of distributions to be made under the Liquidating Trust Waterfall and not for any other purpose (including, but not limited to plan confirmation voting), as part of the Global Settlement, TLC will waive its right to receive any pro rata share of from any and all General Unsecured Distributions, including the Second Tier General Unsecured Distribution and the Seventh Tier 15% Allocation. Such waiver includes any and all deficiency claims or otherwise, including such claims arising under TLC's Convertible Notes and the Pre-Petition Facility, including any distribution to general unsecured claims (the "**TLC Deficiency Waiver**"). |

## II.    TREATMENT OF CLAIMS AND EQUITY INTERESTS

| | |
|---|---|
| **Administrative Expense Claims**<br><br>*Unimpaired*<br><br>*Deemed to Accept*<br><br>*Not Entitled to Vote* | Paid in full at the Effective Date, <u>provided</u> that to the extent such claims arise from allowed professional fees that are not already budgeted for payment under the DIP Budget., the Liquidating Trust will assume such claims on mutually acceptable terms (the "***Deferred Professional Fee Claims***").<br><br>Based on funds paid pursuant to the Transition Services Agreement, and funds available from the Budgeted Reserve, Administrative Expense Claims, inclusive of Deferred Professional Fee Claims, on the Effective Date are estimated to be $640,000. |
| **Priority Claims**<br><br>*Unimpaired.*<br><br>*Deemed to Accept*<br><br>*Not Entitled to Vote* | Deemed to have been paid in full.<br><br>Based upon TLC's funding of the Sales Tax Funding Agreement, the Priority Tax Claims are estimated to be $95,985, as of the Effective Date.<br><br>To the extent that subscribers were able to validly assert Consumer Priority Claims under section 507(a)(7), as a result of TLC's post-sale funding of deferred revenue, which directly inured to the benefit of holders of General Unsecured Claims, the Consumer Priority Claims are estimated to be $0.00, as of the Effective Date. |
| **Pre-Petition Facility Deficiency Claim**<br><br>*Impaired*<br><br>*Entitled to Vote* | As of the Petition Date, the total amount outstanding under the Debtors' Pre-Petition Facility was $41,622,057.  To purchase the Debtors' assets through the Sale, TLC used a credit bid in the amount of $30,000,000, comprised of: (i) the outstanding balance of the DIP Facility of $8,197,165; and (ii) $21,802,835 of the Pre-Petition Facility, resulting in a deficiency claim of $19,819,222 (the "***Pre-Petition Deficiency Claim***").<br><br>The Pre-Petition Deficiency Claim will be deemed credited against distributions to TLC pursuant to the TLC Distributions,[1] <u>provided</u> that, for the avoidance of doubt, the foregoing treatment shall not constitute a cap on the amount TLC shall be entitled to receive through the TLC Distributions in respect of its possessory interests in the Litigation Proceeds pursuant to section 2.1(u) of the APA.<br><br>As part of the Global Compromise, the Pre-Petition Deficiency Claim will be subject to the TLC Deficiency Waiver. |
| **General Unsecured** | General unsecured claims in the Cases, excluding TLC's deficiency |

---

[1] Subject to input and modification by tax, including TLC tax.

| | |
|---|---|
| **Claims**<br><br>*Impaired*<br><br>*Entitled to Vote* | claim, consist of: (i) Convertible Note Claims in the total original principal amount outstanding of $5,748,707, in the aggregate, plus interest (including PIK) and fees; and (ii) all other general unsecured claims in the approximate amount of $32,343,116.03 (collectively with the Convertible Note Claims, the "***General Unsecured Claims***").<br><br>Holders of allowed General Unsecured Claims will receive a pro rata distribution of the General Unsecured Distributions.<br><br>As part of the Global Settlement, the Convertible Notes issued to Lender will be subject to the TLC Deficiency Waiver. |
| **Common and Preferred Stock**<br><br>*Impaired*<br><br>*Deemed to Reject*<br><br>*Not Entitled to Vote* | On the Effective Date, all preferred and common equity interests issued by the Debtors shall be cancelled.  Each holder of preferred or common equity interests in the Debtors shall neither receive nor retain any property on account of such equity interest. |
| **Statutory Fees** | Administrative expense claims for fees payable pursuant to 28 U.S.C. § 1930, shall be paid in cash and in accordance with the statutory schedule.  All fees payable pursuant to 28 U.S.C. § 1930 subsequent to the Effective Date shall be paid by the Debtors' estates on a timely basis until entry of a final decree. |

## III.    OTHER PLAN PROVISIONS

| | |
|---|---|
| **Process for Implementation** | • The Debtors, together with the Committee and TLC, will prepare a combined disclosure statement and liquidating plan, including a liquidating trust agreement on terms consistent with this Term Sheet, each of which will be reasonably acceptable to the Parties, and a motion for interim approval of the disclosure statement, for solicitation procedures, and scheduling a hearing to approve the Plan (the "***Plan Documents***"); |
| | • The Debtors will use commercially reasonable efforts to file, within thirty (30) days of approval of the Pending D&O Claims Pleadings, a motion to establish a deadline for the filing of proofs of claims (the "***Bar Date Motion***"), <u>provided</u> that it will not be a breach if the filing is delayed because the Debtors, in their business judgment, believe it is in the best interests of the estates to delay filing the Bar Date Motion based upon the progress of the 2004 discovery; |
| | • Within thirty (30) days from the date that BCLP, in its reasonable opinion, believes the Debtors have received substantially all responsive communications and documents identified in the 2004 Motion, the Debtors will consult with TLC and the Committee on the current status of its investigation of the Claims (the "***Consultation Period***"); |
| | • On the Effective Date, all administrative expenses (other than the Deferred Professional Fee Claims), including any and all expenses associated with noticing and claims agent, and any outstanding chapter 11 professionals fees shall be paid in full; and |
| | • On the Effective Date, the Debtors' estates and TLC, if any, will assign their respective interest in the Claims and Litigation Proceeds to the Liquidating Trust pursuant to the terms of the Liquidating Trust Agreement which shall incorporate the Liquidating Trust Waterfall on terms acceptable to TLC, including but not limited to the TLC Distributions, the General Unsecured Distributions, and the TLC Deficiency Waiver. |
| **Releases** | The Liquidating Plan, subject to court approval, shall provide customary releases and exculpation provisions to: (i) the Debtors' officers and directors that served during the pendency of the Cases, including Alexandre Zyngier, Osman Khan, Christopher Davis, Mark Palmer, and Stuart Kaufman; (ii) TLC; and (iii) each of the Debtors' advisors, including but not limited to BCLP, Robinson & |

| | Cole LLP, Portage Point Partners, Focal Point, and Theseus Strategy Group, all members of the Committee, and Committee professionals, Morris James and Dundon Advisers ((i) through (iii) above, the "***Releasees***"), and each of the Releasees' respective affiliates, officers, directors, advisors, and professionals. |
|---|---|

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**MONEY CHEST LLC**

By: /s/ Joel Weinshanker
Name: Joel Weinshanker
Title: Sole Member

**THE LOOT COMPANY LLC**

By: /s/ Joel Weinshanker
Name: Joel Weinshanker
Title: Sole Member

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

DEBTORS:                                    **OLD LC, INC**

                                            By: /s/ Mark Palmer
                                            Name: Mark Palmer
                                            Title:   Chief Transformation Officer

                                            **OLD LC HOLDINGS, INC**

                                            By: /s/ Mark Palmer
                                            Name: Mark Palmer
                                            Title:   Chief Transformation Officer

                                            **OLD LCF, INC**

                                            By: /s/ Mark Palmer
                                            Name: Mark Palmer
                                            Title:   Chief Transformation Officer

                                            **OLD LC PARENT, INC**

                                            By: /s/ Mark Palmer
                                            Name: Mark Palmer
                                            Title:   Chief Transformation Officer

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF LOOT CRATE, INC.**

By: /s/ Robert Larsen

Name:  Robert Larsen

Title: Co-Chair of the Committee

# Exhibit E

```
1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
2
                                        .  Chapter 11
3   IN RE:                              .
                                        .  Case No. 19-11791 (BLS)
4   OLD LC, INC., et al.,               .
                                        .  (Jointly Administered)
5                    Debtors.           .
6   . . . . . . . . . . . . . . . . .   .
                                        .
7   OLD LC, INC. (f/k/a/ Loot Crate,.  Adv. No. 22-50107 (BLS)
    Inc.), et al.,                      .
8                                       .
                     Plaintiffs,        .
9                                       .
         v.                             .
10                                      .
    THE LOOT COMPANY (f/k/a Loot        .  Courtroom No. 1
11  Crate Acquisition LLC) and John .  824 North King Street
    Doe,                                .  Wilmington, Delaware 19801
12                                      .
                     Defendants.        .  Friday, February 4, 2022
13  . . . . . . . . . . . . . . . . .   .  2:00 P.M.
14
                     TRANSCRIPT OF OMNIBUS HEARING
15            BEFORE THE HONORABLE BRENDAN L. SHANNON
                   UNITED STATES BANKRUPTCY JUDGE
16
    APPEARANCES:
17
18  For the Plaintiffs:      Mark Duedall, Esquire
                             BRYAN CAVE LEIGHTON PAISNER LLP
19                           1201 W. Peachtree Street, NW
                             14th Floor
20                           Atlanta, Georgia 30309
21  Audio Operator:          Dana L. Moore
22  Transcription Company:   Reliable
                             1007 N. Orange Street
23                           Wilmington, Delaware 19801
                             (302)654-8080
24                           Email:  gmatthews@reliable-co.com
25  Proceedings recorded by electronic sound recording, transcript
    produced by transcription service.
```

APPEARANCES (Cont'd):

For the Loot Company:      Cathy Hershcopf, Esquire
                           COOLEY LLP
                           55 Hudson Yards
                           New York, New York 10001

For the Committee:         Jeffrey Waxman, Esquire
                           MORRIS JAMES LLP
                           500 Delaware Avenue
                           Wilmington, Delaware 19801

1            Now I could go through, from my perspective, why I

2   think the preliminary injunction is moot for all those

3   reasons.  We are not in possession anymore.  There will be a

4   fiduciary who will administer them in accordance with

5   applicable law.  If Your Honor would indulge me for a minute

6   I would just like to go through a little background on the

7   case itself from our perspective rather than from the

8   plaintiff's perspective.

9            THE COURT:  Okay.

10            MS. HERSHCOPF:  This is just a breach of contract

11   and we understand how emotional this particular contract is.

12   It's not very often that a debtor enters into bankruptcy at

13   all with sales tax unpaid.  Fall had lots of cases.  It's the

14   first case in my entire career that I have seen with unpaid

15   sales tax of this momentous amount.

16            THE COURT:  And it was then -- and it was dealt

17   with during the case, right, by an agreement that was

18   submitted to me for approval which I did which was,

19   effectively, part of the sale consideration if I understood

20   the debtors' point, right?

21            MS. HERSHCOPF:  So there are three parts of the

22   sale consideration and the third part is the purchaser, non-

23   recourse, but the purchaser's obligation to pay under the

24   sales tax funding agreement.  Had this business actually

25   performed well, Your Honor, and not needed $18 million in

1  cash, cash-in, not money that anyone took out of this

2  business, but cash infused into this business in the last two

3  years some of which has gone to pay those sales tax

4  agreements.  If this business had done well then this company

5  would have been in the position to pay under that contract.

6         The purchaser was never willing to outright assume

7  those obligations.  They assumed those liabilities to fund to

8  the extent they had the money to fund.  They don't have any

9  more money to fund.  Hands up, they didn't have money to file

10 for Chapter 11.  They are in this ABC in order for these

11 assets to be sold for the benefit of all creditors of which

12 the debtor is one.

13        The payment -- the purchaser actually made

14 payments during the last two years.  It made over $2 million

15 dollars' worth of payments and borrowed money to do that.  We

16 all have seen businesses fail even if they generate revenue.

17 This company does generate revenue, but it loses money.

18 Mr. Weinshanker lent this company, not took money out of this

19 company, lent this company his own funds $15 million in the

20 last two years.  An affiliate, Money Chest, lent another $3

21 and a half million.

22        Our client came to us and said no more, okay.  We

23 understand how emotional this is, but I do need the court to

24 understand that these fraud claims are frivolous on their

25 face. I want to be crystal clear that everything that Cooley

1  relayed to debtors' counsel was true to the best of our

2  knowledge and not stated to intentionally mislead any party.

3  Cooley made this fact clear to Bryan Cave in the weeks before

4  this complaint was filed.  Bryan Cave knows that those

5  allegations in the complaint are patently not true.

6         Your Honor, I started with my understanding of why

7  this is so emotional for Bryan Cave and for Mr. Schoulder.  I

8  need to end there, okay, because unpaid sales tax and

9  bringing your friends and colleagues into a case as

10 independent board members who are now facing joint and

11 several liability for those unpaid sales tax is an emotional

12 issue.  I would be very emotional, but that doesn't excuse

13 Bryan Cave's besmirching of my star associate or including

14 unfounded allegations of fraud that they know not to be true.

15        I know these are questions of fact and should Your

16 Honor think that this whole issue is not moot let them

17 discover way and the facts will be shown.  I, for one, think

18 that the issues before you are moot and hope the court will

19 see it that way.

20        THE COURT:  All right.  Well as of today I

21 certainly don't regard the issues as being moot.  I hear the

22 debtor has expressed -- and, again, I recognize I'm at a

23 status conference two days after the complaint. The debtor

24 alleges, effectively, that it was the victim of a bait and

25 switch in the context of a court approved sale where the